# 24-162-cr

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 24-162-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

KEITH VEREEN, a/k/a SEALED DEFENDANT 1,

Defendant,

STEVEN PEREZ, a/k/a SEALED DEFENDANT 2, a/k/a LUCHA,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**APPENDIX FOR DEFENDANT-APPELLANT STEVEN PEREZ
VOLUME I OF IV**

_____

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8731

*Attorney for Defendant-Appellant*
**STEVEN PEREZ**

**KENDRA L. HUTCHINSON**,
*Of Counsel*

**A000001**

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet,
 S.D.N.Y. 22 Cr. 644 (JSR) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 005

Indictment,
 filed November 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 019

Defense Motion to Suppress and Dismiss,
 filed February 4, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 027

Government's Opposition to Defense Motion,
 filed February 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 056

Defense Reply,
 filed March 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 085

Transcript of Oral Argument,
 dated March 15, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 100

Government's Supplemental Letter Brief,
 filed March 22, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 121

Defense Supplemental Letter Brief,
 filed March 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 125

Transcript of Suppression Hearing,
 dated May 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 130

Opinion and Order,
 filed July 7, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 236

Superseding Indictment,
 filed July 20, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 272

Defense Motions in Limine,
 filed August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 276

# VOLUME II

Government's Motions in Limine,
    filed August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 299

Defense Opposition to Government's Motions,
    filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 326

Government's Opposition to Defense Motions,
    filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 345

Government's Requests to Charge,
    filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 374

Defense Requests to Charge,
    filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 433

Transcript of Pretrial Proceedings,
    dated August 25, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 464

Transcript of Trial,
    dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 482

# VOLUME III

Transcript of Trial (continued),
    dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 572

Transcript of Trial,
    dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 611

Government's Supplemental Requests to Charge,
    dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 847

Defense Supplemental Requests to Charge,
    dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   850

Transcript of Trial,
    dated August 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   855

## VOLUME IV

Transcript of Trial (continued),
    dated August 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   867

Court's Final Jury Instructions,
    filed August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1018

Transcript of Trial,
    dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1050

Jury Notes,
    dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1106

Verdict,
    dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1111

Transcript of Sentencing,
    dated January 8, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1112

Judgment of Conviction,
    entered January 12, 2024. . . . . . . . . . . . . . . . . . . . . . . . . . . A 1149

Notice of Appeal,
    filed January 17, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1156

CLOSED,APPEAL,ECF,INTAPP

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:22-cr-00644-JSR-2

Case title: USA v. VEREEN

Date Filed: 11/30/2022

Date Terminated: 01/12/2024

Assigned to: Judge Jed S. Rakoff

### Defendant (2)

**Steven Perez**
*TERMINATED: 01/12/2024*
*also known as*
Sealed Defendant 2
*TERMINATED: 01/12/2024*
*also known as*
Lucha
*TERMINATED: 01/12/2024*

represented by **Zawadi S Baharanyi**
Federal Defenders of New York
52 Duane Street
10th Fl
New York, NY 10007
917-612-2753
Email: zawadi_baharanyi@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Amanda Joy Mayo**
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212-558-3449
Email: mayoa@sullcrom.com
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

### Pending Counts

18:371.F CONSPIRACY TO RECEIVE
FIREARMS FROM OUTSIDE STATES OF
RESIDENCE
(1s)

18:922E.F INTERSTATE SHIPMENTS
(INTERSTATE TRANSPORT OF
FIREARMS)
(2s)

### Disposition

IMPRISONMENT: Sixteen (16) months.
SUPERVISED RELEASE: Three (3) years.

### Highest Offense Level (Opening)

Felony

**A000005**

| Terminated Counts | Disposition |
|---|---|
| 18:922A.F<br>IMPORTING/MANUFACTURING<br>FIREARMS (INTERSTATE TRANSPORT<br>OR RECEIPT OF FIREARMS)<br>(3) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| Complaints | Disposition |
|---|---|
| None | |

---

**Plaintiff**

**USA**                              represented by    **Ashley Carolyn Nicolas**
                                                       DOJ-USAO
                                                       1 Saint Andrews Plaza
                                                       New York, NY 10001
                                                       646-734-3677
                                                       Email: ashley.nicolas2@usdoj.gov
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Assistant US Attorney*

                                                       **Lucas Estlund Issacharoff**
                                                       United States Attorney's Office
                                                       Southern District Of New York
                                                       86 Chambers Street, Third Floor
                                                       New York, NY 10007
                                                       212-637-2737
                                                       Fax: 212-637-2702
                                                       Email: Lucas.Issacharoff@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Assistant US Attorney*

                                                       **Madison Reddick Smyser**
                                                       DOJ-USAO
                                                       U.S. Attorney's Office, SDNY
                                                       One Saint Andrew's Plaza
                                                       New York, NY 10007
                                                       212-637-2381
                                                       Email: madison.smyser@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Assistant US Attorney*

                                                       **Sarah Mortazavi**
                                                       United States Attorney's Office, SDNY
                                                       One Saint Andrew's Plaza
                                                       New York, NY 10007

A000006

5/2/24, 11:16 AM                                    SDNY CM/ECF NextGen Version 1.7

212-637-2520
Email: sarah.mortazavi@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/30/2022 | 2 | SEALED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, Sealed Defendant 2 (2) count(s) 3. (jm) (Entered: 12/06/2022) |
| 12/06/2022 | 3 | Order to Unseal Indictment as to Sealed Defendant 1, Sealed Defendant 2. (Signed by Magistrate Judge Valerie Figueredo on 12/6/22)(jm) (Entered: 12/06/2022) |
| 12/06/2022 | | INDICTMENT UNSEALED as to Keith Vereen, Steven Perez. (jm) (Entered: 12/06/2022) |
| 12/06/2022 | | Case Designated ECF as to Keith Vereen, Steven Perez. (jm) (Entered: 12/06/2022) |
| 12/06/2022 | | Case as to Keith Vereen, Steven Perez ASSIGNED to Judge Jed S. Rakoff. (jm) (Entered: 12/06/2022) |
| 12/06/2022 | | Attorney update in case as to Keith Vereen, Steven Perez. Attorney Ashley Carolyn Nicolas for USA added. (jm) (Entered: 12/06/2022) |
| 12/07/2022 | | Arrest of Steven Perez. (jbo) (Entered: 12/08/2022) |
| 12/07/2022 | 7 | CJA 23 Financial Affidavit by Steven Perez. Zawadi Bharanyi appointed counsel. APPROVED. (Signed by Magistrate Judge Valerie Figueredo) (jbo) (Entered: 12/08/2022) |
| 12/07/2022 | | Attorney update in case as to Steven Perez. Attorney Zawadi S Baharanyi for Steven Perez added. (jbo) (Entered: 12/08/2022) |
| 12/07/2022 | 8 | Minute Entry for proceedings held before Magistrate Judge Valerie Figueredo: Initial Appearance as to Steven Perez held on 12/7/2022. Bond Hearing as to Steven Perez held on 12/7/2022. Defendant present with Federal Defender Zawadi Baharanyi. AUSA Ashley Nicholas present for the Government. Voluntary surrender. BAIL DISPOSITION: Agreed conditions of release; $30,000 Personal recognizance bond; With three financially responsible persons cosigners; Travel restricted SDNY/EDNY; and to appear for his MA court proceeding; Surrender travel documents and no new applications; Pretrial supervision as directed by Pretrial Services; Mental health evaluation and treatment; Deft to submit to urinalysis, if positive add condition of drug testing and treatment; Home incarceration; Location monitoring technology; Deft not to possess firearm, destructive device, other weapon; Deft to be released on own signature; Plus location monitoring on 12/8/22; Remaining conditions to be met by three weeks; No contact with co-defendant or co-conspirators except in presence of counsel; Exception to home incarceration on Saturdays from 9am to 7pm to meet with son, with locations predetermined by Pretrial. [**Arraignment Conference before District Judge on 12/9/22.] (jbo) (Entered: 12/08/2022) |
| 12/07/2022 | 9 | Appearance Bond Entered as to Steven Perez: $30,000 Personal recognizance bond; To be cosigned by three financially responsible persons; Additional conditions..... (jbo) (Main Document 9 replaced on 2/1/2023) (jbo). (Entered: 12/08/2022) |
| 12/09/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Arraignment as to Steven Perez (2) held on 12/9/2022. Present were the defendant and his counsel, Zawadi Baharanyi, AUSA Ashley Nicolas for the Government and a court reporter. Defendant is arra8gned, pleads not guilty. Courts decision : Discovery closes 12/30/22, any motions |

A000007

| | | |
|---|---|---|
| | | shall be filed by 1/27/23, a pretrial conference shall be held on 2/3/23 at 4:00pm in courtroom 14B of 500 Pearl Street, New York City, NY. Time is excluded in the interest of justice, pursuant to Section 3161 of Title 18. (Discovery due by 12/30/2022. Motions due by 1/27/2023. Pretrial Conference set for 2/3/2023 at 04:00 PM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff.) **Plea entered by Steven Perez (2) Count 3 Not Guilty.** (lnl) (Entered: 12/12/2022) |
| 12/22/2022 | 12 | TRANSCRIPT of Proceedings as to Steven Perez re: Conference held on 12/9/22 before Judge Jed S. Rakoff. Court Reporter/Transcriber: George Malinowski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/22/2023. (Moya, Goretti) (Entered: 12/22/2022) |
| 12/22/2022 | 13 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Conference proceeding held on 12/9/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 12/22/2022) |
| 01/18/2023 | 17 | Writ to remove the GPS monitoring device base on Res Judicata and the Constitution the supreme Law of the land. Document filed by (22-Cr-644-2) Steven Perez. (bw) (Entered: 01/20/2023) |
| 01/18/2023 | 18 | LETTER by (22-Cr-644-2) Steven Perez from Lucha El dated 1/10/2023. (bw) (Entered: 01/20/2023) |
| 01/23/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Keith Vereen, Steven Perez held on 1/23/2023. A teleconference was held on 1/23/23 without transcription or recording. AUSA Ashley Nichols for the Government and Zawadi Baharanyi of the Federal Defenders for defendant Steven Perez a/k/a Lucha El were present, and Edward Sapone of Sapone & Petrillo LLP for defendant Keith Vereen participated via email. Any motions by either defendant will be due on 2/3/23, rather than 1/27/23. The pre-trial conference previously set for 2/3/23 is adjourned to 2/13/23 at 4:30 PM. (Motions due by 2/3/2023. Pretrial Conference set for 2/13/2023 at 04:30 PM before Judge Jed S. Rakoff.) (lnl) (Entered: 01/24/2023) |
| 01/31/2023 | 19 | MOTION to Modify Conditions of Release . Document filed by Steven Perez. (Baharanyi, Zawadi) (Entered: 01/31/2023) |
| 01/31/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Steven Perez held on 1/31/2023. A teleconference was held 1/31/2023 without transcription or recording. Zawadi Baharanyi of the Federal Defenders for defendant Steven Perez a/k/a Lucha El and AUSA Ashley Nicolas for the Government were present. Plaintiff is directed to submit a proposed order modifying Mr. Lucha's conditions of bond as consented to by Pretrial Services. A hearing on any further bail modification is set for Wednesday, February 8 at 9:00 AM at 500 Pearl St., Courtroom 14B. Plaintiff may (but is not required to) file any written submission in support of her application by EOD on Monday, 2/6. (Bond Hearing set for 2/8/2023 at 09:00 AM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff) (ap) (Entered: 02/01/2023) |
| 02/02/2023 | 20 | MEMO ENDORSEMENT 19 Motion to Modify Conditions of Release as to Steven Perez. To respectfully request that the Court remove the condition of home incarceration |

5/2/24, 11:16 AM | SDNY CM/ECF NextGen Version 1.7

| | | and place Mr. Lucha on home detention...ENDORSEMENT...SO ORDERED (Signed by Judge Jed S. Rakoff on 2/1/2023) (jw) (Entered: 02/02/2023) |
|---|---|---|
| 02/04/2023 | 21 | MOTION to Dismiss *and Motion to Suppress Evidence*. Document filed by Steven Perez. (Baharanyi, Zawadi) (Entered: 02/04/2023) |
| 02/04/2023 | 22 | MEMORANDUM OF LAW in Support by Steven Perez re: 21 MOTION to Dismiss *and Motion to Suppress Evidence*. filed by Steven Perez . (Baharanyi, Zawadi) (Entered: 02/04/2023) |
| 02/04/2023 | 23 | DECLARATION of Zawadi S. Baharanyi in Support as to Steven Perez re: 21 MOTION to Dismiss *and Motion to Suppress Evidence*.. (Baharanyi, Zawadi) (Entered: 02/04/2023) |
| 02/06/2023 | 24 | NOTICE OF ATTORNEY APPEARANCE Madison Reddick Smyser appearing for USA. (Smyser, Madison) (Entered: 02/06/2023) |
| 02/06/2023 | 25 | MOTION to Modify Conditions of Release . Document filed by Steven Perez. (Baharanyi, Zawadi) (Entered: 02/06/2023) |
| 02/07/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Steven Perez held on 2/7/2023. A teleconference was held on 2/6/23 without transcription or recording. AUSAs Ashley Nichols and Maddie Reddick Smyser for the Government and Zawadi Baharanyi of the Federal Defenders for defendant Lucha El (Steven Perez) were present, and Edward Sapone of Sapone & Petrillo LLP for defendant Keith Vereen participated via email. The bail hearing for defendant Lucha is reset from 2/8/23 at 9:00 AM to 2/13/23 at 4:30 PM. The final pretrial conference as to both defendants is adjourned from 2/13/23 to 3/6/23 at 4:45 PM. The Government should file its opposition to defendant Luchas motions on or before 2/28/23. (Responses due by 2/28/2023 Bond Hearing set for 2/13/2023 at 04:30 PM before Judge Jed S. Rakoff. Final Pretrial Conference set for 3/6/2023 at 04:45 PM before Judge Jed S. Rakoff.) (lnl) (Entered: 02/07/2023) |
| 02/09/2023 | 26 | ENDORSED LETTER as to (22-Cr-644-2) Steven Perez addressed to Judge Jed S. Rakoff from Attorney Zawadi S. Baharanyi dated February 9, 2023 re: I write with the consent of the Government and the Pretrial Services Agency to respectfully request that the Court allow Mr. Lucha to leave his home tomorrow to attend the funeral services of a family member. ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff)(bw) (Entered: 02/13/2023) |
| 02/13/2023 | | NOTICE OF HEARING as to Steven Perez: The bail hearing at 4:30 2/13/23 is adjourned to 2:30 2/15/23. ***Bond Hearing set for 2/15/2023 at 02:30 PM before Judge Jed S. Rakoff. (jbo) (Entered: 02/13/2023) |
| 02/15/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Bond Hearing as to Steven Perez held on 2/15/2023.. Present were the defendant and his counsel Zawadi Baharanyi, AUSAs Ashley Nichols and Madison Smyser for the Government, Pretrial Services Officer Courtney Defeo, and a court reporter. The defendant's application for bail modifications is granted in part to be memorialized in a proposed stipulation by the parties. (jbo) Modified on 2/15/2023 (jbo). (Entered: 02/15/2023) |
| 02/16/2023 | 27 | ENDORSED LETTER as to Steven Perez addressed to Judge Jed S. Rakoff from Ashley Nicholas, dated 2/15/2023, re: Modification of bond. ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/16/2023) (lnl) (Entered: 02/16/2023) |
| 02/23/2023 | | TRANSCRIPT of Proceedings as to Steven Perez re: Hearing held on 12/7/2022 before Magistrate Judge Valerie Figueredo. Court Reporter/Transcriber: Adrienne Mignano (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. |

| | | |
|---|---|---|
| | | After that date it may be obtained through PACER. Redaction Request due 3/16/2023. Redacted Transcript Deadline set for 3/27/2023. Release of Transcript Restriction set for 5/24/2023. (js) (js). (Entered: 02/23/2023) |
| 02/23/2023 | 28 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Hearing proceeding held on 12/7/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (js) (Entered: 02/23/2023) |
| 02/27/2023 | 29 | NOTICE OF ATTORNEY APPEARANCE Lucas Estlund Issacharoff appearing for USA. (Issacharoff, Lucas) (Entered: 02/27/2023) |
| 02/28/2023 | 30 | MEMORANDUM in Opposition by USA as to Steven Perez re 21 MOTION to Dismiss *and Motion to Suppress Evidence*.. (Smyser, Madison) (Entered: 02/28/2023) |
| 03/06/2023 | 31 | NOTICE OF ATTORNEY APPEARANCE: Amanda Joy Mayo appearing for Steven Perez. Appearance Type: Public Defender or Community Defender Appointment. (Mayo, Amanda) (Entered: 03/06/2023) |
| 03/06/2023 | 32 | REPLY MEMORANDUM OF LAW in Support as to Steven Perez re: 21 MOTION to Dismiss *and Motion to Suppress Evidence*. . (Mayo, Amanda) (Entered: 03/06/2023) |
| 03/10/2023 | 33 | TRANSCRIPT of Proceedings as to Steven Perez re: Hearing held on 2/15/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Horovitz, (212) 805-0348, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/31/2023. Redacted Transcript Deadline set for 4/10/2023. Release of Transcript Restriction set for 6/8/2023. (McGuirk, Kelly) (Entered: 03/10/2023) |
| 03/10/2023 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Hearing proceeding held on 2/15/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 03/10/2023) |
| 03/15/2023 | | MEMORANDUM TO THE DOCKET CLERK as to Steven Perez. A trial date is set for May 22, 2023. (jw) (Entered: 03/15/2023) |
| 03/15/2023 | 35 | ORDER as to Steven Perez. Today (3/15/23), the Court held a pretrial conference on defendant Lucha El Libertad (a/k/a Steven Perez)'s motion to dismiss the indictment against him and to suppress evidence. On consent of the parties, the Court set a trial date of 5/22/23 pending resolution of defendant's motions. Because the Court finds the time between now and 5/22/23 is necessary to allow rulings on defendant's motions and to allow counsel to adequately prepare for trial and for other reasons reflected in the transcript of today's hearings, the Court finds that the ends of justice in delaying trial through 5/22/23 substantially outweigh the best interests of the public and the defendant in a speedy trial. As such, the Court excludes all time between now and 5/22/23 under 18 U.S.C. § 3161(h) (7) of the Speedy Trial Act. Time excluded from 3/15/2023 until 5/22/2023. (Signed by Judge Jed S. Rakoff on 3/15/2023)(jw) (Entered: 03/15/2023) |
| 03/15/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff Argument on the motions to dismiss and suppress at 21 on the docket. Present were the defendant and his counsel |

|  |  | Zawadi Baharanyi and Amanda May, AUSAs Lucas Issacharoff, Madison Smyser and Ashley Nicolas for the Governmentan a court reporter. Further briefing is due from the Government on 3/23/2023, from the defense 3/29/2023. TDS May 22, 2023. Bail continued. (Defense due by 3/29/2023., Government due by 3/23/2023) (jw) (Entered: 03/16/2023) |
|------------|-----|---|
| 03/22/2023 | 37 | ORDER as to (22-Cr-644-2) Steven Perez. At a 3/15/23 conference, this Court previously set a trial date for defendant Lucha El Libertad (named in the indictment as Steven Perez) of 5/22/23, pending resolution of Mr. El's motions. The trial date was at that time agreed to by all the parties. The Court also excluded time under 18 U.S.C. § 3161(h)(7), finding the time between then and 5/22/23 necessary to allow supplemental briefing and ruling on defendant's motions and to allow counsel to adequately prepare for trial, among other reasons. See 3/15/23 Order, Dkt. 35. Counsel for both parties have since informed the Court by email and during a 3/21/23 teleconference that Mr. El is also set to stand trial in Massachusetts state court on 5/22/23 in a seven-defendant trial in which Mr. El is representing himself pro se. As that trial date was apparently set before this Court's 3/15/23 conference, the Court grants Mr. El's application to adjourn the 5/22/23 trial date. In light of the number of pre-existing trial commitments counsel for Mr. El has throughout this Spring and Summer and the Court's own busy preexisting trial schedule, the earliest date on which the Court and parties would all be prepared and available to begin trial is 8/28/23. As such, the Court resets Mr. El's trial to 8/28/23 (pending resolution of his motions) and hereby excludes all time between then and now under 18 U.S.C. § 3161(h)(7) of the Speedy Trial Act, finding that such time is necessary to enable Mr. El to prepare for and stand trial at the previously scheduled criminal trial in Massachusetts in which he is representing himself pro se, to allow supplemental briefing and ruling on Mr. El's motions, to allow counsel for both sides to adequately prepare for trial, and to accommodate the already very busy schedules of Mr. El's counsel, the Government, and this Court. For these and other reasons, the Court finds that the ends of justice in delaying trial through 8/28/23 substantially outweigh the best interests of the public and the defendant in a speedy trial. SO ORDERED. ( Ready for Trial by 8/28/2023. )(Signed by Judge Jed S. Rakoff on 3/22/2023)(bw) (Entered: 03/22/2023) |
| 03/22/2023 |  | NOTICE OF HEARING as to (22-Cr-644-2) Steven Perez, aka/Lucha El. The trial is adjourned to August 28, 2023 at 9:30am. ( Jury Trial set for 8/28/2023 at 09:30 AM before Judge Jed S. Rakoff. ) (bw) (Entered: 03/22/2023) |
| 03/22/2023 | 38 | RESPONSE in Opposition by USA as to Steven Perez re: 21 MOTION to Dismiss *and Motion to Suppress Evidence*.. (Issacharoff, Lucas) (Entered: 03/22/2023) |
| 03/23/2023 | 39 | TRANSCRIPT of Proceedings as to Keith Vereen, Steven Perez re: Conference held on 3/15/23 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/13/2023. Redacted Transcript Deadline set for 4/24/2023. Release of Transcript Restriction set for 6/21/2023. (Moya, Goretti) (Entered: 03/23/2023) |
| 03/23/2023 | 40 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Keith Vereen, Steven Perez. Notice is hereby given that an official transcript of a Conference proceeding held on 3/15/23 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/23/2023) |

SDNY CM/ECF NextGen Version 1.7

| 03/23/2023 | 41 | TRANSCRIPT of Proceedings as to Keith Vereen, Steven Perez re: Plea held on 3/15/23 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/13/2023. Redacted Transcript Deadline set for 4/24/2023. Release of Transcript Restriction set for 6/21/2023. (Moya, Goretti) (Entered: 03/23/2023) |
| --- | --- | --- |
| 03/23/2023 | 42 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Keith Vereen, Steven Perez. Notice is hereby given that an official transcript of a Plea proceeding held on 3/15/23 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/23/2023) |
| 03/29/2023 | 43 | RESPONSE in Support of Motion by Steven Perez re: 21 MOTION to Dismiss *and Motion to Suppress Evidence*.. (Baharanyi, Zawadi) (Entered: 03/29/2023) |
| 04/10/2023 | 44 | MOTION for Protective Order . Document filed by USA as to Keith Vereen, Steven Perez. (Attachments: # 1 Exhibit Proposed Protective Order)(Nicolas, Ashley) (Entered: 04/10/2023) |
| 04/19/2023 | 45 | PROTECTIVE ORDER as to Keith Vereen, Steven Perez...regarding procedures to be followed that shall govern the handling of confidential material. SO ORDERED: (Signed by Judge Jed S. Rakoff on 4/18/2023)(bw) (Entered: 04/19/2023) |
| 04/21/2023 | 46 | ENDORSED LETTER as to Steven Perez ("A/K/A Lucha El") addressed to Judge Jed S. Rakoff from Zawadi Baharanyi dated 4/21/2022 re: I write to request that Lucha El be permitted to travel to the District of Massachusetts from Sunday, April 23 to Monday, April 24 for the purposes of attending a court appearance..ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 4/21/23)(jw) (Entered: 04/21/2023) |
| 05/17/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Steven Perez held on 5/17/2023. On May 17, 2023, a teleconference was held without transcription or recording. Zawadi Baharanyi for defendant Lucha El and AUSAs Maddie Smyser and Ashley Nicolas for the Government were present. A hearing on defendant Lucha El's motion to suppress is set for Tuesday, May 30 at 2:00 PM. (Motion Hearing set for 5/30/2023 at 02:00 PM before Judge Jed S. Rakoff.) (ap) (Entered: 05/18/2023) |
| 05/30/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Motion Hearing as to Steven Perez held on 5/30/2023. On May 30, 2023 Judge Rakoff held a hearing on a Motion to Suppress. Present were the defendant and his counsel Zawadi Baharanyi and Amanda Mayo, AUSAs Ashley Nicolas, Lucas Issacharoff and Madison Smyser and a court reporter. (lnl) (Entered: 06/01/2023) |
| 06/08/2023 | 49 | ORDER as to Steven Perez: Following full briefing and argument on defendant Lucha El Libertad1's motion to dismiss the indictment and full briefing, argument, and an evidentiary hearing on defendant's motion to suppress the results of a 6/23/21 search, the Court hereby denies both motions. An opinion explaining the rationale for this decision will issue indue course. (Signed by Judge Jed S. Rakoff on 6/8/2023) (ap) (Entered: 06/08/2023) |
| 06/26/2023 | 50 | TRANSCRIPT of Proceedings as to Steven Perez re: Hearing held on 5/30/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that |

8/14

SDNY CM/ECF NextGen Version 1.7

| | | |
|---|---|---|
| | | date it may be obtained through PACER. Redaction Request due 7/17/2023. Redacted Transcript Deadline set for 7/27/2023. Release of Transcript Restriction set for 9/25/2023. (McGuirk, Kelly) (Entered: 06/26/2023) |
| 06/26/2023 | 51 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Hearing proceeding held on 5/30/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/26/2023) |
| 07/07/2023 | 52 | OPINION AND ORDER as to Steven Perez. For the foregoing reasons, the Court reaffirms its prior denial of defendant Lucha El's motion to dismiss and to suppress. The Clerk is directed to close both motions on the docket (Dkt. 21). (Signed by Judge Jed S. Rakoff on 7/7/2023)(jw) (Entered: 07/07/2023) |
| 07/20/2023 | 54 | (S1) SUPERSEDING INDICTMENT FILED as to Steven Perez (2) count(s) 1s, 2s. (jm) (Entered: 07/21/2023) |
| 08/03/2023 | 55 | NOTICE OF APPEAL (Interlocutory) by Steven Perez a/k/a Lucha from 52 Opinion & Order. (nd) (Entered: 08/11/2023) |
| 08/11/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Steven Perez to US Court of Appeals re: 55 Notice of Appeal - Interlocutory. (nd) (Entered: 08/11/2023) |
| 08/11/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Steven Perez re: 55 Notice of Appeal - Interlocutory were transmitted to the U.S. Court of Appeals. (nd) (Entered: 08/11/2023) |
| 08/14/2023 | 56 | MOTION in Limine . Document filed by Steven Perez. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Mayo, Amanda) (Entered: 08/14/2023) |
| 08/14/2023 | 57 | MOTION in Limine . Document filed by USA as to Steven Perez. (Attachments: # 1 Exhibit Latimer BWC, # 2 Exhibit Text Message Excerpt 1, # 3 Exhibit Text Message Excerpt 2, # 4 Exhibit Text Message Excerpt 3, # 5 Exhibit Note, # 6 Exhibit Search History)(Smyser, Madison) (Entered: 08/14/2023) |
| 08/21/2023 | 58 | NOTICE OF ATTORNEY APPEARANCE Sarah Mortazavi appearing for USA. (Mortazavi, Sarah) (Entered: 08/21/2023) |
| 08/21/2023 | 59 | Proposed Jury Instructions by USA as to Steven Perez. (Nicolas, Ashley) (Entered: 08/21/2023) |
| 08/21/2023 | 60 | RESPONSE in Opposition by Steven Perez re: 57 MOTION in Limine .. (Baharanyi, Zawadi) (Entered: 08/21/2023) |
| 08/21/2023 | 61 | Proposed Jury Instructions by Steven Perez. (Baharanyi, Zawadi) (Entered: 08/21/2023) |
| 08/21/2023 | 62 | MEMORANDUM in Opposition by USA as to Steven Perez re 56 MOTION in Limine .. (Attachments: # 1 Exhibit Latimer BWC)(Smyser, Madison) (Entered: 08/21/2023) |
| 08/22/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Steven Perez held on 8/22/2023. A telephonic conference was held on August 22, 2023, without transcription or recording during which counsel for all parties was present. The Court granted the government's unopposed request to file a reply to defendant's opposition to the government's motions in limine (Dkt. 62) limited to addressing |

A000013

| | | |
|---|---|---|
| | | defendant's request to exclude the government's expert Andrew Petersohn; the government shall file this reply by no later than the close of business on August 24, 2023. A hearing will be held concerning the parties' cross-motions in limine (Dkts. 56, 57) on August 25, 2023, at 2:00 PM in courtroom 14B of the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York City, New York. The Court granted defendant's unopposed request to file a proposed order modifying defendant's bail conditions. (Responses due by 8/24/2023. Motion Hearing set for 8/25/2023 at 02:00 PM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff) (ap) (Entered: 08/22/2023) |
| 08/23/2023 | 63 | PROPOSED EXAMINATION OF JURORS by Steven Perez. (Baharanyi, Zawadi) (Entered: 08/23/2023) |
| 08/23/2023 | 64 | PROPOSED EXAMINATION OF JURORS by USA as to Steven Perez. (Smyser, Madison) (Entered: 08/23/2023) |
| 08/24/2023 | 65 | REPLY MEMORANDUM OF LAW in Support by USA as to Steven Perez re: 57 MOTION in Limine . *Opposition to Defendant's Motion to Preclude Testimony of Andy Petersohn*. (Attachments: # 1 Exhibit Petersohn Expert Disclosure, # 2 Exhibit Scales Daubert Hearing Transcript)(Smyser, Madison) (Entered: 08/25/2023) |
| 08/25/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Steven Perez held on 8/25/2023. On August 25, 2023 Judge Rakoff held a final pretrial conference during which Motions in Limine were considered. Present were the defendant and his counsel Zawadi Baharanyi and Amanda Mayo- Federal Defenders, AUSA's Ashley Nicolas, Madison Smyser and Sarah Mortazavi for the Government and a court reporter. Court's ruling: Any further pro se submissions received by docketing while this defendant is represented by counsel shall be rejected by the Clerk's Office. Defendants bail conditions continued. (ap) (Entered: 08/25/2023) |
| 08/28/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Voir Dire held on 8/28/2023 as to (22-Cr-644-2) Steven Perez. On August 28, 2023 Judge Rakoff held a jury trial. Present were the defendant and his counsel Zawadi Baharanyi and Amanda Mayo, AUSA Ashley Nicholas, Madison Smyser and Sarah Mortazavi and a court reporter. Jurors impaneled, opening statements are made, evidence is entered. (bw) (Entered: 08/29/2023) |
| 08/29/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Steven Perez held on 8/29/2023. On August 29, 2023 the trial continues, evidence is entered. A charging conference is held. The trial is adjourned until the next morning. (bw) (Entered: 08/30/2023) |
| 08/30/2023 | 66 | TRANSCRIPT of Proceedings as to Steven Perez re: Oral Argument held on 8/25/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2023. Redacted Transcript Deadline set for 10/2/2023. Release of Transcript Restriction set for 11/28/2023. (McGuirk, Kelly) (Entered: 08/30/2023) |
| 08/30/2023 | 67 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Oral Argument proceeding held on 8/25/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 08/30/2023) |

| | | |
|---|---|---|
| 08/30/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Steven Perez held on 8/30/2023. On August 30, 2023 the trial of the above listed defendant continued before Judge Rakoff. Evidence is entered. At 12:30 the Government rests. At 12:40 the defense rests. The defense counsel makes motions which are denied by the Court. Government makes its summation, defense makes its summation, Government makes its rebuttal closing argument. Court is adjourned until the next morning. (bw); Modified on 8/31/2023 (bw). (Entered: 08/31/2023) |
| 08/31/2023 | 68 | Proposed Jury Instructions by USA as to Steven Perez. (Smyser, Madison) (Entered: 08/31/2023) |
| 08/31/2023 | 69 | Proposed Jury Instructions by Steven Perez. (Mayo, Amanda) (Entered: 08/31/2023) |
| 08/31/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Steven Perez held on 8/31/2023. On August 31, 2023 Judge Rakoff presided over the continuation of the jury trial for the above listed defendant. Charge by the Court, exceptions to the charge. After Marshal is sworn the jury retires to deliberate. At 12:15, after due deliberation, the jury returns a verdict guilty on both counts. Sentence set for 12/4/2023 at 2:00pm. Governments' application to remand defendant granted. PSI referral made to Probation. (Sentencing set for 12/4/2023 at 02:00 PM before Judge Jed S. Rakoff) (ap) (Entered: 08/31/2023) |
| 08/31/2023 | | JURY VERDICT as to Steven Perez (2) Guilty on Count 1s,2s. (ap) (Entered: 08/31/2023) |
| 08/31/2023 | | Oral Order of Referral to Probation for Presentence Investigation and Report as to Steven Perez. (Signed by Judge Jed S. Rakoff on 8/31/2023) (ap) (Entered: 08/31/2023) |
| 08/31/2023 | 70 | THE COURT'S INSTRUCTIONS OF LAW TO THE JURY as to USA v. Steven Perez. [Ct. Ex. 1] (bw) (Entered: 09/01/2023) |
| 08/31/2023 | 71 | JURY NOTE 1 as to USA v. Steven Perez. (bw) (Entered: 09/01/2023) |
| 08/31/2023 | 72 | JURY NOTE 2 as to USA v. Steven Perez. (bw) (Entered: 09/01/2023) |
| 08/31/2023 | 73 | JURY NOTE 3 as to USA v. Steven Perez. (bw) (Entered: 09/01/2023) |
| 08/31/2023 | 74 | JURY NOTE 4 as to USA v. Steven Perez. (bw) (Entered: 09/01/2023) |
| 08/31/2023 | 75 | JURY NOTE 5 as to USA v. Steven Perez. (bw) (Entered: 09/01/2023) |
| 08/31/2023 | 76 | VERDICT as to USA v. Steven Perez. (bw) (Entered: 09/01/2023) |
| 09/01/2023 | 77 | ORDER as to Steven Perez: ORDERED, that the defendant is hereby remanded to the custody of the United States Marshal. (Signed by Judge Jed S. Rakoff on 8/31/2023) (ap) Modified on 9/7/2023 (ap). (Entered: 09/05/2023) |
| 09/01/2023 | 78 | NOTICE OF APPEAL (Interlocutory) by Steven Perez from 77 Order. (nd) (Entered: 09/08/2023) |
| 09/08/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Steven Perez to US Court of Appeals re: 78 Notice of Appeal - Interlocutory. (nd) (Entered: 09/08/2023) |
| 09/08/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Steven Perez re: 78 Notice of Appeal - Interlocutory were transmitted to the U.S. Court of Appeals. (nd) (Entered: 09/08/2023) |
| 09/08/2023 | 79 | TRANSCRIPT of Proceedings as to Steven Perez re: Trial held on 8/28/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sharonda Jones, (212) 805-0300, |

**A000015**

SDNY CM/ECF NextGen Version 1.7

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/29/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/7/2023. (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Trial proceeding held on 8/28/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 81 | TRANSCRIPT of Proceedings as to Steven Perez re: Trial held on 8/29/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sharonda Jones, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/29/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/7/2023. (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 82 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Trial proceeding held on 8/29/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 83 | TRANSCRIPT of Proceedings as to Steven Perez re: Trial held on 8/30/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sharonda Jones, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/29/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/7/2023. (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 84 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Trial proceeding held on 8/30/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 85 | TRANSCRIPT of Proceedings as to Steven Perez re: Trial held on 8/31/2023 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sharonda Jones, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/29/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/7/2023. (McGuirk, Kelly) (Entered: 09/08/2023) |
| 09/08/2023 | 86 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Trial proceeding held on 8/31/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) |

A000016

| | | |
|---|---|---|
| | | calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/08/2023) |
| 10/26/2023 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Steven Perez held on 10/26/2023. A telephonic conference was held on October 26, 2023, without transcription or recording during which counsel for all parties was present. The Court granted the defendants request for an adjournment of the sentencing hearing that is currently scheduled for December 4, 2023, at 2 PM. The sentencing hearing for defendant Steven Perez (a/k/a Lucha El) will now be held on January 8, 2023, at 4 PM. (Sentencing set for 1/8/2024 at 04:00 PM before Judge Jed S. Rakoff) (lnl) (Entered: 10/26/2023) |
| 11/03/2023 | 92 | ORDER of USCA (Certified Copy) as to Steven Perez re: 78 Notice of Appeal - Interlocutory USCA Case Number 23-7090. Upon due consideration, it is hereby ORDERED that the judgment of the district court is AFFIRMED and the motion for release under Fed. R. App. P. 9(a)(3) is DENIED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 11/3/2023. (tp) (Entered: 11/03/2023) |
| 11/27/2023 | 95 | MANDATE of USCA (Certified Copy) as to Steven Perez USCA Case Number 23-7090. It is hereby ORDERED that the judgment of the district court is AFFIRMED and the motion for release under Fed. R. App. P. 9(a)(3) is DENIED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 11/27/2023. (km) (Entered: 11/27/2023) |
| 11/27/2023 | | Transmission of USCA Mandate/Order to the District Judge re: 95 USCA Mandate - Final Judgment Appeal. (km) (Entered: 11/27/2023) |
| 01/02/2024 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Steven Perez held on 1/2/2024. Held without transcription or recording during which counsel for all parties was present. The Court granted the parties' request for an extension of the deadline to file their respective sentencing submission. The deadline to file sentencing submissions in is now January 4, 2024. (jbo) (Entered: 01/02/2024) |
| 01/05/2024 | 98 | SENTENCING SUBMISSION by USA as to Steven Perez. (Smyser, Madison) (Entered: 01/05/2024) |
| 01/05/2024 | 99 | SENTENCING SUBMISSION by Steven Perez. (Attachments: # 1 Exhibit Exhibits A-L) (Baharanyi, Zawadi) (Entered: 01/05/2024) |
| 01/08/2024 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Sentencing held on 1/8/2024 for Steven Perez (2) Count 1s,2s. On January 8 2024 Judge Rakoff held a sentencing. Present were the defendant and his counsel Zawadi Baharanyi, AUSAs Ashley Nicolas, Maddison Smyser and Sarah Mortazavi for the Government, and a court reporter. Sentence: on counts 1 and 2: 16 months prison, concurrent, remanded, 3 years supervised release, concurrent, $200 assessment. The underlying charging instrument is dismissed on motion of the Government. (bw) (Entered: 01/12/2024) |
| 01/08/2024 | | DISMISSAL OF COUNTS on Court or Defendant Motion as to Steven Perez (2) Count 3. (bw) (Entered: 01/12/2024) |
| 01/12/2024 | 100 | JUDGMENT IN A CRIMINAL CASE as to Steven Perez (2). THE DEFENDANT: was found guilty on counts 1 and 2 after a plea of not guilty. Counts of the underlying indictment are dismissed on the motion of the United States. IMPRISONMENT: On count 1: Sixteen (16) months jail, concurrent to the sentence imposed on count 2. On count 2: Sixteen (16) months jail, concurrent to the sentence imposed on count 1. The court makes the following recommendations to the Bureau of Prisons: Incarceration as close to the New York metropolitan area as possible. The defendant is remanded to the |

A000017

| | | custody of the United States Marshal. SUPERVISED RELEASE: On count 1: Three (3) years. On count 2: Three (3) years, all terms on all counts to run concurrent to each other. ASSESSMENT: $200.00 due immediately. The defendant shall forfeit the defendant's interest in the following property to the United States: pursuant to 18 U.S.C. § 924(d)(I), and 28 U.S.C. § 2461(c), any and all firearms and ammunition involved in or used in said offense. (Signed by Judge Jed S. Rakoff on 1/11/2024)(ap) (Entered: 01/12/2024) |
| 01/17/2024 | 101 | NOTICE OF APPEAL by Steven Perez from 100 Judgment. (km) (Entered: 01/17/2024) |
| 01/17/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Steven Perez to US Court of Appeals re: 101 Notice of Appeal - Final Judgment. (km) (Entered: 01/17/2024) |
| 01/17/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Steven Perez re: 101 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (km) (Entered: 01/17/2024) |
| 01/24/2024 | 102 | TRANSCRIPT of Proceedings as to Steven Perez re: Conference held on 1/8/24 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (Moya, Goretti) (Entered: 01/24/2024) |
| 01/24/2024 | 103 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Steven Perez. Notice is hereby given that an official transcript of a Conference proceeding held on 1/8/24 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 01/24/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/02/2024 11:16:17 | | |
| **PACER Login:** | kendra_hutchinson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cr-00644-JSR |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

**A000018**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA      :    SEALED
                              :    INDICTMENT
        - v. -                :
                              :    22 Cr. _____
KEITH VEREEN, and             :
STEVEN PEREZ,                 :
        a/k/a "Lucha,"        :
                              :
        Defendants.           X
- - - - - - - - - - - - - - -
```

**22 CRIM   644**

## COUNT ONE
### (Firearms Trafficking Conspiracy)

The Grand Jury charges:

1.    Between in or about May 2020, up to and including in or about November 2020, in the Southern District of New York and elsewhere, KEITH VEREEN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, trafficking in firearms in violation of Title 18, United States Code, Section 922(a)(1)(A).

2.    It was a part and an object of the conspiracy that KEITH VEREEN, the defendant, and others known and unknown, not being licensed importers, licensed manufacturers, and licensed dealers of firearms within the meaning of Chapter 44, Title 18, United States Code, would and did willfully and knowingly engage in the business of importing, manufacturing, and dealing in

**A000019**

firearms, and in the course of such business would and did ship, transport, and receive firearms in interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(a)(1)(A).

Overt Acts

3.    In furtherance of the conspiracy and to effect the illegal object thereof, KEITH VEREEN, the defendant, together with others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about September 12, 2020, KEITH VEREEN, the defendant, received two wire transfers in the amounts of approximately $600 and $911 respectively, that were sent from a check cashing facility in the Bronx, New York.

b. On or about September 12, 2020, VEREEN purchased six firearms from a federal firearms licensee ("FFL") in South Carolina.

c. On or about September 14, 2020, VEREEN traveled from South Carolina to the Bronx, New York.

d. On or about September 22, 2020, VEREEN, the defendant, received a wire transfer in the amount of approximately $350, sent from a check cashing facility in the Bronx, New York.

e. Between on or about October 1, 2020, and on or about October 2, 2020, VEREEN purchased five firearms from FFLs in South Carolina.

2

**A000020**

f. On or about October 3, 2020, VEREEN traveled from South Carolina to the Bronx, New York.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Gun Trafficking)

The Grand Jury further charges:

4.     Between in or about May 2020, up to and including in or about November 2020, in the Southern District of New York and elsewhere, KEITH VEREEN, the defendant, not being licensed importers, licensed manufacturers, and licensed dealers of firearms within the meaning of Chapter 44, Title 18, United State Code, would and did willfully and knowingly engage in the business of dealing in firearms, and in the course of such business would and did ship, transport, and receive firearms in interstate and foreign commerce, and travel interstate, in violation of Title 18, United States Code, Sections 922(a)(1)(A), to wit, VEREEN purchased and otherwise obtained firearms in South Carolina for resale in, among other places, New York.

(Title 18, United States Code, Sections 922(a)(1)(A), 924(a)(1), and 2.)

### COUNT THREE
### (Interstate Transport of Firearms)

The Grand Jury further charges:

5.     Between in or about September 2020, up to and including in or about November 2020, in the Southern District of

3

**A000021**

New York and elsewhere, STEVEN PEREZ, the defendant, not being a licensed importer, licensed manufacturer, licensed dealer, and licensed collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, did willfully and knowingly transport into or receive in the State where he resides firearms purchased or otherwise obtained by PEREZ outside that State to wit, PEREZ, a New York state resident who is not a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms, had at least one firearm transferred into New York from South Carolina on his behalf.

(Title 18, United States Code, Sections 922(a)(3), 924(a)(1), and 2.)

### FORFEITURE ALLEGATION

6.    As a result of committing the offenses alleged in Count One, Two, and Three of this Indictment, KEITH VEREEN and STEVEN PEREZ, a/k/a "Lucha," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

4

**A000022**

7.    As a result of committing the offenses alleged in Counts One, Two, and Three of this Indictment, KEITH VEREEN and STEVEN PEREZ, a/k/a "Lucha," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), any and all firearms and ammunition involved in or used in said offense, including but not limited to the following:

a. FN 503, 9mm handgun, Serial Number ("SN") CV006976;

b. MC1 9mm pistol, SN 035736CP;

c. Glock 43, 9mm handgun, SN ADWH603;

d. Taurus G2C, 9mm handgun, SN ABDWH603;

e. Glock 44, 22LR handgun, SN AELY222;

f. Glock 19GEN4, 9mm handgun, SN ACMB656;

g. Hellcat 9mm Pistol, SN BY306999;

h. Taurus Poly Revolver, SN JZ20483;

i. Beretta APX 9mm, SN AXC030812;

j. Beretta APX 9mm, SN AXC030805;

k. Springfield 9mm pistol, SN HG970741;

l. Ruger LCR revolver, SN 154025585;

m. Beretta 21A .22 pistol, SN BCS19935U;

n. Smith & Wesson M&P 9mm handgun, SN JEV8303;

o. Canik TP9 9mm handgun, SN 20CB25810;

p. Taurus PT738 .380 handgun, SN 1D117214;

q. Smith & Wesson 9mm handgun, SN JFC0427;

**A000023**

r. SCCY Model CPX2 9mm handgun, SN C023420;

s. Smith & Wesson M&P .380 handgun, SN RJB4429;

t. Glock GMBH 9mm handgun, SN BRFT833;

u. Mossberg MC1SC 9mm handgun, SN 034425C;

v. Ruger LCR 38 revolver, SN 1541-34460;

w. Glock GMBH 9mm handgun, SN AEYB797;

x. Taurus G2C 9mm handgun, SN ABK021341;

y. Canik TP9 9mm handgun, SN 20CB-33183.

### Substitute Assets Provision

8.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

6

A000024

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 21, United States Code, Section 853.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

7

**A000025**

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

v.

**KEITH VEREEN, and**
**STEVEN PEREZ,**
**a/k/a "Lucha,"**

Defendants.

---

**INDICTMENT**

22 Cr. _____

(18 U.S.C. §§ 371, 922(a)(1)(A),
922(a)(3), 924(a), and 2.)

---

DAMIAN WILLIAMS
United States Attorney

---

███████████
Foreperson

---

*Filed Sealed Indictment*
*Arrest Warrants issued*

KL
11/30/22

8

Steward D. Am...

A000026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------  x
                                                     :
                                                     :
**UNITED STATES OF AMERICA**                         :
                                                     :
                                                     :        22 Cr. 644     (JSR)
- v -                                                :
                                                     :
**STEVEN PEREZ,**                                    :
                                                     :
                              Defendant.             :
----------------------------------------------------  :
                                                     x


## STEVEN PEREZ (LUCHA EL POR LIBERTAD'S)
## PRETRIAL MOTIONS

**DAVID E. PATTON, ESQ.**
Federal Defenders of New York, Inc.
Attorney for Defendant
**STEVEN PEREZ
(LUCHA    EL    POR
LIBERTAD)**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8735


**ZAWADI BAHARANYI**
Of Counsel


TO:  **DAMIAN WILLIAMS, ESQ**.
United States Attorney
Southern District of New York
One. St. Andrew's Plaza
New York, New York 10007
Attn:  **ASHLEY NICOLAS, ESQ.**
         Assistant United States Attorney

**A000027**

# TABLE OF AUTHORITIES

**Cases**

California v. Hodari D., 499 U.S. 621 (1991) .................................................15

District of Columbia v. Heller, 554 U.S. 570 (2008) ............................................4

Florida v. J.L., 529 U.S. 266 (2000) ...................................................................17

McDonald v. City of Chicago, 561 U.S. 767 (2010).............................................4

Navarette v. California, 572 U.S. 393 (2014).....................................................19

New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022) .......5

Terry v. Ohio, 392 U.S. 1 (1968).......................................................................15

United States v. Baldwin, 496 F.3d 215 (2d Cir. 2007) .....................................15

United States v. Cacace, 796 F.3d 176 (2d Cir. 2015) ......................................21

United States v. Elmore, 482 F.3d 172 (2d Cir. 2007).......................................16

United States v. Freeman, 735 F.3d 92 (2d Cir. 2013)........................................17

United States v. Jackson, No. 10 CR 783 NRB (S.D.N.Y. Apr. 12, 2011)..........18

United States v. Jarvis, No. 18 CR. 475 (PAC) (S.D.N.Y. Apr. 30, 2019).........21

United States v. Lee, 916 F.2d 814 (2d Cir. 1990)..............................................15

United States v. Mendenhall, 446 U.S. 544 (1980).............................................15

United States v. Morales, 788 F.2d 883 (2d Cir. 1986).......................................21

United States v. Muhammad 463 F.3d 115 (2d Cir. 2006) ............................17, 20

United States v. Simmons, 560 F.3d 98 (2d Cir. 2009).......................................15

United States v. Sokolow, 490 U.S. 1 (1989)......................................................17

United States v. Weaver, 9 F.4th 129 (2d Cir. 2021) ..........................................15

United States v. Zayas, No. 22 Cr. 178 (NSR), 2022 WL 16737223...................21

Wong Sun v. United States, 371 U.S. 471 (1963).................................................21

A000028

**Statutes**

18 U.S.C. § 922(a)(3) ...................................................................5

Fed. R. Crim. Pro. 12(b) ...............................................................6

**Constitutional Provisions**

U.S. Const. amend. IV ................................................................15

U.S. Const. amends. II, V ..............................................................6

A000029

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMIS AND
MOTION TO SUPPRESS PHYSICAL AND TESTIMONIAL EVIDENCE**

Defendant Lucha El Por Libertad (a/k/a Steven Perez; hereinafter "Mr. Lucha") respectfully moves this Court for an order dismissing the indictment against him, as it was obtained in violation of his Second Amendment rights, and such other and further relief as the Court deems just and proper.

Moreover, Mr. Lucha moves to suppress the firearm seized by police on June 23, 2021, along with his cellphone and post-arrest statements to law enforcement because they were obtained through a violation of his Fourth Amendment rights. In the alternative, the Court should hold an evidentiary hearing.

## I.       Motion to Dismiss

The Second Amendment to the United States Constitution confers an "individual right to keep and bear arms" for self-defense.  District of Columbia v. Heller, 554 U.S. 570, 595 (2008).  That enumerated right is "fundamental to our scheme of ordered liberty." McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (emphasis omitted).  Courts therefore may not treat it "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  Id. at 780.

This year, the Supreme Court gave unequivocal guidance about how courts must interpret whether gun regulations are permissible under the Second Amendment.  Rejecting lower courts' previous approach, which balanced the strength of the government's interest in regulating gun ownership against the degree of infringement on an individual's Second Amendment rights, the Supreme Court instead directed courts to consider only the

4

A000030

"constitutional text and history." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2128-29 (2022). Under the Supreme Court's new approach, gun regulations are unconstitutional unless the government can prove that they are "consistent with this Nation's historical tradition of firearm regulation." Id. at 2126. The burden is squarely on the government.

On June 23, 2021, Mr. Lucha was arrested by NYPD officers for unlawful possession of a Canik TP9 9 mm handgun in the Bronx, New York.[1] The following week, on July 3, 2021, Mr. Lucha was arrested by Massachusetts state troopers for unlawful possession of a firearm, Glock Model 44, .22 caliber pistol, in Wakefield, Massachusetts.[2] Ex. A (Excerpt from Search Warrant Affidavit). On November 30, 2022, Mr. Lucha was indicted by a federal grand jury for violating 18 U.S.C. § 922(a)(3), which prohibits any person who is not a licensed importer, manufacturer, dealer or collector, from receiving in their state of residence a firearm purchased or obtained from another state. The government alleges that Mr. Lucha violated § 922(a)(3) through his unlawful receipt and possession of the firearm he alleged possessed in the Bronx and Wakefield.

§ 922(a)(3), which bans regular citizens from receiving firearms obtained from other states for any use—including self-defense—is plainly not "consistent with this Nation's historical tradition of firearm regulation." While it is solely the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," Bruen, 142 S.Ct. at 2127, undersigned

---

[1] Mr. Lucha was charged in Bronx County in this matter. These charges have been dismissed and the arrest is sealed.
[2] Mr. Lucha was charged in Massachusetts in this matter. The charge in this case is pending and trial is set for May 2023.

A000031

counsel is aware of no laws proscribing the receipt of lawfully procured firearms from another state when the Second Amendment was adopted in 1791, despite the existence of fourteen states within the Union.[3]

Since the Government cannot prove that § 922(a)(3) is consistent with this nation's historical tradition, the statute violates Mr. Lucha's Second Amendment rights. Mr. Lucha therefore respectfully moves this Court for an order dismissing the indictment and granting such other and further relief as the Court deems just and proper. U.S. Const. amends. II, V; Fed. R. Crim. Pro. 12(b).

### a. **Legal Framework**

Adopted in 1791, the Second Amendment provides that "the right of the people to keep and bear Arms [ ] shall not be infringed." There is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." Heller, 554 U.S. at 595. That right stands on the same footing as all enumerated constitutional rights, which "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Id. at 634-35.

Last year, the Supreme Court invalidated the Second Circuit's existing framework for adjudicating Second Amendment challenges – known as "means-end scrutiny" – and instead gave detailed instructions on how courts should resolve such claims going forward. In Bruen, the Court explained that "the standard for applying the Second Amendment is as follows":

---

[3] Order of States' Admission into Union:
https://www.sos.arkansas.gov/education/arkansas-history/history-of-the-flag/order-of-states-admission

6

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2129–30 (internal quotation marks omitted).

The Court then identified two different classes of gun regulations, each carrying a distinct analytical approach.  First, when analyzing a gun regulation directed at "a general societal problem that has persisted since the 18th century," courts are to conduct a "straightforward historical inquiry."  Id. at 2131.  Under that approach, the government bears the burden of identifying a tradition of "distinctly similar" regulations from the founding era. Id. at 2137-38.  Relevant evidence that a modern regulation is unconstitutional includes "the lack of a distinctly similar historical regulation," earlier generations' attempts to regulate the conduct at issue "by materially different means," or the rejection of "analogous regulations" at the time of the founding.  Id.  Put differently, if "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional.  See id.

Courts may only resort to the second type of analysis – a "more nuanced" form of "analogical reasoning" – when a challenged regulation implicates "unprecedented societal concerns or dramatic technological changes."  Id. at 2132.  Under that approach, the Government must "identify a well-established and representative historical *analogue*, not a historical twin."  Id. at 2133 (emphasis in original).  But such analogical reasoning, which is arguably easier for the government to satisfy, only applies to "modern regulations that were unimaginable at the founding."  Id. at 2132.

7

A000033

Here, Mr. Lucha is charged under 18 U.S.C. § 922(a)(3), which prohibits anyone who is not a licensed dealer, manufacturer or collector, from receiving and possessing a firearm from out of state for any purpose– including for purposes of self-defense.  Under Bruen's analytical framework, it is the government's burden – and its burden alone – to identify a tradition of "distinctly" similar founding-era regulations.  See id.  Because no such historical tradition exists, prosecuting Mr. Lucha under § 922(a)(3) violates his constitutional rights.

**b.  The Second Amendment's plain text covers Mr. Lucha's alleged conduct.**

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  Bruen, 142 S. Ct. at 2129-30.  Here, Mr. Lucha's alleged conduct falls squarely within the Second Amendment's plain text.  Mr. Lucha was arrested for possession of a handgun while standing outside of his home in the Bronx, New York. Separately, Mr. Lucha was arrested in Massachusetts for unlawful possession of a pistol. Both firearms were allegedly purchased in South Carolina and received by Mr. Lucha in New York. The firearms that Mr. Lucha is accused of receiving and possessing from out of state are the type of "arm" to which the Second Amendment indisputably applies.  Heller, 554 U.S. at 628 (D.C.'s handgun ban amounted "to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for" the lawful purpose of self-defense).

Mr. Lucha, an American citizen and resident of New York with no prior felony convictions, is unquestionably among "the people" the Second Amendment protects.  As used in the Second Amendment, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." Id. at 580.  The Court in Heller determined

8

that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." Id. (emphasis added); see also Bruen, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)).

Therefore, Mr. Lucha's alleged conduct is plainly covered by the Second Amendment, and is "presumptively protected" on constitutional grounds.

 

**c.  There is no historical tradition of banning regular citizens from receiving and possessing guns obtained from a different state.**

Since the Second Amendment plainly protects Mr. Lucha's right to bear arms, his alleged conduct is presumptively unconstitutional.  The burden therefore falls on the government to establish that § 922(a)(3) "is consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2129–30.  It will not be able to do so.

    *i.*    *Bruen's "straightforward historical analysis" test applies.*

In the 17th and 18th centuries, Great Britain established thirteen colonies along the Atlantic Coast in North America. These thirteen colonies would become the first thirteen states of the United States of America, upon their declaration of independence in 1776.  Just as the existence of distinct political states and territories in the United States is not a modern phenomenon, the "problem" of people receiving and possessing property and guns from outside of their state of residence is not new to modern America nor could regulations of such be considered "unimaginable" to the nation's founders. As such, the question of whether regular citizens (who are not licensed firearms dealers) should be allowed to possess guns obtained from out of state is "a general societal problem that has persisted since the 18th

9

**A000035**

century."  See Bruen, 142 S. Ct. at 2137-38.

As the Supreme Court made clear in Bruen, such "general societal problems" are analyzed utilizing a strict test.  Rather than engaging in the "analogical reasoning" reserved for novel issues, the Court must instead conduct a "straightforward historical analysis," and the government must demonstrate a tradition of "distinctly similar historical regulation[s]" from the founding era.  Id.  A "tradition" of regulation requires more than one or two isolated examples. It instead demands a robust, "widespread" historical practice "broadly prohibiting" the conduct in question.  Id.  Although the Bruen Court did not establish what rises to the level of a "tradition," it did hold that "a single law in a single State" is insufficient, and doubted that regulations of three of the thirteen colonies "could suffice."  Id. at 2142-45 (noting that the three colonial regulations the government identified were not analogous to the challenged New York public-carry restriction).

> ii.    There is no American historical tradition of regulation analogous to §
>        922(a)(3).

When it comes to the Second Amendment, "not all history is created equal."  Id. at 2136.  The most relevant historical evidence is the law as it existed at the time of the founding; "less informative" is "history from Reconstruction to the late nineteenth century." Range, 53 F.4th at 274.  The Supreme Court has paid practically no attention to twentieth-century laws; indeed, it has considered even late-nineteenth century laws to have an unacceptable "temporal distance from the founding."  Bruen, 142 S. Ct. at 2154.  And regardless of the historical record, the Amendment's text is always paramount: post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."  Id. at 2137 (quotations and emphasis omitted).

Although it is the government's burden – **and its burden alone** – to prove a founding-era tradition of prohibiting citizens from receiving, transporting and possessing firearms from other states or jurisdictions, the simple truth is this: such regulations did not exist in the founding era.

Robert H. Churchill, a history professor at the University of Hartford, has taken "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815."  See Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 143 & n.11 (2007).  Based on that survey, Professor Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic.  In essence, American law recognized a zone of immunity surrounding the privately owned guns of citizens."  Id. at 142.

In the aftermath of Heller, Second Amendment history and law scholar Mark Frasetto took on the monumental task of compiling a comprehensive survey of state firearms legislation from the colonial era until the start of the twentieth century.  See Mark Frasetto, Firearms and Weapons Legislation up to the Early 20th Century (January 15, 2013).  Available at:  http://dx.doi.org/10.2139/ssrn.220099.  Frasetto's comprehensive analysis reveals no founding-era regulations prohibiting regular citizens from obtaining firearms in other states. Id.

That the federal government passed the first prohibition on unlicensed individuals receiving and possessing firearms obtained from out of state in 1968[4], is fatal to any argument

---

[4] This was the Gun Control Act of 1968.

11

the government may make regarding a founding-era historical tradition of regulations "distinctly similar" to § 922(a)(3). Those twentieth-century laws are simply insufficient to overcome the presumption of unconstitutionality that attaches to § 922(a)(3). See Bruen, 142 S. Ct. at 2154 (treating twentieth-century regulations as carrying practically no weight in the Second Amendment analysis).

As a political matter, Americans continue to debate issues surrounding the Second Amendment. But as a legal matter, the Supreme Court has been clear: the Second Amendment means what it says, and that meaning is determined by reference to the founding era. In 1791, the right of a person to "keep and bear arms" was not contingent on the geographical source of the "arms" or whether the person was afforded a special license to receive and carry that arm. For this reason, prosecuting Mr. Lucha under 18 U.S.C. § 922(a)(3) violates his Second Amendment rights. The Court should therefore dismiss count three of the indictment

12

## II.     Motion to Suppress Physical and Testimonial Evidence

On June 23, 2021, Mr. Lucha was standing outside of his apartment in the Bronx, speaking with neighbors from his building, when uniformed officers from the New York City Police Department ("NYPD") surrounded him, grabbed his arms and searched a bag strapped across his body.[5] During their search, the officers discovered and recovered a firearm and cellphone.

NYPD officers lacked reasonable suspicion to stop Mr. Lucha. They conducted the seizure based on a single anonymous tip reporting that a person matching Mr. Lucha's description, had a firearm in his bag.  This description of conduct by an anonymous caller did not provide the police with reasonable suspicion, and all fruits of this unlawful stop must be suppressed. The Court should grant Mr. Lucha's motion to suppress or hold a hearing.

### a.  <u>Statement of Relevant Facts</u>

Mr. Lucha is charged by indictment with the unlawful transportation or receipt of a firearm into his state of residence, in violation of Title 18, United States Code, Sections 922(a)(3) and 924 (a)(1). One of the firearms at issue in the indictment is a Canik 9mm handgun seized from Mr. Lucha during his unlawful seizure and arrest by NYPD officers on June 23, 2021.

One June 23, an anonymous caller contacted 911 to report a man with a firearm walking down Gun Hill Road towards Perry Avenue.  Ex. B (Audio of 911 Call). The caller described the person as a Hispanic man, wearing a white shirt, black pants, a black and

---

[5] The factual circumstances surrounding Mr. Lucha's encounter with NYPD officers is captured in body worn camera footage attached as <u>Exhibit C</u> to this motion.

13

white turban on his head, and a blue bag. Id. The caller further stated that the man went by the name of "Lucha." Id. When asked, the caller admitted that she did not know where the individual was headed. Id at 2:20-2:27. Moreover, the caller refused to provide her name when asked. Id. At 3:08.

NYPD Officers Cotter and Smalls were on patrol when they were alerted of the call regarding a possible firearm.  Officer Cotter and Officer Smalls, accompanied by two other uniformed officers, approached Mr. Lucha outside of his home at 3318 Perry Avenue, Bronx, New York. Ex. C (Body Worn Camera Footage from Officer Cotter) at 0:55- 1:10; Ex. D (NYPD Paperwork With Mr. Lucha's Home Address).  As Officer Cotter and Officer Smalls approached, Mr. Lucha remained in place—he made no efforts to run or avoid officers. Id. Officer Smalls grabbed Mr. Lucha's left arm, while Officer Cotter grabbed his right arm and a blue bag strapped across Mr. Lucha's body.  Officer Cotter frisked this bag before searching it and recovering a firearm.

While Mr. Lucha remained detained, NYPD officers attempted to locate the 911 caller to have her participate in a show up identification but had difficulty reaching her and twice described her as being "uncooperative." Ex. E (Radio Run) at 5:47-6:10. By the time officers located the caller and orchestrated a show up identification procedure, Mr. Lucha had already been seized for nearly ten minutes. See Ex. C at 10:15-10:20 (Another uniformed officer can be heard saying "positive" regarding the positive ID of Mr. Lucha by the caller).

14

A000040

**b.** **The seizure of Mr. Lucha violated the Fourth Amendment because NYPD officers lacked reasonable suspicion to believe that he had committed a crime.**

      *i.*     *Mr. Lucha was seized when NYPD officers physically restrained him.*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "seizure" occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). The Supreme Court and Second Circuit have identified two hallmarks of a seizure. First, "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement." California v. Hodari D., 499 U.S. 621, 626 (1991) (quoting U.S. Const. amend. IV). Thus, "[e]xamples of circumstances that might indicate a seizure … would be … some physical touching of the person of the citizen." United States v. Mendenhall, 446 U.S. 544, 554 (1980). See also, e.g., United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) ("physical touching of the person by the officer"). That is true even of de minimis physical contact. See Hodari D., 499 U.S. at 626 n.2 ("mere touching of a person would suffice" to constitute "seizure"). Second, apart from physical contact, a seizure occurs when a person submits to a show of police authority. United States v. Baldwin, 496 F.3d 215, 218 (2d Cir. 2007). That is, "[a] seizure occurs when … a person obeys a police officer's order to stop." United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009).

With respect to a search, a police officer's conduct constitutes a search within the meaning of the Fourth Amendment when the officer physically intrudes on a constitutionally protected area. United States v. Weaver, 9 F.4th 129, 141 (2d Cir. 2021).

15

A000041

Generally, the search of a suspect must be supported by probable cause, however the Supreme Court carved out an exception to this rule in Terry. Under Terry, an officer who reasonably believes that a suspect poses a risk of danger to the officer or others may "conduct a carefully limited search of the *outer clothing* of [the suspect] … to discover weapons which might be used to assault him." Terry, 392 U.S. at 30 (emphasis added). This Terry frisk may occur **only after** a lawful seizure, supported at a minimum by reasonable suspicion. Id. at 29.

Here, there is no question that Officers Cotter and Smalls seized Mr. Lucha when they physically grabbed and pinned his arms in the air. This is readily observable in the body worn camera footage attached as Exhibit A. The officers physically, and substantially, restrained Mr. Lucha's freedom of movement.

Immediately after seizing Mr. Lucha, Officer Cotter grabbed Mr. Lucha's blue bag and felt a firearm.

ii.     *Officers lacked reasonable suspicion to seize Mr. Lucha based on an anonymous 911 call.*

Under Terry, law enforcement officials may initiate an investigatory detention if they have a reasonable, articulable suspicion that a person is engaged in criminal activity. 392 U.S. at 21; see also United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007) ("A Terry stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest.") (emphasis added).  This lesser "reasonable suspicion" standard "is considerably less than proof of wrongdoing by a preponderance of the evidence," but nonetheless

16

A000042

requires "more than an 'inchoate and unparticularized suspicion or 'hunch.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 27).

Whereas here, a seizure is based on an anonymous tip, Courts must consider "whether the 'tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" United States v. Muhammad 463 F.3d 115, 121 (2d Cir. 2006) (quoting Florida v. J.L., 529 U.S. 266, 270 (2000). Generally, anonymous tips "without further corroboration by the police… are insufficient to provide the reasonable suspicion necessary for a valid Terry stop." United States v. Freeman, 735 F.3d 92, 97 (2d Cir. 2013). Allegations of illegality from known informants are considered reliable because of the ability to "assess the credibility and reputation for honesty of the tipper and …hold[] the informant accountable for false reporting." United States v. Freeman, 735 F.3d 92, 97 (2d Cir. 2013). The ability to assess the reliability and credibility of a tipster is missing when that person is unknown, hence Courts require that "anonymous calls be supported by additional indicia of reliability" if the police intend to act on them. Id. at 98. Finally, while details about an individual's appearance and observable location serve to "identify a determinate person" they fail to bolster the reliability of an anonymous informant's "assertion of illegality" and are therefore not sufficient to confer reasonable suspicion to conduct a stop.

Here, the anonymous tip did not give officers reasonable suspicion to stop Mr. Lucha. At the point at which officers physically seized Mr. Lucha, they were doing so on the word of an individual who had refused to provide her name, reluctantly provided a phone number, and failed to provide any predictive information that could be used to "test the informant's knowledge or credibility." Id. at 97.

17

The details provided by the 911 caller served only as an "[a]n accurate description of a suspect's readily observable location and appearance" which is not sufficient to render an anonymous tip reliable or confer reasonable suspicion that would justify a Terry stop. See Id.; United States v. Jackson, No. 10 CR 783 NRB, 2011 WL 1431983, at *10 (S.D.N.Y. Apr. 12, 2011).

The Second Circuit's ruling in United States v. Freeman is particularly illustrative and should guide this Court's analysis. In Freeman, an anonymous caller contacted 911 twice to report a man with a gun arguing with a woman. The caller described the man's race and clothing. Moreover, the caller detailed the person's location, explaining that he was "'walking towards' and then 'standing on the corner of Burke [Avenue].'" Freeman, 735 F.3d at 95. The 911 caller refused to identify herself but her 911 call was recorded as was her phone number. Id. at 94. Police approached Mr. Freeman based solely on this tip and wrestled him to the ground after he ignored their commands to stop. Freeman moved to suppress the firearm taken from his person during his arrest. While the District Judge denied his motion to suppress, the Second Circuit reversed this decision, finding that the circumstances of the anonymous tip did not confer reasonable suspicion for the officers to stop Freeman. The Court held that even though the informant's phone number was known and her call was recorded, this did not change the fact that the caller was unknown and the police had no ability to assess the informant's credibility. See Id. at 98. Moreover, the detailed information about Mr. Freeman's physical appearance and location only served to "correctly identify the person whom the tipster means to accuse" and failed to show that the tipster had "knowledge of concealed criminal activity." Id. at 99.  Finally, the Court found that the caller's real time description of Mr. Freeman's location failed to serve as a

18

"prediction of future behavior" enhancing the reliability of the tip. Id.

The facts here are strikingly similar. In stopping and restraining Mr. Lucha, officers relied solely on the information that had been provided to them in the 911 call— a description and location of Mr. Lucha. Later, after Mr. Lucha had already been seized and was surrounded by at least a dozen officers on the sidewalk, Ex. C at 9:00, other officers attempted to reach the caller to convince her to participate in a show up identification of Mr. Lucha. These officers had difficulty reaching her and described the caller as "uncooperative." Ex. E. While the caller was eventually located, though never identified by name, it was already too late— the NYPD had already significantly infringed on Mr. Lucha's liberty.

Like in Freeman, the caller's detailed description of Mr. Lucha and his location only served to correctly identify Mr. Lucha but did not render the accusation credible. Even if the police were to believe that the caller really was a former friend or neighbor of the Mr. Lucha, they had no way of assessing whether this was true and took no steps to do so before stopping him. By refusing to identify herself when asked, the caller actively tried to ensure that the police could not hold her accountable if she had been falsely accusing Mr. Lucha, to harass him or further a personal grudge.

Significantly, here, as in Freeman, this was not a report of an "ongoing emergency" such as an assault in progress or a reckless and dangerous drunk driver on the road entitling the anonymous tip to "a higher degree of reliability" or removing the need for additional corroboration.  Freeman, 735 F.3d at 100; cf. Navarette v. California, 572 U.S. 393 (2014) (finding that a 911 call about a drunk driver running a motorist off the highway conferred

19

A000045

reasonable suspicion under the circumstances).[6]  The caller here simply reported that Mr. Lucha was in possession of a firearm inside of his bag— conduct that is not necessarily unlawful.[7] The caller did not allege that Mr. Lucha had used or wielded the gun in any way that would create an emergency. See Ex. B. The lack of exigency or even illegality means that the police could have and should have investigated and attempted to assess the credibility of the informant and the totality of the circumstances before infringing on Mr. Lucha's rights. See United States v. Muhammad, 463 F.3d 115 (2d Cir. 2006) (holding that if Mr. Muhammad had been stopped based on the a 911 tip about a firearm alone, the stop would have been invalid under the Fourth Amendment, however, under the totality of the circumstances, the arresting officers had reasonable suspicion because of Muhammad's evasive behavior and flight, the officers' personal observations of Muhammad prior to the stop, and two of the arresting officers' prior knowledge and suspicions of Muhammad.)

Nothing about Mr. Lucha's behavior as officers approached was suspicious and the officers were not justified in stopping him based on the tip or the overall totality of the circumstances.

c. **The evidence obtained from Mr. Lucha as a result of an unlawful seizure must be suppressed as "fruit of the poisonous tree."**

Because the police did not have reasonable suspicion to stop and seize Mr. Lucha,

---

[6]Notably, the call at issue in Navarette was never actually anonymous—the caller provider her name in her 911 call to the original dispatcher— however this call was not played at the suppression hearing at issue in this case. See THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent, v. Lorenzo Prado NAVARETTE and Jose Prado Navarette, Defendants and Appellants., 2012 WL 10206269 (Cal.App. 1 Dist.), 9, fn. 2.
[7] The New York Handgun Application, available here: https://licensing.nypdonline.org/new-app-instruction/,  details circumstances in which an individual may lawfully be permitted to carry a firearm.

20

A000046

the resulting search, which yielded a handgun and a cellphone, was unlawful. These materials, along with statements made by Mr. Lucha after the stop, must be suppressed. See United States v. Jarvis, No. 18 Cr. 475 (PAC), 2019 WL 1932758, at *4 (S.D.N.Y. Apr. 30, 2019) (suppressing handgun recovered following unlawful stop and arrest); Bristol, 819 F. Supp. 2d at 144–45 ("Because the vehicle stop in this case was impermissible, the Officers' search of [the defendant's] person and the subsequent seizure of the firearm are tainted as fruit of the poisonous tree.").

"Evidence obtained by exploitation of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'" United States v. Morales, 788 F.2d 883, 885 (2d Cir. 1986) (citing Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)). See also United States v. Zayas, No. 22 Cr. 178 (NSR), 2022 WL 16737223, at *5 (quoting United States v. Cacace, 796 F.3d 176, 188 (2d Cir. 2015)). Both the "fruit of the poisonous tree" doctrine and the policy underlying it require suppression of the evidence seized from Mr. Lucha. "[W]hen there is a close causal connection between illegal conduct and evidence obtained as a result of that conduct, 'not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.'" Id. at 552 (internal citation omitted).

For these reasons, this Court should suppress the firearm and cellphone recovered from Mr. Lucha, as well as his statements after the seizure. To the extent that the Government raises factual disputes as to the information available to and known by NYPD officers before they seized and searched Mr. Lucha, the Court should hold an evidentiary hearing.

Dated: New York, New York
February 3, 2023

DAVID E. PATTON, ESQ.

Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA EL LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.:  (212) 417-8735


/s/_____
**ZAWADI S. BAHARANYI, ESQ.**
Of Counsel.

TO:     **DAMIAN WILLIAMS, ESQ**.

        United States Attorney

        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn.: **ASHLEY NICOLAS**, **ESQ.**
        Assistant United States Attorney

22

A000048

# EXHIBIT A

### The PEREZ Gun Recoveries

11.    As described above, at least six of the Firearms have been recovered outside South Carolina.  On two occasions, PEREZ was present at the time the firearms were seized:

      a.    Based on my review of NYPD reports and 911 reports as well as ATF trace reports, I have learned that, on or about October 1, 2020 —during October Purchase-1 — VEREEN purchased a Canik TP9 9mm hand gun, Serial Number 20CB25810 (the "Canik").  On or about June 23, 2021, the NYPD arrested PEREZ after a 911 caller reported that a man matching PEREZ's description was carrying a handgun in a blue "man bag" in the vicinity of Gun Hill Road in the Bronx, New York.  The 911 caller reported that the caller knew the man as "Lucha."  The NYPD responded and apprehended PEREZ shortly thereafter.  At the time of his arrest, law enforcement seized and searched a small blue bag being carried by PEREZ and recovered the Canik, which was loaded.

      b.    Based on my review of ATF trace reports and reports prepared by law enforcement officers in Wakefield, Massachusetts (the "Massachusetts Officers"), I know that, on or about July 23, 2020, VEREEN purchased a Glock Model 44, .22 caliber pistol, Serial Number AELY222 (the "Glock .22"), from an FFL in South Carolina.  On or about July 3, 2021, the Massachusetts Officers recovered the Glock .22, along with seven other firearms, during a traffic stop and vehicle search in Wakefield, Massachusetts.[2]  The individuals arrested by the Massachusetts Officers during the

---

[2] During a search of the vehicles, the Massachusetts Officers recovered, among other things, a total of eight firearms, over 1,000 rounds of ammunition of different calibers, and 11 bulletproof vests.

7

2017.08.02

# EXHIBIT B

## 911 Call

# EXHIBIT C

Body Worn
Camera

# EXHIBIT D

# PBBX Gun Enhancement Check List

Boro Log# _____

A/O Cmd/Name/ Tax #: PO Cotter 962327 52pot

Arrest #/Pct/Location : B21616962          Radio Run : Yes/No # 201062322503

Perp Pedigree          Type of Gun  .9mm Century Arms

Name          Steven Perez

Address          3318 Perry Ave Apt 4C Bronx, NY

DOB          5/7/90

NYSID #          10636087J

E-Justice Check:  Det Cito

Open Fel Cases          8

Fel Convictions          0

Brief Description of Arrest          radio run of man with firearm, Stopped perp matching description gun recovered with positive ID by caller

Video Canvass Conducted?          (YES)/NO          Cameras Observed at: 3318 Perry ave.

Supervisor Conducting Canvass : NO

Video Obtained?          YES/(NO)

Location Obtained

Cellphone Possessed?          (YES)/NO          Vouchered as Evidence? (YES)/NO

ECT Responded to swab Gun?          (YES)/NO          If Yes; Tech Name PO Cerda

PDU Dat Notified          Det Zito

Trigger-Lock Del Notified          6/03/21

Perp Debriefed By          Det Zito

## Must be faxed to the Boro Wheel 718-716-9452,
## the Boro PIMS Unit 718-901-0491
## and send to the ADA writing up the gun arrest

USAO_0012163

A000054

# EXHIBIT E

Radio Run

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

STEVEN PEREZ, a/k/a "Lucha,"

Defendant.

22 Cr. 644 (JSR)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO DEFENDANT STEVEN PEREZ'S MOTION TO DISMISS AND
MOTION TO SUPRESS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ashley C. Nicolas
Madison Reddick Smyser
Lucas Issacharoff
Assistant United States Attorneys
    *Of Counsel*

A000056

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................... 1

**FACTUAL BACKGROUND** ........................................................ 2

**ARGUMENT** ........................................................................... 3

   I. Section 922(a)(3) Is Constitutional................................................ 3

   A.   Legal Standard—*Heller*, *McDonald*, and *Bruen* ........................... 4

   B.   The Second Amendment's Text Does Not Cover Lucha's Conduct ................ 7

   C.   Section 922(a)(3) Fits Within This Nation's Historical Tradition of Firearms Regulation 12

   II. The Court Should Deny Lucha's Motion to Suppress ...................... 16

   A.   Relevant Facts.................................................................. 17

   B.   Legal Standard ................................................................. 18

   C.   There Was Reasonable Suspicion to Support the *Terry* Stop ............................ 20

      1.   The 911 Call Was Reliable and Justified the Stop.......................... 20

      2.   The Officer's Personal Observations Justified the Stop ......................... 23

**CONCLUSION** ...................................................................... **24**

A000057

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. White*, 496 U.S. 325 (1990) ......................................................... 25, 26, 28

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ............................................................... 4

*Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016).......................................................... 25

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................. passim

*Florida v. J.L.*, 429 U.S. 266 (2000).................................................................... 27, 28

*Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49 (2d Cir. 2016) ............................. 6

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) ............................................... 12, 21

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............................................... 5, 10

*Miller v. Bonta*, No. 3:19 Civ. 1537 (S.D. Cal. 2022) ................................................ 18

*Navarette v. California*, 572 U.S. 393 (2014)............................................. 25, 26, 27, 28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)...................... passim

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ............................................................... 9

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ....................... 16, 17, 18

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................... 24, 26, 29

*United States v. Arvizu*, 534 U.S. 266 (2002) ........................................................... 29

*United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014) ................................................ 25

*United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) ................................................... 6

*United States v. Bold*, 19 F.3d 99 (2d Cir. 1994)...................................................... 29

*United States v. Bryant*, 711 F.3d 364 (2d Cir. 2013) ................................................. 4

*United States v. Cortez*, 449 U.S. 411 (1981)........................................................... 26

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012).......................................... passim

*United States v. Flores*, No. H-20-427, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023)............ 12, 14

*United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017)........................................ 11, 12

A000058

*United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013) ......................................... 27, 28

*United States v. Gonzales*, No. 22 Cr. 54, 2022 WL 17583769 (D. Utah Dec. 12, 2022) ........... 14

*United States v. Gonzalez*, 111 F. Supp. 3d 416 (S.D.N.Y. 2015) ................................ 30

*United States v. Hawkins*, 37 F.4th 854 (2d Cir. 2022) ........................................ 24

*United States v. Holton*, No. 21 Cr. 482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)........ 14

*United States v. King*, No. 22 Cr. 215, 2022 WL 17668454 (E.D. Pa. Dec. 14, 2022).......... 13, 14

*United States v. Reyna*, No. 21 Cr. 41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022)........ 14, 15

*United States v. Salerno*, 481 U.S. 739 (1987) .............................................. 4

*United States v. Tita*, No. RDB-21-0334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) ....... 12, 14

*United States v. Twiss*, 758 F. App'x 127 (2d Cir. 2018) ...................................... 27

*United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) ....................................... 25, 26

**Statutes**

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ......................................... 9

15 The Public Records of the Colony of Connecticut (1890)................................... 19

3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* (1810) .............................................. 19

6 *Statutes at Large of Pennsylvania from 1682 to 1801* (1899) ................................. 18

*Colonial Laws of Massachusetts Reprinted from the Edition of 1672* (1890).............................. 19

*Laws and Ordinances of New Netherland, 1638-1674* (1868) ................................... 18

Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (1823) ............................................. 17

*The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* (1835) ...................................................... 19

**Other Authorities**

1 Trumbull, *Public Records of the Colony of Connecticut* ......................................... 17

A000059

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Don't Lie for the Other Guy*, http://www.dontlie.org/faq.cfm (accessed Feb. 22, 2023)......................................................... 2

Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees/state?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2022&ffl_date_month%5Bvalue%5D%5Bmonth%5D=6&field_state_value=NY (accessed Feb.17, 2023) ................................................................... 11

David M. Kennedy et. al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147 (1996)......................................... 15

James Whisker, *The Gunsmith's Trade* (1992)............................................................................. 19

Lois Schoewer, *Gun Culture in Early Modern England* (2016)................................................... 20

S. Rep. No. 89-1866 (1966)......................................................................................................... 21

S. Rep. No. 90-1097 (1968)......................................................................................................... 15

U.S. Const. amend. II.................................................................................................................... 8

Webster's 1828 American Dictionary of the English Language .................................................. 10

A000060

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendant Steven Perez's, a/k/a "Lucha" (hereinafter, "Lucha"), pretrial motions to dismiss and to suppress. *See* Dkt. No. 22 ("Def. Mot."). On November 30, 2022, Lucha was charged in Count Three of a three-count indictment (the "Indictment"), with receiving or transporting into his state of residence at least one firearm that was obtained outside his state of residence, in violation of 18 U.S.C. § 922(a)(3). *See* Dkt. No. 2. The charges arose from Lucha's importation into his state of residence (New York) firearms that had been straw-purchased in a state other than his state of residence (South Carolina).

Lucha now moves (1) to dismiss Count Three of the Indictment, arguing that Section 922(a)(3) unconstitutionally restricts his Second Amendment rights; and (2) to suppress physical and testimonial evidence from his June 23, 2021 arrest, arguing that the police lacked reasonable suspicion to stop and search him. For the reasons discussed below, the Court should deny Lucha's motions.

The Court should reject Lucha's argument that Section 922(a)(3) is unconstitutional under the Second Amendment. The prohibition on importation of firearms from other states without a federal firearms license is the sort of commercial restriction on sale that the Supreme Court has repeatedly endorsed, and one that does not work any impairment on an individual's right to lawfully bear arms in self-defense. To the extent that Section 922(a)(3) does implicate the Second Amendment, it fits within this country's historical tradition of firearms regulation—including historical restrictions on the sale of firearms and gunpowder.

The Court should also deny Lucha's motion to suppress the gun without a hearing because, based on undisputed facts, law enforcement had reasonable suspicion to stop Lucha based on a reliable 911 call reporting that he had a gun in his bag, as well as a corresponding radio run and body camera footage capturing the encounter. If the Court does not find that these facts alone give

1

A000061

rise to reasonable suspicion, it should hold a hearing in which an officer is expected to testify that he saw a heavy bulge consistent with a firearm in Lucha's bag.

## FACTUAL BACKGROUND

As charged in Counts One and Two of the Indictment, between in or about May 2020 and in or about November 2020, Keith Vereen ("Vereen") purchased at least 25 firearms from federal firearm licensees ("FFLs") in South Carolina on behalf of others. In other words, Vereen made "straw purchases" by representing to the FFLs that he was the true purchaser of the firearms when, in fact, he was making the purchases on behalf of others. "Straw purchasing" is a common way for those who would be otherwise prohibited from purchasing firearms to circumvent firearms regulations by obtaining guns through an individual—like Vereen—who appears to be a legitimate purchaser and is willing to make false representations about the nature of the purchase, often in exchange for a fee. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Don't Lie for the Other Guy*, http://www.dontlie.org/faq.cfm (accessed Feb. 22, 2023).

After buying the firearms in South Carolina, Vereen made at least four trips from South Carolina to New York in order to deliver the firearms to their true purchasers. On at least three occasions, at or about the time of his trips to New York, Vereen received wire payments from check cashing facilities in the Bronx, New York. These payments were sent by New York state residents who were the true purchasers of the firearms. Before and after the purchases, Vereen consistently communicated with those for whom he was buying the guns. For example, on or about September 22, 2020, "Steven Perez"—that is, Lucha—sent $350 from a check cashing facility in the Bronx to Vereen in South Carolina. Days later, on or about October 1, 2020, Vereen bought five firearms in South Carolina, including a Canik TP9 9mm handgun (the "Canik"). The next day, on or about October 2, 2020, Vereen traveled to New York to deliver guns. During the thirteen-day period between on or about September 21, 2020 and on or about October 3, 2020, Vereen and

Lucha communicated by cellphone at least sixteen times.

As evidence of Lucha's importation of straw-purchased firearms into New York, the Government intends to introduce at trial, among other things, records of phone communications and a wire payment from Lucha to Vereen. In addition, the Government intends to introduce evidence of at least two occasions on which Lucha possessed guns bought by Vereen in South Carolina. Specifically, the Government would show that (1) on or about June 23, 2021, Lucha was in possession of the Canik in the Bronx, and (2) on or about July 3, 2021, during a traffic stop in Massachusetts, Lucha and others were in possession of eight firearms, including a Glock Model 44, .22 caliber pistol, which had been purchased by Vereen on or about July 23, 2020, in South Carolina.

On February 4, 2023, Lucha filed motions seeking (1) to dismiss Count Three of the Indictment, arguing that Section 922(a)(3) unconstitutionally restricts his Second Amendment rights; and (2) to suppress physical and testimonial evidence from his June 23, 2021 arrest, arguing that the police lacked reasonable suspicion to stop and search him.

## ARGUMENT

### I.  Section 922(a)(3) Is Constitutional

Lucha argues, based upon the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that Count Three of the Indictment must be dismissed because Section 922(a)(3) is unconstitutional. He is incorrect.

As an initial matter, Lucha does not specify whether his claim is that Section 922(a)(3) is unconstitutional on its face or as applied to him. To the extent Lucha brings a facial challenge, such a challenge can succeed only if "no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987)—*i.e.*, only if the law is unconstitutional in all its applications, *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Lucha

3

**A000063**

cannot make such a showing. Section 922(a)(3) generally makes it unlawful "for any [unlicensed] person . . . to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State," subject to certain exceptions not applicable here. Section 922(a)(3) would unquestionably be constitutional as applied, for example, to a person who imported "dangerous and unusual weapons" from out of the state, *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)), or who imported weapons as part of a criminal enterprise, *Heller*, 554 U.S. at 608, 612 (explaining that the Second Amendment does not protect the right to keep and bear arms for an "unlawful" or "unjustifiable purpose"); *United States v. Bryant*, 711 F.3d 364, 370 (2d Cir. 2013) ("[T]he Second Amendment does not protect the *unlawful* purpose of possessing a firearm [in violation of 18 U.S.C. § 924(c)].").

The Court need not take up any potential facial challenge because the law is constitutional as applied to Lucha. *See United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012) (finding Section 922(a)(3) constitutional as applied to defendant and holding that "a defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has necessarily failed to state a facial challenge, which requires him to establish that no set of circumstances exists under which the statute would be valid" (internal quotation marks and brackets omitted)). Here, Lucha's Second Amendment challenge fails on two fronts. First, as a minor restriction on the commercial sale and interstate transport of firearms aimed at unlawful purposes, Section 922(a)(3) does not burden the individual right to bear arms in self-defense. Second, even if the Second Amendment does apply, Section 922(a)(3) falls comfortably within this nation's historical tradition of firearm regulation.

### A.  Legal Standard—*Heller*, *McDonald*, and *Bruen*

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. At the

same time, the Court emphasized that "nothing in our opinion should be taken to cast doubt on," *inter alia*, "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. As the Court noted, it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Two years later, the Court "repeat[ed] th[e] assurances" that it had "made . . . clear in *Heller*." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

As courts applied *Heller* and *McDonald*, different methodological approaches emerged. In some cases, courts rejected Second Amendment claims based on the Supreme Court's reassurances in *Heller* and *McDonald* regarding the lawfulness of certain regulations. *See, e.g.*, *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (rejecting challenge to 18 U.S.C. § 922(g)(1)); *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016) (rejecting challenge to 18 U.S.C. § 922(g)(4)). In other cases, courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *i.e.*, whether "the regulation promotes an important [governmental] interest." *Bruen*, 142 S. Ct. at 2125-26. Notably, the Second Circuit used this approach in *Decastro*, finding that Section 922(a)(3) imposed only a minimal burden, if any, on the right to keep and bear arms, and thus did not trigger any form of heightened scrutiny. 682 F.3d at 168-69.

In *Bruen*, the Supreme Court considered a New York State law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which the Second Circuit upheld using the means-end framework. 142 S. Ct. at 2122-23, 2125. The Supreme Court reversed, rejecting the means-end test, *id.* at 2126-27, and reaffirming "*Heller*'s methodology centered on constitutional text and history," *id.* at 2128-29. Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers

A000065

an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

In assessing whether the Second Amendment's text covers an individual's conduct, a court must consider the "textual elements" of the Second Amendment's "operative clause," *i.e.*, "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 2134. In referring to "the right," the Second Amendment "codif[ied] a *pre-existing* right," *id.* at 2130, one that "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. The individual must be "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And the weapons at issue must be "[a]rms" within the meaning of the Second Amendment—"weapons 'in common use' today for self-defense." *Id.* (quoting *Heller*, 554 U.S. at 627). The individual's "proposed course of conduct" must be something "the plain text of the Second Amendment protects," *i.e.*, the conduct must constitute "keep[ing]" or "bear[ing]" arms. *Id.* at 2134-35.

If the Second Amendment's text covers an individual's conduct, "[t]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. This historical inquiry "will often involve reasoning by analogy." *Id.* at 2132. In determining whether a modern regulation and a historical regulation are "relevantly similar," courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *i.e.*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. Such "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. The inquiry

"requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

**B.     The Second Amendment's Text Does Not Cover Lucha's Conduct**

Under *Bruen*, the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court "explained in *Heller*, the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). Because nothing in Section 922(a)(3) infringes upon Lucha's ability to lawfully possess and carry weapons in self-defense, the Second Amendment's text does not cover his conduct.

"[T]he Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (alteration in original) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Instead, it provided that Protestants "may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, *Heller* explained, "[l]ike most rights, the right secured by

the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

*Heller* outlined several of the limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment. *Id*. It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or"—as relevant here—"laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And, as "another important limitation on the right to keep and carry arms," the Court said that the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627. Thus, *Heller* said, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625.

Interpreting the text of the Second Amendment as the Supreme Court has instructed, Section 922(a)(3) does not implicate Lucha's Second Amendment rights for two reasons. First and foremost, Section 922(a)(3) does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). But Section 922(a)(3) says nothing about a person's ability to possess a firearm for self-defense. As the Second Circuit has explained, Section 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Section 922(a)(3) likewise "does not bar purchases from an out-of-state supplier

if the gun is first transferred to a licensed gun dealer in the purchaser's home state." *Id.*; *cf. United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (denying Second Amendment challenge to Section 922(a)(5), which "prohibits only the transfer of a firearm by an unlicensed person to any other unlicensed person who resides in a different state than the state in which the transferor resides" and thus "does not operate to completely prohibit [the defendant] or anyone else, for that matter, from selling or buying firearms"). Indeed, at the time of Lucha's arrest in June 2022 there were 2,250 FFLs in New York—none of which he has alleged would not or could not sell him a firearm. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees/state?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2022&ffl_date_month%5Bvalue%5D%5Bmonth%5D=6&field_state_value=NY (accessed Feb.17, 2023).

The Supreme Court has repeatedly recognized that certain "conditions and qualifications on the commercial sale of arms" do not fall within the protections of the Second Amendment's text. *Heller*, 554 U.S. at 626-27. Section 922(a)(3) is one such condition. Although Section 922(a)(3) regulates the transport of firearms across state lines, it "only minimally affects the ability to acquire a firearm." *Decastro*, 682 F.3d at 164; *see also Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (denying Second Amendment challenge to Section 922(a)(3) and noting that "[t]he delay incurred if a handgun is purchased out of state and transferred to an in-state FFL is de minimis"). Such a de minimis condition on the manner in which a firearm may be acquired does not infringe upon the right of armed self-defense. *See Focia*, 869 F.3d at 1286 (upholding Section 922(a)(5), which "only minimally affects the ability to acquire a firearm"); *United States v. Flores*, No. H-20-427, 2023 WL 361868, at *5 (S.D. Tex. Jan. 23, 2023) (holding that "a *de minimis* burden on downstream possession rights" fails to "trigger *Bruen* scrutiny" in a Section

9

922(a)(1)(A) case); *see also, e.g.*, *United States v. Tita*, No. RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) (rejecting an argument that export controls on firearms implicated the Second Amendment in a Section 922(k) case); *United States v. King*, No. 22 Cr. 215, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (rejecting an argument that commercially "buying and selling firearms . . . is protected by the Second Amendment'" in a Section 922(a)(1)(A) case).

This de minimis burden is far less than that imposed by other regulations that *Bruen* indicated do not infringe upon an individual's Second Amendment right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by Chief Justice Roberts) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible—not to mention dependent to a significant extent on Section 922(a)(3)'s requirement that the interstate traffic in firearms be channeled through legitimate commerce—then Section 922(a)(3)'s prohibition on unlicensed importation of out-of-state firearms similarly falls outside of the Second Amendment's text because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

Post-*Bruen*, many courts that have analyzed whether conditions on the sale, transport, and receipt of firearms fall within the Second Amendment's text have held that they do not. *See, e.g.*, *Flores*, 2023 WL 361868, at *3–5 (holding that Section 922(a)(1)(A)'s prohibition on selling firearms without a license does not fall within the Second Amendment's text or protections); *King*, 2022 WL 17668454, at *3 (same); *United States v. Gonzales*, No. 22 Cr. 54, 2022 WL 17583769, at *2 (D. Utah Dec. 12, 2022) (same for Section 922(a)(1)(A)'s regulation of the sale of firearms and Section 924(n)'s prohibition on traveling to other states to acquire firearms in order to violate Section 922(a)(1)(A)); *Tita*, 2022 WL 17850250, at *7 (same for Section 922(k)'s prohibition on transporting, shipping, receiving, or possessing firearms with removed, altered, or obliterated serial numbers); *United States v. Reyna*, No. 21 Cr. 41, 2022 WL 17714376, at *3-5 (N.D. Ind. Dec. 15, 2022) (same); *United States v. Holton*, No. 21 Cr. 482-B, 2022 WL 16701935, at *3-4 (N.D. Tex. Nov. 3, 2022) (same). This Court should hold the same as to Section 922(a)(3).

Second, firearms purchased from out of state through illegitimate channels are "not typically possessed by law-abiding citizens for lawful purposes" and therefore fall outside the Second Amendment's text. *Heller*, 554 U.S. at 625. As Congress found in enacting Section 922(a)(3), the traffic of guns through mail order common carriers and non-resident sources "is a means which affords circumvention and contravention of State and local laws governing the acquisition of [firearms]." S. Rep. No. 90-1097, at 49 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2166. And studies suggest that guns purchased from out-of-state are more likely to quickly be involved in criminal activity. *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174 (1996). There is little reason why a law-abiding citizen, seeking a gun for law-abiding purposes, would not purchase a firearm through a licensed dealer in his home state, "which is

11

**A000071**

presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Regulations such as this, which are aimed at ensuring that firearms do not fall into the hands of criminals, do not generally violate the Second Amendment. *Cf. Reyna*, 2022 WL 17714376, at *5 (holding that although Section 922(k)'s prohibition on possessing firearms with obliterated serial numbers "reduces the pool of guns available" to law-abiding citizens, it does not fall within the Second Amendment's text because such guns are "useful for criminal activity" and "not typically possessed by law-abiding citizens for lawful purposes" (internal quotation marks omitted)).

The Second Amendment protects the right to keep and bear arms; it does not protect a right to import them or to acquire them without restriction. Section 922(a)(3)'s prohibition on unlicensed importation of firearms does not meaningfully affect, let alone infringe upon, the right to armed self-defense. And because illegally imported firearms are not typically possessed by law-abiding citizens for lawful purposes, the Second Amendment does not protect such weapons or their possession. Accordingly, Section 922(a)(3) does not implicate Lucha's Second Amendment rights, and his as-applied and facial challenges should be denied without further historical inquiry.

## C.  Section 922(a)(3) Fits Within This Nation's Historical Tradition of Firearms Regulation

If the Second Amendment does apply, Section 922(a)(3) remains constitutional because it "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Since the time of the founding, states have regulated how firearms and gunpowder can be traded and transported, particularly across state lines; Section 922(a)(3) is simply another example of this type of permissible regulation.

First and most notably, "colonial governments substantially controlled the firearms trade." *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc); *see generally Bruen*, 142 S. Ct. at 2127 (noting significance of "American colonial views leading up to the founding").

At least two American colonies prohibited the sale of firearms outside jurisdictional bounds. "Connecticut banned the sale of firearms by its residents outside the colony." *Teixeira*, 873 F.3d at 685 (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138-39, 145-46). And while Virginia law provided that all persons were at "'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting *this colony*,'" this liberty "did not, however, extend to sales to others." *Id.* at 685 n.18 (quoting Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 403 (1823)). In particular, "under Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Id.* at 685 (citing Acts of Assembly, Mar. 1676-77, 2 Hening, *supra* at 336-37). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-320 (1899) (1763 law); *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to Section 922(a)(3), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws restricting the import and sale of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller v. Bonta*,

13

No. 3:19 Civ. 1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 240-44 (1810). Similarly, Massachusetts and Connecticut prohibited the export of gunpowder without a license. *See Colonial Laws of Massachusetts Reprinted from the Edition of 1672*, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"). The city of Providence, meanwhile, prohibited the sale *within* Providence of gunpowder without a license—a direct historical precedent for Section 922(a)(3)'s requirement that firearms from out-of-state be sold through FFLs. *See The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor"). Providence's law was similar to England's 1638 Gunmaker's Law and subsequent legislation, which required all firearms manufactured domestically or imported to be inspected and approved by licensed entities of the state. *See* James Whisker, *The Gunsmith's Trade* 68-69 (1992); *accord* Lois Schoewer, *Gun Culture in Early Modern England* 4-25 (2016).

Although these statutes are not identical to Section 922(a)(3), they are "relevantly similar." *Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical *analogue*, not a historical *twin*." *Id.* at 2133. The ultimate question is "whether modern and

14

A000074

historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* In this case, the answer is yes.

As explained above, Section 922(a)(3) imposes a minimal "burden on the right of armed self-defense" because firearms are readily available within New York through licensed dealerships and such firearms are just as effective for self-defense as illegally imported firearms. That burden is no greater than the burdens imposed by historical laws relating to the sale of firearms and gunpowder. And neither the historical laws nor Section 922(a)(3) deprived citizens of the use of firearms for self-defense. *See Decastro*, 682 F.3d at 168 (Section 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything.").

Section 922(a)(3) is also "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws restricting sale of gunpowder without licenses were designed to protect citizens from explosions and render effective states' regulation of gunpowder manufacturers. Section 922(a)(3) serves similar purposes by preventing criminals from circumventing federal and state regulations on firearms purchases and firearms dealers. *See Mance*, 896 F.3d at 706 (noting Congress's conclusion that there was a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State," and these interstate purchases were accomplished "without the knowledge of . . . local authorities" (alteration in original) (quoting S. Rep. No. 89-1866, at 19 (1966))); *accord Decastro*, 682 F.3d at 168. Although Section 922(a)(3) does not reflect precisely the same legislative priorities as these historical

regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

The Court should reject any suggestion that a closer historical analogue is required than those the Government has offered. Such an argument reflects the precise analytical error that the Supreme Court rejected in *Bruen*: "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* That argument also effectively asks this Court not to "apply[ ] constitutional principles to novel modern conditions." *Id.* at 2134. But *Bruen* teaches that "the Second Amendment's historically fixed meaning applies to new circumstances," and thus the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132.

Section 922(a)(3) only minimally burdens the right to lawful armed self-defense, if at all, and thus does not implicate the Second Amendment. And even if it does, this minimal restriction compares favorably in both burden and justification to historical analogues regarding the sale and transport of firearms and gunpowder. Accordingly, Section 922(a)(3) is constitutional both as applied to Lucha and on its face.

## II.  The Court Should Deny Lucha's Motion to Suppress

On the evening of June 23, 2021, a 911 caller (the "Caller") reported that there was a man named Lucha carrying a gun in a blue bag, in the vicinity of Perry Avenue and 207th Street in the Bronx, New York. Within minutes, members of the NYPD (the "Officers") located Lucha and recovered the Canik from his blue bag, as well as a cellphone.

Lucha now seeks to suppress the Canik, the cellphone, and his post-arrest statements on the ground that the 911 call did not give rise to reasonable suspicion to support a *Terry* stop.

A000076

Because the undisputed facts captured by the recording of the 911 call, as well as a radio run and body-worn camera, show that the Officers had reasonable suspicion to believe that Lucha was unlawfully carrying a concealed firearm, the motion should be denied without a hearing. And in the event that the Court held a hearing, the anticipated testimony that an Officer observed a bulge consistent with a gun in Lucha's bag provides further reason that Lucha's motion should be denied.

### A.  Relevant Facts

On June 23, 2021, at approximately 9:52 p.m., the Caller called 911 to report "a man with a gun." Ex. A (911 Call) at 00:03. In response to questioning from the 911 dispatcher, the Caller— who identified herself as a former friend of the man—reported that the man's name was "Lucha," and that she "saw the gun." *Id.* at 00:45, 01:32. She said that Lucha hangs out outside her building, and that he has his gun with him "every day." She described Lucha as a 31-year-old, 5'2", Hispanic male with a medium-build and a mustache, wearing "a white shirt with black stripes on it, black pants, and a blue bag on his back and a black and white turban on his head." *Id.* at 00:02. The Caller narrated Lucha's movements, explaining to the dispatcher that Lucha was walking "down Gun Hill Road" with a gun in his blue purse-like bag, heading toward Perry Avenue. *Id.* at 00:22. She predicted that he would ultimately turn on 207th Street. *Id.* at 01:26. At the conclusion of the call, the dispatcher asked the Caller to provide her name. She declined. *Id.* at 03:12. The dispatcher then asked the Caller for her phone number. The Caller responded, "don't you already have it," and then proceeded to give her full phone number. *Id.* at 03:15.

As she was talking to the Caller, the dispatcher reported on a radio run to the Officers that there was a "male with a firearm" at "East Gun Hill Road and Perry." Ex. B (Radio Run) at 00:12. As she learned more from the Caller, the dispatcher relayed additional information, including that the man goes by the name "Lucha," *id.* 00:34, that he was "Hispanic wearing a . . . white shirt with black stripes, black and white turban, has a mustache, wearing black and white sneakers, medium

17

build, 5'2", light skin," and that he was "turning on Perry towards . . . 207th Street." *Id.* at 02:08-02:22.

About four minutes after the 911 call, two of the Officers ("Officer-1" and "Officer-2") encountered a man dressed exactly as described by the Caller, wearing a blue crossbody bag, standing exactly where the Caller had predicted—at the southwest corner of Perry Avenue and East Gun Hill Road. Ex. C (Officer-1 Body-Worn Camera) at 01:01.

The Government expects that at a hearing, Officer-1 would testify that, as he approached the individual, he observed that the bag appeared heavy and had a bulge in it. As captured on his body-worn camera, Officer-1 performed a pat-down of the bag, while Officer-2 grabbed and held Lucha's arm for approximately five seconds. *Id.* at 1:06. The Government expects that Officer-1 would testify that, during the pat-down, he felt a hard L-shaped object which he believed to be a gun. Officer-1 signaled his suspicion to Officer-2 by saying "92," indicating that he felt a firearm. *Id.* at 01:11. Officer-2 then placed Lucha in handcuffs while Officer-1 removed the bag from Lucha's person. While Officer-1 was removing the bag, Lucha stated, "That's my arm . . . it's my constitutional right to carry." *Id.* at 01:25-01:33. Officer-1 looked inside using a flashlight and saw the Canik. *Id.* at 02:12. Officer-2 asked Lucha if he had a permit for the gun, to which he responded that he did not "need a permit" to carry a gun. *Id.* at 02:16. Lucha then confirmed to the Officers that his name was "Lucha El." *Id.* at 02:23.

While Officer-1 and -2 were interacting with Lucha, other Officers brought the Caller to the scene where, at approximately 10:06 p.m., she confirmed that Lucha was the man whom she had seen with a gun. *Id.* at 10:17. Officer-2 then placed Lucha under arrest.

### B.     Legal Standard

Lucha's motion to suppress is governed by the familiar standard of *Terry v. Ohio*, 392 U.S. 1 (1968). "To conduct a *Terry* stop—that is, a temporary detention of an individual—a police

officer must have reasonable suspicion that the individual has engaged in or is about to engage in criminal activity." *United States v. Hawkins*, 37 F.4th 854, 857 (2d Cir. 2022). "To support an accompanying frisk for weapons, the officer must also have reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016).

"The reasonable suspicion standard is not high." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc). It is a standard that requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot and that the person stopped *may* be armed and presently dangerous." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (first emphasis added). Although reasonable suspicion must be supported by more than a "hunch," the standard is "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014). While officers may rely on information provided by others—including informants—in finding reasonable suspicion to effect a stop, that information must bear indicia of reliability. *See id.* at 396-97 (evaluating reliability of 911 calls); *Alabama v. White*, 496 U.S. 325, 330-31 (1990) (evaluating information provided by anonymous tipster).

"In determining whether an officer has an objective basis for his conduct, the Court must view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene," with a recognition that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Weaver*, 9 F.4th at 140–41; *see also United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[T]he assessment must be based [not] upon . . . library analysis by scholars, but as understood by those versed in the field of law enforcement."). "When an officer is justified in believing that the individual whose suspicious

19

A000079

behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer is authorized "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

### C. There Was Reasonable Suspicion to Support the *Terry* Stop

Because the Officers had reasonable suspicion to stop Lucha based upon the content and reliability of the 911 call, a hearing is unnecessary. If the Court holds a hearing, the Officers' personal observations, including seeing a bulge in Lucha's bag, further show that there was reasonable suspicion to justify the stop.

### 1. The 911 Call Was Reliable and Justified the Stop

Although "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity," it is possible for a tip to demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." *White*, 496 U.S. at 327, 329. A tip received through a 911 call may bear such sufficient indicia of reliability where (i) the caller demonstrates a personal basis of knowledge, (ii) the caller's report is contemporaneous with the caller's observations, and (iii) the caller's uses a formal 911 system with tracing and recording capabilities that will act as a deterrent to false tipsters. *See Navarette,* 572 U.S. at 398-401; *accord United States v. Twiss*, 758 F. App'x 127, 129 (2d Cir. 2018). The Caller's tip, which had all of these characteristics, was reliable and provided reasonable suspicion that Lucha was engaged in criminal activity.

*First*, the Caller was an eyewitness. *See Navarette*, 572 U.S. at 399 (finding anonymous tip reliable where "the caller necessarily claimed eyewitness knowledge"). She not only reported that a man "had a gun," but she also explained *how* she knew this: she "saw the gun." She used to be friends with the 31-year-old named Lucha, and as a result, she knew that he carried the gun "every day." This is not a case—such as *United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013), on

which Lucha relies—"where the tip provided no basis for concluding that the tipster had actually seen the gun." *Navarette*, 572 U.S. at 399 (distinguishing *Florida v. J.L.*, 429 U.S. 266, 271 (2000), in which a "bare-bones tip" reported that a young black male in a plaid shirt standing at a bus stop had a gun); *see also Freeman*, 735 F.3d at 94 (explaining that 911 dispatcher was unable to confirm whether caller "actually saw a firearm").

*Second*, the Caller called 911 at the time she saw Lucha with the gun. *See Navarette*, 572 U.S. at 399 (finding anonymous tip reliable where "the caller reported the incident soon after" it occurred). She explained that the gun was inside his blue, "purse-like" bag and that she was "watching" him. She described what he was wearing and provided updates on where she saw him walking (down East Gun Hill Road to Perry Avenue) and where she expected him to go (to 207th Street). *See White*, 496 U.S. at 332 (finding anonymous tip reliable where caller predicted defendant's "*future behavior*, because it demonstrated inside information—a special familiarity with [the defendant's] affairs"). The Officers encountered Lucha shortly thereafter dressed exactly as had been reported and in the expected location.

*Third*, the 911 call was recorded and could be traced—a fact the Caller acknowledged. As the Supreme Court explained in *Navarette*, "use of the 911 emergency system" is an "indicator of veracity" because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." 572 U.S. at 400. Further, the Caller appeared to *know* that her call could be traced. While she declined to provide her name to the dispatcher, she reacted with incredulity at the dispatcher's request for her phone number, stating, "don't you have it already," before providing her phone number in full.

This case is different from *Freeman*, a case on which Lucha relies extensively and which the Second Circuit decided before *Navarette*. In *Freeman*, "'nothing [was] known about the

21

informant,'" and there was "no way of knowing whether the consequences for false reporting at all influenced [the] caller to tell the truth." 35 F.3d at 98 (quoting *J.L.*, 529 U.S. at 268). On top of that, the Second Circuit was concerned that, throughout the case, the caller's identity was "still unknown, leaving no way for the police (or the reviewing court) to determine her credibility or reputation for honesty." *Id.* None of those potentially concerning circumstances are present here. The Caller stated that she was Lucha's friend and provided her phone number. And, although it occurred minutes after the stop, the Officers brought the Caller to the scene to identify Lucha.

Assessing the totality of the circumstances, the 911 call is reliable and provides reasonable suspicion that Lucha was involved in criminal activity that required prompt police action. *See Terry*, 392 U.S. at 24, *United States v. Bold*, 19 F.3d 99, 104 (2d Cir. 1994) ("Where the tip concerns an individual with a gun, the totality-of-the-circumstances test . . . should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation.").

Lucha argues that his conduct—carrying a concealed firearm on a public street—is "not necessarily unlawful." Def. Mot. at 20. But that is not the relevant question. The low bar of reasonable suspicion "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). That is, just because it was possible that Lucha may have been —but was not—one of the few residents of New York City with a permit to carry a concealed firearm outside his home or business, the Officers were not required to ignore the likelihood that Lucha's possession was unlawful. Nor were the officers required to eliminate any possibility of "innocent conduct" before responding to the exigency created by a 911 call reporting a man with a gun wandering a public street at 10 p.m. As a result, Lucha's motion should be denied without a hearing.

22

**A000082**

## 2. The Officer's Personal Observations Justified the Stop

Even if the Caller's tip alone was insufficient to support the stop, the Officers' observations provided sufficient grounds for a *Terry* stop. The Government anticipates that, at a hearing, Officer-1 would testify that shortly after the 911 call was made, he approached Lucha—a man matching the Caller's reported description and location—and observed that the bag he was wearing was heavily weighted and bore a bulge. Based on his training and experience, Officer-1 believed that the bag may have contained a firearm. Courts have repeatedly held that "an anonymous tip about a gun that has been corroborated by police observation of a bulge" gives rise to reasonable suspicion sufficient to justify a *Terry* stop. *United States v. Gonzalez*, 111 F. Supp. 3d 416, 429 (S.D.N.Y. 2015); *see also id.* at 429-30 (collecting cases). Therefore, if the Court does not find that the 911 call alone justified the stop, it should hold a hearing.

23

A000083

## CONCLUSION

For the foregoing reasons, Lucha's motion to dismiss the indictment against him and his motion to suppress should be denied.

Dated:  New York, New York
         February 28, 2023

                                   Respectfully submitted,

                                   DAMIAN WILLIAMS
                                   United States Attorney for the
                                   Southern District of New York


                          By:      /s/
                                   Ashley C. Nicolas
                                   Madison Reddick Smyser
                                   Lucas Issacharoff
                                   Assistant United States Attorneys
                                   (212) 637-2467 / 2381 / 2737

A000084

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x
                                                    :
                                                    :
**UNITED STATES OF AMERICA**                        :
                                                    :
**- v -**                                           :        22 Cr. 644     (JSR)
                                                    :
**LUCHA EL POR LIBERTAD**,                          :
                                                    :
                         Defendant.                 :
--------------------------------------------------- :
                                                    x

## REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT LUCHA EL'S PRETRIAL MOTIONS

**DAVID E. PATTON, ESQ.**
Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA    EL    POR
LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8735

**ZAWADI BAHARANYI**
**AMANDA MAYO**
 Of Counsel

TO:   **DAMIAN WILLIAMS, ESQ**.
      United States Attorney Southern
      District of New York One. St.
      Andrew's Plaza
      New York, New York 10007
      Attn:  **ASHLEY NICOLAS, ESQ.**
             **MADISON REDDICK SMYSER ESQ.**
             **LUCAS ISSACHAROFF ESQ.**
             Assistant United States Attorneys

A000085

## TABLE OF AUTHORITIES

**Cases**

District of Columbia v. Heller, 554 U.S. 570 (2008)........................................ 3

Florida v. J.L., 529 U.S. 266 (2000) ............................................. 10, 11, 12

New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022)...................... *passim*

Pinner v. State, 74 N.E. 3d 226 (Ind. 2016).................................................. 11

United States v. Decastro, 682 F.3d 160 (2d Cir. 2012) ................................. 2

United States v. Flores, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023)............................ 4

United States v. Freeman, 735 F. 3d 92 (2d Cir. 2013) .................................... 10

United States v. Gonzalez, 2022 WL 17583769 (D. Utah Dec. 12, 2022) ..................... 4

United States v. King, 2022 WL 17668454 (E.D. Pa. Dec. 14, 2022) .......................... 4

United States v. Price, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022)....................... 5

United States v. Twiss, 758 F. App'x 127 (2d Cir. 2018) ..................................... 11, 12

**Statutes**

18 U.S.C. § 922......................................................................... *passim*

**Other Authorities**

Shawn E. Fields, Stop and Frisk in a Concealed Carry World,
   93 Wash. L. Rev. 1675 (2018)............................................................ 11

Lucha El respectfully submits this reply memorandum of law in response to the government's opposition to his motion to dismiss and motion to suppress. For the reasons stated herein and in Mr. Lucha's moving papers, this Court should dismiss the indictment, as it violates Mr. Lucha's Second Amendment right to bear arms. Separately, this Court must suppress the firearm and cellphone taken from Mr. Lucha's person at the time of his June 2021 arrest, as well as any statements following his arrest, as they were obtained in violation of Mr. Lucha's Fourth Amendment rights.

**Reply to the Motion to Dismiss the Indictment**

In New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022), the Supreme Court announced a new framework for resolving Second Amendment challenges. Rejecting the approach lower courts had used for years, which involved balancing an individual's right to bear arms against the government's interest in gun regulation, the Supreme Court's new test required the government to prove that a challenged gun regulation is "consistent with this Nation's historical tradition of firearm regulation." Id. at 2126–29. Under this new test, the constitutional text and history became the *only* relevant considerations. As a result, the Court's decision in Bruen called into question the validity of all prior Second Amendment decisions that did not include a detailed historical analysis.

Mr. Lucha moved to dismiss the indictment in this case, arguing that 18 U.S.C. § 922(a)(3)—which prohibits an individual from possessing a firearm obtained from out of state—is unconstitutional. In its response, the government—which bears the burden of proving a national historical tradition of this form of regulation—does not cite a single founding-era law barring people from possessing guns based on the origin of the guns. Nor does it identify even one instance when a person in the founding era was specifically denied the right to possess a gun

1

A000087

based on where the gun was obtained. Instead, the government obfuscates the requirements of the <u>Bruen</u> test, relies almost entirely on pre-<u>Bruen</u>, abrogated Second Circuit law, and cites a series of laws that not only fail to be "distinctly similar" but are racist in their origin and application and cannot be the standard on which the Court upholds § 922(a)(3).

The government falls far short of establishing a historical tradition of laws preventing law-abiding citizens from possessing handguns obtained in other states. Accordingly, the Court should dismiss the indictment.

## I.      **<u>The Second Amendment clearly covers Mr. Lucha's alleged conduct.</u>**

The government repeatedly characterizes the burden imposed on Mr. Lucha's Second Amendment rights by § 922(a)(3)'s application to his alleged conduct as "minimal" or merely a "de minimis" one. (Opp. 5, 9, 10, 15, 16.) In doing so, the government draws extensively on the Second Circuit's analysis in <u>United States v. Decastro</u> which, applying means-end scrutiny, rejected a constitutional challenge to § 922(a)(3). 682 F.3d 160, 168 (2d Cir. 2012). (<u>See, e.g.</u>, Opp. 9 (arguing that § 922(a)(3) "'only minimally affects the ability to acquire a firearm'" (quoting <u>Decastro</u>, 682 F.3d at 164)).) But the government's reliance on <u>Decastro</u> is wrong because in <u>Bruen</u>, the Supreme Court abrogated <u>Decastro</u> along with every other circuit court decision engaging in means-end scrutiny rather than textual and historical analysis.

<u>Decastro</u> took three primary steps in its reasoning: (1) Heightened scrutiny is only appropriate for laws that substantially burden Second Amendment rights, and otherwise, means-end scrutiny is required; (2) because § 922(a)(3) does not substantially burden Second Amendment rights, means-end scrutiny is appropriate to evaluate the law; and (3) under means-end scrutiny, § 922(a)(3) survives because there is a reasonable basis for the law. 682 F.3d at 164, 168–69. But the Supreme Court has made clear that the fundamental basis for <u>Decastro</u>—reserving heightened

2

A000088

scrutiny for laws that substantially burden Second Amendment rights and employing "means-end analysis" for evaluating all other firearm laws—has been abrogated. Under <u>Bruen</u>, all laws that fall under the umbrella of the Second Amendment's plain text are subject to equivalent historical inspection, regardless of how substantially they impinge on Second Amendment rights. The Court's *only* inquiries are (1) whether the text of the Second Amendment covers the conduct in question, and (2) whether there is historical precedent for the regulation at issue. 142 S. Ct. at 2129–30. <u>Decastro</u> undertakes neither of these questions, neglecting to discuss in serious detail the text of the Second Amendment, and ignores entirely the lack of historical precedent for § 922(a)(3). It has therefore lost its entire legal foundation and accordingly, like the other pre-<u>Bruen</u> cases cited by the government, is no longer instructive.

Under the test that the Supreme Court laid out in <u>Bruen</u>, the relevant question is not whether there is a "minimal" or "de minimis burden" on Mr. Lucha but whether "the Second Amendment's plain text covers" his conduct. <u>Bruen</u>, 142 S. Ct. at 2129–30. The answer here is unequivocally yes.

The government does not dispute that (1) Mr. Lucha is among "the people" protected by the Second Amendment, <u>District of Columbia v. Heller</u>, 554 U.S. 570, 580 (2008), or (2) the firearms at issue are handguns, the type of "arm" to which the Second Amendment straightforwardly applies, <u>id</u>. at 628. And the conduct for which Mr. Lucha was arrested is his *possession* of handguns that had allegedly been purchased outside of New York when he "receive[d]" them in the state. 18 U.S.C. § 922(a)(3). The government's brief makes clear that Mr. Lucha's possession of these handguns is the exact conduct it seeks to criminalize, noting that it intends to introduce at trial "evidence of at least two occasions on which [Mr.] Lucha possessed guns bought by Vereen in South Carolina." (Opp. at 3.) The Supreme Court had "little difficulty

3

A000089

concluding" that "carrying handguns publicly for self-defense" is protected by the Second Amendment, Bruen, 142 S. Ct. at 2134, and that conclusion squarely applies here as well. Thus, Mr. Lucha's alleged conduct is "presumptively protect[ed]" by the Constitution. Id. at 2130.

The government provides two arguments for why Mr. Lucha's Second Amendment rights are not implicated by § 922(a)(3), both of which are easily dispatched. First, the government argues that § 922(a)(3) is a "condition" on the "commercial sale of arms," which does not fall within the protections of the Second Amendment. (Opp. at 9.) But Mr. Lucha is not being prosecuted for commercially selling firearms or firearms trafficking, regulated by different sections of § 922. As such, the government's reliance on post-Bruen case law (Opp. 11) upholding regulations of firearm licensing regimes is misplaced. In United States v. Flores, for example, the defendant was charged with dealing firearms without a license in violation of § 922(a)(1)(A); he moved to dismiss the indictment, arguing that he had "a Second Amendment right to commercially sell firearms." 2023 WL 361868, at *1 (S.D. Tex. Jan. 23, 2023). The court rejected this argument, holding that "commercial firearm dealing is not covered by the Second Amendment's plain text" while affirming that "[p]ossessing a firearm is protected conduct." Id. at *5; see also United States v. King, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (rejecting argument that "buying and selling firearms" is protected by the Second Amendment's plain text); United States v. Gonzalez, 2022 WL 17583769, at *2 (D. Utah Dec. 12, 2022) (rejecting motion to dismiss indictment for transfer of firearms without a license; defendant "put forth no arguments to demonstrate how the charged counts regulate or restrict . . . [his] ability to possess firearms for self-defense"). Mr. Lucha is charged with violating § 922(a)(3) for allegedly *possessing* firearms that were purchased in another state, placing his conduct squarely within the well-recognized ambit of the Second Amendment's plain text.

4

The government also cites to caselaw upholding § 922(k)'s prohibition on transporting firearms with removed, obliterated, or altered serial numbers. (Opp. at 11 (citing United States v. Tita, 2022 WL 17850250 (D. Md. Dec. 22, 2022); United States v. Reyna, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022); United States v. Holton, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)).) Yet a split in authority on this provision has emerged and, as another district court has recently held, § 922(k) "is not a commercial regulation" but "criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered." United States v. Price, 2022 WL 6968457, at *3 (S.D.W. Va. Oct. 12, 2022). As the court in Price noted in holding that § 922(k) prohibits conduct "fall[ing] squarely within the Second Amendment's plain text," when a "law-abiding citizen" can be "prosecuted federally for his possession" of a firearm, that is "the definition of an infringement on one's right to possess a firearm." Id. The same is true here:  Mr. Lucha's federal prosecution for the mere possession of a firearm allegedly purchased in another state falls directly within the realm of what the Second Amendment protects.

Second, the government's argument that "firearms purchased from out of state through illegitimate channels are 'not typically possessed by law-abiding citizens for lawful purposes'" (Opp. at 11 (citation omitted)), is beside the point. Section 922(a)(3) criminalizes the receipt, and therefore the possession, of any firearm obtained from another state, for any purpose (even self-defense). While it might be socially desirable to limit the receipt of out-of-state firearms because of their potential use in criminal activity, "the Supreme Court no longer permits such an analysis." Price, 2022 WL 6968457, at *3–4 (noting that § 922(k) criminalizes possession of firearms with obliterated serial numbers even if the possessor "has no ill intent and never takes any otherwise unlawful action with the firearm").

Thus, Mr. Lucha's alleged conduct of possession of a handgun received from out of state

5

is plainly covered by the Second Amendment's text, and it is "presumptively protect[ed]" by the Constitution unless the government can justify its regulation as consistent with the "historical tradition of firearm regulation." <u>Bruen</u>, 142 S. Ct. at 2129–30. The government has failed to do so.

## II.    <u>The government fails to understand the *Bruen* historical analysis test.</u>

In its opposition, the government insists that it is not required to identify a "historical twin" for § 922(a)(3), but merely a "historical analogue." (Opp. 14.) Indeed, the government goes so far as to instruct the Court to "reject any suggestion that a closer historical analogue is required than those the Government has offered." (<u>Id.</u> at 16.)  The government mischaracterizes—or simply misunderstands—the <u>Bruen</u> test and now asks the Court to do the same.

In <u>Bruen</u>, the Supreme Court established two different analytical frameworks for courts to use when evaluating Second Amendment challenges. The determination of which framework applies depends on the nature of the problem the challenged gun regulation was designed to address:

1. When analyzing a gun regulation directed at "a general societal problem that has persisted since the 18th century," courts must engage in a "straightforward historical inquiry," and the government must identify a tradition of "distinctly similar" founding-era regulations. <u>Bruen</u>, 142 S. Ct. at 2131–32.

2. By contrast, when analyzing gun regulations directed at "unprecedented societal concerns or dramatic technological changes"—that is, laws directed at problems that the Founders could not have anticipated—courts may engage in a "more nuanced" form of "analogical reasoning," and the government need only "identify a well-established and representative historical *analogue*, not a historical twin." <u>Id.</u> at 2132–33.

6

Put differently, Bruen endorsed "analogical reasoning," but only for "modern regulations that were unimaginable at the founding." Id. at 2132. When instead a regulation is one "that the Founders themselves could have adopted to confront [a] problem," the government must prove that founding-era legislatures actually did so. See id. at 2131.

Here, the Government makes no claim that the issue of people receiving and possessing firearms from outside of their jurisdictions was unimaginable at the founding. Instead, the government chooses to ignore Bruen's two-part framework and crafts its own test under which analogical reasoning *always* applies.

Notably, the Government's response, while heavily quoting Bruen's language about analogical reasoning, makes no mention of Bruen's test for "general societal problems that [have] persisted since the 18th century." Id. at 2131–32. The Government does not acknowledge that the Court must conduct a "straightforward historical inquiry," id. at 2131, and fails to address any of the three factors Bruen specifically identified as relevant to determining the constitutionality of a modern regulation directed at a longstanding societal problem: (1) "the lack of a distinctly similar historical regulation," (2) earlier generations' attempts to regulate the conduct at issue "by materially different means," or (3) the *rejection* (not passage) of "analogous regulations" at the time of the founding. Id. Indeed, reading the Government's response, one would be led to believe that that core portion of Bruen's holding did not even exist.

Unfortunately for the Government, merely ignoring half of the Bruen test—the relevant half in this case, no less—does not make it inapplicable. In sum, a straightforward reading of Bruen demonstrates that, when confronted with a modern gun regulation addressing a longstanding societal concern, the government cannot sustain its burden merely by identifying relevant historical analogues. Rather, the government must identify a tradition of distinctly similar founding-era

7

A000093

laws. Applying the test actually enunciated in <u>Bruen</u> here, the Government fails to meet its burden with regard to § 922(a)(3).

### III.  <u>The government has failed to meet its burden of establishing that § 922(a)(3) is consistent with the nation's historical tradition of firearm regulation.</u>

In attempting to meet its burden of establishing that § 922(a)(3) is consistent with a national historical tradition of firearm regulation, the government does not cite a single founding-era statute specifically barring people from possessing a firearm merely because the firearm was obtained out of state. The limited examples proffered by the government focus on the commercial sales of firearms and fail to establish a historical tradition of individuals being prohibited from possessing or using a firearm for self-defense (or other noncommercial purposes) because of the origin of the firearm.

The colonial-era examples provided by the government focus solely on regulations governing the commercial sale of firearms. (Opp. 12–13.) However, that "at least two American colonies prohibited the sale of firearms outside of jurisdictional bounds," and that the sale of firearms to Native Americans was criminalized by several colonies, fails to justify the government's attempt to regulate Mr. Lucha's possession of a firearm. The limited examples are inapposite here because, as discussed above, Mr. Lucha is not charged with the commercial sale of firearms or firearm trafficking. Rather § 922(a)(3) prohibits Mr. Lucha from possessing firearms—even for the purpose of personal self-defense—obtained from out of state. And no colony prohibited an individual from possessing a firearm for self-defense or any other non-commercial purpose merely because that firearm was obtained from another colony or jurisdiction.

Finally, the government writes that laws prohibiting the sale of firearms to Native Americans demonstrate that colonial legislatures were "concerned about the movement of

8

firearms between private parties and the dangers of firearms falling into the wrong hands." (Opp. 13.) It is shocking that the government chooses to cite to a narrow set of colonial era laws that not only fail to be "distinctly similar" to the regulation in question but are unquestionably racist. <u>Bruen</u> does not call on courts to rely on *any* historical tradition of firearm regulation. Otherwise African Americans, Native Americans, and other disfavored groups being routinely deprived of all rights under the Second Amendment because of racist beliefs about their dangerousness and worthiness would provide a basis for Courts to entirely gut Second Amendment protections for all.

The government has failed to identify a pattern of "distinctly similar" founding-era regulations making it illegal for an individual to possess a firearm because it was obtained from out of state, and therefore it has failed to meet its burden of establishing the constitutionality of § 922(a)(3) as applied to Mr. Lucha and on its face. The Court must therefore dismiss the indictment against Mr. Lucha.

<u>**Reply to the Motion to Suppress**</u>

I.    <u>**The anonymous tip was not reliable in its assertion of illegality.**</u>

The government argues that the NYPD had reasonable suspicion to stop Mr. Lucha based on a single tip from an anonymous caller alleging that Mr. Lucha was in possession of a firearm. However, while the tip in question was reliable in its "tendency to identify a determinate person"—here Mr. Lucha—the tip failed to reliably assert illegality, and therefore did not provide grounds for police to stop Mr. Lucha. <u>See</u> <u>United States v. Freeman</u>, 735 F. 3d 92 (2d Cir. 2013).

While the government is correct that the anonymous tipster called 911 while observing Mr. Lucha and accurately reported his physical appearance and public location to the 911 dispatcher, this means little in terms of the reliability of the tip. The caller failed to provide accurate predictive information for Mr. Lucha. When the dispatcher asked the anonymous caller if she knew where Mr. Lucha was headed, the caller responded unequivocally, "I don't know where he's headed." Def. Ex. B at 2:20–2:27.

In <u>Florida v. J.L.</u>, 529 U.S. 266, 272 (2000), the Supreme Court made clear that anonymous tips like this one—reporting on a suspect's "readily observable location and appearance"—fail to cross the reliability threshold. <u>Id</u>. Such details bear only on the reliability of the caller's identification of a particular person but fail to show that the tipster "has knowledge of concealed criminal activity." <u>Id.</u> These tips are unreliable in their assertion of illegality. <u>Id.</u> To the extent that the caller attempted to predict Mr. Lucha's movements by stating that he would "turn on 207 street"— she was wrong. Def. Ex. B at 2:07. Mr. Lucha was stopped while standing on Perry Avenue in front of his home. The anonymous caller's failure to accurately predict Mr. Lucha's movement is further proof that her tip was not sufficiently reliable to justify a <u>Terry</u> stop.

Furthermore, while the anonymous caller *claimed* to have seen the firearm in Mr. Lucha's

10

possession, she failed to provide any information that would establish that she had actually seen a gun. For example, the caller did not offer any details about the appearance of the gun, where she had seen the gun, or the circumstances of seeing the gun. Nor did police seek this information prior to stopping Mr. Lucha. Upholding this <u>Terry</u> stop based on the bare-boned tip by the anonymous caller would encourage the type of harassment that the Court in <u>J.L.</u> specifically warned against. <u>See</u> <u>id.</u> at 272 ("[A]n automatic firearm exception to our established reliability analysis would…enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun.").

Finally, the caller's tip that Mr. Lucha "had a gun" failed to actually allege any illegal conduct justifying a <u>Terry</u> stop. New York, like every other state in the Union, provides grounds for individuals to lawfully carry concealed weapons. [1] In New York City, there are at least seven different licenses and permits that allow an individual to legally possess a firearm. [2] Moreover, in the world post-<u>Heller</u>, states have grown increasingly permissive in their gun possession laws. The allegation of mere possession of a firearm, in a state where concealed carry is permissible, is therefore not by itself sufficient to justify a <u>Terry</u> stop. See <u>Pinner v. State</u>, 74 N.E. 3d 226, 232 (Ind. 2016) (Indiana Supreme Court held that tip that defendant was in possession of a firearm did not justify a <u>Terry</u> stop as officers had no reason to believe the possession of the firearm was in violation of state law).

<u>United States v. Twiss</u>, 758 F. App'x 127 (2d Cir. 2018), a post-<u>Heller</u> case cited by the

---

[1] Shawn E. Fields, Stop and Frisk in a Concealed Carry World, 93 Wash. L. Rev. 1675 (2018). Available at: https://scholarship.law.campbell.edu/fac_sw/154 ("[A]s of 2015, every state and the District of Columbia allows the public concealed carry of firearms.")

[2] New York Handgun Application, available at: https://licensing.nypdonline.org/new-app-instruction/ (listing seven different license and permit types in New York City).

11

A000097

government, provides an example of the type of circumstances involving a firearm that would give rise to reasonable suspicion to conduct a Terry stop.  In Twiss, the Second Circuit held that a stop was reasonable based on an anonymous tip that that the defendant and three others had confronted the callers in a hospital parking lot and displayed a firearm. Id. at 128. The callers drove away in fear following this confrontation. Id. at 129. The Court found that the confrontation and brandishing of a firearm, not merely the possession of a firearm, were sufficient to give rise to reasonable suspicion that criminal activity was afoot. "The tip gave rise to reasonable suspicion of ongoing criminal activity: menacing in the second degree… police thus had reason to believe that the suspects had 'intentionally place[d] or attempt[ed] to place' the callers 'in reasonable fear of physical injury ... by displaying a deadly weapon. N.Y. Penal Law § 120.14(1).'" Id. at 129.

Here, unlike in Twiss, the anonymous caller did not report that Mr. Lucha was involved in any assaultive or threatening conduct. She did not allege that Lucha had brandished or displayed a gun in public. She made no claim that Mr. Lucha was prohibited from possessing a firearm. The tip was merely the assertion that Mr. Lucha "had a gun" which is not sufficient to establish that he was or was about to be engaged in criminal activity justifying a stop. While the police need not rule out innocent conduct before performing a Terry stop, when acting on a tip there must at least be the assertion of some criminal conduct to justify the police intrusion, even where a firearm may be involved. There is no firearm exception to the requirement that there be reasonable articulable suspicion that *crime* is afoot. See J.L., 529 U.S. at 272 (rejecting a firearm exception to the Court's "reliability analysis" in anonymous tip cases.)

The anonymous caller's tip did not provide a sufficient basis for police to stop Mr. Lucha and the government's proffer that Officer-1 would testify to observing a bulge in Mr. Lucha's bag does not tip the scales towards justifying the seizure.  NYPD officers had no reason to believe

that Mr. Lucha was unlawfully in possession of a firearm or otherwise engaged in criminal activity at the moment that they physically restrained him. However, to the extent that the Court wishes to consider Officer-1's proffered observations, the defense requests an evidentiary hearing.

### Conclusion

The Court should grant Mr. Lucha's motion to dismiss because Mr. Lucha's prosecution violates the Second Amendment. Additionally, the Court should grant Mr. Lucha's motion to suppress the physical and testimonial evidence obtained through a violation of Mr. Lucha's Fourth Amendment rights.

Dated: March 6, 2023     Respectfully submitted,
   New York, New York

          _____/s/_____

          Zawadi Baharanyi, Esq.
          Amanda Mayo, Esq.
          Federal Defenders of New York
          52 Duane Street, 10th Floor
          New York, NY 10038
          (917) 612-2753

13

A000099

N3F5lucA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          22 Cr. 644 (JSR)

 5   STEVEN PEREZ, a/k/a "Lucha El",

 6              Defendant.

 7   ------------------------------x

 8                                          March 15, 2023
                                            2:10 p.m.
 9

10   Before:

11                      HON. JED S. RAKOFF,

12                                          U.S. District Judge

13

14                      APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  LUCAS ISSACHAROFF
17        ASHLEY C. NICOLAS
          MADISON SMYSER
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
20   BY:  ZAWADI BAHARANYI
          AMANDA J. MAYO

21

22

23

24

25
```

N3F5lucA

1          (Case called)

2          THE DEPUTY CLERK:  Will everyone please be seated, and

3     will the parties please identify themselves for the record.

4          MR. ISSACHAROFF:  Thank you, your Honor.  Lucas

5     Issacharoff for the government, joined by my colleagues,

6     Madison Smyser and Ashley Nicholas.

7          MS. BAHARANYI:  Good afternoon, your Honor.  Zawadi

8     Baharanyi for the Federal Defenders.  I am joined by my

9     colleague Amanda Mayo, also at the Federal Defenders.  We

10    represent Lucha El, who is seated to my right.

11         THE COURT:  So, we are here to, with respect to this

12    defendant, to hear argument on the motions that have been

13    filed.  There is both a motion to dismiss and a motion to

14    suppress.  Because I have somewhat limited time, I am going to

15    ask counsel not to repeat what is in their briefs, which I have

16    read, but just if there are new arguments they want to make or

17    responses to the other side's arguments that they didn't have

18    the opportunity to yet make, now is the opportunity, starting

19    with, let's take the motion to dismiss first.

20         So, let me hear from moving counsel.

21         MS. BAHARANYI:  Yes, your Honor.

22         So, without repeating what the Court is already aware

23    of, I think there are a couple of new and additional points

24    that further weigh in support of our motion to dismiss.  I will

25    then take, in turn, the motion to suppress, whenever the Court

N3F5lucA

1    wishes to hear that.

2          One of the points that had been raised by the

3    government in its argument is that the conduct in this case was

4    not conduct that was protected by the Second Amendment and one

5    of the cases that the government relies on heavily is *Decastro*,

6    which was discussed in the papers.  What I did not include in

7    our response, our reply last week but what I would like to

8    address now, is *Decastro* does implicitly concede and recognize

9    that 922(a)(3), the statute here, does put some burden, does

10   implicate someone's Second Amendment rights.  In *Decastro*, the

11   analysis was whether there was a heavy or significant or

12   substantial burden, but the Second Circuit at least made this

13   implicit understanding that there was some implication on

14   someone's right to bear and possess arms based on 922(a)(3).

15         Now, because of *Bruen*, which obviously has now upended

16   *Decastro* and its reasoning, we know that the analysis, the

17   determination of whether there is a heavy burden or significant

18   impact on someone's right to bear arms versus a governmental

19   interest is no longer the correct inquiry.  The correct inquiry

20   is, one, whether this conduct does in fact implicate the Second

21   Amendment, is his conduct in this case, which is receiving and

22   possessing a firearm, covered by the Second Amendment, and even

23   *Decastro* recognizes that this Court must say yes.

24         THE COURT:  Let me ask you this.  Your client is not

25   charged with unlawful possession, he is charged with unlawful

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000102**

4

N3F5lucA

1    transportation.

2            MS. BAHARANYI:  Your Honor, he --

3            THE COURT:  Go ahead.

4            MS. BAHARANYI:  He is charged with receiving, and

5    receiving --

6            THE COURT:  Well --

7            MS. BAHARANYI:  Receiving into his state residence and

8    that by its --

9            THE COURT:  The statute is, yes, he willfully and

10   knowingly transported or received in New York firearms

11   purchased or otherwise obtained out-of-state.  Right?

12           MS. BAHARANYI:  And that is what the government is

13   saying --

14           THE COURT:  So why is that a regulation of gun

15   possession, as you claim, as opposed to a regulation about

16   out-of-state acquisition and transfer?

17           MS. BAHARANYI:  Your Honor, in order for them to apply

18   the statute here the government will have to prove that he

19   received and possessed these firearms.  That is a necessary --

20   that's what the government also concedes in their own motion,

21   that they are going to prove.

22           THE COURT:  But it doesn't stop him if he was

23   otherwise lawfully entitled to go out and buy a gun but that's

24   not what he is being charged with here.

25           MS. BAHARANYI:  He is not charged with going -- that's

**A000103**

N3F5lucA

1 correct. He is not charged with going out and buying a gun

2 unlawfully, but the charge here does rest on his receipt of a

3 firearm. And I think to the give the court a few more cases

4 that weren't cited in our briefs, there have been a number of

5 District Court opinions on similar 922 statutes that say the

6 receipt, the process of receiving a firearm, necessarily

7 entails possessing it.

8 So, for example, in 18 U.S.C. 922(n) it makes it

9 unlawful for an individual, who is under some form of

10 indictment, to receive a firearm. I have a couple of cases

11 that I will cite to the Court now. *United States v. Quiroz*,

12 2022 WL 4354282, that's a Western District of Texas case from

13 September of last year. It explains that that statute, 922(n),

14 which again governs or is concerned with the receipt of a

15 firearm is unconstitutional because, one, it does entail

16 someone possessing a firearm; and two, there is no historical

17 tradition of that sort of regulation.

18 Similarly, I will give the Court a couple more

19 statutes, case citations if the Court will allow it, *United*

20 *States v. Hicks*, which is a 2023 Western District of Texas case

21 and that case, the citation is another Westlaw case, 2023 WL

22 164170, the Court explicitly opines on whether receiving a

23 firearm under 922(n) necessarily entails someone possessing a

24 firearm and whether that then comes under the gambit of

25 someone's right to bear and possess guns. That Court, as I

N3F5lucA

1   believe your Honor should do as well, found that the act of

2   receiving requires someone to possess.  And we are talking

3   about the same language here so we are talking about receipt

4   and receiving in the context of someone being under federal

5   document, or receipt and receiving in the context of someone

6   receiving or obtaining a gun from out of state but both have to

7   do with someone's ability to possess a firearm and one -- the

8   receipt -- requires the other -- possession.  And in this

9   particular case as well the government has made clear that they

10  intend to prove his guilt in this case by arguing that on two

11  separate occasions he possessed these firearms in June and July

12  of 2021.  So, very much so, receipt here has everything to do

13  with Mr. Lucha's ability to possess and his actual possession

14  of these firearms.

15          So that takes us then to the next question, your

16  Honor.  If there is any --

17          THE COURT:  Let me ask you this.  I will look at those

18  cases and thank you for bringing them to my attention.  Did you

19  tell your adversary that you were going to cite those cases

20  before today's argument?

21          MS. BAHARANYI:  I did not, your Honor, but I can

22  provide them with copies of the cases as well.

23          THE COURT:  Well, if they want it I will give them an

24  opportunity to put in a written response, because otherwise

25  they didn't know that you were going to be citing that, but go

A000105

N3F5lucA

1    ahead.

2            MS. BAHARANYI:  Yes.  Your Honor, obviously we are

3    happy to --

4            THE COURT:  No, I think it is the better practice, if

5    you are going to cite a case that isn't in your briefs, which

6    is not uncommon in these kinds of situations, to give your

7    adversary advance warning, at least a few hours, so the person

8    can take a quick look at it, maybe he has independently, I

9    don't know, he or she, but, if not, I will certainly give them

10   the opportunity to put in a written response since they

11   otherwise would be surprised.

12           Go ahead.

13           MS. BAHARANYI:  Understood, your Honor.  Those cases

14   are just two examples of cases where the district courts have

15   taken and assessed what "receipt" means and have found it to be

16   conduct that requires possession and falls under the Second

17   Amendment.

18           So then that brings us to the next point, the only

19   other kind of prong in this inquiry since *Bruen*, which is is

20   there any sort of historical tradition of this form of

21   regulation.  Now, it is only the government's burden to prove

22   this historical tradition and not history broadly, as I think

23   is made clear in our papers, but did the founding fathers, when

24   they were ratifying the Second Amendment, envision this sort of

25   regulation, this sort of constraint on someone's Second

**A000106**

N3F5lucA

Amendment rights.  And what is missing from the government's brief is any example of a law that is distinctly similar to the law that is being applied against Mr. Lucha here.

What is in the government's brief are numerous -- well, not quite numerous but a couple of examples of colonial era laws of commercial regulations so of the regulations of the sale or trafficking of firearms.  What Mr. Lucha has been charged with is not commercial sale of firearms.  He is not charged with gun trafficking either, I think that's a charge that applies solely to his co-defendant.  He is charged under 922(a)(3) which does prohibit his individual possession of a firearm based off of how it was obtained but he is not someone who has been charged as being engaged in the commercial sale provision of these firearms.  And I want to point this out because we did not raise this in our motion, there is a second of 922 that governs the commercial sale of firearms or licensed importers providing firearms to individuals in similar context.

So 922(b)(3) says that it is a crime, it is unlawful for someone who is a licensed importer of firearms, to sell or deliver any firearm to any person who the licensee knew, knows, or has reason to believe, does not reside in the state in which the licenses operate.  So that is the commercial regulation and if that is what Mr. Lucha had been charged under, your Honor, then the examples provided to the government would be somewhat on point.  But that's not at all what he has been charged with

N3F5lucA

1    here.  So, he is not charged with engaging in the sales, he is

2    charged with his actual -- his possession for receiving and

3    possessing firearms.

4              THE COURT:  All right.

5              MS. BAHARANYI:  If the government is unable to provide

6    a single distinctly similar statute, which they have been

7    unable to provide, then *Bruen* makes clear the only next step is

8    dismissal because the Second Amendment does cover what his

9    conduct was in this case, because the government has been

10   unable to provide that statute, just one example, your Honor,

11   then that's the only result that is now required under *Bruen*.

12             THE COURT:  All right.  Thank you very much.  Let me

13   hear from the government.

14             MR. ISSACHAROFF:  Thank you, your Honor.

15             I want to start with the conduct question that defense

16   counsel began with.  So first I just want to clarify that the

17   government is not taking the position that receipt is

18   categorically unprotected under the Second Amendment as

19   distinct from possession.  The government acknowledges that

20   receipt is a necessary precursor to possession for ability to

21   keep and bear arms in certain instances.  That being said, what

22   distinguishes 922(a)(3), for example, from 922(n) discussed in

23   the *Quiroz* case and I am familiar with that case and don't need

24   the opportunity to provide supplemental briefing but appreciate

25   the Court's consideration.

10

N3F5lucA

```
 1          So, 922(n) states that a person who is under felony

 2    indictment cannot transport or receive.  That means that it

 3    functions as a complete extinguishment of that person's ability

 4    to acquire arms for self-defense.  That is why 922(n)

 5    implicates the Second Amendment, because although it doesn't

 6    affect the pre-indictment -- any arms that were already

 7    possessed pre-indictment, it does state that a person cannot

 8    acquire any arms from any source.  922(a)(3), on the other

 9    hand, simply channels the acquisition of arms for lawful

10    self-defense through legitimate channels.  As we cited in our

11    brief, there are over 2,000 federal firearms licensees in the

12    State of New York.  Presumably these were not only available to

13    the defendant, they were in fact, by far, the most convenient

14    way for him to obtain a firearm rather than have somebody

15    acquire them for him from out of state.

16          So, that is why 922(a)(3) falls within the category

17    recognized by *Heller*, conditions and qualifications on the

18    commercial sale of arms which is a recognized, long-standing

19    regulation that *Heller* and *Bruen*, and the Supreme Court's

20    Second Amendment juris prudence casts no doubt on --

21          THE COURT:  So, just looking at the text of the

22    statute, might it not be read to prohibit a gun owner who is

23    moving regularly between various states but who lawfully

24    required his gun in the initial state of residence from

25    bringing it with him to the new state of residence?  If that's
```

A000109

N3F5lucA

```
1    the case would that pre-Second Amendment --
2              MR. ISSACHAROFF:  Your Honor, I believe that
3    Section 922(a)(3) includes, it states that:  Shall not preclude
4    any person -- I'm sorry.  So subsection A of 922(a)(3) talks
5    about inheritance through bequest or intestate succession.  So
6    I don't -- I apologize, but I believe the text of 922(a)(3), it
7    states that it discusses transport into or receipt in the state
8    where he resides.  So I think that if one lawfully acquired an
9    arm, received that arm while residing within a state and then
10   moved to another state, I'm not certain that 922(a)(3) would
11   prohibit that conduct.  Nevertheless, that is not the
12   circumstance that we face here and so considering an as-applied
13   challenge, which we noted in our brief, is the appropriate
14   order.
15             THE COURT:  All right.
16             MR. ISSACHAROFF:  So then I want to turn briefly to
17   the Decastro case.  I disagree with defense counsel that
18   Decastro does acknowledge that there is a Second Amendment
19   burden imposed by 922(a)(3).  Decastro rejects heightened
20   scrutiny by noting repeatedly that there is no substantial
21   limitation on the right to acquire arms, noting the ready
22   availability and the greater convenience of arms required
23   through legitimate channels within one state.  Now, it may be
24   that an individual is prohibited by, say, New York State's laws
25   from using those channels, but that is not -- this is not the
```

A000110

N3F5lucA

```
 1    context in which they made that challenge.  They should
 2    separately challenge the New York State laws rather than seek
 3    to acquire them from out-of-state.  The Decastro Court does not
 4    actually apply any means-end scrutiny.  They reject heightened
 5    scrutiny and say therefore the challenge must fail.  And they
 6    do analogize to time place restrictions under the amendment but
 7    it is not clear that they do accept the proposition that there
 8    is any actual limitation on the right to keep and bear arms in
 9    self-defense which is the right as defined by the Supreme Court
10    in Heller.  There were literally thousands of legitimate
11    channels through which defendant could have acquired arms for
12    self-defense and it simply doesn't restrict those.
13              THE COURT:  I'm going to take the liberty of cutting
14    you off because, as I hear the arguments from both sides, I
15    think it would be useful to have some additional brief
16    briefing.  So I will allow the government to put in a further
17    brief not to exceed five single-spaced pages addressing both
18    the cases that were first raised here today but also any other
19    issue that was raised here in the argument today, and then I
20    will allow defense counsel to put in a five-page surrebuttal or
21    whatever you want to call it.
22              So, how soon can the government get in its paper?  You
23    are talking to the real party in interest I can see.
24              MR. ISSACHAROFF:  I was asking how long before we get
25    the transcript but I think that 10 days.
```

N3F5lucA

```
 1              THE COURT:  You need 10 days?

 2              MR. ISSACHAROFF:  A few days to get the transcript so

 3     that we can --

 4              THE COURT:  I am sure your colleague was taking notes

 5     of what was said today.

 6              MR. ISSACHAROFF:  We did, your Honor, but I do want to

 7     make sure.

 8              THE COURT:  You don't think her notes, you are

 9     skeptical that her notes are less than complete and accurate?

10              MR. ISSACHAROFF:  Of course not, your Honor.

11              THE COURT:  All right, 10 days, but I really want to

12     move it along.  Then so that would be, let's see, today is the

13     15th, so that would be.

14              MR. ISSACHAROFF:  We can do the 20th, your Honor.

15              THE COURT:  I'm sorry?

16              MR. ISSACHAROFF:  We can do the 20th, next Wednesday.

17     That's fine.

18              THE COURT:  The 22nd?

19              MR. ISSACHAROFF:  The 22nd, yes.

20              THE COURT:  So one week, that sounds better, and one

21     week for the defense so that's the 29th, and I will give you at

22     least a bottom line ruling by no later than the week after that

23     May 5th.  I may or may not have a full opinion ready for you by

24     that time but at least you will know where you stand one way or

25     the other.
```

N3F5lucA

1          So, let's turn to the motion to suppress and let me go

2     back to moving counsel.

3          MS. BAHARANYI:  Thank you, your Honor.

4          Your Honor, there actually aren't additional points

5     that I need to make beyond what has been provided in both our

6     moving papers and our reply.  I would reiterate, though, if the

7     Court does want to consider any part of that Officer 1's

8     observations we would ask for a hearing on that matter.

9          THE COURT:  OK.  Let me hear what the government says.

10    I won't speak until your colleague is ready to take complete

11    notes.

12         MS. SMYSER:  Great.  We are ready, your Honor.

13         So I just want to respond briefly to a few points that

14    came up in defense counsel's briefing.  One thing that they

15    focus significantly on, I think there are two main issues here,

16    one is whether the 911 call is a reliable indicator that gives

17    the officers reasonable suspicion for the stop.

18         THE COURT:  Didn't the person say that she knew Lucha?

19    Did she provide her phone number?  Didn't she identify him by

20    name and location?  And isn't there every indication that she

21    had actually seen the gun?

22         MS. SMYSER:  Yes, your Honor.  All of that is true and

23    that is what we believe distinguishes this case from many cases

24    cited by the defense and including the *Freeman* case.  I think

25    that those indications that your Honor just cited show her

N3F5lucA

1    basis for believing that Lucha had a gun and also show a

2    familiarity with him.  They had been friends, she had seen the

3    gun before, and that shows where this information comes from

4    and that it is reliable.  So I won't talk too much more about

5    the reliability of the 911 call unless your Honor has --

6            THE COURT:  No.  I think -- frankly, I am not yet

7    persuaded by the defense argument on that point.  I think a

8    more interesting argument is the question of whether there is

9    reasonable suspicion when someone may be carrying the gun

10   lawfully but that is colored, very much, by *Bruen*, and this all

11   occurred before *Bruen*, as I understand it.

12           MS. SMYSER:  That's correct, your Honor.

13           THE COURT:  So it has to be looked at from the context

14   of what the law reasonably was held to be or appeared to be at

15   that time.

16           MS. SMYSER:  That's correct, and that was something I

17   wanted to just touch briefly on, this question of whether the

18   gun possession in this instance is sufficient to show

19   reasonable suspicion that Lucha was engaging in ongoing

20   criminal activity, and obviously this --

21           THE COURT:  Even though pre-*Bruen*, what is the basis

22   for saying that one has a reasonable suspicion that someone is

23   engaged in unlawful activity just based on knowing they are

24   carrying a gun?

25           MS. SMYSER:  So, your Honor a few points on that.

N3F5lucA

1          One, this 911 call was made around 10:00 p.m.

2   reporting gun possession on a sidewalk in the Bronx and the

3   standard here is reasonable suspicion to indicate that they are

4   engaging in some sort of crime, it is not probable cause, not

5   beyond a reasonable doubt, it is just to engage in that initial

6   investigatory stop.  We see from case law that this falls well

7   within what rises to the level of reasonable suspicion.  For

8   example, this is discussed in the *Gonzalez* case that we cite,

9   by Judge Engelmayer, in our briefing and he, in addition, cited

10  a few Second Circuit cases *Wiggan* and *Manuel* that I am happy to

11  provide the specific citations for in which 911 calls were made

12  reporting gun possession and then a subsequent stop was made.

13  Now, in those cases they also saw a bulge, which we have in our

14  case if an officer were to testify, but the point I am making

15  here is that the 911 call about gun possession was sufficient

16  in those cases to show that someone was engaging in some sort

17  of criminal activity based on the gun possession alone without

18  additional facts from how they were using the gun or anything

19  of that nature.

20          THE COURT:  All right.  Unless you had anything else

21  you wanted to cover, again unfortunately we are under a fairly

22  tight time frame today.  I wanted to hear from your adversary

23  in response to the arguments you have just made.

24          MS. SMYSER:  Of course.

25          MS. BAHARANYI:  Thank you, your Honor.

N3F5lucA

1      Briefly, question 1 or part 1 regarding the

2  reliability of this call, I think the issue is the exact

3  concern that was raised in *Florida v. J.L.*, which is what is to

4  stop someone from calling in some tip about someone they can

5  readily observe on the street in the community, claim that they

6  have a firearm, and setting off a chain of events to harass

7  that person.  And I think if you keep that kind of concern in

8  the back of your mind, it highlights what our problem is here

9  in this type of case.  The tip that was called in was by

10  someone who refused to provide her name and prior to police

11  actually stopping Lucha, refused to cooperate with them,

12  meaning they tried multiple times to reach back out to her, get

13  in contact with her, and she refused, which I think is one

14  signal that there is a concern that she might have done

15  something or been engaged in reporting someone that she knew

16  she should not have done.  So there is that, that piece on the

17  reliability.

18      I think the second piece is in Alabama v. White, one

19  of the reasons why the Supreme Court found the tip there

20  reliable is because it provided some predictive information

21  that only someone familiar with the wrongful conduct or

22  intimately familiar with the wrongful conduct going on could

23  have known so that person gave the police a play-by-play of

24  where this individual -- White in this case -- was going to

25  pick up cocaine.  Here there is no predictive information that

A000116

N3F5lucA

1    is being provided and in fact, as we say in our motion, the 911

2    dispatcher explicitly asked the caller, do you know where he is

3    going? and she says no.  So what we have here is someone who is

4    able to provide a very detailed description of someone that

5    they can see, maybe someone they have seen around the

6    community, but who in no way has provided information that

7    would suggest their tip is reliable in its assertion of

8    illegality, not just identifying him.

9             THE COURT:  All right.

10            MS. BAHARANYI:  And I also find that second issue

11   quite concerning, that someone could call and say, this person

12   has a firearm, in a state where individuals can legally carry

13   concealed weapons, and set off this motion of events allowing

14   police to stop and seize them.  This caller, at no point, said

15   this person had a firearm and I am concerned, or he is

16   threatening people, or he is waiving it around.  She didn't

17   even say that it has come out of his bag, it is simply a report

18   that he is in possession of a firearm which is not unlawful.

19   And, this case came after the *Heller* case, your Honor.  So it

20   came after there has already been this shift from the Supreme

21   Court in what someone's rights to carry are.  And I think the

22   fact that this is not a pre-*Heller* case but this is *Heller* on

23   our way to *Bruen* but understandably not there yet, I think

24   shows that the police had no reason at that point to suspect

25   that he was engaged in unlawful activity, unlawfully carrying a

firearm.  And if there had been some suggestion as there are in

the cases that there was threatening or assaultive or

concerning conduct in addition to it, then I think we would be

in a very different position but none of that was present here.

THE COURT:  So, I will reserve on this as well and get

you a bottom line ruling but remind me, do we have a trial

date?

MS. BAHARANYI:  We do not, your Honor.

THE COURT:  Let's set a trial date.  So I'm going to

get you bottom line rulings on both of these motions by what

did we say, early May?  What was the date I just gave you?  May

5th.  And it is conceivable on the second motion that there

might be a need for an evidentiary hearing, but even if that is

true we would have it in a matter of a couple days.  So, the

motions will all be done with by the middle of May.  How long a

trial are we talking about?

MS. SMYSER:  A week, your Honor.

THE COURT:  So I don't have my trial schedule in front

of me, so my ever-ready courtroom deputy has just handed it to

me, and so we could do the last week of May.  We could do the

middle of June.  Let's stop there.  How about either of those?

MS. BAHARANYI:  Your Honor, if you are hearing

suggestions about trial date, I would ask for a date in

mid-June or early to mid-June if the Court is available June

5th through the week of June 12th.  I will be out June 19th

N3F5lucA

1    through the 30th but again available following that time.

2              THE COURT:  So I think if we are going into June I

3    have a trial starting June 7th that will be over early the

4    following week, so let's look at Tuesday, June 13th.

5              THE DEPUTY CLERK:  You are sitting in Portland.

6              THE COURT:  Oh.  I am sitting on the Ninth Circuit in

7    Portland.  So how about June 20th?

8              MS. BAHARANYI:  Your Honor, I am going to be out of

9    the country that week and the week of the 26th.  I know the

10   Court mentioned end of May dates.  I would be available that

11   time as well.

12             THE COURT:  So how about -- I'm sorry, so in May?  I

13   have a three-week trial starting May 1st so how about May 22nd?

14   Does that work?

15             MS. BAHARANYI:  That time works for the defense.

16             MS. NICOLAS:  It is fine for the government.  I want

17   to clarify the timeline you set forth earlier.  The defense

18   response for March 29th, I think your Honor originally said a

19   bottom line decision a week after that, which would be April

20   5th?

21             THE COURT:  That's right.  May 5th sounded wrong, that

22   is not my style.  So I will decide these motions by April 5th,

23   giving everyone plenty of time to prepare for the trial, so

24   let's set it down for May 22nd.

25             All right?  Very good.

N3F5lucA

1          MS. BAHARANYI:  Your Honor, before we adjourn, may I

2    have one moment?

3          THE COURT:  Yes.

4          MS. BAHARANYI:  I think there is something we may want

5    to address with the Court, if I could have one moment.

6          (Defendant and counsel conferring)

7          MS. BAHARANYI:  Thank you, your Honor.  Actually,

8    nothing further.

9          THE COURT:  So you folks are excused except for

10   whoever with the government is remaining for the other matter,

11   and let's have the counsel and defendant of the co-defendant

12   set up right now.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 22, 2023

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

  Re: *United States v. Steven Perez, a/k/a "Lucha,"* 22 Cr. 644 (JSR)

Dear Judge Rakoff:

  The Government writes in response to the Court's request for supplemental letter briefing on issues relating to Defendant's motion to dismiss the indictment at the March 15, 2022 conference and raised in Defendant's reply brief. In particular, the Governments writes to (1) clarify its position on the Second Amendment implications of 18 U.S.C. § 922(a)(3)'s prohibition on "receipt" versus possession; (2) distinguish Section 922(a)(3) from Section 922(n) and cases evaluating that latter provision; (3) explain the relevance of *United States v. DeCastro*, 682 F.3d 160 (2d Cir. 2012); and (4) address certain arguments made by Defendant relating to the method of historical analysis under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

  First, as the Government stated at the conference, the United States does not take the possession that "receipt," as distinct from possession, is *categorically* unprotected by the Second Amendment. *Cf. United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023) (holding receipt covered by Second Amendment in context of 18 U.S.C. § 922(n)); *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *3-4 (W.D. Tex. Sept. 19, 2022) (same). Defendant takes this point and argues that, like Section 922(n), Section 922(a)(3) must therefore implicate the Second Amendment because it prohibits the "receipt" of arms. Transcript of Mar. 15, 2023 Conference ("Tr.") at 5:8-6:14. That conclusion, however, does not follow. Under Section 922(n), a person under felony indictment is prohibited from receiving *any* arms; accordingly, unless they already possess a firearm prior to indictment, they have no legal ability to bear arms in self-defense.

  By contrast, Section 922(a)(3) works no meaningful impediment, and thus does not "infringe," on any person's right to bear arms in self-defense. As the Government noted in its brief in opposition to the motion to dismiss, Defendant had available to him over 2,000 federally licensed firearms dealers within his state of residence, which the Second Circuit has noted "is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Section

**A000121**

Page 2

922(a)(3) does not work to restrict anyone's ability to lawfully acquire arms; it merely funnels that commerce through designated, regulated channels. Accordingly, unlike Section 922(n), Section 922(a)(3) is among the "laws imposing conditions and qualifications on the commercial sale of arms" that were not called into question by *Heller* or its progeny. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). The fact that, as Defendant noted, other provisions of 18 U.S.C. § 922 more explicitly regulate commercial firearms traffic is irrelevant to that conclusion; the statutory scheme works as a whole to ensure that firearms purchases are made through legitimate commercial channels and impose "conditions and qualifications" upon those channels.

Defendant separately argues that *DeCastro* has foreclosed any argument that Section 922(a)(3) does not implicate the text of the Second Amendment because it assumed the existence of a Second Amendment burden in conducting its means-end analysis. Tr. at 3:6-23. As an initial matter, Defendant cannot have it both ways: arguing that *DeCastro*'s holding does not bind this Court because *Bruen* has repudiated all decisions made under the prior two-step framework, while also arguing that the *DeCastro* Court implicitly made an analytical step under that same framework that *does* bind this Court. And further, Defendant is simply not correct as to *DeCastro*'s reasoning. *DeCastro* did not accept—explicitly or implicitly—that Section 922(a)(3) imposed *any* burden on Second Amendment rights. Rather, the Second Circuit applied the usual test at the time to determine whether heightened scrutiny was appropriate in its analysis of Section 922(a)(3)—it asked whether the statutory provision at issue "substantially burden[ed] the Second Amendment." *DeCastro*, 682 F.3d at 164. In concluding that it did not, the Court—far from implying that any burden existed at all—stressed that Section 922(a)(3) "only minimally affects the ability to acquire a firearm." *Id.* The Court went on to uphold Section 922(a)(3) over the defendant's as-applied and facial challenges without conducting any means-end analysis. *See id.* at 1698-69. Accordingly, the Second Circuit has never implied—much less held—that the Second Amendment covers the conduct regulated by Section 922(a)(3), as required at the first step of the *Bruen* analysis.

Turning to the second step of the *Bruen* analysis, the Government addresses certain points raised by Defendant. First, Defendant interprets *Bruen* to impose a rigid, bifurcated historical analysis: when a modern regulation is directed at a societal problem that has existed since the 18th century, courts must eschew analogical reasoning and apply only a straightforward historical analysis; by contrast, when a modern regulation was unimaginable at the founding, then and only then can the court employ analogical reasoning. *See* Def. Reply at 6-7.

This dichotomy is unsupported by *Bruen*. It may be that analogical reasoning is the primary or only tool available when a regulation (say, of AI-operated killer drones) was unimaginable at the founding, but that does not mean that this same tool is unavailable to courts considering less novel regulations. Indeed, the *Bruen* Court considered analogous regulations in its description of the "straightforward" historical inquiry: "In some cases, that inquiry will be fairly straightforward. For instance, . . . if some jurisdictions actually attempted to enact *analogous regulations* during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Bruen*, 142 S. Ct. at 2131 (emphasis added).

The *Bruen* Court's acceptance of analogical reasoning as applied to longstanding problems is further demonstrated by its discussion of *Heller*. Per *Bruen*, "*Heller* itself exemplifies this kind

of straightforward historical inquiry." *Bruen*, 142 S. Ct. at 2131. And the *Heller* Court did not eschew analogy; rather, "after considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was *analogous* to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Id.* (quoting *Heller*, 554 U.S. at 631) (emphasis added). Indeed, the very paragraph of *Bruen* that Defendant relies upon to reject analogical reasoning in this context stated that "*the historical analogies* here and in *Heller* are relatively simple to draw . . . ." *Id.* at 2132 (emphasis added). The *Bruen* Court further endorsed *Heller*'s use of analogies to historical regulations of "sensitive places," without anywhere suggesting that regulations of such places were unimaginable at the founding. *Id.* at 2133. *Bruen* should therefore be read to endorse the use of analogical reasoning—"a commonplace task for any lawyer or judge," *Bruen*, 142 S. Ct. at 2132—in any historical context, even if the necessary closeness of the analogical fit is dependent in part on the novelty of the regulation at issue.

Applying a correct understanding of *Bruen*'s historical methodology, the Court should reject Defendant's remaining arguments that the Government's proffered historical regulations are insufficiently similar. Defendant argued at the conference that the Government's historical examples are distinguishable from Section 922(a)(3) because they involved commercial restrictions, not simple restrictions on receipt or transfer. Tr. at 8:4-9:3. That mischaracterizes the colonial-era laws relating to transactions with Native Americans cited by the Government, which sweep more broadly than commercial sale, *see* Gov. Br. at 12-13, and ignores entirely the gunpowder-transportation and gunpowder and firearm licensing laws cited by the Government, *see id.* at 13-14.

Finally, Defendant suggests that the Court should not look to historical precedents that were "unquestionably racist." Def. Reply at 9. The Government does not dispute Defendant's characterization of those laws, but, as numerous courts have held, "the Second Amendment's inquiry into historical analogues is not a normative one." *Rowson*, 2023 WL 431037, at *22 (upholding constitutionality of 18 U.S.C. § 922(n)). Indeed, the Supreme Court in *Heller* cited to similarly repugnant historical precedents in determining what constituted an "arm" and the meaning of the phrase "keep and bear arms." 554 U.S. at 581, 582 (citing An Act for the trial of Negroes, 1797 Del. Laws ch. XLIII, § 6, in 1 First Laws of the State of Delaware 102, 104 (J. Cushing ed.1981 (pt. 1)); 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House . . . any Arms . . .")); *see also Bruen* 142 S. Ct. at 2142 n.12 (citing same English law disarming Catholics); *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (citing colonial laws disarming aliens, Native Americans, and Catholics); *United States v. Balde*, 20 Cr. 281 (S.D.N.Y. Dec. 19, 2022) (transcript of oral opinion) at 24:14-23 (citing *Perez* concurrence and "recognizing the abhorrence of certain of these prior statutes" while drawing "lessons from the historical record" to uphold constitutionality of 18 U.S.C. § 922(g)(5)). While these laws "would be anathema, and clearly unconstitutional" today, *Rowson*, 2023 WL 431037, at *22, the examples cited by the Government speak to a common practice in regulating the transfer in firearms in and out of jurisdictional bounds at the time of the Founding, and provide ample historical support for the constitutionality of Section 922(a)(3).

The Government separately writes to address a hypothetical posed by the Court at oral argument: whether Section 922(a)(3) would prohibit a person who lawfully purchased a firearm while a resident of one state from retaining that firearm while moving to another state. Tr. at

Page 4

10:21-25.  The answer is no.  18 U.S.C. § 926A states that, "Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm" subject to certain conditions on the transportation of said firearm.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


by: ___/s/_____
Lucas Issacharoff
Ashley C. Nicolas
Madison Reddick Smyser
Assistant United States Attorneys
(212) 637-2737 / 2467 / 2381

A000124

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 29, 2023

*Via ECF*
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re:**   ***United States v. Lucha El,***
**22-CR-644 (JSR)**

Honorable Judge Rakoff:

Defendant Lucha El Por Libertad respectfully submits this supplemental letter-brief in accordance with the Court's March 15, 2023 order and in response to the government's submission ("Gov't Ltr."; ECF No. 38). The government continues to misconstrue *Bruen*'s required analysis and fails to sustain its burden to show that 18 U.S.C. § 922(a)(3) "is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Assoc., Inc.* v. *Bruen*, 142 S. Ct. 2111, 2130 (2022). Accordingly, the indictment against Mr. Lucha must be dismissed.

The government wrongly insists that § 922(a)(3) is a purely "commercial" regulation of the sale of firearms. (Gov't Ltr. at 2.) But § 922(a)(3)'s prohibition sweeps much more broadly than commercial firearm sales. Take, for example, a law-abiding citizen of New York, fully able to own a gun in his home state, who visits a brother in New Jersey. The brother, concerned for the citizen's safety in New York City, offers him a handgun for use in self-defense. The citizen accepts and takes the handgun home with him. No commercial sale has occurred: yet the law-abiding citizen has now "transport[ed]" into "the State where he resides" a firearm "obtained by [him] outside that State," in violation of 18 U.S.C. § 922(a)(3)—even if he is lawfully able to own a gun in New York.[1] Far from acting solely as a "funnel[]" for the sale of guns "through designated, regulated channels" (Gov't Ltr. at 2), § 922(a)(3) criminalizes law-abiding citizens' *possession* of firearms based solely on the origin of those firearms.

---

[1] Notably, § 926A (cited by the government (Gov't Ltr. at 4)), would not protect the law-abiding citizen in this scenario from this independent Chapter 44 violation. *See* 18 U.S.C. § 926A (applying only where a person is "not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm").

Other provisions of § 922 do in fact regulate the sale, rather than the possession, of firearms obtained from out of state. *See, e.g.*, 18 U.S.C. § 922(b)(3) ("It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located."). If Mr. Lucha had been charged with a violation of this provision, the conduct at issue would more closely resemble the types of "conditions and qualifications on the commercial sale of arms" recognized by the Supreme Court as potentially lawful. *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

But Mr. Lucha's possession of handguns is what the government is prosecuting here—the indictment charges that Mr. Lucha, "not being a licensed importer, licensed manufacturer, licensed dealer, [or] licensed collector of firearms," did "willfully and knowingly transport into or receive in the State where he resides firearms purchased or otherwise obtained by [him] outside that State." (ECF No. 2 at 4.) As the government now concedes, "receipt is a necessary precursor to possession." (Mar. 15, 2023 Tr. ("Tr.") 9:19–21); *see United States v. Rowson*, 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023) ("shipping, receiving, or transporting a firearm" is "presumptively protected by the [Second] Amendment"); *United States v. Hicks*, 2023 WL 164170, at *2 (W.D. Tex. Jan. 9, 2023) ("Receipt is the condition precedent to possession—the latter is impossible without the former."); *United States v. Stambaugh*, 2022 WL 16936043, at *3 (W.D. Okla. Nov. 14, 2022) ("[R]eceipt is the condition precedent to keeping and bearing arms."); *United States v. Quiroz*, 2022 WL 4352482, at *4 (W.D. Tex. Sept. 19, 2022) ("The Second Amendment's plain text does cover 'receipt' and the Constitution presumptively protects such conduct."). Far from being charged in connection with a role in a commercial transaction involving the sale of a firearm, Mr. Lucha faces prosecution for mere possession of a firearm outside of any stream of commerce. *See United States v. Price*, 2022 WL 6968457, at *3 (S.D.W. Va. Oct. 12, 2022) (holding § 922(k) unconstitutional; "Other commercial regulations may well require that any firearm sale only involve firearms bearing a manufacturer's serial number. Section 922(k) goes farther. It criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce.").

With this proper framing, there can be no serious dispute that Mr. Lucha's conduct is protected by the "plain text" of the Second Amendment. The government continues to insist that § 922(a)(3) "works no meaningful impediment" on Mr. Lucha's right to bear arms (Gov't Ltr. at 1) because it does not "complete[ly] extinguish[]" the right the way other statutes do (Tr. 10:1–10). That argument finds no purchase in *Bruen*; while § 922(a)(3) does not completely ban individuals such as Mr. Lucha from possessing certain weapons, "neither [did] the law found to be unconstitutional in *Bruen*." *United States v. Kelly*, 2022 WL 17336578, at *3 (M.D. Tenn. Nov. 16, 2022). In fact, the Supreme Court rejected a similar argument in *Heller*: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629; *see also Kelly*, 2022 WL 17336578, at *3 ("[T]he infringement on a constitutional right in one way is not typically

negated by the fact that the government did not violate the same right even further in another way.").

Nor, indeed, is this argument supported by the text of the Second Amendment, which provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the government acknowledged in its opposition, the definition of "infringe" includes "[t]o destroy or hinder." (Gov't Opp. at 8 (citing Webster's 1828 Dictionary of the English Language).) "Hinder," in turn, is defined as "[t]o stop," "[t]o obstruct," "[t]o impede," or "[t]o prevent." Webster's 1828 Dictionary of the English Language. Section 922(a)(3) "prevents" Mr. Lucha from exercising his Second Amendment rights by making it unlawful for him to carry a weapon in self-defense based solely on the weapon's state of origin. After *Bruen*, there can be no further inquiry into how much Mr. Lucha's Second Amendment rights are "hindered" by the challenged law: "Instead, any intrusion into a right protected by the Second Amendment thrusts us into the territory of justifying the regulation as one historically placed on similar weapons." *Ocean State Tactical, LLC* v. *Rhode Island*, 2022 WL 17721175, at *14 n.28 (D.R.I. Dec. 14, 2022).

Even the Second Circuit recognized in *United States v. Decastro* that § 922(a)(3) "affects the ability to acquire a firearm," even if only "minimally." 682 F.3d 160, 164 (2d Cir. 2012). Contrary to the government's argument, Mr. Lucha is not arguing that "the *DeCastro* Court implicitly made an analytical step" that "bind[s] this Court." (Gov't Ltr. at 2.) As explained at length in reply (at 2–3), *Decastro*'s reasoning has been abrogated by *Bruen*, and whether the burden imposed on an individual's ability to acquire a firearm by § 922(a)(3) is "minimal" or "meaningful" is beside the point. But this Court can and should reach the same conclusion the *Decastro* court did that § 922(a)(3)'s prohibition implicates the Second Amendment. *See Decastro*, 682 F.3d at 168 (§ 922(a)(3) "does not burden" Second Amendment rights "in a way so substantial as to justify heightened scrutiny"). This triggers the second step of the *Bruen* analysis. *See Bruen*, 142 S. Ct. at 2134 (having "little difficulty [in] concluding that" "carrying handguns publicly for self-defense" is protected conduct and proceeding to analyze whether the challenged law comports with the historical tradition of firearm regulation).

Turning to the historical analysis at the core of *Bruen*'s second step, the government argues that the analytical distinction between "modern regulation[s] [] directed at a societal problem that has existed since the 18th century" and "modern regulation[s] [] unimaginable at the founding" is "unsupported by *Bruen*." (Gov't Ltr. at 2.) Not so. *Bruen* explicitly states that for a regulation that "addresses a general societal problem that has persisted since the 18th century," "the lack of a *distinctly similar* historical regulation addressing that problem" is evidence that the regulation is inconsistent with the Second Amendment. 142 S. Ct. at 2131 (emphasis added). Only "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," which asks whether the modern regulation and a proffered historical analogue are "*relevantly similar*." *Id.* at 2132 (emphasis added). Both cases certainly permit analogical reasoning, but the "distinctly similar" standard for longstanding societal problems requires a much closer fit. *See United States v. Harrison*,

Page 4

2023 WL 1771138, at *5–6 (W.D. Okla. Feb. 3, 2023) (explaining that the historical inquiry is "'fairly straightforward' when the challenged regulation addresses a 'general societal problem that has persisted since the 18th century,'" and holding that "the United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3)—which *Bruen* suggests is dispositive").

Courts consistently recognize the difference between these two types of analyses. *See United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. Jan. 13, 2023) ("[T]he court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for assessment of the government's proffered historical analogues . . . This is so even though . . . the Court [in *Bruen*] talked about 'analogues' in discussing both standards."); *Price*, 2022 WL 6968457, at *4–5 (recognizing two approaches and concluding that the "societal problem[s] addressed by Section 922(k) appear to be crime, including crime involving stolen firearms"; "According to *Bruen*, that the societal problem addressed by Section 922(k) was likely in existence at the founding but not addressed by similar means is relevant evidence" that the law is "inconsistent with the Second Amendment"); *United States v. Melendez-Machado*, 2022 WL 17684319, at *3 (W.D. Tex. Oct. 18, 2022) (distinguishing the application of the "distinctly similar" and "relevantly similar" standards); *United States v. Holden*, 2022 WL 17103509, at *2–3 (N.D. Ind. Oct. 31, 2022) (same); *United States v. Power*, 2023 WL 131050, at *2 (D. Md. Jan. 9, 2023) (same); *United States v. Perez-Gallan*, 2022 WL 16858516, at *3 (W.D. Tex. Nov. 10, 2022) (same).

Ultimately, the government cannot prevail here under either standard because it has not provided *any* historical analogue that is "distinctly similar," or even "relevantly similar," to § 922(a)(3). Nothing in the government's opposition or supplemental submission requires a different result. In its opposition, the government references several examples of how firearms and gunpowder were "traded and transported" at the time of the founding. (Gov't Opp. at 12.) But as described in Mr. Lucha's reply and at oral argument, Mr. Lucha is not charged with commercial sale of firearms or gun trafficking, and § 922(a)(3)'s scope sweeps much more broadly than just "commercial" firearm sales. (Reply at 8; *see* Tr. 8:4–17.) These "trade and transport" laws may have addressed the "sale" of firearms or gunpowder in certain circumstances, but they do not criminalize the mere possession of a firearm based on its state of origin. Further, the laws restricting the sale of gunpowder referenced in the government's opposition (at 15) were targeted at "protect[ing] citizens from explosions" (*id.*) and did not serve the purpose of regulating individuals' possession of a firearm. *See Harrison*, 2023 WL 1771138, at *15 ("[T]he justification of modern restrictions still must be analogous to the justifications of Founding-era restrictions."). These examples therefore cannot support a historical tradition of regulation that is "distinctly similar" or "relevantly similar" to § 922(a)(3)'s ban on possession of out-of-state firearms.

In its supplemental letter, the government also refers to the "colonial-era laws relating to transactions with Native Americans" that it cited in its opposition, arguing that they "speak to a common practice in regulating the transfer in firearms in and out of jurisdictional bounds at the time of the Founding." (Gov't Ltr. at 3.) Yet in addition to

A000128

Page 5

being unquestionably racist (Reply at 9), these historical examples certainly cannot be held up as evidence that at the time of the founding, there was a common practice of regulating possession of firearms based on the jurisdiction in which they were obtained.

Instead, courts have considered the colonial-era prohibitions on transactions with Native Americans as evidence that early firearm legislation was concerned with firearms ending up in the hands of those perceived as "dangerous." *See Rowson*, 2023 WL 431037, at *20 ("[F]irearm legislation in colonial America prohibited various categories of persons viewed at the time as dangerous, having violent propensities, and/or unfaithful to the sovereign and its laws from owning firearms," including 'Native Americans, Black persons, and indentured servants'"); *United States v. Bartucci*, 2023 WL 2189530, at *7 (E.D. Cal. Feb. 23, 2023) (citing laws disarming "those unwilling to take an oath of allegiance . . ., slaves, and Native Americans" as evidence that "these laws permitted certain categories of persons from being disarmed based on their perceived dangerousness or lack of status"); *see also Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) (citing laws that disarmed "slaves and Native Americans" as support for proposition that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"). Section 922(a)(3) criminalizes the possession of *any* weapon obtained out of state, even by law-abiding citizens that pose no threat to public safety and are not otherwise prohibited from owning a firearm for any reason. This law therefore cannot serve the purpose of keeping firearms out of the hands of those perceived as "dangerous," meaning the government's proffered analogues do not have sufficiently "analogous" justifications. *Harrison*, 2023 WL 1771138, at *15.[2]

For these reasons, and the reasons set out in Mr. Lucha's opening and reply papers, the indictment against Mr. Lucha must be dismissed.

Respectfully submitted,

_____/s/_____

Zawadi Baharanyi
Amanda J. Mayo
Assistant Federal Defenders
Tel.: (212) 417-8735

cc:   Lucas Issacharoff, Ashley C. Nicolas, & Madison Reddick Smyser,
      AUSAs (by ECF)

---

[2]   The government's citation to these laws prohibiting Native Americans from receiving firearms is also inapt because at the time of the founding, Native Americans "were generally not considered to be a part of the political community protected by the Second Amendment." *Harrison*, 2023 WL 1771138, at *20.

1

N5UQlucH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   UNITED STATES OF AMERICA

3              v.                        22 CR 644 (JSR)
                                         Suppression Hearing
4   STEVEN PEREZ (aka Lucha El)

5              Defendant
    ------------------------------x
6
                                         New York, N.Y.
7                                        May 30, 2023
                                         2:00 p.m.
8

9   Before:

10                     HON. JED S. RAKOFF
                                         District Judge
11

12                     APPEARANCES

13  DAMIAN WILLIAMS
         United States Attorney for the
14       Southern District of New York
    ASHLEY C. NICOLAS
15  MADISON SMYSER
    SARAH MORTAZAVI
16       Assistant United States Attorneys

17  FEDERAL DEFENDERS OF NEW YORK INC.
         Attorneys for Defendant
18  ZAWADI BAHARANYI
    AMANDA JOY MAYO
19

20  ALSO PRESENT:  JOSEPH MAGLIOCCO, Paralegal Specialist (USAO)
                    SARAH KWON, Paralegal Specialist (Fed. Def.)
21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000130

N5UQlucH

```
 1              (In open court; case called)
 2              THE COURT:  We are here for a suppression hearing on
 3    the fruits of the search.  I don't particularly feel the need
 4    for opening statements, but if anyone wanted to make one, you
 5    can.  Otherwise, please call your first witness.
 6              MS. NICOLAS:  Thank you, your Honor.  The government
 7    is prepared to proceed without an opening statement.
 8              But before the government calls their first witness,
 9    just one thing for the Court's attention.  The physical
10    exhibits for the first witness are staged at the witness box
11    already.  Happy to move those back if the Court would prefer,
12    but in the interest of time, we've placed them there in
13    advance.
14              THE COURT:  That's fine.  I neglected, because my
15    courtroom deputy is out today, for counsel to identify
16    themselves for the record.
17              MS. NICOLAS:  Ashley Nicolas, Madison Smyser, and
18    Sarah Mortazavi for the government.  We are joined by Joseph
19    Magliocco, a paralegal specialist.
20              MS. BAHARANYI:  Zawadi Baharanyi for Federal
21    Defenders.  I'm here with counsel from our office, Amanda Mayo,
22    as well as paralegal specialist Sarah Kwon.  And seated to my
23    right is Lucha El.
24              THE COURT:  Go ahead, call your first witness.
25              MS. NICOLAS:  Before the government calls its first
```

N5UQlucH

1    witness, I would like to offer two stipulations as well as the

2    exhibits that are the subject of those stipulations.

3            The first is Government Exhibit 1000, which stipulates

4    between the parties that Government Exhibit 100 is a disk

5    containing a true and accurate copy of a recording of a

6    telephone call made to New York City's 911 call system on

7    June 23, 2021 at approximately 9:52 p.m. from the vicinity of

8    161 East Gun Hill Road in the Bronx, New York.

9            Government Exhibit 200 is a disk containing a true and

10   accurate copy of a recording of a radio run broadcast over a

11   New York City Police Department radio system on June 23, 2021

12   at approximately 9:52 p.m.

13           The parties further stipulate and agree that the

14   exhibits marked as Government Exhibit 1000, as well as

15   Governments Exhibits 100 and 200 may be received in evidence at

16   this hearing.

17           At this time, your Honor, the government offers

18   Government Exhibits 100, and 200 and 1000.

19           THE COURT:  Received.

20           (Government's Exhibits 100, 200 and 1000 received in

21   evidence)

22           MS. NICOLAS:  At this time, your Honor, the government

23   also offers Government Exhibit 1001, as well as Government

24   Exhibit 100T and 200T, which are the subject of that

25   stipulation.

4

N5UQlucH

1          In this stipulation, the parties stipulate and agree

2     the Government Exhibit 100T is a true and accurate transcript

3     of Government Exhibit 100, and that Government Exhibit 200T is

4     a true and accurate transcript of Government Exhibit 200.

5          The parties further stipulate and agree that

6     Government Exhibit 1001 as well as Government Exhibits 100T and

7     200T may be received in evidence at a hearing.

8          At this time the government offers 1001, 100T and

9     200T.

10          THE COURT:  Received.

11          (Government's Exhibits 100T, 200T and 1001 received in

12     evidence)

13          MS. NICOLAS:  With that, your Honor, the government

14     calls Police Officer Jarren Smalls.

15      JARREN SMALLS,

16          called as a witness by the Government,

17          having been duly sworn, testified as follows:

18          THE COURT:  State your full name and spell it for the

19     record.

20          THE WITNESS:  My name is Jarren Smalls.  I work for

21     the New York City Police Department.  J-A-R-R-E-N.  Smalls,

22     S-M-A-L-L-S.

23          THE COURT:  Counsel.

24

25

N5UQlucH                          Smalls - Direct

```
 1    DIRECT EXAMINATION

 2    BY MS. NICOLAS:

 3    Q.  Thank you, your Honor.

 4             Officer Smalls, before we begin your testimony,

 5    Mr. Magliocco, I would ask you to please publish what's in

 6    evidence as the 911 call as Government Exhibit 100.

 7             (Audio played)

 8             MS. NICOLAS:  May the record reflect that the 911 call

 9    marked as Government Exhibit 100 was played in full at 3

10    minutes 31 seconds.

11    Q.  Officer Smalls, good afternoon.

12    A.  Good afternoon.

13    Q.  You said you're employed by the NYPD.  How long have you

14    worked for the NYPD?

15    A.  Five years.

16    Q.  What's your current title?

17    A.  Police officer.

18    Q.  Are you assigned to a particular precinct?

19    A.  Yes, I work for Bronx Public Safety.

20    Q.  In Bronx Public Safety, do you report to a particular

21    precinct office?

22    A.  Yes.

23    Q.  What precinct is that?

24    A.  We report out of 500 Abbott Street.

25    Q.  How long have you been assigned to that precinct?
```

N5UQlucH                    Smalls – Direct

1   A.  Approximately a month and a half now.

2   Q.  Where were you assigned before that?

3   A.  The 52 precinct.

4   Q.  How long were you assigned at the 52 precinct?

5   A.  Since I've been out of the academy.

6   Q.  Which is how long?

7   A.  Four and a half years.

8   Q.  I want to focus on June of 2021.  Where were you working

9   then?

10  A.  The 25 precinct.

11  Q.  Were you assigned to a particular unit in the 25 precinct?

12  A.  Yes, I was assigned to the public safety team.

13  Q.  Can you describe some of the responsibilities that you have

14  as a member of the public safety team?

15  A.  We patrol high-crime locations within that precinct that

16  are plagued by gun violence, shootings, assaults, robberies and

17  are frequented by gang members.

18  Q.  You said high-crime areas.  Can you describe what you mean

19  by a high-crime area?

20  A.  Narcotic sales, shootings, stabbings, assaults.

21  Q.  When you're on patrol, what are some of the things you

22  might do as a public safety team member?

23  A.  We patrol those locations, proactively address those

24  conditions.

25  Q.  Do you respond to 911 calls?

N5UQlucH                    Smalls - Direct

1  A.  Yes.

2  Q.  As of June of 2021, approximately how many arrests would

3  you say you'd participated in?

4  A.  More than a hundred.

5  Q.  Of those more than a hundred or less, how many of them were

6  gun arrests?

7  A.  Approximately 50.

8  Q.  Focusing on guns, have you received firearms training as a

9  member of the NYPD?

10  A.  Yes.

11  Q.  Again, focusing on the time up to June of 2021, how many

12  hours of training would you say you've received, approximately?

13  A.  More than a hundred.

14  Q.  At a high level what are some of the topics of that

15  firearms training that you received?

16  A.  Maintaining firearms, carrying firearms, identifying

17  firearms, shooting firearms, identifying subjects that may be

18  carrying firearms.

19  Q.  I'm going to ask you to talk a little bit closer to the

20  mic.  When you say you received training on identifying

21  subjects that might be carrying firearms, can you give me some

22  more detail on that?

23  A.  Sure.  Basically taught how subjects may carry firearms,

24  how they may act when they see police officers when they're

25  carrying a firearm, locations where they may carry the firearm.

N5UQlucH                    Smalls - Direct

1    Q.  When you say locations, what do you mean?

2    A.  Locations as on their person.

3    Q.  A moment ago you testified that as of June of 2021, you

4    participated in approximately 50 gun arrests.  Of those 50 gun

5    arrests, how many were within the confines of the 52 precinct?

6    A.  All of them.

7    Q.  I want to direct your attention to the night of June 23,

8    2021.  Were you working that evening?

9    A.  Yes.

10   Q.  What was your assignment that night?

11   A.  Public safety.

12   Q.  What were some of the things you were expected to do when

13   assigned to public safety on the night of June 23, 2021?

14   A.  As I said before, to patrol the high-crime locations within

15   that precinct, precincts that are sectors that were plagued

16   with gang violence, robberies, shootings.

17   Q.  You just used the word sector.  What do you mean by sector?

18   A.  Sectors are a portion of the precinct.  The precinct is

19   divided into different sectors or different neighborhoods

20   within the precinct.

21   Q.  Were you responsible for a particular sector on June 23?

22   A.  We were responsible for the whole precinct, but at that

23   time we were in sector David.

24   Q.  On June 23, 2021, were you patrolling on foot or in a car?

25   A.  In a car.

N5UQlucH                    Smalls - Direct

1   Q.  Were you alone?

2   A.  No.

3   Q.  Who were you with?

4   A.  My partner, Officer Cotter.

5   Q.  On June 23 of 2021, were you wearing a body-worn camera?

6   A.  Yes.

7   Q.  Does your body-worn camera need to be turned on in order to

8   record?

9   A.  Yes.

10  Q.  Can you explain how that works?

11  A.  Once you activate the body-worn camera, the video starts

12  recording.  It also goes back a minute prior to you pressing

13  the button to activate the camera.

14  Q.  From the time you press the button forward, do you get

15  audio?

16  A.  No -- yes.

17  Q.  Forward?

18  A.  You get audio once you activate the camera.  The minute

19  prior that gets memorialized does not have audio.

20  Q.  But it has video?

21  A.  Yes.

22  Q.  Next to you is an item that's marked as Government Exhibit

23  300 for identification.  Do you see it?

24  A.  Yes.

25  Q.  Have you seen that before?

N5UQlucH                        Smalls – Direct

1   A.  Yes.

2   Q.  How do you recognize it?

3   A.  I put my initials on it.

4   Q.  What is that item?

5   A.  This is the -- it's a copy of body-worn camera footage.

6   Q.  Is it saved on a disk?

7   A.  Yes.

8   Q.  Did you review the contents of that disk before testifying

9   today?

10  A.  Yes.

11  Q.  Are the contents of that disk a fair and accurate depiction

12  of the events of June 23, 2021 as recorded on your body-worn

13  camera?

14  A.  Yes.

15          MS. NICOLAS:  Your Honor, at this time the government

16  offers Government Exhibit 300.

17          MS. BAHARANYI:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 300 received in evidence)

20  Q.  We'll come back to your body-worn camera in a moment.

21          I want to turn your attention back to June 23 of 2021.

22  Did you make an arrest that evening?

23  A.  Yes.

24  Q.  Approximately what time?

25  A.  Approximately 2200 hours.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000139

N5UQlucH                    Smalls - Direct

1   Q.  2200 hours is what time?

2   A.  10:00 p.m.

3   Q.  10:00 p.m.  Approximately where did that arrest occur?

4   A.  The center of Perry Avenue and East Gun Hill Road.

5   Q.  Who did you arrest?

6   A.  Mr. Steven Perez.

7   Q.  Do you know him by any other names?

8   A.  Lucha.

9   Q.  Do you see Steven Perez a/k/a Lucha in the courtroom?

10  A.  Yes.

11  Q.  Can you describe him by where he's sitting and an article

12  of clothing he's wearing?

13  A.  Sitting at the second table wearing a white shirt.

14          MS. NICOLAS:  Your Honor, may the record reflect that

15  the witness has identified the defendant as Steven Perez, a/k/a

16  Lucha.

17          THE COURT:  Yes.

18  Q.  You testified a moment ago that on June 23 of 2021, you

19  were patrolling in a car with Officer Cotter.  Who was driving?

20  A.  Officer Cotter.

21  Q.  Where were you sitting?

22  A.  In the passenger seat.

23  Q.  When you are seated in the passenger seat on a patrol, do

24  you have any responsibilities?

25  A.  Yes.

N5UQlucH                    Smalls - Direct

1   Q.  What are some of those responsibilities?

2   A.  Responsible to make radio transmissions, listen to the

3   radio, also to record what we do throughout the day.

4   Q.  Directing your attention to about 9:50 p.m. on June 23 of

5   2021.  Were you monitoring the radio at that time?

6   A.  Yes.

7   Q.  Did you receive a radio run?

8   A.  Yes.

9   Q.  Can you explain what a radio run is?

10  A.  A radio run is when someone calls 911 asking for

11  assistance, whether it be medical, an emergency, or a crime.

12  Q.  And what do you hear when you receive a radio run?

13  A.  I hear central, which is dispatch, putting over the

14  information to the officers.

15  Q.  So whose voices are you hearing when it comes across the

16  radio?

17  A.  I'm hearing central's voice and responding officers.

18  Q.  Do you hear the 911 caller themselves?

19  A.  No.

20  Q.  When you're receiving that radio run over the radio, the

21  audio, are you receiving that information any other way?

22  A.  Yes.

23  Q.  How are you receiving it?

24  A.  The information is also accessible on our work phones.  We

25  can pull it up and get the information through text.

N5UQlucH                    Smalls - Direct

1            MS. NICOLAS:  Your Honor, at this time the government

2    offers Government Exhibit 1002, which is a stipulation.

3            MS. BAHARANYI:  No objection, your Honor.

4            THE COURT:  Received.

5            (Government's Exhibit 1002 received in evidence)

6            MS. NICOLAS:  Your Honor, the government offers

7    Exhibit 1002 which stipulates between the parties that

8    Government Exhibit 101 is a true and correct copy of a Sprint

9    report maintained by the New York City Police Department

10   documenting a 911 call and law enforcement response to that

11   call on or about June 23, 2021.

12           It is a record of regularly conducted activity of the

13   NYPD that was created, kept and maintained in the ordinary

14   course of regularly conducted activities of the NYPD, made as a

15   regular practice of the activities of the NYPD, and made at or

16   near the time by or from information transmitted by someone

17   with knowledge of the information contained therein.

18           Your Honor, the government also offers Government

19   Exhibit 101 at this time.

20           THE COURT:  Received.

21           (Government's Exhibit 101 received in evidence)

22           MS. NICOLAS:  Mr. Magliocco, would you please publish

23   what's in evidence as Government Exhibit 101.

24   Q.  Officer Smalls, can you see that on the screen in front of

25   you?

N5UQlucH                    Smalls - Direct

```
 1    A.  Yes.

 2    Q.  Do you recognize this?

 3    A.  Yes.

 4    Q.  What is this?

 5    A.  This is the CAD.  This is the job information that I was

 6    looking at during the call.

 7    Q.  Did you say CAD?

 8    A.  Yes.

 9    Q.  C-A-D?

10    A.  Yes.

11    Q.  What is a CAD?

12    A.  It's basically the job, the 911 radio run printed out into

13    text.

14    Q.  The information that appears here on the face of Government

15    Exhibit 101, did you see that information somewhere when you

16    were responding?

17    A.  Yes.

18    Q.  Where?

19    A.  On my work phone.

20    Q.  Okay.  I want to focus on 9:53 p.m., so 9:53 and 07

21    seconds.

22         Officer Smalls, at a high level, what do you learn

23    from the radio run you receive at approximately 9:53 p.m.?

24    A.  That there was a male armed with a firearm in the vicinity

25    of Gun Hill and Perry Avenue, wearing a white shirt with black
```

N5UQlucH                    Smalls - Direct

1   pants and a black-and-white turban.

2   Q.  Earlier you testified about sectors of the 52nd precinct.

3   When you received this radio run, what sector of the 52

4   precinct were you in?

5   A.  Sector David.

6   Q.  Had you patrolled Sector David before?

7   A.  Yes.

8   Q.  How many times approximately?

9   A.  Hundreds of times.

10  Q.  When you have been in Sector David in the past, what types

11  of crimes have you been responding to?

12  A.  Responding to crimes in progress, subjects with firearms,

13  assaults, robberies, aided cases.

14  Q.  What's an aided case?

15  A.  Basically a medical case.

16  Q.  Okay.  How would you characterize Sector David in June of

17  2021?  How would you describe it?

18  A.  Sector David was placed --

19          MS. BAHARANYI:  Objection, your Honor.

20          THE COURT:  Ground.

21          MS. BAHARANYI:  Your Honor, this question of how would

22  you characterize Sector David I think bears -- there's no

23  relevance to the issue here, which is the legality of the stop.

24          THE COURT:  Well, I think it's marginally relevant.

25  Overruled.  You may answer.

N5UQlucH                    Smalls - Direct

1   A.  Sector David at that time was plagued with gang violence,

2   assaults, shootings.

3   Q.  You just testified a moment ago that you've patrolled

4   Sector David hundreds of times by June of 2021.  Were any of

5   those at night?

6   A.  Yes.

7           MS. NICOLAS:  Mr. Magliocco, can you please show to

8   the witness what's been marked for identification as Government

9   Exhibit 601.

10  Q.  Is it on your screen, Officer Smalls?

11  A.  No.

12  Q.  Officer Smalls, do you recognize Government Exhibit 601?

13  A.  Yes.

14  Q.  What is this?

15  A.  This is a portion of the 25 precinct.  It's predominantly

16  showing Sector David.

17  Q.  Based on your hundreds of patrols around June of 2021, is

18  this a fair and accurate depiction of that portion of Sector

19  David as it appeared in June of 2021?

20          THE COURT:  Yes.

21          MS. NICOLAS:  Your Honor, the government offers

22  Government Exhibit 601.

23          MS. BAHARANYI:  No objection, your Honor.

24          THE COURT:  Received.

25          (Government's Exhibit 601 received in evidence)

N5UQlucH                    Smalls - Direct

1          MS. NICOLAS:  Mr. Magliocco, please publish Government

2     Exhibit 601.

3     Q.  Officer Smalls, just generally describe where you were in

4     Sector David at 9:53 p.m. when you received the radio run.

5     A.  In the vicinity of East Gun Hill Road and Hull Avenue.

6     Q.  I believe that screen may work if you touch where it is.

7          MS. NICOLAS:  Please let the record reflect that the

8     witness has marked a pink circle in the area near Bronx School

9     for Music on Government Exhibit 601 with a pink circle.

10         THE COURT:  Yes.

11    Q.  Mr. Magliocco, please clear the screen and pull down --

12         THE COURT:  Looks violet to me, but otherwise what you

13    said is correct.

14         MS. NICOLAS:  We'll adopt the Court's opinion there,

15    the violet circle.

16         Can you please publish what's in evidence as

17    Government Exhibit 200T?  Move to page 2, please.

18         Mr. Magliocco, I'm going to ask you to play what's in

19    evidence as Government Exhibit 200, if possible, while 200T is

20    displayed on the screen from the beginning to second 45.

21         (Audio played)

22    Q.  Officer Smalls, what did we just listen to?

23    A.  You were listening to central giving us the job and me

24    responding to central.

25    Q.  Whose voices do you recognize?

N5UQlucH                         Smalls – Direct

1   A.  Central's voice and my voice.

2   Q.  Who was that last voice that we heard?

3   A.  My voice.

4   Q.  Focusing on line 12 of Government Exhibit 200T that's

5   displayed on the screen, when you said "2 public safety going,"

6   what were you saying?

7   A.  That I was responding to the call.

8   Q.  What is 2 public safety a reference to?

9   A.  My unit or my job that I was doing that night.

10  Q.  So at this point based on what you've learned so far from

11  the radio run, what are you looking for?

12  A.  I was looking for a male Hispanic wearing a white T-shirt,

13  black pants with black-and-white sneakers with a

14  black-and-white turban armed with a firearm.

15  Q.  Okay.  Based on the radio run, what location did you expect

16  that individual to be at?

17  A.  To be in the vicinity of East Gun Hill Road and Perry

18  Avenue.

19       MS. NICOLAS:  Mr. Magliocco, I ask you to pull down

20  Government Exhibit 200T and publish for us what's in evidence

21  as Government Exhibit 601.

22  Q.  I believe you can use the screen here, Officer Smalls.  Can

23  you describe how you and Officer Cotter traveled from the

24  location you were at when you heard the radio run to the

25  location you believed the 911 call was reporting an individual

N5UQlucH                    Smalls - Direct

1   with a gun?

2   A.  Yes.  We traveled southbound on Hull Avenue, and we made a

3   right turn to travel west on East 209th Street and made another

4   right to travel northbound onto Perry Avenue.

5            MS. NICOLAS:  Let the record reflect that the witness

6   used a violet pen to draw a line moving down Hull Avenue,

7   taking a right at East 209th Street and another right at Perry

8   Avenue.

9   Q.  Now, as you were traveling, Officer Smalls, did you receive

10  additional information from the radio run?

11  A.  Yes.

12           MS. NICOLAS:  Mr. Magliocco, I'm going to ask you to

13  pull down Government Exhibit 601.  If we could go back to

14  Government Exhibit 200T, please.

15           Stop right there for a second, Mr. Magliocco.

16  Q.  Going back to the initial part of the radio run captured on

17  lines 3 through 11, is there any mention of footwear in those?

18  And take a second if you need to.

19  A.  No.

20  Q.  Now you said you received additional information as you

21  were traveling to the scene of the arrest.  Is that correct?

22  A.  Yes.

23           MS. NICOLAS:  Mr. Magliocco, could you please go to

24  the next page of 200T.  Thank you.  I'm going to ask that you

25  play Government Exhibit 200 beginning at 1 minute and 55

N5UQlucH                    Smalls - Direct

1    seconds and ending at 2 minutes and 35 seconds.

2              (Audio played)

3    Q.  At this point, what information do you know about the

4    individual you're looking for?

5    A.  That the individual is wearing black-and-white sneakers,

6    he's medium build, about five foot two, light skinned.

7    Q.  At line 16, you say "2 public safety show me rolling E4."

8    What did you mean by that?

9    A.  Showing me arriving on scene.

10   Q.  When the operator said, "CAD time 2155," what did that

11   mean?

12   A.  Basically timestamping me saying when I get there.

13              MS. NICOLAS:  Mr. Magliocco, if you could pull down

14   these two exhibits and publish what's in evidence as Government

15   Exhibit 300.

16   Q.  Officer Smalls, before I ask Mr. Magliocco to start

17   playing, could you please explain what it is that we're looking

18   at on the screen here?

19   A.  This is my body cam captured from my point of view that

20   evening.

21   Q.  In the top right corner of the screen, could you please

22   read the timestamp?

23   A.  Sure.  It's June 23, 2021 at 2155 hours.

24   Q.  How many seconds?

25   A.  54 seconds.

N5UQlucH                         Smalls - Direct

1    Q.  Where are you seated as this video is recording?

2    A.  The passenger seat.

3    Q.  Passenger seat of what?

4    A.  Of our unmarked RMP.

5    Q.  Where is Officer Cotter relative to you?

6    A.  He's in the driver's seat.

7         MS. NICOLAS:  Mr. Magliocco, could you please play the

8    first 15 seconds of this video.

9         (Video played)

10   Q.  Officer Smalls, why isn't there any sound in the first 15

11   seconds of Government Exhibit 10?

12   A.  I hadn't activated my body-worn camera yet.

13   Q.  What are you doing in this first 15 seconds?

14   A.  Responding to the location, I'm reading the information

15   that's being put over by -- I'm reading the 911 call, or the

16   job on my department-issued cellphone.

17   Q.  Is that the job we looked at earlier in Government Exhibit

18   101?

19   A.  Yes.

20        MS. NICOLAS:  Mr. Magliocco, could you please continue

21   playing and pause at 38 seconds.

22        (Audio played)

23        MS. NICOLAS:  Take it back about one second.  We are

24   paused at 37 seconds in the Government Exhibit 300.

25   Q.  Officer Smalls, what did we just watch happen in that clip?

N5UQlucH                    Smalls - Direct

A.   You watched us responding to the location; and as we made

the right turn on to Perry Avenue from East 209th Street, I

observed a subject matching that description on Perry Avenue,

and I'm pointing at him identifying him to my partner.

Q.   You're identifying the subject.  We're going to look at

Government Exhibit 601 in just a second.  Relative to you,

where is that subject?

A.   Perry Avenue.

Q.   What attracted your attention?

A.   He's matching the specific description of white T-shirt,

black pants.

        MS. NICOLAS:  Mr. Magliocco, could you put up

Government Exhibit 601, please.

Q.   Looking at Government Exhibit 601 as you turned that corner

and pointed at 37 seconds into Government Exhibit 300, can you

just indicate on the map for us where you were.

A.   I was here.

Q.   And you were making the right turn onto Perry Avenue?

A.   Correct.

Q.   Where was the subject that you were pointing at?

A.   Where this red marker is.

Q.   Where did you expect based on the radio run to see the

individual matching the description to be?

A.   Between this gray marker and this red marker.

        MS. NICOLAS:  Let the record reflect that the witness

N5UQlucH                    Smalls - Direct

1   has indicated that he was making a right at the corner of East

2   209th and Perry Avenue with a violet mark.  He has circled a

3   red flag along Perry Avenue as the subject he identified and

4   he's drawn a line between a flag marking the Bronx School for

5   Music and the red flag along Perry Avenue as the location where

6   he expected to see an individual with a firearm.

7           THE COURT:  If you don't like violet mark, you could

8   substitute plum, lavender, perhaps amethyst.

9           MS. NICOLAS:  I think I've become partial to violet,

10  your Honor.

11          THE COURT:  There we are.

12  Q.  From your location on Perry Avenue down to East 209th,

13  Officer Smalls, what could you see on the subject from that

14  distance?

15  A.  I could see that he was wearing some sort of headgear.  I

16  can also see that he had a bag.

17  Q.  Anything in particular about the bag?

18  A.  Yes.  It was a blue bag, and it matched the description

19  that the caller had put over.

20          MS. NICOLAS:  Mr. Magliocco, can you please pull this

21  down, and we are going to pull Government Exhibit 300 back up.

22  We left off at 37 seconds.

23  Q.  After you pointed at the defendant, Officer Smalls, what

24  did you do next?

25  A.  Me and my partner got closer to him with the vehicle.

N5UQlucH                    Smalls - Direct

1          MS. NICOLAS:  Mr. Magliocco, if you could, please

2     continue playing Government Exhibit 300 beginning at 37 seconds

3     and pausing it at the one minute mark.

4          (Audio played)

5     Q.  Officer Smalls, we just heard sound there at the end about

6     59 seconds.  Why did the sound begin there?

7     A.  That's when I activated by body-worn camera.

8     Q.  Can you describe for us right now what's on the screen?

9     A.  Sure.  This is what I arrived to.  I arrived to the subject

10    matching the very specific description with headgear,

11    black-and-white headgear, the white T-shirt, black pants with

12    the blue bag.

13    Q.  Before we go any further, can you just read the timestamp

14    for me in the right top corner of the screen?

15    A.  Sure.  June 23 of 2021, at 2156 hours and 55 seconds.

16    Q.  Now, as you approached the defendant, was anyone with you?

17    A.  Yes.

18    Q.  Who?

19    A.  My partner.

20    Q.  Were there any other officers on the scene at this point?

21    A.  No.

22    Q.  Now, as you approached the defendant, can you describe the

23    angle of your body relative to the angle of his body?

24    A.  Sure.  I was facing the subject.  The subject was parallel

25    to the wall, so he was perpendicular towards me.

N5UQlucH                    Smalls - Direct

1   Q.  As you approached him, what, if anything, did you notice

2   about his appearance?

3   A.  I noticed that he matched the very specific description

4   that was put over the radio, and I noticed the bag that was

5   affixed to his person.

6   Q.  So let's start with the appearance.  Did you notice

7   anything about his build?

8   A.  Yes, he was male Hispanic.  He was slim build and about

9   five-two.

10  Q.  As to the way he was dressed specifically, what did you

11  notice?  You testified about the headgear.  What else?

12  A.  The white T-shirt, the black pants, the black-and-white

13  sneakers, wearing the blue bag.

14  Q.  Let's talk about the bag.  What attracted your attention

15  about the way he was wearing the bag?

16  A.  The bag was across his body underneath his arm

17  perpendicular to him, so as his torso was facing the wall, the

18  bag is laying along the side of his body.

19  Q.  So as you approached him, how was the bag angled towards

20  you?

21  A.  Parallel to me.

22  Q.  What, if anything, did you notice about the way the bag was

23  on his body?

24  A.  The bag looked like it had a heavily weighted object in it.

25  It was pulling towards the ground.  The string was taught

A000154

N5UQlucH                    Smalls - Direct

1  across his chest.  The top portion of the bag was compressed by

2  the upper portion of his arm.  I was able to see a bulge at the

3  lower portion of the bag.

4  Q.  Can you explain to me what you mean by the top part was

5  compressed by his arm?

6  A.  The top part of his bag was compressed by his arm,

7  flattening it.

8  Q.  Flattening what?

9  A.  Flattening the top portion of the bag.

10  Q.  And what about the bottom portion?

11  A.  The bottom portion wasn't covered, so the bottom portion

12  you can see there was objects inside the bag or an object

13  inside the bag creating a bulge at the bottom.

14  Q.  What, if anything, did you notice about the way that the

15  bag moved?

16  A.  The bag moved quite tight to his body.  It didn't swing off

17  his body.  It was close to him.

18        MS. NICOLAS:  Mr. Magliocco, could you please show to

19  the witness what has been marked for identification as

20  Government Exhibits 300A and B.  Thank you.

21  Q.  Officer Smalls, do you recognize Government Exhibits 300A

22  and B?

23  A.  Yes.

24  Q.  What are they in general terms?

25  A.  These are still images of my body-worn camera footage.

N5UQlucH                    Smalls - Direct

1    Q.  Are they fair and accurate depictions from your body-worn

2    camera on June 23, 2021?

3    A.  Yes.

4            MS. NICOLAS:  Your Honor, at this time the government

5    offers Government Exhibits 300A and B.

6            MS. BAHARANYI:  No objection.

7            THE COURT:  Received.

8            (Government's Exhibits 300A and 300B received in

9    evidence)

10           MS. NICOLAS:  Mr. Magliocco, if you could please

11   publish Government Exhibit 300A.

12   Q.  Officer Smalls, while Mr. Magliocco is doing that, next to

13   you is an item that was marked as Government Exhibit 501.  Do

14   you see that?

15   A.  Yes.

16   Q.  Do you recognize it?

17   A.  Yes.

18   Q.  What was that?

19   A.  That was the bag that was affixed to the defendant.

20   Q.  How do you know that?

21   A.  I recognize it by this crocodile emblem on the bottom of

22   the bag.

23   Q.  Did you have an opportunity to view it before your

24   testimony?

25   A.  Yes.

N5UQlucH                    Smalls - Direct

1  Q.  Is it in substantially the same condition as when you saw

2  it on June 23 of 2021?

3  A.  Yes.

4       MS. NICOLAS:  Your Honor, at this time the government

5  offers Government Exhibit 501.

6       MS. BAHARANYI:  Your Honor, if we may take the bag and

7  inspect it briefly ourselves?

8       THE COURT:  Yes.

9       MS. BAHARANYI:  May I approach?

10       THE COURT:  Yes.

11       MS. BAHARANYI:  No objection, your Honor.

12       THE COURT:  Received.

13       (Government's Exhibit 501 received in evidence)

14       MS. NICOLAS:  For the record, Government Exhibit 501

15  is a blue fabric crossbody bag with a strap, approximately

16  eight inches wide, ten inches tall, and about an inch deep.

17       Mr. Magliocco, please show to the witness what is

18  marked as Government Exhibit 401.

19  Q.  Officer Smalls, do you recognize Government Exhibit 401?

20  A.  Yes.

21  Q.  What is that?

22  A.  It's a photograph of the bag.

23  Q.  Is that a fair and accurate depiction of the bag as it

24  appeared after it was removed from the defendant on the evening

25  of June 23, 2021?

N5UQlucH                    Smalls - Direct

1    A.  Yes.

2              MS. NICOLAS:  Your Honor, at this time the government

3    offers Government Exhibit 401.

4              MS. BAHARANYI:  No objection, your Honor.

5              THE COURT:  Received.

6              (Government's Exhibit 401 received in evidence)

7    Q.  In your time patrolling the 25 precinct, had you

8    encountered bags like this before?

9    A.  Yes.

10   Q.  Had you ever recovered firearms from bag likes this before?

11   A.  Yes.

12   Q.  Approximately how many times?

13   A.  Approximately ten times.

14   Q.  You mentioned earlier you received some firearms training

15   in the course of your employment with the NYPD.  Is that right?

16   A.  Yes.

17   Q.  In any of that training, did you learn about bags like

18   this?

19   A.  Yes.

20   Q.  What did you learn?

21   A.  The subjects carry firearms in them.  They don't have

22   holsters most of the time.

23   Q.  Now, after you approached the defendant, what did you do

24   next?

25   A.  I frisked the bag that was affixed to his person.

```
       N5UQlucH                    Smalls - Direct
```

1    Q.  When you say you "frisked the bag," what do you mean?

2    A.  I patted down the outer portion of it and squeezed the

3    outer portion of it.

4    Q.  And what did you feel?

5    A.  At that time I felt a hard metal, L-shaped object, the

6    shape and size consistent of a firearm.

7    Q.  Have there been other occasions during your employment with

8    the NYPD that you frisked the exterior of a bag?

9    A.  Yes.

10   Q.  On other occasions, have you then recovered firearms from

11   those bags?

12   A.  Yes.

13   Q.  Was what you felt on June 23, 2021 consistent with what you

14   felt on other occasions when you've recovered a firearm from a

15   bag?

16   A.  Yes.

17         MS. NICOLAS:  Mr. Magliocco, can you please pull up

18   what's in evidence as Government Exhibit 300.  I believe we

19   left off at minute one.  I'm going to ask to play starting at

20   59 seconds to 1 minute and 12 seconds.

21         (Video played)

22   Q.  What were you doing in that clip?

23   A.  That's me frisking the outside portion of the defendant's

24   bag.

25   Q.  At the end of the clip, what did you say?

N5UQlucH                    Smalls - Direct

1    A.  I stated to my partner "92."

2    Q.  What does 92 mean?

3    A.  92 means arrest.

4    Q.  Why did you say 92?

5    A.  I wanted the defendant handcuffed because once I frisked

6    the bag, I felt an object that was consistent with a firearm,

7    so I wanted him handcuffed for our safety.

8    Q.  What did Officer Cotter do in response to you saying 92?

9    A.  He placed him in handcuffs.

10          MS. NICOLAS:  Mr. Magliocco, could you continue

11   playing the body-worn camera, which is Government Exhibit 300,

12   from one minute 12 seconds up to 1:55:00.

13          (Video played)

14          MS. NICOLAS:  Pause, Mr. Magliocco.  We're paused at

15   one minute 54 seconds.

16   Q.  Officer Smalls, what were you doing during that portion of

17   the video?

18   A.  I was removing the bag from the subject.

19   Q.  What, if anything, was he saying as you were removing the

20   bag?

21   A.  He said, "Where you going with my bag?  That's my arm.

22   That's my arm.  That's my constitutional right."

23   Q.  What did you understand that to mean?

24   A.  That that was his firearm in the bag, and it was his right

25   to carry it.

N5UQlucH                        Smalls - Direct

1   Q.  Why did you remove the bag from his person?

2   A.  I wanted it off his person so he couldn't retrieve it.

3   It's dangerous when people are armed with firearms.

4   Q.  Once you removed it from his person, what did you do next?

5   A.  I further inspected it.  I opened the bag to search, to see

6   if the object or if what I felt was in fact a firearm.

7           MS. NICOLAS:  Mr. Magliocco, could you please continue

8   playing Government Exhibit 300 beginning at one minute 54

9   seconds.  And I'd ask you to play it through two minutes and 20

10  seconds, two-zero.

11          (Video played)

12          MS. NICOLAS:  We are paused at two minutes 20 seconds

13  into Government Exhibit 300.

14  Q.  Officer Smalls, what were you doing in that clip?

15  A.  That's when I had opened the bag to search the bag to see

16  if the object was a firearm.  I shined my flashlight on it to

17  make sure that it was in fact real and was a gun.

18  Q.  And what did you see when you looked into the bag with your

19  flashlight?

20  A.  I saw the firearm.

21  Q.  How was it positioned?

22  A.  It was positioned with the slide on the bottom of the bag

23  with the butt of the handle facing up towards the sky.

24  Q.  At the end of the clip, what did you ask the defendant?

25  A.  I asked him if he had a permit for this firearm.

N5UQlucH                    Smalls - Direct

1   Q.  How did he respond?

2   A.  He said "No.  I don't need a permit.  It's my

3   constitutional right."

4           MS. NICOLAS:  Your Honor, may I approach the witness?

5           THE COURT:  Yes.

6   Q.  Officer Smalls, do you see an object next to you that's

7   been marked for identification marked as Government Exhibit

8   502?

9   A.  Yes.

10  Q.  Do you recognize that?

11  A.  Yes.

12  Q.  What is it?

13  A.  This is the firearm that was recovered out of the bag that

14  was affixed to the defendant.

15  Q.  How do you know that's the same gun?

16  A.  I recognize it by the light and the laser that's attached

17  to it and also the serial number.

18  Q.  You had an opportunity to review the serial number before

19  you testified?

20  A.  Yes.

21  Q.  Did you initial the firearm?

22  A.  Yes.

23  Q.  Is it the same firearm you viewed earlier?

24  A.  Yes.

25  Q.  Is that firearm in substantially the same condition as it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000162**

N5UQlucH                    Smalls - Direct

1   was on June 23 of 2021?

2   A.  No.

3   Q.  What's different?

4   A.  The firearm was loaded.  So the cartridges were inside the

5   magazine, and the magazine was inside the firearm.

6           MS. NICOLAS:  Your Honor, at this time the government

7   offers Government Exhibit 502 into evidence.

8           MS. BAHARANYI:  No objection, your Honor.

9           THE COURT:  Received.

10          (Government's Exhibit 502 received in evidence)

11  Q.  Now, while you were looking in the bag and viewing the

12  firearm, what was Officer Cotter doing?

13  A.  Officer Cotter was securing the subject and trying to

14  secure a show-up to happen.

15  Q.  You said he was trying to secure a show-up, what is a

16  show-up in general terms?

17  A.  A show-up is when we call the CV, the complainant or

18  victim, over to the scene to basically verify that we got the

19  person they were calling about, basically point them out.

20  Q.  Are there occasions when that CV or victim is the 911

21  caller?

22  A.  Yes.

23  Q.  Was there a show-up in this case?

24  A.  Yes.

25  Q.  What's the purpose of show-ups?  You just mentioned it, but

N5UQlucH                    Smalls - Direct

1    to be clear, why do you do a show-up?

2    A.   Just to make sure that we have the right person.

3          MS. NICOLAS:  Mr. Magliocco, could you please publish

4    what's in evidence as Government Exhibit 101.

5    Q.   Now that Government Exhibit 101 is on the screen, Officer

6    Smalls, if you could remind us what this is?

7    A.   This is the CAD or the job or the 911 call in text.

8    Q.   I want to turn your attention to the entry at 21:58 and 9

9    seconds.  What does that entry say?

10   A.   It says, "52 public safety 1 need show-up at 3318 Perry."

11   Q.   What do you understand that to mean?

12   A.   That was my partner calling for a show-up.

13         MS. NICOLAS:  Mr. Magliocco, you could pull this down

14   and publish what's in evidence as the body-worn camera at

15   Government Exhibit 300.

16         I would like to begin at timestamp 10:08.  For audio

17   purposes, let's start at 10:06.

18   Q.   Now before we play this, Officer Smalls, could you just

19   describe what's going on at the scene at 10:06 and zero

20   seconds?

21   A.   This is us waiting for the show-up.

22         MS. NICOLAS:  Mr. Magliocco, if you could play from

23   10:06 to 10:23.

24         (Video played)

25         MS. NICOLAS:  Pause at 10:25.

N5UQlucH                    Smalls - Direct

Q.  Officer Smalls, can you explain what we just watched in
that clip?

A.  We watched the show-up being conducted.  We had positive
results, meaning the witness CV, the victim, said that that was
the guy, and then we subsequently placed him under arrest.

        MS. NICOLAS:  Mr. Magliocco, could you take us back to
10:06 and pause it there for a second?

Q.  Can you describe, Officer Smalls, where the CV, which
you're referring to the 911 caller, where they're located as
you're standing here on the sidewalk?

A.  They're in the street.

Q.  Are they visible to you?

A.  No.

Q.  Where are they on the street?

A.  They're in the back of an RMP.

Q.  How do you know that there was a positive ID?

A.  Usually the cops in the front window will ask the CV in the
back, will relay it to one another saying negative or positive
and giving each other thumbs up or thumbs down.

Q.  Did that happen in this case?

A.  Yes.

Q.  Let's watch again from 10:06 to 10:23.

        (Video played)

        MS. NICOLAS:  Stop it there.  That's at 10:19.

        Mr. Magliocco, can you pull that down, please.

N5UQlucH                    Smalls - Direct

1   Q.  Officer Smalls, I want to take a step back for a second.

2   In preparing to testify today, did you have an opportunity to

3   inspect Government Exhibit 501, which is the blue fabric bag?

4   A.  Yes.

5   Q.  Did you also have an opportunity to inspect Government

6   Exhibit 502, which is the firearm?

7   A.  Yes.

8   Q.  Did you have an opportunity to view Government Exhibit 502,

9   which is the gun inside 501, which is the bag?

10  A.  Yes.

11  Q.  Once that gun was placed into the bag, did you have an

12  opportunity to view it straight on held up for you?

13  A.  Yes.

14  Q.  And when that bag is held straight up, looked at straight

15  on, what, if anything, did you notice with respect to the

16  firearm?

17  A.  I wasn't able to see that there was a firearm in the bag.

18  Q.  How was that angle straight at you held up different from

19  the way you viewed the firearm on the night -- the way you

20  viewed the bag on the night of June 23, 2021?

21  A.  Because the bag wasn't being held up straight in front of

22  me.  It was affixed to the subject's body, and the top portion

23  of the bag itself was compressed and flattened by the

24  defendant's arm.

25  Q.  Turning back to June 23, 2021 at about 10:06 p.m. after the

N5UQlucH                    Smalls - Direct

1  defendant was placed under arrest, what happened?

2  A.  He was brought back to the precinct basically where we

3  searched him again.  We grabbed pedigree information.  He's

4  also lodged.

5  Q.  At that point when he was placed under arrest, what

6  violations in New York Penal Law did you believe had been or

7  what sections of the New York Penal Law did you believe had

8  been violated?

9  A.  Section 265.03.01(b), as in boy, which is criminal

10  possession of a weapon second degree loaded firearm.

11  Q.  Aside from the bag and the gun, did you learn of any other

12  items being recovered from the defendant after he was searched

13  at the precinct?

14  A.  Yes.

15  Q.  What?

16  A.  I believe there was a bag of cocaine.

17  Q.  Anything else?

18  A.  Yes.

19  Q.  Anything else?

20  A.  An ID.

21  Q.  Once you got to the precinct, did you maintain possession

22  of the firearm?

23  A.  I maintained it up until we got to the precinct.  After

24  that, I transferred custody of the firearm to my partner

25  Cotter.

N5UQlucH                    Smalls – Direct

1   Q.  After the custody was transferred to Officer Cotter, what

2   happened?

3   A.  ECT was called, and ECT processed the firearm.

4   Q.  What is ECT?

5   A.  Evidence collection team.

6   Q.  What do they do?

7   A.  Basically they process evidence.  They swab it for DNA.

8   They will dust for prints.  They'll make the firearm safe.

9   Q.  What do you mean by make a firearm safe?

10  A.  So they unload it.

11  Q.  Were you present when ECT came and made safe this

12  particular firearm?

13  A.  Yes.

14  Q.  Did you learn whether or not the firearm was loaded?

15  A.  Yes.

16  Q.  Was the firearm loaded?

17  A.  Yes.

18          MS. NICOLAS:  Mr. Magliocco, showing just the witness

19  what's been marked for identification as Government Exhibits

20  402A, B and C.

21          (Photographs shown)

22          MS. NICOLAS:  B and C as well.

23          Also show the witness 403A, B and C.

24  Q.  Officer Smalls, do you recognize these photographs?

25  A.  Yes.

N5UQlucH                    Smalls - Direct

1    Q.  What are they?

2    A.  These are photographs that the evidence collection team

3    took.

4    Q.  Are these fair and accurate depictions of how the gun

5    appeared during the ECT inspection on the night of the June 23,

6    2021?

7    A.  Yes.

8              MS. NICOLAS:  Your Honor, at this time the government

9    offers Government Exhibits 402A, 402B, 402C, 403A, 403B and

10   403C.

11             MS. BAHARANYI:  No objection, your Honor.

12             THE COURT:  Received.

13             (Government's Exhibits 402A, 402B, 402C, 403A, 403B

14   and 403C received in evidence)

15   Q.  Next to you, Officer Smalls, are two exhibits:  One marked

16   as Government Exhibit 503, and one is marked as Government

17   Exhibit 504.

18             For the record, defense counsel has inspected these

19   items.

20             Do you recognize these items, Officer Smalls?

21   A.  Yes.

22   Q.  Beginning with 503, what is that?

23   A.  This is the magazine that was inside the firearm.

24   Q.  And 504?

25   A.  Those are the cartridges that were inside the magazine

N5UQlucH                    Smalls - Direct

1   inside the firearm.

2   Q.  Did you have an opportunity to view those before you

3   testified today?

4   A.  Yes.

5   Q.  How do you know those are the same objects you testified

6   prior to your testimony?

7   A.  I initialed them.

8   Q.  Now, are those in substantially the same condition, both

9   the cartridges and magazine, as they were on June 23, 2021?

10  A.  No.

11  Q.  What's different?

12  A.  The cartridges were inside the magazine, and the magazine

13  was inside the firearm.

14          MS. NICOLAS:  Your Honor, at this time the government

15  offers Government Exhibits 503 and 504.

16          MS. BAHARANYI:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibits 503 and 504 in evidence)

19          MS. NICOLAS:  Mr. Magliocco, can you please publish

20  what's in evidence as Government Exhibit 402A.

21  Q.  Officer Smalls, what's depicted on the screen in Government

22  Exhibit 402A?

23  A.  This is a picture of the firearm in the condition that we

24  recovered it in.

25  Q.  You were present when this photograph was taken?

N5UQlucH                    Smalls - Direct

1   A.  Yes.

2   Q.  Was this on the night of June 23, 2021 after the firearm

3   was seized?

4   A.  Yes.

5   Q.  Is there a magazine inserted in that firearm?

6   A.  Yes.

7   Q.  Was the magazine removed by ECT?

8   A.  Yes.

9        MS. NICOLAS:  Mr. Magliocco, can you please publish

10  what's in evidence as Government Exhibit 403A?

11  Q.  What's depicted on the screen now, Officer Smalls?

12  A.  This is a depiction of the firearm with the magazine

13  removed.

14        MS. NICOLAS:  Mr. Magliocco, showing Government

15  Exhibit 403B, please.

16  Q.  Officer Smalls, what are we looking at here?

17  A.  This is a picture of the firearm with the magazine removed,

18  and the cartridges are removed from the magazine.

19  Q.  You can consult Government Exhibit 403B here.  How many

20  rounds were inside that of magazine?

21  A.  12.

22  Q.  Can you say it a little bit louder?

23  A.  12.

24  Q.  Based on your training and experience handling firearms,

25  how, if at all, does a magazine and 12 cartridges affect the

```
N5UQlucH                    Mr. Smalls - Cross
```

1    weight of a firearm?

2    A.  It makes the firearm considerably heavier.

3            MS. NICOLAS:  Your Honor, may I have one moment?

4            (Pause)

5            MS. NICOLAS:  Nothing further.

6            THE COURT:  Cross-examination.

7            MS. BAHARANYI:  Yes, your Honor.  One moment, please.

8    CROSS-EXAMINATION

9    BY MS. BAHARANYI:

10   Q.  Good afternoon.

11   A.  Good afternoon.

12   Q.  Let's start with the radio run that you heard on the night

13   of June 23.  So you said that you were at that time on patrol

14   with your fellow officer, Officer Cotter.  Is that right?

15   A.  Correct.

16   Q.  And you heard the radio run specifically request assistance

17   that night, right?

18   A.  Yes.

19   Q.  And they requested units to investigate someone in

20   possession of a gun, right?

21   A.  Yes.

22   Q.  And across or on the radio run, you heard a description of

23   this person who was believed to be armed, right?

24   A.  Correct.

25   Q.  And that included his race, right?  It included his race?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000172**

N5UQlucH                    Mr. Smalls - Cross

1   A.  Yes.

2   Q.  His height, right?

3   A.  Mmm-hmm.

4   Q.  Included what he was wearing on top of his head.  Is that

5   right?

6   A.  Yes.

7   Q.  You heard a description for a Hispanic male wearing a

8   black-and-white turban, right?

9   A.  Correct.

10  Q.  You also heard that this person went by the name of Lucha,

11  correct?

12  A.  Correct.

13  Q.  Based on this radio run, you believed you were looking for

14  an armed suspect, right?

15  A.  Yes.

16  Q.  And you believed this person had a bag in his possession,

17  right?

18  A.  Yes.

19  Q.  And you believed that this person had a firearm inside of

20  this bag.  Is that right?

21  A.  Correct.

22  Q.  Other than the radio run and the text description of the

23  radio run, was there any other information you were relying on

24  this evening before engaging in a stop?

25  A.  No.

N5UQlucH                    Mr. Smalls - Cross

1    Q.  So, Officer, on this radio run, let me clarify, the

2    dispatch did not mention any assault in progress, right?

3    A.  Correct.

4    Q.  No shooting, right?

5    A.  Correct.

6    Q.  No mention of any gang activity or gang involvement

7    whatsoever?

8    A.  No.

9    Q.  And dispatch did not mention that the gun had been

10   displayed, right?

11   A.  No.

12   Q.  You testified on direct about what you know about bags,

13   right?

14   A.  Correct.

15   Q.  And I believe you said on direct that you're quite familiar

16   with certain types of bags, right?

17   A.  Yes.

18   Q.  On direct, you mentioned -- you talked about crossbody

19   bags.  Is that right?

20   A.  Yes.

21   Q.  And you mentioned that sometimes crossbody bags have

22   contraband in them, right?

23   A.  Correct.

24   Q.  Is it fair to say sometimes these bags don't have

25   contraband, right?

N5UQlucH                    Mr. Smalls - Cross

1   A.  Yes.

2   Q.  That these crossbody bags are often used for fashion?

3   A.  Yes.

4   Q.  For function, right?

5   A.  Yes.

6   Q.  So for carrying things like a cellphone, right?

7   A.  Yes.

8   Q.  Or a wallet, right?

9        But this evening you were looking for someone in

10  possession of a bag, right?

11  A.  Yes.

12  Q.  And that you -- and you believed that this bag, this

13  particular bag would contain a firearm, right?

14  A.  Through the description and what the caller stated, yes.

15  Q.  So based on the information you had from the radio run, you

16  were looking for someone in possession of a bag, and you

17  believed that bag contained a firearm?

18  A.  Correct.

19  Q.  Now, after receiving this information from the radio run,

20  you and Officer Cotter then started canvassing, right?

21  A.  Correct.

22  Q.  And canvassing just means you are looking for someone who

23  matches the description you heard on the radio run, right?

24  A.  Yes.

25  Q.  And you began looking for this person in the vicinity of

N5UQlucH                    Mr. Smalls - Cross

1   Gun Hill Road and 209th Street, right?

2   A.  Yes.

3   Q.  And you actually traveled from where you were -- let me

4   back up a bit.

5        You received this call while you were on Hull Street.

6   Is that correct?

7   A.  Yes.

8   Q.  Based on this call, you traveled in the direction of Perry

9   Avenue, right?

10  A.  Correct.

11  Q.  And you were going in this direction in order to find the

12  person who matched this description, right?

13  A.  Correct.

14  Q.  Now, your plan, if you saw this person who matched this

15  description, was to conduct a stop, right?

16  A.  Yes, to engage the individual.

17  Q.  To engage this individual, meaning to stop this individual,

18  right?

19  A.  Yes, to engage him.

20  Q.  Officer Smalls, you were under the impression that the

21  person you were looking for was armed with a firearm, right?

22  A.  Yes.

23  Q.  And you were concerned about firearms on the streets,

24  right?

25  A.  Correct.

N5UQlucH                    Mr. Smalls - Cross

1    Q.  So your intent upon seeing someone who matched this

2    description was to engage this individual, right?

3    A.  Yes.

4    Q.  And not to let them walk away, right?

5    A.  Well, by -- after I engaged them, depending on where that

6    investigation and encounter went, would deem if they were free

7    to walk away.

8    Q.  Well, let's talk a bit about how you engaged Lucha in this

9    case.  So you did in fact stop someone who matched the

10   description you heard on the radio run, right?

11   A.  Correct.

12   Q.  And, in fact, you said someone who matched the very

13   description that you heard on the radio run?

14   A.  Correct.

15   Q.  And this person was Lucha, who's seated here today, right?

16   A.  Yes.

17   Q.  So when you first saw -- when you first saw Lucha, you were

18   at the intersection of Perry Avenue and 209th Street.  Is that

19   right?

20   A.  Yes.

21          MS. BAHARANYI:  And so -- actually, at this point,

22   Sarah, would you show the witness only what we've marked as

23   Defendant's Exhibit D.

24   Q.  Officer Smalls, I'm showing you an aerial view of Perry and

25   209th Street.  Does this in fact look like an aerial view of

N5UQlucH                    Mr. Smalls – Cross

1    the intersection of Perry Avenue and 209th Street?

2    A.  Yes.

3    Q.  Is this a picture of this intersection an accurate

4    representation of that area?

5    A.  Yes.

6    Q.  An accurate depiction of that area?

7    A.  Yes.

8            MS. BAHARANYI:  At this time we'd like to admit

9    Defendant's Exhibit 3.

10           MS. NICOLAS:  No objection.

11           THE COURT:  Received.

12           (Defendant's Exhibit D received in evidence)

13           MS. BAHARANYI:  And publish as well.

14   Q.  So now, Officer Smalls, on this photo you can see Perry

15   Avenue and 209th Street.  I'm going to have a marker placed at

16   the intersection of Perry Avenue and 209th.  Do you see a red

17   arrow?

18   A.  Yes, I do.

19   Q.  That's precisely at the first time you saw Lucha, right?

20   A.  Yes.

21   Q.  Now, at this point Lucha was not also at that intersection

22   of Perry Avenue and 209th Street, right?

23   A.  No.

24   Q.  At the point where you saw him, he was actually farther

25   down the block.  Is that right?

N5UQlucH                    Mr. Smalls - Cross

1    A.  Yes, he was up the block.

2    Q.  There's a red marker on the screen, and that represents

3    near or near where Lucha was standing at the time that you saw

4    him, right?

5    A.  I'm not sure because I can't see the rest of Perry, so I

6    don't know.  Actually, no, the building, yes, I see it by the

7    number.

8    Q.  At the point which you saw Lucha for the very first time,

9    he was at least a couple buildings away from you, right?

10   A.  Yes.

11   Q.  And at this point, you did not get out of the car, right?

12   A.  No.

13   Q.  You did not decide to walk down the sidewalk to approach.

14   Is that right?

15   A.  Yes.

16   Q.  You stayed in the car, right?

17   A.  Yes.

18   Q.  And rode down Perry Avenue inside of the squad car.  Is that

19   right?

20   A.  Yes.

21   Q.  And Officer Cotter drove both of you down Perry Avenue,

22   right?

23   A.  Correct.

24   Q.  And you were seated in the passenger seat, right?

25   A.  Correct.

N5UQlucH                        Mr. Smalls - Cross

1    Q.   And you drove down Perry Avenue until you reached the area

2    where Lucha was standing, right?

3    A.   Yes.

4    Q.   This evening on Perry Avenue, there were a number of cars

5    parked on the street, right?

6    A.   Mmm-hmm.

7             THE COURT:   Sorry.   You can't answer mmm-hmm.   You

8    have to say yes or no.

9    A.   Oh, yes.

10   Q.   When I say parked on the street, I mean in the street

11   parking area next to the sidewalk, there were cars parked next

12   to the sidewalk?

13   A.   Yes.

14   Q.   And Perry Avenue is a one-way street, right?

15   A.   Yes.

16   Q.   In order to travel down Perry Avenue, you were traveling

17   one way with cars to your right, right?

18   A.   Yes.

19   Q.   And you were looking through your window trying to see what

20   you could see as you're traveling down Perry Avenue, right?

21   A.   Yes.

22   Q.   But what was the closest to you were certainly the parked

23   cars on Perry Avenue, right?

24   A.   Yes.

25   Q.   Now, Officer Smalls, on direct you stated you saw Lucha's

N5UQlucH                    Mr. Smalls - Cross

1    bag as you approached him from your car.  Is that correct?

2    A.  No.

3    Q.  Well, let me back up.

4             So, Officer Smalls, as you're riding down Perry

5    Avenue, you weren't able to see Lucha, right?

6    A.  Yes, as we were going down Perry Avenue, I was able to see

7    Lucha.

8    Q.  Your testimony is that as you were riding in your car or as

9    you were riding in the passenger seat down Perry Avenue, you're

10   able to see onto the sidewalk. Is that right?

11   A.  Correct.

12            MS. BAHARANYI:  Sarah, would you mind pulling up

13   Government Exhibit 300.  If you can start it at 2:25.  Just

14   start it there and publish that.

15   Q.  Officer Smalls, you recognize this scene from the night of

16   the arrest, right?

17   A.  Yes.

18   Q.  And this is from your body-worn camera footage, right?

19   A.  Correct.

20   Q.  You can see from your body-worn camera footage cars parked

21   alongside the sidewalk.  Is that right?

22   A.  Yes.

23   Q.  You can see a silver Jeep parked alongside the sidewalk,

24   right?

25   A.  Mmm-hmm.  Yes.  Sorry.

N5UQlucH                    Mr. Smalls - Cross

1    Q.  And a white van behind that Jeep, right?

2    A.  Yes.

3    Q.  Behind that, there's a sedan, right?  And a faint hint of

4    another car behind that, right?

5    A.  Yes.

6    Q.  And these cars were all parked between you -- these cars

7    were all located between you in your squad car and the

8    sidewalk, right?

9    A.  Yes.

10   Q.  And the sidewalk was where Lucha was standing that evening,

11   right?

12   A.  Correct.

13   Q.  So your testimony today is that you were driving as you're

14   riding down Perry Avenue, you were able to see across these

15   cars.  Is that right?

16   A.  I could see through the gaps between cars.

17   Q.  Officer Smalls, the first point at which you see any

18   details in Lucha's bag is as you actually were approaching him

19   in the car.  Is that right?

20   A.  When I was approaching him on foot, that's when I made the

21   observation of the bag.

22   Q.  And by approaching on foot, this means you've exited your

23   car, right?

24   A.  Right.

25   Q.  And you are able to see these details as you're walking

N5UQlucH                    Mr. Smalls - Cross

1   from the car to Lucha on the sidewalk.  Is that right?

2   A.  Correct.

3   Q.  If I recall from your direct, during this approach, you are

4   able to see a heavy weighted object in this bag.  Is that

5   right?

6   A.  Yes.

7   Q.  And the bag pulling down towards the ground.  Is that

8   right?

9   A.  Correct.

10  Q.  And the bag taut across Lucha's chest.  Is that right?

11  A.  Yes.

12  Q.  As well as a bulge in the bag.  Is that right?

13  A.  Yes.

14  Q.  Officer Smalls, let's actually look at Government Exhibit

15  300 beginning at 52 seconds --

16           MS. BAHARANYI:  Sarah, if you mind playing that now

17  from 52 seconds to one minute and 3 seconds.

18           (Video played)

19  Q.  Officer Smalls, that is your approach to Lucha, right?

20  A.  Correct.

21  Q.  That's the entirety of your walking up to Lucha, right?

22  A.  Yes.

23  Q.  And from the video that we just watched, we can see you

24  getting out of the police car, right?

25  A.  Yes.

N5UQlucH                    Mr. Smalls - Cross

1   Q.  And we can see you walking through two cars in order to

2   approach the sidewalk.  Is that right?

3   A.  Yes.

4   Q.  Specifically, those cars were a Jeep and a van too, right?

5   A.  Yes.

6   Q.  At that point of you getting out of the car, Lucha was not

7   in the middle of the Jeep or van.  Is that right?

8   A.  No.

9   Q.  He was not in front of 318 Perry Avenue either, right?

10  A.  I can't tell from the video.

11  Q.  Let's go back to 52 seconds here in Government Exhibit 300,

12  and play it.  I will let you know when to pause.

13          (Video played)

14  Q.  You can pause there, actually.

15          This is the front of 318 Perry Avenue, right?

16  A.  Mmm-hmm.

17  Q.  Lucha is not standing in front of the door there, correct?

18  A.  Correct.

19  Q.  He's not located on the sidewalk in front of that address,

20  right?

21  A.  Correct.

22  Q.  The only person there is another -- I'm assuming another

23  unrelated individual walking by, right?

24  A.  Yes.

25  Q.  Prior to your reaching the sidewalk, so where you are now,

N5UQlucH                    Mr. Smalls - Cross

1   you were blocked by two cars, right?

2   A.  Yes.

3   Q.  So your opportunity to see Lucha began once you were on the

4   sidewalk with him, right?

5   A.  No, I could see him as I turned the corner, I saw him on

6   Perry Avenue.

7   Q.  Officer Smalls, let me clarify.  So you were able to see

8   Lucha from far away at Perry Avenue and 209th Street, right?

9   A.  Yes.

10  Q.  That's when you first saw him, right?

11  A.  Yes.

12  Q.  So then when you were approaching him to observe these

13  details about Lucha, this is when you were approaching him on

14  the sidewalk on foot, right?

15  A.  Correct.

16  Q.  So the amount of time that you were actually on foot and

17  able to observe Lucha, I guess closer, was a matter of seconds,

18  right?

19  A.  Correct.

20  Q.  In fact, there are only five seconds of you on the sidewalk

21  with Lucha before you physically grabbed him, right?

22  A.  I am not sure how many seconds specifically it was.

23        MS. BAHARANYI:  Sarah, actually play from this point

24  at Government Exhibit 300.  And for the record, that's at 56

25  seconds --

```
         N5UQlucH                    Mr. Smalls - Cross
```

1   Q.  Actually, before we begin, Officer Smalls, this is you as

2   you're about to walk up to the sidewalk, correct?

3   A.  Yes.

4            MS. BAHARANYI:  Let's begin at 56 seconds.

5            (Video played)

6            MS. BAHARANYI:  Stop there.

7   Q.  So where I paused it, Officer Smalls, you've already now

8   touched Lucha, right?

9   A.  I touched the -- or I grabbed his bag that was across his

10  body.

11  Q.  We'll watch another footage of this as well.  But, Officer

12  Smalls, you've certainly now physically approached Lucha,

13  right?

14  A.  Yes.

15  Q.  And the minute marker is at one minute and two seconds,

16  right?

17  A.  Mmm-hmm.

18  Q.  So it's just about six seconds that had passed from you

19  walking on the sidewalk and approaching Lucha, right?

20  A.  Yes.

21  Q.  And in those six seconds of your approaching Lucha, you

22  certainly, I imagine you were paying attention to your

23  surroundings generally, right?

24  A.  Yes.

25  Q.  You were aware that there were other individuals present

**A000186**

N5UQlucH                    Mr. Smalls – Cross

1    and by Lucha, right?

2    A.   Yes.

3    Q.   Two women, actually, right?

4    A.   Yes.

5    Q.   And there were also other passersby, one other passerby in

6    that area, right?

7    A.   Correct.

8    Q.   And in this time you have a sense of what your surroundings

9    are, right?

10   A.   Yes.

11   Q.   And that's what you're trained to do, right?

12   A.   Yes.

13   Q.   In this six-second window, it is nighttime, right?

14   A.   Yes.

15   Q.   At this point, it's almost 10:00 at night, right?

16   A.   Correct.

17   Q.   The sun has already set, right?

18   A.   Correct.

19   Q.   And there is no natural light at this point, right?

20   A.   No.

21   Q.   And as you were walking up to Lucha, you didn't ask him for

22   his name, right?

23   A.   No.

24   Q.   And you did not command him not to run, right, or give him

25   any commands, right?

N5UQlucH                    Mr. Smalls - Cross

1    A.  I think I told him hold on for a minute before I activated

2    my body-worn camera, before I pressed the button.

3    Q.  So as you're approaching Lucha, you told him to hold on,

4    right?

5    A.  Yes.

6    Q.  Meaning, don't go anywhere, right?

7    A.  Correct.

8    Q.  And Lucha did not go anywhere.  Is that right?

9    A.  Correct.  He stayed there.

10   Q.  He stayed where he was, right?

11   A.  Yes.

12   Q.  He did not try to run at this point, right?

13   A.  No.

14   Q.  Or at any point this evening, right?

15   A.  No.

16   Q.  You didn't ask him for any sort of identification as you

17   were approaching him, right?

18   A.  No.

19   Q.  You did not ask him for -- you didn't ask him whether he

20   had a permit to carry the firearm as you approached him?

21   A.  No.

22   Q.  And you are aware that there are individuals who can

23   legally carry firearms in New York, right?

24   A.  Yes.

25   Q.  And individuals who can legally carry concealed weapons in

N5UQlucH                    Mr. Smalls - Cross

1   New York, right?

2   A.  Yes.

3   Q.  But you did not ask Lucha if he was one of those

4   individuals, right?

5   A.  No, I didn't.

6   Q.  So you approached Lucha in these six seconds, right?  You

7   approached Lucha in the six seconds it took you?

8   A.  Correct.

9   Q.  And once you reached Lucha, you did immediately touch

10  Lucha, right?

11  A.  I remember touching his bag.

12  Q.  Actually --

13          MS. BAHARANYI:  So, Sarah, if you would pull up

14  Government Exhibits 301 and publish that.

15          MS. NICOLAS:  Objection.  This is not in evidence,

16  your Honor.

17          MS. BAHARANYI:  Apologies.  Actually, can you please

18  just show the witness only Government Exhibit 301.

19  Q.  I'm going to play a small portion of this exhibit for

20  purposes of you identifying it only, Officer Smalls.

21          MS. BAHARANYI:  If you could please play from 58

22  seconds to one minute and four seconds.

23          (Audio played).

24  Q.  Officer Smalls, Government Exhibit 301 is body-worn camera

25  footage, right?

N5UQlucH                    Mr. Smalls - Cross

1   A.  Correct.

2   Q.  It's not your body-worn camera footage, correct?

3   A.  Correct.

4   Q.  It's from your partner, Officer Cotter, right?

5   A.  Yes.

6   Q.  This footage does show you, right?

7   A.  Yes.

8   Q.  You can see yourself on this body-worn camera footage?

9   A.  Yes.

10  Q.  In the process of interacting with Lucha, right?

11  A.  Correct.

12  Q.  This is a fair and accurate representation of you the

13  evening of this arrest, right?

14  A.  Yes.

15  Q.  And a fair and accurate representation of you engaging with

16  Lucha the evening of this arrest?

17  A.  Yes.

18          MS. BAHARANYI:  At this time, your Honor, we would

19  admit Government Exhibits 301.  Your Honor, I don't think we

20  need to admit it as a defense exhibit.

21          THE COURT:  No.  What's the number again?

22          MS. BAHARANYI:  It's 301.

23          THE COURT:  301.

24          MS. BAHARANYI:  Yes.

25          THE COURT:  Any objection?

N5UQlucH                    Mr. Smalls - Cross

1           MS. NICOLAS:  No, your Honor.

2           THE COURT:  Received.

3           (Government's Exhibit 301 received in evidence)

4           MS. BAHARANYI:  Sarah, let's publish that if it's not

5    already published.  I'm going to have it played one more time

6    as we watch it for purposes of identification, but I want you

7    to also review it for the next questions I'm going to ask you.

8    So beginning at 58 seconds to one minute and five seconds.

9           (Video played)

10          MS. BAHARANYI:  Sarah, can you back up to 58 seconds,

11   and I'll tell you exactly where to pause.

12          (Video played)

13          MS. BAHARANYI:  Pause right there.

14   Q.  At this point, Officer Smalls, you are able to see yourself

15   on the body-worn camera footage, right?

16   A.  Yes.

17   Q.  At this point you are touching Lucha's side, correct?

18   A.  Yes, I am.

19   Q.  The left side of his body, right?

20   A.  Yes.

21          MS. BAHARANYI:  And if you play for just a couple more

22   seconds here.

23          (Video played)

24          MS. BAHARANYI:  Pause there.

25   Q.  Now, you had touched Lucha's side before you actually

N5UQlucH                    Mr. Smalls - Cross

1   touched the firearm -- excuse me -- touched the bag, right?

2   A.  Correct.

3   Q.  And you did not pause in between -- there was no pause

4   between you walking up to Lucha and touching the side of his

5   body, right?

6   A.  No.

7   Q.  So, Officer Smalls, we talked a lot about the bag in this

8   case, so let's take a closer look.  I understand that you were

9   responsible for holding the bag at issue in this case while at

10  the scene of the arrest, right?

11  A.  Correct.

12  Q.  And while you were at the scene of the arrest, you held the

13  bag with the firearm still inside of it, right?

14  A.  Yes.

15          MS. BAHARANYI:  Sarah, if you could please show the

16  witness only what's been marked as Defendant's Exhibit 1, and

17  that's at 35 seconds and pause.

18          (Video played)

19  Q.  Officer Smalls, I'm showing you some additional body-worn

20  camera footage, right?

21  A.  Yes.

22  Q.  You can see yourself in this body-worn camera footage,

23  right?

24  A.  Yes.

25  Q.  Along with Lucha, right?

N5UQlucH                    Mr. Smalls - Cross

1   A.  Yes.

2   Q.  And Officer Smalls?

3   A.  And Officer Cotter.

4   Q.  Excuse me, and Officer Cotter.  So Officer Cotter is

5   standing with his hand on Lucha's chest, right?

6   A.  Correct.

7   Q.  Now, this is a video of you after stopping Lucha and after

8   frisking the bag, correct?

9   A.  Yes.

10  Q.  From June 23, right, from that same evening?

11  A.  Yes.

12  Q.  And you're holding the bag that was seized that was taken

13  from Lucha, right?

14  A.  Yes.

15  Q.  This is a fair and accurate depiction of you holding this

16  bag on the evening of June 23, right?

17          MS. BAHARANYI:  At this time, we would ask to admit

18  this Exhibit as Defendant's Exhibit 1.

19          MS. NICOLAS:  No objection.

20          THE COURT:  What's the number?

21          MS. BAHARANYI:  Defense Exhibit 1, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit 1 received in evidence)

24          MS. BAHARANYI:  Sarah, if you would please play

25  Defense Exhibit 1 at 35 seconds.

N5UQlucH                        Mr. Smalls – Cross

1              (Video played)

2    Q.  Officer Smalls, in this still of the footage, you're

3    holding the bag in your right hand, right?

4    A.  Correct.

5    Q.  And as you're holding the bag, you're able to feel the

6    fabric of this bag, right?

7    A.  Yes.

8    Q.  It's a fairly thick material bag, right?

9    A.  Yes.

10   Q.  And this is the same bag that you had just taken off of

11   Lucha's body, right?

12   A.  Correct.

13   Q.  This is the same bag that you're saying was heavily

14   weighted.  Is that right?

15   A.  Yes.

16   Q.  And bulging.  Is that right?

17   A.  Yes.

18   Q.  Now, at this point on the video you haven't removed any

19   cartridges from the bag, right?

20   A.  No.

21   Q.  You didn't remove the gun from the bag, right?

22   A.  No.

23   Q.  It's exactly the way that it would have been as you

24   approached Lucha, right?

25   A.  Yes.

N5UQlucH                    Mr. Smalls - Cross

1   Q.  So, Officer Smalls, after Lucha's arrest --

2           MS. BAHARANYI:  Sarah, you can take down Defense

3   Exhibit 1.

4   Q.  After Lucha's arrest, you were tasked with filling out some

5   of the paperwork in connection with this case, right?

6   A.  Correct.

7   Q.  Specifically, you entered a complaint report in this case,

8   right?

9   A.  I don't recall.  I don't remember if I did.

10  Q.  Would it refresh your recollection to see a copy of the

11  complaint report issued in this case?

12  A.  Yes.

13          MS. BAHARANYI:  Sarah, if you could please show the

14  witness 3502-001, page 2.

15  Q.  Now, officer Smalls, I'm going to direct your attention to

16  the bottom of page 2 where it says "complaint report entered

17  by."  Let me know when you've had a chance to review that.

18  A.  Yes.

19  Q.  Officer Smalls, I'm also going to direct you to page 1 of

20  the same document and the narrative at the bottom of page 1.

21  Please review and let me know when you've had a chance to

22  review that.

23  A.  Yes.

24  Q.  Officer Smalls, you entered the --

25          MS. NICOLAS:  Objection.  Improper refreshing of

N5UQlucH                    Mr. Smalls - Cross

1   recollection, your Honor.

2           MS. BAHARANYI:  Excuse me?

3           THE COURT:  Are you offering this?

4           MS. BAHARANYI:  I'm not offering it.

5   Q.  Has your recollection now been refreshed, Officer Smalls?

6           THE COURT:  As to what?

7           MS. BAHARANYI:  As to authoring a complaint report in

8   this case.

9   A.  I really don't remember if I'm the one who typed it or it

10  was just logged in.  I don't remember.

11  Q.  So, Officer Smalls, you have now had a chance to look at

12  the complaint report, right?

13  A.  Correct.

14  Q.  And you do recall filling out paperwork in connection to

15  this case, correct?

16  A.  Correct.

17  Q.  And complaint reports are part of the types of paperwork

18  that must be filled out in connection with an arrest, right?

19  A.  Correct.

20  Q.  So, Officer Smalls, as per the complaint report in this

21  particular case, you do recognize that your name is entered as

22  the individual who authored the report?

23  A.  Yes.

24          MS. NICOLAS:  Objection, your Honor.

25          THE COURT:  Sustained.  It's not in evidence.

N5UQ1ucH                     Mr. Smalls - Cross

1      MS. BAHARANYI:  Well, at this point -- your Honor, one

2   moment.

3      (Pause)

4   Q.  Officer Smalls, what paperwork did you fill out in

5   connection to this case?

6   A.  I don't recall.

7   Q.  Do you recall completing an activity log in connection with

8   this case?

9   A.  Yes.

10  Q.  And this activity log is something that officers have to

11  fill out when they begin, I guess, their tour of duty for the

12  day.  Is that right?

13  A.  Yes.

14  Q.  And this activity log also requires you to document what

15  happened in your duty for the day.  Is that right?

16  A.  Yes.

17  Q.  And you completed your own activity log, right?

18  A.  Correct.

19  Q.  So, Officer Smalls -- let me back up a little bit.

20      In any activity log that you complete, you do have to

21  document whether there was a stop, right?

22  A.  Yes.

23  Q.  Whether you conducted an arrest.  Is that right?

24  A.  Yes.

25  Q.  And on June 27, 2021, you completed an activity log in

N5UQlucH                    Mr. Smalls - Cross

1  connection to this case, right?

2  A.  I'm not sure when I put the entry in.

3  Q.  Would it refresh your recollection to see the activity log

4  that was entered --

5          THE COURT:  You're never going to get -- and we're

6  wasting a huge amount of time.  You're either you're going to

7  offer this, or you're not.

8          MS. BAHARANYI:  Your Honor, I'd like to offer it.

9          THE COURT:  Good.  Proceed.  What do you want to call

10  it?

11          MS. BAHARANYI:  Excuse me, your Honor?

12          THE COURT:  What number do you want to give it?

13          MS. BAHARANYI:  We can give it Defense Exhibit 4.

14          THE COURT:  Defense Exhibit 4 is received.  I'm sorry.

15  Was there an objection?

16          MS. NICOLAS:  Your Honor, may we have an opportunity

17  to review it since this wasn't --

18          THE COURT:  Yes.

19          MS. NICOLAS:  No objection, your Honor.

20          THE COURT:  Received.

21          (Defendant's Exhibit 4 received in evidence)

22          MS. BAHARANYI:  Sarah, can you please show or please

23  publish what's now been marked as Defense Exhibit 4 and go to

24  the third page of this document.

25  Q.  So, Officer Smalls, this is your activity log.  Is that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N5UQlucH                    Mr. Smalls - Cross

1   right?

2   A.  Yes.

3   Q.  And in an activity log you were required to -- you provided

4   a description of the stop in this case, right?

5   A.  Yes.

6   Q.  And an activity log specifically states what factors led to

7   the stop in this case.  Is that right?

8   A.  Correct.

9   Q.  And it lists those factors, right?

10  A.  Yes.

11  Q.  And the factors that are listed include the very specific

12  description of the suspect in this case, right?

13  A.  Yes.

14  Q.  And the officer's observations, correct, in making the

15  stop?

16  A.  Yes.

17  Q.  And the log states, the log states that one of -- the log

18  states that officers canvassed the area and observed male,

19  medium build, light skinned, wearing white shirt with black

20  stripes and a white turban, black pants and black-and-white

21  sneakers, subject to be in close proximity of crime, matching

22  description with a blue bag.  Officers stopped subject for

23  further investigation, right?

24  A.  Correct.

25  Q.  That log does not mention a heavily weighted bag, right?

N5UQlucH                    Mr. Smalls - Cross

1   A.  No.

2   Q.  It does not mention any sort of bulging, right?

3   A.  No.

4   Q.  It does not mention any taut straps, right?

5   A.  No.

6   Q.  I will add, Officer Smalls, there's no mention of the area

7   where Lucha was stopped being a high-crime area in this log.

8   Is that right?

9   A.  Correct.

10  Q.  Officer Smalls, you did not bring to court with you today

11  any NYPD statistics on the crime rates of this area back in

12  2021, right?

13          MS. NICOLAS:  Objection.

14          THE COURT:  Sustained.

15  Q.  Officer Smalls, you spent some time talking about your

16  subjective experience as an officer, right?  Your own personal

17  experience as an officer, right?

18  A.  Yes.

19  Q.  In Sector David, right?

20  A.  Correct.

21  Q.  And Sector David is the only sector that you were working

22  in in June 2021, right?

23  A.  No.

24  Q.  What other sectors were you working in in June 2021?

25  A.  We were responsible for the whole precinct, so we were in

N5UQlucH                    Mr. Smalls - Cross

```
 1    the whole precinct.
 2    Q.  So the 52nd precinct.  Is that right?
 3    A.  Correct.
 4    Q.  You were working within the 52nd precinct, but no other
 5    precinct back in June 2021.  Is that right?
 6    A.  Correct.
 7    Q.  You don't know the crime statistics for --
 8              THE COURT:  Counsel, just to move things along, you
 9    know I allowed in his statement about the crime rate.  It will
10    not be material to my decision, so we don't need to spend a lot
11    of time.
12              MS. BAHARANYI:  Understood, your Honor.
13    Q.  Let's go back to the bulge.  So, Officer Smalls, you did
14    testify before a Bronx state grand jury in connection to this
15    case, right?
16              MS. NICOLAS:  Objection, your Honor.
17              THE COURT:  Ground.
18              MS. NICOLAS:  Hearsay, your Honor.
19              THE COURT:  I'm sorry, let me hear the question again.
20    Q.  Officer Smalls, you testified before a Bronx state grand
21    jury in connection to this case?
22              THE COURT:  That's not hearsay.  That's a yes-or-no
23    question.  You can answer that yes or no.
24    A.  Yes.
25    Q.  This testimony occurred in November 2021.  Is that right?
```

N5UQlucH                     Mr. Smalls - Cross

1   A.  Correct.

2   Q.  And this was about five months after Lucha's arrest.  Is

3   that right?

4   A.  Yes.

5   Q.  Now, Officer Smalls, while you were -- actually, one

6   moment.

7           THE COURT:  I need to move this along.  I'm sorry.  I

8   have a 4:00 matter which I will not take the 4:00 matter until

9   we complete this hearing, but did you want to offer his grand

10  jury testimony?

11          MS. BAHARANYI:  Not his testimony, not the particulars

12  of the testimony.  What I do want to ask Officer Smalls is that

13  this was the first time he mentioned a bulge was during this

14  grand jury testimony.

15          THE COURT:  I'll allow that.

16  Q.  Officer Smalls, during your grand jury testimony was the

17  first time you mentioned a bulge?

18          THE COURT:  Mentioned to whom?

19          MS. BAHARANYI:  Mentioned to anyone a bulge in this

20  case.

21          THE COURT:  Mentioned to anyone?  All right.  I'll

22  allow that question.

23          MS. BAHARANYI:  Actually, let me back up, your Honor.

24  Q.  Officer Smalls, you did not describe a bulge in paperwork

25  that you completed in connection with this case?

N5UQlucH                          Mr. Smalls - Cross

```
 1              THE COURT:  Asked and answered.  I get that point.
 2    A.  Not in my activity log, no.
 3    Q.  Right.  And there's no other paperwork that you recall
 4    describing this bulge, right?
 5    A.  Not that I recall.
 6    Q.  Now, the first time you ever mentioned seeing a bulge under
 7    oath was at the grand jury testimony in connection to Lucha's
 8    arrest, right -- in connection to this criminal case, right?
 9    A.  Can you repeat your question?
10    Q.  The first time you ever recalled or the first time you ever
11    mentioned a bulge, seeing a bulge in the bag was -- strike
12    that.
13              The first time that you ever mentioned a bulge in a
14    bag while under oath was in connection to your testimony as
15    part of your grand jury testimony in the Bronx state case, is
16    that right, while under oath, correct?
17    Q.  And the timing of this was a few months after this arrest,
18    about five months after his arrest, right?
19    A.  Yes.
20    Q.  Now, you gave -- you have previously given testimony in
21    other cases, right?
22    A.  Yes.
23    Q.  You've previously given grand jury testimony in other
24    cases, right?
25    A.  Yes.
```

N5UQlucH                    Mr. Smalls - Cross

1   Q.  And testimony in suppression hearings as well, right?

2   A.  Correct.

3   Q.  And, in fact, if I recall, Officer Smalls, you testified in

4   a suppression hearing in a completely separate Bronx case

5   People v. James Adams.  Is that right?

6           MS. NICOLAS:  Objection, your Honor.  Relevance.

7           MS. BAHARANYI:  The relevance here, your Honor, is

8   that the testimony in that case is that --

9           THE COURT:  I can't tell yet, so he can answer the

10  question.  But we'll see what the next question is, so the

11  question was you gave testimony --

12  Q.  In a suppression hearing in a People v. Adams case.  Is

13  that right?

14  A.  Correct.

15  Q.  And that case also involved the stop of someone suspected

16  being in possession of a gun, right?

17  A.  Correct.

18  Q.  And in your testimony in that case you can did not testify

19  to seeing a bulge, right?

20  A.  Correct.

21          MS. NICOLAS:  Objection, your Honor.

22          MS. BAHARANYI:  I have two more questions, your Honor,

23  which --

24          THE COURT:  Well, I have doubts about the relevance of

25  the last question, but I will allow for the moment.  Let's see

A000204

N5UQlucH                    Mr. Smalls - Cross

1    what your other questions are.

2            MS. BAHARANYI:  Very good, your Honor.  Thank you.

3    Q.  Officer Smalls, you provided that testimony in the Smalls

4    case, right?

5    A.  In the Adams case?

6    Q.  In the Adams case, excuse me.

7    A.  Yes.

8    Q.  And in the Adams case, you were informed by the district

9    attorney that the case -- the gun was suppressed in that case,

10   right?

11   A.  Correct.

12           THE COURT:  Sustained.  Sustained.  Now I see where

13   you're going.  Sustained.

14           MS. BAHARANYI:  Your Honor, if I may briefly.

15           THE COURT:  You may, but the last I'm not going to

16   change my ruling.  But if you'd like to put a new question and

17   see if you can get a new ruling out of me, that's my job and

18   your job.

19   Q.  Well, okay.  So, your Honor -- not your Honor -- Officer

20   Smalls, before your testimony in the grand jury in Lucha's

21   case, you had a conversation with the assistant district

22   attorney in connection to this other case, the Adams case,

23   right?

24   A.  Can you say that question again?

25   Q.  Sure.  Let me clarify a bit more.  So November 2021, you

N5UQlucH                    Mr. Smalls - Cross

1   testified in the grand jury in Lucha's case, right?

2   A.  Correct.

3   Q.  Now, prior to this date, you testified in a suppression

4   hearing in People v. Adams, right?

5   A.  Yes.

6   Q.  And you learned from the assistant --

7            MS. NICOLAS:  Objection.

8            THE COURT:  Let her finish the question.

9   Q.  You learned from the assistant district attorney the reason

10  or part of the reason why the gun was suppressed in that case

11  was because you did not testify to seeing a bulge, right?

12  A.  Correct.

13  Q.  And this happened before you testified about a bulge in

14  Lucha's case, right?

15  A.  If you could say the dates again?  I don't remember the

16  dates.

17  Q.  The suppression hearing in Adams was in August of 2021,

18  right?

19  A.  Okay.

20  Q.  Lucha's grand jury hearing was in November 2021, right?

21  A.  Okay.

22  Q.  And the Adams ruling occurred before Lucha's grand jury,

23  right?

24  A.  I mean, you're talking, I don't know when the ruling came

25  down.  I don't know the dates.  This was two years ago.

N5UQlucH                    Mr. Smalls - Cross

1    Q.  Let me ask you this:  The conversation --

2               THE COURT:  I will assume we could always look at the

3    public records and determine the dates, but I'll assume they

4    are as you represent so...

5               MS. BAHARANYI:  Actually, your Honor, at this point we

6    do actually have the Adams case we can offer for judicial

7    notice.

8               THE COURT:  I don't need that.  I'll take judicial

9    notice of the date.

10              MS. BAHARANYI:  Understood.  So we would ask the Court

11   to take judicial notice of the date of the suppression hearing

12   of August 17 and 18, 2021 in the People v. Adams case.

13              THE COURT:  Any objection?

14              MS. NICOLAS:  No.

15              THE COURT:  So noticed.

16   BY MS. BAHARANYI:

17   Q.  And this was prior to your testimony at Lucha's grand jury

18   in November 2021, right?

19   A.  Yes.

20   Q.  And this conversation that you had with the assistant

21   district attorney occurred certainly prior to your testimony

22   today, right?

23   A.  Yes.

24   Q.  One moment, your Honor.

25              (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000207

```
        N5UQlucH                    Smalls - Redirect
```

1              MS. BAHARANYI:  Your Honor, no further questions for

2      this witness.

3              THE COURT:  Redirect.

4              MS. NICOLAS:  Very briefly, your Honor.

5      REDIRECT EXAMINATION

6      BY MS. NICOLAS:

7      Q.  Officer Smalls, just two topics I want to cover.

8              First, what I believe is now marked as Defense Exhibit

9      4, 3502-14, your activity log?

10     A.  Yes.

11     Q.  An activity log, what's the purpose of an activity log?

12     A.  It's just to put down what you did that day and what

13     happened that day.

14     Q.  Does the activity log mention every detail of every

15     observation you make while on patrol?

16     A.  No.

17     Q.  The prior case, the Adams case, did you testify truthfully

18     during that case?

19     A.  Yes.

20     Q.  Did you testify truthfully in the grand jury in this case?

21     A.  Yes.

22     Q.  Did you testify truthfully today?

23     A.  Yes, I did.

24     Q.  Would you lie under oath, Officer Smalls?

25     A.  No.

N5UQlucH

1      MS. NICOLAS:  Nothing further, your Honor.

2      THE COURT:  Anything else?

3      MS. BAHARANYI:  Nothing further, your Honor.

4      THE COURT:  Nothing further.  You may step down.

5      (Witness excused)

6      THE COURT:  Anything else from the government?

7      MS. NICOLAS:  Your Honor, Officer Cotter is prepared

8  to testify.  We anticipate his direct to be about 20 minutes.

9      THE COURT:  I think what I'm going to do is excuse you

10 for five minutes while I talk to the lawyers in the 4:00

11 matter, and then we will call you back.  Be prepared.  Come

12 back into the courtroom no later than, say, ten minutes from

13 now.

14     MS. NICOLAS:  Thank you, your Honor.

15     (Recess)

16     (In open court)

17     THE COURT:  Please call your next witness.

18     MS. SMYSER:  Your Honor, the government now rests.  We

19 are not going to call another witness.

20     THE COURT:  Is he here?

21     MS. SMYSER:  He is here, yes.

22     THE COURT:  Bring him in.

23     MS. SMYSER:  The government calls Officer Ryan Cotter.

24     THE COURT:  I'm going to question him.  You don't have

25 to.

N5UQlucH

| | |
|---|---|
| 1 | MS. SMYSER:  Your Honor, I do have questions prepared. |
| 2 | THE COURT:  I bet you do.  And I'm heartbroken to |
| 3 | deprive you of that opportunity. |
| 4 | MS. SMYSER:  No problem. |
| 5 | RYAN COTTER, |
| 6 | called as a witness by the Government, |
| 7 | having been duly sworn, testified as follows: |
| 8 | BY THE COURT: |
| 9 | Q.  State your full name for the record and spell it. |
| 10 | A.  Officer Cotter. |
| 11 | Q.  Officer Cotter.  Gee, it is really interesting that your |
| 12 | mother named you Officer, but I really bet you had a different |
| 13 | first name. |
| 14 | A.  Ryan Cotter.  R-Y-A-N.  C-O-T-T-E-R. |
| 15 | Q.  So were you present at the time of the arrest of the |
| 16 | defendant who goes by the name of Lucha? |
| 17 | A.  Yes. |
| 18 | Q.  And did you have any conversation at the time with your |
| 19 | fellow officer about the basis for the arrest? |
| 20 | A.  Can you reword that? |
| 21 | Q.  Sure.  Who else was present at the arrest? |
| 22 | A.  My partner, Officer Smalls. |
| 23 | Q.  And did he give the order for the arrest? |
| 24 | A.  He stated to me that it was an arrest. |
| 25 | Q.  I'm sorry, you have to speak louder. |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000210**

N5UQlucH

1    A.  He stated to me that it was an arrest.

2    Q.  And did he tell you why?

3    A.  Me and him worked together for awhile, so he stated "92"

4    and I knew it was an arrest.

5    Q.  After the arrest was effectuated, did he tell you what the

6    basis for the arrest was?

7    A.  He nodded to me after he checked the bag, so I knew it was

8    a firearm.

9    Q.  So now you were driving?

10   A.  Yes.

11   Q.  Did you observe the bag yourself or was that simply his

12   observation?

13   A.  I saw him wearing the bag, yes.

14   Q.  The defendant, you mean, Mr. Lucha?

15   A.  Yes.

16   Q.  And did you observe anything about the bag?

17   A.  I didn't -- it was on the opposite side from my approach

18   when we approached him.

19   Q.  So it was really your fellow officer who had the direct

20   view of the bag?

21   A.  Yes.

22   Q.  Now, after the arrest occurred, did you and he transport

23   the defendant to wherever you were taking him?

24   A.  He was brought back to the second precinct.

25   Q.  But brought back in what vehicle?

N5UQlucH                     Cotter - Cross

1   A.  I don't recall if it was our car.

2   Q.  Okay.  My question is, did you have any conversation with

3   your fellow officer during that period when you were

4   transporting the defendant to the precinct?

5   A.  I don't recall what we spoke about.  I just drove back to

6   the command.

7              THE COURT:  That's all I have.

8              Anything either side wants to ask this defendant

9   that's related to the scope of my direct and nothing else will

10  be allowed.

11             MS. BAHARANYI:  Not from the defense, your Honor.

12             MS. SMYSER:  Just a few questions, your Honor.

13             THE COURT:  All right.

14

15  CROSS-EXAMINATION

16  BY MS. SMYSER:

17  Q.  Officer Cotter, did you handcuff Mr. Perez?

18  A.  Yes.

19  Q.  Before you handcuffed Mr. Perez, did Officer Smalls say

20  anything to you?

21  A.  He stated "92."

22  Q.  Is 92 a code for anything?

23  A.  Yes.  It's our code for arrest.

24  Q.  Did you understand 92 to mean anything else?

25  A.  I knew it meant that it involved a firearm.

N5UQlucH                    Cotter – Cross

1    Q.  Why did you know that?

2    A.  Me and him only arrest for firearms.

3    Q.  Officer Cotter, you testified that when you approached

4    Mr. Perez, you approached on the side away from the bag.  Is

5    that correct?

6    A.  Correct.

7    Q.  Did you make any observations about the bag as you

8    approached?

9           MS. BAHARANYI:  Objection, your Honor.

10          THE COURT:  No, I'll allow that.

11   A.  I noticed that it was on his right side under his arm, and

12   it looked like it was heavily weighted due to the straps being

13   tight against his body.

14          MS. SMYSER:  May I have just one moment, your Honor?

15          THE COURT:  Yes.

16   Q.  Officer Cotter, when you saw Mr. Perez, did you notice

17   anything about the defendant's appearance as compared to what

18   you had heard over the radio run?

19   A.  He matched the description that we received perfectly.

20          MS. SMYSER:  No further questions, your Honor.

21          THE COURT:  All right.  I'll allow defense counsel if

22   she wants to follow up on that.

23          MS. BAHARANYI:  Yes, your Honor one moment.

24   CROSS-EXAMINATION

25   BY MS. MAYO:

N5UQlucH                        Cotter - Cross

1    Q.  Good afternoon, Officer Cotter.  I just have a few

2    questions.

3           You testified that you approached Lucha from the left

4    side -- excuse me -- from Lucha's left side?

5    A.  Yes.

6    Q.  Which is the opposite side of where his bag was?

7    A.  Yes.

8    Q.  So Officer Smalls was directly facing the bag?

9    A.  Correct.

10   Q.  You were not?

11   A.  Correct.

12   Q.  And you just testified that you could observe Lucha's bag

13   under his right arm?

14   A.  Yes.

15   Q.  And it looked heavily weighted to you?

16   A.  Yes.

17   Q.  This was happening at night?

18   A.  Yes.

19   Q.  The arrest happened at around 10:00 p.m.?

20   A.  Yes.

21   Q.  So it was dark outside?

22   A.  Yes.

23   Q.  And you approached Lucha from your car.  You got out of

24   your car?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000214

N5UQlucH                    Cotter - Cross

1   Q.  And approached Mr. Lucha on the sidewalk?

2   A.  Yes.

3   Q.  This all happened in a matter of seconds?

4   A.  Yes.

5           MS. MAYO:  No further questions.

6           THE COURT:  Anything else?

7           MS. SMYSER:  Nothing further.

8           THE COURT:  Thank you so much.  You may step down.

9           (Witness excused)

10          THE COURT:  Does either side wish to make summation?

11          MS. SMYSER:  Your Honor, the government is prepared to

12  make a summation.  We have a presentation which we can do for,

13  your Honor, or I can make more informal remarks, whatever you

14  prefer.

15          THE COURT:  A presentation.  My gosh, this is

16  thrilling.

17          MS. SMYSER:  A small one.

18          THE COURT:  Go ahead.

19          MS. SMYSER:  May I proceed, your Honor?

20          THE COURT:  Please.

21          MS. SMYSER:  Mr. Magliocco, you can go to the first

22  slide.

23          Your Honor, the focus of this whole hearing has been

24  answering a simple question, whether there was reasonable

25  suspicion to believe that Mr. Perez may have been committing a

A000215

N5UQlucH                          Cotter - Cross

```
 1   crime at the time that Officer Smalls and Officer Cotter

 2   stopped him.  As your Honor well knows, the standard of proof

 3   here is a preponderance of the evidence, and we have certainly

 4   met that.  And I want to briefly outline why.

 5          There are a number of factors that support reasonable

 6   suspicion for this stop.  First, this 911 call reported gun

 7   possession in a high-crime area and --

 8          THE COURT:  I'm not sure I understand why.  I'm not

 9   saying it's irrelevant, but I don't understand why that is of

10   any materiality.  But why do you say it's material, if at all.

11          MS. SMYSER:  Your Honor, I think a high-crime area is

12   one of many factors mentioned by Court in similar contents --

13          THE COURT:  I know.  Courts will mention all sorts of

14   things, but I'm asking for a reason.

15          MS. SMYSER:  Your Honor, I think here you have an

16   officer who patrols this area daily and is familiar with the

17   types of crimes that generally take place, which includes

18   firearm possession, as he testified.

19          And so when you are in the context of a reasonable

20   cautious officer in Officer Small's position, you know that

21   people in this area often possess firearms and you're trained

22   to look for people who are carrying firearms, as he

23   testified --

24          THE COURT:  I think training and experience is

25   relevant.  I'm not sure -- are you saying, for example, that if
```

N5UQlucH                    Cotter - Cross

1    he was in a low-crime area but he got the same 911 call and he

2    was trained to look for bulges in bags, and he was told by the

3    person making the 911 call this person is carrying a gun, that

4    your case would be any stronger or weaker because it was a

5    low-crime area rather than a high-crime area?

6              MS. SMYSER:  Your Honor, I think in both cases it's a

7    reasonable suspicion to stop.

8              THE COURT:  That's why I don't think it's material,

9    but training and experience is relevant.  Go ahead.

10             MS. SMYSER:  On training and experience, as Officer

11   Smalls testified, he has had over a hundred hours of firearms

12   training, which include training specifically how to figure out

13   people are carrying firearms.  He's had over 50 gun arrests in

14   this particular precinct.  And as you know, what we're

15   assessing here is whether a reasonable and cautious officer in

16   his circumstances would have had reasonable suspicion to

17   conduct a brief investigatory stop.  The answer to that is yes.

18             The third thing we're going to look at here is the 911

19   call, which is Government Exhibit 100.

20             THE COURT:  So just before we get to the 911 call,

21   you're saying that if he in his experience knew that sometimes

22   firearms when carried in bags made bulges, that would be enough

23   to satisfy his stop-and-frisk and so forth?

24             MS. SMYSER:  You're saying just solely based on his

25   training and experience?

N5UQlucH                    Cotter - Cross

1            THE COURT:  Yes.

2            MS. SMYSER:  With nothing else?

3            THE COURT:  That's what I'm asking you.

4            MS. SMYSER:  I'm not sure if that would be enough,

5    your Honor.

6            THE COURT:  I doubt it very much.  I'm sorry I.

7    Didn't have this hearing before I had a few weeks ago a case

8    involving trademark infringement of Hermes Birkin bags, because

9    certainly a Birkin bag with a big bulge would not only be

10   suspicious but downright an antifashion statement, so...

11           Let's get on to the 911 call.

12           MS. SMYSER:  Yes.  Focusing on the 911 call -- and

13   before speaking about it specifically, I think our point here

14   is that, as your Honor knows, Fourth Amendment analyses are all

15   fact specific, and these are simply all circumstances that go

16   to the reasonable suspicion for the stop.  The 911 call is one

17   of those facts.

18           THE COURT:  So I guess what I'm getting at is this --

19   this is probably a question for your adversary.  You've got a

20   call, a highly specific call, gives a detailed description,

21   gives a flatout statement of the fact that he's got a weapon,

22   and gives his approximate location and so forth, and it's

23   not -- even though it was, in some sense, anonymous, it wasn't

24   really anonymous because the person gave a phone number and

25   also indicated her prior relationship with the person, so it

N5UQlucH                    Cotter - Cross

1    would be easy to determine who that was.  And then you see a

2    bag with a bulge.  Isn't that enough?

3              MS. SMYSER:  Your Honor, our position is those two

4    things are enough.

5              THE COURT:  Yes, I think those are the critical

6    questions, or that is the critical question; that it's those

7    two things that are either enough or not enough in the Court's

8    view, while conceding that all the facts and circumstances must

9    be taken account of.  And I'll bet there's only 5,000 opinions

10   saying that, but anyway, okay.

11             So now when I looked at the videos right now, on the

12   one hand, I could see the bag was taut against his chest,

13   indicating that there was something heavy, and I knew that it

14   wasn't -- if it had been a law book, he would have been hunched

15   over in pain, so it was something heavy but not quite that

16   heavy.  So there's something heavy there, it did appear to me.

17   But I will need to go back and look again, but it did appear to

18   me that there was a bulge that was even visible to me.  But it

19   wasn't like a you know, a big bulge.  So I throw that out to

20   hear what defense counsel says about all of that.

21             What about the fact that he seems not to have

22   mentioned the bulge in any of the paperwork or to his -- that's

23   why I asked to have Detective Cotter.  He didn't say anything.

24   Not that he was required to, but defense counsel was going to

25   say the reason he, you know, this is a fabrication that he had

N5UQlucH                         Cotter - Cross

1    it is because he was told by the DA that's what you've got to

2    do or because of another case.  What about all of that?

3         MS. SMYSER:  Well, your Honor, I think that Officer

4    Smalls testified that he -- they don't always include

5    everything in their activity log, and this is a detail that

6    wasn't included, and that doesn't seem to be material here.  An

7    activity log is to record the time they arrive and a short

8    summary of what happened.  And it is when you get into things

9    like suppression hearings or testimony before a grand jury or

10   before a Court where you really get into these details about

11   the events that occurred.  And I think it's important here to

12   note that on the suppression hearing that defense counsel noted

13   Officer Smalls testified that he testified truthfully from that

14   hearing.  He didn't see a bulge, so he said he didn't see a

15   bulge.  So he is doing the same thing.

16        THE COURT:  Supposing we had the detailed 911 call, we

17   had the heavy bag, but we didn't have a bulge.  On that

18   hypothetical scenario, would that be enough?

19        MS. SMYSER:  Your Honor, we do think that is enough,

20   and I think it's important to look at just how detailed this

21   911 call is and how, as you mentioned, it is not entirely an

22   anonymous 911 call, so the case law is often referenced about

23   these calls, we may be concerned that an anonymous tipper is

24   making something up and we can't verify the veracity of their

25   claims.  There's no way to hunt them down and hold them

N5UQlucH                    Cotter - Cross

1   accountable.

2          But that is simply not what happened here.  This 911

3   caller called in, provided a detailed description of what was

4   going on, and provided a basis for what she saw.  She said, "I

5   saw the gun."  She was an eye witness.  That's something you

6   have that is important.  She also said, your Honor, "This

7   individual is Lucha."  She named him, and said, "That's my

8   friend," so she had some intimate knowledge of Mr. Lucha.

9          THE COURT:  I think she said former friend.

10         MS. SMYSER:  Was a friend.

11         THE COURT:  Certainly after that call, it was

12  certainly a former friend, but...

13         MS. SMYSER:  Was a friend, that's correct.  And so in

14  addition for this 911 call providing a basis for what she is

15  providing, she is not also not entirely anonymous.  She leaves

16  her phone number.  She also knows that the 911 system records

17  her phone number, which shows that she is not calling in with

18  false information thinking that nothing will ever happen.

19         On top of that, she says, "I see Lucha."  So she has

20  to be in that location, and they are able to track her down

21  within ten minutes to bring her to do an identification

22  procedure, which is something you simply don't see in the cases

23  involving anonymous 911 callers where we have no clue how to

24  hunt them down per the Second Circuit in *Freeman*.

25         THE COURT:  Would you agree if you will hadn't had

N5UQlucH                    Cotter - Cross

```
 1    that call -- now we're eliminating my hypothetical call -- you
 2    would not have enough.
 3            MS. NICOLAS:  So you're saying no 911 call, but you
 4    see a heavy bag?
 5            THE COURT:  You just see -- you're patrolling, you're
 6    canvassing the area, and you see someone with a not very
 7    stylish blue bag that looks like it's very heavy and it has a
 8    bulge.  Would that be enough?
 9            MS. SMYSER:  That's tough, your Honor.  I'm not sure
10    it would be enough.
11            THE COURT:  I'm very skeptical that would be enough.
12            Was there anything else you wanted to say?
13            MS. SMYSER:  No, your Honor.
14            The only last point I want to mention, just because
15    something had come up in oral argument about this, is just what
16    these officers had reasonable suspicion to believe what laws
17    Mr. Perez was violating.  I just want to point out at this time
18    in June 2021, as the Court, knows, this was pre-*Bruen* and the
19    Court had extensive --
20            THE COURT:  Who could imagine that even this Supreme
21    Court would be so neglectful of the safety of American citizens
22    that it would decide *Bruen*.  But I am bound by *Bruen*
23    nevertheless, but it was not the law at the time of this event.
24            MS. SMYSER:  Correct.  And there were numerous laws
25    under the New York Penal Code including the one cited 265.01 --
```

N5UQlucH                    Cotter - Cross

1   265.031(b) cited by Officer Smalls which are focused on gun

2   possession outside of the home with a permit, which Mr. Lucha

3   said he did not need and he did not have.

4           And so, your Honor, it's for all of these reasons that

5   we've been talking through, the totality of the circumstances

6   in this Fourth Amendment analysis that we believe that there's

7   reasonable suspicion just to engage in that brief investigatory

8   stop, which is what's at issue here.

9           THE COURT:  Let me hear from defense counsel.

10          MS. BAHARANYI:  Your Honor, I'll get straight to the

11  point here.  This was a anonymous tip.  This was an anonymous

12  call.  How do we know it was anonymous?  It's because the

13  person did not provide her name.  Did not provide any

14  identifying information.

15          THE COURT:  Well, she gave phone number.

16          MS. BAHARANYI:  The phone number is something that was

17  already part of the 911 system, so the 911 operator even says,

18  "I have your phone number.  I need confirmation."

19          How do we know that this still falls within the

20  umbrella of an anonymous tip is looking at these other 911 call

21  cases.  So one of the cases I think we talked about in our

22  argument maybe two months ago at this point, your Honor, was

23  *United States v. Gonzalez*.  This is a case that was heard by

24  your colleague, Judge Engelmayer.  And in that particular case,

25  again, we have a 911 caller calling in with very specific

N5UQlucH                    Cotter - Cross

1   information about someone --

2              THE COURT:  A great judge, although a kid, but...

3              MS. BAHARANYI:  But someone I know your Honor respects

4   as well.

5              THE COURT:  I do.

6              MS. BAHARANYI:  This 911 caller calling in, trace

7   calls, the 911 system has been traced for a very long time, but

8   who refuses to provide any identifying information and who

9   provides a report about someone in possession of a firearm,

10  provides their race, their build, a description of how they

11  look, and where they're located.  And in the *Gonzalez* case,

12  which I can provide a cite to in a moment, your Honor,

13  111 F.3d -- the Federal Supplemental 3d. 2015 what's critical

14  or where Judge Engelmayer starts the analysis is this tip by

15  itself would not be sufficient.  Something more is necessary.

16             And here, we're in a similar situation.  We have this

17  tip by itself, a call by someone who claims to be a friend, who

18  claims to have some knowledge of Lucha, but who truly the

19  officers don't know this person whatsoever, don't know the

20  veracity of this person, don't know if this person has a

21  reputation for honesty when they are acting on her information.

22  So this person squarely falls within this realm of an anonymous

23  tipster and squarely falls within the realm of the type of

24  concerning calls that the Supreme Court, the Second Circuit,

25  and courts in this district have been concerned about.  What we

N5UQlucH                    Cotter - Cross

1    don't want is individuals being able to use 911, call in on

2    their former friends or call in on enemies just because they

3    know they see them in public, they can describe them very well,

4    send police to their location, and send police to harass this

5    person.  We don't want that to happen.  So we require more than

6    just these tips.  And the courts require more.

7            I think the real question that today's hearing was

8    about was is whether there was this something more.  And

9    Officer Smalls, who testified today, did not provide that

10   something more.  We have a tip, a tip that he was operating off

11   of about someone with a firearm located in the Perry Avenue/Gun

12   Hill Road area.  Officer Smalls sees someone very closely --

13   very specifically matching this description, and he acts.  He

14   doesn't have time to see if there's a bulge.  He doesn't

15   have -- certainly the conditions don't allow him to see if

16   there is a bulge.  It's six seconds between --

17           THE COURT:  Why do you say that because -- maybe I

18   don't understand how the lighting was on these videos that I

19   just saw, but on the video, which is his camera that he is

20   carrying, you can see the bag pretty clearly.

21           MS. BAHARANYI:  On the video, I think it's Government

22   Exhibit 300, your Honor will see those six seconds that he has

23   to see the bag.  And in those six seconds, your Honor, you

24   don't see a bulge on that video.

25           THE COURT:  No, we'll go back to that in a minute.

N5UQlucH                        Cotter - Cross

1    Maybe we'll play it in a minute, but I'm not so concerned about

2    the six seconds because based on the tip and based on his

3    experience, he is, you know, while he may be looking at other

4    things, as you pointed out in your cross-examination, you know,

5    he's almost certainly going to be focused, or at least in part,

6    on the bag.

7            So let's assume hypothetically -- this is not the

8    case.  Let's assume in a hypothetical that you could see the

9    outline of a gun through the bag.  Are you saying that because

10   it was only six seconds and he had to focus on other things he

11   wouldn't have seen that?

12           MS. BAHARANYI:  He certainly could not have with this

13   bag.  The Court has --

14           THE COURT:  So I think it comes down to, given what he

15   was looking for was, is there evidence of a bulge in the bag.

16   So maybe we can play those six seconds again.

17           (Video played)

18           THE COURT:  No, you got to go back slightly.  No, he

19   was closer.  For my purposes, I need to see where you see the

20   bag itself and stop it at that place.

21           (Video played)

22           MS. BAHARANYI:  Pausing here, your Honor.

23           THE COURT:  Yes, let's go a little further.  Go as

24   close as you can until the bag -- that's good.  So what you see

25   there -- and this is at, for the record, at 21:56:55.  So you

**A000226**

N5UQlucH                         Cotter - Cross

1    see a bag that is clearly taut against his chest.

2          MS. BAHARANYI:  Well, it is a crossbody bag, so it

3    does have to hang across his chest.

4          THE COURT:  But it doesn't -- there are ways it can

5    hang and ways it can hang, but I think you can fairly say it

6    its taut against his chest.

7          MS. BAHARANYI:  Your Honor, as I'm looking at this

8    video -- and this is all that Officer Smalls could see as he's

9    walking up to him at 10:00 p.m. at night, there's no pause, no

10   examination from afar giving it a beat to see what he's looking

11   at.  What I see, your Honor, is someone who has a bag,

12   certainly, strapped across his chest, certainly.  It is -- he

13   does have clothing under this bag so the clothing naturally has

14   to bunch because the bag is across his chest, and an arm that

15   also obscures what this officer could have seen when he claims

16   to have seen a bulge or whatever that --

17          THE COURT:  So on the issue of the bulge, which I

18   agree with you is, you know, open to different interpretations,

19   but it looks to me that there is some sort of slight bulge as

20   we're looking at it here in what would be the left bottom

21   corner of the bag.  Though from the wearer's standpoint, it

22   would be -- it's on his right side towards, sort of towards --

23   where the bag is no longer touching his body towards the back.

24   It's not a big bulge.  Are you saying in your -- now my

25   ophthalmologist claims I now have 20/20 corrected vision, but

N5UQlucH                    Cotter - Cross

1   what does he know?  You don't think there is a bulge there?

2              MS. BAHARANYI:  Your Honor, I do not see a bulge.  I

3   have sat with this video for a very long time, as the Court can

4   imagine.  I think what bolsters this is the additional footage

5   of Officer Smalls that we provided to the Court in Defense

6   Exhibit 1, which shows how flat that bag was that evening.

7              THE COURT:  Let's take a look at that.

8              (Video played)

9              THE COURT:  You're saying that when he reaches into

10  the bag, the bag it appears that we can't see the same -- we're

11  seeing the inside of the bag, not the outside of the bag.

12             MS. BAHARANYI:  I think he closes it up, your Honor.

13             THE COURT:  But there's nothing there that suggests a

14  bulge.

15             MS. BAHARANYI:  Exactly, your Honor.  Looking at these

16  two videos in conjunction, and the Court may also take some

17  time to look at on your own time, your Honor, if you'd like.

18             THE COURT:  I have nothing better to do.  I might as

19  well.

20             MS. BAHARANYI:  In addition to the very, very

21  convenient timing about his statements of this bulge, meaning

22  this statement of the bulge coming up only after he's now been

23  somewhat educated by this other prosecutor -- not a federal

24  prosecutor, but by another prosecutor -- on what it takes to

25  get suppression, this combination of facts make it so clear

N5UQlucH                          Cotter - Cross

1    that that evening Officer Smalls didn't see a bulge.

2              THE COURT:  So let's assume for -- I am going to go

3    back and take a look at these again, but let's assume for the

4    sake of argument no bulge.  And you're saying that the tip is

5    not enough because you think the case law says it's not enough.

6              MS. BAHARANYI:  The tip is not enough -- the case law

7    is quite clear that the tip is not enough.  We had an anonymous

8    caller.

9              THE COURT:  The case law is quite clear.  I've never

10   come across a case like that, but maybe this is the one.  You

11   know, if the law were clear, none of us would have had to go to

12   law school.  Go ahead.

13             MS. BAHARANYI:  I think every now and then you get a

14   set of circumstances that other courts have had to deal with

15   before, and this anonymous call from a 911 caller who doesn't

16   give their name, providing a specific description on the street

17   is a set of circumstances that came up in *Florida v. J. L.*, a

18   Supreme Court case, even in that case the court has to grapple

19   with a very specific description of a person, a very specific

20   description of a location where that person was going to be

21   located at this bus stop, and an allegation that this person

22   was in possession of a firearm.  It came from an anonymous

23   caller.  The Court found this was not sufficient.  Being able

24   to trace the call doesn't matter.  This was not sufficient

25   because we don't know who this tipster is.  We don't know at

N5UQlucH                    Cotter - Cross

1    the point at which the officers are using that information, if

2    they're relying on reliable information, if they're relying on

3    a truthful individual.  And all that we have is reliability of

4    assertions of where that person is located and what they look

5    like.  So we know where they are, we know what they look like,

6    which I can call 911 on any of the individuals at the front

7    table and provide a very specific description and location, but

8    that is not sufficient.

9              The reason we don't allow these anonymous tips to hold

10   the day is because there still needs to be some reliability in

11   the assertion of the illegality, like the actual unlawful

12   conduct.  If you don't have a bulge, which you don't, you don't

13   have this added corroboration, this added objective

14   corroboration, I'd say.

15             THE COURT:  All right.

16             MS. BAHARANYI:  And I don't think the high-crime area

17   crosses the mark for it, and I don't think training and

18   experience does either.  If anything, your Honor --

19             THE COURT:  I think training and experience is more

20   relevant, as I already indicated.  I don't think the high-crime

21   area means that much.

22             MS. BAHARANYI:  Here is why I have an issue with the

23   training and experience though, your Honor.  I understand

24   Officer Smalls has done many of these types of stops and

25   arrests over time, and I think that actually creates a certain

N5UQlucH                    Cotter - Cross

1   bias in his mind.  Your Honor has certainly heard this phrase:

2   To every hammer, it's a nail.  I always mess it up, I think,

3   but in his experience --

4           THE COURT:  I thought the proper cliche for this

5   particular motion was the battle of the bulge.

6           MS. BAHARANYI:  It's a missed opportunity on my part.

7           But I think what your Honor can see is someone who has

8   training and experience, but who in that moment heard a very,

9   very specific description, saw someone very clearly meeting

10  that description, and made a stop.  I'm not saying that, you

11  know, we can have our opinions on what good policing or bad

12  policing is, but we also have what the case law sets as a

13  standard for what reasonable suspicion is.

14          THE COURT:  The standard is what reasonable, of

15  course, means a reasonable police officer, but it still has to

16  be an objective standard.

17          MS. BAHARANYI:  Exactly.  And I think once your Honor

18  is able to spend additional time with the footage, considering

19  the testimony that was provided today, there simply is no

20  reason to believe that this officer actually saw a bulge,

21  actually saw something specific to Lucha that would have

22  corroborated this anonymous tip on the phone.

23          What he did see, what is kind of objective is that

24  Lucha was standing there talking to his two friends in front of

25  his own home as he was approached by officers, not engaging in

N5UQlucH                     Cotter - Cross

```
1    any sort of suspicious conduct, not trying to flee, hide, do

2    any of the things to blade his body, none of these actions that

3    one would suspect as corroboration of a tip or corroboration of

4    illegal conduct.  He doesn't engage in that.

5           THE COURT:  Thank you very much.  I'm sorry, was there

6    something else you wanted to say?  I didn't mean to cut you

7    off, but we are getting on until 5:00.

8           MS. BAHARANYI:  Your Honor, I think that is it.

9           THE COURT:  Okay.  Let me hear from the government in

10   rebuttal, and we will see where we are.

11          MS. SMYSER:  Just very briefly, your Honor.  First, as

12   you go back and watch the videos, which I know that you will

13   do, I think it's important to watch those in the context of

14   Officer Small's testimony which is what we are saying is

15   credible or not.  He testified today that he saw a bulge and he

16   explained what he meant by that.  That meant that the bag was

17   not flat.  He explained you can't always see that straight on,

18   but Lucha had his arm pinned to his chest, as you might expect

19   there's a gun in the bag, and the way he was angled, turned

20   away, you could see a heavy object in the bottom of that bag.

21   And I think that's important to keep in mind as you're watching

22   those videos.

23          I also think at the end of the day, whether bulge or

24   no bulge, it's also important to note that both officers

25   testified to a heavy bag.  I think in the context of this very
```

N5UQlucH                    Cotter - Cross

```
1    specific 911 call reporting an eye witness who saw a gun in a
2    bag of a same person matching that description, those two
3    things coupled together are sufficient to conduct this
4    initial --
5            THE COURT:  Your adversary says that the policy behind
6    disallowing anonymous calls is that anyone could call up and
7    say, "Wow, I just saw Joe Shmoe walking down the street and
8    he's got a big gun in his handbag."  So does that mean that
9    when the police see someone who matches the description of Joe
10   Shmoe in my hypothetical, and they're carrying a handbag, that
11   they now have reasonable suspicion to frisk the guy, et cetera,
12   et cetera.  That seems awfully extreme.
13           MS. SMYSER:  Your Honor, I think it depends on the 911
14   call.  And I will say that we have a very different view of the
15   911 call as our adversaries do.  And the case law that they're
16   citing here have very different 911 calls than the one at issue
17   here.  The worry and the policy concern that your Honor is
18   articulating here is at bottom a concern that people can call
19   in and make reports with false information, with no
20   accountability and we're going to conduct stops all over the
21   place.
22           And that's not what happened in this instance.  There
23   are two things that are articulated by courts that we need to
24   focus on when assessing 911 calls.  That's whether they're
25   providing a basis of knowledge, and also how anonymous is this
```

N5UQlucH                    Cotter - Cross

1   call?  Are we going to be able to track down the caller?  Even

2   In *J.L.* specifically Justice Kennedy focuses on there could

3   come a time when 911 systems could allow for recording of

4   numbers, and we could track down those people, and they could

5   be held accountable for the type of tips that they make, and

6   they know this.  But that wasn't in the record in that case.

7          But it is what we have here.  This caller is calling

8   in.  She is providing her number.  She even says, "I know that

9   you have my number," and she is in that area.  This does not

10  have the same concerns that the 911 calls in anonymous cases

11  generally have.

12          THE COURT:  I do think from both your argument and

13  defense counsel that is a central issue.  And so I want to

14  re-read some of the cases, think about it.  The alternative of

15  course would be to turn it over to a chat GBT, but I think that

16  would not be appropriate.  So I will get you at least a bottom

17  line.  There will be a full opinion, but at least a bottom

18  line, since you've got an August trial date, by at least ten

19  days from now, which would be what, the 9th, the 8th, something

20  like that, and then a full opinion hopefully maybe by then as

21  well, but certainly a full opinion to follow well before the

22  trial.

23          Anything else we need to take up today?

24          MS. SMYSER:  Nothing further from the government, your

25  Honor.

**A000234**

N5UQlucH                    Cotter - Cross

1          THE COURT:  Anything from the defense?

2          MS. BAHARANYI:  No, your Honor.  Thank you.

3          THE COURT:  Very good.  Thanks very much.

4          (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000235

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     -v-<br><br>LUCHA EL LIBERTAD (a/k/a STEVEN PEREZ)<br><br>     Defendants. | 22-cr-644 (JSR)<br><br><u>OPINION AND ORDER</u> |

JED S. RAKOFF, U.S.D.J.:

Defendant Lucha El Libertad[1] is charged with one count of interstate transportation of firearms in violation of 18 U.S.C. § 922(a)(3). Lucha El moved to dismiss the indictment, arguing that § 922(a)(3) -- which makes it unlawful to receive a firearm from out-of-state except through a federally licensed dealer or other specified means -- violates his Second Amendment right "to keep and bear arms." U.S. Const. amdt. II. He also moved to suppress the firearm, arguing the police lacked reasonable suspicion to search him. Following briefing, argument, and an evidentiary hearing, the Court denied both motions by bottom-line order on June 8, 2023. This Opinion and Order reaffirms the denial of both motions and sets forth their reasoning.

---

[1] The defendant is identified in the indictment as "Steven Perez, a/k/a 'Lucha.'" The Court uses the name the defendant goes by: Lucha El Libertad. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

1

A000236

## I.  Section 922(a) does not abridge the right to keep and bear arms.

18 U.S.C. § 922(a)(3) makes it unlawful "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State, except" where the person receives the firearm by bequest or meets certain other narrow criteria.[2] In other words, the statute prohibits people from bringing into their states of residence firearms purchased or obtained out-of-state except in particular circumstances not present here.

The overall aim of § 922(a)(3) was to "funnel access to firearms almost exclusively through dealers" licensed and regulated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). United States v. Matteo, 718 F.2d 340, 341 (2d Cir. 1983) (quoting Dickerson v. New Banner Inst. Inc., 460 U.S. 103, 119 (1983)). Federally licensed dealers are subject to legal restrictions regarding whom they may sell firearms (based on age, criminal history, and other factors), 18 U.S.C. § 922(d), which kinds of firearms they may sell, id. § 922(p), and the records that must be kept regarding firearms sales, id. § 922(m).

---

[2] Specifically, the statute also allows persons to receive firearms from out of state if the firearm was acquired before the enactment of 18 U.S.C. § 922(a)(3) or if "the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States," or when a firearm is loaned or rented "for temporary use for lawful sporting purposes. . . ." 18 U.S.C. § 922(a)(3), 922(b)(3).

2

Furthermore, by funneling firearms sales through in-state dealers (or importers, manufacturers, or collectors), the statute works to ensure that anyone obtaining a gun does so in compliance with not just federal but also state law. 27 C.F.R. § 478.99(b). Section 922(a)(3) thus aims to "stop circumvention of state laws regulating gun possession . . . by requiring state residents to comply with conditions of sale and similar requirements in their home state." Decastro, 682 F.3d at 168.[3]

Lucha argues that § 922(a)(3) infringes his Second Amendment right to keep and bear arms. U.S. Const. amdt. II. The Court disagrees for two reasons. First, as detailed below, the Second Circuit has previously held that § 922(a)(3) does not on its face burden the right to keep and bear arms. See Decastro, 682 F.3d at 169. Although the Supreme Court has since abrogated this and other circuits' application of means-ends scrutiny as a way of analyzing gun regulations that do burden Second Amendment-protected conduct, New York State & Rifle Assoc., Inc. v. Bruen, 142 S.Ct. 2111, 2127 (2022), Decastro's holding that § 922(a)(3) does not on its face regulate core Second Amendment

---

[3] Importantly, Section 922(a)(3), at least as interpreted by the ATF, does not completely prohibit individuals from obtaining a gun from outside their state of residence or from transporting lawfully obtained guns between states. For one thing, the ATF interprets § 922(a)(3) to permit gun purchases "from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state." United States v. Decastro, 682 F.3d 160, 169 (2d Cir. 2012). And, once someone has lawfully obtained a firearm, the Firearms Owner Protection Act makes it legal for that person to transport it between states so long as that person "may lawfully possess and carry such firearm" in both states, transports the gun unloaded, and meets various other requirements. 18 U.S.C. § 926A.

A000238

conduct survives _Bruen_ unscathed. _Id._ Further, a close reading of _Bruen_ confirms that laws such as § 922(a)(3) that operate merely as threshold mechanisms for ensuring that prospective gunowners are authorized to possess and carry a gun do not necessarily infringe the right to keep and bear arms. While the Court can conceive of instances in which laws such as § 922(a)(3) _might_ burden core Second Amendment protected conduct -- and would therefore need to be "consistent with this Nation's historical tradition of firearm regulation" in order to survive constitutional scrutiny, _Bruen_, 142 S.Ct. at 2126, -- Lucha has made no such as-applied showing here. _Second_, even assuming § 922(a)(3) applied on its face to the keeping and bearing of arms, this Court would find that the statute falls well inside the nation's history and tradition of firearms regulation and therefore passes constitutional scrutiny.

**A. § 922(a)(3) does not infringe the right to keep and bear arms**

**1. The right to keep and bear arms, as set out in _Heller_ and _Bruen_**

15 years ago, in _Heller v. District of Columbia_, 554 U.S. 570 (2008), the Supreme Court held for the first time that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation. . . ." _Id._ at 592. There, the Court relied on this understanding to hold unconstitutional Washington D.C.'s total ban on possessing handguns in the home. _Id._ at 627-28. Since the Court believed that total ban "would fail constitutional muster" when evaluated "[u]nder any of the standards of scrutiny that [the Court] applie[s] to enumerated constitutional rights," the Court

4

A000239

declined to specify the precise approach courts should take to deciding the constitutionality of gun regulations. Id. at 629. However, the Court based its identification of the scope of an individual's Second Amendment on its understanding of what the amendment's words meant at the time of ratification, id. at 576-600, as informed by prior, contemporaneous, and subsequent history, id. at 601-19. Relying on this approach, the Court identified "presumptively lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27 & n.26.

In Heller's wake, most lower courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." New York State & Rifle Assoc., Inc. v. Bruen, 142 S.Ct. 2111, 2125 (2022). The first step involved ascertaining whether a particular gun regulation implicates conduct protected by "the original scope of the right based on its historical meaning," because if it did not, "then the analysis can stop there; the regulated activity is categorically unprotected." Id. at 2126. Assuming a gun regulation does infringe on Second Amendment protected conduct, the second step entailed analyzing the extent to which any such infringement was necessary to further important government interests. Id. at 2126-27 (noting circumstances in which courts applied either strict or intermediate scrutiny). In Bruen,

A000240

however, the Supreme Court held that "this two-step approach [was] one step too many." Id. at 2127. Rather, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2129-30. In such cases, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," in which case courts may still "conclude that the individual's conduct falls outside the Second Amendment's unqualified command." Id. at 2129.

### 2. The Second Circuit's decision in United States v. Decastro, 682 F.3d 160 (2d Cir. 2012)

Following Heller but before Bruen, the Second Circuit rejected precisely the argument Lucha raises here: that § 922(a)(3) on its face violates the Second Amendment. See United States v. Decastro, 682 F.3d 160, 169 (2d Cir. 2012). There, the court assumed without deciding that, following Heller, governmental regulations of Second Amendment-protected conduct would be subject to some form of heightened (read: intermediate or strict) scrutiny. Id. at 166. And, indeed, the Second Circuit ultimately decided that intermediate scrutiny should apply to regulations burdening the carrying of arms outside the home, while leaving open the possibility that strict scrutiny might apply to gun regulations implicating the "core" right to possess a gun in one's home for self-defense. Kachalsky v. Cty. of Westchester, 701 F.3d 81, 93-94 (2d Cir. 2012), abrogated by Bruen, 142 S.Ct. at 2126. In

Decastro, however, the Second Circuit did not decide precisely what, if any, form of means-ends scrutiny should apply to regulations burdening Second Amendment-protected conduct "[b]ecause § 922(a)(3) only minimally affects the ability to acquire a firearm" and was therefore not subject to means-ends scrutiny to begin with. Decastro, 682 F.3d at 165. Or, to put Decastro's holding in Bruen's words, "the regulated conduct [implicated by § 922(a)(3)] falls beyond the [Second] Amendment's original scope," such that "the analysis can stop there [because] the regulated activity is categorically unprotected." Bruen, 142 S.Ct. at 2126; see id. at 2127 (confirming that while lower courts' application of means-ends scrutiny to Second-Amendment burdening regulations was inappropriate, lower courts' enunciation of "[s]tep one of the predominant framework . . . which demands a test rooted in the Second Amendment's text, as informed by history" is "broadly consistent with Heller"). And, as it happens, the Decastro court did not need to apply the means-end scrutiny for Second Amendment protected conduct that the Supreme Court explicitly disavowed in Bruen. To the contrary, since it held that § 922(a)(3) does not burden Second Amendment rights at all, that holding survives Bruen and binds this Court.

Lucha disputes this reading of Decastro, pointing to language in Decastro describing § 922(a)(3) as burdening Second Amendment rights "only minimally" or "not substantially," Decastro, 682 F.3d at 164, 168, and therefore arguing that Decastro cannot be read as holding that § 922(a)(3) on its face does not regulate Second Amendment

protected conduct. The Court disagrees. As Decastro made clear, any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually "infringe" it. Decastro, 682 F.3d at 167-68 (analogizing any threshold burden placed by § 922(a)(3) on the right to bear arms to incidental threshold burdens routinely placed on the right to vote or to speak at particular times and places that likewise are not considered to "infringe" the underlying rights). Accordingly, Decastro is best read as holding that § 922(a)(3) does not on its face infringe the right to keep and bear arms.

Of course, Decastro, which came only four years after Heller and nine years before Bruen, did not use Bruen's words. In determining that § 922(a)(3) so minimally burdened Second Amendment rights so as to not trigger Second Amendment scrutiny at all, the Second Circuit's analysis included less focus on a precise historical understanding of the scope of the right protected by the Second Amendment's plain text, and more analogizing to other areas of doctrine dealing with other rights. Id. at 167-68. For instance, in concluding that § 922(a)(3) does not infringe the right to keep or bear arms, Decastro emphasized that our constitution generally allows state and federal governments to place broad-based and non-discriminatory threshold burdens on other fundamental rights (such as the rights to vote, marry, assemble, and even, with respect to times and places, the right to speak) so long as such burdens do not substantially burden the rights in question and leave open ample means of exercising them. Id. Because § 922(a)(3)

does not on its face prohibit anyone lawfully entitled to carry a gun from lawfully acquiring one in-state consistent with the statute, the Decastro court therefore concluded that any burden imposed on Second Amendment rights was entirely incidental, such that § 922(a)(3) does not in fact infringe the right to keep and bear arms. Id. This holding, even if not expressed exactly how a post-Bruen court might have expressed it, remains binding on this Court.

### 3. Under Bruen, § 922(a)(3) does not infringe on the right to keep and bear arms

Moreover, a close reading of both Bruen and the two-justice concurrence authored by Justice Kavanaugh and joined in by Chief Justice Roberts, both necessary to Bruen's majority, confirms that statutes such as § 922(a)(3), which place certain threshold conditions on the acquisition of firearms designed to ensure that those carrying them are lawfully entitled to do so, generally do not infringe the right to keep and bear arms so long as they are not applied to actually prevent law-abiding citizens from obtaining and carrying guns. For instance, while Bruen struck down New York's "may issue" firearms-permitting regime, which required citizens to show a "special need" for self defense and submit to a highly discretionary licensing process in order to exercise their Second Amendment to carry arms, the Court nonetheless emphasized that "[t]o be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." Bruen, 142 S.Ct.

9

at 2138 n.9. Rather, the Court reasoned that "[b]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." Id. Instead, "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" Id. (also noting that "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.").

What is notable here is that notwithstanding Bruen's holding that a regulation infringing on "presumptively protect[ed]" conduct covered by "the Second Amendment's plain text" must be "consistent with this Nation's historical tradition of firearm regulation" in order to pass constitutional muster, id. at 2126, Bruen nonetheless stated that nothing in its analysis "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," at least to the extent those regimes applied in practice in a way that did not substantially interfere with the right of "law-abiding, responsible citizens" to obtain and carry firearms. Id. at 2138 n.9. This point is made even more clearly in Justice Kavanaugh's two-justice concurrence, which explicitly stated that "[t]he Court's

A000245

decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense [and] [i]n particular . . . does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." Id. at 2161 (Kavanaugh, J., concurring). See id. at 2162 ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

Importantly, both the majority opinion and Kavanaugh concurrence indicated the likely constitutionality of shall-issue regimes -- at least to the extent they are not applied in practice to frustrate gun ownership or carrying by law-abiding, responsible citizens -- without first conducting any exhaustive historical analysis, suggesting that such "shall-issue" regimes do not infringe the right to keep and bear arms. As described below, this Court concludes that regulatory regimes designed to verify that a person possessing or carrying a gun is lawfully eligible to do so would pass the historical test laid out by Bruen. But the implication of both the Bruen majority opinion and the Kavanaugh concurrence is that "shall-issue" licensing regimes, so long as they allow persons contemplated by the Second Amendment to keep and bear arms and are not applied in practice to frustrate that right, do not even trigger a Bruen inquiry into whether they are consistent with this Nation's tradition of firearm regulation. This is because they do not on their face prevent anyone lawfully entitled to do so from "keep[ing] and bear[ing] arms."

A000246

Bruen, of course, had no occasion to mention § 922(a)(3), nor analogize it to the 43 states' shall-issue regimes. But, as explained above, § 922(a)(3) operates in tandem with such state licensing regimes by "funnel[ing] access to firearms" through in-state and federally licensed dealers that can then ensure that a person obtaining a firearm is eligible to do so. Mateo, 718 F.2d at 341; see also Decastro, 682 F.3d at 168 ("The evident purpose of the statute is to stop circumvention of state laws regulating gun possession; it does so by requiring state residents to comply with conditions of sale and similar requirements in their home state."). In other words, § 922(a)(3) backstops state licensing regimes by ensuring that individuals can't dodge their home-state's licensing requirements by simply obtaining a gun from out of state. Like the "shall-issue" state-licensing regimes held out by the Bruen majority opinion and Kavanuaugh concurrence as putatively lawful on their face, § 922(a)(3) therefore does not on its face operate to prevent anyone from keeping or bearing arms; it merely prescribes and proscribes particular modes of acquiring guns, so as "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." Bruen, 142 S.Ct. at 2138 n.9.

### 4. Outlier situations should be dealt with in as-applied challenges

Lucha speculates that § 922(a)(3) may operate in particular situations to infringe on the right to keep and bear arms. For instance, he speculates that a New York resident lawfully eligible to

A000247

carry a gun in both New York and New Jersey could be given a gun by a family member in New Jersey to bring home with her to New York. Def. Supp. Br. at 1, Dkt. 43.[4] There are two, independently adequate responses to this line of argument.

First, the fact that a regulation may prevent someone from lawfully keeping or bearing arms in a particular circumstance even if that person might otherwise qualify to do so does not necessarily establish that the regulation infringes the right to keep and bear arms. As noted, the Supreme Court in Bruen justified 43 states' "shall issue" licensing regimes as designed "to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S.Ct. at 2138 n.9. For the people who ultimately obtain a license through such a regime (because they are law-abiding, responsible citizens), the license requirement may appear to act as an unnecessary burden. But while the point of such license requirements may be to screen out those who are not law-abiding and responsible, they cannot work in practice without subjecting everyone -- including the law-abiding and responsible -- to the requirement of getting a license, along with whatever background check or training requirements that may entail. See id.

_____

[4] The more common problem -- that someone who has already lawfully obtained a firearm may seek to bring it with her between states in which she may lawfully keep and carry it -- is separately dealt with by 18 U.S.C. § 926A, which allows gunowners to transport guns between states so long as they "may lawfully possess and carry such firearm" in both states, transport the gun unloaded, and meets various other requirements. Id.

13

With that understanding, it is easy to see the first flaw in Lucha's hypothetical. To ensure that a person is entitled to keep and bear arms, the state may require them to follow certain regulatory steps that necessarily close off paths for keeping and bearing arms that do not follow such steps. But, so long as that person reasonably <u>could</u> comply with such steps, it is hard to see exactly why prohibiting the receipt of firearms outside the regulatorily prescribed mechanism infringes the right to keep and bear arms.

<u>Second</u>, even assuming for the sake of argument that § 922(a)(3) may operate as applied to certain individuals under certain circumstances to infringe the right to keep and bear arms, Lucha has identified nothing about his circumstances that suggests he could not have sought to obtain a firearm lawfully from any of New York's many federally licensed dealers. He is thus totally unlike the petitioners in <u>Bruen</u> who sought to avail themselves of New York's prescribed process and were denied any license to carry as a result of that process. <u>Bruen</u>, 142 S.Ct. at 2124-25. To succeed in a purely facial challenge, Lucha must show that "no set of circumstances exists under which the Act would be valid." <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987). The mere speculation that some such circumstances might exist is insufficient. To the extent § 922(a)(3) infringes specific individuals' right to keep and bear arms in specific situations, the affected individuals may challenge it. <u>Decastro</u>, 682 F.3d 169 n.7; <u>see also</u> <u>Bruen</u>, 142 S.Ct. at 2138 n.9 (noting that if a shall-issue permitting regime were put to "abusive ends," such as "where, for

14

example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry," affected individuals could bring challenges).

**B. § 922(a)(3) is consistent with this country's history and tradition of firearm regulation**

Even if the Court did not conclude, as it does above, that § 922(a)(3) does not on its face implicate the right to keep or bear arms, it would nonetheless conclude that the statute survives facial attack because, when viewed at the appropriate level of generality, it "is consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S.Ct. at 2126. "When confronting [] present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." Id. at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar," which requires determining "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and evaluating whether this "how and why" is sufficiently similar to historical gun regulations viewed as consistent with the Second Amendment. Id. at 2232-33.

The Court notes two lines of relevant historical regulations that support the consistency of § 922(a)(3) with the Second Amendment: one line that is plainly relevant to the "how" and another that is plainly relevant to the "why." As to the "how," the Government points to a

15

reasonably substantial record of colonial and early state-era laws regulating, like § 922(a)(3), the _movement_ of firearms between colonies. For instance, apparently as part of an effort to prevent firearms from falling into the hands of Indian tribes, "Connecticut banned the sale of firearms by its residents outside the colony." _Texeira v. Cty. of Alameda_, 873 F.3d 670, 685 (9th Cir. 2018) (citing 1 Trumbull, Public Records of the Colony of Connecticut, 138-39, 145-46). Several other colonies all also passed laws in the seventeenth and eighteenth centuries criminalizing the sale or delivery of firearms to Indians. _Id._ (citing such laws in Massachusetts, Maryland, Connecticut, and Virginia); _see also_ 6 _Statutes at Large of Pennsylvania from 1682 to 1801_, at 319-320 (1899) (1763 law); _Laws and Ordinances of New Netherland_, 1638-1674, at 18-19 (1868) (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance).

Lucha notes that such laws specifically focused on tribal members were likely racist in intent. The Court agrees that most such laws would likely fail equal protection scrutiny today.[5] But what these laws demonstrate is quite broad colonial authority over the right of citizens to move and transact in firearms across borders out of a fear

---

[5] Of course, a perennial problem with tethering constitutional meaning so closely to the specific practices of centuries-old polities in which power was exercised by and for a fairly narrow subset even of white men -- to say nothing of women and non-white persons -- is that we may end up finding guidance in places we should perhaps not want to seek it. _See, e.g.,_ Jamal Greene, _Originalism's Race Problem_, 88 Den. L. Rev. 517 (2011). Such questions, however, are beyond the scope of today's opinion which takes current case law as it finds it.

16

**A000251**

that such firearms might fall into the wrong hands. See, e.g., Kanter v. Barr, 919 F.3d 437, 457 (7th Cir. 2019) (Barret, J., dissenting) (noting colonial authority to categorically disarm groups viewed as dangerous, including tribal members, people of African descent, and Catholics). While views about whose hands are "the wrong hands" have thankfully changed, the point is that colonial and state governments, consistent with the Second Amendment, possessed significant authority to regulate the flow of arms across borders in order to prevent improper access to firearms.

Although not cited by the Government, mention should also be made of a statute passed by the Third Congress that made it unlawful to "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados, gunpowder, sulphoer, or saltpetre." Act of May 22, 1794, ch. 33, § 1 ("An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Same of the same"). The statute provided for custom-house officers to search ships for any of these arms and seize any such arms "excepting such of them as may constitute a part of the equipment" of the vessel, and for the forfeiture not just of the arms themselves but also the vessel in the event the value of arms seized exceeded $400. Id. §§ 2-4. And early cases demonstrate that forfeitures were instituted under this law. See, e.g., United States v. La Vengeance, 3 U.S. 297, 298 (1796) (discussing unrelated jurisdictional issues relating to a proceeding instituted under this law to seize

muskets, cannons, and gunpowder found on a ship bound to the West Indies).

The Court has identified little contemporaneous discussion of this statute or the problems it was aimed at. Judging solely from its face, it seems reasonably likely that the statute was aimed at ensuring the overall stock of weapons available in this country not be depleted, perhaps out of a concern that the country be sufficiently armed in the case of invasion or insurrection. That is, of course, a distinct purpose from § 922(a)(3)'s goal of ensuring that arms transactions pass through federally licensed dealers positioned to ensure compliance with state law. But at least in terms of the "how" of early gun regulations, the statute provides powerful evidence that an early congress believed it could, consistent with the Second Amendment, place quite sweeping restrictions on the passage of firearms across borders. See, e.g., Printz v. United States, 521 U.S. 898, 905 ("[E]arly congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning . . . .").

Finally, the Government does point to colonial and early state statutes regulating the importation and exportation of gun powder. Pennsylvania, for instance, enacted a 1795 statute requiring that before any gunpowder be brought into the city, county, or port of Philadelphia, it be appropriately marked and deposited in a public magazine. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). As a colony, Massachusetts both required that any person who "shall

18

A000253

import into this jurisdiction, either powder, lead, bullets, or any ammunition whatsoever" to "give particular notice of the quantity thereof to the publick Notary," and that any person who sought to export any gunpowder only do so upon obtaining a "License . . . from some two of the Magistrates. . . ." Colonial Laws of Massachusetts Reprinted from the Edition of 1660, at 186-87 (1889), https://archives.lib.state.ma.us/handle/2452/430907. The Connecticut colonial legislature enacted a similar law. 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute).

Neither party has provided this Court with sufficient detail from the historical record to discern the purpose of these different laws, and the Court acknowledges that none is a dead-wringer for § 922(a)(3). Several of the statutes prohibiting or regulating the export of arms or ammunition likely were motivated by a desire to keep weapons inside the particular polity for purposes of self-defense. Pennsylvania's law regarding the proper marking and storage of gun powder upon its importation likely was motivated by concerns regarding the safe storage of a dangerous and flammable material. Arguably, the laws prohibiting the transfer of arms specifically to tribal members are similar to § 922(a)(3) in that they deal with a concern that weapons will fall into the hands of those deemed dangerous and deal with that concern by regulating the transfer of weapons in order to prevent them reaching those considered dangerous, although even here the Court acknowledges that the historical analogy as to purpose is somewhat attenuated. But while the motivation for these laws may not have exactly paralleled

19

A000254

the motivation for § 922(a)(3), they nonetheless demonstrate the expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders. As described above, this expansive authority was exercised in numerous ways, involving licensing requirements, registration requirements, and flat-out prohibitions on certain courses of conduct. Accordingly, the Court concludes that there is ample historical precedent for the kind of burden § 922(a)(3) imposes (assuming it imposes one at all) on the right to keep and bear arms.

Turning to the "why" behind § 922(a)(3), the Court finds particularly relevant an extensive history in both England and the colonies of disarming those deemed dangerous and requiring large swathes of the citizenry to swear loyalty oaths in order to demonstrate they were not dangerous. See Kanter, 919 F.3d at 456-58 (Barret, J., dissenting) (discussing the power of both the Crown and colonial legislatures to disarm those deemed dangerous). As put by then-judge, now Justice Barrett, "confiscation of guns from those who refused to swear an oath of allegiance was meant to deal with the potential threat coming from armed citizens who remained loyal to another sovereign. . . [b]ut that particular threat dissipated when a person pledged his allegiance to the United States or to a particular state." Id. at 457-58.

What is notable here is that the long tradition of imposing a relatively slight threshold burden on all or at least a large portion

20

A000255

of gunowners, most of whom were likely entitled to keep and bear arms, to demonstrate that they were so entitled and not dangerous by swearing the requisite loyalty oath. Obviously, the "how" of this regulation -- requiring citizens to swear a loyalty oath -- differs significantly from § 922(a)(3)'s prohibition on receiving arms from out of state. But the "why" of it -- enabling gunowners to verify they are not dangerous -- is reasonably similar. And even the "how" bears some similarities: both procedures involve imposing a slight threshold burden on gun ownership designed so as "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." <u>Bruen</u>, 142 S.Ct. at 2138 n.9.

In short, while the Court believes, consistent with <u>Decastro</u>, that § 922(a)(3) does not on its face infringe the right to keep and bear arms, it also concludes that any incidental burden on the right to keep and bear arms is fully consistent with this country's history and tradition of gun regulation. This is true both with respect to the evident goal behind § 922(a)(3) (preventing firearms from getting into dangerous hands), and the chosen means (regulating the transfer of firearms across borders). The Court does not rule out the possibility that a proper litigant might raise a meritorious as-applied challenge to § 922(a)(3), but nothing about the statute's facial breadth or application in this case violates the Second Amendment. Accordingly, the Court reaffirms its prior denial of defendant Lucha El's motion to dismiss the indictment.

A000256

## II.   The search at issue in this case was supported by reasonable suspicion

Separately, defendant Lucha El has moved to suppress the results of the June 23, 2021 search that led to the recovery of the firearm he is charged with having received from out-of-state in violation of § 922(a)(3). The Court conducted an evidentiary hearing on May 30 of this year, in which it heard testimony from the two arresting officers, reviewed video of the arrest as captured by the officers' body cameras, and listened to the recording of a 911 call made prior to Lucha's arrest.

To support a brief "Terry" stop of the sort that took place here, law enforcement must have "reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013); see Terry v. Ohio, 392 U.S. 1 (1968). Lucha makes two kinds of arguments that reasonable suspicion was lacking here. First, he argues that the most the arresting officers had was suspicion that Lucha was carrying a gun, and that since carrying a gun is not by itself unlawful, suspicion that someone is carrying a gun does not constitute suspicion of unlawful activity. Second, Lucha argues that because the 911 caller who tipped off the police that Lucha was carrying a gun did not provide her name, the tip was anonymous and not sufficiently reliable to support reasonable suspicion. The Court addresses these arguments in turn.

22

## A. Reasonable suspicion that Lucha was carrying a gun was sufficient to support the 2021 search

Courts, including both the Supreme Court and the Second Circuit, have long affirmed that reasonable suspicion that a person is carrying a gun suffices to support a brief Terry stop. For instance, in Florida v. J.L., 529 U.S. 266 (2000), the Supreme Court held that "officers' suspicion that J.L. was carrying a weapon" was not sufficient to support a brief search and seizure because the sole basis for that suspicion was an un-corroborated anonymous tip. Id. at 270. However, the Court proceeded on the assumption that, assuming the tip had been sufficiently corroborated, suspicion that J.L. was carrying a gun would have justified the stop, notwithstanding the fact that "J.L. made no threatening or otherwise unusual movements," and the tip at issue merely stated that J.L. "was carrying a gun," not that he was actively committing some independent crime with it. Id.; see also Freeman, 735 F.3d at 98-100 (similar). And, of course, Terry itself involved an officer's (accurate) suspicion that the suspects might "have a gun," although the officer there also had reason to think a theft might be ongoing. Terry, 392 U.S. at 6.

At the same time, reasonable suspicion is generally measured with respect to suspicion "of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981) (emphasis added). In a post-Bruen world, where it is abundantly clear that citizens have the right not just to keep but also to bear arms, including outside the home, it becomes

23

hard to say that the suspicion or even knowledge that someone is carrying a gun constitutes suspicion or knowledge of criminal activity.

While Bruen thus raises serious questions about when the police may stop someone on the ground that they are carrying a gun, the Court notes that these questions are not squarely presented in this case. The Terry stop at issue here occurred on 6/23/21, approximately one year before Bruen, when New York's highly restrictive licensing regime limiting parties' ability to obtain licenses to carry firearms outside the home absent special need was still in place and had been upheld by the Second Circuit. Bruen, 142 S.Ct. at 2123-24. While Lucha points out that even under New York's pre-Bruen licensing regime, some individuals had licenses to carry concealed firearms outside the home, reasonable suspicion "need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002). Officers (and courts) also need not disregard obvious probabilities or likelihoods in evaluating reasonable suspicion. See Kansas v. Glover, 140 S.Ct. 1183, 1189-91 (2020) (holding that the police had reasonable suspicion to stop a vehicle registered to an owner whose license had been suspended, notwithstanding the possibility that someone other than its owner could lawfully have been driving it, based on the inference that the owner and driver were one and the same). As to a search occurring one year before Bruen, this Court therefore has little trouble concluding that to the extent the police had reasonable suspicion Lucha was carrying a concealed gun in New York City, that

24

sufficed at that time to create reasonable suspicion of unlawful activity.

More broadly, the Supreme Court has repeatedly made clear that "the ultimate touchstone of the Fourth Amendment is reasonableness." Id. at 1191. And, as discussed at length above, states may, consistent with the Second Amendment, take reasonable steps to verify that someone with a gun is in fact authorized to carry it. Given that basic backdrop, the Court doubts that, even following Bruen, the police cannot follow up on a sufficiently corroborated tip that someone is carrying a gun by at least taking steps to verify that that person is lawfully entitled to carry a gun, such as, for instance, by verifying her permit.

In this case, seconds after the police searched Lucha's bag to determine if he was in fact carrying a firearm, the police asked Lucha if he had a permit for the gun, to which he answered that he neither had nor needed a permit. See 6/26/23 Hr'g Tr. 32:24-33-3. Even post-Bruen, it seems clear that, assuming reasonable suspicion exists that someone is carrying a gun, law enforcement retains the authority to at least verify that the person carrying the gun is doing so lawfully.

**B. The police had reasonable suspicion to stop Lucha**

The more important issue, therefore, is whether the police lacked reasonable suspicion to believe Lucha was carrying a gun. In particular, Lucha contends that because the 911 caller who reported him as carrying a gun did not give her name, the tip was anonymous and

25

there were insufficient corroborating circumstances to render such a tip sufficiently reliable to give rise to reasonable suspicion.

### 1. Evidence at the 5/30/23 Evidentiary Hearing

To assess this argument, some background is necessary, for which the Court draws on the evidence and testimony introduced during its May 30, 2023 evidentiary hearing on defendant's motion to suppress. See generally 5/30/23 Hr'g Tr., Dkt. 50. On the night of June 23, 2021, a woman called 911 to report a man with a gun. See 911 Audio, Gov't Ex. 100. When asked who the man was, she identified him as "Lucha," and when asked how she knew he was carrying a gun, she explained it was because she had seen it. She further explained that she knew Lucha because she used to be his friend, and she gave a description of him as an Hispanic male wearing a black-and-white turban, a white T-shirt, and black pants, and carrying a blue bag in which the gun was stored. She further described Lucha's height and build, noted he had a moustache, and stated where he was at the moment (heading down Perry Avenue) and where she predicted he was going (that he would turn on 207th Street). After she provided this information, the dispatcher asked the caller to give her name. She declined. The dispatcher then asked for her phone number, and the caller responded by asking "don't you already have it," before proceeding to provide it.

Officer Smalls, who was patrolling in the area with his partner, promptly responded and found an individual precisely matching the caller's description where the caller had placed him and carrying a

26

blue bag. Officer Smalls testified that, as he approached Lucha, he observed that the blue bag worn across Lucha's chest "had a heavily weighted object in it," and that he could "see a bulge at the lower portion of the bag." He also testified that he previously had encountered similar bags as having been used to contain firearms, although as he candidly acknowledged under cross examination, such bags are also routinely used as ordinary bags. Officer Smalls proceeded to approach Lucha and pat down the bag's outer portion, at which point he testified he "felt a hard metal, L-shaped object, the shape and size consistent of a firearm." Hr'g Tr. 30:5-6. At that point, he gave his partner a verbal code to make an arrest, so as to handcuff Lucha while the firearm was secured and he held down the bag with the firearm. Once that was done, Officer Smalls opened the bag and found a loaded firearm in it; he promptly asked Lucha whether he had a permit for the gun, at which point Lucha denied any need for a permit.

It should be noted that, both before and during this encounter, the defendant behaved peaceably. At the time he was approached by Officer Smalls, he appeared from body camera footage to be engaged in a social conversation with two women seated on the sidewalk, and at no time during the encounter did Lucha resist or make any kind of threatening movement or gesture. Soon after Lucha's arrest, other police officers did a drive-by with the original 911 caller who identified the man arrested as Lucha.

## 2. Whether Officer Small's observation of a "bulge" created reasonable suspicion

At the hearing, Defense counsel suggested that Officer Smalls may have been tempted to testify to a "bulge" in Lucha's bag because he previously testified that he had not seen a bulge in an evidentiary hearing on a motion to suppress in another case, and the gun in that case was ultimately suppressed. 5/30/23 Hr'g Tr. 75-79. Defense counsel further suggested that Officer Smalls may have been "coached," following that hearing, that testifying to seeing a "bulge" may be necessary to prevent suppression.

Based on its observations of his demeanor, the Court believes Officer Smalls testified truthfully. But the test for reasonable suspicion is not his subjective belief but what an objectively reasonable officer would have seen and concluded. Freeman, 745 F.3d at 102. After carefully reviewing video footage capturing what Officer Small saw, the Court concludes that while Lucha was wearing a bag strapped across his chest and clearly weighted down with some contents, any "bulge" was sufficiently modest and nondescript that no reasonable officer could have distinguished any "bulge" of the sort reasonably likely to be caused by a weapon from any other sort of bulge that might come from having a reasonably full bag. The Court does not doubt that Officer Smalls, primed as he was by the 911 call and dispatcher to believe Lucha in fact had a gun in his blue bag, sincerely believed that a gun was in the bag or even that he perceived the bag to have a small bulge. But based on its independent review of the body camera

28

footage, the Court concludes that there was no objectively reasonable basis to believe the bag contained a firearm -- <u>except</u> for that provided by the 911 call. Accordingly, whether reasonable suspicion existed depends entirely on whether the 911 call gave rise to it.

### 3. Whether the 911 call created reasonable suspicion

The Court nonetheless concludes that the 911 call, standing alone, gave rise to reasonable suspicion to support a brief investigative search and seizure of the man matching the precise identification laid out by the 911 caller. Reasonable suspicion is not a terribly high standard, and while "a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014).

To be sure, the Supreme Court' and Second Circuit's cases express concern as to whether fully anonymous tips give rise to reasonable suspicion. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000). "[H]owever, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." <u>Id.</u>

In <u>J.L.</u>, the Supreme Court held that an anonymous tip that "a young black male wearing a plaid shirt at the bus stop" was carrying

A000264

a gun lacked sufficient indicia of reliability to give rise to reasonable suspicion to support a Terry stop. Id. at 271. Although the tipster's "accurate description of [the] subject's readily observable location and appearance" was reliable in the "sense . . . [that it] help[ed] the police correctly identify the person whom the tipster mean[t] to accuse," the tipster's accurate description of appearance and location "d[id] not show that the tipster has knowledge of concealed criminal activity." Id. at 272. There were therefore no corroborating circumstances rendering reliable the anonymous tip in its assertion that J.L. was in fact carrying a gun. Id. However, in a concurrence for himself and then-Chief Justice Rehnquist, Justice Kennedy noted the possibility that changing technology -- and, in particular, the possibility for "[i]nstant caller identification" and "[v]oice recording of telephone tips" -- might reduce the possibility that callers using the 911 system would knowingly lie, thereby rendering so-called "anonymous" tips through the 911 system more reliable. Id. at 275-76 (Kennedy, J., concurring).

In Freeman, the Second Circuit expanded on J.L. and also rejected as insufficient an anonymous tip that a precisely identified as an individual carrying a gun. 735 F.3d at 98-100. The district court sought "to distinguish the call in [that] case from that in J.L." as "not 'truly anonymous' because the cell phone number was automatically recorded by the 911 system, the individual twice called 911, and based upon the information conveyed in the call, the caller was an eyewitness." Id. at 98. The Second Circuit held that these distinctions

30

A000265

did not in fact "undermine the reasons why anonymous phone calls must have sufficient indicia of reliability to support a finding of reasonable suspicion, nor d[id] they provide those indicia for this caller or do anything to alter the reliability analysis laid out in J.L." Id. Specifically, notwithstanding Justice Kennedy's suggestion in J.L. that phone recording might increase reliability of 911 calls, the Second Circuit noted in Freeman noted there was no reason to think that the mere fact a tipster's call was recorded and her number known necessarily demonstrated that the caller could be tracked down and her identity verified. Id. at 98. For instance, the caller could have been using a prepaid cellphone solely for the purpose of the tip. Id. And, although the police did not know this at the time of the stop, the caller was in fact never tracked down. Id. At the same time, the Second Circuit did not dismiss the possibility that 911 technology would ever render a seemingly anonymous tip less anonymous; rather, it held that "[i]n each case, the government must show its relevant technological capacities and how those capacities enhanced reliability in that particular instance." Id. at 99.

Freeman likewise dismissed the suggestion that the tip was rendered reliable by the fact that the caller called back twice, noting that this just meant there were two equally uncorroborated anonymous tips. Id. It similarly did not agree that the tip was reliable because the caller was purportedly an eyewitness, since the only things the tipster claimed to have seen directly were facts such as the suspect's location or clothing that were reliable in identifying the suspect but

not in associating him with illegality. Id. at 99. Notably, while the police asked the 911 dispatcher twice to confirm whether the caller "actually saw a firearm," the dispatcher was twice unable to confirm this was the case. Id. at 94. And while the Second Circuit did not dwell on the fact, there was also some reason to think the tipster was not a personal acquaintance of the suspect; for instance, she never gave his name and identified him as Hispanic the first time she called in and as black the second time she called in. Id. at 94-95.

Most recently, however, in Navarette v. California, 572 U.S. 393 (2014), the Supreme Court held that an anonymous tip from a person reporting that a truck had just run her off the road was sufficient to establish reasonable suspicion to stop the truck. Id. at 399-400. The Court noted several factors that rendered the tip reliable even though the caller did not give her name; for one thing, in contrast to the tipster in J.L. who told the police that a person was carrying a gun but "provided no basis for concluding that the tipster had actually seen the gun," the caller in Navarette reported directly seeing the other car driving erratically. Id. For another, analogizing to the hearsay exceptions permitting present tense impressions and excited utterances, the Supreme Court held the fact that the tipster was calling soon after the event heightened the reliability, since contemporaneousness leaves less time for a story to be made up. Id. at 400. And finally, the Court held that the caller's "use of the 911 system is . . . one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the

911 call," since such calls could be recorded and traced, making it less likely that a tipster would give a totally false tip. Id. at 400-01.

To the extent there is any contradiction between Freeman and Navarette -- in particular, as to whether it is appropriate to put weight on a tipster's use of the 911 system as a relevant factor tending to corroborate an otherwise anonymous tip -- the Court notes it is bound by Navarette, as it is more recent and a Supreme Court case. However, the Court concludes there is no contradiction. In Freeman, the Second Circuit held that the mere fact that an anonymous caller's phone call was recorded and allowed tracing of her number did not automatically render an anonymous tip reliable, although it contemplated "that similar calls with more evidence of identification of the caller . . . [and] with more information would have the necessary reliability." Freeman, 735 F.3d at 99. And Navarette likewise did not conclude that use of a 911 system that "allow[s] for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity" created any "per se reliability." Navarette, 572 U.S. at 400-01. Instead, the Court merely held that it was "one relevant circumstance" that might support a finding of sufficient reliability.

Reading J.L., Freeman, and Navarette together, the Court concludes that the tip at issue in this case contained sufficient indicia of reliability to give rise to reasonable suspicion. Specifically, while one factor weighing against reliance on anonymous

33

A000268

tips is the concern that a person who cannot be held to account might give false information, *Freeman*, 735 F.3d at 97-98, the caller in this case not only used the 911 system but indicated her awareness that her use of that system would allow her to be tracked down. When asked for her phone number, the caller responded by asking "don't you already have it?", which the dispatcher appeared to confirm. The caller then provided her phone number. Moreover, the caller was responding quickly to real-time questioning, and as the Court in *Navarette* noted, "substantial contemporaneity of event and statement" give less time for a tipster to make up a lie. *Navarette*, 572 U.S. at 400.

Furthermore, *Navarette* put significant emphasis on the fact that the caller had just seen the reported driver driving erratically, whereas in *J.L.* "the tip provided no basis for concluding that the tipster had actually seen the gun." *Id.* at 399. Similarly, in *Freeman*, the Court rejected the suggestion that the tipster's contemporaneous reporting of what she saw rendered her tip reliable because although she could identify where the suspect was at a particular moment, she (twice) declined to verify that she had actually seen the gun. *Freeman*, 735 F.3d at 94, 99. Here, by contrast, the caller reported that she <u>had</u> seen the gun and knew that Lucha was carrying it in his bag.

Further, still, unlike the tipsters in *J.L.*, *Freeman*, or *Navarette*, the tipster here displayed familiarity with Lucha himself. She identified him not just by location and description, but by name, and indicated she was a former friend who in fact knew that Lucha carried the gun every day. Unlike, for instance, the caller in *Freeman*,

A000269

whose description of the suspect changed between her two calls, id. at 94-95, the instant caller's apparent preexisting relationship with Lucha increased the reliability of her tip in two ways: first, it helped establish a firmer basis for her knowledge that Lucha was in fact carrying a gun, and second, and relatedly, it reduced the possibility that she was merely reporting someone she had seen on the street whose appearance she may have disliked due to prejudice or other unreliable reasons.

In sum, the Court concludes that the tip here was sufficiently corroborated to give rise to the relatively low reasonable suspicion standard. The caller knew Lucha and identified him not just by description and location but also by name; she had a preexisting relationship with him, and spoke to her first-hand knowledge of his gun carrying (both in general and on that day). The call was made close in time to the underlying events -- she knew not just where Lucha was and was going, but that he had placed his gun in a blue bag he was carrying. And while the caller declined to give her name, she demonstrated her awareness that by using the 911 system, she was likely allowing the police to contact her again if needed, and she in fact gave her phone number when asked.[6] Given all these circumstances, the Court concludes there was reasonable suspicion to support the Terry stop.

---

[6] Although this was not of course known at the time Officer Smalls approached Lucha, the police were soon thereafter able to track down the caller, who identified Lucha in person.

### III. Conclusion

For the foregoing reasons, the Court reaffirms its prior denial of defendant Lucha El's motion to dismiss and to suppress. The Clerk is directed to close both motions on the docket (Dkt. 21).


SO ORDERED.

New York, NY
July **7**, 2023



JED S. RAKOFF, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SUPERSEDING INDICTMENT** |
| v. | S1 22 Cr. 644 (JSR) |
| STEVEN PEREZ,<br>a/k/a "Lucha," | |
| Defendant. | |

## COUNT ONE
### (Conspiracy to Receive Firearms from Outside States of Residency)

The Grand Jury charges:

1.     From at least in or about May 2020 through at least in or about July 2021, in the Southern District of New York and elsewhere, STEVEN PEREZ, a/k/a "Lucha," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, transporting and receiving firearms interstate without the requisite licenses, in violation of Title 18, United States Code, Section 922(a)(3).

2.     It was a part and an object of the conspiracy that STEVEN PEREZ, a/k/a "Lucha," the defendant, and others known and unknown, not being licensed importers, licensed manufacturers, licensed dealers, or licensed collectors of firearms within the meaning of Chapter 44, Title 18, United States Code, would and did willfully and knowingly transport into and receive in the State in which a person resided firearms purchased and otherwise obtained by such person outside that State, in violation of Title 18, United States Code, Section 922(a)(3).

### Overt Acts

3.     In furtherance of the conspiracy and to effect the illegal object thereof, the

**A000272**

following overt acts, among others, were committed in the Southern District of New York and elsewhere:

       a.  On or about September 22, 2020, STEVEN PEREZ, a/k/a "Lucha," the defendant, sent a wire transfer in the amount of approximately $350, from a check cashing facility in the Bronx, New York, to a co-conspirator ("CC-1") in South Carolina.

       b.  On or about October 1, 2020, CC-1 purchased at least one firearm from a federal firearms licensee ("FFL") in South Carolina.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Interstate Transport of Firearms)

The Grand Jury further charges:

    4.     From at least in or about September 2020 through at least in or about June 23, 2021, in the Southern District of New York and elsewhere, STEVEN PEREZ, a/k/a "Lucha," the defendant, not being a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, did willfully and knowingly transport into and receive in the State in which he resided firearms purchased and otherwise obtained by PEREZ outside that State, to wit, PEREZ, a New York State resident, received into New York a Century Arms Canik 9-millimeter handgun, serial number 20CB25810, that had been obtained for PEREZ outside of New York.

(Title 18, United States Code, Sections 922(a)(3), 924(a)(1), and 2.)

### FORFEITURE ALLEGATION

    5.     As a result of committing the offenses alleged in Counts One and Two of this Indictment, STEVEN PEREZ, a/k/a "Lucha," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code,

**A000273**

Section 2461(c), any and all firearms and ammunition involved in or used in said offense, including but not limited to:

      a.  FN 503, 9mm handgun, serial number ("SN") CV006976;

      b.  MC1 9mm pistol, SN 035736CP;

      c.  Glock 43, 9mm handgun, SN ADWH603;

      d.  Taurus G2C, 9mm handgun, SN ABDWH603;

      e.  Glock 44, 22LR handgun, SN AELY222;

      f.  Glock 19GEN4, 9mm handgun, SN ACMB656;

      g.  Hellcat 9mm pistol, SN BY306999;

      h.  Taurus Poly revolver, SN JZ20483;

      i.  Beretta APX 9mm, SN AXC030812;

      j.  Beretta APX 9mm, SN AXC030805;

      k.  Springfield 9mm pistol, SN HG970741;

      l.  Ruger LCR revolver, SN 154025585;

      m.  Beretta 21A .22 pistol, SN BCS19935U;

      n.  Smith & Wesson M&P 9mm handgun, SN JEV8303;

      o.  Canik TP9 9mm handgun, SN 20CB25810;

      p.  Taurus PT738 .380 handgun, SN 1D117214;

      q.  Smith & Wesson 9mm handgun, SN JFC0427;

      r.  SCCY Model CPX2 9mm handgun, SN C023420;

      s.  Smith & Wesson M&P .380 handgun, SN RJB4429;

      t.  Glock GMBH 9mm handgun, SN BRFT833;

      u.  Mossberg MC1SC 9mm handgun, SN 034425C;

A000274

v. Ruger LCR 38 revolver, SN 1541-34460;

w. Glock GMBH 9mm handgun, SN AEYB797;

x. Taurus G2C 9mm handgun, SN ABK021341;

y. Canik TP9 9mm handgun, SN 20CB-33183.

### Substitute Assets Provision

6. If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

 a.  cannot be located upon the exercise of due diligence;

 b.  has been transferred or sold to, or deposited with, a third person;

 c.  has been placed beyond the jurisdiction of the Court;

 d.  has been substantially diminished in value; or

 e.  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 924;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

4

**A000275**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- x
                                :

**UNITED STATES OF AMERICA**       :

**- v -**                             :       22 Cr. 644 (JSR)

**LUCHA EL POR LIBERTAD**,      :

                  Defendant.    :
------------------------------------------------- x

## DEFENDANT LUCHA EL POR LIBERTAD'S
## MOTIONS IN LIMINE

**DAVID E. PATTON, ESQ.**
Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA EL POR LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8735

**ZAWADI BAHARANYI, ESQ.**
**AMANDA MAYO, ESQ.**
<u>Of Counsel</u>

TO:   **DAMIAN WILLIAMS, ESQ**.
       United States Attorney
       Southern District of New York
       One. St. Andrew's Plaza
       New York, New York 10007
       Attn:  **ASHLEY NICOLAS, ESQ.**
              **MADISON REDDICK SMYSER, ESQ.**
              **SARAH MORTAZAVI, ESQ.**
              Assistant United States Attorneys

# TABLE OF CONTENTS

Page

**INTRODUCTION** ........................................................................................... 1

**ARGUMENT** ................................................................................................... 2

1. The Court Should Preclude the Government from Introducing Evidence of
   Lucha's Massachusetts Arrest on July 3, 2021. ......................................... 2

   A.  Lucha's July 3, 2021 Massachusetts arrest. ........................................ 2

   B.  The Massachusetts incident is irrelevant and inadmissible under Rule 402. ....................... 4

   C.  The Massachusetts incident is inadmissible under Rule 403. ............................... 6

   D.  The Massachusetts incident should be precluded as improperly noticed
       under Rule 404(b). ........................................................................... 10

2. The Court Should Preclude the Government from Introducing Evidence of Every Firearm
   Allegedly Purchased by Keith Vereen in South Carolina. ...................................... 11

3. The Court Should Preclude the Government from Introducing Evidence That Lucha
   Did Not Have a New York State Firearms License at the Time of the Alleged Offense. ........ 13

4. The Court Should Preclude the Government's Proposed Expert Testimony of
   Lennea Gordon. ................................................................................ 14

   A.  Agent Gordon is not qualified to provide the proposed expert testimony
       under Rule 702. ............................................................................. 15

   B.  Any expert testimony on "straw purchasing" and the "process by which firearms
       can be obtained illegally" is irrelevant and unduly prejudicial. ......................... 16

**CONCLUSION** ................................................................................... 19

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989).......................................... 16

*Arlio v. Lively*, 474 F.3d 46 (2d Cir. 2007).................................................................................... 9

*City of Almaty, Kazakhstan v. Ablyazov*, 2022 WL 16901995 (S.D.N.Y. Nov. 11, 2022)............. 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................................... 15, 16

*Huddleston v. United States*, 485 U.S. 681 (1988) .................................................................... 6, 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)............................... 14

*Old Chief v. United States*, 519 U.S. 172 (1997)....................................................................... 11

*United States v. Balde*, 20 Cr. 281 (S.D.N.Y. Dec. 27, 2022)..................................................... 13

*United States v. Barret*, 2011 WL 6935500 (E.D.N.Y. Dec. 31, 2011) ................................... 5, 6

*United States v. Bradwell*, 388 F.2d 619 (2d Cir. 1968)................................................................ 8

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004) .................................................................... 15

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) ...................................................... 4, 7, 8, 12

*United States v. Davis*, 726 F.3d 434 (3d Cir. 2013) ................................................................... 11

*United States v. Garcia*, 635 F.3d 472 (10th Cir. 2011)............................................................ 18

*United States v. Hernandez*, 859 F.3d 817 (9th Cir. 2017)..................................................... 9, 13

*United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ................................................................ 5, 12

*United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) ..................................................... 10, 11

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ............................................................. 17, 18

*United States v. Rosemond*, 2017 WL 10113790 (S.D.N.Y. Oct. 26, 2017) ............................... 8

*United States v. Serrano*, 192 F. Supp. 3d 407 (S.D.N.Y. 2016) ............................................... 7

*United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010)............................................................ 12

*United States v. Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015).................................................. 9

*United States v. Williams*, 585 F.3d 703 (2d Cir. 2009) ......................................................... 5, 8

ii

A000278

**Page(s)**

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022) ........................................ 6, 8, 17, 18

**Statutes**

18 U.S.C. § 922(a)(3) ........................................................................... 1, 5, 13

**Rules**

Federal Rule of Evidence 104 ................................................................. 11

Federal Rule of Evidence 401 .......................................................... 4, 11, 16

Federal Rule of Evidence 402 .................................................................. *passim*

Federal Rule of Evidence 403 .................................................................. *passim*

Federal Rule of Evidence 404 .................................................................. *passim*

Federal Rule of Evidence 702 ................................................................. 15, 16

**Other Authorities**

2 Modern Federal Jury Instructions-Criminal P 35.03 (2023) ...................... 17

iii

A000279

## INTRODUCTION

Defendant Lucha El Por Libertad ("Lucha") respectfully submits the following motions *in limine* in advance of trial, which is scheduled to begin on August 28, 2023. Lucha is charged in a superseding indictment with one count of interstate transport of firearms, in violation of 18 U.S.C. § 922(a)(3). Lucha is also charged with one count of conspiracy to violate 18 U.S.C. § 922(a)(3).

The allegations here are straightforward. Briefly, in the substantive count of the indictment, Lucha is alleged to have "willfully and knowingly" received in New York, his state of residence, a firearm that was purchased outside of New York—specifically, a Century Arms Canik 9-millimeter handgun, serial number 20CB25810—without being a licensed firearm dealer. In the conspiracy count, Lucha is alleged to have agreed with unnamed co-conspirators to violate § 922(a)(3) by "willfully and knowingly transport[ing] into and receiv[ing] in the State in which a person resided firearms purchased and otherwise obtained by such person outside that State." The indictment alleges two overt acts committed in furtherance of this conspiracy: (1) a $350 wire transfer from Lucha to co-defendant Keith Vereen in South Carolina on September 22, 2020, and (2) Vereen's purchase of a firearm from a federal firearms licensee in South Carolina on October 1, 2020. *See* Indict. (ECF No. 54).

The defense asks that the Court:

(1)     Preclude the government from introducing irrelevant and unduly prejudicial evidence of Lucha's arrest in Massachusetts on July 3, 2021;

(2)     Preclude the government from introducing irrelevant and unduly prejudicial evidence of every firearm allegedly purchased by Keith Vereen in South Carolina between May 15, 2020, and November 4, 2020;

(3)     Preclude the government from introducing evidence that Lucha did not have a New York State firearms license at the time of the alleged offense; and

(4)     Preclude the government's proposed expert witness Special Agent Lennea Gordon.

1

## ARGUMENT

**1. The Court Should Preclude the Government from Introducing Evidence of Lucha's Massachusetts Arrest on July 3, 2021.**

In its July 28, 2023 Rule 404(b) notice, the government stated that it intends to introduce in its case-in-chief evidence of Lucha's arrest on July 3, 2021 "during a traffic stop in Wakefield, Massachusetts . . . with ten other individuals while in possession of, among other things, eight firearms, over one thousand rounds of ammunition of different calibers, night vision goggles, and eleven ballistic vests." *See* Ex. A, Gov't Rule 404(b) Notice. Evidence of this Massachusetts arrest is not relevant to whether Lucha unlawfully received a firearm in his state of residence, and any possible relevance it may have is substantially outweighed by its unduly prejudicial effect and its potential to mislead the jury, confuse the issues, and waste time during the trial. The Court should therefore preclude the government from introducing it under Rules 402, 403, and 404(b) of the Federal Rules of Evidence.[1]

A. *Lucha's July 3, 2021 Massachusetts arrest.*

On July 3, 2021, Lucha was traveling with a group of ten other individuals from Rhode Island to Maine. *See* Ex. B, Probable Cause Narrative, USAO_0012427 at -428. They were traveling in order to conduct militia training on private land once they arrived there. *Id.* At approximately 1:10 A.M., while driving northbound on Route 95 near Wakefield, Massachusetts, the group pulled over to the side of the road so that they could refuel the two cars they were traveling in before continuing their trip. *Id.* at -427.

Massachusetts State Trooper Ryan Casey was driving northbound on Route 95 when he

---

[1]     The defense respectfully requests that the Court rule on this motion *in limine* in advance of trial because it could affect opening statements and proposed areas of voir dire. Moreover, the defense requests the scheduling of a final pre-trial conference to address any outstanding motions prior to the start of trial on August 23, 24, or 25.

2

**A000281**

observed these vehicles pulled over on the side of the road. He pulled over behind the cars and activated his emergency lights. *Id.* Casey approached the cars and observed one of the occupants, Jamhal Latimer, outside of one car carrying a rifle. *Id.* Latimer informed Casey of the group's plans to travel to Maine. *Id.* As Casey spoke to Latimer, Casey observed several other individuals also holding rifles. Lucha was not one of the individuals that Casey purportedly saw holding a firearm. *Id.* at -427 to -428 (stating Casey's observations that Latimer, Aaron Johnson, and Quinn Cumberlander were holding rifles).

Casey and the other officers that arrived on the scene requested that the group stow their weapons in the cars while the police investigated the identities of the group members. Members of the group refused to do so, citing, among other things, the Second Amendment. *Id.* at -428 to -429. Although no weapons were ever pointed or fired at any of the police officers on the scene, the group declined to disarm themselves for several hours. Police officers closed down both sides of Route 95 while negotiating with the group. The group ultimately peacefully disarmed, and subsequently all of the individuals traveling in the group, including Lucha, were arrested. *Id.* at -429 to -430. Lucha was charged with firearm possession offenses under state law as a result of this incident; those charges remain pending in Massachusetts Superior Court, and trial is scheduled for February 2024. *See* Ex. C, Docket in *Commonwealth v. Lucha El Por Libertad*, 2181CR00366 (Mass. Super. Ct.).

After the members of the group were arrested, the Massachusetts authorities obtained search warrants for both of their cars. Eight firearms were recovered from these cars. *See* Ex. B at -430 to -431. According to the government, one of the guns was purchased by Vereen in South Carolina; the other firearms were traced to separate purchasers. *See* Ex. D, Firearm Trace Summaries, USAO_0014939. The government has not presented evidence of this firearm being

3

**A000282**

transported to, or received in, New York by Lucha.

Besides the firearms, several other items were recovered, including ballistic vests, ammunition, camouflage uniforms, ballistic helmets, and a pair of night-vision goggles. *See* Ex. B at -430 to -431. The police also recovered and searched four cell phones belonging to other individuals (Jamhal Latimer, Quinn Cumberlander, and Aaron Johnson) arrested with Lucha during the incident.

B.   *The Massachusetts incident is irrelevant and inadmissible under Rule 402.*

As an initial matter, all evidence relating to and recovered during this Massachusetts incident should be precluded under Rule 402 because it is irrelevant to the charges in the indictment. The Second Circuit employs an "inclusionary" approach to other acts evidence, but this type of evidence is not admissible if (1) it is "irrelevant under Rule 402," (2) it is "overly prejudicial under Rule 403," or (3) it is introduced for "the sole purpose of showing the defendant's bad character." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). "[D]istrict courts should not presume that such evidence is relevant or admissible." *Id.*

The irrelevance of the Massachusetts incident to the substantive violation of § 922(a)(3) charged in the indictment is clear because it has no "tendency to make a fact more or less probable" in this New York trial and is not "of consequence in determining the action." Rule 401(a)–(b). Possession of a firearm in Massachusetts does not violate any prohibitions against importing a firearm into New York. Further, none of the Massachusetts firearms are at issue in this case. The substantive count only charges Lucha with violating § 922(a)(3) with respect to a single firearm that was seized in the Bronx on June 23, 2021—two weeks before the July 3, 2021 Massachusetts arrest. *See* Indict. ¶ 4.

And regarding the conspiracy charge, the government does not claim that Lucha joined a conspiracy to form a militia or a conspiracy to possess firearms (or "ammunition," or "night vision

A000283

goggles," or "ballistic vests," *see* Ex. A). Instead, the government alleges that Lucha conspired to violate 18 U.S.C. § 922(a)(3), *see* Indict. ¶ 2, which makes it unlawful for any person other than a licensed firearm dealer "to transport into or receive in the State where he resides" a firearm obtained outside of that state. Lucha is only alleged to be a New York resident; there is no evidence that he has ever resided in Massachusetts. According to the government's discovery, Vereen—the only other individual alleged to have committed an overt act in furtherance of the alleged conspiracy—is a resident of South Carolina. And to the extent the government would seek to broaden the conspiracy to include every person arrested on July 3, 2021, in addition to Vereen, the government has not produced evidence suggesting that any of those individuals were even Massachusetts residents.

The presence of firearms recovered during Lucha's arrest in Massachusetts, without any connection between those firearms and New York, is not probative of whether Lucha agreed with Vereen or anyone else to receive firearms into his state of residence, nor is it probative of Lucha's motives or intent to receive firearms in New York. *See, e.g.*, *United States v. Litvak*, 889 F.3d 56, 68–69 (2d Cir. 2018) (holding district court erred in admitting witness's testimony because it was not probative of the issue of defendant's conduct or intent). This arrest—having taken place far from New York—is not "part of the very act charged," "inextricably intertwined with the evidence regarding the charged offense," or "necessary to complete the story of the crime on trial." *United States v. Barret*, 2011 WL 6935500, at *3 (E.D.N.Y. Dec. 31, 2011) (citations omitted) (rejecting government's proffered evidence as inadmissible as direct evidence). The elements of this case are straightforward, and failing to inform the jury of the Massachusetts incident—involving other people, other locales, and other firearms—"would not [leave] any gaps in the Government's case, nor [leave] the jury wondering about missing pieces of the story." *United States v. Williams*, 585

5

F.3d 703, 707–08 (2d Cir. 2009) (holding that district court abused its discretion in admitting irrelevant evidence of "weapons, drugs, and related contraband as background evidence" to the charged crime of firearm possession because it was "not particularly helpful to explain the crime").

Further demonstrating the irrelevancy of the Massachusetts incident to the crimes charged here is the lack of a connection between any of the firearms recovered during the arrest and Lucha. *See Huddleston v. United States*, 485 U.S. 681, 689 (1988) ("[S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."). There is no evidence of Lucha receiving into his state of residence (New York) any of the firearms recovered in Massachusetts. Of the eight firearms recovered during the Massachusetts arrest, only one was purchased by alleged co-conspirator Vereen in South Carolina. *See* Ex. D. And the South Carolina firearm purchased by Vereen has not been traced to either Lucha or to New York, or the Southern District of New York more specifically. As such, this arrest is not "necessary" to complete the story of the crime of conspiracy to transport firearms into Lucha's state of residence. *Barret*, 2011 WL 6935500, at *3.

Evidence of the Massachusetts incident, as well as any evidence recovered during the incident, is therefore irrelevant and should be excluded under Rule 402.

### C. *The Massachusetts incident is inadmissible under Rule 403.*

Even if the government could establish any relevance of the Massachusetts incident to the crimes charged in the indictment, it would still be inadmissible under Rule 403 because any possible probative value is substantially outweighed by its unfairly prejudicial effect and potential to both mislead the jury and waste time during trial. *See* Fed. R. Evid. 403; *United States v. Zhong*, 26 F.4th 536, 551–52 (2d Cir. 2022) (holding trial court abused its discretion in admitting evidence of uncharged conduct that should have been excluded under Rule 403).

Here, the government claims that evidence of the Massachusetts incident explains, among

6

**A000285**

other things, "the scope of the defendant's conduct," the "background and context for the relationship between members of the conspiracy," and Lucha's "motive" or "opportunity." Ex. A. But it is wrong. As discussed *supra* Section 1.B, no firearms recovered during this incident were traced to Lucha's home state of New York, and only one firearm recovered after the incident was connected to alleged co-conspirator Vereen. No one arrested on July 3 was a Massachusetts resident. Thus, at most, whatever evidence regarding the Massachusetts incident the government would seek to introduce at trial would only be "minimally probative" of the relevant question in this case—whether Lucha conspired to receive a firearm into his state of residence. *United States v. Serrano*, 192 F. Supp. 3d 407, 410 (S.D.N.Y. 2016) (excluding evidence of a bulletproof vest as "minimally probative of the remaining issue, i.e. whether [defendant] knowingly possessed ammunition").

By contrast, the evidence is highly prejudicial to Lucha. Evidence is unfairly prejudicial when "it tends to have some adverse effect" on a defendant "beyond tending to prove the fact or issue that justified its admission," or when it tends "to excite emotions against the defendant." *Curley*, 639 F.3d at 57 (citations omitted). Introducing evidence of the Massachusetts incident would be highly inflammatory. If the trial is dedicated to describing this incident in detail—the purposes for which Lucha was traveling with this group, the statements made by other members of the group during the incident, the length of time during which the group negotiated with police—this could lead a jury to hypothesize that Lucha is a violent individual who engaged in a scary and dangerous armed "standoff" with the police, who ought to be punished regardless of the government's ability to prove the actual § 922(a)(3) charges. *See, e.g.*, Ex. B at -429; Ex. E, Search Warrant, USAO_0014546, at -556 (describing the incident as a "standoff"). It would also likely put before the jury highly irrelevant and inaccurate evidence concerning the beliefs of Lucha and

7

**A000286**

others in the group that were arrested. *See* Ex. E at -559 (describing the group, the Rise of the Moors, as a "militia movement" that "allege[s] they are not subject to local, state, and federal laws as a result of their identity"). Such inflammatory evidence is "significantly more sensational and disturbing than the charged crimes," which involve the receipt of a firearm into one's state of residence without the proper license to deal in firearms. *Zhong*, 26 F.4th at 553 (citing *Curley*, 639 F.3d at 62). The evidence therefore carries "a high possibility of jury misuse." *Curley*, 639 F.3d at 57; *see United States v. Rosemond*, 2017 WL 10113790, at *3 (S.D.N.Y. Oct. 26, 2017) (refusing to admit evidence offered as "direct evidence of the conspiracy" because "the references in the [proffered] conversation to [a] shooting in Miami and narcotics activities carry an undue risk of unfairly prejudicing defendant given the limited probative value of the evidence"). Thus, the Massachusetts incident should be excluded because of the high probability it will inflame the jury into convicting Lucha on grounds not charged in the indictment. *See Williams*, 585 F.3d at 708 (noting the "undue prejudice that can result when the 'minute peg of relevancy [is] entirely obscured by the dirty linen hung upon it'" (quoting *United States v. Bradwell*, 388 F.2d 619, 622 (2d Cir. 1968)).

Introducing this evidence would also risk confusing the issues for the jury. Presented with evidence of this arrest, a jury may be led to believe they can convict Lucha simply for his (and others') conduct during the Massachusetts incident. And given the government's focus on all eight guns found in the two cars in which Lucha's group was traveling—although only one has been at all connected to co-conspirator Vereen—and on the other materials that were recovered, *see* Ex. A, it is probable that the introduction of this evidence will lead a jury to believe they should convict Lucha simply for possession of any of the weapons that were recovered in Massachusetts.

Courts have recognized this danger in the § 922(a)(3) context. *See United States v.*

A000287

*Hernandez*, 859 F.3d 817 (9th Cir. 2017). In *Hernandez*, the defendant was convicted of violating § 922(a)(3) by transporting firearms from Arizona to his state of residence (California). *Id.* at 819. At trial, the government had introduced evidence of his "arguable commission of uncharged crimes related to the firearms at issue," specifically that he had been reselling those firearms unlawfully. *Id.* at 820. The Ninth Circuit reversed the defendant's conviction because that evidence, combined with a broad jury instruction on the "willfulness" element of § 922(a)(3), created a serious risk that defendant "was targeted as a gun trafficker and that the jury was allowed to convict him, not for his willful, unlawful transportation of weapons, but for his intent to commit the future crimes of unlawfully selling those weapons." *Id.* at 823. Here too, there is a serious risk that allowing the jury to hear evidence of the Massachusetts incident will lead them to believe that they can convict him for having guns in Massachusetts, participating in a "standoff" in Massachusetts, or being part of an armed militia group—conduct that is simply not covered by any of the charges in the indictment. *See Hernandez*, 859 F.3d at 824 (evidence of intent to commit *other* crimes "is not a substitute for" intent to commit the *charged* crime); *United States v. Ulbricht*, 79 F. Supp. 3d 466, 492–93 (S.D.N.Y. 2015) (denying government's request to allow evidence of uncharged conduct because it "unnecessarily injects elements of violence" into the case and "may mislead the jury and lead it to convict defendant for [that] conduct").

Introducing evidence of the Massachusetts incident further risks turning this straightforward case into a "multi-ringed sideshow of mini-trials on collateral issues" on the merits of the still-pending Massachusetts action against Lucha. *City of Almaty, Kazakhstan v. Ablyazov*, 2022 WL 16901995, at *6 (S.D.N.Y. Nov. 11, 2022) (citation omitted); *see Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) (recognizing that admitting evidence about previous cases "inevitably results in trying those case before the jury and reversing district court's failure to exclude such

9

A000288

evidence). It will require introducing testimony and body camera footage to explain the circumstances of the group's first encounter with Massachusetts police, the details of when and how the incident unfolded, and the details of whether or not Lucha actually possessed a gun in Massachusetts—which, again, is not his state of residency. There is no need for trial to devolve into an hours- or days-long sideshow over irrelevant evidence. The evidence of the Massachusetts incident should be excluded.

D. _The Massachusetts incident should be precluded as improperly noticed under Rule 404(b)._

Finally, evidence of the Massachusetts incident should be precluded as improperly noticed and impermissible propensity evidence under Rule 404(b). In its July 28, 2023 Rule 404(b) notice, the government informed the defense that it intends to introduce evidence of Lucha's arrest, if not as direct evidence, then "as proof of the defendant's motive, opportunity, intent, plan, knowledge, absence of mistake, or lack of accident with respect to the charged conduct." *See* Ex. A. By quoting nearly every purpose in the Rule without elaboration, the government's letter fails to "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B). This failure can be attributed to the government's inability to articulate its theory of admission.

Bad-acts evidence is inadmissible unless it is relevant to a disputed, material issue at trial other than the defendant's character and the Court determines that the risk of unfair prejudice does not substantially outweigh the probative value of the evidence. There are four distinct steps that must be taken before the government may be permitted to introduce such evidence against Lucha under Rule 404(b). *See Huddleston*, 485 U.S. at 691; *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009). First, the government must identify a proper, *i.e.*, nonpropensity, purpose for the evidence. Fed. R. Evid. 404(b). Second, it must explain the relevance of the evidence to that

10

proper purpose. Fed. R. Evid. 104(b), 401, 402. In other words, "the government must explain how it fits into a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference." *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013). Third, the Court must determine that the probative value of the evidence to this issue is not substantially outweighed by the danger of unfair prejudice, *e.g.*, that the jury will take it as evidence of the defendant's bad character. Fed. R. Evid. 403; *McCallum*, 584 F.3d at 476 (citing *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). Fourth, and finally, if the Court determines that the evidence is admissible, it must give an appropriate limiting instruction upon the defendant's request. *McCallum*, 584 F.3d at 475.

The government has wholly failed to follow these steps. Instead, it has provided nothing more than a generic, bare-bones, non-detailed laundry list of possible purposes for admission of the evidence. Accordingly, its Rule 404(b) notice is defective, and any effort to introduce evidence of the Massachusetts incident under that Rule should be precluded. The government should not be permitted at this late stage to amend its notice and articulate a more fulsome theory for why evidence of the incident satisfies a Rule 404(b) exception. If the government seeks to do so, however, the defense reserves the right to respond.[2]

## 2. The Court Should Preclude the Government from Introducing Evidence of Every Firearm Allegedly Purchased by Keith Vereen in South Carolina.

For the same reasons discussed above regarding the Massachusetts incident, *see supra* Section 1, the Court should also preclude the government from introducing evidence that Vereen "bought at least 25 firearms" in South Carolina, Ex. A, including firearms that Lucha is not alleged to have purchased or otherwise obtained in his state of residence. This evidence is

---

[2]      Should the Court deny this motion to preclude, the defense requests the opportunity to propose limitations on what details of the Massachusetts incident may be permitted, and any limiting instructions that may be necessary, in light of the Court's ruling.

A000290

irrelevant under Rule 402; unduly prejudicial under Rule 403; and improperly noticed under Rule 404(b).

According to the government's evidence, one firearm purchased by Vereen was recovered during a stop of Lucha in the Bronx in June 2021. Any other firearms that Vereen may have purchased were recovered in other states, or in connection with the arrests of other individuals besides Lucha within New York. The introduction into evidence of these other firearms is irrelevant to the critical issue of whether Lucha willfully received firearms purchased by Vereen in his state of residence. *See Litvak*, 889 F.3d at 69 (holding "irrelevant" evidence should not have been admitted at trial). Nor do these firearms, which may speak to Vereen's participation in a different conspiracy to purchase firearms for others, bear on whether Lucha agreed with Vereen to receive firearms in New York or was even aware that Vereen did purchase any other firearms. *See United States v. Torres*, 604 F.3d 58, 65, 70 (2d Cir. 2010) (reversing defendant's conviction for conspiracy; while "government need not show that the defendant knew all of the details of the conspiracy," the defendant must know "its general nature and extent," which government's proof did not show).

And this evidence is unduly prejudicial to Lucha. A jury may improperly conclude that Lucha should be convicted based solely on the scope of Vereen's conduct, rather than his own conduct. *See Curley*, 639 F.3d at 59–60 (holding it was error to admit evidence that had "low probative value" and "high risk of prejudicial effect" because it "served no real purpose other than to show that [the defendant's brother]—not Curley—had a bad character").

Because it is irrelevant and unduly prejudicial, and because the government's Rule 404(b) notice is deficient, *see supra* at 10–11, any effort to introduce evidence of the Vereen-purchased firearms that Lucha is not alleged to have purchased or otherwise obtained in his state of residence

12

A000291

should be precluded.

### 3. The Court Should Preclude the Government from Introducing Evidence That Lucha Did Not Have a New York State Firearms License at the Time of the Alleged Offense.

The Court should preclude the government from introducing evidence that Lucha had not applied for or received a New York state firearms license at the time he possessed a handgun in June 2021. Such evidence or testimony should be excluded under Rules 402, 403, and 404 of the Federal Rules of Evidence. Lucha's failure to apply for a New York state gun license is irrelevant to whether he violated the federal statute with which he is charged, 18 U.S.C. § 922(a)(3). New York State licensure has nothing to do with whether Lucha willfully received a gun obtained out of state into his state of residence.

First, the *mens rea* issue for the jury to resolve is not whether Lucha knew he could possess a firearm in New York without a New York license; it is instead whether he knew that the act of receiving a gun into his state of residence without being a licensed distributor, manufacturer, or collector of firearms was somehow unlawful. *See Hernandez*, 859 F.3d at 822 (to prove violation of § 922(a)(3), the government must show that Lucha knew that the "transportation of firearms into [his state of residence] was somehow unlawful"). Licensing evidence beyond his lack of federal licensing as an importer, manufacturer, dealer, or collector of firearms, is therefore irrelevant and would confuse the issue before the jury.

Second, the licensing evidence would unfairly prejudice Lucha. It would suggest to the jury an improper basis for decision by inviting jurors to hold Lucha responsible for possessing a gun without a license, without grappling with the actually relevant issue of whether Lucha knew mere receipt of a gun from a different state was unlawful. *See* Tr., *United States v. Balde*, 20 Cr. 281 (S.D.N.Y. Dec. 27, 2022), ECF No. 151 (Judge Failla precluding the government from introducing evidence about the lack of a New York firearm license against Balde—charged with

13

**A000292**

unlawful possession of a firearm as an undocumented person—because, *inter alia*, the risk of the jury punishing him for failure to register the gun was far greater than any probative value).

If the Court were to permit any evidence or reference to New York State licensure, it should allow the defense to discuss the constitutional challenges to New York's licensing scheme that resulted in the Supreme Court invalidating that licensing scheme in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). At the time of the offense conduct, June 2021, New York made it virtually impossible for law-abiding individuals to obtain a permit to carry a firearm outside of their homes. As the Court is well aware, the Supreme Court subsequently held that New York's licensing scheme was unconstitutional. *See Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional.").

**4. The Court Should Preclude the Government's Proposed Expert Testimony of Lennea Gordon.**

On July 28, 2023, the government noticed its intent to call as an expert witness Special Agent Lennea Gordon of the Bureau of Alcohol, Firearms, Tobacco, and Explosives ("ATF"). *See* Ex. F, Gov't Expert Notice. The notice states that Agent Gordon would testify about the process by which firearms can be purchased, documentation of firearm transactions, and firearms tracing. The notice further states that Agent Gordon will testify about "the process by which firearms can be obtained illegally," focusing on "straw purchasing," which simply is "when an otherwise qualified individual . . . buys a firearm on behalf of another person, while purporting to be obtaining the firearm for himself." *Id*.

The Government's notice summarizes Agent Gordon's expected testimony and her experiences in law enforcement but fails to show why her testimony would be reliable. The Court

14

**A000293**

should therefore exclude her testimony or, at the very least, hold an evidentiary hearing. Moreover, the Court should preclude any testimony about "straw purchasing" as unhelpful, irrelevant, and unduly prejudicial to Lucha.

A.  *Agent Gordon is not qualified to provide the proposed expert testimony under Rule 702.*

Federal Rule of Evidence 702 allows the presentation of expert testimony on the basis of "scientific, technical, or other specialized knowledge."  Before such evidence is admitted, however, the trial judge must perform its gatekeeper function and ensure that an expert's testimony "rests on a reliable foundation."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  *Daubert*'s requirement applies equally to law enforcement expert testimony.  *See United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) ("The principles pertaining to expert testimony apply with full force where law enforcement officials are called on to provide scientific, technical, or other specialized knowledge to the trier of fact.")  The Advisory Committee commentary cautions Courts that "[i]if the witness is relying solely or primarily on experience"— as appears to be the case here— "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed. R. Evid. 702 advisory committee's note.

Here, the government's notice fails to provide an explanation as to how or why Agent Gordon's experiences in law enforcement make her qualified to testify on the intricacies of firearm purchasing and the bookkeeping requirements of firearm sellers and buyers.  For example, what observations, investigative tasks, research or writings in her law enforcement capacity qualify her to provide reliable testimony in the proposed areas?  The answer cannot be found in the Government's notice or Agent Gordon's CV, attached to this notice.

Agent Gordon has not provided expert testimony in at least the last four years (perhaps

15

**A000294**

ever) and the government's notice provides no basis for her to be allowed to testify in this case. For these reasons, this Court should find that the government has failed to establish Agent Gordon's qualifications as an expert or that her opinions and conclusions are reliable. In the alternative, the Court should hold a hearing to determine the reliability of Agent Gordon's conclusions.

B. _Any expert testimony on "straw purchasing" and the "process by which firearms can be obtained illegally" is irrelevant and unduly prejudicial._

Even if the Court finds Agent Gordon qualified to testify as an expert witness in some of the areas described in the government's notice, she should nevertheless be precluded from testifying about "straw purchasing," "the mechanics of straw purchasing," and "some of the common reasons why individuals engage in straw purchasing, how straw purchasing enables people to take advantage of the patchwork of state gun laws, and how straw purchasers are typically identified by law enforcement." Ex. F. This proposed testimony is irrelevant, highly prejudicial, and must be excluded pursuant to Rules 401, 402 and 403.

Expert testimony is inadmissible when it merely addresses "lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). Even where expert testimony properly falls within Rule 702, the Court continues to review for relevance under Rule 401 and the risk of unfair prejudice, confusion, or misleading the jury under Rule 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks omitted).

Lucha is accused of unlawfully receiving into his state of residence a firearm obtained

**A000295**

outside of his state and conspiring to do the same. The critical question for the jury will be whether Lucha knew he was doing "something that the law forbids" in receiving a firearm from out of state into his state of residence without being a licensed distributor or manufacturer of firearms.[3] To the extent that the government needs to explain how Lucha came to possess a firearm from another state, they can introduce evidence on the purchase and transportation of the firearm in South Carolina by Vereen. The government may admit relevant ATF documents and testimony explaining the purchaser forms, the mechanics of firearm purchases, and the information that was provided by the purchaser. But expert testimony on "straw purchasing" and the reasons why people use straw purchasers exceeds the proper scope of expert testimony and will only serve to "usurp[] the jury's function by providing an overall conclusion of criminal conduct." *Zhong*, 26 F.4th at 556 (internal quotation marks omitted).

No expert testimony is required to help the jury understand the concept of one person buying a firearm for another person, while claiming that the firearm is for himself. The government is free to put these facts before the jury and allow them to draw their own conclusions, but no specialized knowledge is necessary for the jury to connect these dots. While members of the jury may not be familiar with the process of firearm purchasing, the admissibility of expert testimony requires more than just an unfamiliar subject matter. The legal test is whether the case "concerns matters that the average juror is not capable of *understanding* on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). As the Court can see in Ex. F, the government was able to explain the conduct underlying "straw purchasing" in a single sentence in its notice. This conduct is simple and does not warrant expert interpretation.

Beyond being unnecessary, any expert testimony regarding "straw purchasing" would be

---

[3]     2 Modern Federal Jury Instructions-Criminal P 35.03 (2023).

A000296

highly prejudicial.  Allowing a law enforcement expert to not only discuss the mechanics "of straw purchasing"— which already carries a prejudicial connotation of criminality—but to opine on the common illegal reasons someone engages in this sort of transaction and how "straw purchasing" allows people to insidiously "take advantage of patchwork of state gun laws" creates the unacceptable risk that the jury will assume that Lucha himself engaged in this conduct for these "common illegal" reasons, and therefore knew he was acting unlawfully in receiving a firearm across state lines based on the expert's testimony, instead of the facts.  The Second Circuit has explicitly rejected this "substitution of expert opinion for factual evidence." *Zhong*, 26 F.4th at 556 (quoting *Mejia*, 545 F.3d at 190).

The prejudice that this testimony would inject into trial far outweighs any potential relevance.  Lucha is not charged with being a straw purchaser, submitting false statements on an ATF form or to a licensed firearm seller, or directing others to submit false statements.  There will be no evidence alleging that he acted as straw purchaser, nor is Lucha charged with being a prohibited person who is not allowed to have a firearm, which most likely is going to be the "common illegal reason" for straw purchasing that the expert would talk about.  While expert testimony on straw purchasing has been deemed relevant and helpful in the context of a defendant charged with engaging in straw purchasing, *e.g., United States v. Garcia*, 635 F.3d 472 (10th Cir. 2011) (permitting expert testimony on straw purchasers and the particular demand for firearms in Mexico in case where defendant was charged with multiple counts of knowingly making false statements to a federally licensed firearms dealer), it is not relevant or helpful in this context faced with an entirely different, and narrow legal question—whether Lucha willfully received a firearm obtained in another state into his state of residence.  Because the probative value of the proposed expert testimony on "straw purchasing" is substantially outweighed by a danger of unfair

18

prejudice, the Court should preclude all testimony on this subject matter.

## **CONCLUSION**

For the above-stated reasons, Lucha's motions *in limine* should be granted in their entirety.

Dated: August 14, 2023  
      New York, New York

Respectfully submitted,

_____*/s/*_____

Zawadi Baharanyi, Esq.  
Amanda Mayo, Esq.  
Federal Defenders of New York  
52 Duane Street, 10th Floor  
New York, NY 10038  
(917) 612-2753

19

A000298

---

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **ASHLEY C. NICHOLS, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007

Dated:  New York, New York
May 3, 2024


_____*Kendra Hutchinson*_____
**KENDRA HUTCHINSON**
Assistant Federal Defender