# 24-162-cr

United States Court of Appeals
for the Second Circuit

_____

Docket No. 24-162-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

KEITH VEREEN, a/k/a SEALED DEFENDANT 1,

Defendant,

STEVEN PEREZ, a/k/a SEALED DEFENDANT 2, a/k/a LUCHA,

Defendant-Appellant.

_____
APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT STEVEN PEREZ
VOLUME II OF IV**

Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8731

*Attorney for Defendant-Appellant*
**STEVEN PEREZ**

**KENDRA L. HUTCHINSON**,
 *Of Counsel*

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet,
    S.D.N.Y. 22 Cr. 644 (JSR) . . . . . . . . . . . . . . . . . . . . . . . . . . . A 005

Indictment,
    filed November 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 019

Defense Motion to Suppress and Dismiss,
    filed February 4, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 027

Government's Opposition to Defense Motion,
    filed February 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 056

Defense Reply,
    filed March 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 085

Transcript of Oral Argument,
    dated March 15, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 100

Government's Supplemental Letter Brief,
    filed March 22, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 121

Defense Supplemental Letter Brief,
    filed March 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 125

Transcript of Suppression Hearing,
    dated May 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 130

Opinion and Order,
    filed July 7, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 236

Superseding Indictment,
    filed July 20, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 272

Defense Motions in Limine,
    filed August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 276

# VOLUME II

Government's Motions in Limine,
  filed August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 299

Defense Opposition to Government's Motions,
  filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 326

Government's Opposition to Defense Motions,
  filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 345

Government's Requests to Charge,
  filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 374

Defense Requests to Charge,
  filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 433

Transcript of Pretrial Proceedings,
  dated August 25, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 464

Transcript of Trial,
  dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 482

# VOLUME III

Transcript of Trial (continued),
  dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 572

Transcript of Trial,
  dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 611

Government's Supplemental Requests to Charge,
  dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 847

Defense Supplemental Requests to Charge,
 dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   850

Transcript of Trial,
 dated August 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   855

### VOLUME IV

Transcript of Trial (continued),
 dated August 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   867

Court's Final Jury Instructions,
 filed August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1018

Transcript of Trial,
 dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1050

Jury Notes,
 dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1106

Verdict,
 dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1111

Transcript of Sentencing,
 dated January 8, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1112

Judgment of Conviction,
 entered January 12, 2024. . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1149

Notice of Appeal,
 filed January 17, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1156

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.                                              S1 22 Cr. 644 (JSR)

STEVEN PEREZ,
        a/k/a "Lucha,"

               Defendant.

---

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ashley C. Nicolas
Madison Reddick Smyser
Sarah Mortazavi
Assistant United States Attorneys
    *Of Counsel*

A000299

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ............................................................... **1**

**BACKGROUND** ...................................................................................... **1**

**ARGUMENT** ........................................................................................... **4**

**I.    VEREEN'S GUN PURCHASES AND THE CIRCUMSTANCES OF THE MASSACHUSETTS ARREST ARE ADMISSIBLE AS DIRECT EVIDENCE OR, IN THE ALTERNATIVE, UNDER RULE 404(B)** ................................. **4**

    A.  Applicable Law ................................................................................. 5

        1.  Direct Evidence ........................................................................... 5

        2.  Rule 404(b) .................................................................................. 5

        3.  Rule 403 ....................................................................................... 7

    B.  Discussion ......................................................................................... 7

        1.  Vereen's Gun Purchases Are Admissible ................................ 7

        2.  Evidence of The Massachusetts Arrest Is Admissible ......... 11

**II.   CROSS-EXAMINATION OF LAW ENFORCEMENT OFFICERS ABOUT CERTAIN IRRELEVANT TOPICS SHOULD BE PRECLUDED** ......................... **14**

    A.  Applicable Law ............................................................................... 15

    B.  Discussion ....................................................................................... 17

        1.  Cross-Examination of Officer Smalls About Prior Suppression Hearing Testimony Should Be Precluded ...................................................... 17

        2.  Cross-Examination of Massachusetts Troopers About the Defendant's Dismissed Lawsuit Should Be Precluded ................................................... 18

**III.  ARGUMENT THAT THE DEFENDANT'S ACTIONS WERE OR SHOULD HAVE BEEN LAWFUL UNDER THE SECOND AMENDMENT SHOULD BE PRECLUDED** ......................................................................................... **19**

**CONCLUSION** ....................................................................................... **21**

ii

A000300

## TABLE OF AUTHORITIES

**Cases**

*Delaware v. Van Arsdall*,
   475 U.S. 673 (1986) ............................................................................ 17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ........................................................................ 23

*Phillips v. City of New York*,
   871 F. Supp. 2d 200 (E.D.N.Y. 2012) ........................................... 18, 22

*Saldarriaga v. United States*,
   No. 97 Cr. 1275 (WK), 2002 WL 449651 (S.D.N.Y. Mar. 21, 2002) .................................... 19

*Sparf v. United States*,
   156 U.S. 51, 72 (1895) ..................................................................... 23, 24

*Talib v. Massachusetts*,
   No. 21 Civ. 2805 (S.D. Tex.) ................................................................ 22

*United States v. Aminy*,
   15 F.3d 258 (2d Cir. 1994) ................................................................... 12

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000) ................................................................. 5, 14

*United States v. Colon*,
   880 F.2d 650 (2d Cir. 1989) .................................................................. 6

*United States v. Crowley*,
   318 F.3d 401 (2d Cir. 2003) ............................................................. 18, 19

*United States v. Dekattu*,
   No. 18 Cr. 474 (ARR), 2019 WL 885620 (E.D.N.Y. Feb. 22, 2019) ................................ 19, 22

*United States v. Fernandez*,
   No. 09 Cr. 1049 (RJS), 2009 WL 10637246 (S.D.N.Y. Dec. 30, 2009) ................................ 18

*United States v. Figueroa*,
   618 F.2d 934 (2d Cir. 1980) .................................................................. 9

*United States v. Flaharty*,
   295 F.3d 182 (2d Cir. 2002) ................................................................ 19

*United States v. Gelzer*,
   50 F.3d 1133 (2d Cir. 1995) ............................................................. 8, 16

iii

A000301

*United States v. Gonzalez,*
  110 F.3d 936 (2d Cir. 1997)................................................................ 5, 11

*United States v. Herron,*
  No. 10 Cr. 615 (NGG), 2014 U.S. Dist. LEXIS 63872 (E.D.N.Y. May 8, 2014) .................... 13

*United States v. Hsu,*
  669 F.3d 112 (2d Cir. 2012)................................................................... 5

*United States v. Kaiser,*
  609 F.3d 556 (2d Cir. 2010)................................................................. 11

*United States v. Maldonado-Rivera,*
  922 F.2d 934 (2d Cir. 1990)................................................................. 17

*United States v. Mercado,*
  573 F.3d 138 (2d Cir. 2009).................................................................. 7

*United States v. Meyerson,*
  18 F.3d 153 (2d Cir. 1994)................................................................... 6

*United States v. Moye,*
  793 F. App'x 19 (2d Cir. 2019) .............................................................. 6

*United States v. Nelson,*
  365 F. Supp. 2d 381 (S.D.N.Y. 2005)........................................................ 18

*United States v. Pascarella,*
  84 F.3d 61 (2d Cir. 1996).................................................................... 7

*United States v. Paulino,*
  445 F.3d 211 (2d Cir. 2006).................................................................. 5

*United States v. Pipola,*
  83 F.3d 556 (2d Cir. 1996)................................................................... 8

*United States v. Pitre,*
  960 F.2d 1112 (2d Cir. 1992)................................................................. 8

*United States v. Quintieri,*
  306 F.3d 1217 (2d Cir. 2002)............................................................... 23

*United States v. Ramirez,*
  894 F.2d 565 (2d Cir. 1990).................................................................. 7

*United States v. Regan,*
  103 F.3d 1072 (2d Cir. 1997)............................................................... 24

*United States v. Robinson,*

iv

A000302

No. 17 Cr. 249 (PAE), 2017 WL 4466616 (S.D.N.Y. Oct. 5, 2017) .......................... 6

*United States v. Roldan-Zapata*,
916 F.2d 795 (2d Cir. 1990) .......................................................................... 8, 11

*United States v. Saliba*,
489 F. App'x 501 (2d Cir. 2012) ........................................................................ 24

*United States v. Scarpa*,
913 F.2d 993 (2d Cir. 1990) .............................................................................. 17

*United States v. Schlussel*,
No. 08 Cr. 694 (JFK), 2009 WL 536066 (S.D.N.Y. Feb. 27, 2009) ..................... 18

*United States v. Tarricone*,
996 F.2d 1414 (2d Cir. 1993) .............................................................................. 6

*United States v. Thomas*,
116 F.3d 606 (2d Cir. 1997) .............................................................................. 24

*United States v. Thomas*,
54 F.3d 73 (2d Cir. 1993) ..................................................................................... 6

*United States v. Tussa*,
816 F.2d 58 (2d Cir. 1987) ................................................................................... 9

*United States v. Washington*,
705 F.2d 489 (D.C. Cir. 1983) ........................................................................... 24

*United States v. Williams*,
205 F.3d 23 (2d Cir. 2000) ................................................................................... 7

*United States v. Zackson*,
12 F.3d 1178 (2d Cir. 1993) ................................................................................. 6

**Statutes**

18 U.S.C. § 371 ............................................................................................... 2, 4

18 U.S.C. § 922(a)(1)(A) ....................................................................................... 2

18 U.S.C. § 922(a)(3) ...................................................................... 1, 4, 19, 20, 21

**Rules**

Fed. R. Evid. 403 ............................................................................................ 7, 11

Fed. R. Evid. 608(b) ....................................................................................... 15, 16

Federal Rule of Evidence 404(b) ................................................... 1, 4, 5, 6, 7, 14

Rule 403 ........................................................................................................ 7, 14, 16

v

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings *in limine* in advance of the trial against defendant Steven Perez, a/k/a "Lucha," scheduled to begin on August 28, 2023.

*First*, the Government seeks pretrial rulings that the following categories of evidence are admissible:

- Gun purchases made by Keith Vereen, the defendant's co-conspirator, as direct evidence of the conspiracy to violate 18 U.S.C. § 922(a)(3) charged in Count One of the operative indictment (Dkt. 2 (the "Superseding Indictment")), or, in the alternative, under Federal Rule of Evidence 404(b); and

- The facts and circumstances surrounding the arrest of the defendant and others following a car stop and armed standoff in Massachusetts on or about July 3, 2021, as direct evidence of the aforementioned conspiracy, or, in the alternative, under Rule 404(b).

*Second*, the Government seeks to preclude the defendant from introducing evidence and argument, and from pursuing cross-examination, related to the following topics:

- Testimony in a prior suppression hearing by New York City Police Department ("NYPD") Officer Jarren Smalls, who arrested the defendant in the Bronx, New York, on or about June 23, 2021;

- A dismissed *pro se* civil lawsuit brought by the defendant and others arrested with him in Massachusetts on or about July 3, 2021, against, among others, officers who were involved in the arrest, alleging various violations of their constitutional rights; and

- Argument that the defendant's receipt of firearms was not, or should not have been, unlawful under the Second Amendment.

## BACKGROUND

The defendant is charged in the Superseding Indictment with two counts, both involving his receipt of firearms in his state of residence (New York) that were obtained outside New York State—specifically, in South Carolina—without the proper licenses. The defendant obtained these

firearms from Vereen, his co-conspirator and illegal supplier of firearms.[1]  Specifically, between in or about May 2020 and in or about November 2020, Vereen purchased at least 25 firearms from federal firearm licensees ("FFLs")—more commonly known as gun stores—in South Carolina on behalf of others, including the defendant.  In other words, Vereen made "straw purchases" by representing to the FFLs that he was the true purchaser of the firearms when, in fact, he was making the purchases on behalf of others.  "Straw purchasing" is a common way for those who would be otherwise prohibited from purchasing firearms—like the defendant—to circumvent firearms regulations by obtaining guns through an individual—like Vereen—who appears to be a legitimate purchaser and is willing to make false representations about the nature of the purchase, often in exchange for a fee.

As relevant to the charges against the defendant, after purchasing firearms in South Carolina, Vereen made at least four roundtrips between South Carolina to the Bronx in the fall of 2020 in order to deliver the firearms to their true purchasers, including the defendant.  Before each trip, Vereen purchased multiple guns in South Carolina.  During the trips, Vereen and the defendant contacted each other by phone and, as demonstrated by cell site data, met in person to exchange guns and money.  On at least one occasion, the defendant paid Vereen via a Western Union transfer sent from the Bronx to South Carolina.  Other New York residents, including another of the defendant's co-conspirators, Jamil Bey, also paid Vereen using Western Union. According to toll records, the defendant acted as a middleman between Bey and Vereen, who did not otherwise

---

[1] Vereen was charged with firearms trafficking, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiracy to engage in such trafficking, in violation of 18 U.S.C. § 371 on November 30, 2021. *United States v. Vereen*, No. 22 Cr. 644 (JSR).  Vereen was arrested on December 6, 2021, and pleaded guilty to a gun trafficking conspiracy charge on or about March 15, 2023. Vereen is currently pending sentencing.

2

communicate by phone directly.[2]

The defendant has twice been arrested in possession of firearms that Vereen purchased from a South Carolina FFL.  First, on or about June 23, 2021, the defendant was arrested in the Bronx, New York (the "Bronx Arrest"), in possession of a Canik TP9 9mm handgun ("Firearm-1") that Vereen had purchased in South Carolina on or about October 1, 2020.  Just two weeks later, on or about July 3, 2021, the defendant was again arrested with firearms, including a Glock Model 44, .22 caliber pistol ("Firearm-2"), which Vereen had purchased in South Carolina on or about July 23, 2020.  At the time of this second arrest, the defendant was stopped on I-95 in Massachusetts with a group of individuals (the "co-conspirators," or "CCs"), who self-identified as members of a group called the "Rise of the Moors" (the "Massachusetts Arrest").  One of the CCs was Bey, who had sent $600 to Vereen on or about September 12, 2020, and had communicated repeatedly with the defendant.[3]

The CCs, who at the time of the traffic stop were armed and dressed in camouflage uniforms and ballistic vests, were en route from Rhode Island to Maine to attend a training exercise that they called "Operation Fountainhead."  They had over ten firearms with them, including military-style rifles and handguns; over a thousand rounds of ammunition; over two dozen magazines, including a loaded, large-capacity drum magazine; and other equipment, including night vision goggles.  They had planned the event for weeks, referring to it as the "east coast training exercise," and instructing one another on proper preparations, including packing

---

[2] Specifically, the toll records show a pattern in which Bey and the defendant communicated, followed by communications between the defendant and Vereen.

[3] In sending the money to Vereen, "Jamil Bey" used a phone number subscribed to a building address associated through DMV records with both himself and an individual named Brandon Britton.  Britton was also arrested alongside the defendant during the Massachusetts Arrest.

3

A000306

firearms and other military equipment. What began as a simple traffic stop turned into an hours-long standoff between the CCs and Massachusetts law enforcement, which eventually ended with the voluntary surrender of the defendant and his associates.

The Superseding Indictment charges the defendant in Count Two with one substantive count of receiving Firearm-1 in New York State after its purchase in South Carolina, in violation of 18 U.S.C. § 922(a)(3). It also charges the defendant in Count One with participating in a conspiracy in which individuals, including the defendant, were conspiring to receive firearms that were obtained outside of their state of residency, in violation of 18 U.S.C. § 371. Trial is scheduled to begin on August 28, 2023.

## ARGUMENT

### I. Vereen's Gun Purchases and the Circumstances of the Massachusetts Arrest Are Admissible as Direct Evidence or, in the Alternative, Under Rule 404(b)

As evidence of the defendant's participation in a conspiracy to receive guns in New York State that were obtained outside of the state, the Government seeks to admit evidence of (i) gun purchases by Vereen during the course of the conspiracy, and (ii) the facts and circumstances surrounding the Massachusetts Arrest. Both of these are direct evidence of the conspiracy to obtain firearms in violation of Section 922(a)(3). As set forth below, evidence relating to these instances is admissible either as direct proof of the charged conduct or for other proper purposes under Rule 404(b).[4]

---

[4] On July 28, 2023, the Government provided notice to the defendant that it intended to offer evidence of these arrests as direct evidence or, in the alternative, under Rule 404(b). Defense counsel has indicated in conferrals with the Government that they oppose admission of this evidence.

4

A.      **Applicable Law**

1.      **Direct Evidence**

Direct evidence of a crime is not limited to "that which directly establishes an element of

the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Rather, direct evidence

includes evidence that is "inextricably intertwined with the evidence regarding the charged

offense," and/or "necessary to complete the story of the crime on trial." *United States v. Carboni*,

204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Hsu*,

669 F.3d 112, 118 (2d Cir. 2012).

2.      **Rule 404(b)**

Rule 404(b) allows for the admission of uncharged crimes, wrongs, or other acts for

purposes other than proving criminal propensity, "such as proving motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid.

404(b). The Second Circuit "has long adopted an 'inclusionary' approach to the admission of

uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for

any purpose other than to show a defendant's criminal propensity." *United States v. Paulino*, 445

F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted).

Applying this approach, the Second Circuit has routinely approved of the admission of

"other acts" evidence with respect to the issues of knowledge, intent, and/or motive. *See, e.g.*,

*United States v. Thomas*, 54 F.3d 73, 81–82 (2d Cir. 1993); *United States v. Meyerson*, 18 F.3d

153, 166–67 (2d Cir. 1994). The same is true of evidence of a common scheme or plan and lack

of accident. *See United States v. Moye*, 793 F. App'x 19, 22 (2d Cir. 2019). Where the defendant

claims his conduct has an innocent explanation, the admission of such evidence of prior acts is

particularly appropriate. *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993)

("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is

5

generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

To be admissible, Rule 404(b) evidence "must relate to an issue in dispute." *United States v. Robinson*, No. 17 Cr. 249 (PAE), 2017 WL 4466616, at *2 (S.D.N.Y. Oct. 5, 2017). The defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offenses with which he is charged. *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656–57 (2d Cir. 1989); *see also United States v. Tarricone*, 996 F.2d 1414, 1421 (2d Cir. 1993) (explaining that an issue is only removed from dispute if defendant "express[es] a decision not to dispute that issue with sufficient clarity that the trial court will be justified (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue and (b) in charging the jury that if they find all the other elements beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed."); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the Government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

Evidence of uncharged acts also is admissible as background evidence where it is used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141–42 (2d Cir. 2009); *United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000) (affirming admission of prior act evidence involving co-conspirators "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed" (internal quotation marks omitted)); *United*

6

*States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence is admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.").

### 3. Rule 403

Evidence offered either as direct evidence or under Rule 404(b) remains subject to Federal Rule of Evidence 403. The Court must therefore determine whether the probative value of the offered evidence is "substantially outweighed" by a danger of "unfair prejudice" or confusion. Fed. R. Evid. 403. The Second Circuit has found admission appropriate where the offered evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendant was] charged.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant).

### B. Discussion

### 1. Vereen's Gun Purchases Are Admissible

The purchases of firearms by co-conspirator Vereen, including to sell to individuals other

7

than the defendant, is admissible as direct proof of the charged conspiracy, spanning from in or about May 2020 through in or about July 2021. Vereen and the defendant worked together to commit the charged crime over the course of several months. Vereen's acts in furtherance of the conspiracy, even when those acts were taken for the benefit of conspirators apart from the defendant, are admissible as direct proof of the offense.

As described above, over the course of the conspiracy charged in the Superseding Indictment, the defendant's co-conspirator Keith Vereen purchased 25 firearms (the "Vereen Guns") from at least six FFLs in South Carolina. On at least four occasions, Vereen traveled from South Carolina to the Bronx shortly following firearms purchases, on nearly every occasion communicating with, and traveling in close proximity to, the defendant.  On two occasions, the defendant was arrested while in possession of a Vereen Gun after Vereen had traveled to the Bronx to meet with the defendant.  On one occasion, the defendant transferred money via wire payment from the Bronx to Vereen in South Carolina. On another occasion, the defendant's co-conspirator Bey transferred money via wire payment from the Bronx to Vereen.[5]

_First Trip (September 14-17):_ Specifically, between September 12 and 13, 2020, Vereen purchased seven firearms from FFLs in South Carolina.  On September 14, 2020, Vereen received a Western Union payment from Bey and traveled to New York, communicating with the defendant once.  Over the course of the next two days—September 15 and 16, 2020—Vereen and the defendant communicated at least nine times.  On the evening of September 16, 2020, cellphones

---

[5] At least one other Bronx resident, Ricardo Rodriguez Resto, also sent a Western Union payment to Vereen.  Like with Bey, call records reflect that the defendant had a significant number of communications with Rodriguez Resto.

8

belonging to Vereen and the defendant both connected to the same cellphone tower in the Bronx.[6] On September 17, 2020, Vereen returned to South Carolina.

*Second Trip (October 2-6):* Vereen and the defendant then communicated six times on September 21, 2020.  The next day, the defendant sent Vereen a $350 wire transfer before Vereen purchased an additional five firearms between October 1 and 2, 2020. On October 3, 2020, Vereen communicated with the defendant five times and traveled to New York.  The same day, cellphones belonging to Vereen and the defendant connected to the same cellphone tower in the Bronx at approximately 3:00 a.m.  Then, on the evening of October 4, the defendant's phone, Vereen's phone, and Bey's phone all pinged on the same cell tower within an hour of each another, suggesting that the users of these phones met in person before Vereen returned to South Carolina on October 6, 2020.

*Third Trip (October 22-23):* After returning to South Carolina, Vereen purchased three guns on or about October 21, 2020.  He then traveled to New York on October 22, 2020.  That day, Vereen and the defendant's cellphones connected to the same cell tower multiple times in the Bronx.  The next day, Vereen arrived back in South Carolina, and the defendant attempted to contact him.

*Fourth Trip (November 1-3):* Finally, on or about October 31, 2020, Vereen purchased two firearms in South Carolina.  Following the same pattern, Vereen arrived in New York the next day, and pinged off of the same cell towers as the defendant multiple times.  Vereen was back in South Carolina by the morning of November 3, 2020.

The evidence therefore shows that during each of these four trips, Vereen was bringing

---

[6] The Government expects that Andrew Petersohn, a professional engineer with extensive experience with cell site location data, will testify that the Bronx is a densely populated area in which cell sites serve a relatively small geographical area that typically spans a few city blocks.

9

A000312

guns from South Carolina to New York for the defendant and others with whom the defendant conspired.  Vereen's gun purchases are "inextricably intertwined" with this criminal conspiracy and are direct evidence of the scope and nature of the conspiracy, as well as the nature of the relationship between Vereen and the defendant.  As described above, each of the purchases "arose out of the same transaction or series of transactions as the charged offense" and "is necessary to complete the story of the crime on trial."  *Gonzalez*, 110 F.3d at 942; *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010).  Further, as the Second Circuit has explained, details regarding a "pre-existing . . . relationship" between two co-conspirators, in this case, informed by communications and travel close in time to firearms purchases, can "further[] the jury's understanding of how the instant [offense] came about and their role in it."  *Roldan-Zapata*, 916 F.2d at 804.

Vereen's seven-month history of purchasing firearms from May to November 2020 provides important context for the conspiracy in which both Vereen and the defendant funneled handguns from South Carolina to New York.  The purchase of the Vereen Guns, when combined with the patterns of (i) communication between Vereen and the defendant, (ii) Vereen's travel, and (iii) cell site location information for Vereen, the defendant, and Bey, is clearly direct evidence of the scope and nature of the conspiracy.  The fact of Vereen's gun purchases is a necessary detail, without which the story of the conspiracy is incomplete.

A key issue for the jury to resolve at trial will be knowledge and intent: did the defendant *know* that the firearms that he received in New York state were coming from outside New York state, or, at minimum, did he consciously avoid learning that fact?  To the extent that the defendant intends to argue at trial that he did not know that he was receiving guns that had originated from South Carolina, his familiarity with Vereen, and the timing and circumstances of their meetings as

10

it relates to Vereen's firearms purchases, is probative of the defendant's mental state and knowledge of the unlawfulness of his actions, and tends to negate a defense of mistake or absence of knowledge. *See United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994).

Finally, the probative value of the evidence of the purchase of the Vereen Guns is high and is "not substantially outweighed by the risk of unfair prejudice." Fed. R. Evid. 403. Vereen's gun purchases—which are largely of the same types of guns the defendant was arrested with—are at the heart of the offenses with which the defendant is charged and present no risk of unfair prejudice. All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Comm. Note; *see United States v. Herron*, No. 10 Cr. 615 (NGG), 2014 U.S. Dist. LEXIS 63872, at *13–14 (E.D.N.Y. May 8, 2014) (describing examples of unfair prejudice including evidence that appeals to the jury's sympathies, arouses jurors' sense of horror, and provokes a jury's instinct to punish). There is nothing particularly disturbing about the facts of Vereen's firearms purchases, including the type of firearms purchased, even if intended for others, that would tend to "suggest a decision on an improper basis." Fed. R. Evid. 403, Advisory Comm. Note.

## 2.     Evidence of The Massachusetts Arrest Is Admissible

With regard to the Massachusetts Arrest, the Government intends to prove at trial that Firearm-2, purchased by Vereen, was one of the firearms seized as part of the Massachusetts Arrest, and that their co-conspirator Bey was arrested alongside the defendant. The Government also intends to introduce body-worn camera footage obtained from a camera worn by Jamal Latimer, who was also arrested with the defendant and Bey at that time. This footage captured statements made by the defendant during the stand-off regarding his knowledge of the origin of

11

the firearms in the CCs' possession.  (*See* Ex. A).  Finally, the Government also intends to offer certain evidence from cellphones seized at the time of the Massachusetts Arrest, including communications that show efforts to plan "Operation Fountainhead" and obtain firearms, as well as the extent of the relationship between the defendant and the rest of the CCs.  (*See* Exs. B–F). The proffered evidence as to the Massachusetts Arrest is admissible first and foremost as direct evidence of the conspiracy because it is, in large part, "inextricably intertwined with the evidence regarding the charged offense," and/or is "necessary to complete the story" of the crime on trial. *Carboni*, 204 F.3d at 44 (internal quotation marks omitted).

The circumstances of the Massachusetts Arrest serve as key evidence of the defendant's agreement with at least two co-conspirators,  Bey and Latimer, to commit the charged offense.  As described above, during Vereen's multiple trips in the fall of 2020, Bey did not communicate directly with Vereen, but instead frequently used the defendant as an intermediary.  The defendant, however, communicated with Vereen—a fact that will allow the jury to infer that the defendant was the intermediary helping to facilitate Bey's purchase of out-of-state firearms,[7] as well as his own.  The defendant thus promoted the receipt and transfer of straw-purchased firearms in furtherance of the conspiracy.

The Massachusetts Arrest also provides evidence of the defendant's role in the conspiracy and his own knowledge of the source of the firearms he and others possessed at the time of the arrest.  For example, Latimer's body-worn camera shows that during the standoff with law enforcement, in the course of a discussion about law enforcement's attempt to convince the CCs to surrender their firearms, Latimer confirmed with the defendant, who was wearing camouflage and body armor, and another one of the CCs, "nothing's stolen right?"  The defendant shook his

---

[7] Bey was also a resident of New York State during the relevant time period.

head, indicating his knowledge of how the firearms were obtained, *i.e.*, that they were purchased and not stolen.  (Ex. A, 0:30–0:38).  Shortly thereafter, the defendant confirms that "everything is clean," meaning that the firearms were not stolen.  (Ex. A, 1:30–1:42).  This response is direct evidence of the defendant's involvement in a conspiracy to receive the straw-purchased firearms.

Evidence from the cellphones of the CCs arrested with the defendant contain additional evidence of the conspiracy.  For example, the phones feature a group text with individuals who planned to attend Operation Fountainhead.  In this group text, Latimer, the group leader, circulated a packing list for Operation Fountainhead, which included firearms, ammunition, and other military equipment, and the group discussed their plans to engage in training modeled after the military.  (Ex. B at 4–6).  In his phone, Latimer also had a note entitled "Operation Fountain Head. 7/3 – 7/7, Plan of execution," which sets forth the expected timeline and tasks for the training, including "[g]o over safety brief for if we are pulled over" and establish "weapon safety rules." (Ex. E at 1).  In addition, in the group text, Latimer said they could use "blank-firing-adapters for your training event in July" to "practice firing and maneuvering against each other.  Practice ambushes, assault fighting positions etc."[8]  (Ex. C at 11).

In the group text, they also discussed the defendant's arrest with Firearm-1, including updates as to his bail status and processing, and their views on the enforcement of gun laws in New York.  (*See* Ex. D).  Even though the defendant was not participating in the text thread, the messages of the other CCs discussing the defendant and his pending criminal case shows the nature of their relationship with the defendant, and their interest in the outcome of his arrest.  These texts are "necessary to complete" the story because they show the defendant's connection to the CCs

---

[8] Consistent with the text messages, Latimer's cellphone contains search history that reveals contemporaneous efforts to research out-of-state purchase of firearms, purchase of firearms supplies, and military tactics.  (*See* Ex. F).

13

and provide an explanation as to why the defendant had firearms just two weeks after being arrested with Firearm-1.  Quite simply, he needed the firearm to attend the miliary training exercise with the CCs.

Similarly, and in the alternative, the above evidence is admissible under Rule 404(b) to show intent, knowledge, motive, common plan and scheme, and absence of mistake or accident. The above-proffered evidence rebuts any argument that the defendant did not intend to receive guns from out of state, that he did not understand the origins of such firearms, or that his possession of a gun purchased by Vereen in South Carolina during the Bronx arrest was simply a mistake.  It shows that on multiple occasions, the defendant was in possession of firearms purchased by Vereen, that he knew where the firearms came from, and that he and the other CCs had a clear motive for purchasing these firearms in order to be prepared for their military-style training.  As a result, with proper limiting instructions, this evidence is admissible under Rule 404(b).

Offering evidence from the Massachusetts Arrest would not violate Rule 403.  As the Second Circuit has recognized, any evidence that is probative of guilt—as the Massachusetts Arrest undoubtedly is—may be prejudicial to the defendant.  *See Gelzer*, 50 F.3d at 1139.  But the Massachusetts Arrest evidence is not *unduly* prejudicial.  The Government presently intends to offer, in addition to officer testimony about the arrest, limited video of the scene, photographs of the firearms seized and individuals arrested, short clips of the Latimer body-worn camera, and small excerpts of evidence from the CCs' phones, all of which are necessary to show the scope of the conspiracy and the defendant's role in obtaining firearms.  Accordingly, the Court should admit evidence of the Massachusetts Arrest.

## II.    Cross-Examination of Law Enforcement Officers About Certain Irrelevant Topics Should Be Precluded

The Government intends to offer evidence of the Bronx Arrest largely through testimony

14

from NYPD Officer Jarren Smalls, who participated in the arrest of the defendant and the seizure of Firearm-1. Similarly, the Government expects that law enforcement officers who were on scene at the Massachusetts Arrest will testify about the arrest and the seizure of firearms, including Firearm-2. In advance of their testimony, the Government seeks to preclude cross-examination regarding (1) Officer Small's prior testimony in a suppression hearing in a wholly unrelated New York State case against a different defendant, and (2) the defendant's lawsuit accusing officers who participated in the Massachusetts Arrest of color-of-law violations. These lines of cross-examination are irrelevant and would confuse and prejudice the jury.

### A.    Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the right of a defendant in a criminal case to be confronted with the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *United States v. Maldonado-Rivera*, 922 F.2d 934, 955 (2d Cir. 1990). However, "the scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990). In this regard, "a trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." *Id.* (quotation omitted).

Moreover, cross-examination regarding "specific instances of a witness's conduct" is limited to situations where the conduct of the witness was "probative of the [witness's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). Thus, Rule 608(b) "does not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness." *United States v. Schlussel*, No. 08 Cr. 694 (JFK), 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2009) (quoting *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005)). Further, Rule 608(b) "prohibits a party from presenting 'extrinsic evidence' of '[s]pecific instances

15

of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility' unless that conduct was the subject of a criminal conviction." *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003).

Applying Rules 608 and 403 to cross-examination of law enforcement witnesses, courts have routinely precluded cross-examination about lawsuits that ended without any finding of responsibility. *See United States v. Fernandez*, No. 09 Cr. 1049 (RJS), 2009 WL 10637246, at *2 (S.D.N.Y. Dec. 30, 2009) (rejecting argument that "allegations themselves might still be sufficient to undermine the witnesses' credibility"); *Phillips v. City of New York*, 871 F. Supp. 2d 200, 203 n.2 (E.D.N.Y. 2012) ("[A]ny probative value of the complaints would be substantially outweighed by the danger of unfair prejudice to the Defendant Officers because the lawsuits are mere allegations. . . . "); *United States v. Dekattu*, No. 18 Cr. 474 (ARR), 2019 WL 885620, at *1 (E.D.N.Y. Feb. 22, 2019) (precluding the defendant from cross-examining a police officer about a dismissed lawsuit because "'[t]he existence of a complaint containing unproven allegations' is not probative of [the officer's] truthfulness" (citation omitted)); *Saldarriaga v. United States*, No. 97 Cr. 1275 (WK), 2002 WL 449651, at *4 (S.D.N.Y. Mar. 21, 2002) (stating that "[u]nsubstantiated civil rights allegations . . . have no bearing on [an officer's] 'character for truthfulness'" and noting that "[a]ny cross-examination regarding such allegations would have been irrelevant and improper under the Federal Rules of Evidence").

"Further, under [Federal Rule of Evidence] 403, the district court may exclude even relevant evidence if it finds that the probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Crowley*, 318 F.3d at 417 (quoting *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002)).

16

A000319

B.      **Discussion**

1.      **Cross-Examination of Officer Smalls About Prior Suppression Hearing Testimony Should Be Precluded**

As described above, the Government expects to introduce evidence showing that on two occasions, the defendant possessed the Vereen Guns. In order to so prove, the Government will elicit testimony from Officer Smalls, who was present during the Bronx Arrest on June 23, 2021, and seized Firearm-1 from the defendant pursuant to that arrest. The seizure of Firearm-1 was the subject of a suppression hearing held before this Court on May 30, 2023, during which Officer Smalls testified. At the hearing, defense counsel suggested that Officer Smalls may have been tempted to alter his testimony in the instant case to avoid suppression after having testified in an earlier, unrelated case brought by the Bronx District Attorney's Office that he had not seen a "bulge" before stopping an individual suspected of having a gun in a bag. (Dkt. 52 at 28). In that case, the gun was suppressed. (*Id.*) Defense counsel further suggested at the suppression hearing before this Court that, as a result of the outcome in the earlier hearing, Officer Smalls "may have been 'coached' following [the earlier] hearing" that specific testimony—namely, observing bulges before making gun arrests—is "necessary in order to prevent suppression," implying that Officer Smalls would lie under oath in order secure a favorable outcome for the Government. (*Id.*)

Cross-examination related to Officer Smalls' testimony in a prior, unrelated suppression hearing where there was no adverse credibility finding would be based only on defense counsel's unsupported and improper insinuation that Officer Smalls would lie under oath to secure a favorable outcome. Defense counsel's baseless suggestion that Officer Smalls may testify falsely because of the outcome of a separate suppression hearing does little more than to invite the jury to speculate about baseless claims that have no relevance to Officer Smalls' testimony in this case. It may also lead to confusion by the jurors, who may (mistakenly) assume some factual connection

17

A000320

between the prior matter, against an unrelated defendant, and the instant prosecution against the defendant.

Insofar as Officer Smalls' previous, unrelated testimony had any relevance, it was for the limited purpose of allowing the Court to evaluate Officer Smalls' testimony regarding the reasonable suspicion to stop and ultimate search of the defendant during the Bronx Arrest.  The Court considered Officer Smalls' previous testimony, as well as his testimony at the hearing, and found that Officer Smalls testified truthfully, and had reasonable suspicion to make the stop.  The Court therefore denied the defendant's motion to suppress.  (Dkt. 52 at 28).  Because the legal issue of reasonable suspicion—the only issue for which Officer Smalls' prior testimony was potentially relevant and which the Court has already resolved—will not be before the jury, the defendant should not be permitted to cross-examine Officer Smalls about that testimony.

Further, Officer Smalls' prior testimony does "not actually indicate a lack of truthfulness," as he testified truthfully in the prior case.  (Suppression Hearing Tr. at 79) (Q: "The prior case . . . did you testify truthfully during that case?"  A: "Yes."  Q: Did you testify truthfully in the grand jury in this case?"  A: "Yes."  Q: "Did you testify truthfully today?"  A: "Yes, I did."  Q:  Would you lie under oath, Officer Smalls?"  A: "No.").  Allowing the defendant to cross-examine Officer Smalls on prior testimony from an unrelated and irrelevant case in which he told the truth would only serve to confuse the jury and waste time.

**2.      Cross-Examination of Massachusetts Troopers About the Defendant's Dismissed Lawsuit Should Be Precluded**

As discussed above, the Government intends to introduce evidence that the defendant was arrested with Firearm-2, just two weeks after the Bronx Arrest.  The Government expects that law enforcement officers involved in the Massachusetts Arrest, including Massachusetts State Trooper Ryan Casey and Trooper Michael Sullivan, will testify, among other things, about the

18

A000321

general circumstances of the traffic stop and subsequent standoff that led to the Massachusetts Arrest; the seizure of firearms, including Firearm-2; and the identities of those arrested.

Shortly after the Massachusetts Arrest, the defendant and others arrested with him filed a lawsuit in the Southern District of Texas against the Massachusetts State Troopers and over twenty other defendants, including Troopers Casey and Sullivan, alleging a "conspiracy against rights, deprivation of rights under color of law, [g]enocide . . . and . . . [t]reason." *See Talib v. Massachusetts*, No. 21 Civ. 2805 (S.D. Tex.) (Dkt. 15 at 2).  Based on conversations with Troopers Casey and Sullivan, the Government understands that while Trooper Casey received a summons at some point during the litigation, he was never required to appear, and that Trooper Sullivan was never served or contacted regarding the litigation.  The lawsuit was dismissed without prejudice on June 22, 2022.  *Id.* (Dkt. 101).  Accordingly, there were no findings of wrongdoing or responsibility.

The defendant's lawsuit against the Massachusetts State Troopers is not relevant to Troopers Casey or Sullivan's testimony.  Lawsuits are "mere allegations," *Phillips*, 871 F. Supp. at 203 n.2, and as courts have found time and again, dismissed suits are "not probative of [an officer's] truthfulness," *Dekattu*, 2019 WL 885620, at *1.  Further, any suggestion of bias based on the lawsuit is minimal given that the suit has been dismissed.  Allowing cross-examination about the lawsuit would do little more than to confuse and distract the jury.

## III. Argument That the Defendant's Actions Were or Should Have Been Lawful Under the Second Amendment Should Be Precluded

As the Court is aware, the defendant has argued throughout these proceedings that 18 U.S.C. § 922(a)(3), which he is charged with violating, is unconstitutional.  Defense counsel moved pretrial to dismiss the indictment, arguing that the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022),  rendered Section 922(a)(3)

19

unconstitutional.  (Dkt. 21).  The Court denied the motion.  (Dkt. 52).  Then, on August 11, 2023—after the Court issued the order denying the motion to dismiss—the defendant filed a *pro se* notice of interlocutory appeal in which he continued to press his argument that this prosecution is unlawful because Section 922(a)(3) is unconstitutional.  (Dkt. 55; *see id.* at 4) ("I am being charged with receiving an arm.  I am being tried for taking it upon myself to preserve my life which is my right and my duty to make sure that I prevent anything or anyone from harming me.  The crime is against me.").

At trial, the defendant should not be permitted to relitigate these meritless arguments in front of the jury by calling into question the constitutionality of the statute under which he is charged or by attempting to argue that the defendant's gun possession was simply a legal exercise of his Second Amendment right.  *See United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise" (citation omitted)).  Put differently, the defendant should not be permitted to argue that he should be acquitted because of an incorrect and unfounded interpretation of the law.

It is clearly settled that legal questions, including matters of constitutional interpretation, are within the purview of the judge, not a jury.  *See Sparf v. United States*, 156 U.S. 51, 72 (1895) ("The judge decides questions of law; the jury questions of fact.");  *United States v. Saliba*, 489 F. App'x 501, 502 (2d Cir. 2012) ("This Court reviews attacks on the constitutionality de novo and as a question of law.").  Here, the jury must decide solely the defendant's "factual innocence" or guilt "of the crime charged," and the Court alone must determine the constitutionality of Section 922(a)(3).  *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997).

Allowing the defendant to make Second Amendment arguments is also plainly improper,

20

A000323

because it would invite, at best, confusion or, more likely, nullification, which is entirely inappropriate. *See United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent"); *id.* at 614 ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *see also Sparf*, 156 U.S. at 102 ("Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves."); *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) (per curiam) ("A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." (emphasis in original)).  Significantly, the defendant's arguments in his motion to dismiss and his interlocutory appeal do not suggest that the defendant lacked the requisite *mens rea* to commit the offense because of a good-faith misinterpretation of the law.  Rather, they demonstrate the defendant's belief that Section 922(a)(3), which proscribes his behavior, is necessarily unconstitutional.  Airing such legal argument before the jury can only serve to needlessly prolong the trial, confuse the issues, and invade the province of the Court, which is to provide legal instruction.

A000324

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.


Dated:  New York, New York
          August 14, 2023

                                Respectfully submitted,

                                DAMIAN WILLIAMS
                                United States Attorney

                 By:    s/_____
                                Ashley C. Nicolas
                                Madison Reddick Smyser
                                Sarah Mortazavi
                                Assistant United States Attorneys
                                (212) 637-2467/ -2381/ -2520

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------   x
                                                        :
                                                        :
**UNITED STATES OF AMERICA**                            :
                                                        :
**- v -**                                               :          22 Cr. 644 (JSR)
                                                        :
**LUCHA EL POR LIBERTAD**,                              :
                                                        :
                   Defendant.                           :
----------------------------------------------------   :
                                                        x


## DEFENDANT LUCHA EL POR LIBERTAD'S
## OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*


**DAVID E. PATTON, ESQ.**
Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA EL POR
LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8735


**ZAWADI BAHARANYI, ESQ.**
**AMANDA MAYO, ESQ.**
Of Counsel


TO:    **DAMIAN WILLIAMS, ESQ**.
       United States Attorney
       Southern District of New York
       One. St. Andrew's Plaza
       New York, New York 10007
       Attn:  **ASHLEY NICOLAS, ESQ.**
              **MADISON REDDICK SMYSER, ESQ.**
              **SARAH MORTAZAVI, ESQ.**
              Assistant United States Attorneys


**A000326**

# TABLE OF CONTENTS

Page

**INTRODUCTION** ..................................................................................................1

**ARGUMENT** ........................................................................................................1

1.    Evidence Regarding Lucha's Massachusetts Arrest Is Inadmissible. .......................................1

      The Vereen-Purchased Firearm. .................................................................... 2

      Jamil Bey's Massachusetts Arrest. ................................................................. 2

      Body-worn Camera Footage. ........................................................................ 3

      Phone Messages and Searches. ..................................................................... 4

2.    Vereen's Gun Purchases Are Inadmissible. .....................................................................9

3.    The Court should preclude Andrew Petersohn's proposed expert testimony or hold a *Daubert* hearing. ....................................................................... 11

4.    The Defense Does Not Intend to Argue That § 922(a)(3) Is Unconstitutional. ....................14

5.    The Defense Does Not Intend to Cross-Examine Officer Smalls or Massachusetts Officers on the Identified Topics. ............................................. 14

**CONCLUSION** ..................................................................................................15

i

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......................................... 11

*Loussier v. Univ. Music Grp., Inc.*, 2005 WL 5644421 (S.D.N.Y. July 14, 2005) ...................... 1

*Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001) ................................................. 6

*Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014) ............................................. 12

*United States v. Campos*, 763 F. App'x 97 (2d Cir. 2019) .......................................... 7

*United States v. Cantoni*, No. 18 Cr. 562 (ENV) (E.D.N.Y. March 19, 2019) ........................... 13

*United States v. Chambers*, 800 F. App'x 43 (2d Cir. 2020) ....................................... 2, 7

*United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012) ................................ 12, 13

*United States v. Fama*, 2012 WL 6094135 (E.D.N.Y. Dec. 7, 2012) ................................. 9

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ............................................ 8

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) .......................................... 3

*United States v. Hernandez*, 859 F.3d 817 (9th Cir. 2017) ........................................ 9

*United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012) ............................................... 2

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ............................................... 6

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007) ........................................ 4, 5, 7

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980) .......................................... 6

*United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019) ...................................... 4, 5, 6, 10

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ............................................. 8

*United States v. Ravich*, 421 F.2d 1196 (2d Cir. 1970) ............................................ 7

*United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Feb. 22, 2022) ............................... 13

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997) ....................................... 13

*United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) .......................................... 10

ii

**Statutes**

18 U.S.C. § 922(a)(3) .................................................................................. 1, 7

**Other Authorities**

Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone,* 18 Rich. J.L. & Tech. 3 (Fall 2011) ........................ 12

Victoria Saxe, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence,* 19 U.N.H. L. Rev. 133 (2020) ................................................................ 12

**Rules**

Federal Rule of Evidence 402 ........................................................................ 1

Federal Rule of Evidence 403 ..................................................................... 1, 7

Federal Rule of Evidence 404 .................................................................. 1, 6, 7

Federal Rule of Evidence Rule 801 .............................................................. 6

iii

## INTRODUCTION

Defendant Lucha El Por Libertad ("Lucha") hereby responds to the government's motions *in limine* filed on August 14, 2023.  For the reasons below, the government's motions should be denied.

## ARGUMENT

1.  **Evidence Regarding Lucha's Massachusetts Arrest Is Inadmissible.**

The government seeks to introduce into evidence at trial the facts and circumstances of Lucha's July 3, 2021 arrest in Wakefield, Massachusetts.  As the proponent of this proffered evidence, the government bears the burden of demonstrating why it is relevant.  But its motion fails to identify any relevant connection between Lucha's Massachusetts arrest and the instant charges against Lucha in the Southern District of New York.  Lucha's Massachusetts arrest is nothing more than irrelevant and unduly prejudicial propensity evidence that is inadmissible under Federal Rules of Evidence 402, 403, and 404(b). The Court should not admit evidence or testimony relating to this arrest at trial.

### A.  This Arrest Is Irrelevant as Direct Evidence of the Charged Crimes.

For the same reasons discussed in the defense's motion *in limine* to exclude evidence of this incident, *see* Def. Mot., ECF No. 56 at 2–11, Lucha's Massachusetts arrest is irrelevant to Counts I and II in the superseding indictment.  As the government itself describes, this case is about Lucha's alleged "receipt of firearms in his state of residence (New York) that were obtained outside New York State—specifically, in South Carolina—without the proper licenses" in violation of 18 U.S.C. § 922(a)(3), and his alleged "participation in a conspiracy to receive guns in New York State that were obtained outside of the state" in violation of the same statute.  Gov't Mot., ECF No. 57, at 1, 4.  In other words, this is not a case about whether Lucha allegedly possessed a firearm, but about how he allegedly received a firearm in his state of residence.  Lucha's arrest for gun possession in Massachusetts is not probative of whether he received, or conspired to receive, firearms from South Carolina in New York. *See Loussier v. Univ. Music Grp., Inc.*, 2005 WL 5644421, at *4 (S.D.N.Y. July 14, 2005) (excluding website printouts as irrelevant

1

**A000330**

because "they would not tend to show anything about" the proposition for which they were offered).[1]

A closer look at the materials the government has proffered regarding the Massachusetts arrest only confirms the event's irrelevance to the charged conduct.

The Vereen-Purchased Firearm. The government intends to offer evidence at trial that a firearm purchased by Vereen was seized as part of the Massachusetts arrest. *See* Gov't Mot. at 11. But the government does not proffer any evidence that this Vereen-purchased firearm was ever transported to or received in New York. Indeed, the government's motion largely describes specific Vereen firearm purchases on specific dates and attempts to connect those firearms to four round trips by Vereen from South Carolina to the Bronx in September, October, and November 2020. *Id.* at 2, 8–9. But the Vereen-purchased firearm in Massachusetts was purchased on July 23, 2020, well before these trips supposedly occurred. *Id.* at 3. The firearm's presence in Massachusetts is thus irrelevant to Lucha's alleged "participation in a conspiracy to receive guns in New York State that were obtained outside of the state," *id.* at 4, and it is not "inextricably intertwined" with that actual charged conduct. *United States v. Hsu*, 669 F.3d 112, 118–19 (2d Cir. 2012) (evidence of defendant's uncharged Ponzi scheme activity was relevant in campaign finance fraud trial because there was an established connection between the crimes: defendant "used his Ponzi investors as a source of campaign contributions, and used the connections to politicians to burnish his reputation for respectability so as to recruit and reassure potential investors" in his scheme).

Jamil Bey's Massachusetts Arrest. The government also intends to introduce evidence that Jamil Bey was arrested during the Massachusetts incident alongside Lucha because, it claims, the circumstances

---

[1] Indeed, the substantive count of the indictment only alleges that Lucha received one firearm in New York—a firearm that was recovered by the NYPD on June 23, 2021, two weeks before the Massachusetts arrest even took place. *See United States v. Chambers*, 800 F. App'x 43, 45 (2d Cir. 2020) (district court properly excluded evidence of meeting "which took place two years after the charged conduct" as irrelevant).

2

A000331

of the Massachusetts arrest "serve as key evidence" of Lucha's agreement to serve as an "intermediary" between Bey and Vereen to help "facilitate Bey's purchase of out-of-state firearms."  Gov't Mot. at 11–12.

Yet all the government points to for this proposition are the trips Vereen allegedly took to New York in the Fall of 2020—conduct that is far apart in time and space from the Massachusetts arrest.  *Id.*  This arrest is therefore also not "necessary to complete the story" of the alleged conspiracy to transport firearms from South Carolina to New York.  *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (in gun possession prosecution, affirming admission of evidence of uncharged burglary as relevant to "a possible motive for the defendants' possession of firearms" on that same evening, and "to provide crucial background evidence that gave coherence to the basic sequence of events that occurred on [that same] night").

<u>Body-worn Camera Footage.</u>   The government further claims that the facts of Lucha's Massachusetts arrest contain evidence of Lucha's "own knowledge of the source of the firearms he and others possessed at the time of the arrest."  Gov't Mot. at 12.  This claim is based solely on a few-seconds-long snippet of video from the Massachusetts arrest in which Lucha purportedly states "everything is clean" to Jamhal Latimer.  To the government, this comment means "that the firearms were not stolen" and is "evidence of [Lucha's] involvement in a conspiracy to receive the straw-purchased firearms."  *Id.* at 13; *see also* Gov't Mot. Ex. A.  But this inference does not follow from what has been proffered.

Even assuming that Lucha is referring to knowledge that the firearms involved in the Massachusetts arrest are not stolen (firearms that, with the exception of a single pistol, remain unconnected to Vereen or South Carolina), that is irrelevant to whether Lucha knows *the source of the firearms* (i.e., what states they were purchased in and transported to).  The government inappropriately conflates these two concepts.  Accepting the government's theory of relevance here would require the jury "to draw a

A000332

series of inferences, unsupported by other evidence," connecting Lucha's comment to his actual transport of the firearms. *United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007) (holding that admission of circumstantial evidence of defendant's knowledge was erroneous). Specifically, the jury would have to infer that (1) by referring to the firearms being clean, Lucha is stating that they are not stolen; (2) Lucha is stating this because he personally knows the provenance of the firearms; (3) the firearms were actually obtained in a state outside of New York; and (4) Lucha transported (or conspired to transport) the firearms into New York. "To conclude so much on the basis of so little amounts to impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 659 (2d Cir. 2019).

<u>Phone Messages and Searches.</u> Finally, the government claims that phone messages and internet searches found on cell phones recovered from other individuals—not Lucha—arrested during the Massachusetts incident are also "evidence of the conspiracy" to violate § 922(a)(3). Gov't Mot. at 13–14; *see* Gov't Mot. Ex. B–F. Again, the government falls short in demonstrating the relevance of this material. This material also includes inadmissible out-of-court statements not subject to any hearsay exceptions.

The government first mischaracterizes the "group text" it focuses on in attempting to make this material seem relevant to Lucha and specific to the individuals involved in the Massachusetts arrest. This "group text," excerpts of which are attached as Exhibits B through D to the government's motion, includes *forty-eight* participants. The full context of the messages makes clear that, while some of these 48 people were planning to attend the Maine training in July 2021, this was not a closed conversation between only those who attended. Instead, the chat functioned as a message board, where many people across the country were simply looking for advice or encouragement from a group of like-minded individuals. *See* Ex. G (chat participants in Las Vegas exchanging messages regarding apparent child custody issue).

This material is also entirely disconnected from Lucha, the only defendant in this trial. As the

A000333

government concedes, Lucha "was not participating in the text thread" from which the government quotes liberally. Gov't Mot. at 13. Lucha did not perform the internet searches or write the note identified as being on a phone owned by Jamhal Latimer. *Id.*[2] The government points to messages that were exchanged about Lucha's arrest in June 2021 among the participants in the group chat, but that hardly explains Lucha's "connection" to others in a conspiracy to transport firearms into New York. *Id.* As one participant writes, "Ty for sharing the great news about Luca I don't know the brother but I'm relieved to know my brother is free." Ex. H. Far from explaining any "connection" between Lucha and anyone else, this material shows a discussion *about* Lucha with a large group of people (including those who did not know him), some of whom would go to the Maine training and many of whom would not.

Critically, the government proffers no messages or other materials from these phones discussing or planning to "receive guns in New York State that were obtained outside of the state." Gov't Mot. at 4. To be sure, the group text thread the government heavily relies on does discuss firearms and describe military training involving firearms. But in these materials, there is no discussion of what states to get those firearms from or where to transport them, let alone to obtain them from Vereen or from outside of New York more generally. "[O]nly surmise and guesswork" could connect any of these messages to an agreement to transport firearms into New York without the requisite federal license to do so. *Pauling*, 924 F.3d at 662 (affirming district court's grant of motion to set aside defendant's conviction because jury's verdict could only have been based on "impermissible speculation" considering facts in evidence).

This material is inadmissible for another reason not addressed by the government in its motion; these messages are inadmissible hearsay not subject to any applicable exceptions. More specifically, the

---

[2] And any evidence of Latimer's knowledge from these searches or notes, if it even could be somehow relevant, is particularly irrelevant without evidence of that information being communicated to Lucha (of which there is none). *See Kaplan*, 490 F.3d at 121 ("In the absence of" evidence that others' knowledge "was communicated to Kaplan, or that Kaplan had been exposed to the same sources from which these others derived their knowledge," "the relevance of others' knowledge was at best minimal in proving Kaplan's knowledge.").

A000334

messages are not subject to Rule 801(d)(2)(E)'s exception for statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy."  This exception can only apply if the Court finds "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013) (citation omitted).  Even if the government could establish a conspiracy between Lucha and any of the authors of the messages found on these Massachusetts-recovered phones (which it cannot), this "idle chatter" about firearms could not be construed as "in furtherance of" a conspiracy to transport firearms without the requisite licenses.  *United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980).

*     *     *

None of the government's proffered evidence of the Massachusetts arrest is relevant direct evidence of the charged conduct here.  And this is not a circumstance where the proffered evidence, viewed as a whole, is more than the sum of its parts.  The government seeks to introduce details about the Massachusetts arrest and then ask the jury to use these details to make inference after inference unsupported by actual evidence connected to the crimes that are charged.  While "a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation."  *Pauling*, 924 F.3d at 659 (quoting *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001)).  The Massachusetts arrest can only be connected to the charged conduct through impermissible speculation; it is irrelevant as direct evidence and should be excluded at trial.

### B.  This Arrest Is Inadmissible Propensity Evidence Under Rule 404(b).

The Massachusetts arrest is also inadmissible "other act" evidence under Rule 404(b) for the reasons discussed above and in the defense's motion *in limine*.  *See* Def. Mot. at 10–11.  As in its deficient Rule 404(b) notice, the government's motion includes a rote laundry list of possible purposes for

admission with only the barest of justifications for any of them.  For instance, the government attempts to connect the Massachusetts arrest to an alleged "motive" for Lucha and others to purchase firearms "in order to be prepared for their military-style training."  Gov't Mot. at 14.  Yet this proffer of relevance collapses with the smallest scrutiny.  The training the government refers to took place in July 2021.  The government cannot explain why this event would serve as a motive to receive a firearm (let alone to do so from outside of New York) in the fall of 2020.  *See Chambers*, 800 F. App'x at 45; *United States v. Campos*, 763 F. App'x 97, 100 (2d Cir. 2019) (district court properly excluded proposed defense witness's testimony as irrelevant because witness's participation in conspiracy post-dated defendant's participation in conspiracy).  The Massachusetts arrest is no more admissible as Rule 404(b) evidence than it is as direct evidence.

### C.  <u>This Arrest Is Inadmissible Under Rule 403.</u>

Evidence and testimony regarding the Massachusetts arrest is also inadmissible under Rule 403 because of its unduly prejudicial effect and potential to mislead the jury, which substantially outweighs any possible probative value it could have.  *See Kaplan*, 490 F.3d at 122 ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming." (quoting *United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.)).

Evidence of the circumstances of the Massachusetts arrest is highly inflammatory and could lead a jury to conclude that Lucha should be punished for his conduct during that offense even without proof he violated § 922(a)(3).  As the government acknowledges, the Second Circuit considers whether conduct is "more sensational or disturbing than the crimes with which [the defendant was] charged" in assessing whether evidence should be excluded under Rule 403.  Gov't Mot. at 7 (quoting *United States v. Pitre*,

A000336

960 F.2d 1112, 1120 (2d Cir. 1992)). The government's own motion illustrates the irrelevant details about the Massachusetts arrest that the government would seek to put before the jury—all more "sensational [and] disturbing" than transport of firearms without the requisite licenses. *See* Gov't Mot. at 3 (individuals arrested in Massachusetts "were armed and dressed in camouflage uniforms and ballistic vests," had "over ten firearms with them, including military-style rifles and handguns; over a thousand rounds of ammunition; over two dozen magazines, including a loaded, large-capacity drum magazine; and other equipment, including night vision goggles"); *id.* at 4 ("What began as a simple traffic stop turned into an hours-long standoff between the [co-conspirators] and Massachusetts law enforcement").[3]

Even the government's cited authority (*see* Gov't Mot. at 14) recognizes that such "gratuitous" detail of uncharged acts should not be admitted under Rule 403. *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995). In *Gelzer*, the Second Circuit affirmed the admission of circumstantial evidence about an uncharged robbery, offered to connect a defendant to possession of a gun during the charged crime. *Id.* The court cited with approval the fact that the government, in admitting this evidence, "did not set out to elicit gratuitous testimony" about the prior uncharged crime. *Id.* Instead, the evidence elicited was "the minimum required to achieve the legitimate probative ends of this evidence." *Id.*

The government shows no such restraint here. Its motion instead makes clear that the government intends to make this Southern District of New York trial almost entirely about the Massachusetts arrest, by introducing:

- Testimony from multiple Massachusetts officers about the arrest.
- Video of the scene of the arrest.

---

[3] *See also* Gov't Mot. at 12 (referring to Lucha "wearing camouflage and body armor" "in the course of a discussion about law enforcement's attempt to convince the [co-conspirators] to surrender their firearms"); *id.* at 13 (describing texts with "packing list for Operation Fountainhead, which included firearms, ammunition, and other military equipment," "discuss[ions of] plans to engage in training modeled after the military," and statements about "us[ing] 'blank-firing-adapters for your training event in July' to 'practice firing and maneuvering against each other [and] [p]ractice ambushes, assault fighting positions etc.'").

A000337

- Photographs of the firearms that were seized as a result of the arrest.
- Photographs of the individuals arrested and what they were wearing.
- Clips of body-worn camera worn by Jamhal Latimer and still images from those clips.
- Phone message conversations (which do not include Lucha), notes, and internet searches recovered from the phones of individuals (other than Lucha) arrested during the Massachusetts incident.

*See* Gov't Mot. at 14.  Making this trial about the Massachusetts arrest creates a serious risk that the jury will convict Lucha for conduct not tied to his receipt of a firearm in New York without proper licenses. *See United States v. Hernandez*, 859 F.3d 817, 823 (9th Cir. 2017).

Making this trial about Lucha's Massachusetts arrest also risks turning the case into a "mini-trial" on the merits of the pending Massachusetts charges that Lucha faces as a result of this arrest.  *United States v. Fama*, 2012 WL 6094135, at *1 (E.D.N.Y. Dec. 7, 2012) (excluding proffered evidence as both irrelevant and inadmissible under Rule 403 because "[a]llowing [defendant] to inquire about [alleged instances of abuse] could mislead the jury and confuse the actual issues . . . and having a 'mini-trial' about the purported abuses would result in undue delay and would be a waste of time.").

Introducing such irrelevant evidence in this case would waste the jury and the Court's time.  The government's motion should be denied, and evidence and testimony concerning the Massachusetts arrest should be excluded.

## 2.  Vereen's Gun Purchases Are Inadmissible.

By superseding with a Conspiracy charge just over a month before trial, the government now wishes to introduce evidence at trial of 24 additional firearms purchased by Keith Vereen. Only, as detailed in the defense's motions *in limine* (at 11–13), these firearms have no connection to Lucha.  Lucha did not provide money for these firearms.  He did not engage in any discussion about these other firearms.  He never possessed these other firearms.

The government's proffered evidence around four specific dates in 2020 only highlights the speculative nature of this evidence and why it should not be considered by the jury.  The government

9

details four trips that Vereen took between South Carolina and the Bronx in 2020. Vereen purchased firearms in South Carolina prior to each trip for a total of 17 firearms purchased before his trips to New York. The government proffers no text messages, phone calls, or alleged statements by Lucha connecting him to or even revealing his knowledge of Vereen's 17 firearms beyond the single one he possessed on June 23, 2021. And the government makes no effort to explain why the Court should consider an additional 8 firearms purchased by Vereen outside of the four specific dates.

The government would again require the jury to draw a series of impermissible inferences to render the proposed evidence relevant to the charged conduct. The jury would have to infer from physical proximity and phone calls/messages with no content that Lucha and Vereen had as specific agreement to receive firearms in New York and that Lucha was aware of the nature and scope of this agreement beyond the single firearm that Lucha possessed. *See United States v. Torres*, 604 F.3d 58, 65, 70 (2d Cir. 2010). The inferential leaps required based on the produced and proffered evidence are too great. *See Pauling*, 924 F.3d at 657.

The speculative link between Lucha and Vereen's 24 other firearms nullifies the government's assertion that these firearms are "inextricably intertwined" with the conspiracy involving Lucha, or are part of the "same transaction or series of transactions," or are necessary to "complete the story" of this conspiracy. Much more evidence than what the government can provide would be necessary for these assertions to ring true. And certainly, the government has identified dozens of witnesses and hundreds of documents that it can draw on to tell the story of a single conspiracy to unlawfully receive a firearm obtained out of state into New York.

Finally, the danger in admitting two dozen firearms purchased by Vereen with only a speculative connection to Lucha is that the jury will be blinded by Vereen's repeated and unrelated bad conduct and convict Lucha for the conduct of someone he knows instead of his conduct as proven by the Government

A000339

through probative facts.  Because the risk of undue prejudice far outweighs any potential probative value of the proposed evidence of 24 guns, this evidence must be precluded.

**3. The Court should preclude Andrew Petersohn's proposed expert testimony or hold a *Daubert* hearing.**

On July 28, the government noticed its intent to call Andrew Petersohn as an expert in cell site location data, to opine on the "likely approximate location" of Lucha's phone and the phone of other individuals the government claims are part of the conspiracy charged in Count I. On August 4, the defense requested additional information concerning Mr. Petersohn's proposed testimony, specifically the "draft maps and other reports" that would support his testimony.  On August 16, after the initial *motions in limine* deadline had passed, the Government responded to this request with a proposed PowerPoint and maps further clarifying Mr. Petersohn's anticipated testimony—and the serious problems with it. Mr. Petersohn's proposed testimony is necessarily based on unvalidated information and methodologies and runs afoul of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and his proposed visual aids will only serve to mislead the jury.  This Court, as the gatekeeper for scientific evidence, must exclude this testimony or risk the jury basing their decision on conjecture dressed up as science.

### A. <u>Historical Cell Site Location Information is Not Reliable</u>

A trial judge must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  "Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error … and the existence and maintenance of standards controlling the technique's operation." *Id.* at 594 (citations omitted). Any *Daubert* assessment "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

With these principles in mind, the government seeks to elicit testimony from Mr. Petersohn on the

"likely approximate location" of various cellphones at various points in time based on historical cell site location information (HCSLI) showing which cell sites or towers were used at a particular time. This information is contained in call detail reports (CDRs) gathered by cellular companies.  While Mr. Petersohn's background in engineering would allow him to appropriately opine on some subject matters, he should not be permitted to opine on the location of anyone based on the information in CDRs because he cannot reasonably rely on the information in these reports.

Cellular companies never gathered the information in CDRs with the expectation that this information would later be used for precise location information or for law enforcement purposes. Perhaps for these reasons "[n]either cellular carriers nor the Federal Communications Commission (FCC), … has documented error rates or validation methodologies for CDR or CSLI records." *See* Victoria Saxe, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence*, 19 U.N.H. L. Rev. 133, at *142 (2020).  For example, CDRs are not standardized or otherwise monitored for accuracy.  Any change in a cell tower to which a cellphone connects during any given call is not necessarily included in the CDR. Maps using CDR are based on the assumption that cell phones register to the nearest tower, which is just not true.  Rather, "multiple factors can affect the signal strength of a tower" such as network traffic, the weather, or topography.  *See United States v. Evans*, 892 F. Supp. 2d 949, 952 (N.D. Ill. 2012); *See also Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014).  *See* Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone,* 18 Rich. J.L. & Tech. 3, at *7 (Fall 2011) (listing factors like tower location, geography, and terrain that can affect signal strength).

Simply put, there is no way to reliably use a cell phone's interaction with a specific cell tower to accurately determine or approximate the cell phone user's location. Despite these limitations, juries may be inclined to view HCSLI in a similar category as Global Positioning System (GPS) data, which is and

A000341

was designed to be a reliable indicator of location.  Given the unreliability of the data on which Mr. Petersohn's testimony would be based, this Court should preclude his testimony.  *See Evans*, 892 F. Supp. 2d at 955-57 (precluding expert from testifying about granulization theory because the method was unreliable and based on the inaccurate assumption that cellphones connect to the towers closes to them). *See also United States v. Sepulveda*, 115 F.3d 882, 891 (11th Cir. 1997) (rejecting expert testimony that "bouncing occurred primarily during rush hours totaling approximately four hours per day.  The evidence provided no basis from which to estimate the proportion of the calls that occurred within those times and no basis from which to determine which sector was busier and thus more likely to divert calls to the other").

**B.  B. Mr. Petersohn's Proposed Maps Are Misleading and Confusing and Must Be Excluded**

If the Court permits any testimony by Mr. Petersohn, he should not be permitted to use the maps imbedded in his proposed PowerPoint presentation, attached as Ex. I.[4]  The maps have little verbal explanation of what is depicted, provide no measurements, and contain shading and arrows that would confuse and mislead the jury.  For example, the map on page 16 purports to show "cell site locations" utilized on different days by Vereen and Lucha.  But the map itself has shaded areas covering multiple blocks that are much larger than a single cell site location, shaded areas of various sizes without explanation, overlapping shaded areas for different devices, and arrows pointing to particular areas within each shaded area representing particular devices at particular times.  The shading and arrows are misleading in that they suggest the ability of HSCLI to locate particular devices in a certain location and within a certain distance and area of the tower—a type of precision that is beyond the capabilities of HSCLI. For this reason, misleading shading in the presentation of HSCLI has been rejected by courts in this district.  *United States v. Cantoni,* No. 18 Cr. 562 (ENV) (E.D.N.Y. March 19, 2019), Dkt. 47 at 2

---

[4] Maps are located on pages 10, 12, 16, 17, 21, 24, and 27.

A000342

(The government was directed to remove shading from its cell site trial exhibits to "avoid any confusion that [shaded sectors] might also suggest distance as well as direction"); *See* Tr., *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Feb. 22, 2022); Dkt 404 at 15-18 (Court questioned the government on its misleading use of circles and directed to do more work to clarify their maps).

**4.   The Defense Does Not Intend to Argue That § 922(a)(3) Is Unconstitutional.[5]**

The government seeks to preclude the defense from "calling into question the constitutionality of" § 922(a)(3).  Gov't Mot. at 20; *see also id.* at 1 (government seeking to preclude "[a]rgument that the defendant's receipt of firearms was not, or should not have been, unlawful under the Second Amendment.").  The defense does not intend to argue to the jury that § 922(a)(3) is unconstitutional or that actions that violate § 922(a)(3) should be legal.[6]  The defense also certainly does not intend to encourage jury nullification.  *See* Gov't Mot. at 21.  The government's motion *in limine* should therefore be denied as moot.

**5.   The Defense Does Not Intend to Cross-Examine Officer Smalls or Massachusetts Officers on the Identified Topics.**

Finally, the government "seeks to preclude cross-examination regarding (1) Officer Small's prior testimony in a suppression hearing" in an earlier case and "(2) the defendant's lawsuit accusing officers who participated in the Massachusetts Arrest of color-of-law violations."  Gov't Mot. at 15.  The defense does not intend to cross-examine Officer Smalls or any Massachusetts officers permitted to testify on these identified topics.  This motion *in limine* from the government should therefore also be denied as moot.

---

[5]      While the defense will not argue that 922(a)(3) is unconstitutional under the Second Amendment, Lucha's good faith belief regarding the Second Amendment is nonetheless relevant to whether the government can prove beyond a reasonable doubt that he "willfully" violated the statute.

[6]      The defense rejects the government's characterization of these arguments as "meritless," however. Gov't Mot. at 20.  Further, as described in the defense's motion *in limine*, *see* Def. Mot. at 14, if the Court permits the government to present evidence of New York's licensing scheme, the Court should allow the defense to discuss the constitutional challenges to New York's licensing scheme that resulted in the Supreme Court invalidating that licensing scheme in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

A000343

**<u>CONCLUSION</u>**

For the above-stated reasons, the government's motions *in limine* should be denied.


Dated:  August 21, 2023           Respectfully submitted,
       New York, New York

                                      _____*/s/*_____

                                      Zawadi Baharanyi, Esq.
                                      Amanda Mayo, Esq.
                                      Federal Defenders of New York
                                      52 Duane Street, 10th Floor
                                      New York, NY 10038
                                      (917) 612-2753

15

A000344

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

STEVEN PEREZ,
      a/k/a "Lucha,"

               *Defendant*.

S1 22 Cr. 644 (JSR)

# THE GOVERNMENT'S OPPOSITION TO
## THE DEFENDANT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ashley C. Nicolas
Madison Reddick Smyser
Sarah Mortazavi
Assistant United States Attorneys
    *Of Counsel*

A000345

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ...................................................................................... 1

I.    The Court Should Deny the Defendant's Motion to Preclude Evidence of the Massachusetts Arrest .......................................... 1

    A.  The Massachusetts Arrest Is Admissible as Direct Proof of the Charged Crimes .................................................................. 1

    B.  The Massachusetts Arrest Is Admissible in the Alternative Under Rule 404(b) ................................................................... 7

II.    The Court Should Deny the Defendant's Motion to Preclude Evidence of Vereen's Gun Purchases .......................................... 10

III.    The Court Should Deny the Defendant's Motion to Preclude Evidence of His Lack of a New York Firearms License ............................. 12

IV.    The Court Should Deny the Defendant's Motion to Preclude Expert Testimony from Special Agent Lennea Gordon .............................. 14

    A.  SA Gordon's Anticipated Testimony Will Be Relevant and Helpful to the Jury ................................................................... 17

    B.  SA Gordon Is Qualified to Provide Expert Testimony ......................... 18

    C.  SA Gordon's Anticipated Testimony Is Admissible as Lay Witness Testimony ................................................................. 20

CONCLUSION ................................................................................... 23

A000346

## TABLE OF AUTHORITIES

**Cases**

*Costantino v. Herzog*,
  203 F.3d 164 (2d Cir. 2000)................................................................... 6

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)........................................................................... 19

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)....................................................................... 13

*United States v. Avenatti*,
  No. 19 Cr. 374 (JMF), 2022 WL 103298 (S.D.N.Y. Jan. 11, 2022)......................................... 16

*United States v. Ayala-Pizarro*,
  407 F.3d 25 (1st Cir. 2005).................................................................. 20

*United States v. Balde*,
  No. 16 Cr. 130 (KPF) (S.D.N.Y. Apr. 6, 2020)................................................. 13

*United States v. Baez*,
  349 F.3d 90 (2d Cir. 2003).................................................................... 8

*United States v. Bryan*,
  524 U.S. 184 (1998).......................................................................... 13

*United States v. Carboni*,
  204 F.3d 39 (2d Cir. 2000).................................................................... 2

*United States v. Chan*,
  No. 197 Cr. 1053 (PKL), 2002 WL 46994 (S.D.N.Y. Jan. 14, 2002) ........................................ 9

*United States v. De Jesus Sierra*,
  629 F. App'x 99 (2d Cir. 2015) .............................................................. 21

*United States v. Diakhoumpa*,
  171 F. Supp. 3d 148 (S.D.N.Y. 2016)........................................................ 20

*United States v. Diaz*,
  176 F.3d 52 (2d Cir. 1999)................................................................... 7

ii

*United States v. Duncan,*

    42 F.3d 97 (2d Cir. 1994) ........................................................................... 21

*United States v. Figueroa,*

    618 F.2d 934 (2d Cir. 1980).......................................................................... 6

*United States v. Garcia,*

    413 F.3d 201 (2d Cir. 2005).......................................................................... 21

*United States v. Gonzales,*

    110 F.3d 936 (2d Cir. 1997).................................................................... 8, 10

*United States v. Hamilton,*

    538 F.3d 162 (2d Cir. 2008).......................................................................... 22

*United States v. Livoti,*

    196 F.3d 322 (2d Cir. 1999).......................................................................... 6

*United States v. Lopez,*

    547 F.3d 364 (2d Cir. 2008).......................................................................... 18

*United States v. Malka,*

    623 F. Supp. 3d 306 (S.D.N.Y. 2022)........................................................... 12

*United States v. Martoma,*

    No. 12 Cr. 973 (PGG), 2014 WL 31213 (S.D.N.Y. Jan. 6, 2014).............. 8

*United States v. Mejia,*

    545 F.3d 179 (2d Cir. 2008).......................................................................... 18

*United States v. Milstein,*

    401 F.3d 53 (2d Cir. 2005)............................................................................ 11

*United States v. Mitchell,*

    328 F.3d 77 (2d Cir. 2003)............................................................................ 17

*United States v. Nachamie,*

    91 F. Supp. 2d 565 (S.D.N.Y. 2000)............................................................ 9

*United Staes v. Ojeikere,*

    299 F. Supp. 2d 254 (S.D.N.Y. 2004)........................................................... 10

*United States v. Phillips,*

    952 F.2d 591 (1st Cir. 1991)......................................................................... 17

iii

A000348

*United States v. Ray*,

    585 F. Supp. 3d 445 (S.D.N.Y. 2022) ...................................................... 3

*United States v. Rigas*,

    490 F.3d 208 (2d Cir. 2007) .................................................................... 22

*United States v. Roldan-Zapata*,

    916 F.2d 795 (2d Cir. 1990) ...................................................................... 6

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*,

    828 F. Supp. 2d 698 (S.D.N.Y. 2011) .................................................... 21

*United States v. Santiago*,

    199 F.Supp. 2d 101 (S.D.N.Y.2002) ...................................................... 19

*United States v. Schwartz*,

    924 F.2d 410 (2d Cir. 1991) .................................................................... 18

*United States v. Thomas*,

    116 F.3d 606 (2d Cir. 1997) .................................................................... 13

*United States v. Towne*,

    870 F.2d 880 (2d Cir. 1989) ...................................................................... 8

*United States v. Williams*,

    506 F.3d 151 (2d Cir. 2007) .................................................................... 19

*United States v. Yannotti*,

    541 F.3d 112 (2d Cir. 2008) .................................................................... 21

## **Statutes**

18 U.S.C. § 922(a)(3) ................................................................. 1, 12, 13, 17

18 U.S.C. § 922(g)(5) ............................................................................ 14

## **Rules**

Fed. R. Evid. 401(a) ................................................................................ 3

Fed. R. Evid. 404(b)(3)(A) ...................................................................... 8

Fed. R. Evid. 701 ............................................................................ 20, 21

iv

A000349

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motions *in limine* filed by defendant Steven Perez, a/k/a "Lucha," to preclude the Government from introducing (i) evidence of the defendant's July 3, 2021 arrest in Massachusetts, (Dkt. 56 ("Def. Mot.") 2–11); (ii) evidence of gun purchases made by Keith Vereen, the defendant's co-conspirator, from in or about May 2020 through in or about November 2020, (*id.* at 11–13); (iii) evidence of the defendant's lack of a New York State firearms license, (*id.* at 13–14); and (iv) testimony from Special Agent Lennea Gordon, one of the Government's proposed expert witnesses, (*id.* at 14–19). For the reasons set forth below, these motions are without merit, and should be denied.

## ARGUMENT

### I.    The Court Should Deny the Defendant's Motion to Preclude Evidence of the Massachusetts Arrest

The defendant argues that the Government should be precluded from introducing any evidence of his July 3, 2021 arrest in Massachusetts (the "Massachusetts Arrest") because it is "not relevant to whether Lucha unlawfully received a firearm in his state of residence" and is unduly prejudicial. (Def. Mot. 2). But as set forth in the Government's motions *in limine*, evidence of the Massachusetts arrest is crucial direct evidence that the defendant participated in a conspiracy to violate 18 U.S.C. § 922(a)(3). (*See* Dkt. 57 ("Gov't Mot.") 11–14). Evidence of the Massachusetts Arrest is admissible in the alternative under Rule 404(b).

#### A.    The Massachusetts Arrest Is Admissible as Direct Proof of the Charged Crimes

As described in the Government's motions *in limine*, the circumstances of the Massachusetts Arrest are direct evidence of the defendant's participation in a conspiracy to unlawfully receive firearms that were obtained outside of New York, as they are "inextricably

intertwined" with, and help "complete the story" of, this conspiracy. *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citation omitted). During the July 3, 2021 Massachusetts Arrest, the defendant, as well as eight others (the "co-conspirators" or "CCs") were driving from Rhode Island to "Operation Fountainhead" in Maine to engage in military training exercises. Law enforcement officers approached the defendant and his co-conspirators while their vehicle was pulled over on I-95, intending to render assistance. The encounter then turned into an armed standoff when the defendant and the CCs refused to disarm, ultimately resulting in their arrest. One of the CCs was Lamar Dow, a/k/a "Jamil Bey" ("Bey"), a New York resident who, like the defendant, sent money to Vereen before Vereen purchased firearms in South Carolina and traveled to New York, and who communicated with the defendant around the time of these trips. Following the arrest, Massachusetts law enforcement seized over ten firearms, including one purchased by Vereen ("Firearm-2"); over one thousand rounds of ammunition; over two dozen magazines; a number of ballistics vests, including from the defendant; and other military equipment.

The Massachusetts Arrest is direct evidence of the charged crimes because it shows (i) the extent of the defendant's relationship with Vereen and his collaboration with Vereen as a reliable source of guns; (ii) the scope of the conspiracy, including the defendant's relationships with other co-conspirators, such as Bey; and (iii) the defendant's motive for obtaining guns—namely, to bring the firearms to Operation Fountainhead to engage in military training exercises with the other CCs. (*See* Gov't Mot. at 12–14).

The defendant argues that evidence from the Massachusetts Arrest is not admissible for a variety of reasons. First, he claims that such evidence is not relevant to either of the charged crimes. (Def. Mot. 4–5). That contention is patently wrong. Under Federal of Evidence 401, evidence is relevant if "it has *any* tendency to make a fact more or less probable than it would be

2

A000351

without the evidence" and "the fact is of consequence in determining the action," Fed. R. Evid. 401(a)–(b) (emphasis added)—which is a "relatively low bar." *United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) (citation omitted).  Evidence from the Massachusetts Arrest, including the seizure of a firearm purchased by Vereen, and the defendant and Bey's role in obtaining firearms for the CCs, as evidenced through their interactions during the standoff, clears that low bar, insofar as it has a tendency to make it more probable that the defendant agreed with others to receive firearms in resident states that were obtained by Vereen in South Carolina, and subsequently transported.  Further, evidence that the defendant was arrested on two occasions with guns he had obtained from Vereen tends to show the extent of the defendant's relationship with Vereen, his knowledge of where the guns were sourced, and his indifference to the legality of the manner in which he obtained the firearms.

The defendant further claims that evidence of the Massachusetts Arrest is not relevant because "the government does not claim that [the defendant] joined a conspiracy to form a militia or a conspiracy to possess firearms," and because there is no evidence that the defendant or others arrested in Massachusetts were residents of that state.  (Def. Mot. 4–5).  But in fact, the defendant is charged with a conspiracy: Count One of the Superseding Indictment charges the defendant in a conspiracy to "transport into and receive in the State in which a person resided firearms purchased . . . outside that State" without the proper licenses.  (Dkt. 54 ¶ 2).  And the circumstances of the Massachusetts Arrest and the preparation and attempted execution of "Operation Fountainhead" are direct proof of the existence of the charged conspiracy, the defendant's need for guns, and the defendant's willingness to help others like Bey obtain guns from other states, all of which are germane to Count One.  Further, in light of the circumstances of the defendant's arrest in the Bronx in possession of Firearm-1, the defendant's coordination with the CCs to transport

3

A000352

Firearm-2, which was similarly purchased by Vereen in South Carolina, is persuasive evidence that the defendant had earlier received that firearm in New York—his state of residency—and traveled with it to Massachusetts.  The Government need not demonstrate that the CCs were residents of Massachusetts in order to show the relevance of the Massachusetts Arrest to the charged conspiracy.

The defendant further claims that "none of the Massachusetts firearms are at issue in this case," (Def. Mot. 4), and that there was no "connection between any of the firearms recovered during the arrest and" the defendant, (*id.* at 6),[1] an argument that simply misapprehends the Government's proof.  Firearm-2 is direct evidence of the defendant's participation in a conspiracy to obtain firearms from out-of-state, given that Firearm-2, like Firearm-1, was obtained from Vereen, the defendant's contact and straw purchaser who frequently communicated with the defendant, received money from the defendant, and had met with the defendant after purchasing guns in South Carolina and traveling to New York.  Moreover, the other firearms recovered during the Massachusetts Arrest are helpful conspiracy evidence.  For example, the Government expects the evidence at trial will show that, during the standoff in Massachusetts, the group's leader, Jamal Latimer, a/k/a "Jahmal Abdullah Bey" ("Latimer"), asked the defendant and Bey if the group's guns were "stolen," and the two confirmed they were not.  (*See* Gov't Mot., Ex. A at 0:30-0:38).  This interaction shows that (i) the defendant and Bey had obtained the guns for the group, and (ii)

---

[1] To the extent the defendant is arguing that none of the firearms seized in Massachusetts are "connected" to him because he was not carrying a firearm at the time of his arrest, that claim is misleading.  Body camera footage from Jamal Latimer, a/k/a "Jahmal Abdullah Bey," shows that the defendant handled multiple guns during the standoff.  (*See* Ex. A).  The same is true of other CCs, indicating that these guns were communal guns to be shared among the CCs.  That the defendant was unarmed when he surrendered following the standoff is inapposite given that the defendant and the CCs were instructed to leave their firearms, including Firearm-2, in their vehicles.

4

the defendant knew that the guns had been purchased from a store, and not "stolen" from an individual.  This interaction indicates that the defendant and Bey had obtained the other seized guns in the same manner in which the defendant obtained Firearm-1 and Firearm-2.

The defendant separately argues that all evidence of the Massachusetts Arrest should be precluded as prejudicial under Rule 403, claiming that this evidence is "minimally probative" because none of the guns were "traced" to New York and "only one firearm" (*i.e.*, Firearm-2) was connected to Vereen, and that such evidence otherwise risks turning this case into a "'multi-ringed sideshow of mini-trials on collateral issues' of the still-pending Massachusetts action against Lucha."[2]  (Def. Mot. 7–10).

The evidence, however, has significant probative value.  Despite the defendant's contention that the seized firearms cannot be "traced" to New York, the defendant's possession of these firearms in Massachusetts, particularly Firearm-2, tends to prove that he and Bey—both New York State residents who apparently sourced these firearms for Operation Fountainhead—received the guns in New York before traveling with them to attend Operation Fountainhead.  Further, the defendant cannot diminish the substantial probative value of Firearm-2 by simply stating that it was the "only" firearm purchased by Vereen.  The fact that *any* firearm purchased by Vereen was seized during the Massachusetts Arrest is important proof that the defendant was engaged in a conspiracy to obtain firearms from outside his state of residence.

In addition, the Government does not intend to create a "mini-trial" about the Massachusetts Arrest, nor to unnecessarily dwell on the footage of the arrest.  Rather, the

---

[2] The Court should place limited weight on the fact that the defendant's Massachusetts charges are still pending.  The trial in Massachusetts has been adjourned because of the defendant's actions, even after this trial was adjourned in order to accommodate a May trial date in Massachusetts.

5

Government intends to introduce a limited, targeted set of evidence from the arrest, including less than five minutes of excerpted body-worn camera ("BWC") footage from a responding officer; less than five minutes of excerpted BWC footage from a co-conspirator, which captures statements from the defendant relevant to the charges; physical evidence seized from the scene; a small number of photographs from the scene; and evidence from several cellphones seized from the scene.  Further limiting potential prejudice, the Government intends to introduce evidence of the peaceful resolution of the standoff, and does not intend to put at issue the ideology of those traveling with the defendant beyond what is captured on BWC footage and is on the cellphones.

Given the planned use of this evidence, its probative value is not substantially outweighed by its risks.  All evidence of guilt is prejudicial to some extent, but preclusion under Rule 403 demands that proof be "*unfairly*" prejudicial.  *Costantino v. Herzog*, 203 F.3d 164, 175 (2d Cir. 2000); *see United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence").  Evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged.  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]").  The Massachusetts Arrest evidence is powerful proof of the charged crimes, for the reasons described above, and the nature of the event is no more prejudicial than the gravamen of the charges, namely, transporting, and conspiring to transport, firearms across state lines.

Further, as noted above, the Government's evidence does not purport to suggest that the defendant or the CCs opened fire or engaged in any acts of violence, beyond their refusing to

A000355

disarm, nor does the Government seek to introduce "irrelevant and inaccurate evidence concerning the beliefs" of the defendants and the CCs. (Def. Mot. at 7–8). Far from a sideshow, the facts of the Massachusetts Arrest, including who was arrested, what was recovered, and what was communicated, are key to proving the defendant's participation in the conspiracy. Indeed, the proffered evidence here is far *less* prejudicial than that previously approved by the Second Circuit. *See United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (permitting Government to offer evidence of the defendant's gang affiliation because such evidence would "help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed" (citation omitted)).

**B.     The Massachusetts Arrest Is Admissible in the Alternative Under Rule 404(b)**

In the alternative, evidence of the Massachusetts Arrest is admissible under Rule 404(b) to show his intent, knowledge, motive, common plan and scheme, and absence of mistake or accident with respect to each of the charged offenses. As described in the Government's motions *in limine*, this evidence shows that the defendant intended to receive guns from out of state, that he understood the origin of those guns, and—as relevant to the substantive charge—that his possession of a gun ("Firearm-1") in the Bronx from Vereen was not a mistake. (Gov't Mot. 14).

The defendant argues that proof of the Massachusetts Arrest, to the extent it is not direct evidence, should be separately precluded under Rule 404(b) because it was improperly noticed. (Def. Mot. 10–11). This is hardly a basis for preclusion. First and foremost, as laid out in the Government's Rule 404(b) notice, its motions *in limine*, and in the arguments herein, evidence of the Massachusetts Arrest is direct evidence of the charged conspiracy, and the Court should admit

it on that basis.[3]  "[E]vidence of uncharged criminal activity is not considered 'other crimes' evidence under [Rule] 404(b) if it 'arose out of the same transaction or series of transaction as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'"  *United States v. Gonzales*, 110 F.3d 936, 942 (2d Cir. 1997) (brackets omitted) (quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)).  That is particularly true in conspiracy cases, where the Second Circuit has held that "admission of evidence of uncharged criminal activity is not considered other-crimes evidence subject to [Rule] 404(b)."  *United States v. Baez*, 349 F.3d 90, 93–94 (2d Cir. 2003).  As the Government stated in its Rule 404(b) notice, the Massachusetts Arrest evidence "is admissible as direct evidence of the charged offenses because, among other reasons, it bears directly on the scope of the defendant's conduct and his agreement with others to commit the crimes, as well as his intent," and it provides "necessary background and context of the relationship between members of the conspiracy and the charged offenses."  (Def. Mot., Ex. A at 1).

The Government's notice to the defendant stated that the Massachusetts arrest was direct proof of the charged conspiracy, but acknowledged, in an abundance of caution, that the arrest was nonetheless admissible under Rule 404(b) as evidence of the defendant's "motive, intent, plan, knowledge, absence of mistake, or lack of accident[.]"  (Def. Mot., Ex. A at 1–2).  That notice was sufficient for Rule 404(b) purposes.  Rule 404(b) requires only that the Government provide "reasonable notice" of evidence it intends to offer, "so that the defendant has a fair opportunity to meet it."  Fed. R. Evid. 404(b)(3)(A).  "[R]easonable notice" under the rule is "determined by the circumstances of the case[,]" *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31213,

---

[3] The Government reiterated its view that the Massachusetts Arrest evidence was direct evidence of the charged crimes in a phone call with defense counsel on or about August 4, 2023.

at *2 (S.D.N.Y. Jan. 6, 2014) (citation omitted), and such a determination is committed to the Court's sound discretion, *United States v. Nachamie*, 91 F. Supp. 2d 565, 577 (S.D.N.Y. 2000). The Government's Rule 404(b) notice was reasonable here.  It identified the evidence that the Government may offer under the rule, specifically, evidence related to the defendant's July 3, 2021 arrest in Massachusetts with the CCs, including the firearms, ammunition, and other military items that the group possessed during the standoff.  (Def. Mot., Ex. A at 1).  The notice also identified the purposes for which the Government may seek to offer the evidence, including to show the defendant's opportunity, intent, plan, knowledge, absence of mistake, and lack of accident.  (*Id.*).

The defendant takes issue with the fulsome nature of the Government's notice, arguing that the notice cites "nearly every purpose in the Rule." (Def. Mot. at 10).  A multi-pronged enumeration of the Government's reasons for offering "other acts" evidence is no reason to find the notice deficient.  This is particularly so given that the Government's motivation for offering evidence "often changes as the proof crystallizes or as possible defenses are revealed at trial." *United States v. Chan*, No. 197 Cr. 1053 (PKL), 2002 WL 46994, at *2 (S.D.N.Y. Jan. 14, 2002) (internal quotation marks and citation omitted) (opining in the context of the "timetable" for providing Rule 404(b) notice).  The Government's notice, which was provided approximately one month before trial, provided the defendant with a reasonable opportunity to meet the evidence, as required under the rule.  In light of the challenges in anticipating all purported defenses at trial, expansive notice is no basis to reject otherwise-admissible evidence.

To the extent the notice was deficient, the defendant has suffered no prejudice.  In the Government's motions *in limine*, the defendant received an even more fulsome articulation of the evidence the Government intends to introduce at trial, the purposes for which it will offer that evidence under Rule 404(b) if such evidence is not admitted as direct evidence, and the reasons

9

why the evidence serves such purposes under Rule 404(b).  (*See* Gov't Mot. at 14).  These motions were filed two weeks before trial, and "[c]ourts in this Circuit have routinely found that at least ten business days provides reasonable notice to a defendant under Rule 404(b)."  *United Staes v. Ojeikere*, 299 F. Supp. 2d 254, 257 (S.D.N.Y. 2004).

In sum, proof of the Massachusetts Arrest should be admitted at trial.

## II.    The Court Should Deny the Defendant's Motion to Preclude Evidence of Vereen's Gun Purchases

The defendant argues that the Court should preclude evidence that Vereen, the defendant's co-conspirator, purchased approximately 25 guns in South Carolina from in or about May 2020 through in or about November 2020.  (Def. Mot. 11–13).  Like the Massachusetts Arrest, evidence of Vereen's gun purchases is admissible as direct evidence.  Alternatively, it is admissible under Rule 404(b) to show the defendant's knowledge and intent.

As set forth in the Government's motions *in limine*, the full extent of Vereen's gun purchases is admissible as direct evidence because it "arose out of the same transaction or series of transactions as the charged offense," is "inextricably intertwined with the evidence regarding the charged offense," and is "necessary to complete the story of the crime on trial."  *Gonzalez*, 110 F.3d at 942 (brackets omitted) (quoting *Towne*, 870 F.2d at 886); (*see also* Gov't Mot. 7–10). Between September 2020 and November 2020, Vereen took four round-trips between New York and South Carolina.  Before each of these trips, he purchased firearms in South Carolina.  Shortly thereafter, he traveled to the Bronx, and during those trips, he often communicated with the defendant.  Cellsite location information establishes that Vereen met with the defendant and, at times, Bey, in New York.  The evidence therefore shows that these firearms purchases and four subsequent trips were to deliver firearms to the defendant and/or Bey; consequently, evidence of Vereen's purchases immediately before these trips is directly relevant to establishing the extent of

10

Vereen's relationship with the defendant, the manner in which the defendant procured firearms, and the scope of the conspiracy.

The Government further intends to argue that trial that Vereen's earlier firearms purchases are similarly proof of the charged conspiracy. As argued above, the defendant was found in possession of Firearm-2, a gun that Vereen had purchased on or about July 23, 2020, indicating that the defendant was procuring firearms from Vereen months before the four aforementioned trips to New York. In light of this, the jury can certainly infer from this evidence that Vereen's firearms purchases were for the defendant, Bey, or other CCs. *See United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005) ("Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators[.]").

The defendant further argues that the introduction of Vereen's gun purchases is "irrelevant to the critical issue of whether Lucha willfully received firearms purchased by Vereen in his state of residence." (Def. Mot. 12) However, Vereen's status as a straw purchaser who made extensive unlawful gun purchases over the course of seven months goes directly to the issue of willfulness. That the defendant used a straw purchaser such as Vereen in order to purchase firearms from out of state and transport them to New York is powerful evidence that the defendant knew his receipt of these firearms was unlawful. Rather than obtaining the firearms himself from within New York State, the defendant enlisted Vereen, who lived hundreds of miles away, to buy firearms for the defendant and travel across multiple states to deliver them. Vereen's role as a straw purchaser for the defendant, Bey, and perhaps other CCs helps explain the service he provided within the conspiracy.

In addition, as explained in the Government's motions *in limine*, evidence of Vereen's gun purchases is alternatively admissible under Rule 404(b) to show the defendant's knowledge and

11

A000360

intent.  (Gov't Mot. 10–11).  Given the pattern the evidence will establish, namely, that Vereen's gun purchases in South Carolina are followed by trips to New York and meetings with the defendant, these purchases tend to rebut any argument that the defendant was unaware of the source of the firearms, or that obtaining them through an out-of-state straw purchaser was unlawful.  The jury can infer from the pattern of the purchases and the trips, as well as the multiple instances in which the defendant was arrested with a gun purchased by Vereen, that the defendant knew—or at minimum, consciously avoided learning—the manner in which Vereen acquired and transported these guns.

The defendant separately argues that evidence of Vereen's gun purchases is unduly prejudicial as to the defendant because the jury could convict the defendant "solely on the basis of Vereen's conduct, rather than his own conduct."  (Def. Mot. 12).  That argument is baseless. As discussed above, simply because evidence is prejudicial does not mean it is *unduly* prejudicial. Proof of the activities of a member of a charged conspiracy are persuasive proof regarding the existence of the conspiracy.  To the extent Vereen's actions are foreseeable to the defendant, the jury may properly consider that proof when rendering its verdict on Count One of the Indictment. *See United States v. Malka*, 623 F. Supp. 3d 306, 326 (S.D.N.Y. 2022).

### III.   The Court Should Deny the Defendant's Motion to Preclude Evidence of His Lack of a New York Firearms License

The defendant argues that the Court should preclude any evidence that the defendant did not possess a New York State firearms license at the time he was arrested with Firearm-1 in or about June 2021.  (Def. Mot. 13–14).  He claims that this evidence is irrelevant and unduly prejudicial because it does not establish knowledge that receiving firearms into his state of residence without being a licensed distributor, manufacturer, or collector of firearms, as criminalized by 18 U.S.C. § 922(a)(3), was unlawful.  But the defendant's lack of a New York

firearms license is relevant to the defendant's motive for procuring firearms from South Carolina and knowledge that obtaining those firearms was unlawful.

Section 922(a)(3) requires that a defendant's receipt of firearms from outside his state of residence be willful.  *See* 18 U.S.C. §§ 922(a)(3), 924(a)(1)(D); *see also United States v. Bryan*, 524 U.S. 184, 196 (1998) (Section 924(a)(1)(D) requires "knowledge that [a defendant's] conduct is unlawful").  The defendant's motions *in limine* make clear that the defendant's intent will be at issue in this trial.  (*See* Def. Mot. 13–14).  Although the defendant is not charged with unlawfully possessing a firearm, his lack of a New York firearms permit explains why the defendant had to unlawfully obtain firearms using an out-of-state straw purchaser, rather than purchasing firearms in a New York gun store.

The defendant alternatively argues that introducing evidence that he lacked a New York firearms license necessarily entitles him to discuss constitutional challenges to New York's licensing scheme.  (Def. Mot. 14).  The Court should not allow this.  The Supreme Court case that invalidated New York's licensing scheme, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), had not yet been decided at the time of the charged crimes.  Consequently, *Bruen* is wholly irrelevant to the defendant's state of mind at the time he committed the offense.  Moreover, *Bruen* relates to a legal issue that is not properly before the jury, as argued in the Government's motion *in limine*.  (*See* Gov't Mot. 19–21).  Allowing such argument would be extremely confusing to the jury and may improperly invite juror nullification, which is entirely inappropriate.  *See United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997).

The defendant's reliance on the pre-trial ruling in *United States v. Balde*, No. 20 Cr. 281 (KPF) (S.D.N.Y. Dec. 27, 2022), is unavailing.  (Def. Mot. 13).  In that case, the defendant was charged with having possessed a gun as an alien illegally and unlawfully in the United States, in

A000362

violation of 18 U.S.C. § 922(g)(5). *Balde*, No. 20 Cr. 281 (Dkt. 1). The Government sought to introduce evidence that the defendant had never applied for a license to show the defendant's knowledge that such application would be futile because he was an unlawful alien. In other words, the lack of a license showed that the defendant knew that he was an unlawful alien. The Court there held that there were "many potential reasons" for Balde's failure to apply for a license that were not related to his immigration status. *Balde*, No. 20 Cr. 281 (Dkt. 151 at 30). The Court therefore found that the licensing evidence was indicative of Balde's knowledge of his immigration status "via a series of inferences that . . . are simply too attenuated to be appropriately probative." (*Id.*).

This case is different from *Balde*. Here, the defendant's lack of a New York firearm license shows that the defendant could not legally purchase firearms himself in New York State. Unlike *Balde*, this logic is not attenuated and does not require a series of inferences. It is instead a direct cause and effect. And the fact that the defendant could not purchase firearms himself, in New York State, is of course relevant to explain why he instead illegally sourced his guns from an out-of-state straw purchaser.

For these reasons, the defendant's lack of a New York State firearms license may be properly admitted at trial.

## IV.    The Court Should Deny the Defendant's Motion to Preclude Expert Testimony from Special Agent Lennea Gordon

At trial, the Government intends to offer testimony from Bureau of Alcohol, Tobacco and Firearms ("ATF") Special Agent Lennea Gordon ("SA Gordon"). As more particularly described below, and as explained in the Government's notice to the defense, SA Gordon will offer testimony that reflects her experience as a trained ATF investigator and law enforcement officer regarding:

A000363

> [T]he process by which firearms can be purchased—lawfully and otherwise—including but not limited to the mechanics of a firearms transaction, the administration of the ATF Form 4473, bookkeeping requirements for Federal Firearms Licensees ('FFLs'), and the concept of straw purchasing.  In addition, SA Gordon will testify about the ATF firearms tracing process and the licensure of firearms dealers.

(*See* Def. Mot., Ex. E. (Gov't Expert Notice)).

The defendant seeks to preclude the proposed expert testimony of SA Gordon on two grounds: first, because the topic of the noticed expert testimony is "irrelevant and unduly prejudicial"; and, second, because SA Gordon is supposedly not qualified to provide expert testimony.  (*See* Def. Mot. 14–19).  The defendant separately requests a *Daubert* hearing to determine the reliability of SA Gordon's conclusions.  (*Id.* at 16).

As described below, much of SA Gordon's testimony includes background information on the firearms-purchasing regime in the United States, informed by her training and experience as a law enforcement officer, which does not necessarily require that SA Gordon be qualified as an expert witness.  Specifically, the Government expects that SA Gordon will testify to the following:

1. Businesses and individuals must be certified as Federal Firearms Licensees ("FFLs") before selling guns as a business in the United States. FFLs are issued and tracked by the ATF.

2. FFLs are required to follow particular state and federal procedures when selling firearms. Federal procedures include checking for a state identification card and administering ATF Form 4473 (Firearms Transaction Record) (the "Form 4473"). State requirements vary from state to state and while states can add to federal requirements, they cannot subtract.

3. The Form 4473 must be completed at the time of every firearm purchase completed at an FFL and requires that the purchaser make certain statements under penalty of

15

A000364

perjury. In particular, the Form 4473 requires that the purchaser attest that he is purchasing firearms for himself and not on behalf of someone else.

4. The Form 4473 includes a description of the purchased firearms, including the make, model, caliber, and serial number of the purchased guns. A serial number is a unique identifier affixed to a firearm that can be used by the ATF to trace the purchase history of a firearm.

5. In addition to firearms, most FFLs sell ammunition, blank ammunition, and magazines, among other firearm accessories. A blank is a type of ammunition that allows a firearm to function as if it is loaded but without ejecting a projectile.

6. Straw purchasing is the process by which an individual qualified to purchase a firearm does so on behalf of another person by making false statements to the FFL about the true nature of the transaction. Commonly, people employ straw purchasers to evade detection by law enforcement and state authorities when they would be otherwise unable to buy guns for themselves.

This testimony is relevant and not unduly prejudicial, and SA Gordon is well-qualified to give it as an expert. The Court would also be well within its discretion to admit this testimony as lay witness testimony.[4]

---

[4] The Court may also decide that certain of this testimony, in particular topics 1 through 4, should be done by the Court in its jury instructions. *See, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 103298, at *2 (S.D.N.Y. Jan. 11, 2022) (gathering cases for the proposition that judges' instructions, not witness testimony, is proper way to instruct the jury on applicable principles of law). If the Court so finds, the Government is prepared to submit a supplemental request to charge.

16

A000365

### A.    SA Gordon's Anticipated Testimony Will Be Relevant and Helpful to the Jury

As an initial matter, SA Gordon's testimony on the topic of "straw purchasing"[5] —whether or not she is qualified as an expert—is highly relevant and helpful to the jury's understanding of the charged offense.  The defendant is charged with conspiring to violate and violating 18 U.S.C. § 922(a)(3), which makes it a crime to receive in or transport into the state of residency of the transporter or receiver firearms purchased *or otherwise obtained* outside the state of residency of the transporter or receiver.

Often, as is the case here, straw purchasing is at the heart of the conduct underlying a violation of Section 922(a)(3) and is exactly the type of conduct Congress sought to prohibit.  By including the phrase "otherwise obtained" in the statute, Congress "communicated its intent to have the statute's proscription reach beyond straightforward, one-on-one purchases to cover those illegal firearms transactions effected through the use of agents or straw men."  *United States v. Mitchell*, 328 F.3d 77, 81 (2d Cir. 2003).  In *Mitchell*, as in the instant case, an individual (Lotto) paid a straw purchaser (Mitchell) to buy guns out of state and transport them into Lotto's state of residence.  The Second Circuit held that Mitchell conspired with Lotto by acting as Lotto's "out-of-state agent[]" to purchase firearms and that Lotto "otherwise obtained" the guns through the straw purchases, even though he did not directly purchase the guns himself.  *Id.*; *see also United States v. Phillips*, 952 F.2d 591, 593 (1st Cir. 1991).

The defendant's suggestion that testimony about straw purchasing is irrelevant is meritless.  Testimony regarding straw purchasing is particularly relevant in this case with respect to the

---

[5] While the defense has objected to any testimony about the mechanics of "straw purchasing," they have not objected to the use of the term. Accordingly, the Government intends to employ the phrase in its opening remarks and may do so when questioning witnesses.

defendant's willfulness.  That the defendant decided to enlist the aid of the straw purchaser Vereen, an individual willing to lie to gun stores to conceal the unlawful nature of particular gun purchases, rather than purchase a firearm from a local seller, is highly probative of the defendant's state of mind.

SA Gordon will not offer opinion testimony about the defendant's state of mind.  In fact, SA Gordon was not involved in the investigation of this case; rather, she will offer the jury background information, which will assist in the jury's comprehension of other state-of-mind evidence that the Government will admit at trial.

**B.      SA Gordon Is Qualified to Provide Expert Testimony**

SA Gordon is qualified to give expert testimony on the topics of straw purchasing (and its role in the illegal purchase of guns) as well as firearm dealer licensing.  *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 193–94 (2d Cir. 2008) (discussing the qualifications of a Task Force member as to his knowledge of gang networks); *United States v. Lopez*, 547 F.3d 364, 373 (2d Cir. 2008) (17-year New York City Police Department veteran investigating drug cases was qualified to testify as an expert "in the practices of drug users and dealers").  The decision to admit expert testimony rests with the discretion of the trial court.  *See United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991).

SA Gordon's qualifications are described in her resume and in supplemental disclosures to the defense.  SA Gordon has been a member of law enforcement for approximately ten years— first as a special agent with the Diplomatic Security Service ("DSS") and then with the ATF.  In these roles, SA Gordon has handled firearms nearly every day for the past decade.  As a DSS special agent, SA Gordon received training and instruction on a variety of different weapons— including of the type at issue in this case—and was ultimately responsible for firearms training for United States personnel assigned to particular foreign posts.  Since becoming an ATF special

A000367

agent, SA Gordon has received many hours of classroom instruction, including instruction at the ATF Special Agent Basic Training course on the topics of gun trafficking and straw purchasing.[6] SA Gordon was first assigned to San Diego where she worked primarily on cases involving cross-border gun trafficking.  Since being assigned to New York, SA Gordon has worked in the New York Gun Crime Intelligence Center, where she has focused on using the ATF's investigative tools to identify straw purchasers and gun trafficking cells in New York City.  Currently, SA Gordon serves as an agent with the New York Field Office, where she primarily investigates gun trafficking cells in New York who use straw purchasers in Southern states to funnel firearms into New York City.  By virtue of her current professional experience, including as a Special Agent in the ATF, SA Gordon has gained familiarity with the U.S. firearms licensing regime, and the means by which individuals circumvent that regime. Her experience and training establish that she is amply qualified to testify regarding the topics outlined above.

The defendant argues that, should the Court construe SA Gordon's proposed testimony as expert testimony under Rule 702, a hearing should be held to "determine the reliability of [SA] Gordon's conclusions."  (Def. Mot. 16).  No such hearing is necessary.  The Court possesses "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability." *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (emphasis omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  In the course of her proposed testimony, SA Gordon will not be asked to rely on any particular scientific methods or complex methodology that would require vetting

---

[6] *Special Agent Training*, ATF: Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/careers/special-agent-training (last visited Aug. 21, 2023) (discussing the training provided to ATF trainees during the Special Agent Basic Training Course).

through a pretrial *Daubert* hearing.  *See United States v. Santiago*, 199 F. Supp. 2d 101, 112 (S.D.N.Y.2002) (finding that a *Daubert* hearing was not necessary where a reliability determination could be established through foundation questions at trial and noting that "[c]ounsel for defendants are free to challenge [the witness's] qualifications or his methodology through voir[] dire").  Instead, SA Gordon will be testifying based on knowledge she has gained through her training and experience as a DSS and ATF special agent.  She will also not be asked to provide specific opinions regarding the defendant's conduct—her testimony will instead serve to provide background and context for other evidence at issue in this case.  The written record of her qualifications provides a sufficient basis for the defendant to explore SA Gordon's qualifications, and to the extent he needs any additional information, such concern can be addressed with "additional questioning of the witness at trial."  *United States v. Diakhoumpa*, 171 F. Supp. 3d 148, 153 (S.D.N.Y. 2016).  As such, this Court need not hold a *Daubert* hearing to qualify SA Gordon as an expert.

### C.    SA Gordon's Anticipated Testimony Is Admissible as Lay Witness Testimony

The Court would also be within its discretion to decide that SA Gordon should testify as a lay witness.  As described above, the Government anticipates that much of SA Gordon's testimony will provide important context by broadly describing the firearms purchase process and the paperwork involved in that process, as well as by defining particular terms relating to guns and gun purchases.  SA Gordon's testimony will be informed by her participation in investigations similar to that conducted in this case, including her time assigned to the New York Crime Gun Intelligence Center and her training and experiences as a Diplomatic Security Service Special Agent and ATF Special Agent.  As stated above, she is not expected to opine on the defendant's state of mind or motivation.  Her testimony will include "particularized knowledge that [she] has by virtue of h[er] . . . position" as an ATF special agent. Fed. R. Evid. 701 advisory committee's

**A000369**

note to 2000 amendment; SA Gordon need not be qualified as an expert to offer such testimony under Rule 701. *See United States v. Ayala-Pizarro*, 407 F.3d 25, 27–29 (1st Cir. 2005) (admitting, as lay testimony, the opinion of a police officer as to the operation of "drug points"); *see also United States v. De Jesus Sierra*, 629 F. App'x 99, 102–03 (2d Cir. 2015) (no clear error in admitting, as lay testimony, law enforcement officer's testimony associating physical evidence with drug distribution).

Lay witness opinion testimony is limited by Federal Rule of Evidence 701, which provides that opinion testimony from a lay witness is admissible when it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) *not* based on scientific, technical, or other special knowledge within the scope of Rule 702." Fed. R. Evid. 701 (emphasis added). "[S]ome degree of specific, industry-related knowledge will not disqualify lay opinion testimony." *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 704 (S.D.N.Y. 2011) (citing *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008)). Ultimately, lay witness opinion testimony is admissible so long as it is rationally based on the witness's perception or is the "product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). On the contrary, opinion testimony based on scientific, technical, or other special knowledge is governed by Rule 702 and is only admissible where the witness is first qualified as an expert. Pursuant to Rule 702, expert testimony is admissible if it relates to a specialized area of expertise and will assist the trier of fact to understand the evidence or to determine a fact in issue. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Unlike a lay opinion, an expert opinion results "from a process of reasoning which can be mastered only be specialists in the field." *Garcia*, 413 F.3d at 215 (citation omitted).

21

A000370

There is no question that SA Gordon has the "personal knowledge" required to provide helpful testimony. Her testimony will be informed by the "reasoning processes familiar to the average person in everyday life," *id.*, rather than the type of "specialized training that scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations," *Yannotti*, 541 F.3d at 126; *see also United States v. Rigas*, 490 F.3d 208, 223, 225 (2d Cir. 2007) (permitting, as lay witness testimony, accounting consultant's highly technical description of organization's fraudulent financial statements where witness's knowledge was based on his review of accounting statements during internal investigation).[7] Accordingly, the Government respectfully submits that SA Gordon's testimony may be properly characterized as lay witness testimony.

---

[7] Even if SA Gordon's testimony were admitted under Rule 702 and later determined to have impermissibly relied upon the kind of "specialized knowledge" contemplated under Rule 703, any error would be harmless as the Government (i) provided notice of SA Gordon's anticipated testimony and (ii) will establish her decade of relevant experience, qualifications, and reliability. *See, e.g.*, *United States v. Hamilton*, 538 F.3d 162, 174 (2d Cir. 2008) (harmless error where, after the Government had established a law enforcement officer's qualifications, his lay testimony impermissibly relied on "specialized knowledge").

22

## **CONCLUSION**

For the foregoing reasons, the defendant's motions *in limine* should be denied.


Dated: New York, New York
       August 21, 2023


                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney


                          By:    s/_____
                                 Ashley C. Nicolas
                                 Madison Reddick Smyser
                                 Sarah Mortazavi
                                 Assistant United States Attorneys
                                 (212) 637-2467/ -2381/ -2520

A000372

# EXHIBIT A
## (Video File)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

STEVEN PEREZ,
     a/k/a "Lucha,"

          Defendant.

**S1 22 Cr. 644 (JSR)**

**THE GOVERNMENT'S REQUESTS TO CHARGE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ashley C. Nicolas
Maddison Reddick Smyser
Sarah Mortazavi
Assistant United States Attorneys
    *Of Counsel*

A000374

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

STEVEN PEREZ,
        a/k/a "Lucha,"

                    Defendant.

**S1 22 Cr. 644 (JSR)**

## THE GOVERNMENT'S REQUESTS TO CHARGE

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government respectfully requests that the Court include the following in its instructions to the jury.

ii

A000375

## **TABLE OF CONTENTS**

REQUEST NO. 1 ................................................................................................................... 1

General Requests ................................................................................................................. 1

REQUEST NO. 2 ................................................................................................................... 2

The Indictment .................................................................................................................... 2

REQUEST NO. 3 ................................................................................................................... 3

Multiple Counts ................................................................................................................... 3

REQUEST NO. 4 ................................................................................................................... 4

Count One: Elements of the Offense ................................................................................... 4

REQUEST NO. 5 ................................................................................................................... 6

Count One: Existence of the Conspiracy - Agreement (Element One) ............................... 6

REQUEST NO. 6 ................................................................................................................... 9

Count One: Membership in the Conspiracy (Element Two) ............................................... 9

REQUEST NO. 7 ................................................................................................................. 13

Count One: Overt Acts...................................................................................................... 13

REQUEST NO. 8 ................................................................................................................. 14

Count One: Duration of and Extent of Participation in Conspiracy ................................. 14

REQUEST NO. 9 ................................................................................................................. 16

Count One: Liability for Acts and Declarations of Co-Conspirators ................................ 16

REQUEST NO. 10 ............................................................................................................... 18

Count Two: Interstate Transport or Receipt of Firearms.................................................. 18

REQUEST NO. 11 ............................................................................................................... 19

Count Two: Definitions ..................................................................................................... 19

REQUEST NO. 12 ............................................................................................................... 20

Count Two: Element One – Not a Licensed Dealer .......................................................... 20

REQUEST NO. 13 ............................................................................................................... 21

Count Two: Element Two – Transportation Into or Receipt In State of Residence .......... 21

REQUEST NO. 14 ............................................................................................................... 22

Count Two: Element Three – Willfulness ......................................................................... 22

REQUEST NO. 15 ............................................................................................................... 23

Aiding and Abetting........................................................................................................... 23

REQUEST NO. 16 ............................................................................................................... 26

Willfully Causing a Crime ............................................................................ 26

REQUEST NO. 17 .......................................................................................... 28

Motive ............................................................................................................ 28

REQUEST NO. 18 .......................................................................................... 29

Venue ............................................................................................................. 29

REQUEST NO. 19 .......................................................................................... 31

Variance in Dates .......................................................................................... 31

REQUEST NO. 20 .......................................................................................... 32

Persons Not on Trial ..................................................................................... 32

REQUEST NO. 21 .......................................................................................... 33

Law Enforcement or Government Witnesses ............................................... 33

REQUEST NO. 22 .......................................................................................... 34

Preparation of Witnesses .............................................................................. 34

REQUEST NO. 23 .......................................................................................... 35

Limited Evidence .......................................................................................... 35

REQUEST NO. 24 .......................................................................................... 36

Similar Acts ................................................................................................... 36

REQUEST NO. 25 .......................................................................................... 37

Particular Investigative Techniques ............................................................. 37

REQUEST NO. 26 .......................................................................................... 38

False Exculpatory Statements ....................................................................... 38

REQUEST NO. 27 .......................................................................................... 39

Use of Evidence Obtained Pursuant to Searches and Seizures .................... 39

REQUEST NO. 28 .......................................................................................... 40

Expert Testimony .......................................................................................... 40

REQUEST NO. 29 .......................................................................................... 41

Charts and Summaries: Admitted as Evidence ............................................ 41

REQUEST NO. 30 .......................................................................................... 42

Charts and Summaries: Not Admitted as Evidence ..................................... 42

REQUEST NO. 31 .......................................................................................... 43

Stipulations of Fact ....................................................................................... 43

A000377

REQUEST NO. 32 .................................................................................................. 44

Uncalled Witnesses – Equally Available or Unavailable ....................................... 44

REQUEST NO. 33 .................................................................................................. 45

Defendant's Testimony .......................................................................................... 45

REQUEST NO. 34 .................................................................................................. 46

Conscious Avoidance/Willful Blindness  [*If Applicable*] .................................. 46

REQUEST NO. 35 .................................................................................................. 48

Improper Considerations: Race, Religion, National Origin, Gender, Sexual Orientation, or Age ..... 48

REQUEST NO. 36 .................................................................................................. 49

Juror Duty to Follow Instructions ......................................................................... 49

REQUEST NO. 37 .................................................................................................. 50

Punishment Is Not to Be Considered by the Jury ................................................. 50

REQUEST NO. 38 .................................................................................................. 51

Sympathy: Oath as Jurors ...................................................................................... 51

Conclusion .............................................................................................................. 52

iii

A000378

## REQUEST NO. 1

### General Requests

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a. Function of Court and Jury

b. Jury's Recollection Governs

c. Notetaking by Jurors

d. Duty to Base Verdict on Evidence

e. Statements of Court and Counsel Not Evidence

f. Duty to Weigh Evidence Without Prejudice

g. Government Treated Like Any Other Party

h. Indictment Not Evidence

i. Burden of Proof

j. Presumption of Innocence

k. Reasonable Doubt

l. Direct and Circumstantial Evidence

m. Inferences

n. Credibility of Witnesses

o. Verdict of Guilt or Innocence Must be Unanimous

p. Duties of Foreperson and Return of Verdict Form

q. Right to See Exhibits and Have Testimony Read During Deliberations

A000379

## REQUEST NO. 2

### The Indictment

The defendant, Steven Perez, a/k/a "Lucha," is formally charged in an Indictment.  As I have instructed you already, the Indictment is not evidence of a crime and is simply a way for the Government to present charges in this case.  I will not read the entire Indictment to you at this time.  Rather, I will first summarize the offenses charged in the Indictment and then explain in detail the elements of the offenses.

The Indictment has two counts. Count One of the Indictment alleges that between May 2020 and July 2021, the defendant, who was not a licensed importer, manufacturer, dealer, or collector of firearms, conspired with others to transport or receive into the state of residency of the transporter or receiver firearms that were purchased or otherwise obtained outside that state.

Count Two alleges that between September 2020 and June 2021, the defendant, who was not a licensed importer, manufacturer, dealer, or collector of firearms, transported into and received in the State of New York, a specific firearm — a Century Arms Canik 9mm handgun — that was purchased or otherwise obtained outside the State of New York.

2

**REQUEST NO. 3**

**Multiple Counts**

The Indictment contains two counts. Each count charges the defendant with a different crime. You must consider each count separately and return a separate verdict of guilty or not guilty on each count. Whether you find the defendant guilty of one count should not influence your verdict as to the other count.

Adapted from Sand, Modern Federal Jury Instructions, Instr. 3-6;
*see United States v. Sanzo*, 673 F.2d 64 (2d Cir. 1982).

3

A000381

## REQUEST NO. 4

### Count One: Elements of the Offense

As I said, Count One charges the defendant with participating in a conspiracy to violate a federal law. Specifically – and I am now reading from the Indictment – Count One charges that:

*[The Court is respectfully requested to read Count One of the Indictment to the jury.]*

A conspiracy is a kind of criminal partnership, a combination or agreement of two or more persons to join together to accomplish some unlawful purpose. The crime of conspiracy to violate a federal law, as charged in this Indictment, is an independent offense. The essence of the crime of conspiracy is an agreement or understanding to violate other laws. It is separate and distinct from the crime that is the objective of the conspiracy, and it is separate and distinct from the actual violation of any specific federal laws, which the law refers to as substantive crimes.

Thus, in considering a conspiracy charge, you do not have to find that the actual substantive crime that is the object of the conspiracy was committed – here, interstate transport or receipt of firearms. In other words, you may find the defendant guilty of agreeing to transport or receive in the recipient's state of residency firearms purchased or otherwise obtained outside of that state, even if no firearms were actually received or transported. It is the agreement itself – the agreement with others to commit the crime – along with the other elements of conspiracy that the law forbids and defines as a crime.

To sustain its burden of proof with respect to the charge of conspiracy contained in the Indictment, the Government must prove beyond a reasonable doubt the following three elements:

First, the existence of the conspiracy charged in Count One of the Indictment; in other words, that two or more persons entered into the unlawful agreement charged in the Indictment.

4

A000382

Second, that the defendant knowingly and willfully became a member of that conspiracy or agreement.

Third, that one of the members of the conspiracy—it does not have to be the defendant—knowingly committed at least one overt act for the purpose of furthering some object of the conspiracy.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 19-2; Hon. Vernon S. Broderick, Jury Charge, *United States v. Allums et al.*, 15 Cr. 153 (S.D.N.Y. 2017); Hon. Jesse M. Furman Jury Charge, *United States v. Dambelly*, 16 Cr. 2 (S.D.N.Y. 2016); Hon. Vernon S. Broderick, Jury Charge, *United States v. Ramos-Nunez*, 14 Cr. 102 (VSB) (S.D.N.Y. 2014); Hon. Katherine B. Forrest, Jury Charge, *United States v. Benito Del Rosario*, 12 Cr. 81 (KBF) (S.D.N.Y. 2012); *see also United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990) ("Since the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective, the offense of conspiracy may be established even if the collaborators do not reach their goal."); *United States v. Corsey*, 512 F. App'x 6, 8 (2d Cir. 2013) ("impossibility is not a defense to a conspiracy charge").

5

A000383

## REQUEST NO. 5

### Count One: Existence of the Conspiracy - Agreement (Element One)

Starting with the first element, what is a conspiracy?  A conspiracy is an agreement or an understanding, between two or more persons, to accomplish a criminal or unlawful purpose.  The conspiracy alleged in the Indictment is an agreement to transport or receive into the state of residency of the transporter or receiver firearms that were obtained outside that state.

The gist, or the essence, of the crime of conspiracy is the unlawful combination or agreement to violate the law.  The success of the conspiracy, or the actual commission of the criminal act which is the object of the conspiracy, is not an element of the crime of conspiracy.

To show a conspiracy, the Government is not required to show that two or more people sat around a table and entered into a solemn pact, orally or in writing, stating that they had formed a conspiracy to violate the law and setting forth details of the plans and means by which the unlawful project is to be carried out or the part to be played by each conspirator.  Common sense will tell you that when people enter into a criminal conspiracy much may be left to the unexpressed understanding.  It is rare that a conspiracy can be proven by direct evidence of an explicit agreement.  From its very nature, conspiracy is almost invariably characterized by secrecy and concealment, which makes detection difficult.  Conspirators do not usually reduce their agreements to writing or acknowledge them in front of a notary public; nor do they normally publicly broadcast their plans.  Thus you may infer the existence of a conspiracy from the circumstances of the case and conduct of the parties involved.

The agreement may be implicit.  It is sufficient if two or more persons in some way or manner, impliedly or tacitly, come to a common understanding to violate the law.  In other words,

6

in order to find that the defendant is guilty of the conspiracy charged in the Indictment you must find that he and at least one other person agreed to transport or receive into the state of residency of the transporter or receiver firearms that were obtained outside that state.  Express language or specific words are not required to indicate assent or attachment to the conspiracy.

In determining whether there has been an unlawful agreement as alleged in the Indictment, you may consider the actions of all the alleged co-conspirators that were taken to carry out the apparent criminal purpose, and you may draw reasonable inferences from those acts and conduct. The old adage, "actions speak louder than words," applies here.  Often, the only evidence that is available with respect to the existence of a conspiracy is that of disconnected acts on the part of the alleged individual co-conspirators.  When taken all together and considered as a whole, however, that conduct may warrant the inference that a conspiracy existed just as conclusively as more direct proof, such as evidence of an express agreement.

In considering whether a conspiracy existed, you should consider all the evidence that has been admitted with respect to the conduct and statements of each alleged co-conspirator, and any inferences that may reasonably be drawn from that conduct and those statements.  It is sufficient to establish the existence of the conspiracy, as I have already said, if, from the proof of all the relevant facts and circumstances, you find beyond a reasonable doubt that the minds of at least two alleged co-conspirators met in an understanding way, and that they agreed to work together in furtherance of the objective of the conspiracy charged in the Indictment.

In short, as far as the first element of the conspiracy is concerned, the Government must prove beyond a reasonable doubt that at least two alleged conspirators came to a mutual understanding, either spoken or unspoken, to violate the law in the manner charged in the

7

Indictment.

Object of the Conspiracy

The object of a conspiracy is the illegal goal the coconspirators agree or hope to achieve. The object or goal of the conspiracy charged in Count One corresponds with the substantive (or non-conspiracy) offense charged in Count Two. The object of the conspiracy charged was to transport or receive into the state of residency of the transporter or receiver firearms that were purchased or otherwise obtained outside that state. I will explain the elements of those substantive offenses to you when I instruct you with regard to Count Two.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 19-4; Hon. Norman A. Mordue, Jury Charge, *United States v. Raymond et ano.*, 15 Cr. 81 (N.D.N.Y. 2017); Hon. Vernon S. Broderick, Jury Charge, *United States v. Allums et al.*, 15 Cr. 153 (S.D.N.Y. 2017); Hon. Vernon S. Broderick, Jury Charge, *United States v. Ramos-Nunez*, 14 Cr. 102 (VSB) (S.D.N.Y. 2014); Hon. Katherine B. Forrest, Jury Charge, *United States v. Benito del Rosario*, 12 Cr. 81 (KBF) (S.D.N.Y. 2012); Hon. Laura Taylor Swain, Jury Charge, *United States v. Nelson Solano*, 05 Cr. 563 (LTS) (S.D.N.Y. 2010); Hon. Colleen McMahon, Jury Charge, *United States v. Omar Gonzalez*, 10 Cr. 588 (CM) (S.D.N.Y. 2010).

## REQUEST NO. 6

### Count One: Membership in the Conspiracy (Element Two)

The Government must also prove beyond a reasonable doubt that the defendant unlawfully, willfully, and knowingly entered into the conspiracy, that is, that the defendant agreed to take part in the conspiracy with knowledge of its unlawful purpose, and that he agreed to take part in the conspiracy to promote and cooperate in furtherance of one or more of its unlawful objectives.

Now, as to this element, the terms unlawfully, willfully, and knowingly mean that you must be satisfied that in joining the conspiracy, assuming you find that the defendant did join the conspiracy in which he is charged, that the defendant knew what he was doing. That is, that he took the actions in question deliberately and voluntarily. The key question is whether the defendant joined the relevant conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

As you can see, this element concerns a person's state of mind. Direct proof of state of mind is not always available. Indeed, it would be a rare case where it could be shown that a person wrote or stated that, as of a given time in the past, he committed an act with a certain state of mind. Such direct proof is not required.

### "Unlawfully," "Knowingly," and "Willfully" Defined

"Unlawfully" means contrary to law. A defendant need not have known that the purpose of the conspiracy was to violate any particular or specific law; but he needs to have been aware that the purpose of the conspiracy was generally unlawful in nature.

9

An act is done "knowingly" and "willfully" if it is done deliberately and purposefully; that is, a defendant's acts must have been the product of his or her conscious objective, rather than the product of mistake, accident, mere negligence, or some other innocent reason.

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his conduct, his acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which you, the jury, are permitted to draw—but not required to draw—from the facts which have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense.

When you come to decide, for example, whether the defendant agreed with at least one other person to transport or receive into the state of residency of the transporter or receiver firearms that were purchased or otherwise obtained outside that state, you need not limit yourself to just what he said, but you may also look at what he did and what others did in relation to him and, in general, everything that occurred. Circumstantial evidence, if believed, is of no less value than direct evidence. In either case, the essential elements of the crime charged must be established beyond a reasonable doubt.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not, by itself, make him a member of the conspiracy, even when that association is coupled with knowledge that a conspiracy exists. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may

10

know, or be friendly with, a criminal, without being a criminal himself.  Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy.

I also want to caution you that mere knowledge of a criminal conspiracy, without participation in the unlawful plan, is not sufficient.  Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member.  What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

Knowledge is a matter of inference from the proven facts.  Science has not yet devised a way of looking into a person's mind and knowing what that person is thinking.  However, you do have before you the evidence of certain acts and communications alleged to have taken place by or with the defendant or in his presence.  The Government contends that these acts and conversations show beyond a reasonable doubt knowledge on the part of the defendant of the unlawful purpose of the charged conspiracy.  The defendant denies that he was a member of this conspiracy.  It is for you to determine whether the Government has established to your satisfaction and beyond a reasonable doubt that such knowledge and intent on the part of the defendant existed.

It is not necessary for the Government to show that the defendant was fully aware of every detail of the conspiracy.  Nor is it necessary for a defendant to know every other member of the conspiracy.  In fact, the defendant may know only one other member of the conspiracy and still be a co-conspirator.  Neither is it necessary for the defendant to receive any monetary benefit from his participation in the conspiracy, or to have a financial stake in the outcome.  However, although

11

A000389

proof of a financial interest in the outcome of a scheme is not essential or determinative, if you find that a defendant had a financial or other interest, that is a factor you may properly consider in determining whether a defendant was a member of the conspiracy.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instrs. 19-6, 56-18; Hon. Richard M. Berman in *United States v. Sharpe*, S2 15 Cr. 288 (RMB) (S.D.N.Y. 2017); Hon. Vernon S. Broderick in *United States v. Allums et al.*, 15 Cr. 153 (S.D.N.Y. 2017); Hon. Vernon S. Broderick, Jury Charge, *United States v. Ramos-Nunez*, 14 Cr. 102 (VSB) (S.D.N.Y. 2014); Hon. Richard J. Sullivan in *United States v. Hussain*, 12 Cr. 45 (S.D.N.Y. 2013); Hon. Katherine B. Forrest, Jury Charge, *United States v. Benito del Rosario*, 12 Cr. 81 (KBF) (S.D.N.Y. 2012); Hon. William H. Pauley III in *United States v. Davis et al.*, 06 Cr. 911 (WHP) (S.D.N.Y. 2010); Hon. Laura Taylor Swain, Jury Charge, *United States v. Nelson Solano*, 05 Cr. 563 (LTS) (S.D.N.Y. 2010); Hon. Colleen McMahon, Jury Charge, *United States v. Omar Gonzalez*, 10 Cr. 588 (CM) (S.D.N.Y. 2010); Hon. Lewis A. Kaplan in *United States v. Redden*, 02 Cr. 1141 (S.D.N.Y. 2004); Hon. John F. Keenan, *United States v. Pa Smith*, 02 Cr. 104 (JFK) (S.D.N.Y. 2002); Hon. Leonard B. Sand, Jury Charge, *United States v. Rios*, 91 Cr. 914 (LBS) (S.D.N.Y. 1992); Hon. Michael B. Mukasey, Jury Charge, *United States v. Bello*, 91 Cr. 571 (MBM), *aff'd*, 990 F.2d 622 (2d Cir. 1993).

12

A000390

## REQUEST NO. 7

### Count One: Overt Acts

Count One also requires that the Government prove beyond a reasonable doubt that at least one overt act was committed in furtherance of that conspiracy by at least one of the co-conspirators—not necessarily the defendant himself.

An overt act is any act that is done to further an object of the conspiracy.  An overt act may be a criminal act or the crime that is the object of the conspiracy, but it need not be. It may even be a seemingly innocent act so long as it is a step in carrying out the conspiratorial scheme. In simple language, the overt act element is a requirement that the agreement went beyond the mere talking stage.  The requirement of an overt act is a requirement that some action be taken during the life of the conspiracy by one of the coconspirators to further the conspiracy.

In order for the Government to satisfy the overt act requirement, it is not necessary for the Government to prove the overt acts alleged in the Indictment.  That is, you might find that overt acts were committed that were not alleged at all in the Indictment.  It is sufficient for the Government to show that the defendant, or one of his alleged coconspirators, knowingly committed any overt act in furtherance of the conspiracy during the life of the conspiracy.

You need not reach unanimous agreement on whether a particular overt act was committed in furtherance of the conspiracy; you just need to all agree that at least one overt act was so committed.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 19-7 and 19-8.

13

A000391

### REQUEST NO. 8

### Count One: Duration of and Extent of Participation in Conspiracy

The duration and extent of the defendant's participation in the conspiracy has no bearing on the issue of a defendant's guilt. The defendant need not have joined the conspiracy at the outset. He may have joined it at any time in its progress, and he will still be held responsible for all that was done before he joined and all that was done during the conspiracy's existence while he was a member. Each member of a conspiracy may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor roles in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw a defendant within the ambit of the conspiracy.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering an illegal undertaking. The defendant thereby becomes a knowing and willing participant in the unlawful agreement – that is to say, a conspirator.

A conspiracy, once formed, is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by its members. So, too, once a person is found to be a member of a conspiracy, that person is presumed to continue being a member in the venture until the venture is terminated, unless it is shown by some affirmative proof that the person withdrew and disassociated himself from it.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 19-6; Hon. Laura Taylor Swain, Jury Charge, *United States v. Ovalle*, 02 Cr. 975 (LTS) (S.D.N.Y. 2003); Hon. Leonard B. Sand, Jury Charge, *United States v. Rios*, 91 Cr. 914 (LBS) (S.D.N.Y. 1992); Hon. Michael B. Mukasey, Jury Charge, *United States v. Bello*, 91 Cr. 571 (MBM), *aff'd*, 990 F.2d 622 (2d Cir. 1993); *see also*

14

A000392

*United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992) ("The defendant's knowledge of the conspiracy and participation in it with the requisite criminal intent may be established through circumstantial evidence.   A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member." (citations omitted)); *United States v. Miranda-Ortiz*, 926 F.2d 172, 175-76 (2d Cir. 1991) (generally discussing proof required to show membership in conspiracy), *cert. denied*, 502 U.S. 928 (1991); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 960 (2d Cir. 1990) (same), *cert. denied*, 501 U.S. 1233 (1991).

15

A000393

## REQUEST NO. 9

### Count One: Liability for Acts and Declarations of Co-Conspirators

When people enter into a conspiracy to accomplish an unlawful end, they become agents or partners of one another in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all of the members and all of the members are responsible for such acts, declarations, statements, and omissions.

If you find beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the Indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy may be considered against the defendant. This is so even if such acts were done and statements were made in the defendant's absence, without his knowledge, or before he joined the conspiracy.

However, before you may consider the statements or acts of a co-conspirator in deciding the issue of the defendant's guilt, you must first determine that the acts and statements were made during the existence and in furtherance of the unlawful scheme. If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy or if they were not done or said in furtherance of the conspiracy, they may be considered by you as evidence only against the member who said or did that.

> Adapted from Hon. Vernon S. Broderick, Jury Charge, in *United States v. Allums et al.*, 15 Cr. 153 (S.D.N.Y. 2017); Hon. Katherine B. Forrest, Jury Charge, *United States v. Benito del Rosario*, 12 Cr. 81 (KBF) (S.D.N.Y. 2012); *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *United States v. Heras*, 609 F.3d 101, 110-11

16

A000394

(2d Cir. 2010); *United States v. Maldonado-Rivera*, 922 F.2d 934, 961-62 (2d Cir. 1990).

17

**REQUEST NO. 10**

**Count Two: Interstate Transport or Receipt of Firearms**

In order to prove the defendant guilty of the offense charged in Count Two of the Indictment, which is the substantive offense, the Government must establish the following three elements beyond a reasonable doubt:

First, that the defendant was not a licensed importer, licensed manufacturer, licensed dealer or licensed collector of firearms;

Second, that the defendant transported or received into the state in which he resided a firearm purchased or otherwise obtained outside that state.

Third, the defendant acted willfully.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 35-18.

18

A000396

## REQUEST NO. 11

### Count Two: Definitions

A person is an "importer" when he is "engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution."

A person is a "manufacturer" when he is "engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution."

A person is a "dealer" when he is "engaged in the business of selling firearms at wholesale or retail."

A person is a "collector" when he "acquires, holds, or disposes of firearms as curios or relics."

The terms "licensed importer," "licensed manufacturer," "licensed dealer" and "licensed collector" mean any such persons who are licensed under the provisions of the Gun Control Act.

Under the statute, the term "firearm" includes any weapon which will or is designed to or may be readily converted to expel a projectile by the action of an explosive; or the frame or receiver of any such weapon.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 35-19.

19

A000397

## REQUEST NO. 12

### Count Two: Element One – Not a Licensed Dealer

The first element that the Government must prove beyond a reasonable doubt is that the defendant was not a licensed importer, manufacturer, dealer or collector.

In order to be a licensed dealer, a person must file an application with and receive a license from the Secretary of the Treasury.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 35-20.

20

A000398

## REQUEST NO. 13

### Count Two: Element Two – Transportation Into or Receipt In State of Residence

The second element that the Government must prove beyond a reasonable doubt is that the firearm was obtained outside of the state of residence of the transporter or receiver and then transported into or received in that state.

In order to satisfy this element, the Government must prove that the state in which the firearm was purchased or otherwise obtained was not the defendant's state of residence and that the state into which the firearm was transported into or received in was the defendant's state of residence.

The defendant does not have to himself purchase the firearms out-of-state, but it is enough to prove only that the defendant received or accepted the guns in his state of residence. The Government will have been found to have satisfied this element if he has caused an agent, employee, or other associate to bring the guns into his state of residence. A defendant who uses another person to purchase the guns for him out-of-state through the use of false statements has "otherwise obtained" firearms under the statute.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 35-21. *United States v. Mitchell*, 328 F.3d 77, 81 (2d Cir. 2003) (holding that "the employment of out-of-state agents to purchase firearms as 'otherwise obtaining' such firearms pursuant to [Section] 922(a)(3)"); *United States v. Phillips*, 952 F.2d 591, 593 (1st Cir. 1991) (defendant guilty under Section 922(a)(3) where he wired money to an out-of-state resident to buy guns out of state).

21

A000399

## REQUEST NO. 14

### Count Two: Element Three – Willfulness

The third element the Government must prove beyond a reasonable doubt is that the defendant acted willfully.

In order to satisfy this element, the Government must prove that the defendant acted intentionally and purposely and with the intent to do something the law forbids, that is with the bad purpose to disobey or disregard the law. The defendant need not be aware of the specific law or rule that his conduct may be violating, but he must act with the intent to do something that the law forbids. Willfulness can be proved by direct evidence or by circumstantial evidence.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 35-22;
*see Bryan v. United States*, 524 U.S. 184 (1998).

22

A000400

**REQUEST NO. 15**

**Aiding and Abetting**

Count Two also charges the defendant with violating 18 U.S.C. § 2, the "aiding and abetting" statute. That is, the defendant is charged not only as a principal who committed the crime, but also as an aider and abettor and with having willfully caused the crime. As a result, under 18 U.S.C. § 2, there are two additional ways that the Government may establish a defendant's guilt on Count Two. One way is called "aiding and abetting," and the other is called "willfully causing a crime." Let me explain each of these.

"Aiding and abetting" is set forth in Section 2(a) of the statute. That section reads, in part, as follows:

> Whoever commits an offense against the United States or aids or abets or counsels, commands or induces, or procures its commission, is punishable as a principal.

Under the aiding and abetting statute, it is not necessary for the Government to show that the defendant himself physically committed the crime with which he is charged in order for you to find the defendant guilty. Thus, even if you do not find beyond a reasonable doubt that the defendant himself committed the crime charged, you may, under certain circumstances, still find the defendant guilty of that crime as an aider or abettor.

A person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself. Accordingly, you may find the defendant guilty of the substantive crime if you find beyond a reasonable doubt that the Government has proved that another person actually committed the crime, and that the defendant aided and abetted that person in the commission of the offense.

23

A000401

In order to convict a defendant as an aider and abettor, the Government must prove beyond a reasonable doubt two elements.

First, the Government must prove that another person has committed the crime charged. Obviously, no one can be convicted of aiding or abetting the criminal acts of someone else if no crime was committed by the other person in the first place. But if you do find that a crime was committed by someone other than the defendant, then you must consider whether the defendant you are considering aided or abetted the commission of that crime.

Second, in order to convict of an aiding and abetting theory, the Government must prove that the defendant willfully and knowingly associated himself in some way with the crime, and that he willfully and knowingly sought by some act to help make the crime succeed. Participation in a crime is willful if action is taken voluntarily and intentionally, and with the specific intent to do something that the law forbids.

The mere presence of the defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by the defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture.

To determine whether the defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

-- Did he participate in the crime charged as something

he wished to bring about?

24

A000402

-- Did he associate himself with the criminal venture knowingly and willfully?

-- Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor, and therefore guilty of the offense. If he did not, then the defendant is not an aider and abettor, and is not guilty as an aider and abettor of that offense.

> Adapted from Sand, *Modern Federal Jury Instructions*, 11-1 and 11-2; Hon. Lewis A. Kaplan, Jury Charge, *United States v. James Gatto, et al.,* 17 Cr. 686 (LAK), and from the charge approved in *United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977). *See United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (discussing requirements of aiding and abetting liability); *United States v. Clemente*, 640 F.2d 1069 (2d Cir.) (same), *cert. denied*, 454 U.S. 820 (1981).

25

A000403

## REQUEST NO. 16

### Willfully Causing a Crime

The second way in which the Government can prove the defendant's guilt under 18 U.S.C. § 2 on Count Two is through a finding beyond a reasonable doubt that the defendant willfully caused a crime. Section 2(b) of the aiding and abetting statute, which relates to willfully causing a crime, reads as follows:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States [shall be guilty of a federal crime].

What does the term "willfully caused" mean? It means that the defendant himself need not have physically committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment. Rather, anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States is guilty as a principal.

The meaning of the term "willfully caused" can be found in the answers to the following questions:

First, did the defendant take some action without which the crime would not have occurred?

Second, did the defendant intend that the crime would be actually committed by others?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is "yes" then the defendant is guilty of the crime charged just as if the defendant himself had actually committed it.

> Adapted from Sand, *Modern Federal Jury Instructions*, 11-3, and from the charge of the Honorable Lewis A. Kaplan in *United States v. James Gatto, et al.,* 17 Cr. 686 (LAK). *See United States v. Concepcion,* 983 F.2d 369, 383-84 (2d Cir. 1992); *United States v. Sliker*, 751 F.2d 477, 494 (2d Cir. 1984); *United States v. Margiotta,*

26

A000404

688 F.2d 108 (2d Cir. 1982); *United States v. Gleason*, 616 F.2d 2 (2d Cir. 1979); *United States v. Kelner*, 534 F.2d 1020, 1022-23 (2d Cir. 1976).

27

A000405

## REQUEST NO. 17

### Motive

Proof of motive is not a necessary element of any of the crimes with which the defendant is charged.  Proof of motive does not establish guilt, nor does the lack of proof of motive establish that the defendant is not guilty.  If the guilt of a defendant is shown beyond a reasonable doubt, it is immaterial what that defendant's motive for the crime or crimes may be, or whether that defendant's motive was shown at all.  The presence or absence of motive is, however, a circumstance which you may consider as bearing on the intent of a defendant.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 6-18;
Hon. Deborah A. Batts, Jury Charge, *United States v. Gupta*, 07
Cr. 177 (DAB).

28

## REQUEST NO. 18

### Venue

In addition to all of the elements I have described, you must decide, separately with respect to each count, whether the crime occurred within the Southern District of New York. The Southern District of New York includes all of Manhattan and the Bronx.

Venue must be examined separately for each count in the Indictment. Venue on one count does not establish venue on another count, although, if applicable, you may rely on the same evidence to establish venue on multiple counts.

In this regard, with respect to Count One, the Government need not prove that the entirety of the charged conspiracy was committed in the Southern District of New York, or that the defendant was present here. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred within the Southern District of New York.

With respect to Count Two, venue is proper to the extent that any act in furtherance of the offense occurred within the Southern District of New York.

I should note that on this issue – and this alone – the Government need not prove venue beyond a reasonable doubt, but only by a mere preponderance of the evidence. Thus, the Government has satisfied its venue obligations if you conclude that it is more likely than not that an act in furtherance of the crime was committed in this District.

If you find that the Government has failed to prove the venue requirement, then you must acquit the defendant.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 3-11; Hon. Vernon S. Broderick, Jury Charge, *United States v. Allums et al.*, 15 Cr. 153 (S.D.N.Y. 2017); Hon. Katherine B. Forrest, Jury Charge, *United States v. Benito del Rosario*, 12 Cr. 81 (KBF)

29

A000407

(S.D.N.Y. 2012); Hon. Denise L. Cote, Jury Charge, *United States v. Keshawna Clinton*, 10 Cr. 34 (DLC) (S.D.N.Y. 2011); Hon. Laura Taylor Swain, Jury Charge, *United States v. Nelson Solano*, 05 Cr. 563 (LTS) (S.D.N.Y. 2010); Hon. Colleen McMahon, Jury Charge, *United States v. Omar Gonzalez*, 10 Cr. 588 (CM) (S.D.N.Y. 2010); *see also United States v. Shaw*, No. S1 06 CR 41 (CM), 2007 WL 4208365, at *2 (S.D.N.Y. Nov. 20, 2007). ("The "conspiracy element" provides the nexus with the Southern District that allows the substantive counts [including under 18 U.S.C. § 924(c)] to be properly venued in this district."),

30

A000408

## REQUEST NO. 19

### Variance in Dates

As to Count One, the Indictment alleges that the charged conspiracy occurred from at least in or about May 2020, up to and including at least in or about July 2021. As to Count Two, the Indictment alleges that the charged crime occurred from at least in or about September 2020, up to and including at least on or about June 23, 2021. It is not essential that the Government prove that an act occurred during a specific time period or on a specific date. I instruct you that it does not matter if a crime or specific event is alleged to have occurred on or about a certain date or in a certain month but the testimony indicates that, in fact, it was a different date or a different month. The law requires only a substantial similarity between the dates and months alleged in the indictment and the dates and months established by the evidence.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 3-12; Hon. Edgardo Ramos, Jury Charge, *United States v. Maddawar*, 15 Cr. 627 (S.D.N.Y. 2018); Hon. Harold Baer, Jury Charge, *United States v. Martinez*, 97 Cr. 313 (HB) (S.D.N.Y. 1997); Hon. John G. Koeltl, Jury Charge, *United States v. Alvarado Matriller*, 94 Cr. 723 (JGK) (S.D.N.Y. 1995); Hon. John F. Keenan, Jury Charge, *United States v. Carrero*, 91 Cr. 365 (JFK) (S.D.N.Y. 1991); Hon. Michael B. Mukasey, Jury Charge, *United States v. Bello*, 91 Cr. 571 (MBM), *aff'd*, 990 F.2d 622 (2d Cir. 1993).

31

A000409

## REQUEST NO. 20

## Persons Not on Trial

If you conclude that other persons may have been involved in criminal acts charged in the Indictment, you may not draw any inference, favorable or unfavorable, toward either the Government or the defendant from the fact that those persons are not named as defendants in the Indictment, or are not present at this trial. You also may not speculate as to the reasons why other persons are not defendants in this trial. Those matters are wholly outside your concern and have no bearing on your function as jurors at this trial.

> Adapted from Hon. Loretta A. Preska, Jury Charge, *United States v. Tanner*, 17 Cr. 61 (LAP); Hon. Andrew L. Carter, Jury Charge, *United States v. Seabrook*, 16 Cr. 467 (ALC); Hon. Kimba M. Wood, Jury Charge, *United States v. Cespedes-Pena*, 14 Cr. 520 (KMW); Hon. Loretta A. Preska, Jury Charge, *United States v. Stevenson*, Jury Charge, 13 Cr. 161 (LAP); *see also United States v. Muse*, 06 Cr. 600 (DLC), 2007 WL 1989313, at *22 (S.D.N.Y. July 3, 2017), *aff'd*, 369 F. App'x 242 (2d Cir. 2010).

32

A000410

**REQUEST NO. 21**

**Law Enforcement or Government Witnesses**

You have heard the testimony of law enforcement or other government witnesses. The fact that a witness may be employed as a law enforcement official or government employee does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement or government witnesses, as it is with every other type of witness, and to give to that testimony the weight you find it deserves.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 7-16; Hon. Kimba M. Wood, Jury Charge, *United States v. Juan Cespedes-Pena*, 14 Cr. 520 (KMW).

33

A000411

**REQUEST NO. 22**

**Preparation of Witnesses**

[*If Applicable*]

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation.

The weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

> Adapted from Hon. Michael B. Mukasey, Jury Charge, *United States v. Abdul Latif Abdul Salam*, 98 Cr. 208 (MBM) (S.D.N.Y. 1999); Hon Richard J. Sullivan, Jury Charge, *United States v. Ramirez*, 13 Cr. 135 (RJS) (S.D.N.Y. 2013).

34

## REQUEST NO. 23

### Limited Evidence

[*If Applicable*]

Some of the evidence in this case was introduced for a limited purpose.  Let me emphasize that any evidence admitted solely for a limited purpose may be considered only for that purpose and may not in any respect enter into your deliberations for any other purpose.

Adapted from Sand, *Modern Federal Jury Instructions*, 3-5.

35

A000413

## REQUEST NO. 24

## Similar Acts

*[If Applicable]*

There has been evidence received during the trial that the defendant engaged in conduct which was similar in nature to the conduct charged in the Indictment.

Let me remind you that the defendant is on trial only for committing the acts alleged in the Indictment. Accordingly, you may not consider this evidence of the similar act as a substitute for proof that the defendant committed the crimes charged. Nor may you consider this evidence as proof that the defendant has a criminal personality or bad character. This other-act evidence was admitted for a more limited purpose, and you may consider it for those purposes only.

If you determine that the defendant committed the acts charged in the Indictment and the similar acts as well, then you may, but you need not, draw an inference that in doing the acts charged in the Indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident, or other innocent reasons.

Evidence of similar acts may not be considered by you for any other purpose. Specifically, you may not consider it as evidence that the defendant is of bad character or has a propensity to commit crimes.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 5-25, 5-26; Hon. John Keenan, Jury Charge, *United States v. Carrero*, 91 Cr. 365 (JFK) (S.D.N.Y. 1991). *See also United States v. Brand*, 467 F.3d 179 (2d Cir. 2006) (rejecting challenge to jury instruction "drawn almost verbatim from the model language of the *Sand* federal charge.")

36

A000414

## REQUEST NO. 25

## Particular Investigative Techniques

[*If Applicable*]

You have heard reference [in the arguments of defense counsel in this case,] to the fact that certain investigative techniques were or were not used by law enforcement authorities. There is no legal requirement that law enforcement agents investigate crimes in a particular way or that the Government prove its case through any particular means. While you are to carefully consider the evidence presented, you need not speculate as to why law enforcement used the techniques they did, or why they did not use other techniques. The Government is not on trial and law enforcement techniques are not your concern.

Your sole concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of the defendant has been proven beyond a reasonable doubt.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 4-4; Hon. Kimba M. Wood, Jury Charge, *United States v. Cespedes-Pena*, 14 Cr. 520 (KMW); *see, e.g.*, *United States v. Knox*, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that the "government is not on trial" is "appropriate" (internal quotation marks omitted)); *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) ("The Court properly charged the jury to base its decision on the evidence or lack of evidence that had been presented at trial, and to focus solely on whether, in light of that evidence or lack of evidence, the jury was convinced beyond a reasonable doubt that the defendant was guilty of the crimes with which he was charged.").

37

A000415

## REQUEST NO. 26

### False Exculpatory Statements

[*If Applicable*]

You have heard testimony that the defendant made statements in which he claimed that his conduct was consistent with innocence and not with guilt. The government claims that these statements in which the defendant exculpated himself are false.

If you find that the defendant gave a false statement in order to divert suspicion, you may infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which the defendant is charged.

Whether or not the evidence as to the defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you, the jury, to decide.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 6-11.

## REQUEST NO. 27

## Use of Evidence Obtained Pursuant to Searches and Seizures

You have heard testimony about heard testimony about certain evidence searched and seized by law enforcement officers, including searches of vehicles and certain electronic devices. Evidence obtained from these searches and seizures was properly admitted in this case, and may be properly considered by you. Such searches and seizures were entirely appropriate law enforcement actions. Whether you approve or disapprove of how evidence was obtained should not enter into your deliberations, because I instruct you that the Government's use of the evidence is entirely lawful.

You must, therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the Government has proven the defendant's guilt beyond a reasonable doubt.

> Adapted from Hon. Jesse M. Furman, Jury Charge, *United States v. Ansah*, 19 Cr. 752 (JMF) (S.D.N.Y. 2021), and HonGregory H. Woods, Jury Charge, *United States v. Grant*, 16 Cr. 489 (GHW) (S.D.N.Y. 2018).

A000417

## REQUEST NO. 28

### Expert Testimony

In this case, I have permitted certain witnesses to express their opinions about matters that are in issue. A witness may be permitted to testify to an opinion on those matters about which he or she has special knowledge, skill, experience, and training. Such testimony is presented to you on the theory that someone who is experienced and knowledgeable in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing this opinion testimony, you may consider the witness's qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony. You may give the opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You should not, however, accept opinion testimony merely because I allowed the witness to testify concerning his or her opinion. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you. As with the testimony of any other witness, you may decide to accept all, some, or none of the testimony of any expert witness.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 7-21.

40

A000418

## REQUEST NO. 29

### Charts and Summaries: Admitted as Evidence

[*If Applicable*]

Some of the exhibits that were admitted into evidence were in the form of charts and summaries. I decided to admit these charts in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. You should consider these charts and summaries as you would any other evidence.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 5-12.

A000419

## REQUEST NO. 30

### Charts and Summaries: Not Admitted as Evidence

[*If Applicable*]

There have also been summary charts and exhibits introduced merely as summaries or analyses of testimony and documents in the case. The charts and exhibits act as visual aids for you. They are not, however, evidence in themselves. They are graphic demonstrations of underlying evidence. It is the underlying evidence and the weight which you attribute to it that gives value and significance to these charts. To the extent that the charts conform to what you determine the underlying facts to be, you should accept them. To the extent that the charts differ from what you determine the underlying evidence to be, you may reject them.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 5-13;
Hon. Richard J. Sullivan, Jury Charge, *United States v. Peirce*, 06
Cr. 1032 (RJS).

42

A000420

**REQUEST NO. 31**

**Stipulations of Fact**

In this case you have also heard evidence in the form of stipulations.  A stipulation of fact is an agreement between the parties that a certain fact is true.  You must regard such agreed-upon facts as true.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 5-6.

43

## REQUEST NO. 32

### Uncalled Witnesses – Equally Available or Unavailable

There are several persons whose names you have heard during the course of the trial but who did not appear here to testify.  I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses.  Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.  Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 6-7; *see United States v. Super*, 492 F.2d 319, 323 (2d Cir. 1974) (proper to instruct jury that no inference should be drawn from the absence of a witness who was equally unavailable to both sides); *accord United States v. Brown*, 511 F.2d 920, 925 (2d Cir. 1975).

44

A000422

## REQUEST NO. 33

### Defendant's Testimony

[*Requested Only If the Defendant Testifies*]

[*If the defendant testifies:*]   The defendant in a criminal case never has any duty to testify or come forward with any evidence.  This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the Government at all times, and the defendant is presumed innocent.  That burden remains with the Government throughout the entire trial and never shifts to a defendant.  A defendant is never required to prove that he or she is innocent.

In this case, the defendant did testify, and he was subject to cross-examination like any other witness.

[*If the defendant does not testify and requests an instruction concerning his election not to do so:*]  The defendant did not testify in this case.  Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove the defendant guilty beyond a reasonable doubt.   That burden remains with the Government throughout the entire trial and never shifts to a defendant.  A defendant is never required to prove that he is innocent.

You may not attach any significance to the fact that the defendant did not testify.  No adverse inference against her may be drawn by you because he did not take the witness stand.  You may not consider this against the defendant in any way in your deliberations in the jury room.

> Adapted from Hon. Denise L. Cote, Jury Charge, *United States v. Telemaque Lavidas.*, S1 19 Cr. 716 (DLC) (S.D.N.Y. 2020); Hon. J. Paul Oetken, Jury Charge, *United States v. Block*, 16 Cr. 595 (S.D.N.Y. 2017); and Hon. Gregory Woods, Jury Charge, *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

45

## REQUEST NO. 34

### Conscious Avoidance/Willful Blindness

[*If Applicable*]

In determining whether the defendant acted with the necessary knowledge, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. As you all know, if a person is actually aware of a fact, then he or she knows that fact. But the law also allows you to find that a defendant had knowledge of a fact when the evidence shows that he or she was aware of a high probability of that fact, but intentionally avoided confirming that fact. The law calls this "conscious avoidance" or "willful blindness."

One may not willfully and intentionally remain ignorant of a fact important to his or her conduct in order to escape the consequences of criminal law. And a person cannot look at all sorts of things that make it obvious to any reasonable person what is going on and then claim in court that because he or she deliberately avoided learning explicitly what was obvious anyway, he or she did not actually know the incriminating fact.

However, guilty knowledge may not be established by demonstrating that such defendant was merely negligent, foolish, or mistaken.

Keep in mind, however, that in considering the conspiracy charged in Count One, you cannot rely on conscience avoidance to support a finding that the defendant intentionally joined the conspiracy. Conscious avoidance may apply only to the defendant's knowledge of specific facts, including the specific objectives of the conspiracy, not to whether the defendant joined the conspiracy in the first place. It is logically impossible for the defendant to intend and agree to join a conspiracy if he does not actually know that it exists.

46

A000424

If you find that the defendant was aware of a high probability of a particular fact and that the defendant acted with deliberate disregard of that fact, you may find that the defendant acted knowingly.  However, if you find that the defendant actually believed that the fact was not so, you may not find that he acted knowingly.

It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 3A-2, 44-5; Hon. Jesse M. Furman, Jury Charge, *United States v. Dambelly*, 16 Cr. 2 (S.D.N.Y.); Hon. Loretta A. Preska, Jury Charge, *United States v. Tanner*, 17 Cr. 61 (LAP); Hon. Laura Taylor Swain, Jury Charge, *United States v. Bonventre*, 10 Cr. 228 (LTS); Hon. Richard J. Sullivan, Jury Charge, *United States v. Wadman*, 08 Cr. 1295 (RJS); Hon. John F. Keenan, Jury Charge, *United States v. Rohan Cameron*, 03 Cr. 1457 (JFK). A conscious avoidance charge is appropriate "(i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  *United States v. Henry*, 888 F.3d 589, 600 (2d Cir. 2018) (approving similar language); *United States v. Brito*, 907 F.2d 392, 396 (2d Cir. 1990) (same).

47

A000425

## REQUEST NO. 35

### Improper Considerations: Race, Religion, National Origin, Gender, Sexual Orientation, or Age

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. It would be improper for you to consider any personal feelings you have about the defendant's race, religion, national origin, gender, sexual orientation, or age. Similarly, it would be improper for you to consider any personal feelings you may have about the race, religion, national origin, gender, sexual orientation, or age of any other witness or anyone else involved in this case. The defendant is entitled to a trial free from prejudice and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Adapted from Hon. Kimba M. Wood, Jury Charge, *United States v. Cespedes-Pena*, 14 Cr. 520 (KMW).

48

A000426

## REQUEST NO. 36

### Juror Duty to Follow Instructions

Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you.  Also, if any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

> Adapted from Hon. Jed S. Rakoff, Jury Charge, *United States v. Andrew Ramsey*, 96 Cr 1098 (JSR); Sand, *Modern Federal Jury Instructions*, Instr. 2-2.

49

A000427

## REQUEST NO. 37

### Punishment Is Not to Be Considered by the Jury

The question of possible punishment of the defendant or the potential consequence of conviction is no concern to the jury and should not, in any sense, enter into or influence your deliberations. The duty of imposing sentence rests exclusively with me. Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt, solely on the basis of such evidence. Under your oath as jurors, you cannot allow consideration of the punishment that must be imposed on the defendant or the consequences of conviction, if he is convicted, to influence your verdict, in any way, or, in any sense, enter into your deliberations.

Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 9-1;
*see Shannon v. United States*, 512 U.S. 573, 579 (1994).

50

A000428

## REQUEST NO. 38

## Sympathy: Oath as Jurors

Under your oath as jurors, you are not to be swayed by sympathy. You are to be guided solely by the evidence in the case. You are to determine the guilt or non-guilt of the defendant solely on the basis of the evidence and subject to the law as I have charged you. I know you will try the issues that have been presented to you according to the oath which you have taken as jurors, in which you promised that you would well and truly try the issues joined in this case and render a true verdict. And I suggest to you that if you follow that oath without combining your thinking with any emotions, you will arrive at a just verdict. It must be clear to you that once you get into an emotional state and let fear or prejudice or bias or sympathy interfere with your thinking, then you don't arrive at a true and just verdict. Calm deliberation and good common sense are the qualities you should bring with you into the jury room.

The charges here are serious, and the just determination of this case is important to both the defendant and the Government. Under your oath as jurors, you must decide the case without fear or favor and solely in accordance with the evidence and the law.

If the Government has failed to carry its burden, your sworn duty is to bring in a verdict of not guilty. If the Government has carried its burden, you should not hesitate because of sympathy or any other reason to render a verdict of guilty.

> Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 2-12; Hon. Katherine B. Forrest, Jury Charge, *United States* v. *Ulbricht*, 14 Cr. 68 (KBF) (S.D.N.Y. 2015); Hon. Irving Kaufman, Jury Charge, *United State*s *v. Davis*, Appellant's Appendix at pp. 15a-16a, *aff'd*, 353 F.2d 614 (2d Cir. 1965).

51

A000429

**Conclusion**

Your function now is to weigh the evidence in this case and to determine whether the prosecution has proven the defendant guilty beyond a reasonable doubt with respect to each count in the Indictment.

You must base your verdict solely on the evidence and these instructions as to the law, and you are obliged under your oath as jurors to follow the law as I have instructed you, whether you agree or disagree with the particular law in question.

The verdict on each count must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.

Let me also remind you that you took an oath to decide this case impartially, fairly, without prejudice or sympathy, and without fear, solely based on the evidence in the case and the applicable law. Under your oath as jurors, you are not to be swayed by sympathy. You are to be guided solely by the evidence presented during the trial and the law as I have given it to you, without regard to the consequences of your decision.

You have been chosen to try issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy interfere with clear thinking, there is a risk you will not come to a just result. Both sides are entitled to a fair trial. You are to make a fair and impartial decision so that you come to a just verdict.

It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can possibly do so without violence to individual judgment. Each of you must decide the case for her or himself, but do so only after an impartial discussion and consideration of all the evidence in the case with your fellow jurors. In the course of your

deliberations, do not hesitate to re-examine your own views, and change an opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors.

If you are divided, do not report how the vote stands, and if you have reached a verdict, do not report what it is until you are asked in open court.

In conclusion, ladies and gentlemen, I am sure that, if you listen to the views of your fellow jurors and if you apply your own common sense, you will reach a fair verdict here.  Do not deliberate unless all twelve of you are in the jury room.

Remember that your verdict must be rendered without fear, without favor, and without prejudice or sympathy.

Members of the jury, I am going to ask you to remain seated briefly while I confer with counsel to see if there are any additional instructions that they would like to have me give to you. Because there is a possibility that I might find it proper to give you such additional instructions, I ask that you not discuss the case while seated in the jury box.

> Adapted from Hon. Kimba M. Wood, Jury Charge, *United States v. Cespedes-Pena*, 14 Cr. 520 (KMW).

* * *

53

A000431

The Government respectfully reserves the right to submit additional or modified requests at or near the close of evidence.

Dated: New York, New York
August 21, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:   _/s/_____.
Ashley C. Nicolas
Madison Reddick Smyser
Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2467/ -2381/ -2520

54

A000432

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x
                         :
                         :

**UNITED STATES OF AMERICA**    :
                         :

**- v -**                          :          22 Cr. 644 (JSR)
                         :

**LUCHA EL POR LIBERTAD,**    :
                         :
             Defendant.    :
--------------------------------------------------- :
                         x

## DEFENDANT LUCHA EL POR LIBERTAD'S
## REQUESTS TO CHARGE

**DAVID E. PATTON, ESQ.**
Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA EL POR**
**LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8735

**ZAWADI BAHARANYI, ESQ.**
**AMANDA MAYO, ESQ.**
<u>Of Counsel</u>

TO:    **DAMIAN WILLIAMS, ESQ**.
        United States Attorney
        Southern District of New York
        One. St. Andrew's Plaza
        New York, New York 10007
        Attn:   **ASHLEY NICOLAS, ESQ.**
               **MADISON REDDICK SMYSER, ESQ.**
               **SARAH MORTAZAVI, ESQ.**
               Assistant United States Attorneys

A000433

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------   x
                                                        :

**UNITED STATES OF AMERICA**         :
                                                        :

**- v -**                                            :                   22 Cr. 644 (JSR)
                                                      :

**LUCHA EL POR LIBERTAD**,      :
                                                        :

Defendant.                                :
------------------------------------------------------   x

## LUCHA EL POR LIBERTAD'S REQUESTS TO CHARGE

      Lucha El Por Libertad ("Lucha") respectfully requests that the Court include the following

in its charge to the jury.

A000434

## General Instructions

The defense respectfully requests that the Court give appropriate instructions with respect to the following matters:

- Functions of Court and jury

- Statements of Court and counsel not evidence

- Indictment not evidence

- Witness credibility

- Bias and hostility

- Right to see exhibits and have testimony read during deliberations

- Requirement of unanimity of verdict

- Stipulations

- Expert witnesses

- Government as a party

- Burden of proof

- Presumption of innocence

A000435

**Request No. 1**
**Count One: Conspiracy to Receive Firearms from Outside States of Residency**
**(18 U.S.C. § 371)**

Lucha is charged in Count One of the indictment with conspiracy to receive firearms from outside states of residency.

Count One of the indictment reads:

[Read Count One]

The relevant statute on this subject is 18 U.S.C. § 371. It provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

**Authority**

Adapted from 1 *Modern Federal Jury Instructions*, Instruction 19-1.

3

A000436

**Request No. 2**
**Count One: Elements generally**

In order to satisfy its burden of proof as to Count One, the government must establish each of the following four essential elements beyond a reasonable doubt:

First, that two or more persons entered the unlawful agreement charged in the indictment on or about May 2020 through July 2021;

Second, that the defendant knowingly and willfully became a member of the conspiracy;

Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and

Fourth, that the overt act(s) that you find to have been committed was (were) committed to further some objective of the conspiracy.

**Authority**

Adapted from 1 *Modern Federal Jury Instructions*, Instruction 19-3; *see also United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) (same requirements, but combining third and fourth elements).

4

A000437

**Request No. 3**
**Count One: First element:**
**Existence of the conspiracy**

The first element the government must establish beyond a reasonable doubt is that two or more persons entered the unlawful conspiracy charged in the indictment. A conspiracy is an agreement of two or more people to accomplish, by concerted action, an unlawful purpose. Thus, the government must prove that there was a mutual understanding between two or more people to cooperate with each other to accomplish an unlawful act, known as the object of the conspiracy.

Although you need not find that the alleged conspirators explicitly stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme, SAND the government must nevertheless prove that the defendant entered into an agreement with others with knowledge of the criminal purpose of the scheme and with the specific intent to aid in the accomplishment of those unlawful ends.

Here, the alleged object of the conspiracy was the transport and receipt of firearms outside the states of residency. As I will instruct you later as to Count Two, the elements of this crime are: first, that the individual was not a licensed importer, licensed manufacturer, licensed dealer or licensed collector; second, that the individual resided in a particular state at the time of the alleged crime; third, that the individual transported into the state in which he resided a firearm he purchased outside that state; and fourth, that individual acted willfully and knowingly. Although the actual commission of the object of the conspiracy is not an essential element of the crime of conspiracy, the government must still prove that the defendant and one or more other people agreed upon future conduct that includes all the elements of the object crime that I just set forth.

5

PINCKNEY. In particular, the government must prove that the defendant specifically intended to commit the object crime, and acted willfully and knowingly. ANDERSTON

## Authority

Adapted from 1 *Modern Federal Jury Instructions*, Instruction 19-4; *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014); *Svoboda*, 347 F.3d at 477; *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996); *United States v. Nieves*, 19-cr-354-JSR, Apr. 22, 2021 Tr. 1019-21.

6

A000439

**Request No. 4**
**Count One: Second element:**
**Membership in the conspiracy**

The second element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendant knowingly, willfully and voluntarily became a member of the conspiracy.

If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourselves who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective as an associate or worker?

In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, he must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor that you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendant can be found to have been a conspirator, you must first find that he knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

7

A000440

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

The defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not, by itself, make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a criminal himself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

8

A000441

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law.

**Authority**

Adapted from 1 *Modern Federal Jury Instructions*, Instruction 19-6; *United States v. Nieves*, 19-cr-354-JSR, Apr. 22, 2021 Tr. 1023.

A000442

**Request No. 5**
**Count One: Third element:**
**Commission of an Overt Act**

The third element that the government must prove beyond a reasonable doubt, to establish the offense of conspiracy, is that at least one of the overt acts charged in the indictment was knowingly committed by at least one of the conspirators, at or about the time and place alleged.

The indictment alleges the following overt acts:

(a) On or about September 22, 2020, the defendant sent a wire transfer in the amount of $350 from a check cashing facility in the Bronx, New York, to a co-conspirator in South Carolina.

(b) On or about October 1, 2020, the co-conspirator purchased a firearm from a federal firearms licensee in South Carolina.

In order for the government to satisfy this element, it is not required that all of the overt acts alleged in the indictment be proven. Furthermore, the overt act need not have been committed at precisely the time alleged in the indictment. It is sufficient if you are convinced beyond a reasonable doubt, that it occurred at or about the time and place stated. However, you must find that either the agreement was formed or that an overt act was committed in the Southern District of New York, which includes the Bronx and Manhattan, as well as Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan Counties.

**Authority**

Adapted from 1 *Modern Federal Jury Instructions*, Instruction 19-7.

10

A000443

**Request No. 6**
**Count One: Fourth element:**
**Commission of an Overt Act in Furtherance of Conspiracy**

The fourth, and final, element that the government must prove beyond a reasonable doubt is that the overt act was committed for the purpose of carrying out the unlawful agreement.

In order for the government to satisfy this element, it must prove, beyond a reasonable doubt, that at least one overt act was knowingly and willfully done, by at least one conspirator, in furtherance of some object or purpose of the conspiracy, as charged in the indictment. In this regard, you should bear in mind that the overt act, standing alone, may be an innocent, lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that, in and of itself is criminal or constitutes an objective of the conspiracy.

**Authority**

Adapted from 1 *Modern Federal Jury Instructions*, Instruction 19-8.

11

**Request No. 7**
**Count Two: Interstate Transport of Firearms (18 U.S.C. § 922(a)(3))**

The defendant is charged in Count Two with the transportation into the state where he resides firearms purchased by him outside that state. Count Two of the indictment reads: [Read Count Two]

The relevant statute on this subject is 18 U.S.C. § 922(a)(3). It provides, in relevant part, that: "It shall be unlawful . . . for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State."

**Authority**

Adapted from 2 *Modern Federal Jury Instructions* Instruction 35-16.

12

A000445

**Request No. 8**
**Count Two: Elements generally**

In order to prove the defendant guilty of the charge contained in Count II of the indictment, the government must establish beyond a reasonable doubt each of the following elements:

First, that the defendant was not a licensed importer, licensed manufacturer, licensed dealer or licensed collector;

Second, that the defendant resided in a particular state at the time of the alleged crime;

Third, that the defendant transported into the state in which he resided a firearm he purchased outside that state;

And fourth, that the defendant acted willfully and knowingly.

**Authority**

Adapted from 2 *Modern Federal Jury Instructions* Instruction 35-18 and *United States v. Parker*, 15-cr-10221, ECF No. 127 at 5-159 (D. Mass. Mar. 18, 2016); *see* 18 U.S.C. §§ 922(a)(3), 924(a)(1)(D); *United States v. Thompson*, 18-cr-126, ECF No. 588 at 1077 (W.D.N.Y. Mar. 11, 2020).

13

A000446

**Request No. 9**
**Count Two First Element:**
**Not a Licensed Importer, Manufacturer, Dealer, or Collector**

The first element that the government must prove beyond a reasonable doubt is that the defendant was not a licensed importer, manufacturer, dealer, or collector.

A person is an "importer" when he is "engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution."

A person is a "manufacturer" when he is "engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution … ."

A person is a "dealer" when he is "engaged in the business of selling firearms at wholesale or retail."

A person is a "collector" when he "acquires, holds, or disposes of firearms as curios or relics."

The terms "licensed importer," "licensed manufacturer," "licensed dealer" and "licensed collector" mean any such persons who are licensed under the provisions of the Gun Control Act.

**Authority**

Adapted from 2 *Modern Federal Jury Instructions* 35-19, 35-20; *see also* 18 U.S.C. § 921(a)(9)–(11), (13).

14

A000447

**Request No. 10**
**Counts Two Second Element:**
**Residency**

The second element that the government must prove beyond a reasonable doubt is that the defendant resided in a particular state at the time of the alleged crime. An individual resides in a state if he is present in a state with the intention of making a home in that state.

**Authority**

Adapted from *United States v. Parker*, 15-cr-10221, ECF No. 127 at 5-160 (D. Mass. Mar. 18, 2016).

15

A000448

**Request No. 11**
**Counts Two: Third element:**
**Transportation into State of Residence**

The third element that the government must prove beyond a reasonable doubt is that the defendant obtained the firearm outside of his state of residence and then transported it into that state.

In order to satisfy this element, the government must prove that the state in which the firearm was purchased was not defendant's state of residence and that the state into which the firearm was transported was defendant's state of residence.

**Authority**

Adapted from 2 *Modern Federal Jury Instructions* Instruction 35-21.

16

A000449

**Request No. 12**
**Counts Two: Fourth element:**
**Willfulness**

The fourth element that the government must prove beyond a reasonable doubt is that the defendant acted willfully and knowingly.

An act done willfully is one which is done knowingly and purposely and with the intent to do something that the law forbids, that is, the bad purpose to disobey the law. Therefore, in order to establish a willful violation in this case, the government must prove beyond a reasonable doubt that, when the defendant purchased a firearm outside of his state of residence, and transported it into and received it in his state of residence, he knew that his conduct was unlawful and he intended to disobey the law.

**Authority**

Adapted from 2 Modern Federal Jury Instructions Instruction 35-22; *see also Bryan v. United States,* 524 U.S. 184 (1998); *United States v. Hernandez*, 859 F.3d 817, 823 (9th Cir. 2017). In *Hernandez*, the Ninth Circuit recognized that this instruction is an "accurate[] state[ment]" of the law and appropriately makes clear that a defendant "could have acted willfully *only if* he knew that bringing the guns to [his state of residence] was somehow unlawful." *Id.* The Ninth Circuit went on to note that an instruction like this is necessary "where there is a serious risk that the jury might impute the willfulness to commit an uncharged crime to that required to prove the mens rea for the charged crime," such that "more is required to ensure the government meets its burden of proof and the jury performs its duty." *Id.*

17

A000450

**Request No. 13**
**Willfulness – Good Faith**

A person does not act willfully if he believes in good faith that he is acting within the law, or that his actions comply with the law. Therefore, if the defendant actually believed that what he was doing was in accord with his constitutional right to bear arms under the Second Amendment to the United States Constitution, then he did not willfully transport firearms into his state of residence. This is so even if the defendant's belief was not objectively reasonable, as long as he held the belief in good faith. However, you may consider the reasonableness of the defendant's belief, together with all the other evidence in the case, in determining whether the defendant held that belief in good faith.

**Authority**

Seventh Circuit Pattern Charge 6.11, available at https://www.ca7.uscourts.gov/pattern-jury-instructions/Bauer_pattern_criminal_jury_instructions_2022updates.pdf; *see Ratzlaf v. United States*, 510 U.S. 135, 144–46 (1994); *Cheek v. United States*, 498 U.S. 192, 201 (1991). Although the Supreme Court held in *Bryan*, 524 U.S. 184, that "the willfulness requirement of § 924(a)(1)(D) does not carve out an exception to the traditional rule that ignorance of the law is no excuse," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which upended more decades of jurisprudence, certainly makes it clear that reasonable minds can differ about the scope and meaning of the Second Amendment. Given this, and the fact that the instant case, like *Ratzlef*, "involve[s] highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct," *Bryan*, 524 U.S. at 194, a good faith charge is warranted.

18

A000451

**Request No. 14**
**Special Jury Verdict**

In rendering your verdict, I will be asking you to fill out special verdict forms that contain a series of questions. Your answers to these special verdicts shall be either "yes" or "no" and the answers must be unanimous. After all of you agree on the answer to the questions in these special verdicts, the foreperson should write the answer and initial and date each of the forms.

**Authority**

*Modern Federal Jury Instructions*, Instruction 9-9; *United States v. Reed*, 147 F.3d 1178, 1181 (9th Cir. 1998) (finding a special verdict form to be appropriate where it "requires the jury to determine the occurrence of any of a series of acts, each of which is sufficient to constitute the indicted crime"); *United States v. Robinson*, 16-CR-622 (special verdict form used to identify which images of child pornography the jury unanimously agreed upon).

19

A000452

**Request No. 15**
**Number of Witnesses**

Do not make any decisions simply by counting the number of witnesses who testified about a certain point.  What is important is how truthful and accurate the witnesses were and how much weight you think their testimony deserves.

**Authority**

Seventh Circuit Pattern Jury Instruction 2.04.

20

A000453

**Request No. 16**
**Defendant's election not to testify**
**(if applicable)**

Lucha did not testify in this case. Under our constitution, he has no obligation to testify or to present any evidence because it is the government's burden to prove him guilty beyond a reasonable doubt. The right of a defendant not to testify is an important part of our constitution.

As I stated earlier, this burden remains with the government throughout the entire trial and never shifts to Lucha. He is never required to prove that he is innocent. The right of a defendant not to testify is an important part of our Constitution. As the Supreme Court of the United States has said,

> it is not everyone who can safely venture on the witness stand though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others . . . [may] confuse and embarrass [a defendant] to such a degree as to increase rather than remove any prejudice against him. It is not everyone, however honest, who would therefore willingly be placed on the witness stand.

You may not speculate as to why Lucha did not testify. There are many reasons why a defendant may decide not to testify. A defendant may feel because of the strain of being a witness, the tension, that he may not be calm. A defendant may be embarrassed by his inability to speak well in front of a group of people. You are not to speculate as to these things. You may not draw any inference whatsoever from Lucha's decision not to take the stand.

**Authority**

Adapted from charge by Hon. Robert P. Patterson, Jr., in *United States v. Anibal Soto*, 12 Cr. 556 (RPP), and Sand, *Modern Federal Jury Instructions*, 5-21; *see also Carter v. Kentucky*, 450 U.S. 288, 300 n.15 (1981); *Griffin v. California*, 380 U.S. 609, 613 (1965).

21

A000454

**Request No. 17**
**Defendant's election to testify**
**(if applicable)**

As I instructed you earlier, the defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because the burden of proof beyond a reasonable doubt remains on the government at all times, and the defendant is presumed innocent.

In this case, Lucha did testify and he was subject to cross-examination, like any other witness. The fact that he testified does not in any way remove or lessen the burden on the government to prove the charges against him beyond a reasonable doubt. Lucha did not have to testify and, in fact, did not have to present any evidence whatsoever. You should examine and evaluate his testimony just as you would the testimony of any witness. You should not disregard or disbelieve his testimony simply because he is charged as a defendant in this case. I also remind you that Lucha's decision to testify does not in any way shift the burden of proof to him.

Do not ask yourself whether his testimony convinces you that he is not guilty. Rather, you must consider all the evidence and the lack of evidence presented, and then ask yourselves whether or not the government has proven the charges contained in the indictment beyond a reasonable doubt.

**Authority**

Adapted from *Modern Federal Jury Instructions*, Instruction 7-4; *see United States v. Gaines*, 457 F.3d 238, 249 and n.9 (2d Cir. 2006)

22

A000455

**Request No. 18**
**Unconscious Bias**

When you deliberate, it will be your duty to weigh and to evaluate all the evidence received in the case and in that process to decide the facts.

We all have or have had feelings, assumptions, perceptions, fears and stereotypes also known as biases about people and places that have affected our memories, our thoughts, what we see or hear and/or decisions we make or have made. Some biases we are aware or conscious of and others we might not be fully aware of, which is why they are called "implicit biases" or "unconscious biases."

Unconscious/implicit biases are stereotypes, attitudes, or preferences that we express without conscious awareness, control or intention that can affect how we evaluate information and make decisions.

You must decide the case solely on the evidence and the law before you and resist jumping to conclusions based in favor of or against any party, witness or the defendant because of his or her disability, gender, race, religion, ethnicity, sexual orientation, age, national origin, or socioeconomic status.

If you suspect that you, or a fellow juror, are about to reach a conclusion about a defendant, witness or party to this case through a stereotypical lens, stop yourself and focus simply on the evidence and the legal instructions I have given you. For guidance, if you find yourself or a fellow juror influenced by a stereotype about an individual, presume the individual does not have said stereotype and then again focus solely on the evidence presented and the legal instructions I have given you.

23

**Authority**

Adapted from Ninth Circuit Pattern Jury Instruction 1.1.; Western District of Washington, Illinois Pattern Jury Instructions 1.08; California Civil Jury Instructions 113.

A000457

**Request No. 19**
**Duty to Deliberate**

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that--your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself if the government has proved the defendant guilty beyond a reasonable doubt.

**Authority**

Adapted from Sixth Circuit Pattern Criminal Jury Instruction 8.04.

25

A000458

**Request No. 20**
**Separate Consideration of Multiple Counts**

Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one. Your verdict on one count should not control your decision as to any other count.

**Authority**

Ninth Circuit Pattern Charge 3.11; Seventh Circuit Pattern Charge 7.03.

26

A000459

**Request No. 21**
**Law Enforcement and Government Witnesses**

You have heard testimony from law enforcement officers and employees of the federal government. The fact that a witness may be law enforcement or employed by a government agency does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

At the same time, it is quite legitimate for defense counsel to try to attack the believability of a law enforcement witness on the ground that his or her testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness and to give to that testimony whatever weight, if any, you find it deserves.

**Authority**

Adapted from *Modern Federal Jury Instructions*, Instruction 7-16

27

A000460

**Request No. 22**
**Reasonable Doubt**

I have said that the government must prove Lucha guilty beyond a reasonable doubt. The question then is: what is a reasonable doubt? The words almost define themselves. It is doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt which would cause a reasonable person to hesitate to act in a matter of the highest importance in his or her life.

Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

In a criminal case, the burden is at all times upon the government to prove guilt beyond a reasonable doubt. The law does not require that the government prove guilt beyond all doubt; proof beyond a reasonable doubt is sufficient to convict. This burden never shifts to Lucha. Even if Lucha has presented evidence in his defense, it is not his burden to prove himself innocent. It is always the government's burden to prove each of the elements of the crime charged beyond a reasonable doubt.

If, after fair and impartial consideration of all the evidence and lack of evidence, you are satisfied of Lucha's guilt beyond a reasonable doubt, you should vote to convict. On the other hand, if after fair and impartial consideration of all the evidence and any lack of evidence you have a reasonable doubt, it is your duty to acquit Lucha.

**Authority**
Adapted from *Modern Federal Jury Instructions*, Instruction 4-2.

A000461

**Request No. 23**
**Theory of Defense**

Lucha requests the opportunity to submit a theory of defense charge to the Court at the close of the evidence.

A000462

**Request No. 24 Defendant's Name**

Throughout the trial you have heard the defendant referred to as Lucha El Por Libertad. Lucha El Por Libertad, or simply Lucha, is Steven Perez's preferred name and it is the name he goes by. Lucha El Por Libertad and Steven Perez are the same person.

Dated:    August 21, 2023               Respectfully submitted,
           New York, New York

                                           _____*/s/ Zawadi S. Baharanyi*

                                          Zawadi S. Baharanyi, Esq.
                                          Amanda J. Mayo, Esq.
                                          Federal Defenders of New York
                                          52 Duane Street, 10th Floor
                                          New York, NY 10038
                                          (917) 612-2753

A000463

N8p2PerA kjc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4                 v.                        22 Cr. 644 (JSR)

5    STEVEN PEREZ
             a/k/a "Lucha El Por
6                 Libertad,"

7                 Defendant.

8    ------------------------------x       Argument

9                                          August 25, 2023
                                           2:05 p.m.
10

11   Before:

12                        HON. JED S. RAKOFF,

13                                         District Judge

14
                            APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  ASHLEY C. NICOLAS
          MADISON R. SMYSER
18        SARAH MORTAZAVI
          Assistant United States Attorneys
19

20   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
21   BY: ZAWADI S. BAHARANYI
         AMANDA JOY MAYO
22

23   Also Present:

24   Arjun Ahuja, Paralegal USAO
     Ananya Sankar, Paralegal USAO
25   Sarah Kwon, Paralegal Federal Defenders of New York

A000464

N8p2PerA kjc

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Will the parties please identify |
| 3 | themselves for the record. |
| 4 | MS. NICOLAS:  Good afternoon, your Honor.  At |
| 5 | counsel's table for the government, Ashley Nicolas, Madison |
| 6 | Smyser, and Sarah Mortazavi.  We are also joined by paralegal |
| 7 | specialist Arjun Ahuja. |
| 8 | THE COURT:  Good afternoon. |
| 9 | MS. BAHARANYI:  Good afternoon, your Honor.  Zawadi |
| 10 | Baharanyi of the Federal Defenders of New York.  I am joined by |
| 11 | Amanda Mayo and Sarah Kwon.  We are all here on behalf of Lucha |
| 12 | El, who is seated to my right. |
| 13 | THE COURT:  Good afternoon. |
| 14 | All right.  This conference was requested to deal with |
| 15 | various motions *in limine* that have been filed. |
| 16 | Before we turn to that, I will note for the record |
| 17 | that the defendant filed with the Clerk of the Court a couple |
| 18 | of weeks ago a document that he submitted *pro se* that he |
| 19 | labeled a motion to dismiss.  The first portion of that motion |
| 20 | appears to be an interpretation of the *Bruen* case from the |
| 21 | Supreme Court. |
| 22 | He then turns to expressing his views of the Court. |
| 23 | He says, beginning on page 4, "Judge Rakoff is an evil man. |
| 24 | This judge has been doing everything in his power to make sure |
| 25 | the injustice done against me sticks.  He is a terrible man who |

N8p2PerA kjc

1    is and has allowed a malicious prosecution against me,

2    Lucha El, a man just like him.  I say this.  He will not break

3    me because Allah is the best of planners.  Judge Rakoff is an

4    example of what is wrong with the system.  The man is playing

5    with my life, going against the law of the land, going against

6    the Supreme Court's decision.  He continues to spit on my

7    rights as a man.  This man is tyrant relying on British

8    colonial law."  And he continues with similar accusations for

9    another considerable length.

10            Fortunately, the role of the judge in any case is to

11    be oblivious to such attacks, and I will be.  But I note

12    something else, which is that the defendant had no authority to

13    file this.  The United States Court of Appeals for the Second

14    Circuit addressed this most recently in a case called *United

15    States v. Haje* that was decided on July 20 of this year.  It

16    says, "The Sixth Amendment gives criminal defendants the right

17    to representation by counsel or, should they so choose, to

18    represent themselves.  A defendant has, however, no right to

19    hybrid representation in which he is represented by counsel but

20    supplements his lawyers' work with selected *pro se*

21    submissions."

22            I should ask defense counsel, did you know that your

23    client had submitted that?

24            MS. BAHARANYI:  Your Honor, at the time of the notice

25    is when we received notice about the letter, the document.  We

N8p2PerA kjc

1    have since spoken with him.  We have actually at this time --

2    well, last week, on his behalf, withdrew the interlocutory

3    appeal.  So I don't think that is something that is still

4    pending or an issue in this matter at this time.

5            THE COURT:  It is not even clear to me that it was an

6    interlocutory appeal because it had different labels on it.

7    But that is not really my point.  My point is that, as the

8    Second Circuit has made crystal clear just a few days before he

9    submitted this, if he is represented by counsel, he can't

10   submit anything at all.  You understand that, do you not?

11           MS. BAHARANYI:  Your Honor, I absolutely understand

12   you.

13           THE COURT:  So should he submit anything else to this

14   Court——and he submitted this to the Clerk of the Court——I will

15   direct that it be not filed and disregarded in its entirety.

16   Understood?

17           MS. BAHARANYI:  Understood, your Honor.

18           THE COURT:  Very good.

19           Now, turning to the motions *in limine*, the government

20   first asked for a pretrial ruling that the following two

21   categories of evidence are admissible.  Before I turn to my

22   rulings, I want to remind counsel that, first, there is no

23   actual right to a motion *in limine*.  It is nowhere contained in

24   any law of the United States.  Nevertheless, most judges,

25   including this judge, allow it as a way to try to expedite and

A000467

5

N8p2PerA kjc

1    simplify trials.  But what I have learned from long experience

2    is that many issues cannot be resolved before trial because

3    they turn on the specific testimony that is offered in response

4    to a specific question.  Moreover, frequently, even where a

5    particular kind of evidence has been in general excluded on a

6    motion *in limine*, frequently the door is then opened by the

7    party that won that motion through other submissions they make,

8    and it would be totally unfair to ignore that door-opening.  So

9    all decisions that I make on motions *in limine* are for guidance

10   purposes but may be subject to limitations, further objections,

11   further discussions as we go along.

12           Having said that, the first category that the

13   government seeks a ruling that it's admissible is "gun

14   purchases made by Keith Vereen, the defendant's coconspirator,

15   as direct evidence of the conspiracy to violate 18 U.S.C.

16   922(a)(3) charged in Count One of the operative indictment or,

17   in the alternative, under Federal Rule of Evidence 404(b)."  I

18   think at least some of that evidence is admissible as direct

19   evidence of the conspiracy.  I am more doubtful that it would

20   come in under 404(b).  So the best I can tell you at this point

21   is that it is presumptively admissible, but I am not making a

22   categorical ruling, and more specific objections will be

23   considered when specific evidence is produced.

24           This is even more true of the second category, which

25   is, "The facts and circumstances surrounding the arrest of the

A000468

6

N8p2PerA kjc

1   defendant and others following a car stop and armed standoff in

2   Massachusetts on or about July 3, 2021."  So I think some of

3   that evidence is evidence that bears on the pattern of gun

4   trafficking that forms the basis of the conspiracy charge, but

5   other of the evidence does not seem to me to be so obviously

6   relevant, let alone unprejudicial.  For example, testimony from

7   Massachusetts state troopers about how the incident escalated

8   into a standoff seems to me irrelevant and potentially

9   prejudicial under Rule 403.

10          So, again, the best I can do for you at this point is

11  to say that, as a general matter, some of the facts and

12  circumstances surrounding the arrest of the defendant and

13  others following the car stop in Massachusetts on or about July

14  3 will be likely received, but we will have to take it one item

15  and one question at a time.

16          Now, the government also moves to preclude the

17  defendant from introducing evidence in argument or pursuing on

18  cross-examination the following:

19          First, testimony in a prior suppression hearing by New

20  York City Police Department officer Jarren Smalls.  Let me ask

21  the government, Mr. Smalls is not a government witness or is

22  he?

23          MS. NICOLAS:  He is, your Honor, yes.

24          THE COURT:  So I don't see how I can either exclude or

25  permit inclusion of that testimony until I hear what is brought

A000469

N8p2PerA kjc

1  out on direct testimony and what is the nature of

2  cross-examination.  I don't think I can rule on that one at all

3  at this stage.

4          Second, the government wants to preclude evidence of a

5  dismissed *pro se* civil lawsuit brought by the defendant and

6  others arrested with him in Massachusetts on or about July 3,

7  2021, alleging various violations of their constitutional

8  rights.  That motion to exclude is granted.

9          Third, the government seeks to preclude the defendant

10  from introducing evidence, argument, and so forth that the

11  defendant's receipt of firearms was not unlawful under the

12  Second Amendment.  That motion to exclude is granted.

13          Turning to the defense motions, the defense wants to

14  first exclude evidence that Mr. Lucha did not have a New York

15  State firearms license.  I am skeptical that that will come

16  into evidence, but I'm not making a final decision.  What

17  should happen in a situation like this is at the point in time

18  where the defense proposes to put a question or introduce

19  evidence relating to that, they should first approach the

20  sidebar and we will hear where things stand at that moment in

21  time out of the presence of the jury.

22          Next, the defense moves to exclude the testimony of

23  the government's firearms expert, Special Agent Lennea Gordon.

24  That motion is denied.

25          Next, the defense moves to exclude testimony of the

A000470

N8p2PerA kjc

1    government's historical cell site location expert Andrew

2    Petersohn or hold a *Daubert* hearing.  I think that a *Daubert*

3    hearing would be useful on the limits of that testimony.  When

4    does the government expect to call Mr. Petersohn.

5              MS. SMYSER:  It depends on how quickly things are

6    moving, your Honor, but I would expect on Tuesday morning is

7    probably most likely.

8              THE COURT:  So what I think we will do is we will find

9    a place Monday afternoon to have that hearing.  I don't imagine

10   it will be a very lengthy hearing.  But I am concerned, for

11   example, about whether his testimony will bring out, as I think

12   is appropriate from an expert, the limits of what he is able to

13   opine upon in terms of location and alternative possibilities

14   and things like that.  So I think it's best to clarify that

15   with him in advance through a brief *Daubert* hearing, so we will

16   do that Monday afternoon.

17             MS. SMYSER:  Your Honor, his testimony certainly will

18   opine on some of those limitations which --

19             THE COURT:  Maybe this will be moot after we hear what

20   he is going to say in more specific detail, but it can't hurt

21   to get it settled before he testifies Tuesday morning.

22             MS. SMYSER:  Understood.  I just wanted to flag one

23   issue for the Court about a Monday afternoon hearing.

24   Mr. Petersohn has a prior commitment to testify at a municipal

25   hearing in Pennsylvania on Monday evening.  He would need to

N8p2PerA kjc

1    leave the courthouse here by 4:30.  If it's possible to do it

2    at lunch or slightly earlier in the day, I think that would

3    greatly assist him, but I just wanted to flag that for the

4    Court.

5              THE COURT:  Linda, what else do we have on, if

6    anything, that afternoon?

7              THE DEPUTY CLERK:  We just have a 4:30 criminal status

8    conference.

9              THE COURT:  So why don't we do this.  I will excuse

10   the jury sometime between 3:30 and 4:00, and we will turn

11   directly, then, to that, so he will be out of here by 4:30.

12             MS. SMYSER:  Okay.  Understood, your Honor.  Thank

13   you.

14             THE COURT:  Now, is there any motion that I have

15   overlooked?

16             MS. NICOLAS:  Not from the government's perspective,

17   your Honor.

18             (Counsel confer)

19             MS. BAHARANYI:  Your Honor, no motions that you have

20   overlooked.

21             If I may have a moment just to respond briefly

22   regarding your Honor's ruling on Massachusetts?

23             One of the, perhaps, issues that we have encountered

24   in preparing for the motions *in limine* is grappling with how

25   the government intends to move forward with this conspiracy

A000472

N8p2PerA kjc

1  charge, and specifically whether the government is seeking to

2  prove that firearms are received into the state of residence of

3  New York as part of that conspiracy charge or whether their

4  theory is different, that these are firearms that are received

5  into various other states by other individuals.

6         THE COURT:  All right.  Well, let's ask them.

7         MS. SMYSER:  Your Honor, I think it's both.

8         So, first and foremost, those guns are received in

9  New York in the state of residence of the defendant, but the

10  conspiracy is a little broader than that.  As discussed in our

11  motions, before that Massachusetts arrest, the defendant and

12  others who are arrested traveled from New York through

13  Massachusetts, and they were headed to Maine.  Before they left

14  for Massachusetts, they met in Rhode Island.  So the

15  government's theory is that they transported those firearms

16  from New York with them to Rhode Island, and they met some

17  Rhode Island residents who are part of that arrest, including

18  the leader, Jamhal Latimer, including another man who was

19  arrested, Quinn Cumberlander.  So part of 922(a)(3) is the

20  transport of firearms that were obtained outside of someone's

21  state of residence into that state of residence.  So this

22  conspiracy is broader than just simply New York, but it

23  certainly --

24         THE COURT:  All right.  So that should answer the

25  question.  It will be -- I will start to think about, in terms

N8p2PerA kjc

1    of the charge, whether we will need to, as I think we may, have

2    a unanimity charge, that the jury has to indicate whether they

3    unanimously found it was the New York or the other or both that

4    were involved or something along those lines.  I am painting

5    with too broad a brush here, but you get the idea.  But,

6    anyway, I think now you have the answer to your question.

7            MS. BAHARANYI:  Your Honor, and I think it further

8    underscores some of our confusion about the relevance of

9    Massachusetts in all of this, but we understand the Court's

10   ruling and we will bring that up at the appropriate time.

11           THE COURT:  Okay.  Now, let me just mention, in terms

12   of procedures, the jury panel is usually available by 10:30,

13   sometimes as early as 10:00, so why don't we convene in this

14   courtroom at 9:30, even though it may be that there will be

15   nothing to do until 10:00.

16           How long does the government want for openings?  I'm

17   sorry, before we get to opening statements, we will pick 12

18   jurors and then two alternates.  With respect to the 12 jurors,

19   the government will have six challenges, the defense ten, and

20   we will do that in six rounds.  In the first four rounds, the

21   government has one challenge followed by two by the defense.

22   In the last two rounds, it is one and one.

23           If any party waives their challenge in a given round,

24   they lose that challenge; but unless both sides waive all their

25   challenges in that round, we continue.  So, for example, if in

N8p2PerA kjc

1    round three the government waived its challenge but the defense

2    exercised at least one of its two challenges, then the

3    government will lose that challenge, but we would still go on

4    to round four.  If, by contrast, in round five both sides waive

5    their challenges, then we don't go on to round six.  Then we

6    have the jury.

7              With respect to the alternates, each side will have

8    one challenge, but they will be exercised not in the same

9    round.  So it will be first one challenge for the government,

10   then we will fill -- if the government exercises a challenge,

11   we will fill that seat and there will be one challenge for the

12   defense.

13             I use the jury box method of selection, so we will

14   randomly call up 12 jurors.  I will question them for cause,

15   and then we will turn it over to prosecution and defense

16   counsel for their peremptory challenges.

17             Any question about any of that?

18             MS. NICOLAS:  No question on the process, your Honor,

19   no.

20             (Counsel confer)

21             MS. BAHARANYI:  Not at this time, your Honor.

22             THE COURT:  Well, this is the time.

23             MS. BAHARANYI:  I think by that, your Honor, we may

24   have a question before we get started on Monday morning, but I

25   hope to preview that to the Court well in advance.  We just

A000475

N8p2PerA kjc

1    want a moment to discuss and also discuss with our supervisors.

2            THE COURT:  Well, do you want to give me a hint?  We

3    are having this conference because the parties wanted to try to

4    sort things out as best they could before we started on Monday.

5            MS. BAHARANYI:  To be very transparent, your Honor, I

6    just want to make sure I understand the full rounds process.

7            THE COURT:  Okay.  It's the one I have used for the

8    last 27 years, so you might want to talk to your colleagues --

9            MS. BAHARANYI:  Right, exactly.

10            THE COURT:  -- who have seen it many times.

11            MS. BAHARANYI:  We have so many people in our office

12    who can help us on that.

13            THE COURT:  Okay.

14            Then opening statements, how long -- and by the way,

15    usually it takes me about an hour to pick the jury.  We will

16    then take a 10- or 15-minute break, and then we will have

17    opening statements.

18            We won't have lunch until 1:00.  This will be true

19    every day.  We will sit normally from 9:30 to 1:00 with a short

20    break mid morning and then we will sit in the afternoon

21    possibly as late as 4:30, never more than 4:30.  Some days it

22    will only be until 4:00 if I have other matters that have to be

23    taken up, like the one we just discussed.

24            So anyway, how long does the government want for

25    opening statements?

N8p2PerA kjc

1      MS. NICOLAS:  Your Honor, in the neighborhood of about

2   ten minutes.

3      THE COURT:  Okay.  And defense counsel?

4      MS. MAYO:  About the same, your Honor.

5      THE COURT:  That's fine.  Okay.

6      MS. NICOLAS:  Your Honor, if I may, just one point on

7   openings just to clarify one of your Honor's earlier rulings,

8   just being cognizant and not wanting to draw objections in the

9   opening.  As it relates to the New York gun registration of the

10   defendant, I do expect that there will be mention of the

11   defendant's ability to obtain guns in his own state as part of

12   his motivation to obtain guns from out of state, and so I do

13   want to flag that.

14      THE COURT:  That's the rationale you gave and I

15   understand that, and tentatively I am persuaded.  But this was

16   not -- this came up in the motions *in limine* in regards to

17   another person, not the defendant, or maybe I misunderstood.

18      MS. NICOLAS:  I do think it was raised as to the

19   defendant.

20      THE COURT:  I'm sorry.  I got confused by the name

21   there.  Okay.  Very good.  Anyway, I think that is a

22   permissible argument.  If the evidence turns out to be excluded

23   later on, of course I am going to instruct the jury at the very

24   beginning that nothing that counsel says is evidence, so we

25   will proceed accordingly.  But thank you for that

N8p2PerA kjc

1  clarification, because I think that it does—my mistake in

2  forgetting the numerous names that the defendant operates

3  under—directly pertain to the motive of this defendant, so I

4  think that is a likely basis for admissibility.

5          MS. NICOLAS:  Thank you, your Honor.

6          I think the government doesn't have anything else to

7  raise at this time.

8          THE COURT:  Let me ask defense counsel, how would you

9  prefer my referring to the defendant?

10          MS. BAHARANYI:  Your Honor, we would prefer that we

11 use his name Lucha El.  I also know we are not at that stage

12 yet, we did propose some language about how to address this

13 with the jury in jury instructions, and that's something that

14 maybe we can discuss on Monday morning, as well.

15          THE COURT:  Yes.  We will have a little time Monday

16 morning.  I think I will have to tell the jury during voir dire

17 his other names, because someone may know him or something like

18 that, but as the trial goes on, I am happy to keep it to

19 Lucha El.  Is that how you pronounce it?

20          MS. BAHARANYI:  Lucha El.

21          THE COURT:  Lucha.  Thank you very much.

22          MS. NICOLAS:  The one point the government would raise

23 on this, your Honor, and of course no offense intended to the

24 defendant at all, but much of the government's evidence will

25 contain the defendant's legal name, Steven Perez.  For

N8p2PerA kjc

1    instance, Western Union records do not refer to him as Lucha,

2    and there will be witnesses who only know him by his government

3    name.

4            THE COURT:  That's another reason why at least we have

5    to -- the jury has to know of his other name.  But I don't want

6    to have to, every time I refer to him, go through several

7    names.  I think that would not be appropriate.  So I am happy

8    for, in my statements, to refer to him as Lucha El.

9            Anything else we need to take up?

10           MS. BAHARANYI:  Yes, from the defense.

11           This is not with respect to trial procedure.  We put

12   in a motion requesting that Lucha El be able to be removed from

13   the ankle monitor curfew condition, but I think we have that

14   request starting as of Monday.  He is here in our office

15   already, and I understand that removing an ankle monitor just

16   requires cutting it off by one of us or pretrial.  My request

17   would be to allow that modification to take place as of

18   effective today, meaning he would be able to remove the ankle

19   monitor or we would be able to do it for him today before he

20   leaves our office.

21           THE COURT:  What's the government's view?

22           MS. NICOLAS:  Your Honor, I don't know that there is a

23   justification to change the bail conditions in the weekend

24   before a criminal trial, where there is a strong likelihood of

25   success on the merits.  The government's evidence is quite

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000479

N8p2PerA kjc

1 strong of conviction and ultimately a jail sentence.  I think

2 at any point during an individual's release, that the weekend

3 before they begin their trial is perhaps the time when

4 temptation to flee would be at its greatest.  Acknowledging

5 that the defendant has been compliant with his conditions, I

6 understand the prejudice that the defense has argued and the

7 desire to remove it the morning of trial.  I don't see an

8 additional justification to remove it today.

9   MS. BAHARANYI:  If I may add, your Honor, of all of my

10 clients, I have never been less concerned about flight than

11 Lucha El.  He is very eager to have his day in court, has been

12 here for every single appearance, has made every check-in with

13 pretrial, has been fully active and engaged.  That is not going

14 to change over the weekend.  I think he is just even more eager

15 to have his day in court come Monday.

16   THE COURT:  Well, I don't understand.  At this point

17 it's simply an inconvenience, whereas starting at the trial

18 it's more than an inconvenience, it's something that could be

19 visible to the jury, and that's why I allowed it to be removed

20 starting Monday morning.  At this point I don't understand why

21 it is anything more than just an inconvenience and so what?

22   MS. BAHARANYI:  I think it is also no longer -- the

23 prejudice is certainly there, and that's why we absolutely want

24 it removed by trial.  But there is also this need for these

25 conditions to be meeting some -- well, meeting a need, and he

A000480

N8p2PerA kjc

1    has shown himself over several months to not be any sort of

2    flight risk warranting continued ankle monitoring even for

3    another day or two longer.  I think he's shown quite the

4    contrary.

5              THE COURT:  I am impacted, I'm sorry to say, by the

6    fact that over the last few years, after many, many years of

7    never having defendants flee, I and I think some of my fellow

8    judges have repeatedly been confronted with people who have

9    fled, and often they are people whose able lawyers said, you

10   don't need further conditions, Judge, because he's appeared for

11   every proceeding and all like that and then, as trial neared,

12   for the very reasons the government just mentioned, it became

13   more stressful for the defendant.  In two cases I am thinking

14   of in particular in the last few years, the defendant fled and

15   was never recovered.  So I am going to deny the motion.

16             That concludes the proceeding.

17                             oOo

18

19

20

21

22

23

24

25

N8SAAPER1                     Jury Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                            S1 22 CR 644 (JSR)

5   STEVEN PEREZ, A/K/A "LUCHA,",

6             Defendant.

7   ------------------------------x

8                                      New York, N.Y.
                                       August 28, 2023
9                                      9:30 a.m.

10

    Before:
11
                         HON. JED S. RAKOFF,
12
                                       District Judge
13

14                         APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    ASHLEY NICHOLAS
17  MADISON SMYSER
    SARAH MORTAZAVI
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK
         Attorneys for Defendant Perez
20  ZAWADI BAHARANYI
    AMANDA MAYO

21

22  ALSO PRESENT:  ANANYA SANKAR, Paralegal, U.S. Attorney's Office
         ARJUN AHUJA, Paralegal, U.S. Attorney's Office
         SARAH KWON, Paralegal, Federal Defenders of New York
23

24

25

N8SAAPER1                    Jury Trial

```
 1              (Case called)
 2              MS. NICHOLAS:  Ashley Nicholas, Madison Smyser and
 3     Sarah Mortazavi for the government, joined at counsel table by
 4     paralegal specialist Arjun Ahuja.
 5              THE COURT:  So, the FBI has nothing but special agents
 6     and I'm glad to know that U.S. Attorney's Office has nothing
 7     but paralegal specialists.  Some day I'll be a paralegal
 8     generalist but probably not in my life time.
 9              MS. BAHARANYI:  Good morning, your Honor.
10              Zawadi Baharanyi, on behalf of Lucha El Por Libertad.
11     I am also joined by our paralegal specialist Sarah Kwon.
12              THE COURT:  Let me have my law clerk hand to each side
13     a copy of my preliminary instructions.  Thank you to both sides
14     for submitting your proposed instructions.  Take a look at this
15     because we will want to read it to the jury before opening
16     statements.
17              Second, my law clerk tells me we've not yet received
18     from the parties the list of persons, witnesses and others who
19     we need for the voir dire.
20              MS. NICHOLAS:  We're handing up that hard copy now,
21     your Honor.
22              THE COURT:  Very good.  And from the defense?
23              MS. BAHARANYI:  Your Honor, I am checking in our
24     proposed voir dire, I think we included our names in those
25     questions but what we can do is coordinate with the government
```

N8SAAPER1                     Jury Trial

1    to make sure you have a complete list.

2              THE COURT:  Let me take a look at your voir dire.

3              (Pause)

4              THE COURT:  I don't see it in the defense voir dire.

5    Do you have a copy of your voir dire?

6              MS. BAHARANYI:  Your Honor, I do.  And it lists our

7    names.  So, names of the parties.  There's only one additional

8    name.  So if I may, your Honor, I might write that name on this

9    voir dire copy and pass it up to the Court.

10             THE COURT:  Well, just give me the name.

11             MS. BAHARANYI:  The first name is Maria --

12             THE COURT:  Okay.  Hold on.

13             MS. BAHARANYI:  Last name is O-t-e-r-o.

14             THE COURT:  Otero.

15             MS. BAHARANYI:  The other names are just our names,

16   your Honor.

17             THE COURT:  So, I'm not talking about lawyers' names.

18   I'm talking about -- and I'm not talking about the parties

19   names.  I am talking about the names of persons who either will

20   be witnesses or whose names are likely to come up in the course

21   of the testimony.

22             MS. BAHARANYI:  Understood.  That's all, your Honor.

23             THE COURT:  All right.  Very good.

24             All right.  Anything else we need to take up right

25   now?

N8SAAPER1                        Jury Trial

1          MS. BAHARANYI:  Your Honor, while we have you, your

2     Honor, I think there are a couple of issues that we want to

3     raise right now.  One with respect to, I think it's, before we

4     get to the point of openings, I can raise that now or after.

5          THE COURT:  Go ahead.

6          MS. BAHARANYI:  We understand the Court's ruling

7     regarding the Massachusetts case and the preference to proceed

8     sort of case-by-case or evidence-by-evidence.  One of our

9     concerns is there is a tremendous amount of potentially

10    prejudice evidence that we don't want mentioned in opening

11    selection before the jury.  This includes any reference to

12    armed standoff, any reference to hours long, eight, nine, ten

13    hours-long standoff.

14         THE COURT:  I thought I indicated on Friday that while

15    I was going to allow in much of this evidence subject to

16    specific objections when it was offered that the standoff was

17    likely not to be admitted.  I am pretty sure that's what I

18    said.

19         MS. BAHARANYI:  I heard the "likely not", your Honor.

20    I did want to be clear before we got into openings and the bell

21    was rung --

22         THE COURT:  Is the government planning to say anything

23    about the eight-hour standoff in their opening?

24         MS. NICHOLAS:  We are going to address the fact of the

25    traffic stop.  We don't call it a standoff.  We don't mention

N8SAAPER1                    Jury Trial

1    the temporal element of it but the facts of the stop are
2    mentioned.
3            THE COURT:  Well, that seems to be consistent with
4    what I ruled on Friday.  So --
5            MS. BAHARANYI:  There was one area that wasn't, I
6    think, addressed explicitly on Friday by the parties, and
7    that's what respect to the other firearms that were found
8    during the Massachusetts stop.  I think, as the Court knows,
9    there was only one firearm at that Massachusetts stop that was
10   in any way connected to Vereen, or purchased by the
11   co-defendant Vereen, but there are other eight other firearms
12   that we want to make sure the government doesn't reference in
13   opening because again, it's unrelated to the charge here and it
14   would be highly prejudice for them to open up saying, you are
15   going to hear about all of those other firearms, or things that
16   aren't relevant to the case.
17           THE COURT:  Of course the conspiracy does involve
18   other firearms.
19           MS. BAHARANYI:  The government's provided us with a
20   fairly clear list of firearms that they believe are related and
21   connected to this conspiracy from the point of the indictment
22   where they listed every firearm, its make, its model and serial
23   number, and only one of those firearms shows up during the
24   Massachusetts stop.  The others don't.
25           THE COURT:  So I guess the other question is my

N8SAAPER1                    Jury Trial

1   understanding of the defense here -- I'll listen carefully to

2   your opening -- is that it's basically a knowledge and intent

3   defense state of mind.

4          MS. BAHARANYI:  That is certainly one element, your

5   Honor.

6          THE COURT:  What other element?  Other than the

7   government has to prove every element beyond a reasonable

8   doubt.

9          MS. BAHARANYI:  Of course they've added the conspiracy

10  charge.  So, the agreement and existence of an agreement for

11  this conduct.  But I think it would be highly prejudicial for

12  the jury to hear about guns that have not been traced to the

13  co-defendant in this case that seem to have no connection to

14  this case, not purchased by Vereen and the guns that, frankly,

15  your Honor, look highly prejudicial as well.  There's a great

16  risk that they'll hear this information, hear about these other

17  guns, hear about this stop, hopefully, not a standoff and they

18  convict on that basis instead of relevance to a question of

19  whether the guns were received --

20         THE COURT:  Let me hear from the government.

21         MS. SMYSER:  Your Honor, Ms. Baharanyi is correct.

22  Those in our view are still evidence of the conspiracy.  There

23  are a set of guns that Ms. Baharanyi is referencing that Vereen

24  purchased and that we believe are part of the conspiracy but in

25  addition these other guns he recovered at the Massachusetts

N8SAAPER1                    Jury Trial

```
 1    stop.  This conspiracy is about receiving and transporting
 2    firearms interstate without proper licenses and there's
 3    evidence and body worn camera footage that, for example, the
 4    defendant and this co-conspirator addressed whether the guns
 5    are stolen and whether they're clean.  And that indicates that
 6    they know the source of the guns, not just the one gun that was
 7    recovered from Massachusetts that came from Vereen.  We think
 8    it's helpful evidence -- show that these men are transporting
 9    guns interstate without the proper licenses to do so.
10         THE COURT:  Well, just so I'm clear, first of all,
11    what, if anything, is said by the defendant.
12         MS. SMYSER:  So, your Honor, in this body cam footage
13    the leader of the group, Jamal Latimer, asks the defendant and
14    one of his co-conspirators named Jamil Bey who also paid -- for
15    the firearms, Are any of those stolen?  And the defendant
16    shakes his head and Bey says no.  The defendant later comes
17    back and says, These are clean.  They're clean.
18         THE COURT:  Why does that show anything about the
19    agreement to do something unlawful?
20         MS. SMYSER:  Your Honor, this shows that both Mr. Bey
21    and the defendant were involved in getting the firearms that
22    were with them at this stop and we know that they traveled from
23    New York to Rhode Island to Massachusetts.  They received
24    firearms in New York, traveled with those to Rhode Island
25    including to meet people who are residents of Rhode Island.
```

N8SAAPER1                    Jury Trial

1    Jamal Latimer -- Cumberlander which in itself is an agreement

2    and violation of 922 (A) (3).

3            THE COURT:  Well, that may support your introducing

4    stuff about this situation but I'm still not clear what the

5    specific conversation you just mentioned shows.

6            MS. SMYSER:  I think it goes directly to the

7    defendant's knowledge.

8            THE COURT:  In what way?  He says he's been told that

9    these are not stolen guns.

10           MS. SMYSER:  It is a question.  Are those stolen?  And

11   he shakes his head which indicates his knowledge of where those

12   firearms came from, which is key to put him and Mr. Bey in a

13   conspiracy and to give them knowledge of where those firearms

14   came from.  And they're the ones transporting those firearms

15   from their state of residency, New York to Rhode Island, to

16   Massachusetts.

17           THE COURT:  And what, if anything, is being said about

18   that conversation on opening statement?

19           MS. SMYSER:  One moment, your Honor?

20           THE COURT:  Yes.

21           (Pause)

22           MS. SMYSER:  Your Honor, we plan to say that there is

23   video capturing the defendant and his coconspirator discussing

24   the guns and where those guns came from.

25           MS. BAHARANYI:  Your Honor, that's not a correct

N8SAAPER1                    Jury Trial

1    assessment of the evidence or it's quite misleading actually.
2    There is no discussion about where the guns came from.  And in
3    fact, what the government's just told you like the inferential
4    steps its asking the Court and the jury to make is exactly what
5    we objected to in our motions in limine.  There is so much
6    speculation that is going to be required for them to say that
7    this comment in the middle of this very intense --
8           THE COURT:  I think there are two different points
9    here.  And not it's not clear to me that the wording in the
10   opening is appropriate and I'll get to that in a minute.  But
11   on the more general question of whether circumstantial evidence
12   of your client's knowledge of the location of these guns can be
13   produced, it's a reasonable inference.  It's not only possible
14   inference -- and you are free to of course cross-examine, argue
15   to the contrary -- but it's certainly a reasonable inference
16   that if he says none of the guns are stolen, he knows where
17   those guns came from.  So I don't think that that should be
18   excluded and I don't see the prejudice at all in making that
19   argument.
20          Now, what is different about the statement in the
21   opening is they say he discussed where the guns come from.  I
22   think that is an overstatement from what I just heard.  So they
23   would have to change that to something like, they had
24   discussions which you may well find shows that they knew where
25   the guns came from or something along those lines.

N8SAAPER1                    Jury Trial

1          But in terms of admissibility, the federal law is

2     clear that under Rules 401, 402 and 403, anything that has any

3     reasonable tendency to advance a circumstantial inference is

4     permissible.  403, of course, deals with prejudice.  The

5     prejudice has to be very substantial before otherwise

6     admissible evidence can be excluded.  I don't see -- at least

7     not from anything I just heard.  So, it will be permitted but

8     with the modification I've just indicated.

9          MS. BAHARANYI:  Your Honor, I don't think that --

10    well, we certainly agree that there is actually substantial

11    potential prejudice by allowing the government to make these

12    connections and these speculative leaps.

13         THE COURT:  It's all speculation.  Unlike state law

14    federal law says circumstantial evidence is just as good as

15    direct evidence and the only question then is whether the

16    inference that is being asked to be drawn is one that is

17    reasonable.  And it's certainly reasonable to say that one who

18    says flatout those guns are not stolen could only say that if

19    he knew where the guns were coming from.

20         MS. BAHARANYI:  The context of when the statement is

21    given, your Honor, I don't think that's a fair assessment.

22         THE COURT:  Well, you can argue that to the jury.

23         MS. BAHARANYI:  Returning to the number of guns

24    however, which is when we started this conversation, again, the

25    eight other guns that the government plans to reference are

N8SAAPER1                    Jury Trial

1    guns that never, I don't think they're even alleging were

2    bought by co-defendants were in New York City.

3            THE COURT:  This is all part of the conspiracy.

4            MS. BAHARANYI:  The conspiracy has boundaries, your

5    Honor.  This has limits.

6            THE COURT:  The conspiracy as I understand it is that

7    your client entered into an arrangement or agreement to traffic

8    guns on an interstate basis without a license and that includes

9    everything I've just heard about this particular situation.

10           MS. BAHARANYI:  A conspiracy is about receiving guns

11   into your state of residence.  We're talking about guns that

12   are stopped and in Massachusetts and that have no connection to

13   the buyer in this case, Keith Vereen.

14           THE COURT:  Well, let's look at the indictment.  So

15   Paragraph One of Count One states as follows:

16           "From at least in or about May 2020 through at least

17   in or about July 2021 in the Southern District of New York and

18   elsewhere, Steven Perez, a/k/a "Lucha", the defendant, and

19   others, known and unknown, willfully and knowingly combined,

20   conspired confederate and agreed together and with each other

21   to commit an offense against the United States, to wit,

22   transporting and receiving firearms interstate without the

23   requisite licenses in violation of Title 18 U.S.C. Section 922

24   (A) (3).

25           Why doesn't that cover what we just discussed?

N8SAAPER1                    Jury Trial

1      MS. BAHARANYI:  While that's perhaps a summary or a

2 title of what they believe that statute is about, in effect --

3      THE COURT:  As I checked it was the determination of

4 the grand jury of the United States.

5      MS. BAHARANYI:  Well, your Honor, it has to actually

6 fit with the particular law that's being violated and the law

7 is 18 United States 922 (A) (3).  And that specific provision

8 that he has been charged with and he has been charged with

9 conspiring to violate isn't about the general interstate

10 transportation of firearms.  It's whether someone who was other

11 than a licensed importer, manufacturer, distributor received

12 into or received in a state where he resides firearms that were

13 attained outside of that state.  That's what he's been charged

14 with.

15      THE COURT:  Let me look at 922 (a)(3).  922 is an

16 interesting statute.  It goes on the standard edition of the

17 Criminal Code for six single-spaced pages, showing nothing else

18 Congress believes in a -- approach to drafting.  But in any

19 event, let's take a look at it.

20      (Pause)

21      THE COURT:  It shall be unlawful for any person other

22 than a licensed importer or licensed manufacturer, a licensed

23 dealer or licensed collector to transport into or receive in

24 the state where he resides or if the person is a corporation or

25 other business, entity of the state where he maintains a place

N8SAAPER1                    Jury Trial

1   of business any firearm purchased or otherwise obtained by such

2   person outside that state and under some exceptions.

3            So, why do you think that it says "transport into or

4   receive" that it's limited to received?

5            MS. BAHARANYI:  Your Honor, I'm not saying that's it's

6   limited to receiving.  It is for the transportation into a

7   person's state of residence or receiving into a person's state

8   of residence.  What I'm saying is the conduct in Massachusetts

9   is far removed from what needs to be proven for 922 (a)(3)

10  violation.

11           THE COURT:  No, no.  The conspiracy as I understand it

12  is there are a group of people who agreed that they without a

13  license would transport on an interstate basis, guns that would

14  ultimately wind up in states other than where they were from

15  originally where they were purchased or whatever.  And that was

16  the overall conspiracy and in furtherance of the conspiracy in

17  the second count, brought a gun into New York.  I don't think

18  the conspiracy is limited to guns that just come into New York.

19           MS. BAHARANYI:  The conspiracy is, certainly, should

20  be limited to guns that are received or transported into state

21  of residence -- gunman is able to prove.  Nobody's state of

22  residence is Massachusetts and also only applies if a gun was

23  obtained outside of that state of residence and brought in.

24  So, my first point --

25           THE COURT:  Yeah, but the point is what they agreed

N8SAAPER1                    Jury Trial

1    to, not what actually happened.

2            MS. BAHARANYI:  Agreeing to permit that particular

3    offense with some sort of overt act towards that offense,

4    right?

5            THE COURT:  Yeah.  The overt act could be purchasing

6    anything, as you know.

7            MS. BAHARANYI:  I think that's problematic here, your

8    Honor, is that we have that conduct in Massachusetts that

9    involves one firearm that they, can that they are intending to

10   prove was purchased by someone out of state and received into a

11   state of residence and none of the other --

12           THE COURT:  I think we're talking -- forgive me,

13   because I have great admiration for your eloquent advocacy, but

14   I think what they're talking about is the nature of the

15   conspiracy.  You can have a conspiracy where zero guns ever

16   actually meet the agreement.  That's still a conspiracy if they

17   can show the elements of a conspiracy.  So the objection is

18   overruled.  And with the one loss that I mentioned, the opening

19   is received, is permitted on this ground.  Of course the other

20   side can respond.

21           Okay.  My understanding is the jury will be ready in

22   about five minutes or so.  So, take a look now again at the

23   proposed preliminary instruction and tell me and I'll hear any

24   objection to it.  It is largely consistent with what I received

25   from both sides but I'm obviously happy to hear any edits you

N8SAAPER1                    Jury Trial

```
 1   suggest.
 2           (Pause)
 3           MS. BAHARANYI:  Your Honor, we don't have any
 4   objections to the preliminary instructions.
 5           THE COURT:  Okay.  Anything from the government?
 6           MS. SMYSER:  Your Honor, the government doesn't have
 7   any changes.  I did want to flag, we have one issue as to our
 8   first witness which while we're waiting on the jury happy to
 9   address now or happy to address at a later time.
10           THE COURT:  Go ahead.
11           MS. SMYSER:  So, your Honor, the first government
12   witness is Officer Jarren Smalls who testified in the
13   suppression hearing a few months ago about the defendant's
14   arrest in the Bronx.  And the government is planning to offer a
15   portion of the radio transmission which Officer Smalls heard
16   before he stopped the defendant.  In that transmission there's
17   description of the person with a gun.  And it explains why he
18   arrives at the scene.  My understanding is that the defense has
19   a relevance objection to --
20           THE COURT:  I just heard the jury is ready.  So we
21   will take this up after opening statements but before the first
22   witness.  So if you want to use the facilities, now is the time
23   to do so.  We'll resume in five minutes.
24           MS. SMYSER:  Thank you.
25           MS. BAHARANYI:  Your Honor, I'm so sorry.
```

N8SAAPER1                    Jury Trial

1          THE COURT:  Yes.

2          MS. BAHARANYI:  I don't think we got the intended voir

3    dire questions for the jury.

4          THE COURT:  The questions I am going to put?

5          MS. BAHARANYI:  Yes.

6          THE COURT:  You'll hear them when I put them.

7          MS. BAHARANYI:  Okay.  With respect to the ones that

8    we proposed, I don't know if the Court already made a decision

9    on those and what your Honor plans to include or not include --

10          THE COURT:  You'll hear what I have to say.  Then at

11    the end of every voir dire I ask the parties to come to the

12    sidebar if they want me to ask some other questions.

13          MS. BAHARANYI:  Understood.

14          (Recess)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

N8SAAPER3

```
 1              (Jury not present)
 2              THE COURT:  All right.  So to the remaining members of
 3    the pool who dodged a bullet, you are not off the hook yet
 4    because you may be called for duty on another jury.  You need
 5    to go down to the jury room that you must first came up from.
 6    We will send your cards with you.
 7              Mr. Limphongpand, come on forward and we'll give you
 8    all the cards.  Just give them to the jury clerk when you get
 9    back.
10              I want to express my thanks to you for your jury
11    service.  You are now excused.  You can go back down.
12              (Prospective jurors excused)
13              THE COURT:  Okay.  So when we come back I'll read to
14    the jury and give them a kind of the preliminary instruction
15    then we'll have opening statements from both counsel.  Then I
16    think we'll probably be able to start before lunch with the
17    first witness.  So there was an issue that someone wanted to
18    raise about the first witness.
19              MS. SMYSER:  Yes, your Honor.  The first witness is
20    Officer Jarren Smalls who responded to the 911 call that the
21    defendant having a gun.  The government intends to introduce a
22    portion of the radio transmission that Officer Smalls received
23    before he responded or explain why he was there.  And my
24    understanding that the defense has a relevance objection to
25    that.
```

N8SAAPER3

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | THE COURT:  Let me hear from defense counsel.                        |
| 2   | MS. MAYO:  Yes, your Honor.                                           |
| 3   | We object to the relevance of introducing the actual                 |
| 4   | radio run into evidence that was obviously relevant during the       |
| 5   | suppression hearing but now that we're not -- Officer Smalls         |
| 6   | can testify about what you heard and why he was stopping our          |
| 7   | client in the first place.  So, we don't think it's necessary        |
| 8   | to produce the actual radio run.                                     |
| 9   | THE COURT:  Did you -- to the preliminary question of                |
| 10  | the sort and were you there pursuant to a professional as part       |
| 11  | of your job or something like that -- I'm not wording it             |
| 12  | exactly right -- but he has to explain why he was there.  But I      |
| 13  | agree with you, subject to hearing from the government, that         |
| 14  | the why he's there is not particularly relevant.                     |
| 15  | MS. MAYO:  Yes, your Honor.  We think Officer Smalls                  |
| 16  | can testify as to why he was there and why he was stopping the       |
| 17  | defendant.                                                           |
| 18  | THE COURT:  Let me ask the government, what's wrong               |
| 19  | with that?                                                           |
| 20  | MS. SMYSER:  Your Honor, we do think that's relevant             |
| 21  | and the reason is we don't want the jury to make assumptions         |
| 22  | about why Officer Smalls was there.  To be quite frank, the          |
| 23  | defendant was standing on the sidewalk in a turban and I don't       |
| 24  | want the jury to assume for other reasons Officer Smalls got         |
| 25  | out of his car and approached the defendant.  When you hear it       |

A000499

N8SAAPER3

1    on the radio run it gives context to Officer Smalls hearing

2    that there is a man with a specific description with a firearm

3    and he immediately responds and gets out of the car.

4         MS. MAYO:  Your Honor, I think we would say that's

5    cumulative if Officer smalls can testify to that fact that he

6    received a radio run describing a man with a firearm.

7         THE COURT:  Okay.  Given that representation, I think

8    that's sufficient.  We don't need the actual call if he is

9    going to be able with both sides consent to testify to that.

10        MS. SMYSER:  Your Honor, I hear that point.  I do

11   think the radio run is necessary to corroborate what Officer

12   Smalls is saying.  It is the first thing he is going to

13   corroborate while he is on the stand.

14        THE COURT:  I'm not convinced.  We'll go the way

15   defense counsel suggested.  We'll take another ten-minute break

16   and then we'll resume.

17        (Recess)

18        THE COURT:  Please be seated.

19        (Jury present)

20        THE COURT:  The jurors can be seated immediately.

21   Everyone else stands for the jury.  Except, I don't stand up

22   because I'm an old guy, but you can be seated immediately.

23        So, ladies and gentlemen, before we hear opening

24   statements I'm going to read a short preliminary instruction

25   and you can take it with you also back in the jury room for

N8SAAPER3

1    your guidance.

2            To the jury, before you begin to hear the evidence I

3    want to give you a brief overview of the two charges in this

4    case.  After you've heard all the evidence and the parties have

5    made their closing arguments I will give you detailed

6    instructions of law that will displace this preliminary

7    instruction and will give to your deliberations.

8            This is a criminal case that concerns receiving or

9    transporting firearms in interstate commerce when you don't

10   have a license to do so.  The government alleges in one of its

11   two charges that the defendant, Steven Perez, who goes by the

12   name of "Lucha El Por Libertad" or "Lucha El" under lawfully

13   intentionally and knowingly -- I'm sorry.  The word "he"

14   shouldn't be there -- lacked a license.

15           (Pause)

16           THE COURT:  I'm sorry.  I was looking at an earlier

17   version.  Let me pick up in the second paragraph.

18           This is a criminal case that concerns receiving or

19   transporting firearms in interstate commerce when you don't

20   have a license do so.

21           The government alleges in one of its two charges that

22   the defendant, Steven Perez, who goes by the name "Lucha El Por

23   Libertad" or "Lucha El" unlawfully, intentionally and knowing,

24   he lacked a license, received a firearm specifically Century

25   Arms Canik .9 millimeter handgun into his state of residence,

A000501

N8SAAPER3

```
 1   New York that was purchased or otherwise obtained outside of
 2   New York.
 3           The government alleges in its other charge that
 4   between May 2020 and July 2021 Lucha El conspired, that is,
 5   agreed with one or more other persons to unlawfully,
 6   intentionally without a license transport and receive firearms
 7   that were purchased or otherwise obtained out of state into the
 8   state of residency of person receiving or transporting the
 9   firearm.
10           Lucha El has pleaded not guilty to each of those
11   charges.  This means is presumed innocent on each charge until
12   and unless you were satisfied the government's proved each
13   essential element of that charge beyond a reasonable doubt, a
14   standard that I will explain to you later in this case.
15           Please remember that this preliminary instruction is
16   simply a very brief overview of the charges in this case.  I
17   will give you more detailed final instructions that will
18   replace this overview and will govern your deliberations.
19           Okay.  So now we're going to hear opening statements
20   of counsel.  I want to caution you that nothing that counsel
21   says is evidence.  The evidence, as I mentioned before, is
22   going to come from the testimony of the witnesses, the exhibits
23   that are received in evidence and there may be what we call
24   stipulations where the parties agree to some facts.  And those
25   three things are the only sources of evidence.
```

N8SAAPER3                    Opening statement – Ms. Nicholas

1        So why do we even have the statements?  Well, it's

2   because the evidence is going to come in a little bit at a

3   time.  So it may be useful to you to have a brief overview from

4   each side and what they think the evidence will show or fail to

5   show as the case may be.  Because the government has the burden

6   of proof, we hear first from the government.  So we'll hear now

7   from the government.

8        MS. NICHOLAS:  Your Honor, may I proceed?

9        THE COURT:  Yes.

10        MS. NICHOLAS:  This is a case about guns, a case about

11   guns and a man who ignored the laws designed to keep

12   communities safe so that he could accomplish a simple goal, get

13   guns.  This man, Steven Perez, the defendant.  Get guns.  And

14   he succeeded.  Over and over again he got guns.  He did it with

15   the help of a straw buyer, a man over 600 miles away who lied

16   to South Carolina gun dealers to help the defendant accomplish

17   this goal, getting guns no matter what the law says.

18        Members of the jury, that is why we're here.  Because

19   the defendant committed a federal crime by getting guns from

20   outside the state he lives in without a license.  And he knew

21   exactly what he was doing.

22        Laws like the ones the defendant broke exist for a

23   reason.  Guns are dangerous and so there are state and federal

24   laws that govern how guns are sold and transported, laws that

25   require gun stores to follow certain procedures and require gun

N8SAAPER3                    Opening statement – Ms. Nicholas

1   buyers to follow certain requirements, laws that were violated

2   here.

3           You see the defendant, Steven Perez, who you'll hear

4   referred to as "Lucha El" lives in the Bronx.  He is a resident

5   of New York state, a state that requires handgun buyers to have

6   a license before they buy guns.  The defendant did not have a

7   license.  He never even tried to get one.  So he had a problem.

8   The defendant was fixated on getting guns, but without a New

9   York license he could not legally buy guns for himself in New

10  York.  He found another way, an illegal way to get guns.  How

11  did he do it?  A straw buyer, a man living hours away who was

12  willing to lie on government forms to get guns for the

13  defendant, forms that the defendant straw buyer filled out

14  under the penalty of perjury at South Carolina gun stores so

15  that he could buy guns for defendant in South Carolina and then

16  secretly and illegally transport those guns into defendant's

17  hands here in New York.

18          It was a simple plan.  The defendant wanted guns but

19  he couldn't get them in New York.  So the straw buyer walked

20  into gun stores in South Carolina.  He presented an

21  identification card.  He lied on an official form and he bought

22  guns.  What did he do after he bought those guns?  He

23  communicated with the defendant.  He traveled to the Bronx and

24  he delivered those guns to the defendant, bought the guns in

25  South Carolina, talked to the defendant, delivered those guns

A000504

N8SAAPER3                    Opening statement – Ms. Nicholas

1    to the defendant in the Bronx.  The defendant and his

2    associates paid the straw buyer for those trips on at least

3    three occasions sending money from a check cash store in the

4    Bronx to the straw buyer in South Carolina.

5            On two occasions the defendant was actually arrested

6    with guns that the straw buyer had purchased for him in South

7    Carolina.  First, he was arrested in the Bronx with a handgun

8    in his bag.  Second, just two weeks later he was arrested

9    again, this time in Massachusetts where he was traveling with

10   his associates, members of an armed group that claimed to be a

11   militia, a militia that was heading from Rhode Island to a

12   training exercise in Maine.  Law enforcement searched the

13   vehicles that the defendants and his associates drove in, and

14   that day law enforcement seized a total of nine guns from the

15   group.  One of those guns was a particular handgun, another

16   handgun the straw buyer purchased for the defendant in South

17   Carolina and delivered to him right here in New York City.

18   Just like the handgun seized from the defendant in the Bronx,

19   both bought by that South Carolina straw buyer and delivered to

20   the defendant in New York.

21           So that's what the evidence will show, that the

22   defendant worked with others to illegally receive firearms in

23   New York that had been purchased by a straw buyers in South

24   Carolina.

25           Now, how will the government prove its case beyond a

N8SAAPER3                    Opening statement – Ms. Nicholas

1   reasonable doubt?  You're going to see and hear different types

2   of evidence in this trial.  You will see the guns, the two guns

3   that the straw buyer bought for the defendant, the gun pulled

4   out of the defendant's bag in the Bronx and the gun seized

5   during the defendant's arrest in Massachusetts.

6          You're also going to hear from law enforcement

7   officers who arrested the defendant and seized his guns.

8   You'll see videos from these arrests including video capturing

9   the defendant and his friends armed and dressed in military

10  gear discussing their guns, suggesting that they knew where the

11  guns came from.  You'll see and hear the defendant and you'll

12  see another man, a man standing right next to the defendant,

13  one of the defendant's friends who also sent money to that

14  straw buyer in South Carolina.

15         You're also going to see the forms that the straw

16  buyer bought these two seized guns as well as many others.

17  You'll also see the Western Union report showing payments to

18  the defendant and his friends right around the time the straw

19  buyer was buying guns.  You are going to see evidence from

20  cellphones including cellphones seized from the defendant, as

21  well as that group in Massachusetts.  That evidence includes

22  text messages from the group references their plans for a

23  military style training event.  You'll see that in those text

24  messages the groups discussed the need to prepare to buy guns

25  and obtain other supplies.  You'll see how members of that

N8SAAPER3                    Opening statement – Ms. Nicholas

1    group reacted when they learned just two weeks before their

2    planned exercise that the defendant, a trusted member of their

3    inner circle, had been arrested in the Bronx with a gun

4    purchased by the straw buyer.

5           You will also see location information for cellphones

6    used by the defendant and the straw buyer in South Carolina.

7    You'll see that they were located close together in the Bronx

8    each time the straw buyer traveled to New York.  You'll also

9    see phone record that show the defendant communicated with the

10   straw buyer and facilitated communications between the straw

11   buyer and at least two other New York residents.  At the end of

12   this trial you are going to know exactly what happened here.

13   The defendant illegally received guns in New York, hand

14   delivered to the Bronx from a straw buyer in South Carolina.

15          Now, members of the jury, this will not be a long

16   trial but it is an important one.  The evidence is going to

17   come in piece-by-piece and at end of the trial we'll have

18   another chance to come back and speak with you again to explain

19   how all of this evidence gets together.  But between now and

20   then I'm going to ask you to do three things.  First, pay close

21   attention to the evidence.  Second, listen to Judge Rakoff's

22   instructions on the law, and third use your common sense, the

23   same common sense you used to make important decisions in your

24   lives everyday.

25          If you do those three things you'll reach the only

A000507

N8SAAPER3                    Opening Statement — Ms. Mayo

1   verdict consistent with the evidence, the defendant is guilty.

2               THE COURT:  Thank you very much.  We'll hear now from

3   defense counsel.

4               MS. MAYO:  Thank you, your Honor.

5               Lucha El Por Libertad, Lucha El is not here for

6   possessing a gun.  He is not charged with carrying a gun.  He's

7   certainly not here because he was using or waiving around a gun

8   or threatening anyone with a gun.  So why exactly is Lucha El

9   sitting here today?  In June of 2021 Lucha El was in his

10  neighborhood in the Bronx, a neighborhood that was still

11  emerging from the COVID pandemic still reeling with the crime

12  wave that swept the city during that time.  It was at this time

13  in this atmosphere that Lucha El was stopped by the police,

14  stopped while he was standing in front of his apartment

15  building chatting with his elderly neighbors, minding his own

16  business, all because he had a gun in his bag.

17              That gun, Lucha El had gotten it from someone in his

18  family, someone he knew and trusted, someone he had grown up

19  with in the Bronx who had since moved to South Carolina but

20  still came to visit him sometimes when he was in town, a man

21  named Keith Vereen.  The only reason that Lucha El is sitting

22  here today is because that gun was purchased in another state

23  and Lucha El accepted it in New York.  But the federal

24  government doesn't go around prosecuting people just because

25  they received guns from different states.  To be a crime the

A000508

N8SAAPER3                    Opening Statement - Ms. Mayo

1     government has to prove that Lucha El intended to do something

2     unlawful by accepting that gun in New York City.  To be a crime

3     the government must prove that he acted with a bad purpose in

4     his mind.  But Lucha El did not know there was anything

5     unlawful about accepting that gun.  To Lucha El, what could be

6     wrong about accepting a gun from someone he's known his entire

7     life?  Lucha El by receiving that gun, that gun purchased by

8     someone else in South Carolina did not intend to disobey the

9     law.

10          This matter is because this entire case turns on you

11    deciding what was in Lucha El's mind.  Did Lucha El intend to

12    do something unlawful?  Did he have a bad purpose to disobey

13    the law when he received this handgun from someone that he

14    knew?  Did Lucha El agree with other people to transport guns

15    to do something unlawful?  The answer to both questions is no.

16          But how will you know that Lucha El did not act with

17    this bad purpose?  How will you know that he did not agree with

18    other people to do something unlawful?  You will see the moment

19    that officers surrounded Lucha El standing in front of his

20    apartment building talking with his neighbors on that June

21    night.  It was captured on the body worn camera footage of one

22    of the officers who stopped him.  You'll hear that Lucha El was

23    stopped by the police just because he had a gun, not because

24    there had been a shooting or because anyone had been injured,

25    but just because he had a gun.  And when Lucha El is stopped

A000509

N8SAAPER3                    Opening Statement - Ms. Mayo

1   you'll see that he doesn't run.  He doesn't hide.  He don't try

2   to fight off the police.  In fact, he is bewildered as to why

3   they're even stopping him in the first place.  He says, yeah,

4   that's my arm.  He doesn't know that he did anything wrong and

5   what you won't see is any evidence to the contrary.  You won't

6   see text messages between Lucha El and Keith Vereen.  You won't

7   hear recordings of phone calls between them talking about guns,

8   where to get guns, what states to get guns from.  You'll see a

9   Western Union payment made from Lucha El to Keith Vereen, but

10  that one time payment was for $350.  That's not even enough to

11  cover the cost of a single gun.

12          As to other people, the associates that the government

13  claims are Lucha El's co-conspirators, you will see text

14  messages but most of them won't even involve Lucha.  He didn't

15  send them and he didn't receive them.  None of these messages

16  include Lucha talking about guns.

17          What you won't see is Lucha El intending to disobey

18  the law.  This question of what Lucha El knew and believed and

19  intended is the critical question that you have to anticipate

20  here.  Did Lucha El act with a bad purpose?  It's a simple

21  question.  But the government wants to make a case about

22  everything but that question, everything but that issue of what

23  was in Lucha El's mind.  The government doesn't want you to

24  focus on that.  You just heard the government stand up here and

25  tell you about other guns that Keith Vereen purchased about

N8SAAPER3          Opening Statement - Ms. Mayo

1    other people's text messages that don't involve Lucha El, about

2    other agreements and other plans that other people made without

3    involving Lucha.

4         But this is all a distraction.  Because weaving in

5    these other gun references, other statements by other people,

6    statements that have no connection to Lucha El, the government

7    will only complicate what is simple and distract you from the

8    truth.  Don't fall for it.  This case is about Lucha El and his

9    state of mind.  Did Lucha El receive a gun purchased out of

10   state knowing it was unlawful?  He did not.  Did Lucha El agree

11   with other people to transport guns purchased out of state?  he

12   did not.  This case is about a man who was trying to protect

13   himself by obtaining a handgun who simply did not know he could

14   not accept it.

15        Pay close attention to the relevant evidence.  And

16   like the government said, use your common sense.  When you

17   ignore the distractions and focus on what Lucha says, what

18   Lucha does and what Lucha believes, then you'll know that Lucha

19   El is not guilty.  And after you have heard all of this

20   evidence we will ask you to return a verdict of not guilty.

21        THE COURT:  Thank you very much.

22        All right.  The government will call their first

23   witness.

24        MS. SMYSER:  Your Honor, the government calls Police

25   Officer Jarren Smalls.

**A000511**

N8SAAPER3                    Smalls - Direct

```
 1       JARREN SMALLS,
 2            called as a witness by the Government,
 3            having been duly sworn, testified as follows:
 4                 COURTROOM DEPUTY:  Please state you name and spell it
 5       for the record.
 6                 THE WITNESS:  Officer Jarren Smalls, J-a-r-r-e-n,
 7       Smalls, S-m-a-l-l-s.
 8       DIRECT EXAMINATION
 9       BY SMYSER:
10       Q.  Morning, Officer Smalls.
11       A.  Good morning.
12       Q.  Where do you presently work?
13       A.  New York Police Department.
14       Q.  What is your title there?
15       A.  Police officer.
16       Q.  How long have you worked for the NYPD?
17       A.  Almost five and a half years.
18       Q.  Do you work in a particular unit or team for NYPD?
19       A.  Yes.  I work for Bronx Public Safety.
20       Q.  What are some of your responsibilities as an officer for
21       Bronx Public Safety?
22       A.  We patrol high crime locations, areas with an increase of
23       shootings, gang activities, gang violence, robberies.
24       Q.  Could you pull the microphone a little bit closer to you.
25       In that role, Officer Smalls, do you work in a particular
```

A000512

N8SAAPER3                    Smalls – Direct

1   precinct or throughout the Bronx?

2   A.   Throughout the Bronx.

3   Q.   Prior to joining Bronx Public Safety did you work in a

4   precinct?

5   A.   Yes.

6   Q.   Which precinct was that?

7   A.   The 52nd Precinct.

8   Q.   Where is the 52 Precinct?

9   A.   It covers the Norwood section of the Bronx, University

10  Heights, Fordham, Gun Hill.

11  Q.   How long did you worked for the 52nd Precinct?

12  A.   Approximately, five years.

13  Q.   Were you working there in June of 2021?

14  A.   Yes.

15  Q.   Were you assigned to a particular unit in the precinct at

16  that time?

17  A.   Yes.

18  Q.   What was that?

19  A.   Public Safety Team.

20  Q.   Were your responsibilities as with the Public Safety Team

21  similar to your current responsibilities with Bronx Public

22  Safety?

23  A.   Yes.

24  Q.   As part of your responsibilities did you patrol the 52nd

25  Precinct?

A000513

N8SAAPER3                    Smalls - Direct

```
 1   A.  Yes.
 2   Q.  When you were on patrol, what was some of the kinds of
 3   things that you did?
 4   A.  Responded to radio runs which is 911 calls, emergencies,
 5   accidents, made arrests.
 6   Q.  You mentioned the term "radio run".  What does that mean?
 7   A.  When somebody calls 911 to report a crime or an emergency.
 8   Q.  Officer Smalls, I want to direct your attention to June
 9   23rd of 2021.  Were you on duty that day?
10   A.  Yes.
11   Q.  Did you make any arrests that day?
12   A.  Yes.
13   Q.  Who did you arrest?
14   A.  A Mr. Steven Perez.
15   Q.  Do you know Mr. Perez by any other names?
16   A.  Yes.
17   Q.  What names?
18   A.  "Lucha".
19   Q.  Do you see Mr. Perez or Lucha in the courtroom today?
20   A.  Yes, I do.
21   Q.  Can you identify him based on where he is sitting and an
22   article of clothing that he is wearing?
23   A.  Yes.  He is sitting between those two ladies back there
24   wearing a white shirt.
25            MS. SMYSER:  Your Honor, let the record reflect the
```

A000514

N8SAAPER3                    Smalls - Direct

1   witness has identified the defendant?

2           THE COURT:  Yes.

3   Q.  Officer Smalls, we'll talk about the specifics of that

4   arrest in a moment but I want to talk about the evening of June

5   23rd.

6           Were you patrolling on that night?

7   A.  Yes.

8   Q.  On foot or by car?

9   A.  By car.

10  Q.  Were you alone or with other officers?

11  A.  I was with my partner, Officer Carter.

12  Q.  Who was driving?

13  A.  My partner.

14  Q.  Where were you sitting?

15  A.  In the front passenger seat.

16  Q.  I want to direct your attention to approximately 9:50 p.m.

17  on that evening were you monitoring the radio around that time?

18  A.  Yes.

19  Q.  Did you receive any radio transmissions?

20  A.  Yes.

21  Q.  What did you learn from the radio transmission?

22  A.  That there was a male in the vicinity of East Gun Hill Road

23  and Perry Avenue armed with a firearm.

24  Q.  On that radio transmission did they describe what that man

25  looked like?

N8SAAPER3                    Smalls - Direct

1    A.  Yes.  They gave a description of a male Hispanic,

2    approximately five/six wearing a white T-shirt, black pants

3    wearing a blue purse with a black and white turban.

4    Q.  Did they say what the man's name was?

5    A.  Yes.  Said his name was "Lucha".

6    Q.  Could you just remind us what initiates that radio

7    transmission?

8    A.  That is when someone calls 911 to report a crime or an

9    emergency or something happening.

10   Q.  When you received that radio transmission, where were you?

11   A.  I was in Sector David of the 52nd Precinct.

12   Q.  What's a sector?

13   A.  A sector is a smaller portion of a precinct broken down.

14   Q.  Where is Sector David, just generally?

15   A.  It covers the Gun Hill area of the 52nd Precinct.

16   Q.  How close were you to East Gun Hill Road and Perry Avenue

17   where that was mentioned on the radio run?

18   A.  It was very close.  It was blocks, within blocks.

19        MS. SMYSER:  Could we please pull up for the witness

20   only what has been marked for identification as Government

21   Exhibit 204.

22   Q.  Officer Smalls, can you see that?

23   A.  Yes.

24   Q.  Do you recognize it?

25   A.  Yes.

N8SAAPER3                    Smalls - Direct

1    Q.  What is this?

2    A.  This is a portion of Sector David.

3    Q.  How do you know?

4    A.  I paroled this location for almost five years.

5    Q.  Is it a fair and accurate depiction of the area you were

6    patrolling on the night of June 23rd?

7    A.  Yes.

8            MS. SMYSER:  Government offers Government Exhibit 204.

9            MS. MAYO:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 204 received in evidence)

12           MS. SMYSER:  May we publish, your Honor?

13           THE COURT:  Please.

14           (Pause)

15   Q.  Officer Smalls, using Government Exhibit 204 --

16           MS. SMYSER:  Has that been published for the jury?

17   Q.  Using Government Exhibit 204, could you please show the

18   jury where you were when you received a radio run, and I think

19   you can write on the screen.

20   A.  Sure.  I was in the vicinity of Hull Avenue between -- it

21   is not allowing me to write.

22   Q.  Just walk us through where you were.

23   A.  Between East Gun Hill Road and East 209 Street and Hull

24   Avenue.

25   Q.  After you received the radio run where did you go?

A000517

N8SAAPER3                    Smalls - Direct

1    A.   I went southbound on Hull Avenue, then I made a right onto

2    East 209 Street going westbound and made another right onto

3    Perry Avenue going northbound.

4    Q.   When with you made a right, were you near that supermarket

5    that's indicated on the map?

6    A.   Yes.

7    Q.   Could you please describe where you eventually saw the man?

8    A.   In that location where that red flag is on Perry Avenue.

9    Q.   Officer Smalls, were you wearing a body worn camera that

10   day?

11   A.   Yes.

12   Q.   Does your body worn camera need to be turned on in order to

13   record?

14   A.   Yes, it does.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

A000518

```
     N8SBPER2                    Smalls - Direct
 1   BY MS. SMYSER:
 2   Q.  Could you just explain how that works?
 3   A.  So our body worn camera is always running.  It only
 4   memorializes footage once we press the activation button. It
 5   will go back a minute prior and record what was going on
 6   without the audio, and then you'll get the audio up at the
 7   minute that you pressed it.
 8   Q.  We can take down Government Exhibit 204.
 9            Officer Smalls, do you see in front of you a disk
10   that's been marked for identification as Government Exhibit
11   202A?
12   A.  Yes.
13   Q.  Do you recognize that?
14   A.  Yes.
15   Q.  What is it?
16   A.  This is a copy of my body worn camera.
17   Q.  How do you know that?
18   A.  I watched it and then I signed and initialed and dated it.
19   Q.  Did you review its contents before testifying today?
20   A.  Yes, I did.
21   Q.  Is it a fair and accurate representation of events on the
22   night of June 23, as captured by your body worn camera?
23   A.  Yes.
24            MS. SMYSER:  Your Honor, the government offers
25   Government Exhibit 202A.
```

N8SBPER2                    Smalls - Direct

1          THE COURT:  Any objection?

2          MS. MAYO:  No objection, your Honor.

3          THE COURT:  Received.

4          (Government's Exhibit 202 received in evidence)

5          MS. SMYSER:  Your Honor, at this time I would also

6    offer a stipulation between the parties.  It's Government

7    Exhibit 1008.  I'd like to read a portion of that to the jury.

8          THE COURT:  Okay.

9          MS. SMYSER:  The parties agree that Government Exhibit

10   202AT is a true and accurate transcript of Government Exhibit

11   202A.  And Government Exhibit 205T is a true and accurate

12   transcript of Government Exhibits 205A, 205B and 205C.

13          Your Honor, at this point I would like to publish

14   Government Exhibit 202AT which is a transcript as an aid to the

15   jury.

16          THE COURT:  Any objection?

17          MS. MAYO:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibits 202AT, 205T received in

20   evidence)

21          MS. SMYSER:  Mr. Ahuja, could you please display

22   Government Exhibit 202A side by side with Government Exhibit

23   202AT.

24   Q.  Officer Smalls, can you see that?

25   A.  Yes.

```
N8SBPER2                    Smalls - Direct
```

1  Q.  Before we begin playing your body camera, could you just

2  describe what we're looking at on the right side of the screen?

3  A.  You're looking at footage captured from my body worn camera

4  from my vantage point that evening.

5  Q.  Does your body worn camera record the date and time?

6  A.  Yes, it does.

7  Q.  What is the date and time that this clip begins?

8  A.  It's June 23rd of 2021, at 21:56 hours.

9  Q.  Mr. Ahuja, could you please play the clip for the first ten

10  seconds.

11            (Media played)

12            (Media stopped)

13  Q.  Officer smalls, what happened in this clip?

14  A.  My partner rounded the corner of East 209th Street and

15  Perry Avenue.  As we're rounding the corner, I observed a male

16  subject matching the specific description that was put over the

17  radio, and I'm pointing him out to my partner.

18  Q.  Mr. Ahuja, could we continue to play from ten seconds to

19  one minute and 15 seconds, and we can start with the transcript

20  on page one, line two.

21            (Media played)

22            (Media stopped)

23  Q.  Officer Smalls, who was this man that you approached?

24  A.  Mr. Steven Perez.

25  Q.  As you approached the defendant, who, if anyone, was

A000521

N8SBPER2                    Smalls - Direct

1   approaching with you?

2   A.   My partner Officer Cotter.

3   Q.   When you got to the defendant, what did you do?

4   A.   I frisked his blue purse, and I felt a hard L-shape object

5   that was consistent to the shape and size of a firearm.

6   Q.   What happened after you frisked the bag and felt the

7   L-shape object?

8   A.   That led me to believe a firearm was in the bag, so I told

9   my partner 92, which means arrest, so my partner can begin to

10  handcuff Mr. Steven Perez.

11  Q.   What did Officer Cotter do after he heard you say 92?

12  A.   He immediately started handcuffing Mr. Steven Perez.

13  Q.   The defendant said a few times, "That's my arm."  What did

14  you understand the defendant to mean by that?

15  A.   That being his firearm.

16  Q.   At the end of the clip here you took the blue bag off of

17  the defendant, why did you do that?

18  A.   Cause the defendant I believe was potentially armed with an

19  illegal firearm, dangerous to have subjects on the street to be

20  armed with a weapon, especially when there's other officers in

21  the street and also other people in the street.

22         MS. MAYO:  Objection.

23         THE COURT:  Overruled.

24  A.   Also when there's other people in the street.  So for our

25  safety and the safety of others on the street, I want that

A000522

N8SBPER2                    Smalls - Direct

1   weapon off the subject.

2   Q.  Mr. Ahuja, we can continue now to play Government exhibit

3   202A, and we're going to play through the end of the clip and

4   the transcript here will start on page two, line five.

5           (Media played)

6           (Media stopped)

7   Q.  Officer Smalls, what were you doing in this clip?

8   A.  Once I removed the bag off of him, I looked inside the bag

9   to make sure there was actually a firearm in the bag.  I then

10  asked him if he had a permit for it and he said no.

11  Q.  The defendant said, I don't need a permit in response to

12  your question whether he had one.  Why did you ask him whether

13  he had a permit?

14  A.  Because it's New York State and New York City law to have a

15  permit for a handgun.

16  Q.  At any point after this approach did you look up whether

17  the defendant had a permit for a handgun?

18  A.  Yes, I did.

19  Q.  How did you do that?

20  A.  We ran an individual in our DAS system.  Our DAS system is

21  a database we use in the New York City Police Department to

22  basically run people's pedigree information, get their pedigree

23  information, see if they have any licenses, permits, if they

24  made any reports, if they been a victim of anything or have any

25  domestic incident reports or any arrest they may have had in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000523

```
N8SBPER2                    Smalls - Direct
```

1    the city.

2    Q.  Did the defendant have a permit?

3    A.  No.

4    Q.  Officer Smalls, was your partner Officer Cotter wearing

5    body worn camera that day?

6    A.  Yes, he was.

7    Q.  Could you look in front of you for the disk that contains

8    exhibits marked for identification as Government's Exhibits

9    205A, 205B and 205C.

10            Do you recognize it?

11   A.  Yes.

12   Q.  What is this?

13   A.  This is a copy of my partner's body worn camera footage.

14   Q.  How do you know?

15   A.  I watched it and then I signed and dated it.

16   Q.  Were you present when Officer Cotter's body cam footage was

17   running?

18   A.  Yes.

19            MS. SMYSER:  Your Honor, the government offers

20   Government's Exhibits 205A, 205B and 205C.

21            MS. MAYO:  No objection.

22            THE COURT:  Received.

23            (Government's Exhibits 205A, 205B and 205C received in

24   evidence)

25            MS. SMYSER:  Your Honor, we'd also like to publish

A000524

N8SBPER2                    Smalls - Direct

1    Government Exhibit 205T which is a transcript as an aid to the

2    jury.  Mr. Ahuja, could you please display 205A side by side

3    with 205T.

4    Q.  And Officer Smalls, could you explain what we are looking

5    at here on the right-hand side of the screen?

6    A.  You're looking at a still from my partner's body cam.  You

7    see me in it.  You see Mr. Steven Perez in it.  You see my

8    partner's arm and another police officer in it as well.

9    Q.  Does this capture some of what we just watched from a

10   different vantage point?

11   A.  Yes.

12   Q.  Mr. Ahuja, could you please play the clip and scroll along

13   in Government Exhibit 205T.

14           (Media played)

15           (Media stopped)

16   Q.  Now, could we please display Government Exhibit 205B next

17   to 205T.

18           Officer Smalls, where does this body camera footage

19   come from?

20   A.  This is also from my partner's body camera.

21   Q.  Where is the defendant standing in relation to your

22   partner?

23   A.  To his right.

24   Q.  Mr. Ahuja, could you please play the clip which corresponds

25   to page one, lines 13 through 15 of the transcript.

A000525

```
N8SBPER2                        Smalls - Direct
```

1              (Media played)

2   Q.  The defendant said a permit is a permission, what did you

3   understand him to mean?

4   A.  That --

5              MS. MAYO:  Objection.

6              THE COURT:  Overruled.

7   A.  That a permit is basically him asking for permission to

8   have a firearm.  And I ask him if he had one and he said no.

9   Q.  Mr. Ahuja, could you please display Government Exhibit 205C

10  side by side with 205T.

11             Officer Smalls, what are we looking at here?

12  A.  This is a clip from my partner's body worn camera.

13  Q.  Where is the defendant in relation to this clip?

14  A.  Should be to his right.

15  Q.  Mr. Ahuja, could we please play this clip and it's going to

16  start on page one, line 17 on the transcript to the left.

17             (Media played)

18             (Media stopped)

19  Q.  Officer Smalls, here the defendant stated that you should

20  not uphold legalities and regulations and mandates.

21             By that time had you already placed the defendant

22  under arrest?

23  A.  Yes.

24  Q.  Did those statements change your view on arresting him?

25  A.  No.

A000526

N8SBPER2                     Smalls - Direct

1           MS. SMYSER:  Your Honor, I'd just like to clarify

2    whether the jury was able to see that video?

3           THE COURT:  Were you?

4           JUROR:  No.

5           MS. SMYSER:  Could we replay the video.  We'll start

6    at the beginning of Government Exhibit 205C, and again this is

7    going to start on line 17 of the transcript there.

8           (Media played)

9           (Media stopped)

10   Q.  Now we can take down Government Exhibit 205C and 205T.

11          Officer Smalls, during your interaction with the

12   defendant, did he tell you his name?

13   A.  Yes.

14   Q.  What did he say that his name was?

15   A.  Lucha.

16   Q.  Did he provide any identification?

17   A.  Yes, he did.

18   Q.  Mr. Ahuja, could you display for the witness only what's

19   been marked for identification as Government Exhibit 203.

20          Officer Smalls, do you recognize this?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  This is the ID that was provided by Mr. Perez.

24   Q.  How do you know?

25   A.  It's the name that he provided to us on scene.  It also has

```
N8SBPER2                        Smalls - Direct
```

1    a picture of him.

2    Q.  Is this a fair and accurate representation of the ID he

3    provided on that night?

4    A.  Yes.

5            MS. SMYSER:  Your Honor, the government offers

6    Government Exhibit 203.

7            MS. MAYO:  No objection.

8            THE COURT:  Received.

9            (Government's Exhibit 203 received in evidence)

10           MS. SMYSER:  May we publish it?

11           THE COURT:  Please.

12           MS. SMYSER:  Please publish Government Exhibit 203,

13   and we can take that down.

14   BY MS. SMYSER:

15   Q.  Officer Smalls, after the defendant was placed under

16   arrest, did you take him anywhere?

17   A.  Yes.

18   Q.  Where?

19   A.  Took him to the 52nd precinct.

20   Q.  Once you got to the precinct, what did you do with that

21   firearm that you had seized from the defendant?

22   A.  I gave it to my partner Officer Cotter.

23   Q.  What happened after you gave that gun to Officer Cotter?

24   A.  We called ECT.

25   Q.  What's ECT?

A000528

```
     N8SBPER2                    Smalls - Direct
1    A.  The New York City police department evidence collection
2    team.
3    Q.  Did the evidence collection team respond?
4    A.  Yes.
5    Q.  Were you present when they responded?
6    A.  Yes, I was.
7    Q.  What does the evidence collection team do with respect to
8    firearms?
9    A.  They'll swab it.  They'll fume and dust it for prints.
10   They'll unload it, make it safe, and take photographs of it as
11   well.
12   Q.  Did the evidence collection team examine this particular
13   firearm?
14   A.  Yes, they did.
15   Q.  Was this gun loaded?
16   A.  Yes, it was.
17   Q.  While the evidence collection team was unloading the gun
18   and making it safe, did they take photographs?
19   A.  Yes.
20   Q.  Mr. Ahuja, could you please pull up for the witness only a
21   few exhibits marked for identification first as Government's
22   Exhibits 520A through C, and could you also show for
23   identification Government Exhibit 521A and 522A and B.
24           Officer Smalls, do you recognize these?
25   A.  Yes, I do.
```

N8SBPER2                    Smalls - Direct

1   Q.  What are they?

2   A.  These are photographs of the firearm that was recovered off

3   of Mr. Perez.

4   Q.  How do you know that?

5   A.  It has the distinctive red trigger that I remember that

6   evening.  It has a mounted flashlight on it and also a little

7   pinky extender on the magazine.

8   Q.  Is this a fair and accurate depiction of the firearm and

9   the magazine as it was seized from the defendant that day?

10  A.  No.

11  Q.  Why not?

12  A.  This is a photograph with the firearm unloaded.  When it

13  was seized from Mr. Perez, the firearm was loaded.

14  Q.  Is it a fair and accurate representation of the gun after

15  the evidence collection team disassembled it?

16  A.  Yes.

17          MS. SMYSER:  Your Honor, the government offers

18  Government's Exhibit 520A through C, 521A and 522A and B.

19          MS. MAYO:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibits 520A, 520B, 520C, 521A, 522A,

22  522B received in evidence)

23          MS. SMYSER:  May we publish?

24          THE COURT:  Yes.

25  BY MS. SMYSER:

```
       N8SBPER2                    Smalls - Direct
 1     Q.  Mr. Ahuja, may we please publish 520A.
 2              Officer Smalls, what is this?
 3     A.  This is a photograph of the firearm.
 4     Q.  Is this the same gun that was seized from the defendant?
 5     A.  Yes, it was.
 6     Q.  What brand of firearm is this?
 7     A.  This is a Canik.
 8     Q.  Mr. Ahuja, could you now please display Government Exhibit
 9     520C.
10              Officer Smalls, is this the same gun?
11     A.  Yes, it is.
12     Q.  I'm going to read the serial number depicted on the firearm
13     in Government Exhibit 520C which is 20 CB 25810.
14              Do you see that Officer Smalls?
15     A.  Yes, I do.
16     Q.  Is that correct?
17     A.  Yes, it is.
18     Q.  Mr. Ahuja, could you please publish now Government Exhibit
19     522A.  Officer Smalls, what is the item on the right here?
20     A.  That is the magazine.
21     Q.  Could you explain what a magazine is?
22     A.  A magazine is what holds the rounds or the bullets and that
23     goes inside the firearm.
24     Q.  Is this what the magazine looked like when it was pulled
25     out of that firearm?
```

```
N8SBPER2                    Smalls - Direct
```

1   A.  Yes.

2   Q.  Mr. Ahuja, could you now display Government Exhibit 522B,

3   please.

4           Officer Smalls, do you see the bullets on the screen?

5   A.  Yes, I do.

6   Q.  Where did those come from?

7   A.  Those came from inside the magazine.

8   Q.  So they were inside the firearm?

9   A.  Correct.

10  Q.  How many bullets were in the gun?

11  A.  Twelve.

12  Q.  Officer Smalls, could you please now look to your right for

13  two items marked for identification as Government Exhibits 521

14  and 522.

15  A.  Yes.

16  Q.  Do you see those?

17  A.  Yes, I do.

18  Q.  Do you recognize them?

19  A.  Yes.

20  Q.  What are they?

21  A.  They are the rounds that were in the magazine which were in

22  the firearm and the magazine itself as well that was inside the

23  firearm.

24  Q.  How do you know?

25  A.  They're labeled.  They were in the same magazine that I

N8SBPER2                    Smalls - Direct

1    recognize from the firearm.

2              MS. SMYSER:  Your Honor, the government offers

3    Government's Exhibits 521 and 522.

4              MS. MAYO:  Your Honor, may we briefly just examine the

5    evidence ourselves?

6              THE COURT:  Yes.

7              MS. MAYO:  May we approach?

8              THE COURT:  Yes.

9              MS. MAYO:  Thank you, your Honor.  No objection.

10             THE COURT:  Received.

11             (Government's Exhibits 521, 522 received in evidence)

12   BY MS. SMYSER:

13   Q.  Officer Smalls, can you please take Government Exhibit 522

14   and hold it up for the jury.

15             And what is that?

16   A.  This is the magazine that was inside the firearm.

17   Q.  You can set that down.

18             And next could you please display Government Exhibit

19   521.  What is this?

20   A.  These are the rounds or bullets that were seated inside the

21   magazine that was ultimately seated inside the firearm.

22   Q.  Officer Smalls, could you next look to your right for the

23   item marked for identification as Government Exhibit 520.

24             Do you recognize that?

25   A.  Yes, I do.

N8SBPER2                    Smalls - Direct

1    Q.  What is it?

2    A.  This is the firearm that was recovered off of Mr. Steven

3    Perez.

4    Q.  How do you know?

5    A.  It's labeled.  It matches the exact firearm with the red

6    trigger guard, the mounted flashlight from that evening.

7              MS. SMYSER:  Your Honor, the government offers

8    Government Exhibit 520.

9              MS. MAYO:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibit 520 received in evidence)

12   BY MS. SMYSER:

13   Q.  Officer Smalls, could this gun be loaded right now?

14   A.  No.

15   Q.  Why not?

16   A.  There are zip ties through the barrel and the magazine

17   well, so it doesn't allow for a magazine to be inserted in it

18   or a round to be inserted in the chamber.

19   Q.  Was it loaded on the night of June 23, 2021?

20   A.  Yes, it was.

21             MS. SMYSER:  Could the witness please walk Government

22   Exhibit 520 safely in front of the jury.

23             THE COURT:  Yes.

24             MS. SMYSER:  Your Honor, may I have just a moment.  No

25   further questions.

A000534

```
N8SBPER2                    Smalls - Direct
```

1           THE COURT:  All right.  So we have five minutes before

2   lunch, but we could break early or we could start the cross,

3   whichever defense counsel prefers.

4           MS. MAYO:  Your Honor, we can take a break now.

5           THE COURT:  Ladies and gentlemen, we'll take our lunch

6   break at this time and we'll resume a couple of minutes before

7   2:00.  We're only going as I mentioned today at 3:30 because of

8   other matters, so we won't take any further break after lunch

9   so be prepared to sit 2:00 to 3:30.  Have a very good lunch and

10  we'll see you at 2:00.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
N8SBPER2                    Smalls - Cross
```

1          (Jury not present)

2          THE COURT:  Please be seated.  Let me ask defense

3    counsel how do you propose to put before the jury the evidence

4    of the things you mentioned in your opening statement unless

5    you're planning to call the defendant as a witness?

6          MS. BAHARANYI:  Your Honor, if the evidence doesn't

7    come out through any of the government's witnesses, then we

8    have the option of obviously putting on Lucha El as a witness

9    or putting on another witness who can help support that.

10          THE COURT:  Who would that be?

11          MS. BAHARANYI:  Possibly -- obviously at this point we

12    haven't decided given the government's case is still open, but

13    possibly Maria Otero.

14          THE COURT:  Because, the reason I mention this, the

15    defendant doesn't have to decide whether to take the stand or

16    not until the close of the government's case, although he has

17    to decide right then and there.  But if there are other

18    witnesses who the defense is going to call, I think they need

19    to give the government at least 24 hours' notice before the

20    close of government's case.

21          MS. BAHARANYI:  I understand, your Honor.

22          THE COURT:  Very good.  We'll see you at 2:00.

23          (Recess)

24

25

A000536

N8SBPER2                        Smalls - Cross

1                            AFTERNOON SESSION

2                                2:00 p.m.

3          (Jury not present)

4          THE COURT:  You recall at 3:30 we'll have the *Daubert*

5   hearing on the one witness that I thought we needed it.

6          MS. NICHOLAS:  Yes, your Honor.  We're ready for that.

7          THE DEPUTY CLERK:  Jury entering the courtroom.

8          (Jury present)

9          THE COURT:  Please be seated.  All right.

10  Cross-examination.

11  CROSS-EXAMINATION

12         MS. MAYO:  Thank you, your Honor.

13  BY MS. MAYO:

14  Q.  Good afternoon, Officer Smalls.

15  A.  Good afternoon.

16  Q.  You referred in your direct testimony several times to the

17  name Steven Perez?

18  A.  Yes.

19  Q.  Multiple times?

20  A.  Yes.

21  Q.  You're aware that the name he goes by is Lucha El?

22  A.  Yes.

23  Q.  His ID had the name Lucha El on it that he gave to you?

24  A.  Yes.

25  Q.  You testified that you and your partner were on patrol on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000537**

N8SBPER2                         Smalls - Cross

1    the night of June 23, 2021?

2    A.  Yes.

3    Q.  When you received this information about a man with a

4    firearm?

5    A.  Correct.

6    Q.  When you heard this information, you drove to Perry Avenue?

7    A.  Correct.

8    Q.  And while you were driving on Perry Avenue you saw Lucha El

9    on the sidewalk?

10   A.  Correct.

11   Q.  Standing to the right of you?

12   A.  Correct.

13   Q.  Your partner stopped your patrol car?

14   A.  Yes.

15   Q.  And you both approached Lucha El?

16   A.  Correct.

17   Q.  He was still standing on the sidewalk?

18   A.  Yes.

19   Q.  He was talking to two women?

20   A.  Yes.

21   Q.  The two women were sitting in front of the building that

22   Lucha El was standing in front of?

23   A.  Correct.

24   Q.  And Lucha El saw you approach him?

25   A.  Yes.

N8SBPER2                    Smalls - Cross

1   Q.  And as you walked toward him, he did not run away?

2   A.  No.

3   Q.  He didn't start backing away?

4   A.  No.

5   Q.  He didn't try to hide the bag that he was wearing from you?

6   A.  No.

7   Q.  Or try to prevent you from looking in the bag?

8   A.  No.

9   Q.  Let's talk a little bit more about the information that you

10  were responding to.  You received this information about a 911

11  call?

12  A.  I received a 911 call.

13  Q.  You received a radio run describing a 911 call?

14  A.  Correct.

15  Q.  And the radio run was relaying the information the 911

16  caller described?

17  A.  Correct.

18  Q.  The dispatcher described a call about a man with a firearm?

19  A.  Yes.

20  Q.  And gave his location?

21  A.  Yes.

22  Q.  A description of what he looked like and what he was

23  wearing?

24  A.  Yes.

25  Q.  There was no mention of an assault?

```
             N8SBPER2                    Smalls - Cross
 1    A.  No.
 2    Q.  No mention of a shooting?
 3    A.  No.
 4    Q.  Nothing about any injuries?
 5    A.  No.
 6    Q.  Or any victims?
 7    A.  No.
 8    Q.  And you testified that when you were patrolling, you were
 9    in the 52nd precinct?
10    A.  Yes.
11    Q.  And specifically patrolling as part of the public safety
12    team?
13    A.  Correct.
14    Q.  And as in your role on the public safety team, you were
15    patrolling high crime areas?
16    A.  Correct.
17    Q.  Areas with gang violence?
18    A.  Correct.
19    Q.  Assaults?
20    A.  Correct.
21    Q.  Robberies.  And you were specifically patrolling in a high
22    crime area that night?
23    A.  We patrol the whole precinct, but we were in that area
24    because of an increase of crime around that time period.
25    Q.  So the area was a high crime area that you were patrolling
```

N8SBPER2                    Smalls - Cross

1    in?

2    A.  That specific area had a lot of gang violence at that

3    particular time.

4    Q.  And that's why you were patrolling there?

5    A.  We patrol the whole precinct, but we just happen to be in

6    that area because of the increase of crime.

7    Q.  In that specific area where you were patrolling?

8    A.  Yes.

9    Q.  And that's the area where you arrested Lucha El?

10   A.  Yes.

11   Q.  You arrested Lucha El in front of a building?

12   A.  Yes.

13   Q.  On Perry Avenue.  It was specifically 3318 Perry Avenue?

14   A.  Yes.

15   Q.  Which was Lucha El's home address?

16   A.  I don't recall his home address.

17   Q.  It was the address on the identification card that he gave

18   you?

19   A.  I don't recall the address that was on the identification

20   card.

21   Q.  Sarah, can you please pull up Government Exhibit 203.

22            Officer Smalls, was this the exhibit we were looking

23   at on your direct testimony?

24   A.  Yes.

25   Q.  Does that list 3318 Perry Avenue on this ID card?

```
      N8SBPER2                    Smalls - Cross
```

 1   A.  Yes, it says corner of 3318 Perry Avenue.

 2   Q.  It says c/o 3318 Perry Avenue?

 3   A.  Yes, which means corner of.

 4   Q.  Now I want to turn to talk a little bit about what happened

 5   after you handcuffed Lucha El.

 6          Sarah, can you pull up Government Exhibit 202A and

 7   then play from 1:39 seconds and 1:49 seconds and pause there.

 8          (Media played)

 9          (Media stopped)

10   Q.  This is a clip from your body worn camera footage from that

11   night?

12   A.  Yes.

13   Q.  It shows you at the beginning of the clip that we just

14   played shining a flashlight?

15   A.  Yes, it does.

16   Q.  And you're shining the flashlight into Lucha El's bag?

17   A.  Yes, I am.

18   Q.  And that's to look at the firearm in the bag?

19   A.  Correct.

20   Q.  You asked Lucha El if he has a permit for it?

21   A.  Yes, I did.

22   Q.  By "it," you're referring to the gun?

23   A.  Yes.

24   Q.  And by permit you're asking him if he has a concealed carry

25   permit?

A000542

N8SBPER2                    Smalls - Cross

1   A.  Yes, a permit to carry a handgun.

2   Q.  You weren't asking him where he got the gun from?

3   A.  No.

4   Q.  Or what state the gun was purchased in?

5   A.  No.

6   Q.  You never asked him where did you get this gun from?

7   A.  No, I didn't.  It doesn't matter where you got it from.  If

8   you don't have a permit from New York State or New York City,

9   you're not allowed to be in possession of it.

10  Q.  But you did not ask him that question?

11  A.  I asked him if he had a permit.  He said no.

12  Q.  Thank you.  To talk a little bit more about the government

13  you recovered from Lucha El.  You recovered the gun from the

14  bag that Lucha El was wearing?

15  A.  Correct.

16  Q.  It wasn't tucked in his waistband?

17  A.  No.

18  Q.  Or hidden under his shirt in any way?

19  A.  No.

20  Q.  And you looked at the gun that night when you looked in his

21  bag?

22  A.  Yes.

23  Q.  The gun had a serial number on it?

24  A.  Correct.

25  Q.  The serial number hadn't been filed off?

N8SBPER2                         Smalls – Redirect

 1   A.  No.

 2   Q.  Or removed in any other way?

 3   A.  No.

 4   Q.  And you testified you've been a police officer for several

 5   years now?

 6   A.  Yes.

 7   Q.  And you've made several gun related arrests in this time?

 8   A.  Yes, I have.

 9   Q.  In these gun arrest, you've encountered guns that have no

10   serial numbers?

11   A.  Yes, I have.

12   Q.  Because they've been filed off?

13   A.  Correct.

14   Q.  Or they never had any serial numbers in the first place?

15   A.  Correct.

16           MS. MAYO:  One moment, your Honor.  Thank you.  No

17   further questions.

18           THE COURT:  Any redirect.

19           MS. SMYSER:  Just briefly, your Honor.

20   REDIRECT EXAMINATION

21   BY MS. SMYSER:

22   Q.  Officer Smalls, on cross-examination you were asked a

23   series of questions about the defendant's bag.  Do you recall

24   those?

25   A.  Yes.

A000544

N8SBPER2                    Smalls - Redirect

1   Q.  Do you know whether he told you not to touch his bag?  Do

2   you recall that?

3   A.  During cross or during --

4   Q.  During cross-examination were you asked about whether Lucha

5   El tried to hide his bag?

6   A.  Yes, I was.

7   Q.  Could we just pull up Government Exhibit 201AT.  Scroll to

8   the second page, 202AT.

9        Officer Smalls, just looking here at lines five and

10  six, when you all first approached the defendant, what did he

11  say about his bag?

12  A.  He said, I'm a Moor.  Excuse me.  Don't touch me.  That's

13  my bag. Don't go in my bag.

14  Q.  Officer Smalls, you were asked a series of questions about

15  3318 Perry Avenue on direct examination.  Do you recall that?

16  A.  Yes.

17  Q.  And whether the defendant was standing in front of 3318

18  Perry Avenue?

19  A.  Yes.

20  Q.  Whether that was his address?

21  A.  Correct.

22  Q.  Looking at line 16 and 17, when the defendant was initially

23  asked about the building, what did he say?

24  A.  I have no idea.

25        MS. SMYSER:  Can I have just a moment, your Honor.

N8SBPER2                    Smalls - Redirect

```
 1              THE COURT:  Yes.
 2              MS. SMYSER:  Nothing further.
 3              THE COURT:  Any recross?
 4              MS. MAYO:  No, your Honor.
 5              THE COURT:  Thank you very much.  You may step down.
 6              (Witness excused)
 7              THE COURT:  Please call your next witness.
 8              MS. SMYSER:  Your Honor, before we call our next
 9     witness, the government has a stipulation that we would like to
10     offer.
11              THE COURT:  Okay.
12              MS. SMYSER:  This is Government Exhibit 1006.  Can we
13     please publish it for the jury.  I'm going to start reading the
14     stipulation which is Government Exhibit 1006.  Under this
15     stipulation which is now on the screen here, the parties agree
16     that Steven Perez, AKA Lucha, the defendant, has never applied
17     for or been granted a license for a firearm or a firearms
18     dealers license.
19              Government Exhibit 607 is a true and accurate
20     certification produced by the New York City Police Department,
21     NYPD, certifying that a diligent search of the NYPD's License
22     Division Records was conducted, and there are no licensing
23     records in existence for a license for a firearm or a firearms
24     dealers license for Steven Perez, AKA, Lucha, the defendant.
25     The parties agree that this stipulation as well as Government
```

N8SBPER2                    Archuleta- Direct

1   Exhibit 607 are admissible, and your Honor the government would
2   offer 1006 and 607.
3            THE COURT:  Received.
4            (Government's Exhibits 1006, 607 received in evidence)
5            MS. SMYSER:  Mr. Ahuja, could you please publish
6   Government Exhibit 607 for the jury.  Would you just zoom in on
7   the text in the middle.  We can take down that exhibit and the
8   government's next witness it would call is Mark Archuleta.
9   MARK ARCHULETA,
10       called as a witness by the Government,
11       having been duly sworn, testified as follows:
12           THE DEPUTY CLERK:  Please state your name and spell it
13   for the record.
14           THE WITNESS:  My name is Mark Archuleta, M-A-R-K
15   A-R-C-H-U-L-E-T-A.
16   DIRECT EXAMINATION
17   BY MS. SMYSER:
18   Q.  Good afternoon, Mr. Archuleta.
19   A.  Good afternoon.
20   Q.  Where do you work?
21   A.  I work for Western Union Financial Services Incorporated.
22   Q.  How long have you worked for Western Union?
23   A.  Just about 20 years.
24   Q.  What is your current title there?
25   A.  My current title is senior specialist officer of consumer

N8SBPER2                    Archuleta- Direct

1   monitoring and investigations.
2   Q.  What are some of your responsibilities as senior
3   specialist?
4   A.  My basic responsibility is transaction monitoring.
5   Q.  What do you mean by transaction monitoring?
6   A.  We monitor transaction, both money transfer and money order
7   for suspicious activity.
8   Q.  What are some of the other roles that you've held at
9   Western Union?
10  A.  I worked in regulatory exam management, law enforcement
11  outreach and investigations, corporate security, research and
12  reporting, and now I'm at my current role.
13  Q.  Are those all in kind of a particular group at the company?
14  A.  Yes, it all falls under the umbrella of anti-money
15  laundering.
16  Q.  What kind of company is Western Union?
17  A.  Western Union is a money service business is the
18  classification.  The main thing we do is move money around the
19  world.
20  Q.  Are you familiar with Western Union records that document
21  those money transfers?
22  A.  Yes.
23  Q.  What are some of the ways that you can transfer money with
24  Western Union?
25  A.  A few of the ways are you can go to like a Brick and

A000548

N8SBPER2                    Archuleta- Direct

1  Mortar, certain grocery stores, liquor stores, convenient

2  stores, and do a location to location; or you can transfer it

3  from a bank to a bank or consumer to a bank, mobile wallets as

4  well.

5  Q.  I want to focus on going into a Brick and Mortar store and

6  sending money for a moment.

7          What kind of information is a sender of money required

8  to provide when they go into a Brick and Mortar store?

9  A.  Depending on the amount, you're asked to provide an ID

10 either way.  Sometimes the clerk can just take the information

11 for the sender such as name, address, phone number off of an

12 ID.

13 Q.  What is that money threshold that you just mentioned?

14 A.  A thousand dollars.

15 Q.  So if it is above a thousand dollars, what happens?

16 A.  They're required to input that information into our point

17 of sale system which actually facilitates the transfer.

18 Q.  If it's under thousand dollars, are they required to input

19 that information?

20 A.  Not required to input it, but they are asking to look at

21 the ID to verify the individual sending the money.

22 Q.  Under Western Union policy, they still have to request and

23 inspect the identification of the sender?

24 A.  Yes, ma'am.

25 Q.  What about the person who's picking up the money, what do

A000549

N8SBPER2                    Archuleta- Direct

1    they have to show?

2    A.   They would have to provide a valid ID because we need to

3    know who we're paying the funds to.

4    Q.   Is that regardless of the amount that is sent?

5    A.   Yes.

6    Q.   What kind of identification do they have to show?

7    A.   Usually it's a driver license or state issued ID or you can

8    use a passport as well.

9    Q.   Mr. Ahuja, could you please display for the witness only

10   what's been marked for identification as Government Exhibit

11   803.

12            Mr. Archuleta, do you see this document?

13   A.   Yes.

14   Q.   Do you recognize it?

15   A.   Yes.

16   Q.   What is it?

17   A.   This is a money transfer transaction grid.

18   Q.   Was this grid created, kept and maintained by Western Union

19   as a record of its regularly conducted activities?

20   A.   Yes.

21   Q.   Was it created by persons with knowledge of or from

22   information transmitted by people with knowledge of the

23   information that's contained in this document?

24   A.   Yes.

25   Q.   And was it created at or near the time of the transaction

A000550

N8SBPER2                    Archuleta- Direct

1   when that information became available?

2   A.  Yes.

3           MS. SMYSER:  Your Honor, the government offers

4   Government Exhibit 803.

5           MS. MAYO:  No objection.

6           THE COURT:  Received.

7           (Government's Exhibit 803 received in evidence)

8           MS. SMYSER:  May we publish it?

9           THE COURT:  Yes.

10  Q.  Mr. Ahuja, could you please publish Government Exhibit 803

11  and turn to the tab that's marked Keith Vereen.

12          Mr. Archuleta, have you reviewed this document?

13  A.  Yes.

14  Q.  Before we go through this log in detail, I just want to ask

15  you at a high level what's contained in that?

16  A.  This would be sender and payee information that was

17  captured during the transactions.  It also contains the

18  location where the transactions were conducted.

19  Q.  So it's about several money transfers?

20  A.  Yes.

21  Q.  And now I'd like to walk through some of this table.

22          First, I'd like to direct your attention to column D.

23  What information is contained in column D?

24  A.  Column D contains the sender's name.

25  Q.  And who sent money as reflected in this spreadsheet?

N8SBPER2                    Archuleta- Direct

1    A.  Steven Perez, Ricardo Rodriguez Resto and Jamil Bey.

2    Q.  Can you tell how much money they sent?

3    A.  Yes.  In column B it has the sender amount in U.S. dollars.

4    Q.  How much money did Mr. Perez send?

5    A.  $350.

6    Q.  What about Mr. Rodriguez?

7    A.  $911.

8    Q.  And Mr. Bey?

9    A.  $600.

10   Q.  What does column A show?

11   A.  Column A is the Western Union money transfer fee that was

12   charged along with the principal amount.

13   Q.  Is that fee included in the amount that is transferred to

14   the recipient or not?

15   A.  No.

16   Q.  I want to direct your attention to columns G and H.

17        What information is contained in these columns?

18   A.  G and H contain the send date, the day the transaction was

19   initiated.

20   Q.  When did Perez send money?

21   A.  9/22 of 2020.

22   Q.  At what time?

23   A.  07:15 a.m. eastern standard time.

24   Q.  So this log is in eastern standard time?

25   A.  Yes.

N8SAAPER5                    Archuleta - Direct

1   BY MS. SMYSER:

2   Q.  What about Mr. Rodriguez?

3   A.  9/12 of 2020 at 1619 hours which would be 4:19 in the

4   afternoon, Eastern Standard Time.

5   Q.  Finally, Mr. Bey?

6   A.  9/12/2020, 1538 hours which would be 3:38 p.m. Eastern

7   Standard Time.

8   Q.  Looking at Column C, what does this column reference?

9   A.  Column E.

10  Q.  "C", sorry.

11  A.  "C" contains the money transfer control number which is a

12  transaction identifier assigned by Western Union.

13  Q.  What is that number used for in the transaction?

14  A.  It's to identify the transaction and it's also information

15  for the sender to pass along to the receiver or payee

16  identifying the transaction.

17  Q.  Would you please look at Column F.  What is contained in

18  this column?

19  A.  That would be the sender's phone number that was provided

20  at the time of the transaction.

21  Q.  What is the phone number for Mr. Perez?

22  A.  347-251-1561.

23  Q.  For Mr. Rodriguez?

24  A.  646-875-1041.

25  Q.  For Mr. Bey?

A000553

N8SAAPER5                    Archuleta - Direct

```
1    A.  914-800-4171.
2    Q.  I want to scroll on this table to Columns P through S.
3    What kinds of information are contained in these columns
4    Mr. Archuleta?
5    A.  This would be the -- you said "P" through "S"?
6    Q.  "P" through "S".
7    A.  Okay.  That is the sender's address, the send city and send
8    state and the send zip code.
9    Q.  What is the address for Mr. Perez in the first line?
10   A.  3318 Perry Avenue.
11   Q.  In what city?
12   A.  Bronx, New York.
13   Q.  What about for Mr. Rodriguez in the second line?
14   A.  3556 Webster Avenue again, Bronx, New York.
15   Q.  Finally, for Mr. Bey in the third line?
16   A.  2759 Webster Avenue again, Bronx, New York.
17   Q.  Now I want to turn to Columns AN through AR.
18           (Pause)
19   Q.  What is contained in these columns?
20   A.  This is the Western Union agent location where the money
21   transfer was initiated.
22   Q.  So where did Mr. Perez send the payment from?
23   A.  Pay-O-Matic location number 201 11 East Gun Hill Road in
24   Bronx, New York.
25   Q.  Mr. Rodriguez?
```

N8SAAPER5                    Archuleta - Direct

1   A.  Pay-O-Matic number 242339, East Gun Hill Road in the Bronx,

2   New York.

3   Q.  What about Mr. Bey?

4   A.  Pay-O-Matic number 242339, East Gun Hill Road, again,

5   Bronx, New York.

6   Q.  I want to scroll back in the log to Column W.  What kind of

7   information is contained in the Column W?

8   A.  Welcome.  "W" is the payee's name is the receiver of the

9   money transfer funds.

10  Q.  Did Mr. Perez, Mr. Rodriguez and Mr. Bey send money to the

11  same person here?

12  A.  Yes.

13  Q.  Who was that person?

14  A.  Keith Vereen.

15  Q.  I want to look now at Column Y.  What is contained in that

16  column?

17  A.  That is the payee's phone number.

18  Q.  What is Mr. Vereen's phone number?

19  A.  1-843-460-0166.

20  Q.  Now let's turn to Columns AG through AJ.  What information

21  is in these columns?

22  A.  This is the payee location address for the Western Union

23  location where the one transfer was picked.

24  Q.  Is it for the Western Union location or recipient address?

25  A.  Yes.  It's for the payee address which is the recipient.

N8SAAPER5                    Archuleta – Direct

1   Q.  What is Mr. Vereen's address in line one?

2   A.  Pridgen Road, Unit 16.

3   Q.  In what city?

4   A.  Myrtle Beach, South Carolina.

5   Q.  What about the address in line two?

6   A.  1211 Pridgen Road, Unit 16.

7   Q.  Line three?

8   A.  1211 Pridgen Road.

9   Q.  Next let's turn to columns AU through AY.

10          (Pause)

11  Q.  What is in these columns?

12  A.  This is the Western Union agent location name.

13  Q.  And its address?

14  A.  Yes, address and city and state where it is located.

15  Q.  Where did Mr. Vereen pick up the first two pavements?

16  A.  At Food Lion number 1468, 1430 South Kings Highway in

17  Myrtle Beach, South Carolina.

18  Q.  What about that last payment?

19  A.  That would be Food Lion number 1202, Food Lion Myrtle

20  Beach, South Carolina.

21  Q.  Finally, can we turn to Columns AD and AE.

22          (Pause)

23  Q.  What is contained in these columns, Mr. Archuleta?

24  A.  This is the payee's ID type and payee's ID number that

25  we're associated with the transaction pick up.

N8SAAPER5                    Archuleta - Cross

1   Q.  So what does that mean?

2   A.  This means that the identification numbers provided at the

3   time the funds were received.

4   Q.  What kind of identification did Mr. Vereen provide?

5   A.  Payee ID type number one is a state issued driver's

6   license.

7              MS. SMYSER:  Your Honor, may we just have a moment?

8              THE COURT:  Yes.

9              (Pause)

10             MS. SMYSER:  No further questions.

11             THE COURT:  Cross-examination?

12             MS. MAYO:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MS. MAYO:

15  Q.  Good afternoon, Mr. Archuleta.

16  A.  Good afternoon.

17  Q.  You were asked by the prosecutors to review specific

18  transactions in this case?

19  A.  Yes.

20  Q.  Review the three transactions that you went through on that

21  spreed sheet?

22  A.  Yes.

23  Q.  These were not, you were not personally familiar with these

24  records before you testified?

25  A.  Not personally, no.

N8SAAPER5                    Archuleta - Cross

1   Q.  They weren't flagged independently by Western Union as

2   "suspicious activity"?

3   A.  Initially.

4   Q.  Western Union did not raise an anti money laundering

5   concern or suspicious activity concern?

6   A.  Not to my knowledge.

7   Q.  You were asked to examine the record for purposes of this

8   trial?

9   A.  Yes.

10  Q.  To explain how the money transferred worked?

11  A.  Yes.

12          MS. MAYO:  One moment, your Honor?

13          THE COURT:  Yes.

14          (Pause)

15          MS. MAYO:  Thank you.  No further questions.

16          THE COURT:  Anything else?

17          MS. SMYSER:  Nothing further from the government.

18          THE COURT:  Thank you.  You may step down.

19          Please call your next witness.

20          MS. NICHOLAS:  Your Honor, before the government calls

21  its next witness we have two stipulations to offer.

22          First, your Honor, we'd be offering Government Exhibit

23  101 which is a stipulation between the parties that in

24  Paragraph One Steven Perez, a/k/a "Lucha", the defendant, was

25  at all relevant times a resident of New York State.  Defendant

A000558

N8SAAPER5                    Archuleta - Cross

1   is not, nor has he ever been a licensed importer, licensed

2   manufacturer or licensed dealer of firearms.

3           Paragraph Two, Government Exhibits 400 through 408 are

4   true and accurate Blue Ribbon certifications produced by the

5   Bureau of Alcohol Tobacco firearms and Explosives, the ATF,

6   certifying that a diligent search of ATF's records were

7   conducted and there are no license records in existence for

8   with for the license importation, manufacturer or dealing of

9   firearms by any of the following individuals.

10          Steven Perez, a/k/a "Lucha", Keith Vereen, Lamar Dow,

11  a/k/a "Jamil Bey, "Jamal Latimer, a/k/a "Jahmal Bey", Brandon

12  Britton, a/k/a "Messiah Bey", Quinn Cumberlander, a/k/a "Quinn

13  Khabir", Aaron Jiminez, a/k/a "Alban El Currah" and Ricardo

14  Rodriguez.

15          It is further stipulated and agreed that this

16  stipulation may be marked as Government Exhibit 1001 and that

17  Exhibits 400 through 408 are admissible and may be received in

18  evidence at trial.

19          At this time, the government offers Government

20  Exhibits 1001, as well as Government Exhibits 400 through 408.

21          THE COURT:  Received.

22          (Government's Exhibits 1001, 400 - 408 received in

23  evidence)

24          MS. NICHOLAS:  Next, your Honor, the government would

25  like to offer Government Exhibit 1004 which is an additional

A000559

N8SAAPER5                    Gordon - Direct

1   stipulation between the parties.

2            (Stipulation read)

3            THE COURT:  Received.

4            (Government's Exhibits 1004, 411 - 422 and 430

5   received in evidence)

6            MS. NICHOLAS:  With that, your Honor, the government

7   calls Special Agent Lennea Gordon.

8    LENNAE GORDON,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11           COURTROOM DEPUTY:  Please state and spell your name

12   for the record.

13           THE WITNESS:  Lennea Gordon, L-e-n-n-e-a, G-o-r-d-o-n.

14   DIRECT EXAMINATION

15   BY MS. NICHOLAS:

16   Q.  Good afternoon.

17   A.  Good afternoon.

18   Q.  Special Agent Gordon, where do you work?

19   A.  I work at the Bureau of Alcohol Tobacco, Firearms and

20   Explosives, New York Field Division.

21   Q.  Is that also known as the "ATF"?

22   A.  Yes, it is.

23   Q.  What is your title at the title ATF?

24   A.  Special agent.

25   Q.  Do you have any particular assignment as a special agent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000560

N8SAAPER5                    Gordon - Direct

1   with the ATF?

2   A.  Yes.  I am currently assigned to the New York Group Two

3   Office.

4   Q.  We are going to return to your current job in a moment.  Is

5   this your first job in law enforcement?

6   A.  No, it is not.

7   Q.  What other jobs in law enforcement have you held?

8   A.  I was previously a special agent with the U.S. Department

9   of States Bureau of Diplomatic Security.

10  Q.  What is the U.S. Department of States Bureau of Diplomatic

11  Security?

12  A.  It is the law enforcement wing of the U.S. Department of

13  State.

14  Q.  Was your title also a special agent?

15  A.  Yes, it was.

16  Q.  How long were you a special agent what the Department of

17  State?

18  A.  Approximately, five years.

19  Q.  Now to become a special agent at the Department of State do

20  you have to go through any particular training?

21  A.  Yes, you do.

22  Q.  Do you have to go to multiple schools?

23  A.  Yes, you do.

24  Q.  What's the first school in that pipeline?

25  A.  The first school is the criminal investigator training

N8SAAPER5                    Gordon – Direct

1   program, also referred to as CITP.

2   Q.  So let's talk about CITP for a second.  Where is CITP

3   located?

4   A.  It is located in Brunswick, Georgia at the Federal Law

5   Enforcement Training Center, also referred to as a FLETC.

6   Q.  Approximately, how long is CITP?

7   A.  Approximately, three months.

8   Q.  In general terms can you describe what kind of training a

9   special agent in training experiences when they're at CITP?

10  A.  Yes.  They receive training in federal laws.  They receive

11  training in criminal investigations, in firearms, defensive

12  tactics and physical fitness training.

13  Q.  Now, as a DSS agent did you personally carry a firearm?

14  A.  Yes, I did.

15  Q.  Did you train and qualify with that firearm?

16  A.  Yes, I did.

17  Q.  Was there a time when you were assigned to DSS as A special

18  agent when you were responsible for training of others with

19  firearms?

20  A.  Yes, there was.

21  Q.  Can you briefly describe what that job was?

22  A.  I was posted to the United States Embassy in Kuwait City,

23  Kuwait.  As part of my duties there I was a firearms range

24  safety officer and I would oversee the firearms training and

25  certification programs for our locally employed staff and also

N8SAAPER5                          Gordon – Direct

1     for the main security guards that were also present at the

2     embassy.

3     Q.  When you introduced yourself at the beginning of your

4     testimony you said you are an ATF special agent.

5     A.  That's correct.

6     Q.  When did you transition from the state department to the

7     ATF?

8     A.  I believe it was the summer of 2018.

9     Q.  Now, did you have to undergo any additional training when

10    you made that transition?

11    A.  Yes, I did.

12    Q.  Did you have to attend any particular schools?

13    A.  Yes, I did.

14    Q.  What schools did you attend?

15    A.  I attended the ATF special agent basic training course.

16    Q.  If I call that "SABT", will you know what I am taking

17    about?

18    A.  Yes.

19    Q.  Where is that held?

20    A.  The ATF National Academy which is also in Brunswick

21    Georgia.

22    Q.  About how long is SABT?

23    A.  Approximately, three months.

24    Q.  When one attends SABT, what types of things are you

25    learning ABOUT?

N8SAAPER5                    Gordon - Direct

1    A.  Learning the details OF federal firearms laws AND also the

2    other ATF portfolios which would include arson AND explosives

3    and you're also learning advanced firearms instruction and also

4    defensive tactics.

5    Q.  Now did some of that training happen on gun ranges?

6    A.  Yes.

7    Q.  Is some of it also in a classroom?

8    A.  Yes.

9    Q.  Can you describe what some of the topics you may learn

10    about in this classroom setting?

11    A.  Yes.  Significant amount on firearms investigations,

12    firearms trafficking investigations, arson and the like.

13    Q.  Now, between your time training to become a DSS special

14    agent and your time training you become an ATF special agent,

15    how much time would you estimate you've spent training with

16    firearms?

17    A.  Hundreds of hours.

18    Q.  When did you graduate from SABT?

19    A.  Approximately, the fall of 2018.

20    Q.  Once you graduate from SABT are you an ATF special agent?

21    A.  Yes, you are.

22    Q.  Once you became an ATF special agent where did you report

23    for your first assignment?

24    A.  My first assignment with ATF was to the San Diego field

25    office in San Diego, California.

A000564

N8SAAPER5                          Gordon - Direct

1    Q.  What did you do there?

2    A.  I investigated illegal possession of firearms and also

3    firearms trafficking.

4    Q.  Approximately, how long did you have that assignment?

5    A.  Approximately, three years.

6    Q.  After you completed your assignment in San Diego, where

7    were you next assigned?

8    A.  To the New York Field Division.

9    Q.  When you arrived at the New York Field division, what was

10   your first assignment?

11   A.  My first assignment was to the ATF New York Crime Gun

12   Intelligence Center.

13   Q.  How does the ATF refer to the crime gun --

14   A.  We refer to it as CGIC.

15   Q.  Once you are assigned to CGIC, what sorts of things were

16   you doing there?

17   A.  I was assisting in intel analysis and in providing agents

18   in the field with support.

19   Q.  Just at a high level, what is the mission of CGIC?

20   A.  The CGIC is, at a high level it identifies firearms that

21   have been recovered in and around New York City and analyzes

22   those firearms and looks for indicators that those firearms may

23   have been trafficked into the city and looks for investigative

24   opportunities, I would say.

25   Q.  After you finished your assignment with the CGIC did you

N8SAAPER5                    Gordon - Direct

1   have another job with the New York Field Division?

2   A.  Yes, I did.

3   Q.  Is that the job you are currently in?

4   A.  Yes, it is.

5   Q.  Could you just briefly describe what your duties and

6   responsibilities are in your current job?

7   A.  Yes.  In the New York Group Two Office, also known as the

8   Joint Firearms Task Force, I primarily focused on firearms

9   trafficking into New York City.

10           MS. NICHOLAS:  Your Honor, at this time the government

11  offers Special Agent Gordon's testimony under Rule 702.

12           THE COURT:  You don't need to do that in front of the

13  jury but that is acceptable to the Court.

14           MS. BAHARANYI:  Your Honor, I would just note our

15  previous standing objection.

16           THE COURT:  Yes.

17  Q.  When you are doing investigations as an ATF special agent,

18  do you sometimes visit gun stores?

19  A.  Yes.

20  Q.  Let's talk again by talking a bit about gun stores.  Is

21  there a term that the ATF uses to refer to gun stores?

22  A.  Yes, there is.

23  Q.  What is that term?

24  A.  An FFL.

25  Q.  What does that stand for?

A000566

N8SAAPER5                    Gordon - Direct

1    A.  A "federal firearms licensee".

2    Q.  Okay.  What is a federal firearm license?

3    A.  A federal firearm licensee is what the public would

4    generally know as a gun store.  It is a place of business that

5    is authorized by ATF to sell firearms as their course of

6    business.

7    Q.  Now are FFLs subject to any particular ATF requirements?

8    A.  Yes, they are.

9    Q.  Okay.  Can you describe some of those requirements?

10   A.  When selling firearms they are required to have the

11   purchaser fill out the ATF form 4473.  They're required to

12   report some of their information and maintained their records.

13   Q.  We are going to come back at 4473 in a second.  When an FFL

14   is selling a firearm do they have any obligations to check

15   identifications?

16   A.  Yes, they do.

17   Q.  Now, does the ATF maintain a record of who authorizes or

18   who's authorized to be an FFL?

19   A.  Yes, they do.

20   Q.  Does the ATF have a way to verify that a person or business

21   has received an FFL?

22   A.  Yes, they do.

23   Q.  In front of you just to your right there's a manila

24   envelope with a series of documents in it.  Do you see that?

25   A.  Yes.

**A000567**

N8SAAPER5                    Gordon – Direct

1    Q.  Those are in evidence as Government Exhibits 400 to 408.

2    Can you flip through those for a moment.

3            (Pause)

4    A.  Yes.

5    Q.  Are you familiar with those documents?

6    A.  Yes, I am.

7    Q.  What are those?

8    A.  ATF Blue Ribbon certificates.

9            MS. NICHOLAS:  Can you please publish what's in

10   evidence as Government Exhibit 400.

11           (Pause)

12   Q.  You just described this as a Blue Ribbon certificate.  What

13   is this document in layman's terms?

14   A.  This is a document that verifies whether or not an

15   individual has registered with the ATF.

16           MS. NICHOLAS:  Could you go to page two, please.

17           (Pause)

18   Q.  Special Agent Gordon, I am going to have you read the

19   paragraph that begins with "I do hereby certify".

20   A.  Yes.  I do hereby certify that I made a diligent search of

21   said records and that no record or entry was found therein with

22   respect to the application for or issuance of a firearms

23   license to Steven Perez, a/k/a "Lucha", at any address in the

24   50 states of the United States and its territories for the time

25   period of January 1, 2020 through August 1, 2021.

N8SAAPER5                    Gordon - Direct

1   Q.  Thank you.  Shifting gears just a little bit to talk more

2   particular about the mechanics of a gun sale.

3           You mentioned earlier that -- you testified earlier

4   that FFLs are required to check IDs and administer 4473s; is

5   that correct?

6   A.  Yes.

7   Q.  Why are FFL required to check IDs?

8   A.  To verify the individual is who they purport to be and that

9   they are also, and also to check residency.

10  Q.  There are also state requirements that FFLs are mandated to

11  follow?

12  A.  Yes, there are.

13  Q.  Generally speaking, do those requirements vary between

14  states?

15  A.  Yes, they do.

16  Q.  Are there some states that require license to purchase a

17  firearm?

18  A.  Yes.

19  Q.  I want to turn specifically to the ATF form 4473.  Is there

20  another name for that form?

21  A.  Yes, there is.

22  Q.  What name is that?

23  A.  The firearms transaction record.

24  Q.  What's the purpose of the 4473?

25  A.  The purpose of the 4473 is to determine that the purchaser

N8SAAPER5                    Gordon - Direct

1    is lawfully permitted to possess the firearm.

2    Q.  Who fills out the 4473?

3    A.  The purchaser fills out certain sections and then the FFL

4    employee will fill out other sections.

5    Q.  And does the FFL have to make sure that 4473 is filled out

6    at the time of every gun sale at an FFL?

7    A.  Yes.

8    Q.  Now, after the 4473 is filled out where is it stored?

9    A.  The FFL is responsible for maintaining those records.

10   Q.  And are those records subject to inspection by the ATF?

11   A.  Yes, they are.

12   Q.  Now, if a gun dealer fails to comply with he requirements

13   that are set forth in the 4473, can there be consequences for

14   that FFL?

15   A.  Yes, there can.

16   Q.  What sorts of things?

17   A.  Those consequences can be up to and including the

18   revocation of their FFL license.

19        MS. NICHOLAS:  Ms. Sankar, can you please publish

20   what's in evidence as Government Exhibit 413.

21        (Pause)

22   Q.  Special Agent Gordon, what's on the screen?

23   A.  This is what ATF refers to as a form 4473, the firearms

24   transaction record.

25   Q.  Okay.  Without talking about any specific sections, can you

N8SAAPER5                    Gordon - Direct

1   just broadly explain what the form is that we're looking at?

2   A.  Yep.  So this is the form that the gun store or that an

3   individual when making a firearms purchase will fill out at a

4   gun store.

5   Q.  Now, are you aware of any changes that have been made to

6   the form over time?

7   A.  Yes.

8   Q.  Okay.  Are you aware of what the effective date of the

9   particular form we're looking at in Government Exhibit 413 is?

10  A.  Yes.

11  Q.  What's the date on that form?

12  A.  2016.

13  Q.  This is the 2016 version of the 4473?

14  A.  Yes, it is.

15          MS. NICHOLAS:  Okay.  Ms. Sankar, can you please

16  publish what's in evidence as Government Exhibit 418.

17          (Pause)

18  Q.  Can you see Government Exhibit 418 in front of you, Special

19  Agent Gordon?

20  A.  Yes, I can.

21  Q.  What is the effective date on Government Exhibit 418?

22  A.  May 2020.

23          MS. NICHOLAS:  Ms. Sankar, can you please place 413

24  side-by-side with 418.

25          (Pause)

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **ASHLEY C. NICHOLS, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007

Dated:  New York, New York
        May 3, 2024

_Kendra Hutchinson_

**KENDRA HUTCHINSON**
Assistant Federal Defender