# 24-162-cr

## United States Court of Appeals
## for the Second Circuit

———————————

Docket No. 24-162-cr

———————————

UNITED STATES OF AMERICA,

*Appellee,*

-against-

KEITH VEREEN, a/k/a SEALED DEFENDANT 1,

*Defendant,*

STEVEN PEREZ, a/k/a SEALED DEFENDANT 2, a/k/a LUCHA,

*Defendant-Appellant.*

———————————

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT STEVEN PEREZ**
**VOLUME IV OF IV**

Federal Defenders of New York, Inc.
  Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8731

*Attorney for Defendant-Appellant*
**STEVEN PEREZ**

**KENDRA L. HUTCHINSON**,
  *Of Counsel*

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet,
     S.D.N.Y. 22 Cr. 644 (JSR) . . . . . . . . . . . . . . . . . . . . . . . . . . A 005

Indictment,
     filed November 30, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . A 019

Defense Motion to Suppress and Dismiss,
     filed February 4, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 027

Government's Opposition to Defense Motion,
     filed February 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 056

Defense Reply,
     filed March 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 085

Transcript of Oral Argument,
     dated March 15, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 100

Government's Supplemental Letter Brief,
     filed March 22, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 121

Defense Supplemental Letter Brief,
     filed March 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 125

Transcript of Suppression Hearing,
     dated May 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 130

Opinion and Order,
     filed July 7, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 236

Superseding Indictment,
     filed July 20, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 272

Defense Motions in Limine,
     filed August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . A 276

# VOLUME II

Government's Motions in Limine,
        filed August 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 299

Defense Opposition to Government's Motions,
        filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 326

Government's Opposition to Defense Motions,
        filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 345

Government's Requests to Charge,
        filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 374

Defense Requests to Charge,
        filed August 21, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 433

Transcript of Pretrial Proceedings,
        dated August 25, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 464

Transcript of Trial,
        dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 482

# VOLUME III

Transcript of Trial (continued),
        dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 572

Transcript of Trial,
        dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 611

Government's Supplemental Requests to Charge,
        dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 847

Defense Supplemental Requests to Charge,
     dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   850

Transcript of Trial,
     dated August 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   855

## VOLUME IV

Transcript of Trial (continued),
     dated August 30, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A   867

Court's Final Jury Instructions,
     filed August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1018

Transcript of Trial,
     dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1050

Jury Notes,
     dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1106

Verdict,
     dated August 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1111

Transcript of Sentencing,
     dated January 8, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1112

Judgment of Conviction,
     entered January 12, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1149

Notice of Appeal,
     filed January 17, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1156

N8UAAPER1                         Gutierrez - Direct

1          (side bar)

2          MS. BAHARANYI:  Regarding the first one that you

3     mentioned was just the phone itself.

4          MS. NICHOLAS:  23.

5          MS. BAHARANYI:  We don't have an objection to that.

6     The text messages though I think it would help to go in order

7     with what our objections are.  The first one that you are

8     seeking to admit is 1101.

9          MS. NICHOLAS:  The user device information.

10         MS. BAHARANYI:  That one is fine.  1102.

11         MS. NICHOLAS:  We're not seeking to admit that.  The

12    next one was 1103A.

13         MS. BAHARANYI:  So for that particular exhibit, your

14    Honor, I am going to show you what is -- one moment.

15         (Pause)

16         MS. BAHARANYI:  That particular exhibit seems to be

17    discussing other, during dates other than the June 23rd date

18    when Mr. Lucha was arrested seems to be discussing law

19    enforcement or cop activities without any sort of context.  We

20    think that that being presented to the jury, the full range of

21    those texts there are certainly more prejudice than relevant in

22    this case.  He wasn't arrested on that date which I believe is

23    the June 17th date.  That's correct.

24         THE COURT:  All right.  What's the government say?

25         MS. NICHOLAS:  Your Honor, this is a conspiracy that

A000867

N8UAAPER1                    Gutierrez - Direct

1  spanned between 2020 and 2021 inclusive of this time period.

2  The defend has made clear that the cornerstone of the defense

3  here is the willfulness -- all of this is indicative of the

4  awareness of the police, awareness of his unlawful conduct,

5  awareness of where law enforcement is at all times.  I'll note

6  the person who he is talking to in those texts, we've been

7  referring to Alban El Curragh, Aaron Jiminez, one of the other

8  individuals arrested with him in Massachusetts with the

9  firearms.

10          THE COURT:  This is from that gentleman to whom?

11          MS. NICHOLAS:  To Lucha, the defendant.

12          MS. BAHARANYI:  The particular date, your Honor, has

13  no relevance to this conspiracy.  They have not raised that

14  this was a date where they believed for example he is carrying

15  a firearm.  They have not raised where this is a date where

16  they believed he was transferring or receiving a firearm.

17  There is certainly no context.  And I think to put this before

18  the jury, just conversation that people may have in the Bronx

19  about law enforcement activity in their neighborhoods which can

20  sometimes be dangerous, this leaves an impression that

21  certainly is unduly prejudicial to Lucha without context and

22  they don't have context.

23          MS. NICHOLAS:  It's June 17th, your Honor.  He is

24  arrested with a gun in the Bronx on June 23rd.  Then he is

25  arrested in Massachusetts on July 3rd.

N8UAAPER1                    Gutierrez - Direct

1          MS. BAHARANYI:  We don't object to them admitting text

2     messages about police activities on those dates, your Honor.

3          THE COURT:  The objection is sustained.

4          MS. BAHARANYI:  So the next one is you are envisioning

5     to enter --

6          MS. NICHOLAS:  1103B, everything from this series,

7     your Honor, is a conversation with the defendant from his

8     phone.

9          MS. BAHARANYI:  We don't have an objection to that.

10          MS. NICHOLAS:  1104.

11          MS. BAHARANYI:  No objection to that.

12          MS. NICHOLAS:  Next is 1105.

13          MS. BAHARANYI:  We don't have an objection to that

14     one.

15          MS. NICHOLAS:  1106.

16          MS. BAHARANYI:  No.

17          MS. NICHOLAS:  1107.

18          MS. BAHARANYI:  Nor that one.  It would be helpful to

19     show.

20          (Pause)

21          MS. BAHARANYI:  Your Honor, that one also raised in

22     the June 17 text without any context.  If you can see the first

23     part of the conversation seems to be talking about.

24          THE COURT:  Sustained.  The objection is sustained.

25          Are we going to be here much longer?

N8UAAPER1                    Gutierrez - Direct

1          MS. NICHOLAS:  There's three other series of text

2     messages.  I expect that this is going to happen repeatedly.

3          THE COURT:  Well, so I think the way to do this is

4     let's get this series done.  Then if we have to have further

5     side bars we will but I don't want to keep the jury just

6     sitting there.

7          MS. NICHOLAS:  1108.

8          MS. BAHARANYI:  That's the same issue, your Honor,

9     about the June 17th date, the blue and whites.

10          MS. NICHOLAS:  He is now talking to multiple people

11     about the presence of police days before he gets arrested with

12     a gun he got illegally.

13          THE COURT:  The problem is there's no context for

14     these earlier.  If this had been a date after some of the

15     events that you've referred to, I could see the relevance.

16          MS. NICHOLAS:  It's a date after trips from -- he had

17     already had to gun.  Vereen has already been traveling to the

18     Bronx repeatedly.

19          MS. BAHARANYI:  Those are trips that would have ended

20     in November 2020.

21          THE COURT:  I think it's very hard for the jury to see

22     the relevance.  The objection is sustained.

23          MS. NICHOLAS:  1109.

24          MS. BAHARANYI:  No objection there.

25          MS. NICHOLAS:  1110.

A000870

N8UAAPER1                    Gutierrez – Direct

1           MS. BAHARANYI:  No objection.

2           MS. NICHOLAS:  Just to be clear, 1107 and then 1108.

3           THE COURT:  Okay.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000871

N8UAAPER1                    Gutierrez – Direct

1              (In Open Court)

2              MS. NICHOLAS:  Ms. Sankar, if you could please publish

3     what's now in evidence as Government Exhibit 1101.

4              (Pause)

5     Q.  Ms. Gutierrez, before we continue, can you just describe

6     for the jury what's on the screen at a very high level.  Are

7     you familiar with these types of reports?

8     A.  Yes.

9     Q.  What type of report is this?

10    A.  It's a Cellebrite report.

11    Q.  What is Cellebrite?

12    A.  It's a platform we use in the office when we receive or we

13    seize a phone from somebody.  When we get the data out of the

14    phone we put it into Cellbrite because Cellbrite mikes it

15    easier for us to manage and look through the data.

16             MS. NICHOLAS:  So this information here in Government

17    Exhibit 1101 which per the stipulation is from the defendant's

18    phone.

19             Ms. Sankar, if you could please zoom in on the section

20    that says MSISDN at the top.

21    Q.  Ms. Gutierrez, if you could just read that phone number.

22    A.  It's it 16467241423.

23             MS. NICHOLAS:  Ms. Sankar, if you could zoom back out

24    and zoom in on where it says last known use.

25             (Pause)

A000872

N8UAAPER1                    Gutierrez – Direct

1    Q.   Just above where it says MSISDN for first time could you

2    please read what that says.

3    A.   May 21, 2021.

4    Q.   And the next?

5    A.   June 20, 2021.

6    Q.   And the last one?

7    A.   June 16, 2021.

8         MS. NICHOLAS:   Okay.   Ms. Sankar, if you could zoom

9    back out.

10   Q.   Now the bottom half of this screen could you read what

11   that's labeled in that second section?

12   A.   User accounts.

13   Q.   Okay.   What is listed in that section?

14   A.   Certain applications that were used.

15        MS. NICHOLAS:   Ms. Sankar, could you flip to row 186

16   and zoom-in on that row.

17        (Pause)

18   Q.   Ms. Gutierrez, what application is listed in row 186?

19   A.   Telegram.

20   Q.   Are you familiar with telegram?

21   A.   Yes.

22   Q.   How are you familiar with telegram?

23   A.   From working in the office.

24   Q.   In broad terms, what is telegrams?

25   A.   It is an encrypted messaging app.

A000873

N8UAAPER1                    Gutierrez - Direct

1           MS. NICHOLAS:  If you could zoom out and a zoom back

2     in on row 1906.

3           (Pause)

4     Q.  What application is listed in row 190?

5     A.  What's App.

6           MS. NICHOLAS:  You can zoom back out can you please

7     publish what's now in evidence as Government Exhibit 1103B.

8           (Pause)

9     Q.  Ms. Gutierrez, what's depicted on the screen?

10    A.  A Cellebrite report.

11    Q.  What does the Cellebrite report show in general terms?

12    A.  Messages.

13    Q.  Now at the top who is the user listed as one of the

14    participants in the conversation?

15    A.  The contact name is Alban El Curragh.

16          MS. NICHOLAS:  If you could zoom-in on that actually.

17          (Pause)

18    Q.  Ms. Gutierrez, could you read that phone number into the

19    record, please?

20    A.  3475028867.

21          MS. NICHOLAS:  Okay.  Now, in this conversation

22    Ms. Sankar could you actually go to the next page for us page

23    two.  There are two different color bubbles.

24    Q.  Can you explain to the jury who's speaking in each of the

25    bubbles?

N8UAAPER1                    Gutierrez – Direct

1    A.  So it's like an iPhone.  The owner of the phone is on the

2    right and the other party is on the left.

3    Q.  So, green is the owner of the phone?

4    A.  Green is the owner of the phone and on the left in blue is

5    Alban El Curragh.

6              MS. NICHOLAS:  Per the stipulation, the owner of phone

7    is the defendant going back at first page of 1103, Ms. Sankar.

8    Q.  Ms. Gutierrez, before you begin reading can you please read

9    the date stamp that's listed in that first message?

10   A.  June 21, 2021.

11   Q.  I am going to ask you to read what's in the blue bubbles

12   and I will read what's in the green bubbles.

13   "A.  Do you need a day pack/military bag?  I might order one.

14   "Q.  I got a bag already.  Same backpack.  Got more.

15   "A.  I need that then.  So I'll order mine.

16             MS. NICHOLAS:  Ms. Sankar, you can pull this down.

17             If you could please publish what's in evidence as

18   1104.

19             (Pause)

20   Q.  Okay.  Ms. Gutierrez, can you describe what's on the

21   screen?

22   A.  It's a picture of a phone with text messages.

23   Q.  Are these messages being sent in any particular

24   application?

25   A.  Yes, Signal.

N8UAAPER1                    Gutierrez – Direct

1    Q.  How can you tell that?

2    A.  At the bottom and at the top it says "signal".

3    Q.  Are you familiar with, signal?

4    A.  I am.

5    Q.  What is Signal?

6    A.  It is an encrypted messaging app.

7    Q.  Looking at what's on the screen in Government Exhibit 1104,

8    similar to what you explained with the prior report can you

9    just explain what the messages on the screen mean in terms of

10   who is sending them?

11   A.  So the owner of the phone would be on the right and then

12   the other person, the other party is on the left in the purple.

13   Q.  Now, the other party in 1104, can you read that other

14   party's name?

15   A.  It's Jamil R. Bey.

16   Q.  Can you read the number associated with that name?

17   A.  6469738605.

18   Q.  Can you just read the date and time of the message on that

19   particular message?

20   A.  June 19, 2021 at 1:09 p.m.

21        MS. NICHOLAS:  Can you please publish what's in

22   evidence as Government Exhibit 1105.

23   Q.  Ms. Gutierrez, again explain what we're seeing on the

24   screen here?

25   A.  It's another picture of the phone with text messages pulled

N8UAAPER1                    Gutierrez - Direct

1   up.

2   Q.  What application are these messages in?

3   A.  Signal.

4   Q.  Now here there are two individuals, it appears, discussing,

5   can you describe how you know which individual is speaking?

6   A.  On their right is the owner of the phone in the gray text

7   message or the gray signal messages and on the left is the

8   other party which according to the photo is someone that goes

9   by "Divine Bey Justice" or that's the contact name.

10  Q.  The other party, what color are their messages in?

11  A.  Blue.

12  Q.  The gray message here is the owner of the phone, as per the

13  stipulation, is the defendant and the blue messages are the

14  other contact?

15  A.  Yes.

16  Q.  I am going to direct your attention to the bottom of this

17  photograph.  Can you read what begins with "you"?

18  "A.  You should come to the three day train.

19  Q.  Do you notice anything about that particular message?

20          MS. NICHOLAS:  Ms. Sankar, I'm going to ask you to

21  pull the highlight off of that.

22  A.  Well, "should" is spelled incorrectly, "train" it's like

23  cut off.  I don't know if's supposed to be "train" or

24  "training".  It says "cone" instead of "come" actually.

25  Q.  Is that in the message.

A000877

N8UAAPER1                    Gutierrez - Direct

1    A.  It is not.

2    Q.  How do you know that?

3    A.  Because it's still in the little text bar.

4          MS. NICHOLAS:  Ms. Sankar, pull that down and please

5    publish what's in evidence as Government Exhibit 1106.

6          (Pause)

7    Q.  Okay.  So on this one I don't want to read any of the

8    messages.  I just want to focus on who is participating in the

9    conversation here.  Can you please read the name of the contact

10   in the Signal message?

11   A.  Alban El Curragh.

12   Q.  What's number associated with that use?

13   A.  3475028867.

14         MS. NICHOLAS:  You can it pull that down.  We are

15   going to move to 1109.  And publish that please.

16         (Pause)

17   Q.  Can you explain what we're looking at on the screen here?

18   A.  That's a picture of a phone.

19   Q.  Is there any particular application open?

20   A.  Signal.

21   Q.  What is depicted inside the Signal app on this particular

22   screen shot?

23   A.  It shows that there's missed calls between the parties.

24   Also, that the owner of the phone called this person a couple

25   times.

N8UAAPER1                    Gutierrez - Direct

1    Q.  Can you read the name of the contact?

2    A.  Will El Musa.

3    Q.  And the phone number?

4    A.  9176895444.

5          MS. NICHOLAS:  We can pull that down.  If we can

6    please publish what's in evidence as Government Exhibit 1110.

7          (Pause)

8    Q.  We're shifting gears a bit here.

9          What's depicted on the screen in Government Exhibit

10   1110?

11   A.  Cellebrite report.

12   Q.  If you could just remind us what is the Cellebrite report?

13   A.  It's a report that we get from that application called

14   Cellebrite which extracts data from the phone.

15   Q.  Okay.  Now at the top just above this section, what does

16   the header say?

17   A.  Instant messages.

18          MS. NICHOLAS:  Okay.  Could you just zoom-in on the

19   first row.

20          (Pause)

21   Q.  I want to begin with the timestamp.  Can you please read

22   the timestamp for this message?

23   A.  May 10, 2021 at 4:30 p.m.

24   Q.  Okay.  And under content, the direction, can you read that?

25   A.  Incoming.

N8UAAPER1                    Gutierrez - Direct

1    Q.  The body of the message?

2    A.  And third through the seventh.

3    Q.  Moving down a couple rows within this, can you read the

4    status?

5    A.  It says status read.

6    Q.  Staying here in row one, can you read the contact name.

7           MS. NICHOLAS:  Excuse me.  If we could zoom out and

8    capture that header as well.

9           (Pause)

10   Q.  Who is this message from?

11   A.  Jamil.

12   Q.  What is the phone number associated with Jamil?

13   A.  16469738605.

14          MS. NICHOLAS:  Zoom back out.

15          (Pause)

16   Q.  Going to the messages below that number two, row two.  Is

17   this message also from Jamil?

18   A.  Yes.

19   Q.  Can you just read the body of that message?

20   A.  Moor, we got training in July.

21   Q.  What's the status of that message?

22   A.  Read.

23          MS. NICHOLAS:  You can zoom back out.  You can pull

24   this down.

25          (Pause)

N8UAAPER1                    Gutierrez - Direct

1   Q.  Ms. Gutierrez, I want to shift gears for a moment and go

2   back to talking about the chart that you made.

3            Earlier you testified that you reviewed some documents

4   and records to put together a chart; is that right?

5   A.  Yes.

6   Q.  And those documents and records were in the binder 411 to

7   422 and 426?

8   A.  Yes.

9            MS. NICHOLAS:  Okay.  Can you we publish for the

10  witness Government Exhibit 902.

11           (Pause)

12  Q.  Ms. Gutierrez, do you recognize this document?

13  A.  Yes.

14  Q.  Broadly speaking, what is this?

15  A.  The chart.

16  Q.  Did you create this chart?

17  A.  Yes.

18  Q.  Now in creating this chart did you review information

19  contained in other documents in evidence in this case?

20  A.  Yes.

21  Q.  Specifically, to create the chart did you review Government

22  Exhibits 411 to 422 and 426?

23  A.  Yes.

24  Q.  Based on your review of those underlying documents, is the

25  information contained in Government Exhibit 902 a true and

N8UAAPER1                    Gutierrez - Direct

1    accurate summary of the information associated with guns

2    purchased in this case?

3    A.  Yes.

4           MS. NICHOLAS:  Your Honor, the government offers

5    Government Exhibit 902.

6           MS. BAHARANYI:  Objection, your Honor.

7           THE COURT:  Received.

8           (Government's Exhibit 902 received in evidence)

9           MS. BAHARANYI:  I said "objection", your Honor, but I

10   think --

11          THE COURT:  No.  I heard you.  Received.

12          MS. NICHOLAS:  If you could publish 902.

13          (Pause)

14   Q.  So before we begin talking about content I want to take a

15   second orient the jury to what's in this chart.  Before we talk

16   about any specific columns, can your just explain what this

17   chart is in very general terms?

18   A.  It is a chart that reflects some documents that record

19   firearms transactions.

20   Q.  Now, when is the last time -- let me back up.  Did you

21   revise this chart at any point in preparing to testify?

22   A.  Yes.

23   Q.  When is the last time you revised it?

24   A.  Yesterday.

25   Q.  Were those revisions to reflect evidence that actually had

N8UAAPER1                    Gutierrez – Direct

1    been admitted at this trial?

2    A.  Yes.

3         MS. NICHOLAS:  So let's just go over what the

4    information is in the chart and then we'll get into substance,

5    okay.  Before we dig in, I'm going to have you zoom-in on this

6    very top row, the darker blue.

7         (Pause)

8    Q.  So, Ms. Gutierrez, what I want to do is walk from left to

9    right and talk about the type of information in each of these

10   columns.  So beginning on the far left, that column header says

11   N-O number.

12        What is in that column?

13   A.  That's just the number of the transaction for our

14   reference.

15   Q.  Does that come from any form?

16   A.  No.

17   Q.  That's just used for ease of reference?

18   A.  Yes.

19   Q.  The next column date of transfer box 37, 36 first date of

20   transfer, where did you get that information from?

21   A.  From the form.

22   Q.  Okay.  And what does box 37 and 36 refer to?

23   A.  So there are two versions of the form in the ATF.  One is

24   the older version and one is the new version.  They reflect the

25   same information but they're just different box numbers.  So,

N8UAAPER1                    Gutierrez - Direct

1    box 37 is the box that had date of transfer in the old form and

2    box 36 is the box it had date of transfer in the new form.

3    Q.  Okay.  Next column is labeled "FFL name".  Where did that

4    information come from?

5    A.  Box 33 in both of forms, that would state the same.

6    Q.  Next column?

7    A.  It's the buyer's full name.

8    Q.  Where does that come from?

9    A.  Box one on the old form and box nine on the new form.

10   Q.  Okay.  Next column?

11   A.  It's the manufacturer and caliber of the gun.  The

12   manufacturer portion that comes from box 24 on the old form and

13   box one on the new form.  And then for the caliber portion that

14   comes from box 28 on the old form and box five on the new form.

15   Q.  Okay.  Serial number?

16   A.  That comes from box 26 on the old form and box three in the

17   new form.

18   Q.  Then the furthest all the way is labeled "GX"?

19   A.  That's Government Exhibit number.  It's stamped on the

20   bottom of the exhibits that I looked at.

21   Q.  Does the government exhibit number correspond with the

22   information from the form?

23   A.  Yes.

24        MS. NICHOLAS:  Okay.  So if you could zoom out and

25   just zoom in on the header line as well as row one.

A000884

N8UAAPER1                    Gutierrez - Direct

```
 1              (Pause)
 2    Q.  If the jury wanted to look for an underlying documents
 3    associated with this transaction, what government exhibit would
 4    they go to?
 5    A.  411.
 6              MS. NICHOLAS:  Okay.  You can pull that down.
 7              (Pause)
 8              MS. NICHOLAS:  I want to talk about two of these guns
 9    specifically.  Could you please zoom-in on row five.
10              (Pause)
11    Q.  Ms. Gutierrez, I am just going to ask you to read from the
12    furthest left column to the furthest right.  If you could just
13    remind us of the column header as you go.
14    A.  So this is transaction number five in this chart.  The date
15    it was transferred is July 23, 2020.  The FFL name is Elite
16    firearms.  The buyer's full name is Keith Anthony Vereen.  The
17    manufacturer of the weapon is a Glocl or it's a Glock.  And the
18    caliber is .22 LR.  The serial number is AELY222 and the
19    underlying document is Government Exhibit 413.
20              MS. NICHOLAS:  We can pull that down and whereas
21    zoom-in next ON row 14.
22              (Pause)
23    Q.  I am going to ask you to DO THE same thing.  Just walking
24    us from left to right with the column headers, if you could
25    read row 14?
```

N8UAAPER1                    Gutierrez – Direct

1  A.   So, in this chart it is transaction number 14.  The date of

2  transfer is October 1, 2020.  The FFL was Dick's Pawn Shop

3  West.  The buyer's full name is Keith Anthony Vereen.  The

4  manufacturer of firearm is Canik and the caliber is .9

5  millimeter.  Serial number is 20CB25810.  And the underlying

6  record is Government Exhibit 418.

7  Q.   Ms. Gutierrez, again, did you make any decisions about what

8  information should be in this chart?

9  A.   No.

10  Q.   Who did?

11  A.   The prosecutors.

12            MS. NICHOLAS:  You can pull this down.

13            Your Honor, may we briefly approach?

14            THE COURT:  All right.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

N8UAAPER1                    Gutierrez - Direct

1              (side bar)

2              MS. NICHOLAS:  Your Honor, at this point I plan to

3    transfer to talking about takes messages from phones used by

4    other people in Massachusetts.  I expect there'll be objections

5    to nearly every document.  This may be a time for a midmorning

6    break and perhaps a longer discussion.  I think this would

7    likely be a lengthy conversation.

8              THE COURT:  All right.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000887

N8UAAPER1                    Gutierrez - Direct

1                (In Open Court)

2                THE COURT:  So, ladies and gentlemen, the counsel has

3     informed me that there's a legal issue regarding the next piece

4     of evidence that will probably take 15 minutes to resolve.  So

5     we are going to give you your morning break.  He was going to

6     do it, since we'd only started a 10:00, I was going to wait a

7     little later but I think we'll do it now.  So we'll take a

8     15-minute break at this time.

9                (Jury not present)

10               THE COURT:  You can step down.  I'll see you in 15

11    minutes.

12               (Witness not present)

13               MS. NICHOLAS:  Your Honor, the next series of exhibits

14    the government is going to offer come from a phone seized from

15    Jamal Latimer, who your Honor may recall was the leader of the

16    group during the stop in Massachusetts.  I am happy to, maybe

17    the easiest way to do this is to list the exhibits planned to

18    admit.

19               THE COURT:  OK.

20               MS. NICHOLAS:  So we plan to offer 1201, 1202A, 1202B,

21    1202B-1, 1202B-3, 1202B-2, 1202C, "D", "E", "F"; 1202I, 1202J,

22    1204, 1207A and 1208.

23               MS. BAHARANYI:  Your Honor, if we may have one moment

24    to review?

25               THE COURT:  Yes.  Go ahead.

N8UBPER2                    Gutierrez - Direct

1           MS. BAHARANYI:  Thank you for that moment, your Honor.

2     We understand that the government seeks to admit certain

3     excerpts of a text message chain.  We don't have objection to

4     those certain excerpts, so long as the entire chain is actually

5     admitted to the jury, pursuant to the rule of completeness and

6     to make sure that the text messages are placed in their proper

7     context.

8           So that's what we've explained to the government.  I

9     believe they have an objection to that.

10          THE COURT:  Okay.

11          MS. NICHOLAS:  Your Honor, for context purposes, 1202

12    is a group chat between -- I believe there are 51 participants

13    in the chat, all of whom have some affiliation with this Rise

14    of the Moors group to varying extents.  Some people are present

15    in the chat.  Some are participating.  There are members of

16    that chat who are subsequently arrested in Massachusetts with

17    the defendant.  That is a very lengthy group chat that meanders

18    into other areas of more ideology.  There's parts talking about

19    kind of the background of the trip that's not -- it's simply

20    not relevant.  It's distracting.  It's confusing.

21          What we've done is call out the for portions that are

22    relevant to the case, and that are standalone explainable on

23    their face.  The rule of completeness is all about being able

24    to understand on its face what's happening in a way that's not

25    misleading, which is precisely what these excerpts do.  They

N8UBPER2                    Gutierrez - Direct

1   are listed A through I, I believe. We've excerpted out portions

2   relevant to the defendant, relevant to that arrest in

3   Massachusetts, leaving aside all the other things.  We're

4   talking about a group chat --

5           THE COURT:  I get your point.  Anything defense

6   counsel want to say?

7           MS. BAHARANYI:  Yes, your Honor.  They're seeking to

8   admit a number of excerpts or clips from this overall chain

9   which removes the context for the chain, which means it leaves

10  the jury with a certain impression that this chain is only

11  about militia training or firearm training.  When in fact --

12  and I'm sure maybe that's what the government wants to leave

13  the jury with the impression with -- but for fairness to Lucha,

14  the jury should see that this is not some group chain that's

15  talking about firearms and militia and that's what it's about.

16          This group chain talks about -- it's almost like it

17  functions as a message board for the members of this group.

18  And I think if we only show these portions that the government

19  considers relevant, what we're doing in fact is just making

20  these messages even more prejudicial without the proper

21  context.

22          THE COURT:  All right.  So I think this turns on the

23  interpretation of the rule of completeness which has been

24  assessed in numerous cases in the past.  It is not a rule that

25  says that if one party offers a specific snippet of evidence

N8UBPER2                    Gutierrez - Direct

1    that the entire context is opened up for the jury's

2    consideration.  So to give an analogy, if one party sought to

3    introduce half of a sentence, the other side could demand that

4    the full sentence be admitted, but couldn't use that as a

5    device to admit the entire letter that this sentence came from.

6          And I don't really understand the force of the

7    defense's argument in another respect which is that supposing

8    you had a chat room, and over a course of -- in my

9    hypothetical -- ten days several people on the chat room with

10   the acquiescence of the others spelled out how they were going

11   to rob a bank, but the rest of the chat was all about their

12   social lives, their favorite movies, their plans for future

13   happiness or whatever.  The fact that all that other stuff was

14   there would not, under the rule of completeness, be, admissible

15   so the objection is overruled and the chats will be received.

16         MS. BAHARANYI:  Your Honor, on that point, I do think

17   this is closer to the analogy of your sentence where you excise

18   certain portions of a sentence, it changes the meaning of that

19   sentence.  Here if we're excising certain portions of this

20   chat, it changes the meaning and the tone.

21         THE COURT:  That wasn't your request.  Your request

22   was to put in the whole thing, that's what you specifically

23   asked for.  That's what I'm denying.  Now if you think there's

24   a particular chat where the exact context is not being

25   faithfully presented because another sentence that follows

N8UBPER2                    Gutierrez – Direct

1    immediately is left out or something like that, that's a

2    different story, but that wasn't your argument.

3         MS. BAHARANYI:  Your Honor, my comment about the

4    sentence was just to analogize the entire chat.

5         THE COURT:  I understand you're arguing for the entire

6    chat.  And for the reasons I just said, I'm not persuaded.

7         MS. BAHARANYI:  This is a conspiracy case, and the

8    government is alleging that these conversations between these

9    individuals are conversations in furtherance and related to

10   this conspiracy.  What they're failing to do is provide the

11   full context so that the conversations could be fully

12   understood.

13        THE COURT:  I go come back to what I said before.

14   Supposing you had a conspiracy to rob a bank and to help

15   someone get the best dinner.  The conspiracy to help the other

16   person help get the best dinner would not be chargeable as a

17   crime, but there's no reason why that would be at all relevant

18   to the portion of the chat that talked about how the

19   conspirators are going to rob a bank.  So I am unpersuaded and

20   the objection is overruled.  So we'll take a five-minute break

21   in case anyone needs it.

22        MS. NICHOLAS:  Your Honor, if I may.  That's only one

23   of the three series.

24        MS. BAHARANYI:  In light of that, your Honor, then we

25   do have objections to the specific text that are going to be

N8UBPER2                    Gutierrez - Direct

1  admitted without any context, so I think we should review

2  those.

3           THE COURT:  Okay.

4           (Pause)

5           MS. BAHARANYI:  Your Honor, there's one particular

6  text message that we believe the government is seeking to admit

7  1202J which I think we can pull up.  The text itself is on the

8  last page of that.

9           THE COURT:  I have to pull it up.

10          MS. BAHARANYI:  This is an example of a text with

11  absolutely no context.

12          THE COURT:  So the text just for the record says --

13  this is from Mr. Jahmal Abdullah Bey, How far is that from

14  Brooklyn or the Bronx?  We have Moors in both areas.  So I

15  guess my question to government counsel is, what's the

16  relevance of this?

17          MS. NICHOLAS:  It establishes that there's members of

18  this conspiracy, the Moors, in both Brooklyn and the Bronx.

19          THE COURT:  When have you -- maybe I missed it.  When

20  has there been any reference up to now to the Moors?

21          MS. NICHOLAS:  I think we had our first direct Moors

22  reference during one of the earlier text messages.  I do think

23  it's now been made clear, and will be certainly by the end, by

24  the end of the text messages it will be clear that these people

25  in Massachusetts called themselves the Moors.  If you also

N8UBPER2                    Gutierrez - Direct

1    recall, your Honor, in the first body worn camera when the

2    defendant is approached in the Bronx, his first statement to

3    the police is, I'm a Moor.  I'm a Moor.  Don't touch that.  I'm

4    a Moor.

5           THE COURT:  The point is -- forgive the bad pun

6    without more -- that would have been meaningless to the jury at

7    the time it was said.  He might have been analogizing himself

8    to Othello, so we need greater detail before the jury can

9    appreciate what is meant by Moors there.

10          MS. NICHOLAS:  I think one of the concerns, your

11   Honor, is in their opening defense counsel alluded to I think

12   they use trace, right.  You can't trace the guns in

13   Massachusetts back to New York, and part of the government's

14   theory here is that --

15          THE COURT:  You've answered it.  I think it is

16   relevant now that I know what will be in the other messages

17   about the Moors.  That was really what gave me pause on this.

18          MS. BAHARANYI:  Your Honor, we're certainly not

19   contesting that Lucha is in New York City.  This in our view is

20   cumulative.  We're not quite sure what additional value it adds

21   to the evidence that's in.

22          THE COURT:  It shows that the conspirators include

23   someone in Brooklyn or the Bronx, and of course that is

24   relevant to establishing that -- with other evidence -- that

25   the defendant is part of the conspiracy.

**A000894**

N8UBPER2                    Gutierrez - Direct

1          MS. BAHARANYI:  The government hasn't put forth any

2     evidence that the conspiracy -- I guess the size of the

3     conspiracy overlaps with the size of Moors, the Moorish

4     community.  There seems to be a conflation of the two here.

5          THE COURT:  No, I think Moors here -- that's why I

6     raised the question I did before.  Moors is a term of art in

7     this case, and it refers to a particular group; namely, the

8     group that's putting all these messages out.  This is not a

9     reference to their place of origin or anything like that.  It's

10    a term of art.

11         MS. BAHARANYI:  That applies to a group broader, much

12    broader, than what the government -- the conspirators in this

13    case, or the alleged co-conspirators.  It's a term of art that

14    applies to thousands across the nation.  I think what's

15    misleading about this is where -- I think the government is

16    seeking to introduce this as evidence that we have these other

17    alleged co-conspirators in this area, in both areas, and

18    there's no basis or context for them to say that when this text

19    message on its face just refers to Moors, not Rise of the

20    Moors, not our Moorish militia, Moors generally.

21             It's as if saying, we have Americans in this area, now

22    we're assuming it applies to all these people instead of a

23    particular subset that we're looking at.  It's an identifier

24    for individuals.

25         MS. NICHOLAS:  Context is important here, your Honor.

N8UBPER2                    Gutierrez - Direct

1   This is Jahmal Abdullah Bey, the self-appointed leader of the

2   group who introduces the group in a video in evidence refers to

3   the men in that convoy as "My men."

4        And here he is saying "We have Moors in both areas."

5   Not, there are Moors in both areas.  There are Moors all over

6   the country.  We, the members of this group that is planning

7   this trip in this chat have Moors in both areas.

8        MS. BAHARANYI:  In a chat that we can't even get the

9   whole text message in.

10        THE COURT:  I understand the defense's objection, but

11   I think this passes the modest requirements of relevance

12   based -- as the government I think correctly pointed out --

13   that the words "We Have" coming from this particular person

14   could reasonably be inferred to be a reference to the

15   conspirators, so the objection is overruled.  Can we bring the

16   jury in or does anyone need a break?

17        MS. NICHOLAS:  I think we still have two phones to go,

18   your Honor.  They're much smaller.  I'm not sure if there are

19   other 1200 series objections?

20        MS. BAHARANYI:  No, we've raised them.

21        MS. NICHOLAS:  So the 1300 series, your Honor.  This

22   is a phone belonging to Quinn Cumberlander who is another

23   individual arrested in Massachusetts.  We're offering

24   Government Exhibit 1301.

25        THE COURT:  Before we go any further, because

N8UBPER2                    Gutierrez – Direct

1    yesterday the defendant had a need for frequent breaks.  I

2    don't want to have him not take a break now and tell me 15

3    minutes later that he needs a break.  So if he needs a break,

4    take it now.

5              MS. BAHARANYI:  We took our break, right when we

6    started our argument.

7              THE COURT:  I see.  Okay.  Very good.  Thank you.  Go

8    ahead.

9              MS. NICHOLAS:  For the 1300 series, which is the Quinn

10   Cumberlander phone, is 1301, 1302A, 1303A, 1303B and 1303C.

11   And from the 1400 series which is the Tarrif Bey phone, I

12   believe we're just offering 1402A.

13             THE COURT:  Okay.  Objections?

14             MS. BAHARANYI:  Your Honor, we're just taking a look

15   at the specific exhibits.

16             THE COURT:  Take your time.

17             (Pause)

18             MS. BAHARANYI:  Your Honor, thank you for bearing with

19   us just sorting through different excerpts and clips.  The two

20   objections that we have to the proposed government exhibits are

21   for 1302A and 1402A, which I think we can pull up on the screen

22   for your Honor.

23             MS. NICHOLAS:  Your Honor, we may be able to short

24   circuit this.  I think the government's primarily interested

25   here in admitting the contact list in these two exhibits.  And

N8UBPER2                    Gutierrez - Direct

1   if you could bear with us for a few moments, your Honor, I

2   would be happy to redact the messages if that satisfies defense

3   counsel.

4            MS. BAHARANYI:  That would be fine for us.

5            THE COURT:  Okay.  Great.  Anything else?

6            MS. BAHARANYI:  Not on our part.

7            THE COURT:  Let's bring in the jury.

8            MS. NICHOLAS:  Your Honor, may we have a moment to

9   redact those exhibits before we admit that?

10           THE COURT:  Do that now and tell me when you're ready.

11           (Pause)

12           MS. NICHOLAS:  Your Honor, I believe the parties are

13   prepared to proceed.

14           THE COURT:  Okay.  Let's get the witness, and let's

15   bring in the jury.

16           THE DEPUTY CLERK:  Jury entering the courtroom.

17           (Jury present)

18           THE COURT:  Please be seated.  Please continue.

19           MS. NICHOLAS:  Thank you, your Honor.  Welcome back.

20           Briefly we're going to set aside the defendant's

21   phone, and I want to turn briefly to Government Exhibit 1003,

22   which again is a stipulation.

23           In that stipulation Government Exhibits 1201 through

24   1210, including all subparts, are true and accurate copies of

25   data extracted from the Latimer iPhone 8.

N8UBPER2                    Gutierrez – Direct

1          per paragraph three, On July 3rd of 2021, law

2    enforcement officers arrested, among other people, Jahmal

3    Latimer, aka, Jahmal Abdullah Bey.

4    BY MS. NICHOLAS:

5    Q.  I'm going to turn to that manila folder the Redweld there

6    that has a sticker on it that says 1200 series.

7          Do you see that?

8    A.  Yes.

9          MS. NICHOLAS:  At this time, your Honor, the

10   government offers 1201, 1202A, 1202B, 1202B1, 1202B2, 1202B3,

11   1202C, 1202D, 1202E, 1202F, 1202I, 1202J, 1204, 1207A, and

12   1208.

13         THE COURT:  So all the objections made outside the

14   presence of the jury are preserved but overruled and the

15   exhibits are received.

16         (Government's Exhibits 1201, 1202A, 1202B, 1202B1,

17   1202B2, 1202B3, 1202C, 1202D, 1202E, 1202F, 1202I, 1202J, 1204,

18   1207A, and 1208 received in evidence)

19   BY MS. NICHOLAS:

20   Q.  Mr. Ahuja, if you can please publish what's now in evidence

21   as Government Exhibit 1201.  If you could please zoom in on the

22   row begins with Apple ID.

23         Ms. Gutierrez, if you could just read for us what it

24   says for Apple ID?

25   A.  Latimer, L-A-T-I-M-E-R, 417@gmail.com.

N8UBPER2                    Gutierrez - Direct

Q.   Zooming out, Mr. Ahuja, and zooming back in on last hotspot

activity.

          And, Ms. Gutierrez, if you could read that date stamp

please?

A.   It says July 3, 2021 at 6:53 p.m.

Q.   Thank you.  Mr. Ahuja, we're going to publish what's now in

evidence as Government Exhibit 1202A.

          Ms. Gutierrez, you have a hard copy of these in front

of you as well if that's easier to reference.

          Now, 1202A in general terms, can you describe what

1202A?

A.   It's a Cellebrite report.

Q.   What type of information does this particular Cellebrite

report capture?

A.   Participants in a group chat.

Q.   You said a group chat, are you familiar with group chats?

A.   I am.

Q.   What's a group chat in plain terms?

A.   it's hard to describe without calling it a group chat.  You

can text a bunch of people in one group setting.

Q.   So going through, Mr. Ahuja, if you could, the first three

pages.

          What type of information is captured in the first

three pages of this exhibit?

A.   Contacts.

N8UBPER2                    Gutierrez - Direct

1   Q.  Are those the participants in this particular chat?

2   A.  Yes.

3   Q.  And then after that, Mr. Ahuja, if you could flip through

4   the next three pages.

5        What type of information is contained in those pages?

6   A.  They're messages.

7   Q.  Before we get into the substance of the message, Mr. Ahuja,

8   if you could go back to the previous page.

9        Ms. Gutierrez, if you could orient the jury, how can

10  you tell who's speaking?

11  A.  At the top it says from Jahmal Abdullah Bey, owner.  That's

12  who's speaking.  It's also the owner of a phone on the right in

13  green.

14  Q.  Mr. Ahuja if you could zoom in where it says "from" there

15  at the top.  That's how you know who sent that message?

16  A.  Yes.

17  Q.  And then is it same for the blue boxes?

18  A.  Yes.

19  Q.  You could zoom in there, and zoom back out.

20        And again just to orient without getting into the

21  substance, how can you tell when these messages were sent?

22  A.  There's data at the bottom of the message that says the

23  date and time.

24  Q.  And, Mr. Ahuja, if you could please zoom in on just below

25  the message where it says source info, that section.

N8UBPER2                    Gutierrez – Direct

1          Based on this information, are you able to tell what

2   application these messages were exchanged in?

3   A.  Yes.

4   Q.  How can you tell?

5   A.  It says Telegram data, so it would be from the Telegram

6   messaging app.

7   Q.  Mr. Ahuja, let's go back to the first message in this

8   exhibit Government Exhibit 1202A.  If you can zoom in on that

9   whole box.  Make it a little bit bigger.  Thank you.

10          I'm going to ask you to just read through this,

11  Ms. Gutierrez, if you can start just by reading who this

12  message is from?

13  A.  It's from Jahmal Abdullah Bey.

14  Q.  What's the phone number associated or the Telegram number

15  associated?

16  A.  It's 1608832021.

17  Q.  And just below that I'm going to have you mean the content

18  of that message beginning with operation?

19  A.  Operation Fountainhead.

20          July 3rd through 7th, 2021, Packing List.

21          Firearm, ammunition, 4-30-round magazines, rifle

22  cleaning kit, plate carrier with level III plus SAPIs; IFAK is

23  divide all first aid kit, kevlar, boots, tent, daypack,

24  sleeping bag, Isomat, sleeping pad, hygiene wipes and toilet

25  paper, toothbrush, toothpaste, E-tool, small shovel, Woodland

N8UBPER2                    Gutierrez – Direct

BDUs, camelback hydration backpack, socks, underwear, BAOFENG,

UV, 5R twoway radio, minimum of 320 ounces of potable water,

compass, 3.5 days worth of food, fire starters, fire

extinguishers, a fire watch list needs to be created.  A

personnel list needs to be created.  FIAT will need to be

collected for gas.

             What we need volunteers for:  Two drivers, two RSOs,

range safety officer, designated medic and cooks.

Q.  Mr. Ahuja, if you could zoom out and go to the next page,

and I want to zoom in on that blue message at the bottom.

             Here I just want to have you read beginning below

Salaam.  It starts with East Coast, if you could read from

there?

A.  East Coast operation Fountainhead; training dates July 3rd

through July 7.  Checklist provided, meeting point NAHIGANSETT

territory, C.O.O, Commander of operation, BRATHA, Talib,

Jamhal.

Q.  We can stop right there. Can you read the time and date

stamp for this message?

A.  6/22/2021 at 9:08 p.m.

Q.  Mr. Ahuja, if you can zoom out and go to the next page

please.

             Ms. Gutierrez, does this look familiar?

A.  Yes.

Q.  What does this appear to be?

N8UBPER2                    Gutierrez – Direct

1    A.  The same message I read previously with the packing list.

2    Q.  And what's the date and time on this message?

3    A.  June 28, 2021 at 7:13 a.m.

4    Q.  Mr. Ahuja, you can pull this one down.  I'd like now to go

5    to what's in evidence as Government Exhibit 1202B.

6         Before we talk about the content of 1202B, have you

7    reviewed 1202B?

8    A.  Yes.

9    Q.  Mr. Ahuja, if you could flip through the first three pages

10   of 1202B.

11        Were you able to compare 1202A to 1202B as well as the

12   rest of the 1202 series?

13   A.  Yes.

14   Q.  What did you notice?

15   A.  It's the same group chat, but with different contact names.

16   Q.  Well, let's back up.  Going back to 1202A for a moment,

17   halfway down the slide, Mr. Ahuja.

18        Do you see where it says owner.  Per the stipulation,

19   1202A comes from Latimer's phone.

20        Mr. Ahuja, then if we could go to 1202B, halfway down

21   if you could zoom there.  Listing Jahmal Abdullah Bey as in the

22   stipulation as the owner of this phone.  Is 1202B a

23   continuation of 1202A?

24   A.  Yes.

25   Q.  Going back to the chat.  Mr. Ahuja, if you could please go

A000904

N8UBPER2                    Gutierrez - Direct

1    to the first set of messages in this chat.

2           Ms. Gutierrez, are those large enough for you to be

3    able to read?

4    A.  Yes.

5    Q.  Who sent each of these messages?

6    A.  The owner of the phone.

7    Q.  Can I have you read that first message, and then we'll stop

8    for a second.

9           So the time and date stamp on that first message?

10   A.  June 12, 2021 at 9:41 a.m.

11   Q.  If you could read that message.

12   A.  The mission of the marine corps rifle squad is to locate,

13   close with and destroy the enemy by fire and maneuver or to

14   repel the enemies assault by fire and close combat.

15   Q.  The next two messages, what do those contain?

16   A.  They're links.

17   Q.  Can you tell to what webpage?

18   A.  It is to Wikipedia for a page called Fire and Movement.

19   Q.  Mr. Ahuja, you can go to what's marked as page seven of

20   this document.  If you can make the top set of messages just a

21   little larger so they're easier to read.

22          Ms. Gutierrez, if you could again clarify who's

23   sending these three messages?

24   A.  The owner of the phone.

25   Q.  And who is that?

```
       N8UBPER2                     Gutierrez - Direct
 1     A.   Jahmal Abdullah Bey.
 2     Q.   Can you read the two text messages?
 3     A.   We could have five platoons with the same amount of people
 4     in this group.  That's damn near a company.  A company is a
 5     military unit typically consisting of 80 to 250 soldiers and
 6     usually commanded by a major or a captain.
 7            Most companies are formed of three to six platoons,
 8     although the exact number may vary by country, unit, type and
 9     structure.
10     Q.   What's in the message sent at 10:01 a.m.?
11     A.   I think emoji.
12     Q.   What's an emoji?
13     A.   Little pictures that you text with.
14     Q.   Mr. Ahuja, if you could zoom out and zoom in on the bottom
15     half of the page.
16            What's the name of the individual who responds?
17     A.   In the blue?
18     Q.   In the first blue box, the message at 10:01:32 a.m., who's
19     that from?
20     A.   Quinn.
21     Q.   And then the message received at 10:01 a.m.?
22     A.   Tariff.
23     Q.   And the last name?
24     A.   Bey.
25     Q.   And then the text sent from Jahmal Abdullah Bey at
```

N8UBPER2                    Gutierrez – Direct

1    10:03:07, what does that say?

2    A.  This Could Be Us.

3    Q.  And what follows that?

4    A.  A link to YouTube.

5    Q.  Ms. Gutierrez, did you review this chat before testifying

6    today?

7    A.  Yes.

8    Q.  And did you have an opportunity to visit that link?

9    A.  I did.

10   Q.  Mr. Ahuja, if you could please publish what's in evidence

11   as Government Exhibit 1202B-1.

12          Ms. Gutierrez, what is Government Exhibit 1202B-1?

13   A.  It's a screenshot.

14   Q.  Are you familiar with the screenshot?

15   A.  Yes.

16   Q.  Why?

17   A.  Because I took it.

18   Q.  Where did the screenshot come from?

19   A.  The screenshot of the page that appears when you type in

20   that link from the messages that we just talked about.

21   Q.  So you visited the link in the message, it directed you to

22   this page?

23   A.  Yes.

24   Q.  Can you read the title of the video?

25   A.  U.S. marines military tactics, fire and movement.

```
N8UBPER2                    Gutierrez - Direct
```

1    Q.  Mr. Ahuja, if we could go back to Government Exhibit 1202B.

2    I'm going to move to page ten of this document.

3          Ms. Gutierrez, as this conversation continues, are

4    there additional links that are sent?

5    A.  There are.

6    Q.  Mr. Ahuja, if you can zoom in on the bottom half, the green

7    messages, those three.

8          Did you have a chance to review these links before

9    testifying today?

10   A.  Yes.

11   Q.  The first link, what time was that message sent?

12   A.  7:04 p.m. on June 12, 2021.

13   Q.  Mr. Ahuja, could you please publish what's in evidence as

14   Government Exhibit 1202B-2.

15          Ms. Gutierrez, do you recognize this?

16   A.  I do.

17   Q.  What is this?

18   A.  It's a screenshot of the webpage that -- the link that we

19   just discussed brings you to when you type it into Google.

20   Q.  Mr. Ahuja, could you please return to Government Exhibit

21   1202B, and right back to where we were on page ten.

22          Did you also have an opportunity to visit the link at

23   the bottom of the screen?

24   A.  I did.

25   Q.  That was sent at 7:08:05 p.m.?

```
       N8UBPER2              Gutierrez - Direct
 1     A.  Yes.
 2     Q.  Mr. Ahuja, could you please publish what's in evidence as
 3     Government Exhibit 1202B-3.
 4              Ms. Gutierrez, do you recognize this?
 5     A.  I do.
 6     Q.  What's the name of the website in the top left-hand corner?
 7     A.  Army property.com store.
 8     Q.  What's shown in the slide?
 9              What's the header in the slide?
10     A.  Do you mean the M23?
11     Q.  If you can begin reading at M23.
12     A.  M23 blank firing adapter BFA, yellow, NSN, 1005-01-361-8208
13     for M4/M4A1 rifle.
14     Q.  Do you see where it says product description?
15     A.  Yes.
16     Q.  Can you begin reading where it says fits over?
17     A.  Fits over the muzzle of the weapon and capture gas to make
18     the weapon function and cycle with blank ammunition.  Easy to
19     install and does not alter the weapon.
20     Q.  Mr. Ahuja, if we could return to 1202B, go to page 11.
21              If you could, Mr. Ahuja, if you could just zoom in on
22     those top two green messages.  Make them a bit easier to reed
23              Ms. Gutierrez, can you read those two messages sent by
24     Jahmal Abdullah Bey?
25     A.  If any Moors would like to coordinate to order blanks and
```

A000909

N8UBPER2                    Gutierrez - Direct

1    the blank firing adapter for your training event in July that

2    would be great.

3    Q.  And the next message?

4    A.  With those we can practice firing and maneuvering against

5    each other, practice ambushes, assault fighting positions, etc.

6    Q.  Zoom out.  And, Mr. Ahuja, just zooming in on the last

7    message on that screen.

8            The message received at 8:10:55 p.m. on 6/12/2021, Ms.

9    Gutierrez, could you please read that.

10   A.  We may need more than 1,000 blanks though.

11   Q.  Mr. Ahuja, if you could zoom out.  We're next going to move

12   to Government Exhibit 1202C, which per the stipulation is still

13   from the Latimer phone.

14           Ms. Gutierrez, is this a continuation of the same

15   group chat?

16   A.  Yes.

17   Q.  Mr. Ahuja, if we could go to page four, please, and just

18   zoom in on the whole top half of the screen.

19           Before we read the content, I just want to clarify

20   who's participating in this conversation.  So that blue message

21   on the left side of the screen, who is that from?

22   A.  Jamil Rasul Bey.

23   Q.  Can you read the phone number associated with that name?

24   A.  1586131769.

25   Q.  And the green message?

```
       N8UBPER2                    Gutierrez - Direct
 1     A.  Is from Jahmal Abdullah Bey, and the number is 1608832021.

 2     Q.  If you could please read that blue message?

 3     A.  Lucha has been abducted on "weapon charges" not sure what

 4     was the PC on why they even stopped him.

 5     Q.  And then down to the message sent at 6:58:23 a.m., who's

 6     that from?

 7     A.  It's from Jahmal Abdullah Bey.

 8     Q.  What does that message say?

 9     A.  There's an PDF attachment.

10     Q.  And then the next message?

11     A.  When is his date?  Is he held without bail?  How much is

12     the bail.

13     Q.  Mr. Ahuja, if you could pull that off and move to 1202D,

14     page four, please.

15             Ms. Gutierrez, this is a continuation of the same

16     group chat?

17     A.  Yes.

18     Q.  And again, before we get into content, these four blue

19     messages, who were those sent by?

20             Mr. Ahuja, if you could zoom in on the "from."

21     A.  The contact name is AJ.

22     Q.  And the phone number?

23     A.  910443941.

24     Q.  Who were those sent to?

25     A.  Jahmal Abdullah Bey.
```

N8UBPER2                    Gutierrez - Direct

1   Q.  If you could read the blue.  I will read the green

2   beginning with the message on June 24, 2021 at 9:49:09 a.m.

3   A.  "We are currently waiting for him to let us know.  They're

4   trying to hit him with weapons charges though and appreciate

5   it.  Of course the pigs won't tell us what he was arrested for.

6   Q.  "Of course not.  War is deception.

7   A.  "Facts.  We will keep you updated as soon as we get some

8   more info."

9   Q.  Mr. Ahuja, you can pull that down.

10          Mr. Ahuja, if you want to pull up 1202E, moving to

11  page four.  Again on the right the owner of the phone is listed

12  as who?

13  A.  On the right it's Jahmal Abdullah Bey.

14  Q.  The first two blue messages here, who are those from.

15  A.  Jamil Rasul Bey.

16  Q.  And the phone number?

17  A.  1586131769.

18  Q.  You can pull that down.  Going to the next page, Mr. Ahuja.

19          The first message, who's that from?

20  A.  Jahmal Abdullah Bey.

21  Q.  And what does that message read?

22  A.  Y'all need to be in RI.  It's less of a threat.

23  Q.  You can zoom back out, and zoom in on the response, the

24  last two in the blue.

25          Before you read the messages, who's the first one

```
N8UBPER2                    Gutierrez - Direct
```

1    from?

2    A.   Jamil Rasul Bey.

3    Q.   Can you read that message?

4    A.   Salaam.  GS.  You are right.  By September I would be out

5    there.

6    Q.   You can pull that down, please.

7              Mr. Ahuja, if you can publish what's in evidence as

8    1202J, and go to page four, please.

9              Who's this message from?

10   A.   Jahmal Abdullah Bey.

11   Q.   Can you just read the message, please?

12   A.   How far is that from Brooklyn or the Bronx.  We have Moors

13   in both areas.

14   Q.   Pull that down.

15             MS. NICHOLAS:  Your Honor, may I have one moment?

16             THE COURT:  Yes.

17   Q.   Mr. Ahuja, if you could publish what's in evidence as

18   Government Exhibit 1208.

19             Ms. Gutierrez, what are we looking at in 1208?

20   A.   It's a Cellebrite report.

21   Q.   And just above the information there's a header that says

22   notes.  What does that mean?

23   A.   It comes from a notes app.

24   Q.   Let's begin by talking about when this was created.

25             Mr. Ahuja, if you could please zoom in on the

N8UBPER2                    Gutierrez - Direct

1    information in the column labeled time.

2            When was that note created?

3    A.  June 22, 2021, at 2:39 p.m.

4    Q.  You can zoom back out, please.  And zoom in on the notes

5    column.  What's the title of this note?

6    A.  Operation Fountain Head.

7    Q.  After summary, what does it say?

8    A.  Plan of execution.

9    Q.  After source?

10   A.  Notes.

11   Q.  And then beginning where it says, "body," if you could just

12   read that first line?

13   A.  Operation Fountain Head, 7/3 to 7/7.

14   Q.  And then I'm going to have you read the section beginning

15   with plan of execution, and ending with 2345 hours.

16   A.  Plan of execution.

17           Gear check, noon on Friday at the field, load vehicles

18   at 1500 hours, stage vehicles between 1530 and 1630, establish

19   drivers and A-drivers, go over safety brief for if we are

20   pulled over.  Leave at 2345 hours.

21           (Continued on next page)

22

23

24

25

N8UAAPER3                    Gutierrez - Direct

1    BY MS. NICHOLAS:

2    Q.  Then the next section, we'll start at upon arrival and end

3    at --

4    A.  Upon arrival ETA 5:45 hours, establish birthing area,

5    establish designated hygiene area, establish designated head

6    area, unload the vehicles, camouflage the vehicles and burning

7    area, establish chain of command, establish two-man fire wash

8    list, establish designated cooks, establish a range safety

9    officer and establish armor.

10   Q.  The next section beginning with "safety briefs" and ending

11   with "hospital".

12   A.  Safety brief, weapon safety rule, pick a battle buddy and

13   stay with them at all times, establish a designated person who

14   in the case of emergency will take the injured person to a

15   hospital.

16          MS. NICHOLAS:  Pull that down.

17          (Pause)

18   Q.  Ms. Gutierrez, a few moments ago we talked about Government

19   Exhibits 1202B1, B2 and B3.  Do you see those in front of you?

20   A.  Yes.

21   Q.  Were those screen shots of what pages you personally

22   visited?

23   A.  Of the --

24   Q.  Take a look the 1202B1, B2 and B3.

25   A.  Yes.  Yes.

A000915

N8UAAPER3                    Gutierrez - Direct

Q.  Did the links from those web pages come from the chat
messages that you reviewed?

A.  They did.

Q.  Did you personally create those screen shots?

A.  I did.

Q.  Setting aside those 100 series, I want move to the folder
that has 1300 series on it.  Do you see that?

A.  Yes.

Q.  Returning to the stipulation briefly that's Government
Exhibit 1003.  In Paragraph Three, on or about July 3 of 2021
law enforcement officers arrested, among other people, Quinn
Cumberlander, a/k/a "Quinn Khabir".  On page two, Paragraph
Seven, Government Exhibits 1301, 1304 including all subparts
are true and accurate copies of data extracted from the
Cumberlander phone.

          MS. NICHOLAS:  Turning now to 1302A already in
evidence -- If I can please publish Government Exhibit 1302A.

          (Pause)

Q.  Did you have an opportunity to review this report?  And
again, you do have the hard copies if you want to take a closer
look?

A.  I did.

          MS. NICHOLAS:  Your Honor, apologies.

          Pull this down.

          The government offers 1301, 1302A, 1303A, 1303B and

N8UAAPER3                    Gutierrez – Direct

1    1303C.

2           THE COURT:  Yes, subject to the previous rulings on

3    the objections, those are received.

4           (Government's Exhibits 1301, 1302A, 1303A, 1303B and

5    1303C received in evidence)

6           MS. NICHOLAS:  Go back to 1302A.

7    Q.  A moment ago you testified that you had a chance to review

8    this particular government exhibit.

9    A.  Yes.

10          MS. NICHOLAS:  Could you place this side by side with

11   what's in evidence as Government Exhibit 1202A.

12          (Pause)

13   Q.  Did you have an opportunity to compare these two Government

14   Exhibits 1202A from the Latimer phone and 1302A from the

15   Cumberlander phone?

16   A.  Yes.

17   Q.  What is you notice?

18   A.  They're the same group chat.

19   Q.  Did you notice any differences?

20   A.  No.

21   Q.  Did you notice any differences as to the contacts?

22   A.  Oh, sorry.  The contacts are named differently but they're

23   the same numbers that are in the group chat.

24   Q.  We are going to come back to that in a moment.

25          MS. NICHOLAS:  If you could please publish what's in

N8UAAPER3                    Gutierrez - Direct

1    evidence as Government Exhibit 1303C.

2              (Pause)

3              MS. NICHOLAS:  If you could begin by zooming in on the

4    participant section at the top of this report.

5    Q.  Ms. Gutierrez, if you could read who is participating in

6    this chat?

7    A.  AJ Moore and BROX and Quinn Khabir El.

8              MS. NICHOLAS:  If you could zoom out and then zoom-in

9    on the messages please.

10   Q.  The first blue message, can you read who it's from?

11   A.  AJ.

12   Q.  Read the whole line please beginning with "nine"?

13   A.  910443941 and it's AJ Moore BROX.

14   Q.  What's the time and date that message is received?

15   A.  June 29, 2021.

16   Q.  And the time?

17   A.  12:26 a.m.

18   Q.  Can you read the whole thing please?

19   A.  6292021, 12:26:31 a.m. UPC minus four.

20   Q.  What does that message say?

21   A.  Yo, downward signal.

22   Q.  The next message?

23   A.  Salam.

24   Q.  The message that follows?

25   A.  More private.

N8UAAPER3                    Gutierrez - Direct

1             MS. NICHOLAS:  If you could please pull up Government

2      Exhibit 1303A.

3             (Pause)

4      Q.  Before we get into the messages focusing on the participant

5      section just read the names of two people participating in this

6      chat?

7      A.  AJ Moore BROX and Quinn Khabir El.

8             MS. NICHOLAS:  Okay.  Going to page three of this

9      chat, like start with the first green message and highlight

10     that whole section of the page.

11            (Pause)

12     Q.  I would like you to read the green messages from Quinn

13     Khabir El and I will read the blue from AJ Moor BROX, the

14     firsts message at 11:13:23 a.m.?

15     "A.  Lucha?

16     "Q.  Yeah, they abducted him, bro.

17     "A.  WTF.

18            MS. NICHOLAS:  You can pull that one down.

19            (Pause)

20     Q.  I'm going to ask you to set that set of documents to the

21     side.  I want to have you find the folder that's labeled "1400

22     series".

23            (Pause)

24     Q.  Did you find that?

25     A.  Yes.

N8UAAPER3                    Gutierrez – Direct

Q.  Returning briefly to stipulation which is Government

Exhibit 1003 in Paragraph 3 on or about July 3rd, 2021 law

enforcement officers arrested, among other people, Aaron Lamont

Johnson, a/k/a?

A.  Tarrif Bey.  On page two, Paragraph 8 Government Exhibits

1401, 1403, including all subparts true and accurate copies of

data extracted from the Johnson phone.

          MS. NICHOLAS:  You can pull that down.

          At this time, your Honor, the government offers

Government Exhibit 1402A.

          THE COURT:  Subject to the previous rulings, received.

          (Government's Exhibit 1402A received in evidence)

Q.  Did you have an opportunity to review this Cellebrite

report?

A.  I did.

          MS. NICHOLAS:  Can you place this side by side with

Government Exhibit 1302A.

          (Pause)

Q.  A moment ago you testified that 1202A and 1302A were from

the same group chat.  Did you also have the opportunity to

compare 1302A and 1402A?

A.  Yes.

Q.  What did you notice?

A.  Again, it's the same group chat but with different contact

names.

N8UAAPER3                    Gutierrez - Direct

1          MS. NICHOLAS:  So, I want to go back to comparing

2     1202A and 1302A and then we'll bring back 1402A.  So, if we can

3     to start by displace 1202A and 1302A on the right.

4               (Pause)

5          MS. NICHOLAS:  In 1202A if you could please highlight

6     the phone number that ends in 1769 it may help to zoom-in on

7     this particular number as well on the first page please.

8               (Pause)

9     Q.  How is 1769 can you read the full phone number the name

10    please?

11    A.  1586131769.

12    Q.  And the name?

13    A.  Jamil Rasul Bey.

14          MS. NICHOLAS:  Zoom back out.  Turning to 1302 A page

15    two, the number ending in 1769.

16               (Pause)

17    Q.  Is that the same number where you just write in 1202A?

18    A.  Yes.

19    Q.  1202A was saved as Jamil Rasul Bay.  Can you read how it is

20    saved in 1302A?

21    A.  Jamil BROX Moor.

22          MS. NICHOLAS:  Like to move 1302A to the left and

23    place 1302A on the right.  Stick with that same phone number

24    for a moment.

25               (Pause)

N8UAAPER3                    Gutierrez – Direct

1          MS. NICHOLAS:  Sticking to that same number ending

2     1769 in 1302A saved as Jamil BROX Moors.  In 1402 you could

3     zoom out.

4     Q.  Can you read that phone number please?

5     A.  1586131769.

6     Q.  How is it saved in the 1402A phone?

7     A.  Just "Jamil".

8          MS. NICHOLAS:  I want to do the same thing for one

9     other phone number.  Going back to 1202A and 1302A.

10         (Pause)

11    Q.  On the left side of the screen 1202A is from Jamal Latimer

12    on the right side of the screen is 1302A is from Quinn

13    Cumberlander.  Focusing first on 1202A to focus on the phone

14    number ending in 3941, if could you read that number as well as

15    the contact name?

16    A.  It's 910443941 and the name is AJ.

17         MS. NICHOLAS:  Zoom back out.  Same number ending in

18    3941 in Government Exhibit 1302A.

19         (Pause)

20    Q.  In this phone belonging to Quinn Cumberlander, how is that

21    number saved?

22    A.  AJ Moor BROX.

23         MS. NICHOLAS:  Okay.  We're going to move 1302A to the

24    left and if you could please pull up 1402A on the right.

25    Q.  1302A on page two, that number ending in 3941 you read as

N8UAAPER3                    Gutierrez – Direct

1    AJ Moor BROX.  Turning to 1402 A, if you could find the number

2    that ends in 3941?  I believe it is a on page two.

3          Is this the same phone number we just looked at in

4    1302?

5    A.  Yes.

6    Q.  How is it saved in 1402?

7    A.  "Alban El".

8          MS. NICHOLAS:  Can you pull those down.

9          Your Honor, if I may have a moment?

10          THE COURT:  Yes.

11          (Pause)

12          MS. NICHOLAS:  Nothing further, your Honor.

13          THE COURT:  Cross-examination?

14    CROSS-EXAMINATION

15    BY MS. BAHARANYI:

16    Q.  I think it's good afternoon, Ms. Gutierrez?

17    A.  Good afternoon.

18    Q.  You testified about reviewing certain messages on direct,

19    right?

20    A.  Yes.

21    Q.  And you testified that you reviewed messages that were

22    provided to you by the prosecutor's office?

23    A.  Yes.

24    Q.  And in the context specific of the Signal app, you reviewed

25    certain Signal messages that have been provided to you by the

A000923

N8UAAPER3                    Gutierrez - Direct

1   prosecutor's office?

2   A.  Yes.

3   Q.  Ms. Gutierrez, you didn't review all the text messages that

4   were sent from the devices you were testifying about today,

5   right?

6   A.  I only reviewed what I reviewed.  I don't know what else is

7   out there.

8   Q.  You didn't analyze the device yourself, right?

9   A.  I did not.

10  Q.  Or review any other messaging -- actually, withdrawn.

11          So your testimony is today is based off of only what

12  has been provided to you by the prosecutor sitting here?

13  A.  Yes.

14          MS. BAHARANYI:  One moment.

15          (Pause)

16          MS. BAHARANYI:  Nothing further.

17          THE COURT:  Anything else?

18          MS. NICHOLAS:  No.  Thank you, your Honor.

19          THE COURT:  Thank you very much.  You may step down.

20          Anything else from the government?

21          MS. SMYSER:  Your Honor, we just wanted to raise one

22  thing.  We believe yesterday we offered Government Exhibit

23  1008, which was a transcript stipulation between the parties.

24  Out of an abundance of caution, we just wanted to make sure

25  that that was received.

N8UAAPER3                    Gutierrez – Direct

1          THE COURT:  Any objection?

2          MS. BAHARANYI:  Your Honor, give us one moment.

3          (Pause)

4          MS. BAHARANYI:  No objection, your Honor.

5          THE COURT:  Received.

6          (Government's Exhibit 1008 received in evidence)

7          All right.  Does the government rest.

8          MS. NICHOLAS:  Your Honor, the government rests.

9          THE COURT:  All right.  Come to the side bar please.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000925

N8UAAPER3                    Gutierrez - Direct

1          (Side bar)

2          THE COURT:  Okay.  Any motions from the defense?

3          MS. BAHARANYI:  Yes.  Two, your Honor.  So at this

4    time we would move for a mistrial.  This is based off of the

5    volume of evidence from the Massachusetts incident that has

6    been admitted, has been discussed, evidence that we did move to

7    limit, move to exclude in our motions in limine.  And the

8    reason being that at this point we believe the evidence that

9    the guns, the types of guns, the ammunition, the nature of this

10   interaction on the street with Trooper Casey, the nature of the

11   types of ammunition that were recovered from the vehicles in

12   this incident have certainly led to, could certainly lead the

13   jury to convict -- based on this other incident in another

14   jurisdiction, which we believe the government still hasn't

15   sufficiently tied or shown to be relevant to the charges at

16   issue here.

17          We were always concerned about the potential or mini

18   trial within a trial and I think as the Court has seen from the

19   two hours of testimony today that's largely exclusively focused

20   on the Massachusetts conduct and the hours of testimony

21   yesterday this has in fact evolved in exactly what we feared,

22   that we're taking up the Massachusetts case.  It's a

23   Massachusetts incident that has minimal relevance to the 922

24   (a)(3) charge and conspiracy charge here and is certainly in

25   danger of misleading the jury to convict on that basis instead

A000926

N8UAAPER3                    Gutierrez - Direct

1   of evidence for instead of for the 922 (a)(3) charge that he is

2   charged with.

3          THE COURT:  Okay.  That motion is denied.  I think

4   we've really covered this in previous colloquies.  But to my

5   mind the Massachusetts evidence is clearly and highly relevant

6   to the conspiracy charge in this case and I see nothing in the

7   way it's been presented that would prejudice the defendant

8   other than in the way that is not prejudiced, which is to show

9   that he conspired to commit the conspiracy that's charged here.

10         Now you had a second motion.

11         MS. BAHARANYI:  We do, your Honor.  At this time we

12  would move under Rule 29 for a judgment of acquittal even

13  viewing the evidence in the light most favorable to the

14  government, we don't believe a reasonable jury would convict on

15  the facts as presented.

16         THE COURT:  That motion is denied as well.

17         Now, is Ms. Otero here?

18         MS. BAHARANYI:  She is.

19         THE COURT:  Okay.  So we need to get her in now.  I

20  will inquire more formally of the defendant after we excuse the

21  jury, but tell me now whether he is going to take the stand or

22  not?

23         MS. BAHARANYI:  "No" is the answer.  I do want to

24  still speak with him one more time.

25         THE COURT:  Yes.  So, we'll give you that opportunity

N8UAAPER3                    Gutierrez – Direct

1   but let's get Ms. Otero on the stand and that's, other than the

2   defendant, that's your only other witness, right?

3          MS. BAHARANYI:  That's right.

4          THE COURT:  We'll get that done, excuse the jury for

5   lunch, we'll inquire of the defendant and then we'll be ready

6   for summations this afternoon.

7          MS. BAHARANYI:  Understood.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000928

N8UAAPER3                    Otero - Direct

1              (In Open Court)

2              THE COURT:  So, ladies and gentlemen, the defense is

3    not required to call any witnesses.  The burden of proof is, as

4    I've told you now several times, remains always with the

5    government.  The government has a burden of proving one or both

6    of the charges beyond a reasonable doubt.  But the defense is

7    given the opportunity, if they want, to present evidence.  They

8    are going to call one witness, who I understand is ready to be

9    called right now.

10             MS. BAHARANYI:  That's correct, your Honor.  Our

11   paralegal specialist is getting her from the lobby.

12             THE COURT:  Very good.

13    MARIA OTERO,

14        called as a witness by the Defendant,

15        having been duly sworn, testified as follows:

16             COURTROOM DEPUTY:  Please state your name slowly and

17   spell it for the record.

18             THE WITNESS:  My name is Maria Otero, M-a-r-i-a,

19   O-t-e-r-o.

20   DIRECT EXAMINATION

21   BY MS. BAHARANYI:

22   Q.  Good afternoon, Ms. Otero.

23             Ms. Otero, please tell us where you live?

24   A.  Bronx, New York.

25   Q.  What part of the Bronx?

N8UAAPER3                    Otero - Direct

1    A.  Mosholu Parkway.

2    Q.  How long have you lived in the Bronx?

3    A.  All my life.

4    Q.  Ms. Otero, I want to turn to this case.  Do you know the

5    person seated next to my colleague at defense counsel table?

6    A.  Yes, I do.

7    Q.  What name do you know this person by?

8    A.  His mother named him "Steven".  He goes by "Lucha".  I

9    accept him by "Lucha".

10   Q.  And when you say Steven -- Steven Perez, is that right?

11   A.  Yes, ma'am.

12   Q.  And we'll refer to him as "Lucha" for the rest of this

13   proceeding.

14          How do you know Lucha?

15   A.  He's my cousin.

16   Q.  How are you and Lucha cousins?

17   A.  My grandmother and his great grandma are sisters.

18   Q.  What are their names?

19   A.  Patricia Vasquez is my grandma and his great grandma is

20   Macelina Baez.

21   Q.  Ms. Otero, how long have you known Lucha?

22   A.  All his life.

23   Q.  And about how many years would that be?

24   A.  33.

25   Q.  Do you know where Lucha grew up?

A000930

N8UAAPER3                    Otero - Direct

1   A.  In the Bronx.

2   Q.  What part of the Bronx?

3   A.  Morrisania section of the Bronx.

4   Q.  Can you explain to the jury what section that might be.  Is

5   that south Bronx, north Bronx?

6   A.  That would be east Bronx.

7   Q.  How do you know where Lucha grew up?

8   A.  I lived with his grandma.

9   Q.  And how does that give you information about where Lucha

10  grew up?

11  A.  His mother lived in the next building.  We share the same

12  rooftop.

13  Q.  Did you spend any time with Lucha when he was a child?

14  A.  Yes.

15  Q.  Ms. Otero, do you know someone by the name of Keith Vereen?

16  A.  Yes, I do.

17  Q.  How do you know Keith Vereen?

18  A.  He's my cousin.

19  Q.  Can you explain how you and Mr. Vereen are related?

20  A.  My grandmother and his great grandma are sisters.

21  Q.  So is this with Patricia Vasquez?

22  A.  Yes, ma'am.

23  Q.  How long have you known Keith Vereen?

24  A.  All his life.

25  Q.  Ms. Otero, do you know if Keith Vereen and Lucha are

A000931

N8UAAPER3                    Otero - Direct

1   related?

2   A.  Yes, I do.

3   Q.  And how are they related?

4   A.  Their grandmothers are sisters.

5   Q.  Can you share with us their grandmothers' names?

6   A.  Amina Nunez and Carmen Baez.

7   Q.  Do you happen to know where Keith Vereen grew up?

8   A.  In the Bronx.

9   Q.  What part of the Bronx?

10  A.  Courtlandt Avenue, South Bronx.

11  Q.  South Bronx.  Now, how far away is the part of the Bronx

12  that Keith Vereen grew up from where Lucha grew up?

13  A.  A bus ride, maybe 40 minutes, 30 to 40 minutes.

14  Q.  Do you know if Keith Vereen and Lucha have ever spent time

15  together?

16  A.  I'm pretty sure they did.

17  Q.  When you say "pretty sure", is there any occasion you are

18  thinking of?

19          MS. NICHOLAS:  Objection.

20          THE COURT:  I'll allow it.

21  Q.  When you say "pretty sure" is there any occasion that you

22  are thinking of?

23  A.  I saw them in a barbecue that I went to.  It was a family

24  barbecue.

25  Q.  And about how long ago was that?

A000932

N8UAAPER3                    Otero – Direct

1   A.  That was 2018.

2            MS. BAHARANYI:  Sarah, can you please show just the

3   witness, Ms. Otero, what's been marked for identification as

4   Defense Exhibit C1.

5            (Pause)

6   Q.  Ms. Otero, are you able to see a photograph on your screen?

7   A.  Yes, I do.

8   Q.  And without going into too much detail, what is this a

9   picture of?

10  A.  Family, men.

11  Q.  Do you know who is in this picture?

12  A.  Yes.

13  Q.  Do you recognize Keith Vereen in this picture?

14           MS. NICHOLAS:  Objection.

15           THE COURT:  Overruled.

16  Q.  Do you recognize Keith Vereen in this picture?

17  A.  Yes, I do.

18  Q.  Do you recognize Lucha El in this picture?

19  A.  Yes, I do.

20  Q.  Can you describe an article of clothing that Keith Vereen

21  is wearing?

22           MS. NICHOLAS:  Objection.

23           Your Honor, this is not in evidence.

24           THE COURT:  Excuse me.

25           MS. NICHOLAS:  This photograph is not in evidence,

**A000933**

N8UAAPER3                    Otero - Direct

1    your Honor.

2              THE COURT:  Well, I agree with that.

3              MS. BAHARANYI:  Let me back up one step, your Honor.

4              THE COURT:  Yes.

5    Q.  Is this a fair and accurate representation of both Keith

6    Vereen and Lucha El at a family event that you were describing?

7    A.  Yes.

8              MS. BAHARANYI:  Your Honor, at this time we would move

9    to admit Defense Exhibit C1.

10             THE COURT:  Any objection.

11             MS. NICHOLAS:  No objection.

12             THE COURT:  Received.

13             (Defendant's Exhibit C1 received in evidence)

14             MS. BAHARANYI:  Sarah, can you publish this for the

15   jury.

16             (Pause)

17   Q.  Ms. Otero, I want to turn back to this photograph.  Can you

18   please describe an article of clothing that Keith Vereen is

19   wearing?

20   A.  White T-shirt and back shorts with black sneakers.

21   Q.  And can you describe an article of clothing being worn by

22   Lucha in this photograph?

23   A.  A red hat, white tank top, blue jeans, white sneakers.

24   Q.  Where in the photograph is Keith Vereen located, just

25   moving from left to right?  And by that I mean is he the first,

A000934

N8UAAPER3                    Otero - Direct

1   second, third person?

2   A.  He's on the left side next to Lucha's father in between the

3   father and the brother.

4   Q.  When you say "in between the father and brother", you are

5   talking about Lucha's father?

6   A.  His father and his brother.

7   Q.  And where in this photograph is Lucha's father?

8           MS. NICHOLAS:  Objection.

9           THE COURT:  No.  Overruled.

10  Q.  Where in the photograph is Lucha's father?

11  A.  The far end of the left behind Keith.

12  Q.  Where in this photograph is Lucha's brother?

13  A.  Right next to Keith.

14  Q.  And does that put Keith in the middle of the two?

15  A.  Yes.

16  Q.  Were you also present at this celebration?

17  A.  Yes, I was.

18  Q.  And what was the nature of this celebration?

19          MS. NICHOLAS:  Objection.

20          THE COURT:  Sustained.

21  Q.  The individuals in the photograph are these individuals

22  that you're related to?

23  A.  Yes.

24  Q.  Ms. Otero, how often do these family gatherings take place?

25          MS. NICHOLAS:  Objection.

**A000935**

N8UAAPER3                    Otero – Cross

1              THE COURT:  As phrased, sustained.  Although I think

2       there is a possible question that could be put there.  I'll put

3       it.

4              Do you have a specific memory of seeing Lucha and

5       Keith Vereen together on any occasion other than the one that

6       we've just looked at?

7              THE WITNESS:  No.

8              THE COURT:  Okay.  Very good.

9       Q.  As for this family gatherings, you did see Lucha and Keith

10      Vereen together, right?

11      A.  Yes.

12             MS. BAHARANYI:  Your Honor, no further questions.

13             THE COURT:  Okay.  Cross-examination?

14             MS. NICHOLAS:  Briefly, your Honor.

15      CROSS-EXAMINATION

16      BY MS. NICHOLAS:

17      Q.  Good afternoon, Ms. Otero.

18      A.  Good afternoon.

19      Q.  Ms. Otero, you weren't with Keith Vereen on September 14th

20      of 2020, were you?

21      A.  No.

22      Q.  You weren't with Steven Perez on September 14th of 2020,

23      correct?

24      A.  No.

25      Q.  You weren't with Keith Vereen or Steven Perez on September

N8UAAPER3                    Otero – Cross

1    16th of 2020, were you?

2    A.  No.

3    Q.  You weren't with Keith Vereen and Steven Perez on October

4    3rd of 2020, were you?

5    A.  No.

6    Q.  Specifically, you weren't with them at three in the

7    morning, right?

8    A.  No.

9    Q.  You weren't with Keith Vereen and Steven Perez on October

10   4th of 2020, were you?

11   A.  No.

12   Q.  You weren't with Keith Vereen and Steven Perez on October

13   22nd of 2020, were you?

14   A.  No.

15   Q.  You weren't with Keith Vereen and Steven Perez on November

16   1st of 2020, were you?

17   A.  No.

18           MS. NICHOLAS:  Thank you.

19           THE COURT:  Anything else?

20           MS. BAHARANYI:  No, your Honor.

21           THE COURT:  Thank you, so much.  You may step down.

22           (Witness excused)

23           THE COURT:  All right.  Subject to the one matter that

24   we'll take up after the jury goes to lunch, does the defense

25   rest?

N8UAAPER3                    Otero - Cross

1          MS. BAHARANYI:  We do, your Honor.

2          THE COURT:  Okay.  Very good.

3          So, ladies and gentlemen, I have one question for you.

4    I'd like to give you till two o'clock for your lunch so I can

5    take up some matters with counsel.  But the summations will

6    take as much as but no more than two and a half hours.  If we

7    take a 15-minute break midafternoon, that would put us at 4:45

8    rather than 4:30.  Is going to 4:45 a problem for anyone?

9          Very good.  Okay.  Have a good lunch and we'll see you

10   at two o'clock.

11          (Jury not present)

12          THE COURT:  Please, be seated.

13          Defense counsel wanted to discuss one last time with

14   her client whether or not he wants to take the stand.  So, go

15   ahead.

16          MS. BAHARANYI:  Thank you, your Honor.

17          (Pause)

18          MS. BAHARANYI:  Thank you for that indulgence, your

19   Honor.  At this time -- not at this time.  Lucha will not be

20   testifying.

21          THE COURT:  Mr. Perez, do you confirm that that is

22   your decision?  That your decision is not to testify?

23          THE DEFENDANT:  That is my decision, sir, but I would

24   rather go by "Lucha El".

25          THE COURT:  I'm sorry.  So, Lucha El, is that your

N8UAAPER3                    Otero - Cross

1    decision not to testify?

2            THE DEFENDANT:  It is.

3            THE COURT:  Very good.  All right.  Now, I will get

4    you -- my law clerk is almost finished, I think, putting in my

5    edits -- my charge.  You can look it over before you give your

6    summations.

7            There are three things I want to mention.  One is I've

8    decided not to give the aiding and abetting charge that the

9    government requested.  I really think the substantive count

10   here doesn't, really has not been argued on an aiding and

11   abetting basis and I think it would be more confusing to the

12   jury than helpful to have the aiding and abetting charge.

13           I should mention that -- Well --

14           Second, I am tentatively of the view not to give the

15   good faith charge but I am willing to hear briefly any further

16   argument.  Here is the reason, some of which we discussed last

17   night.  To the extent that the good faith charge is based on,

18   and this also applies to the defense's theory of the case which

19   was identical.  To the extent that the claim is that the

20   defendant believed that these laws were unconstitutional

21   because he had an unfettered constitutional right to receive an

22   out-of-state gun or whatever, that argument cannot be made and

23   must not be made to the jury.  It's precluded by Cheek.

24           To the extent he is arguing that he did not, that he

25   was familiar with the underlying laws but did not for whatever

**A000939**

N8UAAPER3                    Otero - Cross

1    reason believe they applied to him or something like that, a

2    mistake of law defense that is precluded by Bryan.

3           So, I'm not sure what's left of the good faith

4    defense.  If there is something left I would probably charge it

5    but I'm not sure what is left.  So let me hear from defense

6    counsel.

7           MS. BAHARANYI:  Your Honor, for this moment we think

8    it's important to call in our expert on this, which is Kendra

9    Hutchinson from our office.

10          THE COURT:  Yes, who I had the pleasure of having

11   before me last night.  So I'm glad we are getting the world's

12   greatest living expert.

13          MS. HUTCHINSON:  Good afternoon.  Kendra Hutchinson.

14   I can pass my card afterwards.

15          I understand your Honor's position.  You know, we

16   discussed this yesterday about Cheek and Bryan.  We're posing a

17   challenge to Bryan's curtailment of this type of defense in

18   light of the change.

19          THE COURT:  I think that's a great issue for appeal

20   but of course I am bound by the decision.  As it stands, Bryan

21   has never been overruled.

22          MS. HUTCHINSON:  I understand that, your Honor, but we

23   would contend that to the extent that we've amended the charge

24   that we requested, I think your Honor probably noted that we

25   amended the good faith request.

N8UAAPER3                    Otero - Cross

```
 1           THE COURT:  Yeah, but what I received last night --
 2      and by the way, I thank both sides for the letters I received
 3      at nine o'clock.  It was a wonderful evening.  My wife and I
 4      did a very hot rumba and the Yankees won a game for a change
 5      but best of all, of course, was receiving your respective
 6      letters.
 7           But what you asked for in that letter -- and by the
 8      way, these letters have not yet been docketed.  Both sides
 9      should docket them -- is that Lucha El contends that he
10      believed in good faith that his actions were lawful.  That's on
11      your good faith defense request.  And then under the theory of
12      defense "Here Lucha El contends that he believed in good faith
13      that his actions were lawful and that negates the willfulness
14      requirement."
15           So, my problem is if you are arguing that he believed
16      in good faith that his actions were lawful because the
17      Constitution overrules in effect of any restrictions that might
18      otherwise have existed, that's precluded by Cheek, that
19      argument.  To the extent if you are arguing that he didn't have
20      specific knowledge of this statute and therefore, may have
21      mistaken what the law said such as, for example, that he could
22      have believed an import are or something like that, that kind
23      of defense is precluded by Brian.
24           So, I'm not sure what's left that you can argue
25      because this general language doesn't specify.
```

N8UAAPER3                    Otero - Cross

1          MS. HUTCHINSON:  I think what I would turn to then,

2     judge, is the Doyle case that we cited.  The Second Circuit

3     case providing that good faith is a defense to willfulness.

4     That good faith is a defense to many specific crimes including

5     intent to fraud and the wire fraud statute, et cetera.  And so

6     I think that at a minimum, that would be warranted here.  I

7     understand --

8          THE COURT:  But the good faith that comes up as you

9     correctly say, for example, very often in fraud cases.  But the

10    context there is even though the government says this statement

11    was false I believed it was true and I in good faith believed

12    it was true and therefore, I'm not guilty of fraud.  That's the

13    situation.  The situation here is to the extent the argument is

14    I believed that any restrictions were unconstitutional or I in

15    good faith believed that the statute didn't apply to me, those

16    are both precluded by the two Supreme Court cases I mentioned.

17         MS. HUTCHINSON:  But referring back to the willfulness

18    instruction itself, your Honor, we don't know how your Honor is

19    going to charge it, but this is reading from Bryan which we

20    agree controls at least as to the willful element here.  And

21    there does have to be this bad purpose to disobey the law.

22         THE COURT:  Let me grab from my law clerk while he is

23    busy putting in my edits.  So, I'll tell you what I'm going to

24    charge on willfulness.

25         MS. HUTCHINSON:  Thank you, your Honor, very much.

N8UAAPER3                    Otero - Cross

1        (Pause)

2        THE COURT:  Okay.  This is under the third element,

3    substantive count and then it is picked up again as a

4    conspiracy count.

5        The third essential element the government must prove

6    beyond a reasonable doubt is that the defendant in receiving

7    out-of-state firearms into his state of residency, acted

8    knowingly and willfully -- and by the way, I previously defined

9    in the earlier receiving and transporting and all that stuff.

10   "Knowingly" means purposely rather than negligently or

11   accidently, but the defendant need not be aware of the specific

12   law that his conduct has violated.  Willfully means to act with

13   a bad purpose, an evil intent to act unlawfully even if the

14   defendant does not have specific knowledge of the particular

15   law he has violated.  That's it.  And if I weren't going to

16   insert, if there were a good faith defense, it would be the

17   next paragraph.  So that's what I'm going to charge.

18       That I think is exactly what Bryan says.  In fact it

19   may be a little bit better for you by using in addition to bad

20   purpose which Bryan uses.  I used evil intent straight out of

21   Blackstone.  So I think the defense is going to be able to

22   argue to the jury the government hasn't shown that he acted

23   with a bad purpose.  The government's failed to show that he

24   acted with evil intent, whatever you want to say in that regard

25   but, not the argument that he believed it was constitutional,

N8UAAPER3                    Otero - Cross

1     that he believed in good faith it was within the law, et

2     cetera, et cetera.

3            MS. HUTCHINSON:  Judge, we are not in our amended

4     charge for good faith defense, we're not asking for or that his

5     actions comply, were Constitutional any longer.  We amended it

6     in response to the Court's concerns and we ask that the Court

7     charge, a person does not act willfully if it believes good

8     faith that he is acting within the law or that his actions

9     comply with the law.  So we're not referencing the

10    Constitutionality or any specific legal provisions at all or

11    requiring the government to prove that he knew of a specific.

12           THE COURT:  What is the evidence?  Other than the

13    arguments that I say, you can't make for reasons discussed many

14    times that the defendant believed in good faith that he was

15    acting within the law, the sole thing that you pointed me to

16    yesterday was that his statement when he was approached in the

17    Massachusetts case about the Constitution, and that's not going

18    to do it for reasons we've already discussed.

19           So what other evidence do you have that he believed

20    what he was doing was lawful?

21           MS. HUTCHINSON:  Would my co-counsel like to?

22           MS. BAHARANYI:  On the facts I think the full extent

23    the body-worn camera captures his statements that "I didn't do

24    anything wrong".  So, in terms of his the evidence that he --

25           THE COURT:  But --

N8UAAPER3                    Otero - Cross

1          MS. BAHARANYI:  -- was acting in good faith, I think

2     that is evidence of that.  It is a reflection of his mens rea

3     in that moment.  He didn't think he was doing anything wrong.

4          MS. NICHOLAS:  -- cites the Constitution in that

5     statement, your Honor.  He is snaking that precluded --

6          THE COURT:  That is my recollection as well.  In clear

7     context in reference to the Constitution.

8          MS. NICHOLAS:  Is this case, your Honor, we are

9     sitting right now, your Honor, where the defendant did not

10    testify.  The government's position is that the willful

11    instruction captures this.  To add to the good faith

12    instruction is going to do nothing but confuse the jury.  The

13    willful instruction addresses this concern.

14         THE COURT:  Okay.  Well, defense has their many

15    excellent arguments but I am going to adhere to not giving a

16    good faith instruction.

17         Now the last question I had which is for the

18    government is you suggested language in your letter.  Let me

19    find it.  This is towards the bottom of page two of your letter

20    and so that I wouldn't miss it, it's all in both places.  "The

21    defendant does not have to himself purchase the firearms out of

22    state but it is enough to prove only that the defendant

23    received or accepted the guns in a state of residence."

24         That part I am going to give almost those exact words

25    slightly different.  But then you say "The government will have

N8UAAPER3              Otero - Cross

1    been found to have satisfied this element if he caused an

2    agent, employee or other associate to bring the guns into his

3    state of residence.  A defendant who uses another person or

4    person to purchase the guns from out of state through the use

5    of -- statement other ways firearms under the law.  I'm not

6    going to give that second sentence, which is more I think in

7    the way of the very last of the sentences, more in the way of

8    summation for you to argue but not for me to state.  But in the

9    middle sentence the government will have been found to have

10   satisfied the elements -- into the state of residence.  Is that

11   a necessary element?

12            MS. BAHARANYI:  Your Honor?

13            THE COURT:  I am wondering whether the law isn't that

14   if you know the gun was purchased or obtained out of state and

15   then you receive it in your state of residency, that's a

16   different state; isn't that enough?

17            MS. NICHOLAS:  I think that that is enough, your

18   Honor.  I think --

19            MS. BAHARANYI:  Can I interrupt?  I'm so sorry, your

20   Honor.  Can we excuse Lucha?

21            THE COURT:  Yes, absolutely.

22            (Defendant not present)

23            THE COURT:  Go ahead.

24            MS. NICHOLAS:  To the extent the phrase "otherwise

25   obtained" needs to be defined, that's kind of the genesis of

N8UAAPER3                    Otero - Cross

1    the government's proposal here but the government is fine --

2              THE COURT:  I'm going to leave it the way I understand

3    the law to be which is that if you know it's coming to you from

4    out of state and it's not from the state of your residency,

5    then you violate the law if you receive it.

6              MS. NICHOLAS:  Understood.

7              THE COURT:  Okay.  All right.  Very good.  I will get

8    you those charges sometime in the next few minutes.  Let me

9    give the edits back to my law clerk.  And we'll see you at two

10   o'clock.  Oh, I'm sorry.  And I'll also get you -- although,

11   we'll have time later at the end of the day -- the verdict form

12   because I do want to hear whatever you have to say.

13             MS. NICHOLAS:  Your Honor, is it your Honor's

14   preference to send an exhibit list back to the jury?  And if

15   so, should we essentially sanitize that exhibit list?

16             THE COURT:  Yes.  You should prepare.  This is because

17   I don't want you to be spending tonight sleeping or anything

18   like that, tonight you need to prepare a joint exhibit list

19   although the government's part will be the larger part.  That

20   is basically a sanitized exhibit list, a number and brief

21   description of what it is and we are sending them all the

22   exhibits except instead of the videotapes.  We'll send them a

23   laptop and a thumb drive that they could play the videotapes on

24   and even that same thumb drive needs to be the Excel sheet so

25   is that they can access.

N8UAAPER3                    Otero - Cross

1            MS. NICHOLAS:  Thank you.

2            THE COURT:  We're not sending in the guns or

3   ammunition but they will be instructed if they want to see

4   them, they can.

5            MS. NICHOLAS:  Thank you.

6            (Luncheon recess)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
N8UBPER4                    Summation - Ms. Smyser
```

2:00 p.m.

(Jury not present)

THE COURT:  By the way, I assume that the defense counsel at the close of all the evidence renewed the motions, and those motions are deemed renewed and are deemed denied again.

MS. BAHARANYI:  Thank you, your Honor, yes.

THE DEPUTY CLERK:  Jury entering the courtroom.

(Jury present)

THE COURT:  Please be seated.  So, ladies and gentlemen, we're about to hear closing arguments of counsel.  I want to remind you, as I did before opening statements that nothing that counsel says is evidence.  The evidence came from the testimony, from the exhibits, and from the stipulations; but it may be useful before you begin your deliberations to hear what each side believes the evidence shows or fails to show as the case may be.

So this is their opportunity to suggest to you what they think the evidence has proved or failed to prove, and it's because the government bears the burden of proof that the government gets both an opening summation and a rebuttal summation.  And in between that, we'll hear from defense counsel, so we'll start with the government's opening summation.

N8UBPER4                    Summation - Ms. Smyser

1           MS. SMYSER:  May I proceed, your Honor?

2           THE COURT:  Please.

3           MS. SMYSER:  "I don't need a permit.  A permit is a

4    permission."  Those are the words of a man who knew he was

5    violating the laws.  Laws that he decided did not apply to him,

6    and the evidence shows that he knew exactly what he was doing.

7    Let's listen to the defendant's own words.

8           (Media played)

9           (Media stopped)

10          MS. SMYSER:  Those words tell you exactly what you

11   need to know, that this man decided that the legalities and the

12   regulations and the mandates and all of that extra stuff, that

13   extra stuff designed to keep us safe did not apply to him.

14   That is a willful violation of the law.

15          Members of the jury, I'm now going to walk you through

16   the charges and the evidence in this case.  And as I do, I'll

17   show you how it all fits together.  And by the time I sit down,

18   you will know beyond a reasonable doubt that the defendant is

19   guilty.

20          First, we're going to discuss Count Two.  In that

21   count the defendant is charged with receiving the Canik or the

22   Yanik 9mm gun that you heard so much about.  He received this

23   Canik in his residence in New York, and he did so without a

24   license.  After that, we're going to discuss Count One.  His

25   agreement with others to transport and receive firearms

N8UBPER4                    Summation - Ms. Smyser

1    interstate without a license.  And as we walk through each one

2    of these charges, I'm going to talk with you about the evidence

3    that shows you that the defendant knew that he was acting with

4    a bad purpose; that is, that he was acting willfully.

5          So let's start with Count Two, receiving the Canik in

6    New York.  We'll discuss each one of the elements of the crime

7    that are on the screen here, that the defendant was not

8    licensed to deal in firearms, that he received the firearm in

9    his state of residence, which had been purchased outside of his

10   state of residence, and that he acted willfully.  And as we go

11   through each one of those elements, you'll see that there's

12   actually a lot that's not in dispute.

13         So what do the parties agree on?  For starters we

14   agree that the defendant was not a licensed importer, license

15   manufacturer, licensed dealer or licensed collector of

16   firearms -- not now, not ever.  And the parties agreed on that

17   in Government Exhibit 1001 which is on your screen.  You also

18   saw that in a blue ribbon certification from the ATF, it shows

19   that the defendant never applied for or was issued a license to

20   deal firearms.  That's element one.  The defendant was not

21   licensed to do this.

22         The next element involves the defendant's state of

23   residence, and here again the parties agree the defendant

24   resides in New York state.  The second part of this element

25   involves the defendant receiving the gun, that Canik in his

N8UBPER4                    Summation - Ms. Smyser

1    state of residence, New York.  There's also no serious dispute

2    here, but I'm going to walk you through this timeline that's on

3    the slide which shows you how you know that the defendant

4    received the Canik in New York.

5         Let's start with September 21, 2020.  On that day, the

6    defendant communicated with Vereen, Keith Vereen.  Before we

7    discuss the relevance of those communications and others, I

8    first just want to make crystal clear also there's no serious

9    dispute about this that Vereen and the defendant were the users

10   of the two relevant phones.  You know that Vereen was using the

11   device ending in 0166, the green device here which you heard

12   about from Mr. Petersohn, because he gave this phone number to

13   Western Union.  And you see those records in the upper

14   right-hand corner of the screen.

15        And Mr. Archuleta explained to you that Vereen would

16   have to use his ID and provide his information in order to pick

17   up money transfers from Western Union.  In addition, you know

18   that the 0166 number is Keith Anthony Vereen's phone number in

19   Cash App or block records, and those are in the bottom right of

20   your screen, Government Exhibit 801.  You also know that the

21   defendant is the user of the Steven Perez device ending in

22   1561.  Like Vereen, the defendant gave this number to Western

23   Union when he was sending money to Vereen.  And it is also

24   subscribed to him in T-Mobile records which you see in the

25   bottom right side of the screen.

N8UBPER4                    Summation - Ms. Smyser

1          The defendant and Vereen talked on September 21st

2     multiple times.  This was a little over a week before Keith

3     Vereen purchased that Canik in South Carolina.  You saw

4     evidence of these communications in the call records or CDRs

5     that Mr. Petersohn discussed and which are shown on the screen

6     here.  These CDRs and the cell site analysis are contained in

7     Government Exhibit 901.  The calls from September 21st were

8     about Vereen buying a gun for the defendant.  And how do you

9     know?  Because the day after the defendant repeatedly talks to

10    Vereen on the phone, he sends Vereen money.

11         Members of the jury, you also know that the defendant

12    and Vereen are relatives, but that's not all they are.  They

13    are co-conspirators.  They are men working together to

14    transport and receive firearms.  Now, on September 22, the

15    defendant sent $350 to Vereen from a check cashing store in the

16    Bronx.  Vereen picked up this money at a store in South

17    Carolina, which you can see in the Western Union records.  That

18    money was for a gun.  You know this because a week later Vereen

19    went out and bought the Canik as well as other guns.

20         On October 1, 2020, Vereen walked into an FFL Dicks

21    Pawn Shop West in South Carolina.  You see that on the

22    right-hand side of the screen.  He filled out an ATF 4473 form

23    that shows that he was purchasing the 9mm Canik with serial

24    number 20CB25810.  He was purchasing this gun, this gun which

25    he then delivered to the defendant in New York.  When Vereen

N8UBPER4                    Summation - Ms. Smyser

1   bought this gun, he lied for the defendant.  As you can see in

2   the bottom box, Vereen attested under penalty of perjury that

3   he was not purchasing the firearm on behalf of another person.

4   He did this despite the bold warning on the bottom of the form

5   that says very simply that he could not purchase this on behalf

6   of someone else, someone like the defendant.

7        I want to pause for just a moment on Keith Vereen.

8   Vereen, like the defendant, did not have a license to deal in

9   firearms, and this is shown in the ATF blue ribbon

10  certification on the screen.  Yet, the defendant chose Vereen

11  who lived hundreds of miles away to buy him a gun and to bring

12  it to New York.  So Vereen lied and bought that gun on October

13  1st.  When did the defendant get it?  Just two days later on

14  October 3rd.  You saw this with Mr. Petersohn.  Mr. Petersohn

15  showed you that on October 2nd and October 3rd, Vereen traveled

16  from South Carolina where he lived and where he had bought that

17  gun up to New York.  He got there late, sometime before 2:12

18  a.m. as indicated in the box in the upper right-hand side of

19  the screen.

20       After Vereen got to New York, he went to the Bronx,

21  and he didn't go just anywhere in the Bronx.  He went to see

22  the defendant.  You see this in the cell site records and in

23  the call logs.  First starting at 2:31 a.m. right after he gets

24  to New York, Vereen called the defendant.  Indeed he called the

25  defendant multiple times.  And then around 3 a.m., the two

N8UBPER4                    Summation - Ms. Smyser

1    connected to the same cell site.  Why?  They were meeting.

2    They were exchanging guns and money at 3 a.m.

3            On October 6 Vereen is back in South Carolina.  As

4    we'll discuss later, this happens over and over again.  Vereen

5    buys guns.  He travels to New York.  He calls the defendant.

6    He meets with the defendant, and they exchange guns and money.

7    It's no secret what is happening here.  Each time Vereen was

8    buying guns in South Carolina and delivering them to the

9    defendant in New York.  Everything we've talked about so far is

10   sufficient to show you the defendant received the Canik in New

11   York.

12           But this is not the only evidence you have.  You have

13   the fact that the defendant was arrested in the Bronx in June

14   of 2021 with that gun.  This was the stop with Officer Smalls.

15   Officer Smalls was responding to a 911 call reporting that a

16   man had a firearm in the area of East Gun Hill Road and Perry

17   Avenue in the Bronx.  The radio transmission reported that the

18   man was Hispanic, 5'6, wearing a white T-shirt, black pants, a

19   blue purse, a black and white turban and that he went by the

20   name Lucha.  And when Officer Smalls responded, he saw the

21   defendant just as you see on the screen here.

22           Officer Smalls looked inside the defendant's bag and

23   he found the defendant's gun, the Canik, the gun that the

24   defendant had paid Vereen to purchase in South Carolina and

25   that the defendant got from Vereen on a trip to New York.  So

N8UBPER4                    Summation - Ms. Smyser

1   the defendant has not only clearly committed the first element

2   of this crime, but also the second.  He received in New York

3   his state of residence a Canik which Vereen had purchased out

4   of state.

5       The third and final element here is that the defendant

6   acted willfully, and I want to talk just a little bit about

7   willfulness.  Before I do, you should know that Judge Rakoff's

8   instructions of the law govern.  If I or any lawyer says

9   anything that is inconsistent with those instructions, you

10  should follow them.  But I expect that Judge Rakoff will

11  instruct you that willfulness does not require that the

12  defendant knew what specific law he was violating.  Instead, he

13  just needs to know that he was acting with a bad purpose.  And

14  although this seems to be the main dispute at this trial, it's

15  actually not a close call.  The evidence proves beyond a

16  reasonable doubt that the defendant was acting willfully, that

17  he acted with a bad purpose.

18      And I'm now going to walk you through the three ways

19  you know that the defendant was acting willfully.  First, the

20  defendant used a straw purchaser in South Carolina.  Why did he

21  do that?  Because he wanted guns in New York, but he had a

22  problem.  He didn't have a permit to purchase his own guns in

23  New York.  You can see that this is yet another point on which

24  the parties agree, that's Government Exhibit 1006, that the

25  defendant has never been granted a firearms license.  The

N8UBPER4                    Summation - Ms. Smyser

1    defendant's lack of a firearms permit is why he didn't just

2    walk into a gun store in the Bronx and buy a gun himself.  It's

3    why he sought the help of a straw purchaser living 600 miles

4    away to lie at gun stores to buy guns for him.  It's why the

5    defendant called Vereen.  It's why he paid Vereen, and it's why

6    they met in the middle of the night at 3 a.m.

7           Members of the jury, use your common sense.  You don't

8    meet in the middle of the night to get a gun that you think you

9    can have.  No.  You meet in the middle of the night so that you

10   can get an illegal gun without being detected.  You get someone

11   to travel hundreds of miles to see you.  That is how badly the

12   defendant wanted guns.

13          The second reason you know that the defendant was

14   acting willfully is how he reacted during his arrest in the

15   Bronx.  I want to take a moment to talk about that arrest.  As

16   we do, I want you to think about whether this is a man who had

17   no idea he was doing something unlawful.  The evidence shows

18   that the answer to that is no.  What is the first thing that

19   the defendant does when the officers approach, he tells them

20   not to go in his bag.

21          (Media played)

22          (Media stopped)

23          MS. SMYSER:  "Don't go in my bag, brother."  The

24   defendant does not want that officer in his bag.  Why?  Because

25   he knows he's possessing the Canik in New York was illegal and

N8UBPER4                    Summation - Ms. Smyser

1    he doesn't want to get arrested.  He doesn't say he has an arm

2    until he already knows that Officer Smalls has frisked his bag,

3    and he knows that he's been caught.  And what does he do next?

4    He lies about his address.

5              (Media played)

6              (Media stopped)

7              MS. SMYSER:  "What's this building I have no idea."

8    Did the defendant actually have no idea what this building was?

9    No.  This is the building where he lived, as you can see in his

10   DMV records Government Exhibit 601.  He was lying.  Why was he

11   lying?  He'd been caught, and he knew that he was breaking the

12   law.  To be clear, he was not bewildered or confused as to why

13   he was being arrested.  He knew exactly why he was being

14   arrested, and this video makes that clear.

15             (Media played)

16             (Media stopped)

17             MS. SMYSER:  Officer Smalls found the gun and asked

18   the defendant if he had a permit.  The defendant doesn't say,

19   What do you mean.  I had no idea I needed one.  Where do I get

20   one. What should I do.  No.  He says I don't need a permit.  A

21   permit is a permission, and I'll deal with this in court.

22             Now this is not an instance where the defendant just

23   didn't know the laws surrounding how you get guns.

24             (Media played)

25             (Media stopped)

A000958

N8UBPER4                    Summation - Ms. Smyser

1          MS. SMYSER: "I'm not worried about a permission.  A

2    permit is a permission." This is a man who knows about the laws

3    and has decided that they do not apply to him.  That is a

4    willful disregard of the law.  And I know you've seen this clip

5    already, but I want to watch it again because it shows a man

6    who knows exactly what he was doing.

7          (Media played)

8          (Media stopped)

9          MS. SMYSER:  The defendant here tells the officers

10   that they should learn.  They should learn not to uphold the

11   legalities and regulations and mandates and all of that extra

12   stuff.  He's not confused as to why he's being arrested.  He's

13   not trying to comply with the law.  No.  He's disregarding it

14   and telling the officers to do the same.  That is acting with a

15   bad purpose.

16          Third and finally, you know that the defendant knew he

17   was doing something wrong because after he was arrested in the

18   Bronx, he doubled down.  He was told he needed a permit.  His

19   gun was taken away, but he did not stop and think twice.  He

20   did not go out and try to get a gun permit.  He did not try to

21   do the right thing.  Instead, just two weeks later he packed up

22   his guns in the Bronx and he headed to Rhode Island with them

23   to meet his friends, the Rhode Island residents, and they

24   headed to Massachusetts.  And it was there that he was arrested

25   with his friends and with the guns.

N8UBPER4                    Summation - Ms. Smyser

1        We will talk a little bit about the details of that

2    arrest later, but for now it shows that all along the defendant

3    knew that he had been acting with a bad purpose.  These three

4    reasons:  That the defendant used a straw purchaser; his

5    reaction to the Bronx arrest; and the fact that he was arrested

6    in Massachusetts just two weeks later show you that the

7    defendant was not trying to lawfully get guns.  Instead, he was

8    choosing not to follow a law because he did not like it.  But

9    as Americans, we all have to live by the same laws, even if we

10   don't agree with some of them.  You don't get to decide which

11   laws apply to you.

12        So as we've discussed, the defendant was not a license

13   firearms dealer.  He received a firearm in New York that was

14   purchased outside of his state of residence, and he did so

15   willfully.  That is why the defendant is guilty of Count Two.

16        Now that you know that the defendant is guilty of

17   Count Two, I want to talk about Count One which is the

18   conspiracy charge.  As I expect Judge Rakoff will tell you, a

19   conspiracy is just an agreement, and here you know that the

20   defendant agreed to violate Section 922(a)(3) for the reasons

21   we've already walked through and more.  Let's focus on the

22   evidence that we've already seen.  We've already talked about

23   the fact that the defendant got the Canik from Vereen in New

24   York and that he did so willfully.

25        His relationship with Vereen is sufficient in and of

N8UBPER4                    Summation - Ms. Smyser

1    itself to convict on Count One.  The defendant agreed with

2    Vereen at minimum to transport and receive firearms from out of

3    state, but there is more to the defendant's conspiracy than

4    that.  You know, for example, that Vereen bought many more guns

5    than just the Canik, at least 24 guns in total to be exact.  You

6    can see that in Government's Exhibit 902.  Many of those

7    purchases took place right before Vereen traveled to New York

8    and met with the defendant.  You can see that in the

9    highlighted rows on the screen.

10           But it's not just the defendant, these trips also took

11   please after the defendant's friends Jamil Bey and Ricardo

12   Rodriguez paid Vereen for guns.  Bey and Rodriguez are the

13   defendant's co-conspirators too.  They were paying Vereen for

14   guns that Vereen delivered to the Bronx.  Let's focus on Bey

15   for a moment.  Bey paid Vereen on September 12th.  He did not

16   have a gun license, as you can see in the bottom right-hand

17   side of the screen, and he lives in the Bronx.  His DMV and

18   Western Union records show that his address was 2759 Webster,

19   but his cell phone records also show a connection to 236 East

20   Gun Hill Road, which is an address that shows up in his DMV

21   history, and it's also an address where his cell phone

22   frequently is.

23           There's no question that the person who sent the money

24   to Vereen is Jamil Rasul Bey, the same Bey who was arrested

25   with the defendant in Massachusetts, which we'll talk about a

N8UBPER4                    Summation - Ms. Smyser

little bit in the bit.  The defendant is the link between Bey

and Vereen.  The defendant talked to Vereen almost 22 times

over this couple of month period and Bey almost 50 times, but

Bey and Vereen, they never called each other.  The defendant

was their go-between.  The defendant brought Bey into the

conspiracy and communicated on his behalf.  He linked Bey and

Vereen.

Let's talk next about Rodriguez.  The defendant is

also the link between Rodriguez and Vereen.  Like Bey,

Rodriguez paid Vereen on September 12, 2020.  He's from the

Bronx, and he didn't have a license to deal in firearms as you

can see here, and again the calls show that the defendant is

the link.  Rodriguez talked to Vereen just twice on September

14 and September 16 when Vereen is in New York after Rodriguez

had paid him for a gun.  But Rodriguez talked to the defendant

all the time, almost 200 times in three months.  The defendant

was Rodriguez's guy.  This all shows that the defendant is the

link to Vereen's guns.  He brought his friends Bey and

Rodriguez into the conspiracy, and he helped them get guns from

out of state.

Both Bey and Rodriguez like the defendant are

residents of New York and didn't have firearm licenses to

lawfully get guns from out of state, yet they did it anyway

together.  In other words, they're in a conspiracy.  I want to

briefly walk through Vereen's trips which are one of the

N8UBPER4                    Summation - Ms. Smyser

1    powerful pieces of evidence of the defendant's conspiracy.  As

2    you heard in this trial, Vereen took four trips to New York

3    from September 2020 through November 2020.  The first trip is

4    September 14th.  The next is October 3rd.  The third is October

5    22nd, and finally November 1st.  We'll walk through each of

6    these starting with the first.

7                On September 12, Bey and Rodriguez paid Vereen.  That

8    day and the next Vereen bought seven guns, and you see those

9    gun purchases here, six guns from three FFLs all in South

10   Carolina.  After Vereen bought those guns, he took a trip to

11   New York.  He first traveled up to New York.  And after a call

12   with Rodriguez and the defendant, he met with the defendant.

13   And two days later, he met with all of them before heading back

14   home, delivering guns, getting paid and going home.

15               Trip two is more of the same.  I'm not going to dwell

16   on it since we've already discussed it, but on October 1st and

17   2nd Vereen bought four guns in South Carolina, including the

18   Canik.  You can see those purchases here.  As I said, he bought

19   four guns plus the Canik.  He then traveled and met with all

20   these co-conspirators again.  You know that he met with the

21   defendant on October 3rd at 3 a.m., and the next day he's in

22   the same vicinity as the defendant and Bey and Rodriguez

23   delivering guns getting paid, going home.  A few weeks later,

24   Vereen and the defendant did it again.  Vereen bought guns in

25   South Carolina, three guns to be exact, which you can see here.

A000963

N8UBPER4                    Summation - Ms. Smyser

1   He then traveled to New York and he met with the defendant.

2          Here he is traveling up, meeting with the defendant,

3   and heading back home less than 12 hours in the Bronx

4   delivering guns, getting paid, heading home.  Finally, Vereen

5   did it one more time.  He bought two guns in South Carolina.

6   He traveled to New York.  Here he is going up, delivering the

7   guns to the defendant, getting paid, going home.

8          Members of the jury, these are Vereen's only trips to

9   New York over that nine month period from September 2020

10  through July 2021.  These trips happen only after Vereen

11  purchases guns in South Carolina, talks to the defendant and

12  then meets with the defendant, and sometimes he meets with the

13  defendant's co-conspirators too.  This is not a situation where

14  Vereen is just traveling to New York to see his family or his

15  friends or celebrate a holiday.  He's coming for quick trips to

16  see the defendant and deliver guns.  Sometimes staying for only

17  a few hours.

18         Use your common sense.  This is not a coincidence.

19  Again, this is all you need to convict on Count One.  You have

20  the defendant.  You have Vereen.  You have Bey.  You have

21  Rodriguez all in conspiracy together, agreeing to purchase guns

22  from outside their state of residence without licenses.  But

23  again, that is not all the evidence you have about the

24  conspiracy.  You have the Massachusetts arrest.  You know that

25  Vereen bought a gun, a Glock on July 23, 2020, which is

N8UBPER4                    Summation - Ms. Smyser

1    highlighted here.

2              The defendant and Jamil Bey and others were then

3    arrested on July 3, 2021.  This group of men was arrested with

4    the Glock and with many other guns.  They were all part of a

5    conspiracy to transport and receive guns from out of state

6    without the proper licenses.  How do you know?  Let's start

7    with the defendant and with Bey.  This is from Government

8    Exhibit 330C, Jamal Latimer's body worn camera.  On that camera

9    you see the defendant on the right wearing body armor.  The

10   parties have agreed on that, and he is standing right next to

11   Jamil Bey whom he helped get guns from Vereen.  Let's watch

12   this.

13              (Media played)

14              (Media stopped)

15        MS. SMYSER:  Latimer, the leader asked twice, nothing

16   is stolen, right.  Nothing is stolen, right.  And Bey says,

17   nah, nah, hell nah.  And as Bey is answering, the defendant,

18   who's the man in the upper right-hand corner of the screen is

19   standing next to him shaking his head no confirming that those

20   guns were not stolen.

21              Watch this again and pay careful attention to the

22   defendant's head shake as Latimer ask if the guns are stolen.

23              (Media played)

24              (Media stopped)

25        MS. SMYSER:  The defendant knows that these guns

N8UBPER4                    Summation - Ms. Smyser

1   aren't stolen.  How does he know that?  Because he and Bey are

2   the ones who brought the guns from New York to Rhode Island to

3   Massachusetts.  They're the ones who are legally supplied the

4   guns for the group, only two weeks after the defendant's arrest

5   for illegally possessing a firearm in the Bronx.

6          Let's step back for a second and talk about this group

7   and who they are and why they wanted guns.  First, let's focus

8   on Jamal Latimer.  He was the leader and spokesperson for the

9   group that you saw on Trooper Casey's body camera.  He was

10  arrested that day as you see here on the screen, and he is a

11  Rhode Island resident, which you see in his DMV records,

12  Government Exhibit 605.  He also does not have a license to

13  deal firearms.  This is the other individual who's featured in

14  that body worn camera clip which Latimer is asking if the guns

15  are stolen.  This individual is sitting in the car when Latimer

16  is asking that question.  The defendant is confirming that

17  they're not stolen.

18         This is Aaron Jiminez, Alban El Curragh, he is a New

19  York resident, and he also does not have a license to deal in

20  firearms, and DMV records show that at least one point in time

21  he was the defendant's neighbor and they were living at the

22  same address.  One question you might have is why.  Why are the

23  defendants and Bey and all these other men agreeing to

24  illegally transport firearms from out of state?  Because they

25  are part of a so-called militia who wants to train with their

N8UBPER4                    Summation - Ms. Smyser

weapons.  And that training as Jamil Bey tells the defendant
here on the screen starts on July 3rd, 2021, the day they are
arrested in Massachusetts.  When they are arrested, they are
headed to operation Fountain Head which is led by Jamal
Latimer, the commander of operations as you see here.  Latimer
sends a packing list to a group chat with many of the people
who were arrested.  That packing list has a lot of military
equipment on it, but it also has firearms at the very top.

         Latimer wants to use this equipment to train.  You see
here he says he wants blanks to practice firing and ambushes
and assault fighting positions, etc.  Essentially Latimer wants
them to be a military unit.  We could have five platoons with
the amount of people in this group.  That's damn near a company
he says.  And a man named Quinn responds in the bottom
right-hand corner of the screen, Quinn is Quinn Cumberlander,
one of the people who was arrested.  Quinn, like Latimer, is a
Rhode Island resident and does not have a license to deal
firearms.  You see that here on Rhode Island residency in
Government Exhibit 606.

         Now, the defendant is not part of that group chat that
we were talking about, but it's very clear that he knows what's
going on.  This makes sense because his friend Jamil Rasul Bey
is in that group chat.  You could see that here, as is Aaron
Jiminez, his friend and old neighbor.  And as you see here on
June 21st, Latimer sends out the packing list to the group,

A000967

N8UBPER4                     Summation - Ms. Smyser

1    which includes a daypack in addition to firearms.  That same

2    day just a few hours later Jiminez ask the defendant if the

3    defendant needs a daypack, and the defendant responds that he

4    already has one.

5            You also know that the defendant knew what was going

6    on in this group chat because the next day he is starting to

7    text other people about it.  You should come to the three day

8    training.  He's texting on Signal, this unsent message. Signal

9    as you heard was an encrypted messaging application which is

10   more private.  The text messages and the group chat also show

11   that the defendant is a trusted member of this group.  When the

12   defendant was arrested in the Bronx, Jamil Bey informed the

13   group of that arrest.  More precisely he said that the

14   defendant had been abducted.  The group sprung into action.

15   They offered thoughts, and they asked for updates.  And just a

16   few days later Jamal Latimer even sends a text saying countless

17   members of their group, including the defendant included, are

18   in jail.  And these repeated arrests of their group members

19   show that they know that they are violating the law and they

20   are just choosing to ignore it.

21           The defendant gets out of jail in time to go to that

22   training on July 3rd.  The group had a plan.  They would travel

23   from out of state, including the Bronx members, to meet in

24   Rhode Island where Latimer lives, their leader.  That's also

25   where another co-conspirator Quinn Cumberlander lived.  And

N8UBPER4                    Summation - Ms. Smyser

1    from there, they would drive from Massachusetts and other

2    states to Maine. They were going to travel in two cars which

3    were loaded with firearms supplied at least in part from the

4    defendant and Bey who came from New York, and those cars also

5    had a lot of ammunition. Latimer explain this plan to Trooper

6    Casey who comes across the group around 1 a.m. on the 4th of

7    July weekend.

8               (Media played)

9               (Media stopped)

10              MS. SMYSER:  They are a militia decked out in AR-15

11   and military fatigues heading to Maine to train.  The defendant

12   who was helping to get guns for the group knows what's going

13   on.  Which guns is he getting?  He's getting these guns.

14              MS. BAHARANYI:  Objection, your Honor.

15              THE COURT:  Overruled.

16              MS. SMYSER:  One of these guns was purchased by

17   Vereen.  It is a Glock with serial number AELY222.  It's this

18   gun right here purchased by Vereen in South Carolina brought to

19   the defendant in New York.  But that is not the only gun that

20   the defendant is tied to during this stop.

21              (Media played)

22              (Media stopped)

23              MS. SMYSER:  In this video the defendant is holding

24   what appears to be an AR-15 for Latimer.  That is the photo on

25   the left.  In that video he also appears to have a firearm

A000969

N8UBPER4                    Summation - Ms. Smyser

strapped across his chest that's sitting on his hip.  You see
that here in the middle of the screen.  Plus there is the gun
purchased by Vereen, the defendant's straw purchaser.  And
these guns are passed around between the group members because
they are group guns, guns that this group wanted to transport
interstate without a license.

          Based on all of this evidence, you know that the
defendant was in a conspiracy to transport and receive firearms
into the state of residence of the ultimate receiver.  The
Massachusetts arrest as I mentioned earlier also provides
strong evidence of this group's willfulness.  Why?  Remember
that this arrest came two weeks after the defendant's arrest,
two weeks after the group learned about the defendant's arrest.
They had plenty of notice that they were probably doing
something unlawful.

          But on July 3rd when the police calmly asked them to
put their guns away, they refused.  They refused to put away
their guns.  They passed around their guns, including to the
defendant.  They had their guns and their ammunition and their
magazines at the ready, specifically they had nine guns,
including assault rifles, over a thousand rounds of ammunition
and almost 20 magazines.  This arsenal shows that they planned
this.  They needed to transport guns interstate in order to
make this happen.  The Massachusetts arrest tells you what was
in the defendant's mind.  It shows you that the defendant knew

A000970

N8UBPER4                    Summation - Ms. Smyser

1    that he was acting with a bad purpose, just two weeks before

2    he'd been arrested in the Bronx, informed that he needed a

3    permit for the gun.

4           And two weeks later what is he doing, he's not trying

5    to comply with the law.  Instead, he's moving guns from New

6    York to Rhode Island, including to residents of that state, and

7    to Massachusetts and they plan to go to Maine for a military

8    training exercise.  He knows exactly what he is doing.  Now

9    that you've seen the evidence, you know that the defendant and

10   others agreed to violate the law.  You know they didn't have

11   gun licenses.  You know that they transported and received

12   firearms in their states of residence like New York and Rhode

13   Island, and you know that the defendant acted willfully.

14          Members of the jury, this is not a man who received a

15   gun once.  This is not a one-off thing.  It is not a mistake.

16   The defendant is a man who disregards the laws that he doesn't

17   like, laws that are designed to keep everyone safe.  He is a

18   man who thinks he is above the law.  That should end today

19   cause when you consider all of the evidence and when you use

20   your common sense, you will come to the only conclusion that's

21   consistent with the evidence and the law, that the defendant is

22   guilty.

23          THE COURT:  Thank you very much.  Now we'll hear from

24   defense counsel.

25          MS. BAHARANYI:  Your Honor, before we begin, is it

```
N8UBPER4                    Summation - Ms. Smyser
```

1    possible to take a brief break.

2            THE COURT:  All right.  I'm going to give you a longer

3    break later this afternoon, but we'll take a five-minute break

4    at this time.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8UBPER4                    Summation - Ms. Smyser

1    (Jury not present)

2         THE COURT:  Please be seated.  Let me just mention in

3    the final instructions that I sent you earlier today, there

4    were a couple of typos on page 21.  In the last sentence

5    "willfully" means to act with bad purpose and evil intent,

6    there should be no comma after intent, to act unlawfully even

7    if the defendant does not know the specific law he is

8    violating.

9         On page 23 in the third sentence there should be more

10   plural, so it should read in Count One, The unlawful purpose

11   alleged to be the object of the conspiracy is an agreement to

12   transport firearms that were obtained outside the states of

13   residency of the eventual receivers into the states of

14   residency of the receivers.  I've also change slightly, but not

15   in any substantive way, the next sentence, and I'll get you all

16   this before I give the jury the charge tomorrow.  But the

17   sentence beginning the gist of, it now reads, The conspiracy

18   here charged is that several persons, including the defendant,

19   agreed to a plan to commit the same kind of substantive

20   violations.

21        The previous sentence had referred back to Count Two.

22   And finally the next sentence -- and please bear in mind I

23   added I've slight few words there.  Please bear in mind the

24   conspiracy is an entirely distinct and separate offense from

25   the particular substantive crime charged in Count Two of the

A000973

N8UBPER4                     Summation - Ms. Smyser

1    defendant actually receiving a specific out of state firearm in

2    the defendant's state of residence.

3           Finally, with apologies to Blackstone, I think the

4    word "evil" should be taken out of the instruction on page 21.

5    So in addition to the typos I previously corrected, I'm

6    correcting it by deleting the word "evil." So it now reads,

7    willfully means to act with a bad purpose and intent to act

8    unlawfully, even if the defendant does not know the specific

9    law he is violating.  Okay.

10          Defense counsel is ready, we'll bring in the jury.

11          MS. BAHARANYI:  I am, your Honor.

12          THE COURT:  Very good.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1          (Jury present)

2          THE COURT:  Please be seated.

3          Okay, counsel.

4          MS. BAHARANYI:  Yes, your Honor.

5          "That's my arm, sir.  It is my constitutional right to

6     have it.  I'm not doing anything wrong."

7          When Lucha El was surrounded by officers outside of

8     his home, he didn't know why they were approaching him.  He had

9     been listening to music, chatting with his favorite neighbors,

10    minding his own business on a warm summer night.  He had no

11    idea why they approached him.  He had no idea why they

12    surrounded him.  He had no idea why they were grabbing his bag

13    and he certainly did not understand why he was being arrested

14    or grabbing his arm and his bag.  Lucha El, did not believe

15    that he was doing anything wrong in carrying a firearm.  And he

16    certainly did not believe he was doing anything wrong in

17    receiving a firearm from a different safe.

18         Your role as a jury is not to decide whether Lucha El

19    was mistaken.  Your role is not to decide whether he was wrong

20    on the law.  The question for you to decide are whether the

21    government proved beyond a reasonable doubt that Lucha El

22    unlawfully received a handgun from someone that he knew, from a

23    family member and whether the government's proven beyond a

24    reasonable doubt that Lucha El agreed or conspired with others

25    to unlawfully receive a handgun.  Those are the questions.

N8UAAPER5          Closing Statement – Ms. Baharanyi

1    Based on what Lucha El says, you know the answer's no.  Based

2    on what Lucha El does, you know the answer is no.  Based on

3    what he believes, you know the answer is no.

4            The government wants you to convict Lucha based on the

5    places that he's been, the people that he knows, the guns

6    gathered by those other people without Lucha's involvement.

7    They have weaved together a complicated tale of twists and

8    turns based on what they believe.  But the truth is simple.

9    Lucha El had no intent to break the law in receiving a firearm

10   from out of state.  He'd made no agreements with other people

11   to unlawfully receive or transport firearms.  He had no bad

12   purpose.  He did not act with bad intent.  And so he is not

13   guilty.

14           So then what is this case about?  Why are we talking

15   about militias in Massachusetts when we're here in federal

16   courthouse in New York City?  Who are those people he made

17   agreements with and where are those agreements to receive

18   firearms?  Where are the messages, the communications that show

19   you that he is receiving firearms unlawfully?

20           The government, the confusion you might feel based off

21   of what you heard over the past two and a half days, three

22   days, is a product of the government's misdirection.  The

23   government's waived other people in front of you, other places,

24   other agreements to distract you from the truth that was in

25   Lucha's mind, that he was doing nothing wrong.  And as my

A000976

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1   colleague explained in opening, what is in Lucha's mind was

2   what's matters.  That is what distinguishes unlawful conduct

3   from lawful conduct.

4          I'll talk briefly about the law.  The judge will

5   instruct you that the government, the government alone has an

6   extremely high burden of proving that Lucha is guilty beyond a

7   reasonable doubt on two counts.  In Count One Lucha is charged

8   with conspiracy to unlawfully transport firearms out of state

9   and into the state of residency of the receiver.  In Count Two

10  Lucha El is charged with unlawfully receiving or transporting

11  an out of state firearm into his state of residence, New York.

12         To prove Count One the government would have to prove

13  beyond a reasonable doubt that Lucha and at least one other

14  person specifically agreed to willfully receive or transport

15  firearms into their states of residence.

16         The government would have to prove for Count Two

17  beyond a reasonable doubt that Lucha willfully received a Canic

18  or Janic TP 9 firearm from out of state into New York.

19         For both of those counts willfulness matters.  What

20  was in his mind matters.

21         Now the concept of willfulness is simple and will be

22  explained by the judge when he gives you his instructions but I

23  expect the judge to say, a person acts willfully when they do

24  something, when they act with a bad purpose.  A person acts

25  willfully when they act with a bad purpose in their mind.  In

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    short, to prove Count One the government must prove that there

2    was some unlawful agreement and bad purpose.  And to prove

3    Count Two, the government must also prove that there was bad

4    purpose.  His mind matters.  What was in his head matters.  And

5    the government fell far short of proving these two counts,

6    proving willfulness beyond a reasonable doubt.  And for that

7    Lucha El is not guilty.

8         Now a couple of days ago the government opened with a

9    story.  They opened with a story about Lucha coordinating

10   purchases with the straw purchaser far off over 60 miles away

11   and coordinating these purchases for a group that Lucha was a

12   member of.

13        From the beginning this story has never made sense.

14   On the screen you can see the Western Union payment between

15   Lucha and Keith Vereen.  This was a payment sent using Lucha's

16   biological name, his address, his phone number.  Nothing was

17   hidden.  And this is the payment that the government says was

18   for the purchase of the firearm that is described in Government

19   Exhibit 430.

20        Look at the price of that firearm, $495.  Lucha sent

21   $350 over a week before this firearm was purchased.  What straw

22   purchaser or gun trafficker buys a gun at a financial loss?  At

23   a $150 loss?  That's not something that a straw purchaser does.

24   That is something that your family might do.

25        Maria Otero took the stand for her cousin, Lucha.  She

A000978

N8UAAPER5          Closing Statement - Ms. Baharanyi

1  took the stand to explain to you the real relationship between

2  Lucha and Vereen.  Not the straw purchaser straw, purchase

3  relation that was presented to you in openings.  No.  Lucha's

4  grandmother and Keith's grandmother are sisters.  They both

5  grew up in the Bronx.  They've attended family functions

6  together.  Defense Exhibit C1, you can see Lucha surrounded by

7  family and Keith Vereen surrounded by Lucha's brother and

8  Lucha's father.  This is not a straw purchaser relationship.

9  This is family.  And from family Lucha accepted a handgun, a

10 handgun that had been purchased in a gun store, an FFL, a

11 handgun with a serial intact written on its side, a handgun

12 with all the appropriate markings, the manufacturer number, the

13 make, the model, the importer.  Lucha did not believe that he

14 was doing anything wrong in receiving a handgun for self

15 protection in an increasingly dangerous neighborhood.

16      And Officer Smalls told you exactly what the

17 neighborhood that Lucha El was like is from.  He told you

18 exactly what Lucha El's neighborhood is like, gang violence,

19 assaults, robberies.  Lucha El received this handgun for his

20 own self protection.  He didn't intend to disobey the law in

21 receiving a handgun.  He did not act with bad purpose.  He

22 accepted this from family.

23      But how will you know that Lucha did not have bad

24 purpose in his mind when you received this firearm?  How will

25 you know?  Well, we spoke a little bit earlier about the

A000979

N8UAAPER5                    Closing Statement - Ms. Baharanyi

1    firearm but take a look at this.  You can see clearly the

2    details on this firearm.  As I mentioned, the manufacturer, the

3    model, the importer and ATF Agent Lennea Gordon got on the

4    stand.  She explained that these markings on a firearm, they

5    are important.  They are the way that the ATF can trace a

6    firearm, the way that the ATF can determine who purchased a

7    firearm, who bought a firearm.  And without this information

8    without the manufacturer, without the serial number, without

9    the model, tracing these guns are almost impossible.

10           Lucha did not file off the serial number.  You can see

11   it right there in front of your face.  Lucha El did not remove

12   or hammer it off.  He did not remove what is the easiest way to

13   prove where a gun came from and who purchased it and he didn't

14   do that.  He didn't remove that because he did not believe that

15   receiving a firearm from his cousin was somehow unlawful.

16           How else will you know is that Lucha did not act with

17   bad purpose in his mind?  The proof is on the video.

18           (Video playing)

19           MS. BAHARANYI:  Officers approached Lucha, surrounded

20   him.  He never tries to run away.  He never tries to fight the

21   officers.  In fact, he gives the officers his ID card with his

22   address, the address that he is standing in front of, 3318

23   Perry Avenue.  He hands that to officers during this

24   interaction.  He explains to officers why he believes he has a

25   right to carry that firearm.  He tells them, "It's my

A000980

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1  constitutional right".

2          Now, if you are sitting there and you are thinking

3  everybody knows you can't have a gun in New York City, if

4  that's going through your mind, I want you to acknowledge it.

5  I want you to take those beliefs, those preconceived notions

6  and I want you to leave them outside the deliberation room.

7  Your job today is to consider the facts and evidence, the facts

8  that were presented and decide if the government's met their

9  burden, their heavy burden.  And from the facts that are in

10 evidence here in this courtroom, the facts about Lucha's

11 actions about his words, about his beliefs, you'll know he did

12 not act with a bad purpose in his mind.

13         The government spent a lot of time talking about Keith

14 Vereen and Keith Vereen's trips up and down the Atlantic coast

15 in the fall of 2020.  These trips are not proof of Lucha El's

16 role in the conspiracy.  They're not proof of Lucha El's state

17 of mind when receiving a firearm from Keith.  These trips are

18 distractions.  Over dozens of slides and nearly two hours of

19 testimony from Mr. Petersohn, you did not hear any reliable

20 information on the location of the four devices that

21 Mr. Petersohn reviewed and analyzed.  Mr. Petersohn, who is the

22 government's frequently used and very well paid expert or cell

23 site location consultant testified at length about cell site

24 location information.  But his testimony made clear that he

25 can't pin a cellphone to a particular location.  And his

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1   testimony made clear that the general vicinity, his estimate

2   about a phone being in the general vicinity is based on the

3   assumption that a cellphone connects to the closest tower.

4   That's an assumption you heard him say he didn't test.  He

5   didn't go to the neighborhood at east Gun Hill Road in

6   Bainbridge.  He didn't drive to the Bronx to check out the

7   towers that he was testifying about.  He didn't do those drive

8   tests that can provide concrete information on the signal

9   strength of a tower.  He provided conclusions to you, the jury,

10  without proof to back it up.  But even if you were to set aside

11  our concerns about the reliability of Mr. Petersohn's

12  testimony, the reliability of his conclusions about the Bey

13  device, Lucha's device, Rodriguez's device, Vereen's device,

14  even if you set that aside and you accept his conclusions, this

15  does not mean that Lucha El was part of any elicit conspiracy

16  to deal in firearms, receive firearms, transport firearms.

17          As you know from Ms. Otero, Keith Vereen is from the

18  Bronx.  he grew up in the Bronx.  He has a family still living

19  in the Bronx, Maria, Lucha, all of the men in the family that

20  you saw in those photographs.  He has ties here in the Bronx

21  and a community in the Bronx and all of that location

22  information could each suggest is that when he comes to town he

23  visits family.  He visits his community.

24          And Mr. Petersohn was clear when I asked him, the call

25  detail records don't tell you what phone calls were about.

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    Text messages, the content of text messages aren't recorded on

2    call detail records.  So anything the government has to say

3    about what was said to whom or when or where, all of that is

4    speculation.  They don't know.  They're guessing.  But you

5    shouldn't.

6            We also know from Mr. Petersohn from his

7    cross-examination that he didn't include all the towers, the

8    cell site, location towers that Vereen used when he traveled

9    between September and November 2020.  What that means is he

10   didn't include all the towers that he says can help determine

11   or give a general vicinity of where a cellphone is located and

12   that's no fault to Mr. Petersohn.  The government told

13   Mr. Petersohn what areas to focus on.  The government gave

14   Mr. Petersohn the particular call detail record they wanted him

15   to review.  The government told Mr. Petersohn, here is the

16   limits.

17           We took the time to go through the records for Keith

18   Vereen's phone.  We didn't limit ourselves.  We didn't limit

19   ourselves to the location or to the particular people the

20   government wants to focus on, and what we found was telling.

21   Towers and different parts of the Bronx that Vereen used that

22   weren't used by Lucha, the tower at 815 Gerard Avenue and the

23   tower at 643 Tinton Avenue used multiple times during this same

24   time period that did not show up on Mr. Petersohn's maps.

25           Towers in different cities that Vereen passed through

A000983

N8UAAPER5                      Closing Statement – Ms. Baharanyi

1   that he used while he is on his trips, a tower in Ramsey, New

2   Jersey, these locations weren't provided to you.  Neither were

3   the different phone numbers, phone numbers other than the

4   numbers provided by the government.  Phone numbers that did not

5   show up in Mr. Petersohn's direct testimony.  But there are

6   different phone numbers that the Vereen device called multiple

7   times over and over during the months of September, October and

8   November 2020.

9         We spoke at length about one of these numbers,

10   9178038650.  That number showed up over 100 times over 100 on

11   Vereen's device during this timeframe.  That number was not

12   part of his presentation and that number certainly didn't

13   belong to Lucha.

14         All of this matters because Lucha El had one firearm,

15   one firearm from his cousin.  Yet the government wants you to

16   believe that Lucha El is somehow connected to 23 other

17   firearms.  And this isn't based on any communications that the

18   government has.  This isn't based on any video surveillance

19   footage that the government has.  This is not based on any

20   trail of money payments.  It's not based in fact.  It's

21   speculation.  And the call detail records show that this

22   speculation is unwarranted.  Especially when there are other

23   people that Vereen contacted other places that Vereen went.

24   There were other recipients of those 23 guns.

25         Now, how else do we know that Lucha was only involved

A000984

N8UAAPER5                    Closing Statement - Ms. Baharanyi

1   in receiving that one firearm, that one from his cousin?  The

2   call detail record do show a pattern.  The records show that

3   before Keith Vereen took his trip to New York on August --

4   excuse me -- October 1, 2020?  Before that trip he spoke to

5   Lucha multiple times.  There are five calls between Vereen and

6   Lucha before that trip.  Again, this trip where Keith Vereen

7   purchased the firearm that was given to Lucha, the one, these

8   communications with Vereen coordinating with Lucha before

9   leaving South Carolina and before arriving in New York.  But

10  for every other trip discussed by the government, Vereen's

11  device only communicates with Lucha when Vereen is already in

12  New York City.  He is already in town.  There's no coordination

13  beforehand.  For his trip -- excuse me -- for the purchase of a

14  gun in South Carolina on September 12 and September 13 Keith

15  Vereen's device connected with Lucha only after Vereen was

16  already in New York.  There is no coordination.  There is no --

17  arrangements.  For the gun purchased on October 21, 2020 and

18  then the trip that Vereen took after that gun purchase, there

19  were no phone calls between Lucha, Lucha El and Keith Vereen,

20  none, no coordination, no planning, nothing.

21        And finally, for that last trip that was discussed,

22  the gun was purchased on October 31st.  Vereen's trip was from

23  October 31st to November 1st.  His device didn't connect to

24  Lucha's a single time.  No communications.  No arrangements.

25  No coordination.  The pattern of these communications was

A000985

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    September 14 through October 21st, for October 31 is consistent

2    with Vereen saying hey, cousin, I'm in town, when he shows up.

3    It is not consistent with Lucha coordinating gun purchases.  If

4    Lucha were working with Vereen to coordinate the purchase of

5    nearly two dozen firearms worth thousands of dollars for

6    himself or for anyone else, you'd see proof of that.  You'd see

7    a conversation.  A message, arrangements, phone calls at the

8    time of purchase or before the purchase.  There is nothing like

9    that here and there is nothing like that because Lucha did not

10   receive or conspire with anyone else or Keith Vereen to receive

11   23 firearms.  Lucha had one gun.  And for that one gun he

12   accepted it from his cousin without knowing that he did

13   anything wrong.

14        Now, the government does claim that Lucha, the

15   government claims that Lucha coordinated purchases of firearms

16   for a group, a group that he had joined and a group that is

17   planning to go camping and conduct firearms training in Maine.

18   The government told you in openings that Lucha El wasn't only

19   charged with the important task of coordinating firearm

20   purchases for the group but he was a trusted member of their

21   inner circle.  From the two and a half days of testimony that

22   you heard you now know this story was another distraction.  The

23   only thing that the government got right about Lucha El and his

24   membership or relationship to that group is they planned to

25   learn and train with firearms and camp out in July 3, 2021,

A000986

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    that group.  And there's no question that Lucha El knows

2    members in this group.  But Lucha was not a trusted member of

3    the inner circle responsible for receiving or transporting

4    firearms.  He was not involved in the planning of this training

5    in July 2021.  And he certainly did not coordinate with others

6    receiving or transporting firearms for this training.

7            This afternoon we spent a long time on text messages

8    and group chats a couple of hours.  This particular group chat

9    which is Government Exhibit 1202A involves dozens of Moors and

10   was created by Mr. Abdullah Bey, the owner of the chat.  And,

11   yes, in this chat there is conversation about a training in

12   July 2021.  But look closely at the numbers.  The phone numbers

13   and the people who were involved in this group chat.  Lucha

14   El's not one of them.  He's not a member of this group.  We

15   spent hours talking about text after text, group chats, duo

16   chats that Lucha was not part of:  Lucha's name and his number

17   was not part of this thread because he is not part of this

18   conversation.  Lucha did not receive any firearm packing list.

19   He did not receive new firearms, packing lists from this group

20   thread.  Again, he was not in this conversation.  He's not a

21   trusted member of this inner circle.  He isn't the middleman

22   for firearms.  He want even in the group chat.

23           Not a single one of the messages that you saw today

24   during the government's last witness involves Lucha discussing

25   firearms.  There is not a single text with Lucha discussing how

A000987

N8UAAPER5                     Closing Statement – Ms. Baharanyi

```
 1    to obtain firearms, send firearms, transport them across state

 2    lines, coordinate the purchases of firearms for other people,

 3    nothing.  No text.  No communication.  That's because Lucha had

 4    nothing to do with obtaining firearms for this group.

 5            And with this particular group the absence of text is

 6    not out of a fear of detection.  They are not trying to hide

 7    how much they valued the second amendment.  They are not trying

 8    to hide how much they, how proud they are to possess firearms.

 9    They have no problem discussing plans with firearms by text

10    message.

11            You can see on the screen this is one of the messages

12    shared in the group.  This message discussed Marine Corp, the

13    use of different maneuvers, the use of close combat.  These are

14    not individuals who are afraid of firearms or anything in that

15    realm and is not afraid of putting it in writing.

16            Lucha is not in any of these texts because he never

17    agreed to transport or receive anyone's state of residence a

18    firearm.  These messages are sent in group chats and group

19    texts without Lucha by people who are not Lucha and have

20    nothing to do with Lucha.

21            The government's own theory about why Lucha would have

22    been gathering or helping others gather firearms for a July

23    2021 training makes no sense chronologically.  You see from the

24    messages Lucha is told about this training in May 2021.  Those

25    told about this training by someone named Jamil Bey.  The
```

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    government's story is that Lucha worked to purchase or

2    coordinate purchases with Keith Vereen in September and

3    October, November 2020 for a training that he hadn't even been

4    invited to until May 2021.  That doesn't make sense.  The

5    chronology doesn't make sense.  The timeline doesn't make sense

6    and that's because Lucha was not coordinating with anyone to

7    receive or transport firearms out of state.

8         A lot was made, a big deal was made out of Lucha's

9    arrest in Massachusetts.  This arrest in Massachusetts with

10   other members of this training group is not proof that he was

11   part of a federal conspiracy to receive firearms into his state

12   of residence.  It is just a final distraction.  That's it.

13        And how do you know this is a distraction?  Well, you

14   saw the DMV record for different people that the government

15   believes were involved in this conspiracy.  No one's state of

16   residence?  Massachusetts.  Not a single person lives there.

17   Massachusetts is not the state of residence for any of people,

18   any of the other people mentioned this case, not a single

19   person could be found guilty for receiving a firearm into the

20   state of Massachusetts because they don't live there.

21        But beyond the problem, the geography for the

22   government Lucha doesn't say or do anything in this arrest that

23   proves his membership in is conspiracy.  His membership in a

24   conspiracy to receive guns into states of residence.  He was

25   not the leader of this group.  He was not the spokesperson for

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    this group.  You heard Trooper Casey testify that he couldn't

2    really recall ever interacting with Lucha in Massachusetts.

3          The government made a very big deal about what a

4    headshake meant during this Massachusetts arrest.  I want us to

5    take a look at that again.

6          (Video played)

7          MS. BAHARANYI:  Stop there.

8          The government asks you to assume from that clip those

9    few seconds that Lucha's headshake meant that he knew the guns

10   were not stolen, that he new where the guns came from, that he

11   somehow agreed with other people to transport guns into

12   Massachusetts or into other states of residence.  They asked

13   you to make layers and layers of assumptions about what this

14   head shake meant.

15         So use your common sense.  There is only one right

16   answer when the leader of your group approaches you and another

17   individual, asks you are any of these firearms stolen right

18   before you are about to get arrested by the police.  A

19   headshake.  That headshake says nothing about the origins of

20   the guns.  That headshake says nothing about whether the guns

21   were received into states of residence and that headshake is

22   truly just a headshake in a moment where Lucha appeared

23   bewildered was largely silent and panicked.

24         There were guns found inside of the cars in

25   Massachusetts.  Now I want to take a moment to discuss those

A000990

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    guns.  The government has asserted claims that Lucha somehow

2    brought these guns or coordinated with others to bring these

3    guns from New York to Rhode Island to Massachusetts.  But of

4    the nine guns that were inside of those cars, zero had any

5    connection to Lucha.  One was purchased by Keith Vereen.  The

6    other eight don't even show up on the list of purchases that

7    Vereen made.  And for the single gun that shows up in those

8    cars that's connected to Keith Vereen, Lucha didn't send any

9    money to Keith for that gun.  There aren't messages between

10   Keith Vereen and Lucha about this gun.  And Lucha was certainly

11   not stopped in Massachusetts holding this gun.  That's because

12   Lucha never possessed this firearm.  He was in no way connected

13   to it.  And the government's claim that Lucha brought,

14   tailgated with these guns from New York to Rhode Island to

15   Massachusetts is a statement and claim that you've seen

16   absolutely no fact or evidence to support and that's because it

17   didn't happen.

18          So really, why did you hear so much about

19   Massachusetts from two different witnesses?  Why were you shown

20   photographs of big guns that Lucha never touched and Lucha

21   never bought and never brought?  Why has the government spent

22   so much time talking about other people and other places?  The

23   reason is because the government does not have proof that Lucha

24   willfully disobeyed the law.  And that is because Lucha did not

25   violate the law.  He did not know that he was doing anything

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000991

N8UAAPER5                    Closing Statement – Ms. Baharanyi

wrong or unlawful.  He did not form any agreements with other
people to do anything wrong or unlawful, to receive firearms
into other states of residence.  He had no bad purpose in his
mind.  He formed no bad agreements and that's the simple truth.
And fortunately for Lucha, the government has not find a word
on this.  There are important legal principles that protect
Lucha El and there is you, the jury.

        Judge Rakoff will tell you in a few moments or perhaps
tomorrow that there are two fundamental protections that exist
for people in Lucha's position, people accused of crimes that
they did not commit.  The first, the presumption innocence.
The second, reasonable doubt.  These protections are put in
place to make sure that we don't wrongfully convict people.
Make sure we don't wrongfully convict innocent people like
Lucha El.

        These principles protect Lucha today just as they
would protect any of you sitting in those chairs.  The
presumption of innocence means that we presume that Lucha is
innocent and that can be very easy to say.  But it can
sometimes be hard to do.  So here's a good way to think about
it.

        Think of someone you admire, you respect, maybe a
sibling, a parent, a close friendly.  Now imagine you get a
call one day and you are told that this person that you admire,
this person you respect, this person that you trust committed a

A000992

501

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1     serious crime like the one Lucha El is charged with.  Imagine
2     how you would feel, the shock, the disbelief.  No way.  That
3     feeling is the presumption of innocence.  That is the way that
4     the law requires you to feel about Lucha El.  You must presume
5     that Lucha did not act willfully or with bad purpose to violate
6     the law when he received a firearm from his cousin.  You must
7     presume that Lucha did not agree with other people to violate
8     the law, to unlawfully receive firearms into their states of
9     residence.  That's what the presumption of innocence requires
10    in that case.

11          Now the second fundamental protection that's in place
12    for all of us is reasonable doubt.  Before the government can
13    convict someone convict, a person of a serious crime they have
14    to prove their case beyond a reasonable doubt.  The judge will
15    instruct you in a moment on what that means as well.  And I
16    expect he will tell you that reasonable doubt is doubt that
17    would cause a reasonable person to hesitate to act in a matter
18    of importance in their life.

19          Proof beyond a reasonable doubt is so convincing that
20    you would not hesitate to rely on it in your important affairs.
21    This is a high burden.  This is an extremely high burden,
22    higher than what it takes for the state to take someone's child
23    away, and it has to be high.

24          Proof beyond a reasonable doubt is what protects
25    innocent people like Lucha El from wrongful conviction.  Only

A000993

N8UAAPER5                    Closing Statement - Ms. Baharanyi

1      if the government satisfies its burden, proves its case beyond

2      a reasonable doubt, can you convict Lucha.  But they can't in

3      this case because he did not act unlawfully.  He did not act

4      with bad purpose.  And if you are left with any questions about

5      what Lucha El really intended when he received a firearm from

6      his cousin, then you have reasonable doubt and the government

7      has not proved its case

8              MS. SMYSER:  Objection.

9              THE COURT:  Well, I will give you tomorrow morning the

10     exact definition of reasonable doubt and that will be what

11     governs.

12             MS. BAHARANYI:  If you are having trouble

13     understanding how Lucha fits into that conspiracy with people

14     he's never spoken to about firearms, he's never communicated

15     with about firearms, people who have their own group chats,

16     their own conversations and their own agreements, if you are

17     having trouble connecting those dots, that is reasonable doubt.

18             And if you have lingering questions about Lucha El's

19     state of mind or lingering questions about the conspiracy

20     because of all the people you did not hear from, then again,

21     the government has not met its burden.  You have another reason

22     to doubt.

23             And of course, if based on all of the evidence and the

24     lack of evidence, you conclude that Lucha El never unlawfully

25     received or agreed with others to unlawfully receive firearms

A000994

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1   into their states, then you must find Lucha, Lucha El not

2   guilty.

3           In Spanish, "Lucha El Por Libertad" means quite simply

4   "the struggle for freedom".  And throughout this case we asked

5   you to focus on Lucha.  We've asked you to call him by his

6   right name to honor him.  And even as the government dangles

7   distraction after distraction in front of you and even when

8   they stand back up after me to remind you of those

9   distractions, what matters is what Lucha El intended, what was

10  in his mind.  He did not receive a firearm into New York with

11  the intent to violate the law.  And he never agreed with others

12  to unlawfully receive firearms into their states of residence.

13          Lucha El Por Libertad should not be sitting in that

14  chair.  Like I said, "Lucha El Por Libertad" means "the

15  struggle for freedom".  And, jury, today you have the power.

16  You have the ability and you have the duty to help him in that

17  struggle.  When you finished what is a very heavy

18  responsibility of deliberating in this case I will ask you to

19  return the only just verdict, not guilty.

20          THE COURT:  Thank you very much.

21          All right.  Ladies and gentlemen, I will give you a

22  15-minute break at this time.

23          (Recess)

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000995

N8UBPER6                    Rebuttal - Ms. Nicholas

1          THE DEPUTY CLERK:  Jury entering the courtroom.

2          (Jury present)

3          THE COURT:  Please be seated.  All right.  Now we'll

4     hear rebuttal from the government.

5          MS. NICHOLAS:  Your Honor, may I proceed?

6          THE COURT:  Please.

7          MS. NICHOLAS:  Ladies and gentlemen, I'm not going to

8     respond to everything you just heard because I don't need to.

9     You sat through this trial.  You know that a lot of what you

10    heard just doesn't make any sense.  A little over an hour ago,

11    my colleague Ms. Smyser walked you through the evidence in this

12    case.  She took you through step by step each part of the proof

13    that shows the defendant is guilty.  I'm not going to redo that

14    now, but there are a few points that were brought up by defense

15    counsel that I do want to respond to, and those are points that

16    have very little to do with the evidence in the case; things

17    that are intended to distract you.  Because when you look at

18    the evidence, when you closely examine the government's

19    exhibits, when you think about the testimony you heard from the

20    witnesses that sat on that stand under oath, you will come to

21    the only conclusion that's consistent with that proof that the

22    defendant is guilty.

23          Now before I go any further, I want to talk about the

24    burden that the government bears in a criminal case.  I told

25    you in my opening statement that the government would prove its

N8UBPER6                    Rebuttal - Ms. Nicholas

1    case beyond a reasonable doubt.  The defense talked about that

2    burden.  They refer to it as a heavy, heavy burden, and it is,

3    and we embrace it.  We don't run from it.  Of course that's the

4    standard.  We embrace it, but it's not a magical standard.

5    It's the standard that's guided by common sense, and it's not

6    insurmountable.  It's the standard that's been used in every

7    criminal case in the history of this country.  It's been met

8    before, and we've met it here.

9            I want to be clear that the defense has no burden.  We

10   embrace the burden that sits on the government's table and

11   never leaves.  But when a defendant through their counsel

12   decides to make arguments, you should scrutinize those

13   arguments just like you do any other piece of evidence.  So

14   let's talk about some of those arguments.  Defense counsel

15   invited you to make your decisions in deliberation based on

16   what the defendant said and what the defendant did.  So let's

17   talk about what the defendant said.

18           When the defendant is standing on the sidewalk in the

19   Bronx after having just been placed under arrest for possessing

20   a gun, his response is not confusion.  It's not a desire to do

21   the right thing, to make sure he's in compliance with the law.

22   His response is to say, I'm not worried about a permission.  A

23   permit is permission.  I'm not giving my right away.  I'm not

24   going to do it because I am above the law and I can do what I

25   want.

A000997

N8UBPER6                    Rebuttal – Ms. Nicholas

1          Let's keep going.  Same interaction.  Starting at line

2    18.  "Telling me I need a permit.  I don't need a permit.  A

3    permit is permission.  You should learn that.  You guys take

4    your oaths to uphold the Constitution, not to uphold legalities

5    and regulations and mandates and all that extra stuff.  You

6    took your oaths to uphold the Constitution."

7          What he's saying there?  I know there are laws. I know

8    there are rules.  There are legalities and regulations and

9    mandates, all that extra stuff.  I know.  But you guys should

10   ignore it because that's what I'm doing.  It doesn't apply to

11   me.  I can do what I want.  That's what he says.  And what does

12   he do?  He gets arrested.  Officer Smalls tells him he needs a

13   permit.  Does he go apply for a permit?  Does he try to make

14   sure that he gets in compliance with the law because he

15   respects these gun laws and he wants to make sure he's done the

16   right thing.  Absolutely not.  He packs his guns in his car in

17   the Bronx and he heads to Rhode Island.  He heads to Rhode

18   Island where he gets arrested again with guns.  And we're going

19   to talk more about that arrest.

20          Defense counsel said that none of those guns had any

21   connection to Lucha.  One of those connections is the man on

22   the right, Jamal Latimer.  Ladies and gentlemen, what the

23   defendant says to the police in the Bronx, "We could argue this

24   in court.  I'd deal with this in court.  I don't need a permit

25   for that.  It's my constitutional."  That should sound familiar

N8UBPER6                    Rebuttal - Ms. Nicholas

1   because it's the same thing Jamal Latimer says in

2   Massachusetts.  "Of Course, so here's the thing.  It's already

3   going to court.  I already know it's going to court."  That's

4   not a firmly held belief.  It's a script.  These guys know

5   they're going to court.  They know they're going to court

6   because they know they're breaking the law.  And here we are.

7   We are in court.  We have seen the evidence.

8          Why did they think they were ending up in court?

9   Because they knew about the legalities.  They knew about the

10  mandates.  They knew about the regulations, and they decided to

11  ignore it because they're above the law.  They knew all those

12  gun laws existed.  They didn't like them, so they didn't follow

13  them.  He thought he could do whatever he wanted and get away

14  with it.  Not anymore.  Now, the defense knows that the

15  evidence here is overwhelming, so the best thing they can try

16  to do is distract you.  They can try to persuade you to care

17  about things that don't actually matter in the case, and they

18  offered a lot of distractions hoping that you'd mistake those

19  distractions for reasonable doubt.

20          We saw some slides.  One of those slides the defense

21  showed you had a bunch of names and places on it, things they

22  said were the government's attempts at distraction.  But let's

23  stop and scrutinize exactly what the defense just tried to

24  characterize as distractions.  One of the things on that list

25  was Keith Vereen.  Far from a distraction.  Keith Vereen is the

N8UBPER6                    Rebuttal - Ms. Nicholas

1    straw purchaser that the defendant used to avoid having to

2    follow the gun laws.  Another thing on that list, Myrtle Beach,

3    South Carolina, where Keith Vereen bought the guns for the

4    defendant.

5          Another name on that list, Jamil Abdullah Bey, Jamal

6    Latimer, the leader of the group.  We're going to come back to

7    him in a second.  On that list Wakefield, Massachusetts where

8    they get arrested with all of these guns.  Another name on that

9    list, Jamil Bey.  Not only is he there in Massachusetts, but

10   you also know he sent a wire payment from a Western Union in

11   the Bronx to Keith Vereen in South Carolina.  Another name on

12   that list, Ricardo Rodriguez, also sent a wire payment from the

13   Bronx to Keith Vereen in South Carolina.  Far from

14   distractions.  These are essential elements of the case.  These

15   are the facts that prove to you beyond a reasonable doubt the

16   defendant was working with other people to acquire guns from

17   out of state and have them brought to his state of residency.

18         Let's talk about some things that are actually

19   distractions.  The fact that the defendant and Keith Vereen are

20   cousins.  That makes sense.  Keith Vereen committed a federal

21   crime for the defendant.  He lied on forms under which he had

22   an obligation to be truthful.  That's a big risk for somebody

23   you don't really know, but maybe that's a risk you're willing

24   to take for a member of your family.  That makes sense.

25   There's nothing mysterious about that.  And I want to stay on

N8UBPER6                    Rebuttal - Ms. Nicholas

1   that for a second to talk about just how absurd it is to think

2   that a relationship with your cousin could explain what was

3   going on between these two people.  A lot of people have

4   cousins that live out of town.  Those cousins may very well

5   travel into town to visit them.  They may come at the holidays.

6   They may stay for a few days, maybe they bring flowers, maybe

7   they make a stop, get a nice bottle of wine before they get to

8   the apartment.  What they don't do is drive directly to your

9   apartment from a gun store.  They don't bring handguns with

10  them.  They don't just swing by at three in the morning almost

11  directly from a gun store.  They don't just come to town for

12  about 12 hours right from the gun store and head back to South

13  Carolina.  That's not consistent with a social relationship.

14          What is that consistent with?  That's the relationship

15  between co-conspirators.  These men weren't just cousins.  They

16  were men who were working together to break the law.  Western

17  Union.  A few points on Western Union.  First, the defense

18  tried to suggest that it's only a single payment so you should

19  ignore it.  Of course it's a single payment.  We're talking

20  about committing serious federal crimes.  You heard a witness

21  sit on that stand for almost 30 minutes and explain to you in

22  detail all the information that Western Union records when you

23  come and you use their service.  They write down your name,

24  your phone number, your address.  They maintain all of that

25  information.  You're committing a crime, and you do that once.

A001001

N8UBPER6                    Rebuttal - Ms. Nicholas

1   You may realize it's a pretty bad idea, maybe we shouldn't do

2   it again.  Maybe going forward, I'll just pay cash.

3        Let's talk about the amount of cash.  Defense counsel

4   seem to suggest that the fact that a $350 payment is less than

5   the particular price for a particular gun is somehow persuasive

6   evidence that that wasn't a firearm purchase.  I think defense

7   counsel said something to the effect of what kind of gun

8   trafficker accepts partial payment. Well, what kind of out of

9   state firearms recipient make a full payment before they have

10  the gun in their hand.  It's a down payment.  I'll send you the

11  350 now. You go buy the gun.  And then when I see you in New

12  York when you put the gun in my hand, I'll hand you the rest of

13  the cash.  There's nothing nefarious about that.  That's

14  exactly what they're doing.  It's not a mystery.  It's not a

15  partial payment.  It's a down payment, a down payment between

16  co-conspirators.

17       Now defense counsel ask you to leave your preconceived

18  notions at the door.  That's not actually what they're asking

19  you to do. What they're actually asking you to do is leave your

20  common sense at the door, because when we really look at the

21  evidence in this case and use our common sense, it's very clear

22  what was going on here.  You don't need to know what was said

23  in the phone calls to understand what was happening in these

24  communications.  And this is important because the evidence in

25  this case came in, in pieces, and each piece of that evidence

N8UBPER6                    Rebuttal - Ms. Nicholas

1   is like a puzzle piece.  None of it tells the whole story by

2   itself.  Put it altogether, and that's what Ms. Smyser did for

3   you in her closing.  She explained to you how all these things

4   fit together, which is why it's such a problem that defense

5   counsel kept one of those pieces from you when they tried to

6   suggest that there wasn't a pattern.

7           Defense counsel told you, look, on September 21 there

8   were five phone calls.  And then time goes by, and then there

9   is a gun purchase on October 1st.  That's the only time they

10  talked between gun purchase.  That's the only time there's

11  communication before a gun purchase.  That one shows you

12  there's nothing to worry about here.  Ladies and gentlemen, the

13  Western Union payment from the defendant to Keith Vereen was on

14  September 22nd.  So it's not September 21st silence, gun buy.

15  It's September 21st, set up the payment, talk about how to get

16  this done.  September 22, Western Union payment, then gun buy.

17  Every single piece of this puzzle is critical in understanding

18  how this story fits together.  It's not a complicated tale like

19  defense counsel called it.  It's quite simple.  It's quite

20  simple.

21          Now, the pattern of those purchases is obviously

22  important.  Communications, gun buy, travel, meeting; but so is

23  the fact that the defendant was arrested twice with the guns

24  bought by Keith Vereen.  It's not some random pattern the

25  government cobbled together.  It's a clear pattern shows how

N8UBPER6                    Rebuttal - Ms. Nicholas

1  those two guns ended up in his hands.  You also heard testimony

2  about encrypted messaging applications, Signal, What'sApp.  The

3  defendant learned his lesson at Western Union, don't leave a

4  paper trail, don't give up all your information.  We saw a text

5  from one of the defendant's co-conspirators, you, download

6  Signal.  It's more private.  I want to talk about text for a

7  couple of minutes because defense counsel really focused on

8  this group chat.  You heard that Lucha's name doesn't come up

9  anywhere in the thread.  That's just not true.

10          MS. BAHARANYI:  Objection, your Honor.

11          THE COURT:  Overruled.

12          MS. NICHOLAS:  Lucha has been abducted on weapon

13  charges, not sure what the PC on why they even stopped him.

14  The response. Nobody responds, who's Lucha.  What are you guys

15  talking about.  The response is all about getting bail money.

16  There's concern. They're asking for updates.  This isn't just

17  some random person they reported has been arrested.  This is a

18  member of their group.  They're worried about him. They're

19  getting ready to go for training, training with guns.  They're

20  concerned about somebody in their group getting arrested with a

21  gun.

22          There's also suggestion that the packing list never

23  made it to the defendant, that he's not really part of this

24  group.  Ladies and gentlemen, you saw the videos.  He got the

25  packet list.  He's got body armor on.  He's got gloves on.

N8UBPER6                    Rebuttal – Ms. Nicholas

1    He's wearing his BDUs.  He's in camo, his hat.  He's got the

2    whole thing going.  He knew exactly what he was suppose to be

3    wearing when he went to this training.  He got the packing

4    list.  He got the message, and he got the other message.  We're

5    above the law.  We do what we want.  We like guns.  We like

6    traveling with our guns.  We're going to get them regardless of

7    what the law says about it.

8            Now, there's an important moment in one of those

9    videos that both parties have talked a lot about, and over the

10   course of the case, ladies and gentlemen, there's often little

11   moments that tell you everything you need to know.  Let's watch

12   this video.

13           (Media played)

14           (Media stopped)

15       MS. NICHOLAS:  Let's put this in context.  The leader

16   of the group, Jamal Latimer, he is trying to figure out whether

17   or not the weapons that his men, those are his words, my men.

18   He's trying to figure out if the weapons that his men are

19   carrying are stolen.  He wants to know what's the status of

20   these guns.  In that moment, who does he go talk to?  All those

21   people you saw on the list that were arrested that day when

22   Latimer wants to know what's the status of my guns, he talks to

23   the defendant and he talks to Jamil Bey, two men that you know

24   sent wire payments from New York to South Carolina.

25           And in that moment when he's approached by the leader

A001005

```
N8UBPER6                    Rebuttal - Ms. Nicholas
```

1    of the group, what does he do?  He tells the truth.  He shakes

2    his head.  They're not stolen.  The only way he could say that,

3    the only way he could indicate to the leader of his group,

4    we're good, they're not stolen, is if he knew where the guns

5    came from.  And he wasn't worried, ladies and gentlemen,

6    because he thought he outsmarted the law.  He was using a straw

7    purchaser.  He was having his cousin walk into gun stores and

8    lie for him.  He thought the paperwork looked good.  He thought

9    he'd outsmarted the system.  So as long as the cops don't think

10   these guns are stolen, we're good, because I made sure the

11   paperwork was clean because I knew what I needed to do was get

12   guns from out of state.  I knew I needed to get these guns

13   unlawfully.  That's exactly what he did.

14           Now there's only a few more points I want to make.

15   They're really all related.  And what they are things that are

16   just not defenses in this case, things that defense counsel

17   asked you to think about which are simply not relevant.  The

18   fact that the defendant lived in the Bronx and felt like he

19   needed a gun for safety is not relevant.  Just because you want

20   a gun or feel like you need a gun doesn't mean you get to make

21   little exceptions to use for yourself for gun laws.  There are

22   properly and legal ways to do things, and then there's

23   violating the law.  The defendant decided that the law that

24   applies to everyone didn't apply to him.  The fact that his

25   straw purchaser was his cousin, not a defense as we talked

N8UBPER6                    Rebuttal - Ms. Nicholas

1    about, just explains why they trusted one another.  And the

2    fact that he's not a leader in the conspiracy, doesn't mean

3    he's not in the conspiracy.

4         In fact, I expect that when Judge Rakoff instructs you

5    on the law, he's going to tell you that the defendant not

6    necessarily need to be fully informed of all the details of the

7    conspiracy in order to justify an inference of membership.

8    He's obviously part of this conspiracy.  He's sending money.

9    He's making phone calls.  He's showing up.  He's showing up

10   with guns.

11        Ladies and gentlemen, very shortly Judge Rakoff is

12   going to instruct you that what I say is not evidence, nor is

13   anything else that any of the lawyers have said.  You, the

14   jury, are entrusted with finding the facts in this case.  When

15   you do that, look pass all of the distractions.  Look at the

16   evidence, scrutinize the evidence, put the puzzle pieces

17   together.  Members of the jury, it's clear what happened here.

18   The defendant lived in New York.  He got guns from South

19   Carolina.  He knew what he was doing, and he knew it was

20   against the law.  Members of the jury, the defendant is guilty.

21        THE COURT:  Thank you very much.  All right.  Ladies

22   and gentlemen, even though you were kind enough to agree to

23   stay till 4:45 if necessary, turns out not to be necessary, so

24   tomorrow we will begin promptly at 9:30.  First order of

25   business will be for me to give you my instructions of law, and

516

N8UBPER6                    Rebuttal - Ms. Nicholas

1    I'll take about a half hour and then the case will be yours to

2    deliberate.  So to prepare for that, don't even think about the

3    case tonight.  Don't discuss it with anyone.  I don't know if

4    the Yankees are playing tonight.  They played last night and

5    they won and that was so amazing to me to see.  I was in pure

6    ecstasy.  In any event, don't even think about this case, but

7    tomorrow it will be yours to deliberate after I give you your

8    instructions.  Have a very good evening, and we'll see you at

9    9:30.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A001008

N8UBPER6                          Rebuttal - Ms. Nicholas

1              (Jury not present)

2              THE COURT:  Please be seated.  So the only thing that

3     remains is the verdict.  I just sent you a tiny revision of it,

4     but it's essentially what you've seen previously.  Any

5     objections to the verdict from the government?

6              MS. SMYSER:  No objections from the government.

7              THE COURT:  Any from the defense?

8              MS. BAHARANYI:  Your Honor, I think we did request a

9     special verdict form.

10             THE COURT:  You did and I considered that.  I almost

11    never do that except when the Second Circuit has expressly

12    stated that it wants a special verdict.  And the reason is that

13    after more than 300 jury trials, it seems to me clear from

14    talking to the jurors afterwards that the important part of

15    jury service is the jury's overall feeling about the case based

16    on the evidence and based on the instructions of law.  The main

17    advantage of a special verdict is to make it easier for the

18    Second Circuit.  Rather than having to send back a case if they

19    think there's been some question raised, they say, oh, we got a

20    special verdict, and now we know whether that question was

21    resolved or not by the jury.  I have nothing but admiration for

22    the folks in the Second Circuit.  They have their job and I

23    have mine, so I will not give a special verdict in this case.

24             MS. BAHARANYI:  Your Honor, no further objections on

25    that then.  On the jury charge briefly, not to take up too much

A001009

```
N8UBPER6                    Rebuttal - Ms. Nicholas
```

1    time.

2              THE COURT:  Go ahead.

3              MS. BAHARANYI:  But we have received the Court's final

4    instructions, and I think we object to the Court not accepting

5    our versions of the --

6              THE COURT:  I should make clear on the record that all

7    previously raised objections to the charge are fully preserved

8    for purposes of the appeal.

9              MS. BAHARANYI:  The only additional one was for the

10   conspiracy, the first element.  We raise an objection to that

11   as well regarding the wording of that charge, that it seems

12   like it might marshal a bit of the government's evidence or

13   case.

14             THE COURT:  In what respect?  Some of the things they

15   asked for would have done that, but I rejected their proposals.

16             MS. BAHARANYI:  We're grateful for that, your Honor.

17   This is just on that first paragraph.

18             THE COURT:  I left my copy downstairs.  Let me get it.

19   Which page?

20             MS. BAHARANYI:  On page 23, the wording of this

21   particular instruction, the last sentence in that about, The

22   gist of the conspiracy here charged is that several persons,

23   including the defendant agreed to obtain and transport several

24   out of state firearms in order to enable the conspirators to

25   receive these firearms in their state of residency.  In reading

N8UBPER6                    Rebuttal - Ms. Nicholas

1    that it seems like there is some sort of leaning towards the

2    government's sort of fact pattern and evidence there.

3            THE COURT:  All I'm saying is that's what's charged.

4    This is in -- just so the record is clear -- the paragraph

5    reads "Starting with the first essential element, what is a

6    conspiracy.  Conspiracy is an treatment or an understanding of

7    two or more persons to accomplish by concerted action one or

8    more unlawful purposes, known as the object or objects of the

9    conspiracy.  In Count One, the unlawful purpose alleged to be

10   the object of the conspiracy is an agreement to transport

11   firearms that were obtained outside the state of residency of

12   the eventual receiver into the state of residency of the

13   receiver.  I have already instructed you on the essential

14   elements of that underlying crime when I instructed you on

15   Count Two.  The gist of the conspiracy here charged is that

16   several persons, including the defendant, agreed to obtain and

17   transport several out of state firearms in order to enable the

18   conspirators to receive the firearms in states of their

19   residency."

20           I'm not understanding what you think is more than a

21   fairly straightforward statement of what the charge is.

22           MS. BAHARANYI:  For one example, conspiracy only

23   requires one other person.  It's certainly the government's

24   view that this was a conspiracy involving several individuals.

25           THE COURT:  Do you want me to change -- several of

N8UBPER6                    Rebuttal - Ms. Nicholas

1    course could include two, but do you want me to change several

2    to one or more?

3          MS. BAHARANYI:  One moment, your Honor.  There's a

4    reason why we consult experts. I'm going to withdraw that

5    particular objection.

6          THE COURT:  Very good.

7          MS. BAHARANYI:  I think the Court may have already

8    addressed this yesterday, but we do maintain our objection to

9    the Court not charging the good faith defense theory defense.

10         THE COURT:  I think that has been the heart of many of

11   your objections right now, and it's fully preserved for

12   purposes of appeal.

13         MS. BAHARANYI:  And then our very last piece on this,

14   this is outside of the jury instructions, your Honor.  But

15   regarding the slides that were used in the government's

16   presentation of its summation, we do believe that there -- the

17   slides were prejudicial, particularly the one that I objected

18   to with respect to the firearms in combination with the

19   government's comment that, These guns came from Lucha.  And

20   it's a level of prejudice that warrants a mistrial in this

21   case, so that we would be moving for a mistrial on the basis of

22   this prejudicial presentation or slide show that was presented

23   with their summation.

24         THE COURT:  Let me make sure I understand your

25   argument.  You previously made the argument which I rejected

N8UBPER6                    Rebuttal - Ms. Nicholas

1   that those, for lack of a better word, bigger guns were

2   prejudicial.  And I have rejected that because I think it was

3   part of the evidence of the conspiracy.

4          So what further objection -- that objection is fully

5   preserved.  Is there anything more that you were objecting to?

6          MS. BAHARANYI:  I think there is just the added level

7   of prejudice we believe comes with including those images

8   again, and all of the things that came in about Massachusetts,

9   we would move for a mistrial.  We understand the Court may not

10  grant it.

11         THE COURT:  Yes.  That motion is denied.

12  Notwithstanding your apparent view that Massachusetts is a

13  foreign country far removed from the Southern District of New

14  York, last I checked federal law applies to the entire United

15  States, and that includes conspiracies that occur anywhere in

16  the United States, as long as some act occurs in the venue.  So

17  that objection is denied.

18         MS. BAHARANYI:  I think just to preserve that issue

19  for our sake, your Honor, we'd ask to have the exhibits -- not

20  the exhibits, the presentation used to support summation moved

21  I guess -- excuse me.  It's been a long day.

22         THE COURT:  I know.

23         MS. BAHARANYI:  Entered as Court exhibits.

24         THE COURT:  How is the Court of Appeals going to be

25  able to view that?

A001013

N8UBPER6                    Rebuttal - Ms. Nicholas

1          MS. BAHARANYI:  Right.

2          THE COURT:  I think that all the videotapes are in

3     evidence.

4          MS. BAHARANYI:  I think for the language and the

5     presentations, that's not going to be actually part of the

6     record.

7          THE COURT:  On appeal you can say, in their summation

8     on page 75, at lines three and four, they referred again to

9     this highly -- in your view, highly prejudicial image and said

10    the following.  And attached to our brief is a photograph of

11    the image that they put on the -- the Court of Appeals will

12    allow that.  I don't think they will even count it against your

13    25 pages.

14         MS. BAHARANYI:  I'm not the expert on that, but I do

15    think we just want to make the record clear about what was

16    presented to the jury.

17         THE COURT:  Okay.  Very good.  Thank you very much.  I

18    have another matter so if you can all clear out and we'll see

19    you tomorrow at 9:30.

20         MS. SMYSER:  Your Honor, we have two brief things we

21    want to raise.

22         THE COURT:  Go ahead.

23         MS. SMYSER:  The first is on this sentence on the gist

24    of the conspiracy that we were just talking about. I do think

25    that --

N8UBPER6                    Rebuttal - Ms. Nicholas

1          THE COURT:  The next case is, by the way, mostly about

2     Maryland, which is even more remote than Massachusetts.

3          MS. SMYSER:  This sentence makes a reference and says

4     that the conspiracy was to transport several out of state

5     firearms in order to enable the co-conspirators to receive the

6     firearms.  Our view is that that should be transport any

7     firearms, because one firearm is sufficient for a conspiracy.

8          THE COURT:  So you think that the language that they

9     were objecting to and then withdrew their objection, you now

10    think is too favorable to them, and that makes me think I got

11    it right.  No, this is just the gist of what you argued.  I

12    make clear elsewhere that you only need one conspirator.  I'm

13    very clear on that in the instruction that you only need one

14    firearm.  That's all contained elsewhere in the instructions.

15    But my effort in all of this as was pointed out the other day

16    is to present the jury with something that is simple English

17    that corresponds to what they've just heard and seen and I

18    think that sentence really is consistent with that, so I will

19    leave it as is.

20         MS. SMYSER:  Understood.  Finally, the government

21    wanted to bring up is that defense counsel in her closing

22    statement made several mentions of this case being about

23    Lucha's belief followed by a statement about his Constitutional

24    beliefs.

25         THE COURT:  Well, I think mostly just at the very

```
N8UBPER6                    Rebuttal – Ms. Nicholas
```

1    beginning.

2          MS. SMYSER:  At the beginning, there were several.

3          THE COURT:  And I was waiting for you to stand up and

4    object because given our entire discussion previously, that was

5    the time to object.  But you decided to sit on your derrière,

6    and I think it's much too late now to raise that objection.  My

7    own view is, although she came awfully close to the line that I

8    had forbidden, I'm not sure she went over that line.  She was

9    careful.  So, anyway, I don't think she went over that line.

10   But in any event, the objection was waived by not making it at

11   the time.

12         MS. SMYSER:  Understood, your Honor. We just ask for

13   the record, making a request for a curative instruction based

14   on --

15         THE COURT:  We can have a curative instruction right

16   after we have the new trial because of the mistrial that your

17   adversary wants.  All denied.

18         MS. SMYSER:  Understood.

19         THE COURT:  Very good.  Okay.  Anything else?

20         MS. SMYSER:  No, your Honor.

21         THE COURT:  Very good.  We'll see you all tomorrow at

22   9:30.

23               (Adjourned to August 31, 2023, at 9:30 a.m.)

24

25

525

```
1                      INDEX OF EXAMINATION

2    Examination of:                           Page

3     JULIA GUTIERREZ

4    Direct By Ms. Nicholas . . . . . . . . . . . 370

5    Cross By Ms. Baharanyi . . . . . . . . . . . 431

6     MARIA OTERO

7    Direct By Ms. Baharanyi  . . . . . . . . . . 437

8    Cross By Ms. Nicholas  . . . . . . . . . . . 444

9                      GOVERNMENT EXHIBITS

10   Exhibit No.                              Received

11    532A and 533A  . . . . . . . . . . . . . . 365

12    532 and 533  . . . . . . . . . . . . . . . 367

13    902  . . . . . . . . . . . . . . . . . . . 390

14    1201, 1202A, 1202B, 1202B1, 1202B2, . . . . 407

15            1202B3, 1202C, 1202D, 1202E,

16            1202F, 1202I, 1202J, 1204,

17            1207A, and 1208

18    1301, 1302A, 1303A, 1303B and 1303C  . . . . 425

19    1402A  . . . . . . . . . . . . . . . . . . . 428

20    1008  . . . . . . . . . . . . . . . . . . . 433

21                     DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    C1  . . . . . . . . . . . . . . . . . . . . 442

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A001017

Ct. Ex. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

.....................................................................................x

UNITED STATES OF AMERICA       :

                          :

           -v-              :          22-cr-644 (JSR)

                          :

STEVEN PEREZ (A/K/A "LUCHA EL POR   :
LIBERTAD"),                      :

                          :

        Defendant.        :

.....................................................................................x

## THE COURT'S INSTRUCTIONS OF LAW TO THE JURY

TABLE OF CONTENTS

## I. GENERAL INSTRUCTIONS

1.    Duty of the Court

2.    Duty of the Jury

3.    Duty of Impartiality

4.    Burden of Proof

5.    Reasonable Doubt

6.    Direct and Circumstantial Evidence

7.    Witness Credibility

8.    A Defendant's Right to Not Testify

## II. THE CHARGES

9.    Summary of Charges

10.   Count Two: Interstate Transport or Receipt of Out-of-State Firearm

11.   Count Two – First Element – Lack of License

12.   Count Two – Second Element – Transport or Receipt of Out-of-State Firearm

13.   Count Two – Third Element – Criminal Intent

14.   Count One: Conspiracy to Transport or Receive Firearms from Outside States of
      Residency

15.   Count One – First Element – Conspiracy

2

A001019

16.     Count One – Second Element – Joining the Conspiracy

17.     Count One – Third Element – Overt Act

18.     Motive

19.     Venue

### III. CONCLUDING INSTRUCTIONS

20.     Selection of Foreperson; Right to See Exhibits and Hear Testimony;

        Communications with the Court

21.     Verdict; Need for Unanimity; Duty to Consult

3

**A001020**

## I. GENERAL INSTRUCTIONS

## INSTRUCTION NO. 1

### Duty of the Court

We are now approaching the most important part of this case, your deliberations. You have heard all the evidence in the case, as well as the final arguments of the lawyers for the parties. Before you retire to deliberate, it is my duty to instruct you as to the law that will govern your deliberations. These are the final and binding instructions, which entirely replace the preliminary instruction I gave you earlier. As I told you at the start of this case, and as you agreed, it is your duty to accept my instructions of law and apply them to the facts as you determine them.

Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you. Also, if any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

Because my instructions cover many points, I have provided each of you with a copy of them, not only so that you can follow them as I read them to you now, but also so that you can have them with you for reference throughout your deliberations. In listening to them now and reviewing them later, you should not single out any particular instruction as alone stating the law, but you should instead consider my instructions as a whole.

4

A001021

## INSTRUCTION NO. 2

### Duty of The Jury

Your duty is to decide the fact issues in the case and arrive, if you can, at a verdict. You, the members of the jury, are the sole and exclusive judges of the facts. You pass upon the weight of the evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own recollection of the evidence. To aid your recollection, we will send you at the start of your deliberations a list of all the exhibits, a laptop on which you can view the videotapes, all the other exhibits themselves except the guns and ammunition (which will remain outside unless you ask to see them, and certain Excel spreadsheets that, for convenience, you can view on the laptop). If you need to review particular items of testimony, we can also arrange to provide them to you in transcript or read-back form.

Please remember that none of what the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions, is evidence. Nor is anything I may have said evidence. The evidence before you consists of just three things: the testimony given by witnesses that was received in evidence, the exhibits that were received in evidence, and the stipulations of the parties that were received in evidence.

5

A001022

Testimony consists of the answers that were given by the witnesses to the questions that were permitted. Please remember that questions, although they may provide the context for answers, are not themselves evidence; only answers are evidence, and you should therefore disregard any question to which I sustained an objection. Also, you may not consider any answer that I directed you to disregard or that I directed be stricken from the record. Likewise, you may not consider anything you heard about the contents of any exhibit that was not received in evidence.

Furthermore, you should be careful not to speculate about matters not in evidence. For example, there is no legal requirement that the Government prove its case through a particular witness or by use of a particular law enforcement technique. Nor should you speculate about why one or another person whose name may have figured in the evidence is not part of this trial or what his or her situation may be. Your focus should be entirely on assessing the evidence that was presented here for your consideration.

It is the duty of the attorney for each side of a case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences at the side bar out of the hearing of the jury. All such questions of law must be decided by me. You should not show any prejudice against any attorney or party because the attorney objected to the admissibility of evidence, asked for a conference out of the hearing of the jury, or asked me for a ruling on the law.

6

**A001023**

I also ask you to draw no inference from my rulings or from the fact that on occasion I asked questions of certain witnesses. My rulings were no more than applications of the law and my questions were only intended for clarification or to expedite matters. You are expressly to understand that I have no opinion as to the verdict you should render in this case.

7

**A001024**

## INSTRUCTION NO. 3

### Duty of Impartiality

You are to perform your duty of finding the facts without bias or prejudice as to any party. You are to perform your final duty in an attitude of complete fairness and impartiality. You are not to be swayed by rhetoric or emotional appeals.

The fact that the prosecution is brought in the name of the United States of America entitles the Government to no greater consideration than that accorded any other party. By the same token, it is entitled to no less consideration. All parties, whether the Government or individuals, stand as equals at the bar of justice.

Please also be aware that the question of possible punishment is the province of the judge, not the jury, and it should therefore not enter into or influence your deliberations in any way. Your duty is to weigh the evidence and not be affected by extraneous considerations.

It must be clear to you that if you were to let bias, or prejudice, or fear, or sympathy, or any other irrelevant consideration interfere with your thinking, there would be a risk that you would not arrive at a true and just verdict. So do not be guided by anything except clear thinking and calm analysis of the evidence.

8

A001025

## INSTRUCTION NO. 4

### Presumption of Innocence and Burden of Proof

The defendant here, Steven Perez, also known as Lucha El, is charged with two federal crimes about which I will instruct you shortly. Please bear in mind, however, that the charges, or "counts" as they are called, are not themselves evidence of anything.

The defendant has pleaded not guilty. To prevail against the defendant on a given charge, the Government must prove each essential element of that charge beyond a reasonable doubt. If the Government succeeds in meeting this burden, your verdict should be guilty on that charge; if it fails, your verdict must be not guilty on that charge. This burden never shifts to the defendant, for the simple reason that the law presumes a defendant to be innocent and never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

In other words, as to each charge, the defendant starts with a clean slate and is presumed innocent until such time, if ever, that you as a jury are satisfied that the Government has proved that he is guilty of that charge beyond a reasonable doubt.

9

**A001026**

## INSTRUCTION NO. 5

### Reasonable Doubt

Since, to convict the defendant of a given charge, the Government is required to prove that charge beyond a reasonable doubt, the question then is: What is a reasonable doubt? The words almost define themselves. It is a doubt based upon reason. It is doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt must therefore be proof of a convincing character that a reasonable person would not hesitate to rely on in making an important decision.

A reasonable doubt is not caprice or whim. It is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. The law does not require that the Government prove guilt beyond all possible or imaginable doubt: proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to the defendant's guilt with respect to a particular charge against him, you must find the defendant not guilty of that charge. On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of the defendant's guilt with respect to a particular charge against him, you should not hesitate to find the defendant guilty of that charge.

10

**A001027**

INSTRUCTION NO. 6

Direct and Circumstantial Evidence

In deciding whether the Government has met its burden of proof, you may consider both direct evidence and circumstantial evidence.

Direct evidence is evidence that proves a fact directly. For example, where a witness testifies to what he or she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to prove a fact by proof of other facts. To give a simple example, suppose that when you came into the courthouse today the sun was shining and it was a nice day, but the courtroom blinds were drawn and you could not look outside. Later, as you were sitting here, someone walked in with a dripping wet umbrella, and, soon after, somebody else walked in with a dripping wet raincoat. Now, on our assumed facts, you cannot look outside of the courtroom and you cannot see whether it is raining. So you have no direct evidence of that fact. But on the combination of the facts about the umbrella and the raincoat, it would be reasonable for you to infer that it had begun raining.

That is all there is to circumstantial evidence. Using your reason and experience, you infer from established facts the existence or the nonexistence of some other fact. Please note, however, that it is not a matter of speculation or guess: it is a matter of logical inference.

11

The law makes no distinction between direct and circumstantial evidence. Circumstantial evidence is of no less value than direct evidence, and you may consider either or both, and may give them such weight as you conclude is warranted.

12

INSTRUCTION NO. 7

Witness Credibility

It must be clear to you by now that counsel for the Government and counsel for the defendant are asking you to draw very different conclusions about various factual issues in the case. Deciding these issues will involve making judgments about the testimony of the witnesses you have listened to and observed. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you to decide the truth and the importance of each witness's testimony.

Your decision to believe or to not believe a witness may depend on how that witness impressed you. How did the witness appear? Was the witness candid, frank, and forthright, or did the witness seem to be evasive or suspect in some way? How did the way the witness testified on direct examination compare with how the witness testified on cross-examination? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? These are examples of the kinds of common sense questions you should ask yourselves in deciding whether a witness is or is not truthful.

How much you choose to believe a witness may also be influenced by the witness's bias. Does the witness have a relationship with the Government or the defendant that may affect how

13

A001030

he or she testified? Does the witness have some incentive, loyalty, or motive that might cause him or her to shade the truth? Does the witness have some bias, prejudice, or hostility that may cause the witness to give you something other than a completely accurate account of the facts he or she testified to?

As to all witnesses, you should also consider whether a witness had an opportunity to observe the facts he or she testified about and whether the witness's recollection of the facts stands up in light of the other evidence in the case.

In other words, what you must try to do in deciding credibility is to size up a person just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

14

## INSTRUCTION NO. 8

### A Defendant's Right to Not Testify

The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt. A defendant is never required to prove that he or she is innocent.

Accordingly, you must not attach any significance to the fact that the defendant did not testify. No adverse inference against the defendant may be drawn by you because he did not take the witness stand, and you may not consider it against the defendant in any way in your deliberations in the jury room.

15

**A001032**

## II. THE CHARGES

## INSTRUCTION NO. 9

### Summary of the Charges

With these preliminary instructions in mind, let us turn to the two specific charges against the defendant, Steven Perez, who goes by the name Lucha El Por Libertad or (as he prefers) Lucha El. These charges were originally set forth in what is called an Indictment, which is simply a charging instrument and is not itself evidence, so it will not be presented to you. The Indictment in this case charges Lucha El with a total of two charges, or "counts" as they are called, and each count charges a different crime. I will, for convenience, refer to each charge or count by its number as it appears in the Indictment.

Count One charges the defendant with conspiring to unlawfully transport or receive firearms that were purchased out-of-state into the state of residency of the person receiving or transporting the firearm. Count Two charges the defendant with unlawfully receiving or transporting a specific firearm purchased out-of-state into his state of residence.

Before the defendant can be convicted of any of these charges, the Government must prove every essential element of the particular charge you are considering beyond a reasonable doubt. In your deliberations and in reaching your verdict, you must consider each charge separately and determine whether the Government has carried its burden of proof with respect to each essential element of that particular charge.

16

**A001033**

For convenience, I will start with Count Two, which charges the defendant with willfully receiving a specific out-of-state firearm in his state of residency, New York. After that, I will turn to Count One, which charges the defendant with conspiring with other people to willfully transport or receive out-of-state firearms in states of their residency.

17

INSTRUCTION NO. 10

Count Two: Interstate Transport or Receipt of Out-of-State Firearms

Count Two, sometimes referred to as a "substantive count," charges the defendant with unlawfully receiving or transporting a specific out-of-state firearm into his state of residence. Before the defendant can be convicted on this Count, the Government must prove beyond a reasonable doubt three elements:

First, that the defendant was not licensed to receive out-of-state firearms, specifically, that he was not a licensed importer, licensed manufacturer, licensed dealer or licensed collector of firearms;

Second, that the defendant transported or received into the state in which he resided a specific firearm purchased or otherwise obtained outside that state; and

Third, that the defendant acted knowingly and willfully.

I will now address each of the three elements of Count Two in detail.

18

**A001035**

## INSTRUCTION NO. 11

### Count Two – First Element – Lack of License

Starting with the first essential element, the Government must prove beyond a reasonable doubt that the defendant was not licensed to receive out-of-state firearms, specifically, that he was not a licensed importer, manufacturer, dealer or collector of firearms.

A person is an "importer" when he is "engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution."

A person is a "manufacturer" when he is "engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution."

A person is a "dealer" when he is "engaged in the business of selling firearms at wholesale or retail."

A person is a "collector" when he "acquires, holds, or disposes of firearms as curios or relics."

The terms "licensed importer," "licensed manufacturer," "licensed dealer" and "licensed collector" mean any such persons who are licensed under the provisions of the federal Gun Control Act. In order to be a "licensed dealer" a person must file an application with and receive a license from the United States Secretary of the Treasury.

19

**A001036**

INSTRUCTION NO. 12

Count Two – Second Element – Transport or Receipt of Out-of-State Firearms

The second essential element that the Government must prove beyond a reasonable doubt is that a specific firearm – in this case, a Century Arms Canik 9mm handgun, serial number 20CB25810 – was purchased or obtained outside of the defendant's state of residence and then was received by the defendant in his state of residence. In order to satisfy this element, the Government must prove that the state in which the firearm was purchased or was otherwise obtained was not the defendant's state of residence and that the state in which the defendant received the firearm was the defendant's state of residence.

The defendant does not have to himself purchase the firearm out-of-state. A defendant who, knowing that another person has purchased the gun out of state, then receives the gun in the defendant's state of residence, satisfies the second essential element.

20

**A001037**

## INSTRUCTION NO. 13

### Count Two – Third Element – Criminal Intent

The third essential element the Government must prove beyond a reasonable doubt is that the defendant, in receiving the out-of-state firearm into his state of residency, acted knowingly and willfully. "Knowingly" means purposely, rather than negligently or accidentally; but the defendant need not be aware of the specific law that his conduct is violating. "Willfully" means to act with a bad purpose and intent to act unlawfully even if the defendant does not know the specific law he is violating.

21

**A001038**

## INSTRUCTION NO. 14

### Count One: Conspiracy to Transport and Receive Firearms from Outside States of Residency

Count One, sometimes referred to as the "conspiracy count," charges the defendant with conspiring with others to unlawfully transport firearms that were purchased out-of-state into the state of residency of the persons actually receiving the firearm. Before the defendant can be convicted of this Count, the Government must prove beyond a reasonable doubt three elements:

First, the existence of the charged conspiracy;

Second, that the defendant knowingly and willfully became a member of that conspiracy; and

Third, that at least one of the co-conspirators committed an overt act in furtherance of the conspiracy.

I will now address each of the three elements of Count One in detail.

22

A001039

INSTRUCTION NO. 15

Count One – First Element – Conspiracy

Starting with the first essential element, what is a conspiracy? A conspiracy is an agreement, or an understanding, of two or more persons to accomplish by concerted action one or more unlawful purposes, known as the "object" or "objects" of the conspiracy. In Count One, the unlawful purpose alleged to be the object of the conspiracy is an agreement to transport firearms that were obtained outside the states of residency of the eventual receivers into the states of residency of the receivers. I have already instructed you on the essential elements of that underlying crime when I instructed you on Count Two. The conspiracy here charged is that several persons, including the defendant, agreed to a plan to commit the same kind of substantive violations.

Please bear in mind that conspiracy is an entirely distinct and separate offense from the particular substantive crime charged in Count Two of the defendant actually receiving a specific out-of-state firearm in the defendant's state of residency. The actual commission of the object of the conspiracy is not an essential element of the crime of conspiracy. Rather, the Government is required to prove beyond a reasonable doubt only that two or more persons, in some way or manner, explicitly or implicitly, came to an understanding to accomplish the objective of unlawfully obtaining or transporting one or more out-of-state firearms in order to enable one or more conspirators to receive them in their states of residency.

23

**A001040**

While the indictment charges that the alleged conspiracy began in or around May 2020 and continued up to in or around July 2021, it is not essential that the Government prove that the conspiracy started and ended on those specific dates or that it existed throughout that period. Rather, it is sufficient to satisfy the first element that you find that in fact a conspiracy was formed and that it existed for any time within the charged period.

24

A001041

INSTRUCTION NO. 16

Count One – Second Element – Joining the Conspiracy

If you conclude that the Government has proved beyond a reasonable doubt that the charged conspiracy existed, you must then consider whether the Government has proved beyond a reasonable doubt the second essential element: that the defendant joined and participated in the conspiracy and did so knowingly and willfully. I have already defined the terms "knowingly" and "willfully" for you in in Instruction No. 13, and the same definitions apply here.

To join and participate in a conspiracy, it is not necessary that the defendant be fully informed of all the details of the conspiracy in order to justify an inference of membership on his part. Nor does the defendant need to know the full extent of the conspiracy or all of its participants. It is also not necessary that the defendant receive any monetary benefit from participating in the conspiracy. All that is necessary is proof beyond a reasonable doubt that the defendant joined and participated in the conspiracy knowingly, and with the intent to aid in the accomplishment of its unlawful object as previously discussed.

The defendant also need not have joined the conspiracy at the outset. The defendant may have joined it at any time in its progress, and he will still be held responsible for all that was done before he joined, as well as all that was done during the conspiracy's existence while the defendant was a member. The law does not require that each conspirator have an equal role in

25

A001042

the conspiracy. Even a single act may be sufficient to draw the defendant within the ambit of a conspiracy if it meets the essential requirements I have described.

However, I want to caution you that the mere association or friendship by one person with another person does not make the first person a member of the conspiracy, even when coupled with knowledge that second person is committing a crime. In other words, knowledge without participation is not sufficient. What is necessary is that the defendant have participated in the conspiracy with knowledge its object and with an intent to aid in the accomplishment of that unlawful object.

26

INSTRUCTION NO. 17

Count One – Third Element – Overt Act

The third essential element of Count One is that one of the conspirators – not necessarily the defendant, but any one of the conspirators – took at least one overt act in furtherance of the conspiracy. An overt act in furtherance of the conspiracy can be any act of any kind taken by any member of the conspiracy that is done to effectuate the conspiracy in any respect. The overt act, itself, need not have been an unlawful act. While the Government need not prove more than one overt act, you must unanimously agree on which specific overt act or acts, if any, the Government has proven beyond a reasonable doubt.

27

**A001044**

## INSTRUCTION NO. 18

### Motive

Proof of motive is not a necessary element of any of the crimes with which the defendant is charged. Proof of motive does not establish guilt, nor does the lack of proof of motive establish that the defendant is not guilty. If the guilt of a defendant is shown beyond a reasonable doubt, it is immaterial what that defendant's motive for the crime or crimes may be, or whether that defendant's motive was shown at all. The presence or absence of motive is, however, a circumstance which you may consider as bearing on the intent of a defendant.

28

## INSTRUCTION NO. 19

### Venue

One last requirement. Before the defendant can be convicted of any of the foregoing charges, the Government must also establish what is called "venue," that is, that some act in furtherance of that charge occurred in the Southern District of New York. As relevant here, the Southern District of New York is the judicial district that includes (among other places) Manhattan, the Bronx, and Westchester. Venue is proven if any act in furtherance of the count you are considering occurred in any of these counties, regardless of whether it was an act of the charged defendant or anyone else.

Furthermore, on the issue of venue—and on this alone—the Government can meet its burden by a preponderance of the evidence, that is, by showing that it was more likely than not that an act in furtherance of a given charge occurred in the Southern District of New York.

**A001046**

## III. CONCLUDING INSTRUCTIONS

## INSTRUCTION NO. 20

### Selection of Foreperson; Right to See Exhibits and Hear Testimony; Communications with the Court

You will shortly retire to the jury room to begin your deliberations. As soon as you get to the jury room, please select one of your number as the foreperson, to preside over your deliberations and to serve as your spokesperson if you need to communicate with the Court.

You will be bringing with you into the jury room a copy of my instructions of law and a verdict form on which to record your verdict. In addition, we will send into the jury room a list of all the exhibits; a laptop that can be used to see and hear the videos and see certain Excel spreadsheets that were also admitted into evidence; and all the other exhibits that were admitted into evidence except for the guns and ammunition (which will be kept here but which you can examine on request). If you want any of the testimony provided, that can also be done, in either transcript or read-back form. But please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

Any of your requests, in fact any communication with the Court, should be made to me in writing, signed by your foreperson, and given to the marshal, who will be available outside the jury room throughout your deliberations. After consulting with counsel, I will respond to any

30

A001047

question or request you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person.

31

A001048

## INSTRUCTION NO. 21

### Verdict; Need for Unanimity; Duty to Consult

You should not, however, tell me or anyone else how the jury stands on any issue until you have reached your verdict and recorded it on your verdict form. As I have already explained, the Government, to prevail on a particular charge against the defendant, must prove each essential element of that charge beyond a reasonable doubt. If the Government carries this burden, you should find the defendant guilty of that charge. Otherwise, you must find the defendant not guilty of that charge.

Each of you must decide the case for yourself, after consideration, with your fellow jurors, of the evidence in the case, and your verdict must be unanimous. In deliberating, bear in mind that while each juror is entitled to his or her opinion, you should exchange views with your fellow jurors. That is the very purpose of jury deliberation—to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another; and to reach a verdict based solely and wholly on the evidence. If, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others', you are not to yield your view simply because you are outnumbered. On the other hand, you should not hesitate to change an opinion that, after discussion with your fellow jurors, now appears to you erroneous.

In short, your verdict must reflect your individual views and must also be unanimous.

This completes my instructions of law.

32

A001049

```
N8VBPER1                        JURY TRIAL
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      S1 22 CR 644 (JSR)

STEVEN PEREZ, A/K/A "LUCHA,",

             Defendant.

------------------------------x

                             New York, N.Y.
                             August 31, 2023
                             9:30 a.m.

Before:

                  HON. JED S. RAKOFF,

                           District Judge

                   APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ASHLEY NICHOLAS
MADISON SMYSER
SARAH MORTAZAVI
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant Perez
ZAWADI BAHARANYI
AMANDA MAYO

ALSO PRESENT:  ANANYA SANKAR, Paralegal, U.S. Attorney's Office
     ARJUN AHUJA, Paralegal, U.S. Attorney's Office
     SARAH KWON, Paralegal, Federal Defenders of New York

A001050

527

N8VBPER1                    JURY TRIAL

1          (Trial resumed; jury not present)

2          THE COURT:  While we're waiting for that juror, at the

3     end of yesterday we had an interesting discussion about a

4     sentence in my charge beginning with the words "the gist."

5     Counsel for both sides and the Court were all looking at the

6     wrong version, what was labeled the revised version, but not

7     the second revised version.

8          And in fact, even though I stout the defendant the

9     language in the revised version, I had changed the language

10    pretty much in accordance with the issues that both sides had

11    raised.  So you got last night the final version, and I will

12    give my courtroom deputy a copy of my charge marked as Court

13    Exhibit 1 to docket.

14         THE DEPUTY CLERK:  And all jurors are present now.

15         THE COURT:  Now we've just received three, four, five

16    notes from the jury.  They're all dated 9:30, so there's no

17    particular order.  But the notes are -- and it's unclear who

18    they're from.  One was any search made in the house of the

19    accused.  Two, if yes, were any firearms found that was

20    purchased by the straw purchaser.

21         Next note.  What is the law on searching someone's

22    belongings?  Does he have to provide permission?

23         Third note.  Your Honor, it is important what state

24    the defendant received the gun in.  If he received the gun in a

25    different state other than New York, did he still break the

N8VBPER1                    JURY TRIAL

1  law.  With regard to charge number two, the same.

2          Your Honor, I find the definition of "willfulness" is

3  operating with bad intent to be too vague to reason about.

4  What is "bad" and by whose judgment must it be bad.  Certainly

5  many cases are connected by people who do not think they are

6  doing something bad, and yet they are doing something bad by

7  someone else's judgment.  Can you help make this more clear.

8  Thank you.  And finally, can we hear the 911 call.

9          You will recall that the government wanted to put that

10  in.  Defense objected, and I sustained the objection.  So it's

11  clear they've been thinking about this overnight.  My

12  suggestion is that we bring them in, deliver the charge, and

13  then tell them if they still have any questions, then's the

14  time to send us a new note through their foreperson and we'll

15  deal with the note then.  Any objection to that?

16          MS. NICHOLAS:  No objection, your Honor.  I just will

17  raise that in particular I think the third note about which

18  state the guns were obtained in is exactly what the government

19  was getting at with the proposed instruction about use of an

20  agent.  So I think we would want to renew that request to add

21  the sentence back in about that being otherwise attaining

22  within the definition of the law.

23          THE COURT:  I'm not going to change the charge at this

24  point, but I will respond to any questions they have after

25  we've given them the charge.

```
N8VBPER1                    JURY TRIAL
```

1          MS. NICHOLAS:  Understood.

2          MS. BAHARANYI:  That's fine, your Honor.

3          THE COURT:  That's fine from the defense?

4          MS. BAHARANYI:  Yes, your Honor.  That's fine.

5          THE COURT:  Okay.  Very good.  Okay.  Let's bring in

6  the jury.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8VBPER1                    Charge

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Thank

3   you again for your promptness.  Please be seated.  Thank you

4   also for your notes.  We're going to read together now and then

5   you'll have with you to take into the jury room my instructions

6   of law.  I this that will answer some of your questions.

7          But if it doesn't answer all your questions, then

8   after you get back in the jury room, the formal way to do this

9   is to have your foreperson, whoever you select as your

10  foreperson, then send me a note with whatever questions you

11  still have and I'll be happy to answer them at that time.  But

12  let's take a look at the instructions of law.  As you will see

13  from the table of contents, they're divided into three

14  sections.

15         First, there are general instructions which pretty

16  much apply not just to this case, but all criminal cases.  Then

17  there is a section on the specific charges in this case, and

18  finally there's some concluding instructions about how you fill

19  out your verdict form and things like that.  So let's turn to

20  page four and begin with instruction number four.

21         We are now approaching the most important part of this

22  case, your deliberations. You have heard all the evidence in

23  the case, as well as the final arguments of the lawyers for the

24  parties. Before you retire to deliberate, it is my duty to

25  instruct you as to the law that will govern your deliberations.

N8VBPER1                    Charge

1    These are the final and binding instructions, which entirely

2    replace the preliminary instruction I gave you earlier. As I

3    told you at the start of this case, and as you agreed, it is

4    your duty to accept my instructions of law and apply them to

5    the facts as you determine them.

6          Regardless of any opinion that you may have as to what

7    the law may be or ought to be, it is your sworn duty to follow

8    the law as I give it to you. Also, if any attorney or other

9    person has stated a legal principle different from any that I

10   state to you in my instructions, it is my instructions that you

11   must follow.

12         Because my instructions cover many points, I have

13   provided each of you with a copy of them, not only so that you

14   can follow them as I read them to you now, but also so that you

15   can have them with you for reference throughout your

16   deliberations. In listening to them now and reviewing them

17   later, you should not single out any particular instruction as

18   alone stating the law, but you should instead consider my

19   instructions as a whole.

20         Your duty is to decide the fact issues in the case and

21   arrive, if you can, at a verdict. You, the members of the jury,

22   are the sole and exclusive judges of the facts. You pass upon

23   the weight of the evidence; you determine the credibility of

24   the witnesses; you resolve such conflicts as there may be in

25   the testimony; and you draw whatever reasonable inferences you

N8VBPER1                    Charge

1   decide to draw from the facts as you determine them.

2   In determining the facts, you must rely upon your own

3   recollection of the evidence.

4        To aid your recollection, we will send you at the

5   start of your deliberations a list of all the exhibits, a

6   laptop on which you can view the videotapes, all the other

7   exhibits themselves except the guns and ammunition (which will

8   remain outside unless you ask to see them, and certain Excel

9   spreadsheets that, for convenience, you can view on the

10  laptop). If you need to review particular items of testimony,

11  we can also arrange to provide them to you in transcript or

12  read-back form.

13       Please remember that none of what the lawyers have

14  said in their opening statements, in their closing arguments,

15  in their objections, or in their questions, is evidence. Nor is

16  anything I may have said evidence. The evidence before you

17  consists of just three things: the testimony given by witnesses

18  that was received in evidence, the exhibits that were received

19  in evidence, and the stipulations of the parties that were

20  received in evidence.

21       Testimony consists of the answers that were given by

22  the witnesses to the questions that were permitted. Please

23  remember that questions, although they may provide the context

24  for answers, are not themselves evidence; only answers are

25  evidence, and you should therefore disregard any question to

N8VBPER1                          Charge

1    which I sustained an objection. Also, you may not consider any

2    answer that I directed you to disregard or that I directed be

3    stricken from the record. Likewise, you may not consider

4    anything you heard about the contents of any exhibit that was

5    not received in evidence.

6             Furthermore, you should be careful not to speculate

7    about matters not in evidence. For example, there is no legal

8    requirement that the Government prove its case through a

9    particular witness or by use of a particular law enforcement

10   technique. Nor should you speculate about why one or another

11   person whose name may have figured in the evidence is not part

12   of this trial or what his or her situation may be. Your focus

13   should be entirely on assessing the evidence that was presented

14   here for your consideration.

15            It is the duty of the attorney for each side of a case

16   to object when the other side offers testimony or other

17   evidence that the attorney believes is not properly admissible.

18   Counsel also have the right and duty to ask the Court to make

19   rulings of law and to request conferences at the side bar out

20   of the hearing of the jury. All such questions of law must be

21   decided by me. You should not show any prejudice against any

22   attorney or party because the attorney objected to the

23   admissibility of evidence, asked for a conference out of the

24   hearing of the jury, or asked me for a ruling on the law.

25            I also ask you to draw no inference from my rulings or

A001057

N8VBPER1                      Charge

1     from the fact that on occasion I asked questions of certain

2     witnesses. My rulings were no more than applications of the law

3     and my questions were only intended for clarification or to

4     expedite matters. You are expressly to understand that I have

5     no opinion as to the verdict you should render in this case.

6              You are to perform your duty of finding the facts

7     without bias or prejudice as to any party. You are to perform

8     your final duty in an attitude of complete fairness and

9     impartiality. You are not to be swayed by rhetoric or emotional

10    appeals.

11             The fact that the prosecution is brought in the name

12    of the United States of America entitles the Government to no

13    greater consideration than that accorded any other party. By

14    the same token, it is entitled to no less consideration. All

15    parties, whether the Government or individuals, stand as equals

16    at the bar of justice.

17             Please also be aware that the question of possible

18    punishment is the province of the judge, not the jury, and it

19    should therefore not enter into or influence your deliberations

20    in any way. Your duty is to weigh the evidence and not be

21    affected by extraneous considerations.  It must be clear to you

22    that if you were to let bias, or prejudice, or fear, or

23    sympathy, or any other irrelevant consideration interfere with

24    your thinking, there would be a risk that you would not arrive

25    at a true and just verdict. So do not be guided by anything

N8VBPER1                          Charge

1     except clear thinking and calm analysis of the evidence.

2              The defendant here, Steven Perez, also known as Lucha

3     El, is charged with two federal crimes about which I will

4     instruct you shortly. Please bear in mind, however, that the

5     charges, or "counts" as they are called, are not themselves

6     evidence of anything.

7              The defendant has pleaded not guilty. To prevail

8     against the defendant on a given charge, the Government must

9     prove each essential element of that charge beyond a reasonable

10    doubt. If the Government succeeds in meeting this burden, your

11    verdict should be guilty on that charge; if it fails, your

12    verdict must be not guilty on that charge. This burden never

13    shifts to the defendant, for the simple reason that the law

14    presumes a defendant to be innocent and never imposes upon a

15    defendant in a criminal case the burden or duty of calling any

16    witness or producing any evidence.

17             In other words, as to each charge, the defendant

18    starts with a clean slate and is presumed innocent until such

19    time, if ever, that you as a jury are satisfied that the

20    Government has proved that he is guilty of that charge beyond a

21    reasonable doubt.

22             Since, to convict the defendant of a given charge, the

23    Government is required to prove that charge beyond a reasonable

24    doubt, the question then is: What is a reasonable doubt? The

25    words almost define themselves. It is a doubt based upon

A001059

N8VBPER1                    Charge

1   reason. It is doubt that a reasonable person has after

2   carefully weighing all of the evidence. It is a doubt that

3   would cause a reasonable person to hesitate to act in a matter

4   of importance in his or her personal life. Proof beyond a

5   reasonable doubt must therefore be proof of a convincing

6   character that a reasonable person would not hesitate to rely

7   on in making an important decision.

8           A reasonable doubt is not caprice or whim. It is not

9   speculation or suspicion. It is not an excuse to avoid the

10  performance of an unpleasant duty. The law does not require

11  that the Government prove guilt beyond all possible or

12  imaginable doubt: proof beyond a reasonable doubt is sufficient

13  to convict.

14          If, after fair and impartial consideration of the

15  evidence, you have a reasonable doubt as to the defendant's

16  guilt with respect to a particular charge against him, you must

17  find the defendant not guilty of that charge. On the other

18  hand, if, after fair and impartial consideration of all the

19  evidence, you are satisfied beyond a reasonable doubt of the

20  defendant's guilt with respect to a particular charge against

21  him, you should not hesitate to find the defendant guilty of

22  that charge.

23          In deciding whether the Government has met its burden

24  of proof, you may consider both direct evidence and

25  circumstantial evidence.

N8VBPER1                         Charge

1          Direct evidence is evidence that proves a fact

2     directly. For example, where a witness testifies to what he or

3     she saw, heard, or observed, that is called direct evidence.

4     Circumstantial evidence is evidence that tends to prove a fact

5     by proof of other facts. To give a simple example, suppose that

6     when you came into the courthouse today the sun was shining and

7     it was a nice day, but the courtroom blinds were drawn and you

8     could not look outside.  Later, as you were sitting here,

9     someone walked in with a dripping wet umbrella, and, soon

10    after, somebody else walked in with a dripping wet raincoat.

11    Now, on our assumed facts, you cannot look outside of the

12    courtroom and you cannot see whether it is raining. So you have

13    no direct evidence of that fact. But on the combination of the

14    facts about the umbrella and the raincoat, it would be

15    reasonable for you to infer that it had begun raining.

16    That is all there is to circumstantial evidence.

17          Using your reason and experience, you infer from

18    established facts the existence or the nonexistence of some

19    other fact. Please note, however, that it is not a matter of

20    speculation or guess: it is a matter of logical inference.

21    The law makes no distinction between direct and circumstantial

22    evidence. Circumstantial evidence is of no less value than

23    direct evidence, and you may consider either or both, and may

24    give them such weight as you conclude is warranted.

25          It must be clear to you by now that counsel for the

A001061

N8VBPER1                    Charge

 1    Government and counsel for the defendant are asking you to draw

 2    very different conclusions about various factual issues in the

 3    case. Deciding these issues will involve making judgments about

 4    the testimony of the witnesses you have listened to and

 5    observed. In making these judgments, you should carefully

 6    scrutinize all of the testimony of each witness, the

 7    circumstances under which each witness testified, and any other

 8    matter in evidence that may help you to decide the truth and

 9    the importance of each witness's testimony.

10            Your decision to believe or to not believe a witness

11    may depend on how that witness impressed you. How did the

12    witness appear? Was the witness candid, frank, and forthright,

13    or did the witness seem to be evasive or suspect in some way?

14    How did the way the witness testified on direct examination

15    compare with how the witness testified on cross-examination?

16    Was the witness consistent or contradictory? Did the witness

17    appear to know what he or she was talking about? Did the

18    witness strike you as someone who was trying to report his or

19    her knowledge accurately? These are examples of the kinds of

20    common sense questions you should ask yourselves in deciding

21    whether a witness is or is not truthful.

22            How much you choose to believe a witness may also be

23    influenced by the witness's bias. Does the witness have a

24    relationship with the Government or the defendant that may

25    affect how he or she testified? Does the witness have some

A001062

N8VBPER1                          Charge

incentive, loyalty, or motive that might cause him or her to
shade the truth? Does the witness have some bias, prejudice, or
hostility that may cause the witness to give you something
other than a completely accurate account of the facts he or she
testified to?

As to all witnesses, you should also consider whether
a witness had an opportunity to observe the facts he or she
testified about and whether the witness's recollection of the
facts stands up in light of the other evidence in the case.
In other words, what you must try to do in deciding credibility
is to size up a person just as you would in any important
matter where you are trying to decide if a person is truthful,
straightforward, and accurate in his or her recollection.

The defendant did not testify in this case. Under our
Constitution, a defendant has no obligation to testify or to
present any evidence, because it is the Government's burden to
prove a defendant guilty beyond a reasonable doubt. A defendant
is never required to prove that he or she is innocent.
Accordingly, you must not attach any significance to the fact
that the defendant did not testify. No adverse inference
against the defendant may be drawn by you because he did not
take the witness stand, and you may not consider it against the
defendant in any way in your deliberations in the jury room.

With these preliminary instructions in mind, let us
turn to the two specific charges against the defendant, Steven

A001063

N8VBPER1                        Charge

1   Perez, who goes by the name Lucha El Por Libertad or (as he

2   prefers) Lucha El. These charges were originally set forth in

3   what is called an Indictment, which is simply a charging

4   instrument and is not itself evidence, so it will not be

5   presented to you. The Indictment in this case charges Lucha El

6   with a total of two charges, or "counts" as they are called,

7   and each count charges a different crime. I will, for

8   convenience, refer to each charge or count by its number as it

9   appears in the Indictment.

10          Count One charges the defendant with conspiring to

11  unlawfully transport or receive firearms that were purchased

12  out-of-state into the state of residency of the person

13  receiving or transporting the firearm. Count Two charges the

14  defendant with unlawfully receiving or transporting a specific

15  firearm purchased out-of-state into his state of residence.

16  Before the defendant can be convicted of any of these charges,

17  the Government must prove every essential element of the

18  particular charge you are considering beyond a reasonable

19  doubt. In your deliberations and in reaching your verdict, you

20  must consider each charge separately and determine whether the

21  Government has carried its burden of proof with respect to each

22  essential element of that particular charge.

23          For convenience, I will start with Count Two, which

24  charges the defendant with willfully receiving a specific

25  out-of-state firearm in his state of residency, New York. After

A001064

N8VBPER1                    Charge

1    that, I will turn to Count One, which charges the defendant

2    with conspiring with other people to willfully transport or

3    receive out-of-state firearms in states of their residency.

4              Count Two, sometimes referred to as a "substantive

5    count," charges the defendant with unlawfully receiving or

6    transporting a specific out-of-state firearm into his state of

7    residence. Before the defendant can be convicted on this Count,

8    the Government must prove beyond a reasonable doubt three

9    elements:

10             First, that the defendant was not licensed to receive

11   out-of-state firearms, specifically, that he was not a licensed

12   importer, licensed manufacturer, licensed dealer or licensed

13   collector of firearms; second, that the defendant transported

14   or received into the state in which he resided a specific

15   firearm purchased or otherwise obtained outside that state; and

16   Third, that the defendant acted knowingly and willfully.

17   I will now address each of the three elements of Count Two in

18   detail.

19

20             Starting with the first essential element, the

21   Government must prove beyond a reasonable doubt that the

22   defendant was not licensed to receive out-of-state firearms,

23   specifically, that he was not a licensed importer,

24   manufacturer, dealer or collector of firearms.

25             A person is an "importer" when he is "engaged in the

N8VBPER1                    Charge

1   business of importing or bringing firearms or ammunition into

2   the United States for purposes of sale or distribution."

3   A person is a "manufacturer" when he is "engaged in the

4   business of manufacturing firearms or ammunition for purposes

5   of sale or distribution."

6           A person is a "dealer" when he is "engaged in the

7   business of selling firearms at wholesale or retail."

8   A person is a "collector" when he "acquires, holds, or disposes

9   of firearms as curios or relics."

10          The terms "licensed importer," "licensed

11  manufacturer," "licensed dealer" and "licensed collector" mean

12  any such persons who are licensed under the provisions of the

13  federal Gun Control Act. In order to be a "licensed dealer" a

14  person must file an application with and receive a license from

15  the United States Secretary of the Treasury.

16          The second essential element that the Government must

17  prove beyond a reasonable doubt is that a specific firearm – in

18  this case, a Century Arms Canik 9mm handgun, serial number

19  20CB25810 – was purchased or obtained outside of the

20  defendant's state of residence and then was received by the

21  defendant in his state of residence. In order to satisfy this

22  element, the Government must prove that the state in which the

23  firearm was purchased or was otherwise obtained was not the

24  defendant's state of residence and that the state in which the

25  defendant received the firearm was the defendant's state of

N8VBPER1                    Charge

1    residence.

2           The defendant does not have to himself purchase the

3    firearm out-of-state. A defendant who, knowing that another

4    person has purchased the gun out of state, then receives the

5    gun in the defendant's state of residence, satisfies the second

6    essential element.

7           The third essential element the Government must prove

8    beyond a reasonable doubt is that the defendant, in receiving

9    the out-of-state firearm into his state of residency, acted

10   knowingly and willfully. "Knowingly" means purposely, rather

11   than negligently or accidentally; but the defendant need not be

12   aware of the specific law that his conduct is violating.

13   "Willfully" means to act with a bad purpose and intent to act

14   unlawfully even if the defendant does not know the specific law

15   he is violating.

16          Count One, sometimes referred to as the "conspiracy

17   count," charges the defendant with conspiring with others to

18   unlawfully transport firearms that were purchased out-of-state

19   into the state of residency of the persons actually receiving

20   the firearm. Before the defendant can be convicted of this

21   Count, the Government must prove beyond a reasonable doubt

22   three elements:

23          First, the existence of the charged conspiracy;

24   Second, that the defendant knowingly and willfully became a

25   member of that conspiracy; and third, that at least one of the

N8VBPER1                    Charge

1    co-conspirators committed an overt act in furtherance of the

2    conspiracy.

3         I will now address each of the three elements of Count

4    One in detail.  Starting with the first essential element, what

5    is a conspiracy? A conspiracy is an agreement, or an

6    understanding, of two or more persons to accomplish by

7    concerted action one or more unlawful purposes, known as the

8    "object" or "objects" of the conspiracy.

9         In Count One, the unlawful purpose alleged to be the

10   object of the conspiracy is an agreement to transport firearms

11   that were obtained outside the states of residency of the

12   eventual receivers into the states of residency of the

13   receivers. I have already instructed you on the essential

14   elements of that underlying crime when I instructed you on

15   Count Two. The conspiracy here charged is that several persons,

16   including the defendant, agreed to a plan to commit the same

17   kind of substantive violations.

18        Please bear in mind that conspiracy is an entirely

19   distinct and separate offense from the particular substantive

20   crime charged in Count Two of the defendant actually receiving

21   a specific out-of-state firearm in the defendant's state of

22   residency. The actual commission of the object of the

23   conspiracy is not an essential element of the crime of

24   conspiracy. Rather, the Government is required to prove beyond

25   a reasonable doubt only that two or more persons, in some way

N8VBPER1                          Charge

or manner, explicitly or implicitly, came to an understanding
to accomplish the objective of unlawfully obtaining or
transporting one or more out-of-state firearms in order to
enable one or more conspirators to receive them in their states
of residency.

While the indictment charges that the alleged
conspiracy began in or around May 2020 and continued up to in
or around July 2021, it is not essential that the Government
prove that the conspiracy started and ended on those specific
dates or that it existed throughout that period. Rather, it is
sufficient to satisfy the first element that you find that in
fact a conspiracy was formed and that it existed for any time
within the charged period.

If you conclude that the Government has proved beyond
a reasonable doubt that the charged conspiracy existed, you
must then consider whether the Government has proved beyond a
reasonable doubt the second essential element: that the
defendant joined and participated in the conspiracy and did so
knowingly and willfully. I have already defined the terms
"knowingly" and "willfully" for you in in Instruction No. 13,
and the same definitions apply here.

To join and participate in a conspiracy, it is not
necessary that the defendant be fully informed of all the
details of the conspiracy in order to justify an inference of
membership on his part. Nor does the defendant need to know the

A001069

N8VBPER1                          Charge

1    full extent of the conspiracy or all of its participants. It is

2    also not necessary that the defendant receive any monetary

3    benefit from participating in the conspiracy. All that is

4    necessary is proof beyond a reasonable doubt that the defendant

5    joined and participated in the conspiracy knowingly, and with

6    the intent to aid in the accomplishment of its unlawful object

7    as previously discussed.

8              The defendant also need not have joined the conspiracy

9    at the outset. The defendant may have joined it at any time in

10   its progress, and he will still be held responsible for all

11   that was done before he joined, as well as all that was done

12   during the conspiracy's existence while the defendant was a

13   member. The law does not require that each conspirator have an

14   equal role in the conspiracy. Even a single act may be

15   sufficient to draw the defendant within the ambit of a

16   conspiracy if it meets the essential requirements I have

17   described.

18             However, I want to caution you that the mere

19   association or friendship by one person with another person

20   does not make the first person a member of the conspiracy, even

21   when coupled with knowledge that second person is committing a

22   crime. In other words, knowledge without participation is not

23   sufficient. What is necessary is that the defendant have

24   participated in the conspiracy with knowledge its object and

25   with an intent to aid in the accomplishment of that unlawful

N8VBPER1                         Charge

1    object.

2         The third essential element of Count One is that one

3    of the conspirators – not necessarily the defendant, but any

4    one of the conspirators – took at least one overt act in

5    furtherance of the conspiracy. An overt act in furtherance of

6    the conspiracy can be any act of any kind taken by any member

7    of the conspiracy that is done to effectuate the conspiracy in

8    any respect. The overt act, itself, need not have been an

9    unlawful act. While the Government need not prove more than one

10   overt act, you must unanimously agree on which specific overt

11   act or acts, if any, the Government has proven beyond a

12   reasonable doubt.

13        Proof of motive is not a necessary element of any of

14   the crimes with which the defendant is charged. Proof of motive

15   does not establish guilt, nor does the lack of proof of motive

16   establish that the defendant is not guilty. If the guilt of a

17   defendant is shown beyond a reasonable doubt, it is immaterial

18   what that defendant's motive for the crime or crimes may be, or

19   whether that defendant's motive was shown at all. The presence

20   or absence of motive is, however, a circumstance which you may

21   consider as bearing on the intent of a defendant.

22        One last requirement. Before the defendant can be

23   convicted of any of the foregoing charges, the Government must

24   also establish what is called "venue," that is, that some act

25   in furtherance of that charge occurred in the Southern District

N8VBPER1                        Charge

1    of New York. As relevant here, the Southern District of New

2    York is the judicial district that includes (among other

3    places) Manhattan, the Bronx, and Westchester. Venue is proven

4    if any act in furtherance of the count you are considering

5    occurred in any of these counties, regardless of whether it was

6    an act of the charged defendant or anyone else.

7           Furthermore, on the issue of venue-and on this

8    alone-the Government can meet its burden by a preponderance of

9    the evidence, that is, by showing that it was more likely than

10   not that an act in furtherance of a given charge occurred in

11   the Southern District of New York.

12          You will shortly retire to the jury room to begin your

13   deliberations. As soon as you get to the jury room, please

14   select one of your number as the foreperson, to preside over

15   your deliberations and to serve as your spokesperson if you

16   need to communicate with the Court.  You will be bringing with

17   you into the jury room a copy of my instructions of law and a

18   verdict form on which to record your verdict.

19          Let me just show you the verdict form.  It's a very

20   simple white page, and it just ask you to determine as to each

21   of the respective counts whether you find the defendant guilty

22   or not guilty on that count.  After you've made that

23   determination, your foreperson will sign the verdict form, date

24   it, and seal it in this envelope very cleverly marked verdict,

25   and that will then be brought to me.

A001072

N8VBPER1                           Charge

1        And I will not open that envelope until you'll all

2    back here in the courtroom, and then we will open it, read it,

3    and ask each of you individually whether that is in fact your

4    verdict.  And we go through all those technicalities to be

5    absolutely sure we have your verdict as you have decided.  Back

6    to instructions.

7        In addition, we will send into the jury room a list of

8    all the exhibits; a laptop that can be used to see and hear the

9    videos and see certain Excel spreadsheets that were also

10   admitted into evidence; and all the other exhibits that were

11   admitted into evidence except for the guns and ammunition

12   (which will be kept here but which you can examine on request).

13   If you want any of the testimony provided, that can also be

14   done, in either transcript or read-back form. But please

15   remember that it is not always easy to locate what you might

16   want, so be as specific as you possibly can be in requesting

17   portions of the testimony.

18       Any of your requests, in fact any communication with

19   the Court, should be made to me in writing, signed by your

20   foreperson, and given to the marshal, who will be available

21   outside the jury room throughout your deliberations. After

22   consulting with counsel, I will respond to any question or

23   request you have as promptly as possible, either in writing or

24   by having you return to the courtroom so that I can speak with

25   you in person.

N8VBPER1                    Charge

1          You should not, however, tell me or anyone else how

2     the jury stands on any issue until you have reached your

3     verdict and recorded it on your verdict form. As I have already

4     explained, the Government, to prevail on a particular charge

5     against the defendant, must prove each essential element of

6     that charge beyond a reasonable doubt. If the Government

7     carries this burden, you should find the defendant guilty of

8     that charge. Otherwise, you must find the defendant not guilty

9     of that charge.

10         Each of you must decide the case for yourself, after

11    consideration, with your fellow jurors, of the evidence in the

12    case, and your verdict must be unanimous. In deliberating, bear

13    in mind that while each juror is entitled to his or her

14    opinion, you should exchange views with your fellow jurors.

15    That is the very purpose of jury deliberation-to discuss and

16    consider the evidence; to listen to the arguments of fellow

17    jurors; to present your individual views; to consult with one

18    another; and to reach a verdict based solely and wholly on the

19    evidence.

20         If, after carefully considering all the evidence and

21    the arguments of your fellow jurors, you entertain a

22    conscientious view that differs from the others', you are not

23    to yield your view simply because you are outnumbered. On the

24    other hand, you should not hesitate to change an opinion that,

25    after discussion with your fellow jurors, now appears to you

N8VBPER1                          Charge

1    erroneous.

2           In short, your verdict must reflect your individual

3    views and must also be unanimous.  This completes my

4    instructions of law.

5           Now before we swear in the marshal and excuse you to

6    your deliberations, a couple of housekeeping items.  First, you

7    can take as little, as long as you want for your deliberations.

8    I've had juries return a verdict in ten minutes.  I've had

9    juries return a verdict in ten days.  You may not want to adopt

10   that latter position, but the point is, it's totally up to you

11   how much time you need.

12          We will be here till 4:30, but I will excuse the

13   lawyers and parties for a one-hour break at 1:00 for lunch, and

14   you'll have your lunch in the jury room as well from 1:00 to

15   2:00.  So if you send out any notes at or shortly before 1:00,

16   we probably won't be able to respond to you until 2:00.  I want

17   you to be aware of that one hour break that will occur.  If you

18   haven't reached a verdict by 4:30, you should just go home and

19   return at 9:30 tomorrow morning, and your foreperson will be in

20   charge of making sure you don't resume your deliberations until

21   all 12 of you are back in the jury room.

22          Now we come now to the one part of this process that I

23   don't like, which is excusing our alternate jurors.  But you're

24   not off the hook yet because if for some unfortunate reason

25   some juror later on had to be excused or got sick or something

A001075

N8VBPER1                    Charge

1    like that, we would call you back and then start deliberations

2    all over again.  So you still should not discuss the case with

3    anyone.  We'll let you know when the case is over, but I want

4    to thank you immensely for your very excellent service.  And

5    what you should do now is go back in the jury room, get your

6    stuff and leave before the jury comes in to begin their

7    deliberations.  Thanks again.  We will swear in the marshal.

8              (Marshal sworn)

9              THE DEPUTY CLERK:  Jurors, please follow the marshal.

10             (At 10:11 a.m., the jury retired to deliberate)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A001076

N8VBPER1                         Charge

1           (Jury not present)

2           THE COURT:  Please be seated.  All objections to the

3      charge that were previously made are preserved for purposes of

4      appeal.  Now, where do we stand on the exhibits, the laptop and

5      so forth?

6           MS. NICHOLAS:  Everything is here, your Honor.  We

7      have the laptop as well as the thumb drive with the videos and

8      a sanitized exhibit list that I believe defense counsel has had

9      a chance to review, and we're in agreement.  We have provided

10     written instructions as to logging in to the laptop.  I know

11     that is sometimes a bit of a difficulty.

12          THE COURT:  If the jury has problems, they'll let us

13     know and we'll send in some techy guy to work it out.  So give

14     all that to my courtroom deputy and she will take it to the

15     marshal to give to the jury.

16          MS. BAHARANYI:  Your Honor, we have our single exhibit

17     which is our photograph.

18          THE COURT:  Yes.  So my practice is that the defendant

19     and at least one attorney from each side who is authorized to

20     answer any questions has to remain on this floor.  You can go

21     outside the courtroom, but you can't leave the floor because we

22     don't want to go searching for you when a note comes in.  The

23     only exception is between one and two, which as I already

24     indicated to the jury you're excused for lunch during that

25     hour.

N8VBPER1                         Charge

1          I want to take a moment to commend counsel for both

2     sides in this case, regardless of the verdict, and I never

3     comment on a verdict.  I thought this was a very well-tried

4     case by both sides, very professional, and you all have reason

5     to be proud of your work on this case.  So I thank you for that

6     because it makes my job a lot easier.  And I should include in

7     that commendation the appellate counsel for the defense who's

8     sitting beyond the table.  So very good.  Thanks so much.

9                    (Recess pending verdict)

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A001078

N8VBPER1                          Charge

1              (Jury not present – 12:04 p.m.)

2              THE COURT:  So my law clerk says that the defense

3    wanted to have marked as exhibits those five unsolicited notes

4    that we received this morning before I charged the jury.  I

5    don't think they should be marked as exhibits because really

6    they were nullities.  I told the jury that after they heard my

7    charge, they had any questions, they should put them, and they

8    chose not to put any further questions.  And I read those

9    unsolicited notes into the record, but I will give a copy of

10   them to counsel for each side just so you can compare them with

11   the transcript in case you think there was any typos or things

12   like that.

13             MS. BAHARANYI:  Your Honor, on that point, before we

14   proceed. We do think that -- well, not think.  The Second

15   Circuit has made clear the type of procedures for handling any

16   inquiries by the jury, and that's in *United States v. Ronder*,

17   and specifically any notes that are sent to the Court by the

18   jury should be marked as exhibits.

19             THE COURT:  I don't think that applies to this

20   situation.  They're not even signed.  Of course any

21   communication by a juror with the Court or with my staff, I

22   immediately report it, put on the record.  And in this case,

23   they were, in my view, the Court could have just simply

24   rejected them out of hand because it was before the charge.

25   And most of the questions were answered by the charges, events

N8VBPER1                     Charge

1    have proven, but what do you mean mark them as exhibits?

2              MS. BAHARANYI:  Well, given that these were

3    communications from the jury about this case.

4              THE COURT:  What do you mean physically by marking

5    them as exhibits?

6              MS. BAHARANYI:  Taking the notes themselves just like

7    we would any defense --

8              THE COURT:  And marking them as what kind of exhibits?

9              MS. BAHARANYI:  Court exhibits.

10             THE COURT:  No, I'm not going to mark them as court

11   exhibits, because I think I could have rejected them.  I will

12   tell you what, I will give the originals to my courtroom deputy

13   and ask her to docket them as unsolicited jury notes.  Any

14   problem with that?

15             MS. BAHARANYI:  Your Honor, if I may have one moment.

16             THE COURT:  Yeah.

17             (Pause)

18             MS. BAHARANYI:  Your Honor, we maintain our objection.

19             THE COURT:  I don't understand it.  The only purpose

20   that you could want them marked is so that you can make

21   reference to them on any appeal, if there is a conviction.  And

22   of course we're waiting on the verdict.  It may be acquittal

23   for all we know.  But assuming it's a conviction, you have, I

24   read them into the record.  I gave you copies, and I'm going to

25   have them placed on the docket.  So the Second Circuit can have

A001080

N8VBPER1                    Charge

1    numerous references to them verbatim.  What more do you want?

2    The reason I'm not willing to mark them as court exhibits is

3    because I think that we didn't have occasion to discuss it that

4    I could have rejected them out of hand and ripped them up as

5    improper communication from unknown jurors, but I didn't do

6    that.

7            Instead, I told them if you still have any of these

8    questions after you, or any other question, after you've heard

9    my charge, you can put the question to me in the proper form

10   through your foreperson, and they chose not to do that.  So

11   you're going to have three different ways of having them on the

12   record.  I don't understand why they have to be "court

13   exhibits."  Denied.  Bring in the jury.

14           THE DEPUTY CLERK:  Officer, can you please bring in

15   the jury.  Defense counsel, can you please spell the name of

16   that case for the court reporter.

17           MS. BAHARANYI:  R-O-N-D-E-R.

18           THE DEPUTY CLERK:  Thank you.

19           (Continued on next page)

20

21

22

23

24

25

A001081

N8VBPER1                    Charge

1           THE MARSHAL:  Jury entering.

2           (Jury present – 12:09 p.m.)

3           THE DEPUTY CLERK:  Will the foreperson please rise.

4           THE COURT:  The rest of you can be seated.

5           THE DEPUTY CLERK:  You've say you've agreed upon a

6    verdict?

7           FOREPERSON:  Yes.

8           THE COURT:  All right.  I'm going to open the verdict

9    envelope in a second, but I won't comment on it, because

10   deciding a verdict is your job, not mine, but I do want to

11   comment on what a great jury you were.  I have been watching

12   you carefully out of the corners of my eye, and you were all so

13   attentive throughout this trial.

14          And, you know, I have another trial starting in a week

15   or two, would you like to come -- no, I guess not.  Actually,

16   you'll be glad to know that you're excused from federal jury

17   service for four years now.  Okay.  I will open the verdict

18   form.  So the verdict appears to be in proper form.  I will

19   give it to my courtroom deputy to take the reading of the

20   verdict.

21          THE DEPUTY CLERK:  Will the foreperson please rise.

22   In *United States v. Steven Perez, AKA "Lucha El Por Libertad*,"

23   Dkt. No. 22 Cr. 466.  On Count One, the charge of conspiracy to

24   transport or receive firearms from outside states of residency,

25   you the jury find defendant Steven Perez, also known as, Lucha

A001082

N8VBPER1                    Charge

1    El Por Libertad, guilty or not guilty.  You say?

2              FOREPERSON:  Guilty.

3              THE DEPUTY CLERK:  On Count Two, the charge of

4    interstate transport or receipt of a specific out-of-state

5    firearm, you the jury find defendant Steven Perez, also known

6    as, Lucha El Por Libertad, guilty or not guilty.  You say?

7              FOREPERSON:  Guilty.

8              THE DEPUTY CLERK:  Shall I poll --

9              THE COURT:  I'll do it.  Ladies and gentlemen, you

10   heard your verdict read by your foreperson.

11             Ms. Foreperson, is that your verdict?

12             FOREPERSON:  Yes.

13             THE COURT:  Juror No. 2, is that your verdict?

14             JUROR:  Yes.

15             THE COURT:  Juror No. 3, is that your verdict?

16             JUROR:  Yes.

17             THE COURT:  Juror No. 4, is that your verdict?

18             JUROR:  Yes.

19             THE COURT:  Juror No. 5, is that your verdict?

20             JUROR:  Yes.

21             THE COURT:  Juror No. 6, is that your verdict?

22             JUROR:  Yes.

23             THE COURT:  Juror No. 7, is that your verdict?

24             JUROR:  Yes.

25             THE COURT:  Juror No. 8, is that your verdict?

N8VBPER1                    Charge

1           JUROR:  Yes.

2           THE COURT:  Juror No. 9, is that your verdict?

3           JUROR:  Yes.

4           THE COURT:  Juror No. 10, is that verdict?

5           JUROR:  Yes.

6           THE COURT:  Juror No. 11, is that verdict?

7           JUROR:  Yes.

8           THE COURT:  Juror No. 12, is that your verdict?

9           JUROR:  Yes.

10           THE COURT:  Jury polled. Verdict unanimous.

11           All right.  Ladies and gentlemen, again my very great

12   thank for your excellent service, and you are now excused.

13   Have a very good weekend.

14           (Jury excused)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

A001084

N8VBPER1                        Charge

1      THE COURT:  Please be seated.  All right.  We need to

2  set a sentence date.  Linda.

3      THE DEPUTY CLERK:  Monday, December 4th, at 2.

4      THE COURT:  Monday, December 4th, at 2 p.m.  Let me

5  ask the government do you have any bail application.

6      MS. NICHOLAS:  Yes, your Honor.  The government's

7  position is detention is mandatory in this, and we are seeking

8  detention as we have at every point throughout this litigation.

9      THE COURT:  Let me hear from defense counsel.

10      MS. BAHARANYI:  Your Honor, as the Court is aware, the

11  Court does have the ability to continue bail in this case even

12  following a conviction.  The Court has seen Lucha El show up to

13  court numerous times, and at this point during this week

14  without any sort of even ankle monitoring condition.  He is

15  eager to be part of every single step of this process.  He is

16  not a flight risk, and certainly I think the family that he has

17  here today, his younger brother Israel Perez, the family that

18  is on their way back having briefly stepped outside are further

19  testaments to the ties to this community that he has.  They're

20  extensive. They're long lasting.

21      THE COURT:  My recollection is it's not at this point

22  just a question of flight risk, it's mandatory unless you

23  establish certain conditions.  Maybe the government can remind

24  me of the statute.

25      MS. NICHOLAS:  Yes, your Honor, 3143(a)(2).

A001085

N8VBPER1                          Charge

1          THE COURT:  Hold on.

2          MS. BAHARANYI:  Your Honor, flight is one of the

3     factors for the Court to consider.

4          THE COURT:  I'm not saying that.  I'm just saying it's

5     not the whole story, but let me look at 3143.

6          MS. BAHARANYI:  I think to clarify, it's a presumption

7     of detention, not mandatory.

8          THE COURT:  3143, which is entitled, Release or

9     Detention of the Defendant Pending Sentence or Appeal.

10          (a) except as provided in paragraph two, the judicial

11     officer shall order that a person who has been found guilty of

12     an offense and who is awaiting imposition or execution of

13     sentence be detained unless the judicial officer finds by clear

14     and convincing evidence that the person is not likely to flee

15     or pose a danger to the safety of any other person or the

16     community.

17          Then paragraph two says, The judicial officer shall

18     order that a person who has been found guilty of an offense in

19     a case described in subparagraphs A, B or C of subsection (f)

20     (1) of section 3142, and is awaiting imposition or execution of

21     sentence be detained unless,;(a)(1),  the judicial officer

22     finds there is a substantial likelihood of a motion for an

23     acquittal or a new trial will be granted; or (2) an attorney

24     for the government has recommended that no sentence of

25     imprisonment be imposed on the person; and the judicial officer

A001086

N8VBPER1                    Charge

1    finds by clear and convincing evidence that the person is not

2    likely to flee or pose a danger to any other person or the

3    community.

4            And then, let me ask the government, does this

5    conviction fall within any of the provisions of A, B or C of

6    subsection (f)(1) of section 3142 or not?

7            MS. NICHOLAS:  Our position is that it does, your

8    Honor, for the same reason that a felon in possession case

9    does.  And I'm happy to provide the Court with the cite that

10   the government is relying on for that argument.

11           THE COURT:  If, going back to defense counsel, if it's

12   falls within 3143(2), then the defendant must be detained

13   unless there is a substantial likelihood that a motion for

14   acquittal or a new trial be granted.  I would say at this point

15   without prejudging any such motion, I think that's not a

16   finding I would remotely be able to make at this time; or, an

17   attorney for the government has recommended that no sentence of

18   imprisonment be imposed on the person.  The government

19   obviously is not recommending that.  And then there's again the

20   question of flight or danger to the community.

21           So if it's under the second paragraph of sub 3143,

22   it's not a question of just flight or even flight is not even a

23   question of discretion, it's a question of mandatory detention.

24           MS. BAHARANYI:  Your Honor, we disagree with the

25   government's characterization or position on where this offense

A001087

N8VBPER1                    Charge

1    falls, and perhaps a proffer from them would be helpful.

2              THE COURT:  Yeah, I think that's fair.  So why do you

3    think it falls within section two.

4              MS. NICHOLAS:  Yes, your Honor.  The case is *Watkins*.

5    It's 940 F.3d 152, which is a 2019, Second Circuit case. That

6    case is specifically about possession of ammunition under

7    922(g)(1).  That case looks back at how the Second Circuit has

8    looked at crimes involving the possession of a firearm, and

9    says clearly -- and I'll quote directly, "It's long been the

10   law of our Circuit, that possession of a firearm is

11   unequivocally a crime of violence for the purposes of Section

12   3142(f)(1)(A)".

13             And really the turning stone of the reasoning the

14   Court uses here is the idea that there is some risk even in

15   where it's just the possession of ammunition, the ammunition

16   can find its way into a gun, and we're in the world of a crime

17   of violence.  I think there's clearly the same risks here in a

18   case involving possession transportation of firearms.

19             MS. BAHARANYI:  Your Honor, if I may respond?

20             THE COURT:  Yes.

21             MS. BAHARANYI:  He certainly has not been charged with

22   922(g) or any subsection there.  He's not charged with the

23   possession of a firearm, and I think the differences between

24   the section under which he's been charged with and what the

25   government has discussed are significant.  One of the primary

N8VBPER1                         Charge

1    differences is, Congress treats these two statutes quite

2    differently.  There's a maximum punishment of 15 years imposed

3    if someone's charged with 922(g).  The maximum punishment for a

4    922(a)(3) offense is five years.  I think they treat the

5    conduct differently -- or the statutes differently because it's

6    also meant to capture different conduct, different *mens rea*,

7    different elements.

8            We're asking the Court to follow I think the command

9    or the instructions, guidance given to us by Congress, given to

10   us to by the codebook.  And I think that the arguments that we

11   would make about flight and danger are still arguments that the

12   Court can consider even if the Court were to find that this

13   fell under prong two because mandatory -- I think the Court is

14   very familiar -- mandatory remand cases come before this Court

15   often, even in the conduct of 922(g) cases, which we don't have

16   here.

17           And if there are certain compelling reasons, certain

18   exceptional reasons that exist, then a person may be allowed to

19   continue and remain in the community.

20           THE COURT:  I will, before ruling on whether this

21   falls within (2) or not, what do you want to say on all those

22   other grounds.

23           MS. BAHARANYI:  One of the first and primary grounds

24   is I think the ability of this Court over several months to see

25   that, while Lucha El may have different, very different

N8VBPER1                    Charge

1    opinions from the Court, very different opinions about how the

2    Court even wishes to be communicated with, he certainly has not

3    in the months since December of 2022 ever once violated a

4    condition of release, ever once failed to show up where he was

5    supposed to show up, failed to stay in touch with his pretrial

6    officer, failed to come to court.  He has shown the ability to

7    abide by these very important and serious conditions that have

8    been put in place.  And he was able to do that even under

9    strict conditions, home incarceration and a curfew, and under

10   the more lenient conditions that he was able to experience over

11   the past few days.

12          No matter what type of conditions the Court imposes,

13   he's able to follow them.  And that segways to safety in the

14   community, his ability to maintain and conduct himself in the

15   community that does not pose a danger.  Over the past several

16   months while he's been on pretrial supervision under the

17   supervision of his pretrial officer Mr. Jonathan Lettieri, he's

18   also never once had any contact with law enforcement.  He's

19   never once violated any laws.  In fact, in the community, his

20   community, he's been the person feeding the community.  He host

21   barbecues for individuals just right outside of his home on

22   3318 Perry Avenue.  He takes care of people.  He's sort of the

23   community caretaker if you will.

24          Your Honor, just yesterday leaving the courthouse, one

25   of the individuals who helps sweep up outside, the different

N8VBPER1                    Charge

1    floors in this courthouse says hi to Lucha, greets him.  They

2    talk about their families.  They talk about each other.  Lucha

3    El tells us about how he is doing after the lost of his wife

4    because that person is part of his neighbor, that person is

5    part of his community.  And Lucha El looks out for him and

6    looks out for everyone in his sort of purview in the community

7    around 3318 Perry Avenue.  That's not the first and only person

8    even in this courthouse that Lucha El is somewhat of a

9    caretaker for when he goes back home to the Bronx.

10           When he goes back home, he's also a caretaker for

11   those in his family.  He has a son, a six-year-old named

12   Hayden.  That son is his entire world.  He speaks with him

13   quite regularly, daily since we've been on trial.  That would

14   be another devastating loss, for that communication to no

15   longer be able to continue, for that relationship to at this

16   point be broken by his incarceration, an incarceration on

17   charges that don't involve any violence or danger on his part.

18   He did not shoot.  He did not threaten.  He did not assault.

19           THE COURT:  What do you make of the fact that the

20   evidence showed overwhelmingly in my view that he had allied

21   himself with a "militia group" who intended to transport a

22   large number of arms to various places, and who felt strongly,

23   as he seemingly did as well, that the law be damned.  They

24   thought, this was their view of the law was the law, and they

25   could do with guns and transport, receive, obtain, and

**A001091**

N8VBPER1                    Charge

1    otherwise handle weapons, indeed train to handle weapons, in

2    any way they chose because that was in their view the law.  So

3    how can I have even the slightest confidence that he would

4    abide by the law now that he knows that he faces sentence?

5         MS. BAHARANYI:  Your Honor, since he was arrested, he

6    knew that he faced potential serious consequences in this case.

7    He's been very involved at every stage of this case.  He knows

8    what the punishments have been.  Today is not the first day

9    that he knew what could happen.  He's conducted himself in a

10   way that has shown the Court that he is certainly able to abide

11   by the laws, the Court's rules, the Court's pretrial rules in

12   his community.  He's not pose any sort of danger.  He's not

13   threatened or hurt or assaulted anyone.  And that goes just

14   generally, your Honor, but certainly also during this time that

15   the Court has known him and has the opportunity to spend time

16   with him if you will as part of this case.

17        I do want to point out that for this militia, for this

18   group, there again is no allegation that they threatened or

19   hurt or assaulted anyone.  This conduct that happened in

20   Massachusetts, I know we've heard a great deal about it.  We

21   haven't heard everything about it, but we've heard a great deal

22   about it.  I think what's salient is, this is an arrest or

23   incident that ended peacefully.  It's an arrest or incident

24   that I think even as it started the group leader said, we don't

25   intend this to be a violent interaction.  And I don't think

A001092

N8VBPER1                    Charge

1    there's been any evidence in the record that they ever once

2    were intending violence or destruction or to threaten anyone or

3    assault anyone.

4            THE COURT:  What were they doing with all those

5    weapons?

6            MS. BAHARANYI:  I think what did come out -- well,

7    maybe it didn't come out here, but what we know from the

8    discovery they've provided that they were planning to do

9    trainings.  They had camping gear.  They plan to go into the

10   woods and eat out of cans of beans and sleep outside and really

11   camp and train, learn how to use firearms, not use firearms on

12   individuals, not threaten anyone with firearms.  It was truly

13   sort of a camping and training exercise, not with any violent

14   or violent intent behind it.  And that's for that group.

15           I think what's also been hopefully clear from the

16   evidence is, Lucha El's involvement in that group is not as a

17   leader.  It's not a longterm involvement.  The only messages

18   that came in, the discussion was for about a month or two

19   before his arrest in Massachusetts.  So I think to suggest that

20   he's some core member, a leader of the group I think is

21   misleading.  And also to suggest that this group itself, his

22   association in any way with this group, who has a First

23   Amendment to espouse their beliefs, to speak about what they

24   believe in.  But to suggest that his association with that

25   group that did not engage in violence somehow makes Lucha

A001093

N8VBPER1                    Charge

1   violent is not a fair suggestion in this case.  It's quite

2   misleading.

3          I would just note that for his -- I think the Court

4   may not know this because you were not part of the initial bail

5   hearing, but Lucha stands before the court with a single prior

6   conviction that's for misdemeanor drug possession from ten

7   years ago at this point.  So this is a person who has, in his

8   33 years, has a very minimal record, who's facing conviction on

9   crimes that carry a five-year statutory maximum, who did not

10  engage in any sort of violent, assaultive conduct, did not

11  threaten anyone.  And the 911 call wasn't initiated because he

12  threatened anyone or engaged in violence or assaultive conduct

13  against anyone, that's not who he is.  He has no convictions of

14  the nature for that.  And I think he's shown the Court over

15  several months now his ability to remain in the community, his

16  ability to remain in the community and not pose any sort of

17  danger or not pose any sort of violence to anyone.

18         THE COURT:  Thank you.  Let me hear from the

19  government.

20         MS. BAHARANYI:  I'm sorry.  The last thing, your

21  Honor, because I think this is also important.  And thank you

22  for my co-counsel.

23         When it comes to mandatory detention, I think we're

24  talking a bit about the standard.  I want to be a bit more

25  precise about the Court's power, ability there.  If there are

A001094

N8VBPER1                    Charge

1    exceptional circumstances, and I think the exceptional

2    circumstances are those we laid out to the Court, then your

3    Honor absolutely has the ability to allow him to stay out

4    remain with his family.

5         THE COURT:  My recollection is that by exceptional

6    circumstances, you're not talking about just that you've shown

7    that he's not a flight risk and/or a danger to the community,

8    because that would mean that the mandatory aspects of these

9    statutes are irrelevant.  I think exceptional circumstances

10   means things like someone whose got a very serious heart

11   condition and needs immediate hospitalization or something like

12   that.  I don't see anything like that here.  What you've just

13   been arguing are the standard positions for under the first

14   section of 3143, not anything that is exceptional.

15        MS. BAHARANYI:  Certainly the arguments for -- we

16   believe still your Honor should be considering this under the

17   first section.  But, I think even his background, what we've

18   explained about his background, his exceptional behavior on

19   pretrial release is proof that these backgrounds would even fit

20   the exceptional circumstances that the Court is required to

21   consider.  I will also note his position as someone who is a

22   community caretaker, his position as someone who is taking care

23   of his family as well, his position as a young father who has

24   again a very minimal crime history, that is exceptional in this

25   case as well.

A001095

N8VBPER1                    Charge

1          THE COURT:  I want to hear from the government, but
2    just on that narrow point of, none of that strikes me as
3    exceptional.  It's very common because unfortunately most
4    crimes are committed by young males who often have dependents,
5    but let me hear from the government.
6          MS. NICHOLAS:  Thank you, your Honor.  I want to begin
7    by going back to 3143(a)(2) as to why this is in fact
8    mandatory.  And again, *Watkins* is controlling here.  *Watkins* is
9    not about anything other than possession of a firearm.  It's
10   the operative concept there is crime of violence.  And I think
11   all the Court needs to know is what the Second Circuit said and
12   has long said, which is that it's unequivocal that possession
13   of a firearm is a crime of violence for purposes of Bail Reform
14   Act.  I think that gets us there.
15         Your Honor, I want to be clear that the government
16   would be seeking remand here as well under the non-mandatory
17   provisions for both danger and flight reasons as have been
18   articulated frequently throughout the case, but I want to
19   respond to a couple of specific arguments.  First is defense
20   counsel's characterization of this group, Rise of the Moors.
21   This militia group that was traveling to Maine.  The government
22   provided an extremely narrow set of materials to the jury.
23         Taken on their own, defense counsel's characterization
24   maybe plausible.  Taken together, the full scope of what we
25   know about this group, what they were talking about, what they

**A001096**

N8VBPER1                    Charge

1    were planning, what they did in response to the defendant's

2    first arrest in the Bronx, there is nothing about them that

3    would suggest this was some kind of harmless camping trip in

4    Maine.  What this was, was a group of people training with

5    firearms because they contemplated eventual violence.

6           In response to defendant's arrest in the Bronx, Al

7    Aban, one of the people arrested with him in Massachusetts,

8    told Jamal Latimer, make me lethal.  They were frustrated with

9    law enforcement.  They had no regard for the law, and that was

10   the response.  This is not a harmless group, and that's the

11   first point I want to make.  I think it's just completely

12   misleading to go off of what was shown to the jury based on

13   decisions --

14          THE COURT:  The Court as well kept from the jury much

15   of the information regarding what that militia was doing and

16   what they were up to; but of course I can consider it now on

17   bail.

18          MS. NICHOLAS:  And in that vein, this group refused to

19   disarm.  They refused to give their names to law enforcement.

20   The defendant has repeatedly refused to be fingerprinted.  This

21   is not a group that respects the law, the mandates issued by

22   courts.  We also have a sample set of information about how the

23   defendant has conducted himself in his case in Massachusetts,

24   which has been again adjourned till February.  This defendant

25   has multiple sentences that are coming that he has every reason

A001097

N8VBPER1                    Charge

1    to want to try to avoid, which is a very clear risk of flight.

2    Even under the non-mandatory provisions, the government would

3    be seeking detention here, think it's a very compelling

4    argument both on danger and on flight.

5              MS. BAHARANYI:  Your Honor, if I may respond to a few

6    points that have been raised.

7              THE COURT:  Sure.

8              MS. BAHARANYI:  First, regarding the characterization

9    of the group, the militia training, all of what has been raised

10   by the government.  I think it's important to note that there

11   has never been once been an allegation by the government, they

12   certainly aren't charged with violent conduct in Massachusetts.

13   They have not been -- there's no allegation that they ever

14   engaged in violence.

15             I think what the government has cited or talked about

16   are messages where people are expressing frustrations, but

17   certainly not an intent to threaten or harm or assault anyone.

18   And I think the idea that this was -- not to go so far into the

19   training details, but the idea that this training was only for

20   the purpose of conducting violence is a certain speculative

21   lens; or, I would say, a filter that the government is viewing

22   the evidence through.  I think the group's own words and their

23   actions, the fact that they alerted the sheriff in Maine that

24   they were going to be training there; the fact that they were

25   given permission to train in Maine; the fact that they tried --

N8VBPER1                    Charge

1    albeit perhaps in an incorrect way, they tried to go about

2    their business peacefully, all of that is proof that his

3    association with this group does not make him violent.

4         But I think to turn to some particular exceptional

5    circumstances that exist here.  One, if Lucha El is remanded,

6    if he's placed in jail, it's going to be at the MDC Brooklyn.

7    I think the Court is aware of generally how dysfunctional and

8    chaotic that space is. It's only getting more so by the day

9    because of staffing shortages.  They're operating at about 50

10   percent capacity for their staff right now, which means that

11   he's going to go into a cell and stay in his cell, sometimes

12   24/48 hours or a whole weekend at a time.  This is problematic

13   not just because of truly how inhumane those conditions are,

14   it's also problematic because he has a pending criminal case in

15   Massachusetts that he has been attending.  He's been on bail

16   for a few years now, and that pending case is going to trial in

17   February and requires his input, his participation.  He's

18   actually *pro se* there, so he's instrumental in his need to have

19   access to discovery, his need to be able to talk to witnesses

20   is quite instrumental.

21        And I think the Court has seen, contrary to the

22   government's assertions, that Lucha El is someone who does have

23   a desire to be deeply involved in his legal cases.  He will be

24   completely hamstrung if he's sitting at the MDC Brooklyn on

25   lockdown 24/72 hours at a time because a guard or staff member

N8VBPER1                    Charge

1    won't let him out of his cell.  It also means during those time

2    periods he's not speaking with his son Hayden.  He's certainly

3    not having any communication with his family, with Israel

4    Perez, with his mother Maria who is here, and also his cousin

5    Maria who the Court had the opportunity to meet.  It is a

6    completely exceptional circumstance that he would be sent to a

7    place that is so isolating, so chaotic, and so violent at this

8    time, and that would hamstring, and that would completely

9    prevent him from defending himself in this other pending action

10   that the Court has been aware of now for sometime as well.  One

11   moment, your Honor.

12          (Counsel and defendant conferred)

13          MS. BAHARANYI:  Two more things, your Honor.  The case

14   that my colleague just handed up to me which is, *United States*

15   *v. Boyd*, and I'm just looking for the cite in front of me.

16   I'll give the exact cite to the Court.  The cite is 2022

17   WLS90771. This was a case decided out of this district, the

18   Southern District.  There the Court held that the conditions at

19   the MDC were in fact an exceptional circumstance warranting

20   someone's continued release even after conviction.

21          The conditions have truly, your Honor, only gotten

22   worse since the pandemic, not better; that's Covid, staffing

23   related.  It's truly an inhumane place to be.  But one of the

24   reasons why I wanted to take a moment was to speak to Lucha El,

25   because as the Court knows, he's been very deeply involved in

N8VBPER1                     Charge

1   this case.  One thing he wants the Court to know, he is not a

2   violent man.  He's not a violent person.  He isn't committed or

3   conducted himself ever in a violent way.  He is someone who is

4   moved by love, certainly the community around him knows that

5   well, and it is certainly hard for your Honor to see that

6   because you don't see him everyday.

7              THE COURT:  I received a love letter from him.

8              MS. BAHARANYI:  That's not representative of who he is

9   in terms of how he feels and how he takes care of those in his

10  community.  He certainly had no intent or desire at any point

11  to receive firearms to conduct violence.  And I think what

12  certainly is clear from the government's preparation today is

13  they don't have any evidence to the contrary.  He's not a

14  violent person.  He has no history of it, and that was not the

15  goal of the conduct in this case.

16             THE COURT:  All right.  So the first thing the Court

17  needs to consider is whether this case fits within Section 3143

18  (a)(2) such that detention is mandatory unless there are

19  exceptional circumstances.  The only thing raised by the

20  defense that this Court considers to fit within the notion of

21  exceptional circumstances would hypothetically be the

22  conditions at the MDC, although they effect.  And many of the

23  same respects that were just mentioned by defense counsel the

24  conditions at the MDC negatively effect numerous defendants in

25  their ability to feel safe and their ability to prepare

N8VBPER1                          Charge

1    properly for their legal defense and so forth.  So that is a

2    serious problem that has bothered this Court otherwise as well.

3            Now having said that, what I have been able to do in

4    individual cases before me, not this case, but cases where

5    there were difficulties preparing for trial or so forth is

6    arrange with the warden for appropriate provisions to be made.

7    I don't know that I have the power to do that in regard to a

8    case pending in Massachusetts, but certainly a judge there

9    could do that.  The warden is very receptive to that kind of

10   arrangement.

11           So while I don't mean to in any way minimize the

12   serious problems at the MDC, I don't think they meet the

13   requirements for exceptional circumstances in this context of

14   bail, so I think I am obliged under section 3143(a)(2) to

15   detain the defendant.

16           Now assuming for the sake of argument that the

17   conditions at the MDC would meet the exceptional circumstance

18   provision, though as I say I don't they that's right, if I had

19   to consider the factors under section 3143(a)(1), although it'd

20   be a closer call, I would still detain the defendant because

21   what I think has emerged from the proof in this case

22   overwhelmingly is how totally he disrespects the law when it

23   comes to firearms.  And however much he may respect the law

24   with respect to the showing up for court before a conviction,

25   though the risk of flight is now obviously increased by the

N8VBPER1                        Charge

1    fact of conviction, it pales by comparison to his deep-seeded

2    belief that he is the law when it comes to dangerous weapons.

3            Now I went to great lengths throughout this trial to

4    make sure to put out of my mind his letter to the Court and

5    told myself repeatedly during the course of the trial, if

6    anything, Judge, lean in his favor, because you must not allow

7    that letter to impact.  But when it comes to the issues made

8    here of bail, I think I can consider that letter as well.  And

9    that letter just further shows that he's not just a follower,

10   he has a deep-seeded heartfelt unfortunately belief that he is

11   the law when it comes to weapons, he and his co-conspirators.

12           So even under section 3143(a)(1), I would still detain

13   him, so the marshal will take the defendant into custody at

14   this time.

15           MS. BAHARANYI:  Your Honor, before that happens, I

16   think there are still a couple of points the Court should know,

17   and I understand what the Court has said.  What the government

18   hasn't shared with the Court, but I'm sure the government is

19   aware of, is that these firearms in Massachusetts, except for

20   the one from Keith Vereen, were firearms that had been

21   purchased by other people, not by Lucha; firearms that had been

22   purchased legally too, not by Lucha, but by other individuals

23   in their own states of residence.  I could see them talking

24   here, but I believe that's some information they are privy to,

25   your Honor.

N8VBPER1                    Charge

1          I think more important is, his views on the Second
2    Amendment, those are views.  And those are views that he's now
3    heard that the Court strongly, strongly disagrees with.  His
4    conduct over the past several month shows that even if there
5    are disagreements, he can follow by whatever the Court --
6    whatever conditions are imposed, whatever the Court says he
7    must do, he can do it.  And that includes not being around, not
8    using, not holding firearms.  He's done that for several
9    months.  He will continue to do that.  And throughout, up until
10   the time of his sentencing and throughout, because now it would
11   be a felony for him to have a firearm.  He's shown he can abide
12   by the Court's conditions.
13          THE COURT:  I need to at this point cut you off
14   because I've heard your arguments.  I will hear the government
15   on the last point you made that you said was within their
16   knowledge; but of course you can appeal this ruling to the
17   Second Circuit as you know.  And if they take a different view,
18   so be it.
19          MS. BAHARANYI:  We would ask for the ability to have a
20   stay pending appeal for that purpose.
21          THE COURT:  No.  Denied.
22          MS. BAHARANYI:  Or a surrender date for Lucha El so
23   that he can at least say good-bye to his family and his son.
24          THE COURT:  Denied.  Let me hear from the government
25   if they want to say anything on that.

N8VBPER1                    Charge

1          MS. NICHOLAS:  Very shortly, your Honor.  The

2     government has never alleged there was only one straw purchaser

3     in this case.  As to the names on the purchase reports, at

4     least two of the firearms were purchased by Quinn Cumberlander,

5     also of the militia arrest on behalf of Al Aban, who was in New

6     York with the defendant. It's not relevant to this question,

7     your Honor.

8          THE COURT:  One who even saw even the small snippets

9     of the Massachusetts events that the Court saw would join with

10    the government in saying this was not just a friendly camping

11    trip in Maine.  That is ridiculous.  These folks were up to no

12    good, and it's self-evident to any objective observer.  That

13    concludes this proceeding.  The marshals may proceed with

14    taking the defendant into custody.

15          (Adjourned)

A001105

8/31/23     930     Jury Note 1
US v Perez  22 cr 644-02 (JSR)

Your Honor,

Is it important what state the defendant
received the gun in? If he received
the gun in a different state other than
New York, did he still break the law?
(with regard to charge #2, the canie).

Thank You

A001106

① 8/31/23  9:30

US v. Perez 22cr644-02 (Jury Note 7
(SK))

Was any search made
in the house of the
accused?

② If yes was any
firearms found that
was purchased by the
straw purchaser?

Jury Note 3   8/31/23   70
USv Perez 22/CR64702 JSH

Your Honor,

I find the definition of willfullness as operating with bad intent to be too vague to reason about. What is "bad"? And by whose judgement must it be "bad"? Certainly many crimes are commited by people who do not think they are doing something bad, and yet they are doing something bad by someone else's judgement. Can you help make this more clear?

Thank You

A001108

Jury Note 4     8/31/23 3 USvPerez 22cR644
Can we hear the 911 call.?     (JSJ)

A001109

US v Perez 22cr 644-02 (CJSJC)    Jury Notes

What is the law on searching
someone's belongings?

Does he have to provide permission?

A001110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

STEVEN PEREZ (A/K/A "LUCHA EL
POR LIBERTAD"),

Defendant.

22-cr-644 (JSR)

<u>VERDICT</u>

1. On Count One, the charge of conspiracy to transport or receive firearms from outside states of residency, we the jury find defendant Steven Perez, also known as Lucha El Por Libertad:

   Guilty ✓          Not Guilty _____

2. On Count Two, the charge of interstate transport or receipt of a specific out-of-state firearm, we the jury find defendant Steven Perez, also known as Lucha El Por Libertad:

   Guilty ✓          Not Guilty _____

_____
FOREPERSON

Date: ___8/31/23___

**A001111**

O185elS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4             v.                             22 Cr. 644 (JSR)

5   STEVEN PEREZ, a/k/a "Lucha",

6             Defendant.

7   ------------------------------x

8                                            January 8, 2024
                                             4:15 p.m.
9

10  Before:

11                   HON. JED S. RAKOFF,

12                                       U.S. District Judge

13

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  ASHLEY C. NICOLAS
17       MADISON SMYSER
         Assistant United States Attorneys
18
    FEDERAL DEFENDERS OF NEW YORK
19       Attorneys for Defendant
    BY:  ZAWADI BAHARANYI
20

21

22

23

24

25

O185elS

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties please identify

3     themselves for the record?

4          MS. NICOLAS:  Good afternoon, your Honor.  Ashley

5     Nicolas and Madison Smyser for the government.

6          THE COURT:  Good afternoon.

7          MS. BAHARANYI:  Good afternoon, your Honor.  Zawadi

8     Baharanyi with the Federal Defenders.  I am here on behalf of

9     Lucha El, who is being brought out now.

10          THE COURT:  Good afternoon.

11          So, we are here for sentencing.  The first item is the

12     calculation of the guidelines, even though I will say, as I now

13     say at all sentences, that the federal sentencing guidelines

14     are completely irrational and will have no bearing on my

15     sentence.  This is just another case where that is

16     demonstrated.

17          There is all this controversy, which we will get to in

18     a moment, of how many guns this defendant was involved with and

19     if it's three guns he gets two extra points, if it is eight

20     guns he gets four extra points.  I wonder how the brilliant

21     members of the Sentencing Commission came up with that.  Why

22     wasn't it one point?  Why wasn't it seven points?  Why wasn't

23     it three points?  This is all hocus-pocus, masquerading as

24     rationality.

25          So the guidelines are of no concern to me.  What, of

A001113

O185elS

1    course, is of concern to me, is the serious crime that was

2    committed and we will get to that later on.  But, since I have

3    to calculate the guidelines, the defense objects to the

4    government and the probation office's calculation which was a

5    total offense level of 20 and a Criminal History Category of I,

6    and therefore a guideline range of 33 to 41 months, a sentence

7    higher than any I am remotely contemplating in this case but

8    the defense objects to that calculation on two different

9    grounds.

10          First, the defense says that the four-level

11   enhancement for an offense involving 8 to 24 firearms was not

12   resolved by the jury -- I agree with that -- and is not

13   supported by the evidence and I am not so sure I agree with

14   that second part of the argument; and then the defense also

15   says that the guideline that says there should be another

16   four-level enhancement for the provision that says the

17   defendant used or possessed a firearm or ammunition in

18   connection with another felony offense really should not be

19   invoked on the other felony offense is simply, if you will, the

20   state parallel to the federal offense.

21          So, let me hear first from the government on those

22   objections and then I will turn to the defense.

23          MS. NICOLAS:  Thank you, your Honor.

24          I will start with the first which is under

25   2K2.1(b)(1), which is the number of guns involved in the

4

O185elS

offense.  I think your Honor already alluded to kind of the touchpoint of the government's argument here, what was argued before the jury is not the question.  It is actually quite a low standard, it is what is reasonably foreseeable to the defendant as a natural consequence of the unlawful agreement proven by a preponderance.

The government laid out, on page 7 of its sentencing submission, while constraining ourselves only to the four trips in which the defendant and Mr. Vereen, the straw purchaser, were located together, that that results in 17 firearms right there, if we only constrain ourselves to those four trips. That is setting aside the firearms that are outside that time span.  That also disregards the Glock, which is the additional firearm that the defendant was arrested with, taking us to 18. I think, based on the cell site information which was Government Exhibit 901, was the presentation that supported Mr. Peterson's testimony at trial, combined with the wire transfer information both for the defendant and the co-conspirator with whom he was arrested in Massachusetts, establish by a preponderance that at least 18 firearms were reasonably foreseeable to the defendant as a natural consequence of the criminal agreement.

I am happy to stop there.

THE COURT:  Why don't you stop there and let's hear from defense counsel.

A001115

O185elS

| | |
|---|---|
| 1 | MS. BAHARANYI:  Your Honor, we do agree with the |
| 2 | government that the question is about reasonable |
| 3 | foreseeability.  There is a lot of speculation that is going |
| 4 | into the government's calculation that should be highlighted. |
| 5 | First, they've at least limited now from 24 to 17. |
| 6 | Kudos to them for recognizing that the number 24 was also quite |
| 7 | speculative.  But if we look at the four trips, what we know |
| 8 | from these trips is that there was a cell tower that |
| 9 | Mr. Vereen's phone pinged off of that Lucha El's phone also |
| 10 | pinged off of.  We know that there were other cell towers that |
| 11 | Mr. Vereen's phone pinged off of that weren't anywhere in the |
| 12 | vicinity of Lucha El.  That includes cell towers in upstate New |
| 13 | York, in New Jersey, in different parts of the Bronx.  This was |
| 14 | all part of our cross-examination with Mr. Peterson, the expert |
| 15 | witness called by the government. |
| 16 | What that tells us is that while there were these |
| 17 | interactions after certain firearm purchases between Mr. Vereen |
| 18 | and between Lucha, we cannot glean from these interactions that |
| 19 | all of the firearms that were purchased during this time frame |
| 20 | were destined to Lucha El's hands or individuals that were |
| 21 | known to him. |
| 22 | I think it might be helpful to think of this in the |
| 23 | context, perhaps an unsavory context of someone who is dealing |
| 24 | drugs.  Someone who is dealing drugs to one purchaser, one |
| 25 | person who is buying it.  That person who is buying from them |

O185elS

1    in the moment may have no sense of how many other drugs the

2    person they're buying from is dealing.  They have no sense of

3    the overall conspiracy.  And what the government hasn't given

4    your Honor today or even at trial is any reason to fill in the

5    gaps in the way that they've proposed.  There are no

6    communications, text messages, wiretappings that would show

7    that Lucha El was aware of the grand scope of Mr. Vereen's

8    firearm dealings, and even the four dates that we have here,

9    for each of the wire transfers that the government has

10   highlighted, it certainly would not support the suggestion that

11   18 guns were purchased from about $1,000 worth of money

12   transferred.  That just does not compute.

13           So, your Honor, I do think while the government,

14   again, kudos to them, has lowered their number, in reality what

15   we are dealing with is just truly a lack of information and

16   information they cannot provide by a preponderance of the

17   evidence to show that the number was anything from 2, 3, 10, 11

18   firearms.  They just don't have the ability to prove that and

19   it is their burden.

20           THE COURT:  Before I hear from the government let me

21   make sure.  Are you asking for a Fatico hearing on this or are

22   you saying I can decide on the materials that both sides have

23   presented, but of course you interpret that as materials that

24   do not sufficiently support the government's burden.

25           MS. BAHARANYI:  It is the latter, your Honor.

O185elS

| | |
|---|---|
| 1 | THE COURT:  Same question to the government.  Are you |
| 2 | seeking a Fatico hearing? |
| 3 | MS. NICOLAS:  We are not, your Honor. |
| 4 | THE COURT:  OK.  So go ahead. |
| 5 | MS. NICOLAS:  Your Honor, I think we need to parse out |
| 6 | what defense counsel just said because I think there was some |
| 7 | mixing of standards. |
| 8 | The question is not whether or not 18 firearms ended |
| 9 | up in this defendant's hands.  The question is actually if we |
| 10 | get past the threshold of eight as part of a foreseeable |
| 11 | result, a natural consequence of the unlawful agreement in |
| 12 | which the defendant participated, we are talking about the |
| 13 | defendant with whom he was arrested in Massachusetts with |
| 14 | another person who sent money to Mr. Vereen and it is not just |
| 15 | the stand-alone cell site information, it is also the pattern |
| 16 | of communications, cell site information, gun purchases and |
| 17 | money transfers, and certainly this is not in evidence but the |
| 18 | government's closing slides laid that out quite clearly, |
| 19 | putting together all of that evidence -- the cell site, the |
| 20 | toll records. |
| 21 | THE COURT:  On this first point I agree with the |
| 22 | government.  I think the government's position is based on a |
| 23 | number of circumstantial inferences but, of course, those are |
| 24 | totally permissible to be drawn and the burden is only |
| 25 | preponderance and I think they have established that he |

O185elS

| | |
|---|---|
| 1 | reasonably foresaw that eight or more guns would be involved. |
| 2 | Let's now turn to the other enhancement.  The |
| 3 | government's position, while it may comport with the facial |
| 4 | language of the guideline and therefore satisfy the textualness |
| 5 | of the Supreme Court, seems kind of crazy.  It means that every |
| 6 | single time there is a parallel state statute, which is going |
| 7 | to be true in the many, many, many states, you are just going |
| 8 | to have an automatic enhancement.  That sounds awfully like |
| 9 | double punishment to me. |
| 10 | MS. NICOLAS:  Your Honor, I actually don't think that |
| 11 | is the relevant question in this case where the defendant was |
| 12 | charged with an offense relating to how he obtained the guns. |
| 13 | And I understand and acknowledge that it is a nuanced |
| 14 | difference, but any potential state case in New York related to |
| 15 | the firearm would be a possession offense, but even here it is |
| 16 | one step further in that there were other offenses, even if we |
| 17 | were to argue, which we are not, that that is the point of the |
| 18 | statute, the two possession enhancements can't exist together. |
| 19 | Here we have a body armor offense, we have an ammunition |
| 20 | offense, we have an offense relating to extended magazines, all |
| 21 | of which he was charged with in Massachusetts.  That's not even |
| 22 | the question.  The question is, is there another offense, |
| 23 | another felony offense that the defendant has committed in |
| 24 | connection with his acquisition of a firearm under which he was |
| 25 | convicted in the federal courts. |

O185elS

1          THE COURT:  Well, one of the problems, many problems I
2     have with the guidelines but I don't want to spend the next
3     five hours going through them all, is very little legislative
4     history.  So, one would have thought that this might have been
5     intended to deal with situations where one obtained a gun
6     illegally in order to carry out a bank robbery or a violent
7     assault or something like that and none of the situations you
8     are positing are really like that.  It is more like, yes,
9     Massachusetts has a bunch of those, as does New York, a bunch
10    of laws relating to obtaining handling, so forth, illegal guns,
11    and so it is almost an automatic that in every case involving
12    the federal gun laws there is going to be the enhancement you
13    are referring to.  I get your point that went further here that
14    would narrow my hypothetical but I wonder if it is still the
15    same basic ball of wax.  But, let me hear from defense counsel.
16         MS. BAHARANYI:  Your Honor, that gets at exactly what
17    our issue is with this enhancement and I think the Court
18    actually does have power not to apply it here.
19         THE COURT:  I have the power not to consider the
20    guidelines at all and I am going to invoke that power.
21         MS. BAHARANYI:  Absolutely.
22         THE COURT:  Without any question.
23         MS. BAHARANYI:  I don't mean at all to limit,
24    especially given the direction we hope the Court goes and I
25    don't mean to limit the Court's discretion there but, again,

A001120

O185elS

the idea, if we get to the heart of what this enhancement is
supposed to be addressing is exactly that, firearms that are
possessed in connection with this other felony, conduct or
activity, firearm possessed with bank fraud or kidnapping.
Something that enhances the dangerousness of this other
felonious conduct.  Here, the other --

THE COURT:  Since there is no legislative history
maybe what I should do is have a Fatico hearing involving all
the members of the Sentencing Commission at the time they
enacted this, we could question them.  Maybe we won't do that.

MS. BAHARANYI:  That sounds potentially painful, your
Honor.

I think here what the Court should also focus on is
this guidance from the guidelines in the commentary that the
possession of a firearm in connection with the felony, another
felony offense, needs to be a firearm that's facilitating or
somehow making easier the commission of this other felony
offense, and simply possessing a firearm does not make easier
the possession of a firearm.  That's where I believe the Court
has room to certainly not apply the enhancement in this case.
It certainly is illogical and the guidelines, the commentary of
the guidelines at least does give us some area or room not to
apply it.

I would also note the government, in its letter,
mentioned that there are other felony offenses beyond

O185elS

possession of a firearm that were happening here.  Those felony

offenses, again, all relate to possession of ammunition or

other firearms or body armor which, again, if anything, body

armor potentially could facilitate the carrying of a firearm

but I don't think that goes in the reverse direction here, not

logically.

THE COURT:  Well, I'm going to cut this short only

because, as I said perhaps too often now, it is all an

irrelevancy to my sentence in any event, but I agree with

defense counsel.  I think I have some room so I'm going to deny

that enhancement, which means that the total offense level is

16, the Criminal History is I, and the guideline range is 21 to

27 months.

Now let's talk about what is of importance to the

Court which is the factors under Section 3553(a) of Title 18, a

statute I am very fond of because I think it sets forth all the

relevant factors to any Judge's sentencing.  And before I hear

from defense counsel and from government counsel and then from

the defendant, if he wishes to be heard, let me ask the

government what, to me, is an important question, which is

where do you rank this defendant in comparison with Mr. Vereen.

MS. NICOLAS:  It is a difficult question, your Honor,

because their conduct is quite different from one another.  As

it relates to the offense itself, on its face, I certainly

think that this defendant maybe is a little less culpable in

O185elS

1    terms of he is not necessarily in the gun store at every

2    transaction but in other ways that Mr. Vereen presented

3    mitigating factors:  His employment, his service record,

4    otherwise lack of criminal history, general showing of remorse.

5    I don't necessarily think we have that with this defendant so,

6    in some senses, this defendant almost has a more aggravating

7    position which I will talk about more, but I do think it is a

8    difficult one-to-one comparison.

9           THE COURT:  OK.  That's fair enough.  Now let me hear

10   on all issues first from defense counsel, then from government

11   counsel and then from the defendant, if he wishes to be heard.

12          MS. BAHARANYI:  Thank you, your Honor.

13          Before I begin, I do want to take a moment to

14   introduce some of the many family members and community members

15   who are here in support of Lucha.

16          THE COURT:  Yes.  And I should mention I have received

17   and carefully read some very excellent letters on his behalf

18   from friends and family members.

19          MS. BAHARANYI:  And of those, his brother Israel

20   Perez, who wrote a letter to the Court, is present.  His

21   mother, Maria Gonzalez, is also present who also wrote a letter

22   to the Court, as is Jacqueline Jimenez and Sheryl Jones or

23   "CJ", as she is affectionately known in the community.

24          Your Honor, I do want to also note that at the end of

25   my presentation, as I included in my sentencing submission, I

O185elS

1    request the opportunity for Ms. Jimenez -- Jackie Jimenez, who

2    is here, to be able to share a bit more on Lucha El's specific

3    connection to his community and why his absence or the loss of

4    him in the community has been a hardship that extends beyond

5    his family.

6         THE COURT:  I'm happy to hear, as long as it is a

7    reasonably brief presentation.

8         MS. BAHARANYI:  Absolutely, your Honor.

9         Every single person behind me, your Honor, is here

10   because they know who Lucha El Libertard truly is.  They know

11   his heart, they know his actions, they know that he is not the

12   radical, violent, government-hating militia member that the

13   government has made him out to be, not just I anticipate at

14   today's sentencing, but at trial.

15        After our own lengthy amount of time with Lucha El

16   during trial and preparation, we have come to know the same as

17   well.  He is someone who cares deeply for his community, for

18   his family.  He is someone who loves infinitely, somehow,

19   despite challenging circumstances that have existed since his

20   childbirth.  But we are obviously here because he is also

21   someone who made a mistake.  The Court knows that in 2020 and

22   2021 there were decisions that Lucha El made in the middle of a

23   global health pandemic, in the middle of time that brought

24   about extreme uncertainty and lack of security to many, but

25   decisions that led him here.

O185elS

|    |                                                                  |
|----|------------------------------------------------------------------|
| 1  | For Lucha El, he is from -- well, grew up for decades             |
| 2  | in a community in Norwood Bronx around Perry Avenue, and in       |
| 3  | COVID he saw that community suffering in ways that Officer        |
| 4  | Smalls took to the stand and described: Gang violence,            |
| 5  | robberies, rampant shootings, just truly a chaotic almost         |
| 6  | desperate environment that was brought on by the desperation of   |
| 7  | an unprecedented pandemic, and at that time Lucha El was a        |
| 8  | father to a 3-year-old, Hayden, someone who is his child who is   |
| 9  | truly his love and his joy, and he felt the desire and the need  |
| 10 | to be a protector. He felt the desire and need to be able to     |
| 11 | protect him as he has done for so many family members since he   |
| 12 | was a child. And that happened to coincide with him learning     |
| 13 | about the Moors, that happened to coincide with him learning     |
| 14 | about the Second Amendment, and he developed views on what the   |
| 15 | Second Amendment meant to him.                                    |
| 16 | He made the decision, your Honor, to carry a firearm            |
| 17 | in 2021. The Court now is very well aware of the circumstances   |
| 18 | of him carrying that firearm. On two occasions, in the Bronx     |
| 19 | and in Massachusetts, he was arrested in possession of           |
| 20 | firearms, and immediately after his Massachusetts arrest he      |
| 21 | went to jail. That's critical here. He spent eight months in     |
| 22 | custody away from his son, eight months in custody away from     |
| 23 | his family in a jail far off in Massachusetts that was, itself,  |
| 24 | suffering from the rampant -- the onslaught of COVID-19. This     |
| 25 | was a time of immense suffering but also of immense reflection.  |

O185elS

```
 1    Eight months -- eight months and three weeks specifically, your
 2    Honor, was punishing and was more than sufficient punishment.
 3    And after that time he has not carried a gun since.  So, eight
 4    months and three weeks in jail was exactly the course
 5    correction that I think Courts try to impose in cases like this
 6    often.
 7              THE COURT:  I'm not sure that I have any reason to
 8    believe he really changed his mind.  We have some evidence that
 9    he retained his absurd views of what the law permitted and
10    didn't permit.
11              MS. BAHARANYI:  Your Honor, I'm quite happy you raised
12    that because I think that has been so much of the focus of our
13    time in this courtroom, is what he believes, what he feels,
14    what his views are on the law, and we have lost focus on his
15    ability to actually abide by the law.
16              Many Courts, I think, think of sometimes jail as being
17    an opportunity for a taste of punishment, something to course
18    correct.  And I think in his case he got more than a taste, he
19    got, quite frankly, a meal, because he got punishment during
20    the darkest time to be incarcerated and that, in fact, changed
21    his actions.
22              His views, his opinions, what he believes the Second
23    Amendment means to others, what he believes the Second
24    Amendment should be or could be, does not change the fact that
25    he is able to abide by the law as it is and we saw that.  We
```

O185elS

saw that after eight months and three weeks in jail, that he

came back into the community, no more contact, no more police

contact, no more firearms, no more incidents of misconduct in

the community.  He focused in on supporting those who he loves,

those who have stood by him from day one.  He focused in on his

son, on his son Hayden.  He focused in on what matters most.

The community that he was concerned about, he dedicated his

time to that community, he did not dedicate his time to

carrying around firearms or facilitating others carrying

firearms.

I guess what I am trying to convey to the Court is

that that time worked, and yet that time was not all that he

has now faced.  So beyond those nearly nine months in custody,

he has now spent another four months at the MDC Brooklyn.

THE COURT:  Yes.  Of course, he gets credit for that

on any sentence I impose.

MS. BAHARANYI:  He gets credit for that time.  He

doesn't technically get any credit for the Massachusetts time

but, again, this is all happening -- the arrest occurs in 2021

and all of this has happened after, so it is not as though he

was arrested and decided again to carry another firearm after

these eight months.  No.  The arrest happened, his

incarceration happened, his conduct has been changed.  This

venue, the criminal justice system, is not here to change

people's opinions on what the law should be, that's not what we

A001127

O185elS

1    are doing here.  It is here to ensure that people can abide by

2    the law and can go out into the world and live in that world

3    safely and Lucha El has done that.  I think the Court -- not I

4    think, I know the Court has certainly been inundated with his

5    views and opinions on the law in ways that weren't always

6    welcome and he addressed that in his letter to the Court.

7            THE COURT:  I have long since forgotten and put out of

8    my mind his thoughts in that regard.

9            MS. BAHARANYI:  But during his time on pretrial

10   release, despite those communications, he was in fact

11   compliant.  He was someone who was in his home during his

12   curfew as he was required to do, he worked odd jobs in the

13   community to support different community members including a

14   neighbor of his who was renovating his home.  He spent eight

15   months outside showing the Court that he is able to, again, be

16   in the community under the supervision without committing

17   crimes, without carrying firearms, without posing a danger.

18           I think what has been lost in this case is something

19   that we truly must focus on here, the conduct and the actions

20   and not his views or opinions because that is certainly not

21   what this space is designed to change.

22           THE COURT:  I totally agree that he should not, and I

23   don't think his sentence should reflect in any way his opinions

24   of the law, misguided though they may be, but I think your more

25   fundamental point, which I think you agree with is if he has

O185elS

| | |
|---|---|
| 1 | got a bunch of silly opinions, well, sobeit, he shouldn't be |
| 2 | punished for that.  But, of course, I haven't heard much though |
| 3 | from you about the fact that at the very time when, as you say, |
| 4 | because of the pandemic there was terrible situations in his |
| 5 | community, what did he do?  I'm not talking about opinions now, |
| 6 | I am talking about what he did.  He went out and got -- |
| 7 | illegally -- some guns, for whatever purpose.  So he |
| 8 | contributed to that violent atmosphere that you have so well |
| 9 | described. |
| 10 | MS. BAHARANYI:  Lucha was not engaging in any violence |
| 11 | in the community and -- |
| 12 | THE COURT:  You thought he got a gun not to use it? |
| 13 | MS. BAHARANYI:  Your Honor, as many in this country |
| 14 | do.  He got a gun for protection.  He got it illegally and that |
| 15 | is why we are here, but he did not get a gun to commit -- |
| 16 | THE COURT:  By which you mean that if he had felt |
| 17 | someone was threatening him or his child he would have used the |
| 18 | gun. |
| 19 | MS. BAHARANYI:  Your Honor, as many people do, he got |
| 20 | a gun for his own sense of security and protection, not to go |
| 21 | out and assault, harass. |
| 22 | THE COURT:  I don't understand that argument.  Maybe I |
| 23 | am missing something here. |
| 24 | MS. BAHARANYI:  It is the basis of the Second |
| 25 | Amendment. |

A001129

O185elS

| | |
|---|---|
| 1 | THE COURT:  So you go out, you are confronted with a |
| 2 | violent situation on your account, you fear for the safety of |
| 3 | yourself or others close to you, and you then go out and |
| 4 | illegally get a gun and it is not for the purpose of, if |
| 5 | threatened, you will resort to it, it is just so you can keep |
| 6 | it in your basement and feel a better sense of security?  That |
| 7 | doesn't make much sense to me. |
| 8 | MS. BAHARANYI:  Your Honor, I think it is completely |
| 9 | appropriate and fair to have very different views on how the |
| 10 | Second Amendment functions in practice and how people feel. |
| 11 | THE COURT:  I'm not talking about the Second |
| 12 | Amendment.  He can hold whatever it is he wants with the Second |
| 13 | Amendment.  I'm talking about what is the logical inference on |
| 14 | your account of why he got a gun.  On your account he got it so |
| 15 | he could protect either himself or those he loved and how would |
| 16 | that work if he didn't use it? |
| 17 | MS. BAHARANYI:  Your Honor, again, we understand why |
| 18 | we are here.  He received it in a way he should not have but he |
| 19 | did not receive it with the intent of going out and committing |
| 20 | acts of violence.  He received it with the idea that this is a |
| 21 | part of how he -- self-defense, how one protects themselves if |
| 22 | violence is brought on to them. |
| 23 | THE COURT:  In which case he would use it. |
| 24 | MS. BAHARANYI:  Your Honor, again -- |
| 25 | THE COURT:  I agree that's a hypothetical but you are |

A001130

O185elS

1    asking me to credit your hypothetical about what his intentions

2    were and I am just trying to figure out that the extent it is

3    relevant at all, which it may not be.

4           MS. BAHARANYI:  His intentions weren't to violate the

5    law and I think even the law creates protections for those who

6    defend themselves, either with a firearm or with their fists.

7    There are exceptions in the law.

8           THE COURT:  Quite limited.  Quite limited.

9           MS. BAHARANYI:  Quite limited, right; but again

10   limited, but they exist and they exist for a reason.

11          THE COURT:  All right.

12          MS. BAHARANYI:  I think what is important to remember

13   here is this is a person who has no violent history, has never

14   assaulted, attacked, shot, done anything of violence to another

15   individual, and in 2020 and 2021 he had no intention nor did he

16   do violence to other individuals.

17          THE COURT:  What was him going up to Massachusetts?

18          MS. BAHARANYI:  That was intended as a, I guess, a

19   practice on how to safely use firearms and camping in Maine on

20   private land that the leader of that group had organized.

21          THE COURT:  I'm never going to use this firearm, I

22   just want it for protection, but I better figure out how I can

23   go with my friends and learn how to use it.  Is that what you

24   are saying?

25          MS. BAHARANYI:  I feel much safer in this world if

O185elS

| | |
|---|---|
| 1 | people, who possess firearms legally, do actually know how to |
| 2 | use them. |
| 3 | THE COURT:  OK. |
| 4 | MS. BAHARANYI:  And I think that's why gun ranges |
| 5 | exist, your Honor.  But I think we are stepping away from what |
| 6 | I do think is kind of the most critical and compelling, |
| 7 | mitigating factor behind Lucha and his story. |
| 8 | The government mentioned that there are all of these |
| 9 | aggravating factors and they exist but glossed over the |
| 10 | importance that Lucha has to his community and the community |
| 11 | that he was in fact still giving back to in 2020 and 2021.  The |
| 12 | different ways he was giving to that community have been |
| 13 | outlined in some of the letters of support that we gave to the |
| 14 | Court but I don't think necessarily I'm the best speaker on |
| 15 | that as someone who is not from that same community, which is |
| 16 | why I have asked Ms. Jimenez, someone who has known Lucha El |
| 17 | for two decades at this point. |
| 18 | THE COURT:  I am more than happy to hear from her and |
| 19 | will do that now, but I want to just raise one thing for you |
| 20 | before we do that.  So, I am frequently confronted with the |
| 21 | argument:  *Judge, Mr. Hypothetical defendant* -- I'm not talking |
| 22 | about this defendant but a defendant just in general -- *Judge,* |
| 23 | *he is a good family man, has been wonderful to his children,* |
| 24 | *they need him, his neighbors speak highly of him, and therefore* |
| 25 | *you should, in effect, give him a break.*  And what I always |

A001132

O185elS

wonder when I hear that argument is who brought this on his
neighbors?  Who deprived them of his help, of his love, of his
contribution?  It was he, when he decided to commit a crime.
They are his victims in that sense.  Now, I don't mean to
overstate it but I do think that it is a little ironic that in
case after case I'm told, *Oh, Judge, he loves his family and we
can show how deeply he has loved them.*  If he really, really
loved his family, why would he go out and commit a crime and
deprive them of his help?

          MS. BAHARANYI:  Your Honor, I think from the letters
of support there is no question that he loves his family and
his community.  He is also someone that the Court has
recognized has made a mistake and those two things just aren't
mutually exclusive.  What Lucha El means to his community is
something that we want to speak more to the Court about but the
reason why we want to make sure your Honor understands this is
because I'm asking for him to go back to the community after he
has already faced serious punishment for his conduct.  So this
isn't a request to have him go back and time-served because he
hasn't spent any time in jail.  No.  He has spent eight months
and three weeks, another four months at the MDC, he has been
seriously punished for his actions in 2020 and 2021, and now I
ask the Court to give him the opportunity to go back to the
space and the people who do mourn his absence, who do love him,
and who he loves and he has supported for several years, not in

A001133

O185elS

1    my own words, in my own opinion, but in the words and opinions

2    of those very community members.

3            THE COURT:  All right.  Well, let me hear from

4    Ms. Jimenez.

5            MS. BAHARANYI:  One moment, your Honor.  Logistically,

6    Judge, I should have asked if you would you like for her to

7    stand at the podium?

8            THE COURT:  Yes.

9            MS. JIMENEZ:  Good afternoon.

10           THE COURT:  Good afternoon.

11           MS. JIMENEZ:  Thank you for giving me the opportunity

12   to speak this afternoon.

13           My name is Jacqueline Jimenez.  I have known Lucha for

14   most of his life.  We have been neighbors in the same

15   community, the same building, watched him grow up.  I am a

16   little older than he is so he grew up mostly with my son and a

17   lot of the other youth in the building.

18           I am currently working in social services, I am

19   pursuing a masters in social work in grad school at Hunter

20   College, and I currently volunteer with a friend who has a

21   foundation called Uplife, which I intend to involve Lucha in

22   when he does come home.  We service the community by giving out

23   food, back to school events for children, just a number of

24   things.

25           I guess my reason for wanting to talk is to, I guess,

O185elS

1   help you see something beyond what you are reading on paper.

2   And I am hearing what you are saying, I am trying to digest

3   what you are saying but I feel like it is important for you to

4   know that who you are seeing here is not a violent man.  And,

5   you know, you spoke of people's acts and how they affect the

6   family and the people that they love and you are right, yes, it

7   has affected us all deeply, but I don't think we consider

8   ourselves victims of his crime, we just -- you know, he made

9   mistakes and we still love him even though he made those

10  mistakes.  But beyond the mistakes, he is a man with many

11  different facets.  He helps the community, he is passionate,

12  not violent.  He is always, you see him around the community,

13  he's helping somebody, helping unload boxes at a store or

14  helping someone paint their apartment, helping as -- cliche as

15  it sounds -- helping the old lady across the street and with

16  her bags.  Like, you can always find him in a heated

17  conversation, in a debate, but positive things.  You know?

18  Like telling children to go back to school.  Come off the

19  corner, let's go play basketball at our local park.

20          You know, from myself, aside from seeing him grow up,

21  he was always involved in sports, he was an athlete.  We have a

22  common love of boxing and, most recently, I am really grateful

23  for him because he helped my son go through a very challenging

24  time.  My son is one of the people that wrote letters, his name

25  is Donald, and he helped him through a very challenging time.

A001135

O185elS

He was the guy that came and knocked on my door every single

morning to make my son get up out of bed and go play basketball

or do some type of activity.

So, I don't know. I just -- I don't know if I can say

enough about him but I just really would like you to maybe

reflect a little bit more on the fact that he is not a violent

person, he is not the words that you -- the charges that are

being brought upon him. He is more than that. We are all more

than our mistakes. You know? We are not just -- we are not

just our mistakes, we are more than that, and we deserve the

opportunity to redeem ourselves and I feel like he has shown

that during his time after being incarcerated.

While he has been home I have spent many hours talking

to him about his plans and his life. I see how he is with his

child. I don't consider myself a victim of his crime, I am

honored to know him as a person. I think anyone who knows him

is deeply affected by him in a positive way, regardless if you

agree with his opinions, to say the least. You know, I don't

have to agree with him to know that he is a thinker, he is a

good man, and he is brave to go against the grain of things

that maybe people don't normally speak about.

Do you have any questions for me?

THE COURT: No. It is very helpful and I much

appreciate hearing from you.

MS. JIMENEZ: Thank you for your time.

O185elS

1          THE COURT:  Thank you.

2          MS. BAHARANYI:  Thank you, Ms. Jimenez.

3          Your Honor, thank you for giving us that opportunity

4  for having someone from his community address the Court.  And I

5  will close with this:  He is facing the harshest of conditions

6  now.  As the Court is aware from the exhibit we provided

7  showing Judge Furman's latest order about the conditions at

8  MDC, this has been his reality, a space where he isn't

9  connected to his community.  He can rarely, if ever, speak to

10  his family.  His ability to practice his religion has been

11  severely limited because of the chaos at the MDC Brooklyn.  And

12  this, coupled with the significant time he spent in

13  Massachusetts and the additional time he faces because he has

14  to go and face the resolution of those charges and faces

15  another two to four years, but all of that together is more

16  than sufficient punishment with the request that we have made

17  for five months, especially for someone who is not the gun

18  trafficker in this scenario.  He is not someone who obstructed

19  justice.  And he is someone who has shown he can abide by the

20  law.

21          THE COURT:  Thank you very much.

22          Let me hear from the government.

23          MS. NICOLAS:  Thank you, your Honor.

24          Defense counsel referred to the heart of the Second

25  Amendment and I want to be really clear about what the heart of

A001137

O185elS

the Second Amendment is and why that is not what we saw here.
The heart of the Second Amendment is lawfully obtaining a
firearm to have in your own home for your own protection.  It
is not unlawfully obtaining multiple firearms, so that in one
instance you can stand on the street with the gun in the same
bag as your personal use narcotics and on another occasion
transport that firearm with your militia on the way up to some
kind of unregulated land in Maine that you are going to go fire
off live rounds on for whatever purpose that is.

What the defendant did is not the heart of the Second
Amendment, he is not being punished because of his words.  He
was charged with crimes because there are federal regulations,
there are federal laws that governs the way in which firearms
are sold and possessed and regulated to keep everyone safe.
They're not just laws that exist for fun, they're not
frivolous, they're not -- you know, the defendant referred to
them as mandates and legalities and all that other stuff.  That
could not be further from the truth.  They exist because
they're important.  Because without people like the defendant,
there is no way to lawfully get a firearm in New York City.
The defendant invited those guns into the same community that
he is standing here today telling us he cares so deeply about.
That's reality.  This is not a man who walked into a gun store
and made some kind of administrative mistake and accidentally
got a gun.

A001138

O185elS

1          The jury found he willfully violated the law --

2     willfully -- violated the law.  And I think part of the

3     timeline here is pretty disturbing and one we need to keep in

4     the forefront of our mind when we talk about specific

5     deterrence and the sincerity of any kind of acceptance of

6     responsibility that the defendant might have now and that is

7     the timeline from the Bronx arrest to the Massachusetts arrest.

8          The defendant gets arrested by the NYPD possessing a

9     firearm in the Bronx.  At the time of that arrest he is told

10     you need a permit for this.  He is told this is not something

11     you can do.  And he tells the officers, sorry, disagree, I get

12     to decide what laws apply to me, I don't need it, I don't need

13     a permit, a permit is permission, I don't need permission.

14          Two weeks later he is with a convoy in Massachusetts;

15     it is a two-car convoy.  It is a convoy.  It is guys dressed

16     like they're going into battle and they're not carrying rubber

17     bullets, they're carrying thousands of rounds of real

18     ammunition, over 20 magazines, run magazines, with huge

19     capacities; semi-automatic long gun rifles, of which the

20     defendant was wearing one and at another point holding another.

21          He didn't make a single mistake on a form.  That is

22     not what we are talking about.  He didn't make a single mistake

23     when he got a gun from someone.  He made the same, quote

24     unquote, mistake over and over and over again because he

25     decided he didn't want to abide by laws that he didn't like.

A001139

O185elS

That is not how society works.  There is of course of general

deterrence issue here.  There is a specific deterrence issue

here.  This defendant has made clear these laws don't apply to

him, he is not going to do it.

I also want to talk about COVID for a second because,

again, timing is important.

While we are supposed to be hearing about COVID being

difficult and making everyone's lives difficult and there is no

denying that was reality, we all lived it, the defendant was

loading up his convoy with his friends to go drive to Maine to

go shoot some guns.  He was moving interstate, freely, on 4th

of July weekend, while we are supposed to think that he was

desperate and this was a mistake that he made out of

desperation during COVID.  The reality is quite clear, he was

getting guns to do whatever he wanted because that's how he

views the law, it doesn't apply to him.

That's why gun ranges exist.  That's another thing I

heard.  This wasn't a gun range.  This wasn't harmless,

innocent activity.  This defendant invited guns into his

community, he did it over and over again when he knew what he

was doing was wrong, your Honor, and for that reason a

substantial period of incarceration is appropriate here.

THE COURT:  Let me ask you one more particularized

question which is should I give him, in your view, a credit,

since it won't be credited as a technical matter, for the time

O185elS

| 1 | he spent in jail in Massachusetts as opposed to time he spent
| 2 | here which will be credited?

3      MS. NICOLAS:  I certainly think that's a relevant

4 3553(a) factor for your Honor.  What I will say about that is

5 the defendant's pretrial detention in Massachusetts was also,

6 in part, predicated on his refusal to identify himself, his

7 refusal to comply with booking procedures.  So, I do think that

8 that pretrial detention took, in effect, factors that are not

9 relevant to what we are here for today.

10      I will also note he is getting ready to stand trial in

11 February on that Massachusetts case which, I imagine, will be

12 putting before the judge a lot more than was put before the

13 Court here as it related to the details of that traffic stop.

14 So while it is relevant, your Honor, I don't think it is

15 tremendously mitigating.

16      THE COURT:  Let me hear from defense counsel and then

17 from the defendant, if he wishes to be heard.

18      MS. BAHARANYI:  Thank you, your Honor.  Just briefly.

19      The government's very, very impassioned speech here

20 feels misplaced.  If this were a conversation, a sentencing

21 that were taking place after his arrest in 2021, fair game;

22 there needs to be punishment, there needs to be consequence,

23 there is a need for specific and general deterrence.  But, in

24 fact, we are having this conversation about appropriate

25 punishment after he has already been seriously and sufficiently

O185elS

1    punished, your Honor, and that's what has been lost sight of.

2    We are having this conversation about whether jail is necessary

3    to course correct or correct his conduct in the future after

4    jail has already been imposed in his life and after it has

5    already, in fact, changed his conduct and changed his actions.

6         THE COURT:  Well, of course that is highly relevant to

7    one factor, namely specific deterrence.  It doesn't really go

8    to most of the other factors.

9         MS. BAHARANYI:  Your Honor, I do think it speaks to

10   general deterrence as well.  The credibility of the system is

11   not just about whether people are punished for doing bad

12   things, for breaking the law, but it's about whether that

13   punishment is in fact proportional.  That's how it has any

14   credence, any credibility with any community that might learn

15   about this case.  And if the Court were to impose --

16        THE COURT:  I don't know how you come to that.  It is

17   rare that anyone who is considering a future crime gets into

18   detailed analysis of why Mr. Jones received X months and

19   Mr. Smith received Y months.  What is relevant for someone who

20   is thinking about committing a crime is, oh, the people who

21   committed that crime got serious time.  I really think it is --

22   I don't know of anywhere in the criminological literature where

23   it has been shown that defendants who are considering future

24   crimes -- that's what general deterrence is all about -- get

25   into an analysis of, oh, he got a lower sentence but that was

O185elS

1    because he had learned his lesson or anything like that.  That

2    is highly relevant for specific deterrence but I don't see how

3    it is relevant for general deterrence.

4            MS. BAHARANYI:  Your Honor, if we are focusing on

5    statistics then, truly, what has been proven to be most

6    effective or effective when it comes to general deterrence

7    isn't at all the length or severity of punishment that someone

8    received, but is, in fact, the fact that someone has been

9    arrest and about been punished.

10           THE COURT:  That's the biggest factor but that is only

11   factor.  That factor we have known for about a hundred years,

12   well-documented, and I agree with you, that's the single most

13   established factor in general deterrence but it is, by far,

14   from the only factor.

15           MS. BAHARANYI:  I think if we are to assume that if we

16   step beyond what has been proven in the science and we are now

17   a little bit speculating on what will affect the community and

18   what they will believe or how they will be affected by

19   someone's sentence, then I do think it is completely fair to

20   believe the community, like the community here, will have the

21   capacity to understand the difference between excessive

22   punishment and the right punishment, just punishment.

23           THE COURT:  All right.

24           MS. BAHARANYI:  And what we have asked for, your

25   Honor, truly is the just punishment given the totality of the

O185elS

circumstances of his overall punishment here during COVID, in

MDC when it is at its worse.  Anything beyond the five months I

have asked would be beyond what is necessary and no longer

carries the deterrent weight or effect that I believe the Court

is concerned about.

THE COURT:  Let me hear from the defendant, if he

wishes to be heard.

MS. BAHARANYI:  Your Honor has received a letter from

Lucha and he does not wish to make any further statements

beyond what he provided to the Court in his letter.

THE COURT:  OK.  That's fine.

So, on the one hand I think I take his criminal

activity to be considerably more serious than the defense is

arguing.  I think the government is absolutely right and,

indeed, the jury found that this defendant intentionally,

willfully engaged in this misconduct, blatantly in violation of

the law and as part of an ongoing relation with others who were

doing the same.  And where, at the end of the story, I think

the factors under Section 3553(a) would all counsel a sentence

not unlike the two years I gave to Mr. Vereen, there are,

however, I think two mitigating factors that warrant a lesser

sentence.  The first is the time he has already spent in jail

in Massachusetts, which will not be credited against this

sentence unlike the time he spent in federal custody but which

is nevertheless real punishment for activity very closely

O185elS

1    related to what the defendant stands accused of here.  Not

2    identical, but related.  And while I am not particularly

3    convinced that this defendant learned his lesson from that

4    incarceration, I think that is much too simplistic when you are

5    dealing with someone as complicated as this defendant.  But I

6    think some credit should be given for that.

7        The much bigger factor is the numerous people, many of

8    whom are here today, who have supported him and told me of his

9    good side, of his good nature.  My own view of sentencing,

10   which is part of Section 3553(a) but seems to me to be

11   especially important, is that a person at this moment of

12   sentence be judged by the entire character he has demonstrated

13   and not just by his mistakes.  I thought Ms. Jimenez made that

14   point quite eloquently and the fact that there are all of these

15   people who have not only written to me but are here today to

16   say that this defendant has a good side that they recognize,

17   that they've experienced, that they have seen, is quite

18   important to me.

19       So I'm going to give a lesser sentence than the one I

20   contemplated.  It is nothing like the sentence that defense

21   counsel asks for because I think that grossly understates both

22   the crime itself, its potential for violence, and the

23   defendant's involvement with a different kind of community, if

24   you will, a community dedicated to the illegal possession of

25   guns and the seeming preparation to use them.

A001145

O185elS

1    Putting all of these factors together, the sentence of

2  the Court is that the defendant is sentenced to 16 months in

3  prison, that's on each count, concurrently, and similarly, to

4  three years of supervised release, concurrent on each of the

5  counts.

6    No fine will be imposed because the Court makes a

7  finding that this defendant is not in a position to pay any

8  meaningful fine now or in the foreseeable future.  There is,

9  however, a $200 mandatory special assessment that must be paid.

10    The terms of supervised release are, first, mandatory

11  conditions that the defendant not commit any other federal,

12  state or local crime; that he not unlawfully possess a

13  controlled substance; that he cooperate in the collection of

14  DNA; and that within 15 days of his release from prison he

15  submit to one drug test to be followed by two periodic drug

16  tests thereafter, as determined by the probation officer.

17    There will also be imposed standard conditions 1

18  through 12.  They appear on the face of the judgment but also

19  will be gone over with the defendant when he begins his period

20  of supervised release, which he will do by reporting to the

21  nearest probation office within 72 hours of his release from

22  prison.

23    And finally, there are the special conditions:

24    First, the defendant will participate in an outpatient

25  treatment program for drugs and alcohol under standard terms;

O185elS

1    and secondly, that he will be supervised by the district of his

2    residence.

3              Now, before I advise the defendant of his right of

4    appeal, let me ask counsel for both sides whether there is

5    anything else we needed to take up.

6              Anything further from the government?

7              MS. NICOLAS:  Your Honor, just a couple of

8    housekeeping matters.

9              First, we would ask that the Court adopt the factual

10   findings that are set forth in the presentence report.  There

11   is no objections from the government on that.

12             THE COURT:  Yes.  I adopt the presentence report other

13   than I disagree with the calculation, as previously indicated.

14             MS. NICOLAS:  The other matter, your Honor, is that

15   the government would ask that the forfeiture order be made

16   final as to the firearms in the case.  There is no money

17   judgment but it is the firearm.

18             THE COURT:  Any objection to that?

19             MS. BAHARANYI:  No objection, your Honor.

20             THE COURT:  So ordered.

21             MS. BAHARANYI:  Your Honor, on the special conditions,

22   probation recommended outpatient drug treatment.  I don't

23   believe that is an appropriate condition in this case because

24   Lucha El has no history of abusing illegal substances.  The one

25   reason for this recommendation is because of his prior use of

O185elS

1    marijuana and that was before he was on pretrial supervision.

2              THE COURT:  I wondered about that myself.  I will

3    withdraw that special condition.

4              MS. BAHARANYI:  Thank you.  That's all on our behalf.

5              THE COURT:  Did you want to make any recommendation as

6    to where he should be housed?

7              MS. BAHARANYI:  Absolutely, your Honor.  We do ask he

8    be housed as close to New York City as possible.

9              THE COURT:  I will make that recommendation.  I can't

10   order it, as you know, but I will recommend it.

11             So, speaking to the defendant, let me advise you,

12   first, that you have a right to appeal the sentence.

13             Do you understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  If you can't afford counsel for the

16   appeal, the Court will appoint one for you free of charge.

17             Do you understand that?

18             THE DEFENDANT:  Yes.

19             THE COURT:  That concludes --

20             MS. NICOLAS:  Your Honor, the government now moves to

21   dismiss the underlying indictment.

22             THE COURT:  Yes.  Thank you very much.  That motion is

23   granted.

24             Very good.  Thanks a lot.

25                           o0o

A001148

AO 245B (Rev. 09/19)  Judgment in a Criminal Case  (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT
## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. ) | |
| Steven Perez ) | Case Number:  S1 22 CR 644-002 (JSR) |
| a/k/a "Lucha El" ) | USM Number:  34959-510 |
| ) | Zawadi S. Baharanyi, Esq. |
| ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1 and 2
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 371 | Conspiracy-Receive Firearms Outside States of Residency | 7/30/2021 | 1 |
| 18 U.S.C. 922 (a)3 | Interstate Transport of Firearms | 6/23/2021 | 2 |

The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   of the underlying indictment   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/8/2024
_____
Date of Imposition of Judgment

_____
Signature of Judge

Hon. Jed S. Rakoff U.S.D.J.
_____
Name and Title of Judge

1/cc/24
_____
Date

**A001149**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    7

DEFENDANT:   Steven Perez a/k/a "Lucha El"
CASE NUMBER:   S1 22 CR 644-002 (JSR)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

On count 1: Sixteen (16) months jail, concurrent to the sentence imposed on count 2.
On count 2: Sixteen (16) months jail, concurrent to the sentence imposed on count 1.

☑ The court makes the following recommendations to the Bureau of Prisons:
Incarceration as close to the New York metropolitan area as possible.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A001150

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT: Steven Perez a/k/a "Lucha El"
CASE NUMBER: S1 22 CR 644-002 (JSR)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

On count 1: Three (3) years.
On count 2: Three (3) years, all terms on all counts to run concurrent to each other.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**A001151**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
              Sheet 3A — Supervised Release

DEFENDANT: Steven Perez a/k/a "Lucha El"

CASE NUMBER: S1 22 CR 644-002 (JSR)

Judgment—Page    4    of    7

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____  Date _____

**A001152**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page  5  of  7

DEFENDANT:  Steven Perez a/k/a "Lucha El"
CASE NUMBER:  S1 22 CR 644-002 (JSR)

## SPECIAL CONDITIONS OF SUPERVISION

1. The Court recommends the defendant be supervised in his district of residence.

**A001153**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
        Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   7

DEFENDANT: Steven Perez a/k/a "Lucha El"
CASE NUMBER: S1 22 CR 644-002 (JSR)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**A001154**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT:  Steven Perez a/k/a "Lucha El"
CASE NUMBER:  S1 22 CR 644-002 (JSR)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States: pursuant to 18 U.S.C. § 924(d)(l), and 28 U.S.C. § 2461(c), any and all firearms and ammunition involved in or used in said offense.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A001155

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

Southern     District of New York     ORIGINAL

Caption:

United States of America v.

Steven Perez,   Defendant.

Docket No.: 22 Cr. 644

Honorable Jed S. Rakoff

(District Court Judge)

Notice is hereby given that Steven Perez _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment |✔| , other | _____

(specify)

entered in this action on 1/12/2024 _____.

(date)

This appeal concerns: Conviction only |___|   Sentence only |___|   Conviction & Sentence |✔|   Other |___|

Defendant found guilty by plea |✔| trial | | N/A |   .

Offense occurred after November 1, 1987?  Yes |✔|  No |   N/A |

Date of sentence: 1/8/2024 _____   N/A |___|

Bail/Jail Disposition: Committed |✔|   Not committed |   | N/A |

RECEIVED
JAN 17 2024
S.D.N.Y - APPEALS

Appellant is represented by counsel? Yes |✔| No |   If yes, provide the following information:

Defendant's Counsel:   Barry D. Leiwant, Esq.

Counsel's Address:   Federal Defenders of New York

52 Duane Street, 10th Floor, New York, NY 10007

Counsel's Phone:   Tel. (212) 417-8742

Assistant U.S. Attorney:   AUSA Ashley Nicolas

AUSA's Address:   One St. Andrews Plaza

New York, NY  10007

AUSA's Phone:   Tel: (646) 734-3677

*Zawadi Baharanyi/wT*

ZAWADI BAHARANYI, ESQ.

Signature

A001156

---

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **ASHLEY C. NICHOLS, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007

Dated:  New York, New York
       May 3, 2024

*Kendra Hutchinson*
**KENDRA HUTCHINSON**
Assistant Federal Defender