# 24-162-cr

United States Court of Appeals
for the Second Circuit

————————————

Docket No. 24-162-cr

————————————

UNITED STATES OF AMERICA,

Appellee,

-against-

KEITH VEREEN, a/k/a SEALED DEFENDANT 1,

Defendant,

STEVEN PEREZ, a/k/a SEALED DEFENDANT 2, a/k/a LUCHA,

Defendant-Appellant.

————————————

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**SPECIAL APPENDIX FOR DEFENDANT-APPELLANT
STEVEN PEREZ**

---

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8731

*Attorney for Defendant-Appellant*
**STEVEN PEREZ**


**KENDRA L. HUTCHINSON**,
*Of Counsel*

**SPA001**

# TABLE OF CONTENTS

Order,
      filed June 8, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SPA 3

Opinion and Order,
      filed July 7, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SPA 4

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 22-cr-644 (JSR) |
| LUCHA EL LIBERTAD (a/k/a STEVEN PEREZ) | ORDER |
| Defendants. | |

JED S. RAKOFF, U.S.D.J.:

Following full briefing and argument on defendant Lucha El Libertad[1]'s motion to dismiss the indictment and full briefing, argument, and an evidentiary hearing on defendant's motion to suppress the results of a 6/23/21 search, the Court hereby denies both motions. An opinion explaining the rationale for this decision will issue in due course.

        SO ORDERED.

New York, NY
June 8, 2023

_____
JED S. RAKOFF, U.S.D.J.

---

    [1] The defendant is identified in the indictment as "Steven Perez, a/k/a 'Lucha.'" The Court uses the name the defendant goes by: Lucha El Libertad.

1

**SPA003**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        -v-<br><br>LUCHA EL LIBERTAD (a/k/a<br>STEVEN PEREZ)<br><br>        Defendants. | 22-cr-644 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

Defendant Lucha El Libertad[1] is charged with one count of interstate transportation of firearms in violation of 18 U.S.C. § 922(a)(3). Lucha El moved to dismiss the indictment, arguing that § 922(a)(3) -- which makes it unlawful to receive a firearm from out-of-state except through a federally licensed dealer or other specified means -- violates his Second Amendment right "to keep and bear arms." U.S. Const. amdt. II. He also moved to suppress the firearm, arguing the police lacked reasonable suspicion to search him. Following briefing, argument, and an evidentiary hearing, the Court denied both motions by bottom-line order on June 8, 2023. This Opinion and Order reaffirms the denial of both motions and sets forth their reasoning.

---

[1] The defendant is identified in the indictment as "Steven Perez, a/k/a 'Lucha.'" The Court uses the name the defendant goes by: Lucha El Libertad. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

1

SPA004

### I.    Section 922(a) does not abridge the right to keep and bear arms.

18 U.S.C. § 922(a)(3) makes it unlawful "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State, except" where the person receives the firearm by bequest or meets certain other narrow criteria.[2] In other words, the statute prohibits people from bringing into their states of residence firearms purchased or obtained out-of-state except in particular circumstances not present here.

The overall aim of § 922(a)(3) was to "funnel access to firearms almost exclusively through dealers" licensed and regulated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). <u>United States v. Matteo</u>, 718 F.2d 340, 341 (2d Cir. 1983) (quoting <u>Dickerson v. New Banner Inst. Inc.</u>, 460 U.S. 103, 119 (1983)). Federally licensed dealers are subject to legal restrictions regarding whom they may sell firearms (based on age, criminal history, and other factors), 18 U.S.C. § 922(d), which kinds of firearms they may sell, <u>id.</u> § 922(p), and the records that must be kept regarding firearms sales, <u>id.</u> § 922(m).

---

[2] Specifically, the statute also allows persons to receive firearms from out of state if the firearm was acquired before the enactment of 18 U.S.C. § 922(a)(3) or if "the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States," or when a firearm is loaned or rented "for temporary use for lawful sporting purposes. . . ." 18 U.S.C. § 922(a)(3), 922(b)(3).

SPA005

Furthermore, by funneling firearms sales through in-state dealers (or importers, manufacturers, or collectors), the statute works to ensure that anyone obtaining a gun does so in compliance with not just federal but also state law. 27 C.F.R. § 478.99(b). Section 922(a)(3) thus aims to "stop circumvention of state laws regulating gun possession . . . by requiring state residents to comply with conditions of sale and similar requirements in their home state." Decastro, 682 F.3d at 168.[3]

Lucha argues that § 922(a)(3) infringes his Second Amendment right to keep and bear arms. U.S. Const. amdt. II. The Court disagrees for two reasons. First, as detailed below, the Second Circuit has previously held that § 922(a)(3) does not on its face burden the right to keep and bear arms. See Decastro, 682 F.3d at 169. Although the Supreme Court has since abrogated this and other circuits' application of means-ends scrutiny as a way of analyzing gun regulations that do burden Second Amendment-protected conduct, New York State & Rifle Assoc., Inc. v. Bruen, 142 S.Ct. 2111, 2127 (2022), Decastro's holding that § 922(a)(3) does not on its face regulate core Second Amendment

---

[3] Importantly, Section 922(a)(3), at least as interpreted by the ATF, does not completely prohibit individuals from obtaining a gun from outside their state of residence or from transporting lawfully obtained guns between states. For one thing, the ATF interprets § 922(a)(3) to permit gun purchases "from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state." United States v. Decastro, 682 F.3d 160, 169 (2d Cir. 2012). And, once someone has lawfully obtained a firearm, the Firearms Owner Protection Act makes it legal for that person to transport it between states so long as that person "may lawfully possess and carry such firearm" in both states, transports the gun unloaded, and meets various other requirements. 18 U.S.C. § 926A.

conduct survives _Bruen_ unscathed. _Id._ Further, a close reading of _Bruen_ confirms that laws such as § 922(a)(3) that operate merely as threshold mechanisms for ensuring that prospective gunowners are authorized to possess and carry a gun do not necessarily infringe the right to keep and bear arms. While the Court can conceive of instances in which laws such as § 922(a)(3) _might_ burden core Second Amendment protected conduct -- and would therefore need to be "consistent with this Nation's historical tradition of firearm regulation" in order to survive constitutional scrutiny, _Bruen_, 142 S.Ct. at 2126, -- Lucha has made no such as-applied showing here. _Second_, even assuming § 922(a)(3) applied on its face to the keeping and bearing of arms, this Court would find that the statute falls well inside the nation's history and tradition of firearms regulation and therefore passes constitutional scrutiny.

**A. § 922(a)(3) does not infringe the right to keep and bear arms**

**1. The right to keep and bear arms, as set out in _Heller_ and _Bruen_**

15 years ago, in _Heller v. District of Columbia_, 554 U.S. 570 (2008), the Supreme Court held for the first time that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation. . . ." _Id._ at 592. There, the Court relied on this understanding to hold unconstitutional Washington D.C.'s total ban on possessing handguns in the home. _Id._ at 627-28. Since the Court believed that total ban "would fail constitutional muster" when evaluated "[u]nder any of the standards of scrutiny that [the Court] applie[s] to enumerated constitutional rights," the Court

4

SPA007

declined to specify the precise approach courts should take to deciding the constitutionality of gun regulations. Id. at 629. However, the Court based its identification of the scope of an individual's Second Amendment on its understanding of what the amendment's words meant at the time of ratification, id. at 576-600, as informed by prior, contemporaneous, and subsequent history, id. at 601-19. Relying on this approach, the Court identified "presumptively lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27 & n.26.

In Heller's wake, most lower courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." New York State & Rifle Assoc., Inc. v. Bruen, 142 S.Ct. 2111, 2125 (2022). The first step involved ascertaining whether a particular gun regulation implicates conduct protected by "the original scope of the right based on its historical meaning," because if it did not, "then the analysis can stop there; the regulated activity is categorically unprotected." Id. at 2126. Assuming a gun regulation does infringe on Second Amendment protected conduct, the second step entailed analyzing the extent to which any such infringement was necessary to further important government interests. Id. at 2126-27 (noting circumstances in which courts applied either strict or intermediate scrutiny). In Bruen,

5

SPA008

however, the Supreme Court held that "this two-step approach [was] one step too many." Id. at 2127. Rather, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2129-30. In such cases, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," in which case courts may still "conclude that the individual's conduct falls outside the Second Amendment's unqualified command." Id. at 2129.

### 2. The Second Circuit's decision in United States v. Decastro, 682 F.3d 160 (2d Cir. 2012)

Following Heller but before Bruen, the Second Circuit rejected precisely the argument Lucha raises here: that § 922(a)(3) on its face violates the Second Amendment. See United States v. Decastro, 682 F.3d 160, 169 (2d Cir. 2012). There, the court assumed without deciding that, following Heller, governmental regulations of Second Amendment-protected conduct would be subject to some form of heightened (read: intermediate or strict) scrutiny. Id. at 166. And, indeed, the Second Circuit ultimately decided that intermediate scrutiny should apply to regulations burdening the carrying of arms outside the home, while leaving open the possibility that strict scrutiny might apply to gun regulations implicating the "core" right to possess a gun in one's home for self-defense. Kachalsky v. Cty. of Westchester, 701 F.3d 81, 93-94 (2d Cir. 2012), abrogated by Bruen, 142 S.Ct. at 2126. In

_Decastro_, however, the Second Circuit did not decide precisely what, if any, form of means-ends scrutiny should apply to regulations burdening Second Amendment-protected conduct "[b]ecause § 922(a)(3) only minimally affects the ability to acquire a firearm" and was therefore not subject to means-ends scrutiny to begin with. _Decastro_, 682 F.3d at 165. Or, to put _Decastro_'s holding in _Bruen_'s words, "the regulated conduct [implicated by § 922(a)(3)] falls beyond the [Second] Amendment's original scope," such that "the analysis can stop there [because] the regulated activity is categorically unprotected." _Bruen_, 142 S.Ct. at 2126; _see id._ at 2127 (confirming that while lower courts' application of means-ends scrutiny to Second-Amendment burdening regulations was inappropriate, lower courts' enunciation of "[s]tep one of the predominant framework . . . which demands a test rooted in the Second Amendment's text, as informed by history" is "broadly consistent with _Heller_"). And, as it happens, the _Decastro_ court did not need to apply the means-end scrutiny for Second Amendment protected conduct that the Supreme Court explicitly disavowed in _Bruen_. To the contrary, since it held that § 922(a)(3) does not burden Second Amendment rights at all, that holding survives _Bruen_ and binds this Court.

Lucha disputes this reading of _Decastro_, pointing to language in _Decastro_ describing § 922(a)(3) as burdening Second Amendment rights "only minimally" or "not substantially," _Decastro_, 682 F.3d at 164, 168, and therefore arguing that _Decastro_ cannot be read as holding that § 922(a)(3) on its face does not regulate Second Amendment

protected conduct. The Court disagrees. As Decastro made clear, any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually "infringe" it. Decastro, 682 F.3d at 167-68 (analogizing any threshold burden placed by § 922(a)(3) on the right to bear arms to incidental threshold burdens routinely placed on the right to vote or to speak at particular times and places that likewise are not considered to "infringe" the underlying rights). Accordingly, Decastro is best read as holding that § 922(a)(3) does not on its face infringe the right to keep and bear arms.

Of course, Decastro, which came only four years after Heller and nine years before Bruen, did not use Bruen's words. In determining that § 922(a)(3) so minimally burdened Second Amendment rights so as to not trigger Second Amendment scrutiny at all, the Second Circuit's analysis included less focus on a precise historical understanding of the scope of the right protected by the Second Amendment's plain text, and more analogizing to other areas of doctrine dealing with other rights. Id. at 167-68. For instance, in concluding that § 922(a)(3) does not infringe the right to keep or bear arms, Decastro emphasized that our constitution generally allows state and federal governments to place broad-based and non-discriminatory threshold burdens on other fundamental rights (such as the rights to vote, marry, assemble, and even, with respect to times and places, the right to speak) so long as such burdens do not substantially burden the rights in question and leave open ample means of exercising them. Id. Because § 922(a)(3)

8

does not on its face prohibit anyone lawfully entitled to carry a gun from lawfully acquiring one in-state consistent with the statute, the _Decastro_ court therefore concluded that any burden imposed on Second Amendment rights was entirely incidental, such that § 922(a)(3) does not in fact infringe the right to keep and bear arms. Id. This holding, even if not expressed exactly how a post-_Bruen_ court might have expressed it, remains binding on this Court.

### 3. Under _Bruen_, § 922(a)(3) does not infringe on the right to keep and bear arms

Moreover, a close reading of both _Bruen_ and the two-justice concurrence authored by Justice Kavanaugh and joined in by Chief Justice Roberts, both necessary to _Bruen_'s majority, confirms that statutes such as § 922(a)(3), which place certain threshold conditions on the acquisition of firearms designed to ensure that those carrying them are lawfully entitled to do so, generally do not infringe the right to keep and bear arms so long as they are not applied to actually prevent law-abiding citizens from obtaining and carrying guns. For instance, while _Bruen_ struck down New York's "may issue" firearms-permitting regime, which required citizens to show a "special need" for self defense and submit to a highly discretionary licensing process in order to exercise their Second Amendment to carry arms, the Court nonetheless emphasized that "[t]o be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." _Bruen_, 142 S.Ct.

at 2138 n.9. Rather, the Court reasoned that "[b]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." Id. Instead, "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.'" Id. (also noting that "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.").

What is notable here is that notwithstanding Bruen's holding that a regulation infringing on "presumptively protect[ed]" conduct covered by "the Second Amendment's plain text" must be "consistent with this Nation's historical tradition of firearm regulation" in order to pass constitutional muster, id. at 2126, Bruen nonetheless stated that nothing in its analysis "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," at least to the extent those regimes applied in practice in a way that did not substantially interfere with the right of "law-abiding, responsible citizens" to obtain and carry firearms. Id. at 2138 n.9. This point is made even more clearly in Justice Kavanaugh's two-justice concurrence, which explicitly stated that "[t]he Court's

decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense [and] [i]n particular . . . does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." Id. at 2161 (Kavanaugh, J., concurring). See id. at 2162 ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

Importantly, both the majority opinion and Kavanaugh concurrence indicated the likely constitutionality of shall-issue regimes -- at least to the extent they are not applied in practice to frustrate gun ownership or carrying by law-abiding, responsible citizens -- without first conducting any exhaustive historical analysis, suggesting that such "shall-issue" regimes do not infringe the right to keep and bear arms. As described below, this Court concludes that regulatory regimes designed to verify that a person possessing or carrying a gun is lawfully eligible to do so would pass the historical test laid out by Bruen. But the implication of both the Bruen majority opinion and the Kavanaugh concurrence is that "shall-issue" licensing regimes, so long as they allow persons contemplated by the Second Amendment to keep and bear arms and are not applied in practice to frustrate that right, do not even trigger a Bruen inquiry into whether they are consistent with this Nation's tradition of firearm regulation. This is because they do not on their face prevent anyone lawfully entitled to do so from "keep[ing] and bear[ing] arms."

11

Bruen, of course, had no occasion to mention § 922(a)(3), nor analogize it to the 43 states' shall-issue regimes. But, as explained above, § 922(a)(3) operates in tandem with such state licensing regimes by "funnel[ing] access to firearms" through in-state and federally licensed dealers that can then ensure that a person obtaining a firearm is eligible to do so. Mateo, 718 F.2d at 341; see also Decastro, 682 F.3d at 168 ("The evident purpose of the statute is to stop circumvention of state laws regulating gun possession; it does so by requiring state residents to comply with conditions of sale and similar requirements in their home state."). In other words, § 922(a)(3) backstops state licensing regimes by ensuring that individuals can't dodge their home-state's licensing requirements by simply obtaining a gun from out of state. Like the "shall-issue" state-licensing regimes held out by the Bruen majority opinion and Kavanuaugh concurrence as putatively lawful on their face, § 922(a)(3) therefore does not on its face operate to prevent anyone from keeping or bearing arms; it merely prescribes and proscribes particular modes of acquiring guns, so as "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." Bruen, 142 S.Ct. at 2138 n.9.

### 4. Outlier situations should be dealt with in as-applied challenges

Lucha speculates that § 922(a)(3) may operate in particular situations to infringe on the right to keep and bear arms. For instance, he speculates that a New York resident lawfully eligible to

SPA015

carry a gun in both New York and New Jersey could be given a gun by a family member in New Jersey to bring home with her to New York. Def. Supp. Br. at 1, Dkt. 43.[4] There are two, independently adequate responses to this line of argument.

First, the fact that a regulation may prevent someone from lawfully keeping or bearing arms in a particular circumstance even if that person might otherwise qualify to do so does not necessarily establish that the regulation infringes the right to keep and bear arms. As noted, the Supreme Court in Bruen justified 43 states' "shall issue" licensing regimes as designed "to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S.Ct. at 2138 n.9. For the people who ultimately obtain a license through such a regime (because they are law-abiding, responsible citizens), the license requirement may appear to act as an unnecessary burden. But while the point of such license requirements may be to screen out those who are not law-abiding and responsible, they cannot work in practice without subjecting everyone -- including the law-abiding and responsible -- to the requirement of getting a license, along with whatever background check or training requirements that may entail. See id.

---

[4] The more common problem -- that someone who has already lawfully obtained a firearm may seek to bring it with her between states in which she may lawfully keep and carry it -- is separately dealt with by 18 U.S.C. § 926A, which allows gunowners to transport guns between states so long as they "may lawfully possess and carry such firearm" in both states, transport the gun unloaded, and meets various other requirements. Id.

13

SPA016

With that understanding, it is easy to see the first flaw in Lucha's hypothetical. To ensure that a person is entitled to keep and bear arms, the state may require them to follow certain regulatory steps that necessarily close off paths for keeping and bearing arms that do not follow such steps. But, so long as that person reasonably <u>could</u> comply with such steps, it is hard to see exactly why prohibiting the receipt of firearms outside the regulatorily prescribed mechanism infringes the right to keep and bear arms.

<u>Second</u>, even assuming for the sake of argument that § 922(a)(3) may operate as applied to certain individuals under certain circumstances to infringe the right to keep and bear arms, Lucha has identified nothing about his circumstances that suggests he could not have sought to obtain a firearm lawfully from any of New York's many federally licensed dealers. He is thus totally unlike the petitioners in <u>Bruen</u> who sought to avail themselves of New York's prescribed process and were denied any license to carry as a result of that process. <u>Bruen</u>, 142 S.Ct. at 2124-25. To succeed in a purely facial challenge, Lucha must show that "no set of circumstances exists under which the Act would be valid." <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987). The mere speculation that some such circumstances might exist is insufficient. To the extent § 922(a)(3) infringes specific individuals' right to keep and bear arms in specific situations, the affected individuals may challenge it. <u>Decastro</u>, 682 F.3d 169 n.7; <u>see also</u> <u>Bruen</u>, 142 S.Ct. at 2138 n.9 (noting that if a shall-issue permitting regime were put to "abusive ends," such as "where, for

14

SPA017

example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry," affected individuals could bring challenges).

**B. § 922(a)(3) is consistent with this country's history and tradition of firearm regulation**

Even if the Court did not conclude, as it does above, that § 922(a)(3) does not on its face implicate the right to keep or bear arms, it would nonetheless conclude that the statute survives facial attack because, when viewed at the appropriate level of generality, it "is consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S.Ct. at 2126. "When confronting [] present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." Id. at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar," which requires determining "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and evaluating whether this "how and why" is sufficiently similar to historical gun regulations viewed as consistent with the Second Amendment. Id. at 2232-33.

The Court notes two lines of relevant historical regulations that support the consistency of § 922(a)(3) with the Second Amendment: one line that is plainly relevant to the "how" and another that is plainly relevant to the "why." As to the "how," the Government points to a

15

SPA018

reasonably substantial record of colonial and early state-era laws regulating, like § 922(a)(3), the underlined movement of firearms between colonies. For instance, apparently as part of an effort to prevent firearms from falling into the hands of Indian tribes, "Connecticut banned the sale of firearms by its residents outside the colony." Texeira v. Cty. of Alameda, 873 F.3d 670, 685 (9th Cir. 2018) (citing 1 Trumbull, Public Records of the Colony of Connecticut, 138-39, 145-46). Several other colonies all also passed laws in the seventeenth and eighteenth centuries criminalizing the sale or delivery of firearms to Indians. Id. (citing such laws in Massachusetts, Maryland, Connecticut, and Virginia); see also 6 Statutes at Large of Pennsylvania from 1682 to 1801, at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638-1674, at 18-19 (1868) (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance).

Lucha notes that such laws specifically focused on tribal members were likely racist in intent. The Court agrees that most such laws would likely fail equal protection scrutiny today.[5] But what these laws demonstrate is quite broad colonial authority over the right of citizens to move and transact in firearms across borders out of a fear

---

[5] Of course, a perennial problem with tethering constitutional meaning so closely to the specific practices of centuries-old polities in which power was exercised by and for a fairly narrow subset even of white men -- to say nothing of women and non-white persons -- is that we may end up finding guidance in places we should perhaps not want to seek it. See, e.g., Jamal Greene, Originalism's Race Problem, 88 Den. L. Rev. 517 (2011). Such questions, however, are beyond the scope of today's opinion which takes current case law as it finds it.

that such firearms might fall into the wrong hands. See, e.g., Kanter v. Barr, 919 F.3d 437, 457 (7th Cir. 2019) (Barret, J., dissenting) (noting colonial authority to categorically disarm groups viewed as dangerous, including tribal members, people of African descent, and Catholics). While views about whose hands are "the wrong hands" have thankfully changed, the point is that colonial and state governments, consistent with the Second Amendment, possessed significant authority to regulate the flow of arms across borders in order to prevent improper access to firearms.

Although not cited by the Government, mention should also be made of a statute passed by the Third Congress that made it unlawful to "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados, gunpowder, sulphoer, or saltpetre." Act of May 22, 1794, ch. 33, § 1 ("An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Same of the same"). The statute provided for custom-house officers to search ships for any of these arms and seize any such arms "excepting such of them as may constitute a part of the equipment" of the vessel, and for the forfeiture not just of the arms themselves but also the vessel in the event the value of arms seized exceeded $400. Id. §§ 2-4. And early cases demonstrate that forfeitures were instituted under this law. See, e.g., United States v. La Vengeance, 3 U.S. 297, 298 (1796) (discussing unrelated jurisdictional issues relating to a proceeding instituted under this law to seize

17

muskets, cannons, and gunpowder found on a ship bound to the West Indies).

The Court has identified little contemporaneous discussion of this statute or the problems it was aimed at. Judging solely from its face, it seems reasonably likely that the statute was aimed at ensuring the overall stock of weapons available in this country not be depleted, perhaps out of a concern that the country be sufficiently armed in the case of invasion or insurrection. That is, of course, a distinct purpose from § 922(a)(3)'s goal of ensuring that arms transactions pass through federally licensed dealers positioned to ensure compliance with state law. But at least in terms of the "how" of early gun regulations, the statute provides powerful evidence that an early congress believed it could, consistent with the Second Amendment, place quite sweeping restrictions on the passage of firearms across borders. See, e.g., Printz v. United States, 521 U.S. 898, 905 ("[E]arly congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning . . . ."").

Finally, the Government does point to colonial and early state statutes regulating the importation and exportation of gun powder. Pennsylvania, for instance, enacted a 1795 statute requiring that before any gunpowder be brought into the city, county, or port of Philadelphia, it be appropriately marked and deposited in a public magazine. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). As a colony, Massachusetts both required that any person who "shall

18

SPA021

import into this jurisdiction, either powder, lead, bullets, or any ammunition whatsoever" to "give particular notice of the quantity thereof to the publick Notary," and that any person who sought to export any gunpowder only do so upon obtaining a "License . . . from some two of the Magistrates. . . ." Colonial Laws of Massachusetts Reprinted from the Edition of 1660, at 186-87 (1889), https://archives.lib.state.ma.us/handle/2452/430907. The Connecticut colonial legislature enacted a similar law. 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute).

Neither party has provided this Court with sufficient detail from the historical record to discern the purpose of these different laws, and the Court acknowledges that none is a dead-wringer for § 922(a)(3). Several of the statutes prohibiting or regulating the export of arms or ammunition likely were motivated by a desire to keep weapons inside the particular polity for purposes of self-defense. Pennsylvania's law regarding the proper marking and storage of gun powder upon its importation likely was motivated by concerns regarding the safe storage of a dangerous and flammable material. Arguably, the laws prohibiting the transfer of arms specifically to tribal members are similar to § 922(a)(3) in that they deal with a concern that weapons will fall into the hands of those deemed dangerous and deal with that concern by regulating the transfer of weapons in order to prevent them reaching those considered dangerous, although even here the Court acknowledges that the historical analogy as to purpose is somewhat attenuated. But while the motivation for these laws may not have exactly paralleled

SPA022

the motivation for § 922(a)(3), they nonetheless demonstrate the expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders. As described above, this expansive authority was exercised in numerous ways, involving licensing requirements, registration requirements, and flat-out prohibitions on certain courses of conduct. Accordingly, the Court concludes that there is ample historical precedent for the kind of burden § 922(a)(3) imposes (assuming it imposes one at all) on the right to keep and bear arms.

Turning to the "why" behind § 922(a)(3), the Court finds particularly relevant an extensive history in both England and the colonies of disarming those deemed dangerous and requiring large swathes of the citizenry to swear loyalty oaths in order to demonstrate they were not dangerous. See Kanter, 919 F.3d at 456-58 (Barret, J., dissenting) (discussing the power of both the Crown and colonial legislatures to disarm those deemed dangerous). As put by then-judge, now Justice Barrett, "confiscation of guns from those who refused to swear an oath of allegiance was meant to deal with the potential threat coming from armed citizens who remained loyal to another sovereign. . . [b]ut that particular threat dissipated when a person pledged his allegiance to the United States or to a particular state." Id. at 457-58.

What is notable here is that the long tradition of imposing a relatively slight threshold burden on all or at least a large portion

of gunowners, most of whom were likely entitled to keep and bear arms, to demonstrate that they were so entitled and not dangerous by swearing the requisite loyalty oath. Obviously, the "how" of this regulation -- requiring citizens to swear a loyalty oath -- differs significantly from § 922(a)(3)'s prohibition on receiving arms from out of state. But the "why" of it -- enabling gunowners to verify they are not dangerous -- is reasonably similar. And even the "how" bears some similarities: both procedures involve imposing a slight threshold burden on gun ownership designed so as "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." Bruen, 142 S.Ct. at 2138 n.9.

    In short, while the Court believes, consistent with Decastro, that § 922(a)(3) does not on its face infringe the right to keep and bear arms, it also concludes that any incidental burden on the right to keep and bear arms is fully consistent with this country's history and tradition of gun regulation. This is true both with respect to the evident goal behind § 922(a)(3) (preventing firearms from getting into dangerous hands), and the chosen means (regulating the transfer of firearms across borders). The Court does not rule out the possibility that a proper litigant might raise a meritorious as-applied challenge to § 922(a)(3), but nothing about the statute's facial breadth or application in this case violates the Second Amendment. Accordingly, the Court reaffirms its prior denial of defendant Lucha El's motion to dismiss the indictment.

## II.  The search at issue in this case was supported by reasonable suspicion

Separately, defendant Lucha El has moved to suppress the results of the June 23, 2021 search that led to the recovery of the firearm he is charged with having received from out-of-state in violation of § 922(a)(3). The Court conducted an evidentiary hearing on May 30 of this year, in which it heard testimony from the two arresting officers, reviewed video of the arrest as captured by the officers' body cameras, and listened to the recording of a 911 call made prior to Lucha's arrest.

To support a brief "Terry" stop of the sort that took place here, law enforcement must have "reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013); see Terry v. Ohio, 392 U.S. 1 (1968). Lucha makes two kinds of arguments that reasonable suspicion was lacking here. First, he argues that the most the arresting officers had was suspicion that Lucha was carrying a gun, and that since carrying a gun is not by itself unlawful, suspicion that someone is carrying a gun does not constitute suspicion of unlawful activity. Second, Lucha argues that because the 911 caller who tipped off the police that Lucha was carrying a gun did not provide her name, the tip was anonymous and not sufficiently reliable to support reasonable suspicion. The Court addresses these arguments in turn.

22

### A. Reasonable suspicion that Lucha was carrying a gun was sufficient to support the 2021 search

Courts, including both the Supreme Court and the Second Circuit, have long affirmed that reasonable suspicion that a person is carrying a gun suffices to support a brief <u>Terry</u> stop. For instance, in <u>Florida v. J.L.</u>, 529 U.S. 266 (2000), the Supreme Court held that "officers' suspicion that J.L. was carrying a weapon" was not sufficient to support a brief search and seizure because the sole basis for that suspicion was an un-corroborated anonymous tip. <u>Id.</u> at 270. However, the Court proceeded on the assumption that, assuming the tip had been sufficiently corroborated, suspicion that J.L. was carrying a gun would have justified the stop, notwithstanding the fact that "J.L. made no threatening or otherwise unusual movements," and the tip at issue merely stated that J.L. "was carrying a gun," not that he was actively committing some independent crime with it. <u>Id.</u>; <u>see also</u> <u>Freeman</u>, 735 F.3d at 98-100 (similar). And, of course, <u>Terry</u> itself involved an officer's (accurate) suspicion that the suspects might "have a gun," although the officer there also had reason to think a theft might be ongoing. <u>Terry</u>, 392 U.S. at 6.

At the same time, reasonable suspicion is generally measured with respect to suspicion "<u>of criminal activity</u>." <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981) (emphasis added). In a post-<u>Bruen</u> world, where it is abundantly clear that citizens have the right not just to keep but also to bear arms, including outside the home, it becomes

23

SPA026

hard to say that the suspicion or even knowledge that someone is carrying a gun constitutes suspicion or knowledge of criminal activity.

While *Bruen* thus raises serious questions about when the police may stop someone on the ground that they are carrying a gun, the Court notes that these questions are not squarely presented in this case. The *Terry* stop at issue here occurred on 6/23/21, approximately one year before *Bruen*, when New York's highly restrictive licensing regime limiting parties' ability to obtain licenses to carry firearms outside the home absent special need was still in place and had been upheld by the Second Circuit. *Bruen*, 142 S.Ct. at 2123-24. While Lucha points out that even under New York's pre-*Bruen* licensing regime, some individuals had licenses to carry concealed firearms outside the home, reasonable suspicion "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Officers (and courts) also need not disregard obvious probabilities or likelihoods in evaluating reasonable suspicion. See *Kansas v. Glover*, 140 S.Ct. 1183, 1189-91 (2020) (holding that the police had reasonable suspicion to stop a vehicle registered to an owner whose license had been suspended, notwithstanding the possibility that someone other than its owner could lawfully have been driving it, based on the inference that the owner and driver were one and the same). As to a search occurring one year before *Bruen*, this Court therefore has little trouble concluding that to the extent the police had reasonable suspicion Lucha was carrying a concealed gun in New York City, that

**SPA027**

sufficed at that time to create reasonable suspicion of unlawful activity.

More broadly, the Supreme Court has repeatedly made clear that "the ultimate touchstone of the Fourth Amendment is reasonableness." Id. at 1191. And, as discussed at length above, states may, consistent with the Second Amendment, take reasonable steps to verify that someone with a gun is in fact authorized to carry it. Given that basic backdrop, the Court doubts that, even following Bruen, the police cannot follow up on a sufficiently corroborated tip that someone is carrying a gun by at least taking steps to verify that that person is lawfully entitled to carry a gun, such as, for instance, by verifying her permit.

In this case, seconds after the police searched Lucha's bag to determine if he was in fact carrying a firearm, the police asked Lucha if he had a permit for the gun, to which he answered that he neither had nor needed a permit. See 6/26/23 Hr'g Tr. 32:24-33-3. Even post-Bruen, it seems clear that, assuming reasonable suspicion exists that someone is carrying a gun, law enforcement retains the authority to at least verify that the person carrying the gun is doing so lawfully.

**B. The police had reasonable suspicion to stop Lucha**

The more important issue, therefore, is whether the police lacked reasonable suspicion to believe Lucha was carrying a gun. In particular, Lucha contends that because the 911 caller who reported him as carrying a gun did not give her name, the tip was anonymous and

25

there were insufficient corroborating circumstances to render such a tip sufficiently reliable to give rise to reasonable suspicion.

### 1. Evidence at the 5/30/23 Evidentiary Hearing

To assess this argument, some background is necessary, for which the Court draws on the evidence and testimony introduced during its May 30, 2023 evidentiary hearing on defendant's motion to suppress. See generally 5/30/23 Hr'g Tr., Dkt. 50. On the night of June 23, 2021, a woman called 911 to report a man with a gun. See 911 Audio, Gov't Ex. 100. When asked who the man was, she identified him as "Lucha," and when asked how she knew he was carrying a gun, she explained it was because she had seen it. She further explained that she knew Lucha because she used to be his friend, and she gave a description of him as an Hispanic male wearing a black-and-white turban, a white T-shirt, and black pants, and carrying a blue bag in which the gun was stored. She further described Lucha's height and build, noted he had a moustache, and stated where he was at the moment (heading down Perry Avenue) and where she predicted he was going (that he would turn on 207th Street). After she provided this information, the dispatcher asked the caller to give her name. She declined. The dispatcher then asked for her phone number, and the caller responded by asking "don't you already have it," before proceeding to provide it.

Officer Smalls, who was patrolling in the area with his partner, promptly responded and found an individual precisely matching the caller's description where the caller had placed him and carrying a

blue bag. Officer Smalls testified that, as he approached Lucha, he observed that the blue bag worn across Lucha's chest "had a heavily weighted object in it," and that he could "see a bulge at the lower portion of the bag." He also testified that he previously had encountered similar bags as having been used to contain firearms, although as he candidly acknowledged under cross examination, such bags are also routinely used as ordinary bags. Officer Smalls proceeded to approach Lucha and pat down the bag's outer portion, at which point he testified he "felt a hard metal, L-shaped object, the shape and size consistent of a firearm." Hr'g Tr. 30:5-6. At that point, he gave his partner a verbal code to make an arrest, so as to handcuff Lucha while the firearm was secured and he held down the bag with the firearm. Once that was done, Officer Smalls opened the bag and found a loaded firearm in it; he promptly asked Lucha whether he had a permit for the gun, at which point Lucha denied any need for a permit.

It should be noted that, both before and during this encounter, the defendant behaved peaceably. At the time he was approached by Officer Smalls, he appeared from body camera footage to be engaged in a social conversation with two women seated on the sidewalk, and at no time during the encounter did Lucha resist or make any kind of threatening movement or gesture. Soon after Lucha's arrest, other police officers did a drive-by with the original 911 caller who identified the man arrested as Lucha.

27

SPA030

## 2. Whether Officer Small's observation of a "bulge" created reasonable suspicion

At the hearing, Defense counsel suggested that Officer Smalls may have been tempted to testify to a "bulge" in Lucha's bag because he previously testified that he had not seen a bulge in an evidentiary hearing on a motion to suppress in another case, and the gun in that case was ultimately suppressed. 5/30/23 Hr'g Tr. 75-79. Defense counsel further suggested that Officer Smalls may have been "coached," following that hearing, that testifying to seeing a "bulge" may be necessary to prevent suppression.

Based on its observations of his demeanor, the Court believes Officer Smalls testified truthfully. But the test for reasonable suspicion is not his subjective belief but what an objectively reasonable officer would have seen and concluded. Freeman, 745 F.3d at 102. After carefully reviewing video footage capturing what Officer Small saw, the Court concludes that while Lucha was wearing a bag strapped across his chest and clearly weighted down with some contents, any "bulge" was sufficiently modest and nondescript that no reasonable officer could have distinguished any "bulge" of the sort reasonably likely to be caused by a weapon from any other sort of bulge that might come from having a reasonably full bag. The Court does not doubt that Officer Smalls, primed as he was by the 911 call and dispatcher to believe Lucha in fact had a gun in his blue bag, sincerely believed that a gun was in the bag or even that he perceived the bag to have a small bulge. But based on its independent review of the body camera

28

footage, the Court concludes that there was no objectively reasonable basis to believe the bag contained a firearm -- <u>except</u> for that provided by the 911 call. Accordingly, whether reasonable suspicion existed depends entirely on whether the 911 call gave rise to it.

### 3. Whether the 911 call created reasonable suspicion

The Court nonetheless concludes that the 911 call, standing alone, gave rise to reasonable suspicion to support a brief investigative search and seizure of the man matching the precise identification laid out by the 911 caller. Reasonable suspicion is not a terribly high standard, and while "a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014).

To be sure, the Supreme Court' and Second Circuit's cases express concern as to whether fully anonymous tips give rise to reasonable suspicion. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000). "[H]owever, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." <u>Id.</u>

In <u>J.L.</u>, the Supreme Court held that an anonymous tip that "a young black male wearing a plaid shirt at the bus stop" was carrying

29

**SPA032**

a gun lacked sufficient indicia of reliability to give rise to reasonable suspicion to support a Terry stop. Id. at 271. Although the tipster's "accurate description of [the] subject's readily observable location and appearance" was reliable in the "sense . . . [that it] help[ed] the police correctly identify the person whom the tipster mean[t] to accuse," the tipster's accurate description of appearance and location "d[id] not show that the tipster has knowledge of concealed criminal activity." Id. at 272. There were therefore no corroborating circumstances rendering reliable the anonymous tip in its assertion that J.L. was in fact carrying a gun. Id. However, in a concurrence for himself and then-Chief Justice Rehnquist, Justice Kennedy noted the possibility that changing technology -- and, in particular, the possibility for "[i]nstant caller identification" and "[v]oice recording of telephone tips" -- might reduce the possibility that callers using the 911 system would knowingly lie, thereby rendering so-called "anonymous" tips through the 911 system more reliable. Id. at 275-76 (Kennedy, J., concurring).

In Freeman, the Second Circuit expanded on J.L. and also rejected as insufficient an anonymous tip that a precisely identified as an individual carrying a gun. 735 F.3d at 98-100. The district court sought "to distinguish the call in [that] case from that in J.L." as "not 'truly anonymous' because the cell phone number was automatically recorded by the 911 system, the individual twice called 911, and based upon the information conveyed in the call, the caller was an eyewitness." Id. at 98. The Second Circuit held that these distinctions

30

did not in fact "undermine the reasons why anonymous phone calls must have sufficient indicia of reliability to support a finding of reasonable suspicion, nor d[id] they provide those indicia for this caller or do anything to alter the reliability analysis laid out in J.L." Id. Specifically, notwithstanding Justice Kennedy's suggestion in J.L. that phone recording might increase reliability of 911 calls, the Second Circuit noted in Freeman noted there was no reason to think that the mere fact a tipster's call was recorded and her number known necessarily demonstrated that the caller could be tracked down and her identity verified. Id. at 98. For instance, the caller could have been using a prepaid cellphone solely for the purpose of the tip. Id. And, although the police did not know this at the time of the stop, the caller was in fact never tracked down. Id. At the same time, the Second Circuit did not dismiss the possibility that 911 technology would ever render a seemingly anonymous tip less anonymous; rather, it held that "[i]n each case, the government must show its relevant technological capacities and how those capacities enhanced reliability in that particular instance." Id. at 99.

Freeman likewise dismissed the suggestion that the tip was rendered reliable by the fact that the caller called back twice, noting that this just meant there were two equally uncorroborated anonymous tips. Id. It similarly did not agree that the tip was reliable because the caller was purportedly an eyewitness, since the only things the tipster claimed to have seen directly were facts such as the suspect's location or clothing that were reliable in identifying the suspect but

31

not in associating him with illegality. Id. at 99. Notably, while the police asked the 911 dispatcher twice to confirm whether the caller "actually saw a firearm," the dispatcher was twice unable to confirm this was the case. Id. at 94. And while the Second Circuit did not dwell on the fact, there was also some reason to think the tipster was not a personal acquaintance of the suspect; for instance, she never gave his name and identified him as Hispanic the first time she called in and as black the second time she called in. Id. at 94-95.

Most recently, however, in Navarette v. California, 572 U.S. 393 (2014), the Supreme Court held that an anonymous tip from a person reporting that a truck had just run her off the road was sufficient to establish reasonable suspicion to stop the truck. Id. at 399-400. The Court noted several factors that rendered the tip reliable even though the caller did not give her name; for one thing, in contrast to the tipster in J.L. who told the police that a person was carrying a gun but "provided no basis for concluding that the tipster had actually seen the gun," the caller in Navarette reported directly seeing the other car driving erratically. Id. For another, analogizing to the hearsay exceptions permitting present tense impressions and excited utterances, the Supreme Court held the fact that the tipster was calling soon after the event heightened the reliability, since contemporaneousness leaves less time for a story to be made up. Id. at 400. And finally, the Court held that the caller's "use of the 911 system is . . . one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the

911 call," since such calls could be recorded and traced, making it less likely that a tipster would give a totally false tip. Id. at 400-01.

To the extent there is any contradiction between Freeman and Navarette -- in particular, as to whether it is appropriate to put weight on a tipster's use of the 911 system as a relevant factor tending to corroborate an otherwise anonymous tip -- the Court notes it is bound by Navarette, as it is more recent and a Supreme Court case. However, the Court concludes there is no contradiction. In Freeman, the Second Circuit held that the mere fact that an anonymous caller's phone call was recorded and allowed tracing of her number did not automatically render an anonymous tip reliable, although it contemplated "that similar calls with more evidence of identification of the caller . . . [and] with more information would have the necessary reliability." Freeman, 735 F.3d at 99. And Navarette likewise did not conclude that use of a 911 system that "allow[s] for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity" created any "per se reliability." Navarette, 572 U.S. at 400-01. Instead, the Court merely held that it was "one relevant circumstance" that might support a finding of sufficient reliability.

Reading J.L., Freeman, and Navarette together, the Court concludes that the tip at issue in this case contained sufficient indicia of reliability to give rise to reasonable suspicion. Specifically, while one factor weighing against reliance on anonymous

33

SPA036

tips is the concern that a person who cannot be held to account might give false information, <u>Freeman</u>, 735 F.3d at 97-98, the caller in this case not only used the 911 system but indicated her awareness that her use of that system would allow her to be tracked down. When asked for her phone number, the caller responded by asking "don't you already have it?", which the dispatcher appeared to confirm. The caller then provided her phone number. Moreover, the caller was responding quickly to real-time questioning, and as the Court in <u>Navarette</u> noted, "substantial contemporaneity of event and statement" give less time for a tipster to make up a lie. <u>Navarette</u>, 572 U.S. at 400.

Furthermore, <u>Navarette</u> put significant emphasis on the fact that the caller had just seen the reported driver driving erratically, whereas in <u>J.L.</u> "the tip provided no basis for concluding that the tipster had actually seen the gun." <u>Id.</u> at 399. Similarly, in <u>Freeman</u>, the Court rejected the suggestion that the tipster's contemporaneous reporting of what she saw rendered her tip reliable because although she could identify where the suspect was at a particular moment, she (twice) declined to verify that she had actually seen the gun. <u>Freeman</u>, 735 F.3d at 94, 99. Here, by contrast, the caller reported that she <u>had</u> seen the gun and knew that Lucha was carrying it in his bag.

Further, still, unlike the tipsters in <u>J.L.</u>, <u>Freeman</u>, or <u>Navarette</u>, the tipster here displayed familiarity with Lucha himself. She identified him not just by location and description, but by name, and indicated she was a former friend who in fact knew that Lucha carried the gun every day. Unlike, for instance, the caller in <u>Freeman</u>,

34

whose description of the suspect changed between her two calls, id. at 94-95, the instant caller's apparent preexisting relationship with Lucha increased the reliability of her tip in two ways: first, it helped establish a firmer basis for her knowledge that Lucha was in fact carrying a gun, and second, and relatedly, it reduced the possibility that she was merely reporting someone she had seen on the street whose appearance she may have disliked due to prejudice or other unreliable reasons.

In sum, the Court concludes that the tip here was sufficiently corroborated to give rise to the relatively low reasonable suspicion standard. The caller knew Lucha and identified him not just by description and location but also by name; she had a preexisting relationship with him, and spoke to her first-hand knowledge of his gun carrying (both in general and on that day). The call was made close in time to the underlying events -- she knew not just where Lucha was and was going, but that he had placed his gun in a blue bag he was carrying. And while the caller declined to give her name, she demonstrated her awareness that by using the 911 system, she was likely allowing the police to contact her again if needed, and she in fact gave her phone number when asked.[6] Given all these circumstances, the Court concludes there was reasonable suspicion to support the Terry stop.

---

[6] Although this was not of course known at the time Officer Smalls approached Lucha, the police were soon thereafter able to track down the caller, who identified Lucha in person.

SPA038

### III. Conclusion

For the foregoing reasons, the Court reaffirms its prior denial of defendant Lucha El's motion to dismiss and to suppress. The Clerk is directed to close both motions on the docket (Dkt. 21).


SO ORDERED.

New York, NY
July **7**, 2023

_____
JED S. RAKOFF, U.S.D.J.

SPA039

# CERTIFICATE OF SERVICE

I certify that a copy of this Special Appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **ASHLEY C. NICHOLS, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007

Dated:  New York, New York
        May 3, 2024

_Kendra Hutchinson_

**KENDRA HUTCHINSON**
Assistant Federal Defender