# 24-162

*To Be Argued By*:
LUCAS ISSACHAROFF

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 24-162

━━━━◆◆◆◆━━━━

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

STEVEN PEREZ, also known as
Sealed Defendant 2, also known as Lucha,

*Defendant-Appellant,*

KEITH VEREEN, also known as Sealed Defendant 1,

*Defendant-Appellant.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

ASHLEY C. NICOLAS,
MADISON REDDICK SMYSER,
LUCAS ISSACHAROFF,
NATHAN REHN,
  *Assistant United States Attorneys,*
    *Of Counsel.*

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Offense Conduct . . . . . . . . . . . . . . . . . .  2

    B.  The Charges . . . . . . . . . . . . . . . . . . . . . . . . .  4

    C.  Lucha El's Motion to Dismiss the Section
         922(a)(3) Charge . . . . . . . . . . . . . . . . . . . . . .  5

    D.  The Trial and Sentencing . . . . . . . . . . . . . . .  7

ARGUMENT:

Section 922(a)(3) Is Constitutional . . . . . . . . . . . . .  7

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  8

        1.  The Second Amendment and Conditions
            on Commercial Sale of Firearms . . . . .  8

        2.  Standard of Review . . . . . . . . . . . . . . .  12

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  13

        1.  *Decastro* Forecloses Lucha El's
            Argument . . . . . . . . . . . . . . . . . . . . . .  13

        2.  Text and History Confirm that Section
            922(a)(3) Is Constitutional Facially and
            as Applied to Lucha El . . . . . . . . . . .  15

            a.  The Second Amendment's Text Does
                Not Cover Lucha El's Conduct . . .  16

ii

PAGE

    b.   Section 922(a)(3) Is Consistent
with the Principles Underlying This
Nation's Regulatory Tradition . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

*Cases*:

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . *passim*

*Gazzola v. Hochul*,
    88 F.4th 186 (2d Cir. 2023) . . . . . . . . . . . . . 12, 15

*Heller v. Bedford Cent. Sch. Dist.*,
    665 F. App'x 49 (2d Cir. 2016) . . . . . . . . . . . . . . . 8

*Mance v. Sessions*,
    896 F.3d 699 (5th Cir. 2018) . . . . . . . . . . . . 19, 26

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . 8, 13, 18

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) . . . . . . . . . . . . . . . . . . . . . *passim*

*Robertson v. Baldwin*,
    165 U.S. 275 (1897) . . . . . . . . . . . . . . . . . . . 16, 17

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) . . . . . . . . . . . . 22, 23

*United States v. Bogle*,
    717 F.3d 281 (2d Cir. 2013) . . . . . . . . . . . . . 8, 23

iii

PAGE

*United States v. Daniels,*
   77 F.4th 337 (5th Cir. 2023) . . . . . . . . . . . . . . . . 27

*United States v. Decastro,*
   682 F.3d 160 (2d Cir. 2012) . . . . . . . . . . . . . *passim*

*United States v. Focia,*
   869 F.3d 1269 (11th Cir. 2017) . . . . . . . . . . 18, 19

*United States v. Jimenez,*
   895 F.3d 228 (2d Cir. 2018) . . . . . . . . . . . . . . . 12

*United States v. Peguero,*
   34 F.4th 143 (2d Cir. 2022) . . . . . . . . . . . . . . . 15

*United States v. Rahimi,*
   144 S. Ct. 1889 (2024). . . . . . . . . . . . . . . . . *passim*

*Statutes, Rules & Other Authorities:*

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. §§ 371 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

S. Rep. No. 90-1097 (1968). . . . . . . . . . . . . . . . . . 21

15 *The Public Records of the Colony of Connecticut*
   (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Colonial Laws of Massachusetts Reprinted from the*
   *Edition of 1672* (1890) . . . . . . . . . . . . . . . . . . . . 24

*Laws and Ordinances of New Netherland, 1638-1674*
   (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iv

PAGE

3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* (1810) . . . . . . . . . . . . . . . . . . . . . 24

6 *Statutes at Large of Pennsylvania from 1682 to 1801* (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* (1835) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Federal Firearms Listings* . . . . . . . . . . . . . 19

*Miller v. Bonta*, No. 19 Civ. 1537 (S.D. Cal. 2022) (Dkt. 137-3) (Declaration of Prof. Saul Cornell) . . . . . . . . . . 24

David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Lois Schoewer, *Gun Culture in Early Modern England* (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Webster's 1828 American Dictionary of the English Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

James Whisker, *The Gunsmith's Trade* (1992) . . . . 24

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-162

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

STEVEN PEREZ, also known as Sealed Defendant
2, also known as Lucha,

*Defendant-Appellant,*

KEITH VEREEN, also known as Sealed Defendant 1,

*Defendant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Steven Perez, also known as Lucha El,[1] appeals
from a judgment of conviction entered on January 12,
2024, in the United States District Court for the
Southern District of New York, following a trial before

---

[1] The Government hereafter refers to Perez by his
preferred name, "Lucha El."

2

the Honorable Jed S. Rakoff, United States District Judge, and a jury.

Indictment 22 Cr. 644 (JSR) (the "Indictment") was filed on November 30, 2022. It charged Lucha El with one count of interstate transportation and receipt of firearms, in violation of 18 U.S.C. § 922(a)(3). Superseding Indictment 22 Cr. 644 (JSR) (the "Superseding Indictment") was filed on July 20, 2023. It charged Lucha El with one count of conspiracy to commit interstate transportation and receipt of firearms, in violation of 18 U.S.C. §§ 371 and 922(a)(3), and one count of interstate transportation and receipt of firearms, in violation of 18 U.S.C. § 922(a)(3).

Trial commenced on August 28, 2023, and ended on August 31, 2023, when Lucha El was convicted on both counts of the Superseding Indictment. On January 8, 2024, Judge Rakoff sentenced Lucha El to a term of 16 months' imprisonment, to be followed by 3 years' supervised release; ordered the forfeiture of the firearms involved in the offense; and imposed a $200 mandatory special assessment.

Lucha El is serving his sentence.

## Statement of Facts

### A.   The Offense Conduct

Between May 2020 and November 2020, Lucha El received, in New York State, multiple firearms that had been illegally purchased on Lucha El's behalf by a straw purchaser (the "Straw Purchaser") in South Carolina. The Straw Purchaser bought at least 25 firearms (the "Firearms") from dealers with federal

3

firearms licenses ("FFLs")—more commonly known as gun stores—in South Carolina on behalf of Lucha El and others. (A. 882-86; GX 902).[2] On at least four occasions, the Straw Purchaser then transported the Firearms from South Carolina to New York City and delivered them to Lucha El and others. (A. 681-83).

On at least one occasion, Lucha El paid the Straw Purchaser via a wire transfer, which Lucha El sent from the Bronx to South Carolina. (A. 552-53). Other New York residents, including at least one of Lucha El's coconspirators, also paid the Straw Purchaser by sending wire transfers from New York to South Carolina. (A. 552).

Lucha El was twice arrested in possession of firearms purchased by the Straw Purchaser at South Carolina FFLs. Specifically, on June 23, 2021, Lucha El was arrested in the Bronx, New York, in possession of a Canik TP9 9mm handgun that the Straw Purchaser had purchased in South Carolina. (A. 530-31; GX 902).

Around two weeks later, on July 3, 2021, Lucha El was stopped on Interstate 95 in Massachusetts with a group of individuals (the "CCs"), who self-identified as members of a militia group. (A. 773-80; Gx. 301A). One of the CCs had sent $600 to the Straw Purchaser on

---

[2]    "Br." refers to Lucha El's brief on appeal; "A." and "SA." refer to the appendix and special appendix filed with that brief; and "GX" refers to a Government exhibit at trial. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, alterations, and footnotes.

4

September 12, 2020, and had communicated repeatedly with Lucha El. (A. 552, 685-98, 765). Law enforcement recovered nine firearms, over a thousand rounds of ammunition, and almost 20 magazines from Lucha El, the CCs, and the vehicles that they were driving. (A. 807, 860-61). The seized firearms included a Glock Model 44 .22 caliber pistol, which the Straw Purchaser had purchased in South Carolina. (A. 807-08; GX 902).

The CCs, who at the time of the traffic stop were armed and dressed in camouflage uniforms and ballistic vests, were traveling from Rhode Island to Maine to attend a training exercise that they called "Operation Fountainhead." (A. 775-84, 914-15; GX 301A). The CCs had planned to "practice firing and maneuvering against each other. Practice ambushes, assault firing positions etc." (GX 1202B). They were in possession of firearms, ammunition, and other military style equipment. (A. 807, 861-62, 902). The CCs had planned the event for weeks, referring to it as the "east coast training exercise," and instructing one another on proper preparations, including packing firearms and other military equipment. (A. 877-80, 902-03; GX 1105, 1106, 1109, 1110). At the time of his arrest, Lucha El was wearing a ballistic vest with a firearm strapped across his chest. (GX 330C).

## B. The Charges

On November 30, 2022, a grand jury sitting in the Southern District of New York returned the Indictment, charging Lucha El with one count of interstate

transportation and receipt of firearms, in violation of 18 U.S.C. § 922(a)(3). (A. 19-26).[3]

On July 20, 2023, a grand jury returned the Superseding Indictment, charging Lucha El in two counts. Count One charged Lucha El with conspiracy to commit interstate transportation and receipt of firearms, in violation of 18 U.S.C. §§ 371 and 922(a)(3). Count Two charged Lucha El with interstate transportation and receipt of firearms, in violation of 18 U.S.C. § 922(a)(3). (A. 272-75).

## C. Lucha El's Motion to Dismiss the Section 922(a)(3) Charge

On February 4, 2023, Lucha El moved to dismiss the charge against him in the Indictment on the grounds that 18 U.S.C. § 922(a)(3) violated his Second Amendment rights.[4] On June 8, 2023, Judge Rakoff issued an order denying the motion. (SA. 3). On July 7, 2023, Judge Rakoff issued an opinion providing the basis for the ruling. (SA. 4-39).

Judge Rakoff held that Section 922(a)(3) does not infringe the right to keep and bear arms. The District

_____

[3]  The Indictment also charged Lucha El's co-defendant, Keith Vereen, with two offenses in Counts One and Two.

[4]  In the District Court, Lucha El did not specify whether his constitutional challenge was facial or as-applied. (A. 30-38). On appeal, he asserts that he is raising both a facial and an as-applied challenge. (Br. 24-25).

6

Court first held that *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), in which this Court rejected a Second Amendment challenge to 18 U.S.C. § 922(a)(3), remained good law and was thus binding on the District Court because "§ 922(a)(3) does not on its face prohibit anyone lawfully entitled to carry a gun from lawfully acquiring one in-state consistent with the statute." (SA. 11-12). Judge Rakoff also concluded that *Decastro*'s holding was in fact consistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). (SA. 12-15.) Judge Rakoff noted that the *Bruen* court had approved "shall-issue" licensing regimes and held that, like these regimes, Section 922(a)(3) "does not on its face operate to prevent anyone from keeping or bearing arms; it merely prescribes and proscribes particular modes of acquiring guns." (SA. 15).

Finally, Judge Rakoff held that even if Section 922(a)(3) did implicate the right to bear arms, it would nevertheless survive Lucha El's challenge because it is consistent with this nation's historical tradition of firearms regulation. (SA. 18-24.) Citing a number of historical examples of regulation of the firearms and gunpowder trades, the court found "expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders," and concluded that Section 922(a)(3) was consistent with this historical tradition. (SA. 23).

7

### D. The Trial and Sentencing

On August 31, 2023, a jury found Lucha El guilty on both counts of the Superseding Indictment. (A. 1082-83). On January 8, 2024, Judge Rakoff sentenced Lucha El to a term of 16 months' imprisonment, to be followed by 3 years' supervised release; ordered the forfeiture of the firearms involved in the offense; and imposed a $200 mandatory special assessment. (A. 1149-55).

## A R G U M E N T

### Section 922(a)(3) Is Constitutional

Lucha El argues that the prohibition against unlicensed interstate shipment of firearms, 18 U.S.C. § 922(a)(3), violates his Second Amendment right to bear arms. That claim, based on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), is meritless. Section 922(a)(3) is constitutional under Supreme Court and Second Circuit precedents, which have consistently recognized that the Second Amendment does not cast doubt on laws regulating the commercial sale of firearms. Section 922(a)(3) is a licensing requirement on the commercial sale and interstate transport of firearms, and does not burden the individual right to bear arms in self-defense. Nothing in *Bruen* casts doubt on the validity of this Court's precedent upholding Section 922(a)(3). And even if this Court were to consider the question anew, Section 922(a)(3) falls comfortably within this nation's historical tradition of firearms regulation. Thus, Judge Rakoff committed no

8

error in concluding that Section 922(a)(3) is constitutional.

## A. Applicable Law

### 1. The Second Amendment and Conditions on Commercial Sale of Firearms

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. At the same time, the Court emphasized that "nothing in our opinion should be taken to cast doubt on," *inter alia*, "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. As the Court noted, it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Two years later, the Court "repeat[ed] th[e] assurances" that it had "made . . . clear in *Heller*." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

As courts applied *Heller* and *McDonald*, different methodological approaches emerged. In some cases, courts rejected Second Amendment claims based on the Supreme Court's reassurances in *Heller* and *McDonald* regarding the lawfulness of certain regulations. *See, e.g.*, *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (rejecting challenge to 18 U.S.C. § 922(g)(1)); *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016) (rejecting challenge to 18 U.S.C. § 922(g)(4)). In other cases, courts applied a "'two-step' framework for analyzing Second

9

Amendment challenges that combines history with means-end scrutiny," *i.e.*, whether "the regulation promotes an important [governmental] interest." *Bruen*, 597 U.S. at 18-19.

In *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), this Court held that Section 922(a)(3) imposed only a minimal burden, if any, on the right to keep and bear arms, and thus did not trigger any form of heightened scrutiny. *Id.* at 168-69. The *Decastro* Court noted that the focus of Second Amendment scrutiny in *Heller* was on "the practical impact of a challenged regulation on the ability of citizens to possess and use guns for the core lawful purpose of self-defense." *Id.* at 166. "Section 922(a)(3) prohibits the transportation into one's state of residence of firearms acquired outside the state; but it does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Id.* at 168. Accordingly, the Court concluded that "§ 922(a)(3) does not substantially burden [the] right to keep and bear arms," and therefore that no heightened scrutiny was appropriate and that the law remained constitutional post-*Heller*. *Id.*

In *Bruen*, the Supreme Court considered a New York State law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which this Court had upheld using the means-end framework. 597 U.S. 1 at 11-15. The Supreme Court reversed, rejecting the means-end test, *see id.* at 17-19, and reaffirming "*Heller*'s methodology centered on constitutional text and history," *id.* at 22. Thus, "the standard for applying the Second

10

Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 17.

In assessing whether the Second Amendment's text covers an individual's conduct, a court must consider the "textual elements" of the Second Amendment's "operative clause," which protects "the right of the people to keep and bear Arms." *Id.* at 32. The "right" that is protected in the Second Amendment was a "*pre-existing* right" that was "inherited from our English ancestors." *Id.* at 25. This right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The individual asserting the right must be "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32. And the weapons at issue must be "[a]rms" within the meaning of the Second Amendment—"weapons 'in common use' today for self-defense." *Id.* at 32 (quoting *Heller*, 554 U.S. at 627). The individual's "proposed course of conduct" must be something "the plain text of the Second Amendment protects," *i.e.*, the conduct must constitute "keep[ing]" or "bear[ing]" arms. *Id.*

If the Second Amendment's text covers an individual's conduct, "[t]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. This historical inquiry "will often involve reasoning by analogy." *Id.* at 28. In determining whether a modern

11

regulation and a historical regulation are "relevantly similar," courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense," *i.e.*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 28-29. Such "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. The inquiry "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court clarified this analogical inquiry. Noting that some courts had "misunderstood the methodology of our recent Second Amendment cases," the Court rejected a historical inquiry that would leave "a law trapped in amber." *Id.* at 1897. "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." Instead of hunting for a precise historical precursor, courts should instead consider "whether the challenged regulation is consistent with the *principles* underlying our regulatory tradition." *Id.* at 1898 (emphasis added). As Justice Barrett elaborated in her concurrence, "[t]o be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart." *Id.* at 1925 (Barrett, J., concurring) (emphasis in original). Critically, this principles-based

12

analysis holds true even where addressing a problem that has existed since the founding, such as (in *Rahimi*) "individuals who pose a credible threat to the physical safety of others." *Id.* at 1898.

Following *Bruen*, this Court has explained how conditions on the commercial sale of firearms should be analyzed. In *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023), *cert. denied*, No. 23-995, 2024 WL 3014531 (U.S. June 17, 2024), the Court followed *Heller*'s reassurances regarding the presumptive lawfulness of "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 195 (quoting *Heller*, 554 U.S. at 526-27). The Court noted, however, that such "commercial regulations . . . cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Id.* at 196. Applying these principles, the Court upheld several New York requirements on FFLs that, plaintiffs claimed, would impose severe costs on FFLs. Because the plaintiffs failed to present sufficient evidence that enough FFLs would be closed to deprive New Yorkers of "relatively easy access to sellers of firearms," the Court held that the plaintiffs had failed to show a likelihood of success on their Second Amendment challenge to New York's statutes. *Id.* at 198.

## 2.  Standard of Review

Where, as here, the appellant raised his constitutional challenge below, this Court "review[s] *de novo* a district court's determination that the application of a law does not violate the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018).

13

Lucha El now purports to raise both a facial and an as-applied challenge to 18 U.S.C. § 922(a)(3). The Court need not take up any facial challenge because the law is constitutional as applied to Lucha El. *See Decastro*, 682 F.3d at 163 (holding that "a defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has necessarily failed to state a facial challenge, which requires him to establish that no set of circumstances exists under which the statute would be valid"); *accord Rahimi*, 144 S. Ct. at 1902-03. Moreover, as Judge Rakoff noted, Lucha El has not identified any set of personal circumstances that would potentially render Section 922(a)(3) uniquely unconstitutional as applied to him. (SA. 17-18).

## B.  Discussion

### 1.  *Decastro* Forecloses Lucha El's Argument

Throughout its Second Amendment case law, the Supreme Court has made it clear that there are "permissible . . . exceptions" to the Second Amendment, such as "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626, 635; *see also McDonald*, 561 U.S. at 786 (plurality). In *Decastro*, this Court cited the Supreme Court's "disclaim[er of] any reading that calls into question (among other things) 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms,'" to hold that "§ 922(a)(3) does not substantially burden [the

14

defendant's] right to bear arms," and accordingly is constitutional. *Decastro*, 682 U.S. at 165, 168.

Contrary to Lucha El's argument (Br. 17-18), *Decastro* did not accept—explicitly or implicitly—that Section 922(a)(3) imposed *any* burden on Second Amendment rights, and did not apply any since-abrogated means-end balancing. Rather, the Court inquired whether heightened scrutiny was appropriate in its analysis of Section 922(a)(3)—it asked whether the statutory provision at issue "substantially burden[ed] the Second Amendment." *Decastro*, 682 F.3d at 164. In concluding that it did not, the Court—far from implying that any burden existed at all and balancing it against a countervailing governmental interest—stressed that Section 922(a)(3) "only minimally affects the ability to acquire a firearm." *Id.* The Court went on to uphold Section 922(a)(3) over the defendant's as-applied and facial challenges without conducting any means-end analysis. *See id.* at 168-69. Accordingly, the *Decastro* opinion was based entirely on the first step of the since-abrogated two-step approach. This step—in which "the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood"—"is broadly consistent with *Heller*" (and thus with *Bruen* itself). *Bruen*, 597 U.S. at 18-19. *Decastro* is therefore consistent with, and decidedly not overruled by, *Bruen*.

*Gazzola* confirmed that this approach to restrictions on the sale of arms survives *Bruen*. *Gazzola*, in determining whether the dealers' Second Amendment claim had merit, looked first to whether the

15

commercial restrictions at issue might "have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Gazzola*, 88 F.4th at 196. Because New Yorkers would still be served by an abundance of FFLs even if significant costs were imposed, the laws at issue fell outside the scope of the right as originally understood. *Id.* at 196-97. The *Gazzola* Court therefore upheld the laws without conducting any hunt for an analogous historical precursor. This analysis is precisely that undertaken pre-*Bruen* in *Decastro*, even down to noting the widespread availability of FFLs from which to acquire firearms. *Compare Gazzola*, 88 F.4th at 197 (noting that there are "more than 1,700 such dealers" in New York), *with Decastro*, 682 F.3d at 168 (noting the ability to transfer out-of-state purchases through "a licensed gun dealer in the purchaser's home state").

Accordingly, because both the methodology and the result of *Decastro* survive *Bruen* unscathed, binding precedent forecloses Lucha El's challenge to 18 U.S.C. § 922(a)(3). *See, e.g., United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.").

## 2. Text and History Confirm that Section 922(a)(3) Is Constitutional Facially and as Applied to Lucha El

Even if this Court were to ignore *Decastro* and consider the constitutionality of Section 922(a)(3) anew,

16

the text and historical context of the Second Amendment make clear that Section 922(a)(3) is a constitutional qualification on the sale and transfer of arms, both facially and as applied to Lucha El.

### a. The Second Amendment's Text Does Not Cover Lucha El's Conduct

Under *Bruen*, the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the Supreme Court "explained in *Heller*, the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed' —'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 592). Because nothing in Section 922(a)(3) infringes upon Lucha El's ability to lawfully possess and carry weapons in self-defense, the Second Amendment's text does not cover his conduct.

"[T]he Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (alteration in original) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The English Bill

17

of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Instead, it provided that Protestants "may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

*Heller* outlined several of the limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment. *Id.* It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or"—as relevant here—"laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.

Section 922(a)(3) states in relevant part that "[i]t shall be unlawful . . . for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State . . . ." 18 U.S.C. § 922(a)(3).

Interpreting the text of the Second Amendment as the Supreme Court has instructed, Section 922(a)(3) does not implicate Lucha El's Second Amendment

18

rights for two reasons. First and foremost, Section 922(a)(3) does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). But Section 922(a)(3) says nothing about a person's ability to possess a firearm for self-defense.

As this Court has explained, Section 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Section 922(a)(3) likewise "does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state." *Id.*; *cf. United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (denying Second Amendment challenge to Section 922(a)(5), which "prohibits only the transfer of a firearm by an unlicensed person to any other unlicensed person who resides in a different state than the state in which the transferor resides" and thus "does not operate to completely prohibit [the defendant] or anyone else, for that matter, from selling or buying firearms"). Indeed, at the time of Lucha El's arrest in June 2022, there were 2,250 FFLs in New

19

York—and he does not suggest that any of these FFLs would not or could not sell him a firearm.[5]

The Supreme Court has repeatedly recognized that certain "conditions and qualifications on the commercial sale of arms" do not fall within the protections of the Second Amendment's text. *Heller*, 554 U.S. at 626-27. Section 922(a)(3) is one such condition. Although Section 922(a)(3) regulates the transport of firearms across state lines, it "only minimally affects the ability to acquire a firearm." *Decastro*, 682 F.3d at 164; *see also Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (denying Second Amendment challenge to Section 922(a)(3) and noting that "[t]he delay incurred if a handgun is purchased out of state and transferred to an in-state FFL is de minimis"). Such a de minimis condition on the manner in which a firearm may be acquired does not infringe upon the right of armed self-defense. *See Focia*, 869 F.3d at 1286 (upholding Section 922(a)(5), which "only minimally affects the ability to acquire a firearm").

This de minimis burden is far less than that imposed by other regulations that *Bruen* indicated do not infringe upon an individual's Second Amendment right. *Bruen* made clear that "nothing in [its] analysis

---

[5] *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees/state?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2022&ffl_date_month%5Bvalue%5D%5Bmonth%5D=6&field_state_value=NY (accessed August 2, 2024).

20

should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 597 U.S. at 38 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by Chief Justice Roberts) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 80 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible—not to mention dependent to a significant extent on Section 922(a)(3)'s requirement that the interstate traffic in firearms be channeled through legitimate commerce—then Section 922(a)(3)'s prohibition on unlicensed importation of out-of-state firearms similarly falls outside of the Second Amendment's text because it does not "deny ordinary citizens their right to public carry." *Id.* at 38 n.9 (majority opinion).

Second, firearms purchased from out of state through illegitimate channels are "not typically possessed by law-abiding citizens for lawful purposes" and therefore fall outside the Second Amendment's text. *Heller*, 554 U.S. at 625. As Congress found in enacting Section 922(a)(3), the traffic of guns through mail order common carriers and non-resident sources "is a

21

means which affords circumvention and contravention of State and local laws governing the acquisition of [firearms]." S. Rep. No. 90-1097, at 49 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2166. And studies suggest that guns purchased from out-of-state are more likely to quickly be involved in criminal activity. *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174 (1996). There is little reason why a law-abiding citizen, seeking a gun for law-abiding purposes, would not purchase a firearm through a licensed dealer in his home state, "which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168. Regulations such as this, which are aimed at ensuring that firearms do not fall into the hands of criminals, do not generally violate the Second Amendment.

The Second Amendment protects the right to keep and bear arms; it does not protect a right to import them or to acquire them without restriction. Section 922(a)(3)'s prohibition on unlicensed importation of firearms does not meaningfully affect, let alone infringe upon, the right to armed self-defense. And because illegally imported firearms are not typically possessed by law-abiding citizens for lawful purposes, the Second Amendment does not protect such weapons or their possession. Accordingly, Section 922(a)(3) does not implicate Lucha El's Second Amendment rights, and his as-applied and facial challenges should be denied without further historical inquiry.

22

### b. Section 922(a)(3) Is Consistent with the Principles Underlying This Nation's Regulatory Tradition

To the extent the Second Amendment's historical inquiry is implicated, Section 922(a)(3) remains constitutional because it "is consistent with the Nation's historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1896. Since the time of the founding, states have regulated how firearms and gunpowder can be traded and transported, particularly across state lines; Section 922(a)(3) is entirely "consistent with the principles that underpin" these types of permissible regulations. *Id.* at 1898.

First, "colonial governments substantially controlled the firearms trade." *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc); *see generally Bruen*, 597 U.S. at 20 (noting significance of "American colonial views leading up to the founding"). At least two American colonies prohibited the sale of firearms outside jurisdictional bounds. "Connecticut banned the sale of firearms by its residents outside the colony." *Teixeira*, 873 F.3d at 685 (citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138-39, 145-46). And while Virginia law provided that all persons were at "'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting *this colony*,'" this liberty "did not, however, extend to sales to others." *Id.* at 685 n.18 (quoting Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 403 (1823)). In particular,

23

"under Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Id.* at 685 (citing Acts of Assembly, Mar. 1675-76, 2 Hening, *supra* at 336-37). At least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-320 (1899) (1763 law); *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance).[6]

Second, several states had laws restricting the import and sale of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense."

---

[6] Similarly, the District Court noted that the Third Congress passed a prohibition on exporting weapons and ammunition from the early United States and provided for the forfeiture of arms and ammunition to enforce this prohibition. (SA. 20-21 (discussing Act of May 22, 1794, ch. 33, § 1 ("An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Same of the same"))).

24

*Miller v. Bonta*, No. 19 Civ. 1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 597 U.S. at 58 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 240-44 (1810). Similarly, Massachusetts and Connecticut prohibited the export of gunpowder without a license. *See Colonial Laws of Massachusetts Reprinted from the Edition of 1672*, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 *The Public Records of the Colony of Connecticut* 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"). The city of Providence, meanwhile, prohibited the sale *within* Providence of gunpowder without a license—a direct historical precedent for Section 922(a)(3)'s requirement that firearms from out-of-state be sold through FFLs. *See The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor"). Providence's law was similar to England's 1638 Gunmaker's Law and subsequent legislation, which required all firearms manufactured domestically or imported to be inspected and approved by licensed entities of the state. *See* James Whisker, *The Gunsmith's Trade* 68-

25

69 (1992); *accord* Lois Schoewer, *Gun Culture in Early Modern England* 4-25 (2016).

Although these statutes are not identical to Section 922(a)(3), they are "relevantly similar." *Rahimi*, 144 S. Ct. at 1898. Both *Bruen* and *Rahimi* made clear that the government need only identify a "historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30; *Rahimi*, 144 S. Ct. at 1903. The ultimate question is whether the challenged law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898. In this case, the answer is yes.

As explained above, Section 922(a)(3) imposes a minimal "burden on the right of armed self-defense" because firearms are readily available within New York through licensed dealerships and such firearms are just as effective for self-defense as illegally imported firearms. That burden is no greater than the burdens imposed by historical laws relating to the sale of firearms and gunpowder. And neither the historical laws nor Section 922(a)(3) deprived citizens of the use of firearms for self-defense. *See Decastro*, 682 F.3d at 168 (Section 922(a)(3) "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything").

Section 922(a)(3) is also "comparably justified." *Bruen*, 597 U.S. at 29. The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws restricting sale of gunpowder without licenses were designed to protect citizens from

26

explosions and render effective states' regulation of gunpowder manufacturers. Section 922(a)(3) serves similar purposes by preventing criminals from circumventing federal and state regulations on firearms purchases and firearms dealers. *See Mance*, 896 F.3d at 706 (noting Congress's conclusion that there was a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State," and these interstate purchases were accomplished "without the knowledge of . . . local authorities" (alteration in original) (quoting S. Rep. No. 89-1866, at 19 (1966))); *accord Decastro*, 682 F.3d at 168. Although Section 922(a)(3) does not reflect precisely the same legislative priorities as these historical regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 597 U.S. at 29.

The Court should reject any suggestion that a closer historical analogue is required than those the Government has offered. Such an argument reflects the precise analytical error that the Supreme Court cautioned against in *Bruen* and firmly rejected in *Rahimi*. *Heller* and *Bruen* "were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. In his brief, which was filed before the Supreme Court issued its *Rahimi* decision, Lucha El asserts that there is actually a "dual-track analytic framework" lurking in *Bruen*, in which the Court applies either a "relevantly similar" test or a "distinctly similar" test depending on whether the problem addressed by the regulation is novel or

27

longstanding. (Br. 21-22 (citing *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023)). That argument is cobbled together from out-of-context snippets of text from *Bruen*, and cannot be squared with *Rahimi*, which expressly and repeatedly framed the question as whether the modern regulation is "relevantly similar." 144 S. Ct. at 1898, 1901.

In analyzing *any* regulation, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29 & n.7). By contrast, the methodology urged by Lucha El commits two serious errors: "It forces 21st-century regulations to follow late-18th-century policy choices, giving us a law trapped in amber. And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them." *Id.* at 1925 (Barrett, J., concurring).

Because history demonstrates that legislatures have the power to restrict interstate trade in firearms to promote public safety and use of regulated channels of commerce, Lucha El's facial challenge to Section 922(a)(3) fails. And Lucha El has offered no argument as to why there is any particular constitutional problem with the application of the statute to him. Nor

28

could he make any such argument, because as noted above, there is nothing in the record to suggest that Lucha El would have been unable to obtain a firearm from one of New York State's thousands of FFLs. Instead, he simply argues that the law is facially unconstitutional, and therefore also unconstitutional as applied to him. (Br. 24-25). Because his facial challenge fails, his attempt to frame the same argument as an "as-applied challenge" also fails.

\* \* \*

In sum, both the Supreme Court and this Court have long recognized that laws like Section 922(a)(3) that impose conditions and qualifications on the commercial sale of arms do not run afoul of the Second Amendment. This Court upheld the constitutionality of Section 922(a)(3) in *Decastro*, and the Supreme Court's subsequent cases did not overrule or abrogate that precedent. And because this Nation's historical tradition of firearm regulation is consistent with Section 922(a)(3), the District Court did not err by rejecting Lucha El's challenge to Section 922(a)(3).

29

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
           August 5, 2024

                       Respectfully submitted,

                       DAMIAN WILLIAMS,
                       *United States Attorney for the*
                       *Southern District of New York,*
                       *Attorney for the United States*
                           *of America.*

ASHLEY C. NICOLAS,
MADISON REDDICK SMYSER,
LUCAS ISSACHAROFF,
NATHAN REHN,
       *Assistant United States Attorneys,*
                *Of Counsel.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 6,580 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*