

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

November 22, 2024

<u>By electronic filing</u>

Catherine O'Hagan Wolfe
Clerk of the Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

    Re:  *United States v. Perez*, No. 24-162
          Oral argument calendared for December 12, 2024

Dear Ms. Wolfe:

      The government respectfully submits this supplemental brief in response to the Court's order of November 8, 2024, directing the parties to address the effect of *Antonyuk v. James*, No. 22-2908(L), 2023 WL 11963034 (2d Cir. Oct. 24, 2024) ("*Antonyuk II*"), on this case. In *Antonyuk II*, this Court considered the constitutionality of several portions of New York's Concealed Carry Improvement Act ("CCIA")—specifically, those relating to licensing requirements, including in particular the "good moral character" requirement and the attendant requirement of disclosure of social media accounts; sensitive locations, including healthcare facilities, places of worship, zoos and public parks, locations where alcohol is consumed, event spaces, and places where individuals exercise their right to assembly; and restricted locations on private property.

      *Antonyuk II* was decided on remand from the Supreme Court, which had vacated the same panel's decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir.

2023) ("*Antonyuk I*"), for further consideration following *United States v. Rahimi*, 144 S. Ct. 1889 (2024). *Antonyuk II* concluded that *Rahimi* had "little direct bearing" on *Antonyuk*, as *Rahimi*, unlike *Antonyuk*, concerned "a criminal prohibition of firearms possession by a particular class of individuals based on a prior judicial adjudication." *Antonyuk II* at *2. But *Antonyuk II* also noted that *Rahimi* provided helpful "analysis of the considerations and methodology" to apply in Second Amendment cases, in particular "the role of history in interpreting the Second Amendment," which "clarified to some degree the meaning and effect of [the Supreme Court's] prior decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022)." *Antonyuk II* at *2. *Antonyuk II*'s explanation of the *Bruen* framework, as clarified by *Rahimi*, emphasizes the flexibility of the historical inquiry, accounting for changing circumstances rather than creating a law "trapped in amber." *Antonyuk II*, like *Rahimi*, also undermines the rigid historical inquiry urged by Lucha El.[1]

Overall, *Antonyuk II*'s application of the *Rahimi/Bruen* framework supports the government's use of similarly analogous historical examples in support of the constitutional validity of 18 U.S.C. § 922(a)(3). This historical evidence confirms the outcome also required under binding precedent: "§ 922(a)(3) . . . does not infringe the Second Amendment right to keep and bear arms." *United States v. Decastro*, 682 F.3d 160, 168-69 (2d Cir. 2012); *see also, e.g.*, *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) (emphasizing the presumptive constitutionality of laws imposing

---

[1] The Government hereafter refers to Perez by his preferred name, "Lucha El."

conditions and qualifications on the commercial sale of arms). The District Court's judgment should accordingly be affirmed.

## I.    *Antonyuk II* Clarified the Analytical Framework Governing Second Amendment Challenges

*Antonyuk II* clarified the analytical framework for Second Amendment challenges established by *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen*, 597 U.S. 1 (2022); and *Rahimi*, 144 S. Ct. 1889 (2024). These cases "require[] courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk II* at \*14 (quoting *Bruen*, 597 U.S. at 19).

The government notes at the outset that this case, unlike *Antonyuk II*, can be decided at the first step of that test. 18 U.S.C. § 922(a)(3) merely imposes a qualification on the commercial sale of arms that channels firearms commerce through regulated channels—it does not impose *any* burden on the right to keep and bear arms, and accordingly does not implicate the plain text of the Second Amendment as historically understood. (Gov't Br. 15-21).

To the extent the Court proceeds to the second step, *Antonyuk II* helpfully elucidates the historical analysis. *Antonyuk II*, like *Rahimi* and *Bruen*, focused primarily on history and tradition, which "give content to the indeterminate and underdetermined text of the Second Amendment" and "inform the meaning of the

pre-existing right to keep and bear arms." *Id.* (quotation marks and alterations omitted). Several implications follow from that methodology, some of which may affect this case.

"First, when used to interpret text, 'not all history is created equal.'" *Antonyuk II* at *14 (quoting *Bruen*, 597 U.S. at 34). Courts should focus on history roughly contemporaneous with the enactment of the Second and Fourteenth Amendments, rather than practices that long predate or postdate the relevant text. In addition, certain sources such as military decrees, territorial law, and local law may be relevant but cannot overcome the weight of other historical evidence. *Id.*

"Second, in examining history and tradition, a court must identify the 'societal problem' that the challenged regulation seeks to address, and then ask 'whether the challenged regulation is consistent with the principles that underpin our regulatory tradition' for firearms." *Id.* (quoting *Bruen*, 597 U.S. at 26-27; *Rahimi*, 144 S. Ct. at 1898). Notably, *Antonyuk II* frames this inquiry by reference to *Rahimi*'s discussion of "principles," rather than the narrow focus on precisely analogous historical practices urged by Lucha El. (Gov't Br. 25-27).

"Third, the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Antonyuk II* at *15. "Legislatures past and present have not generally legislated to their constitutional limits. Reasoning from historical silence is thus risky; it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a

regulation inconsistent with the right to bear arms." *Id.* This observation is particularly relevant to 18 U.S.C. § 922(a)(3). Although there may not be identical 18th and 19th century laws governing interstate firearms trafficking, that must be understood against the background of firearms' scarcity in the colonies. (Gov't Br. 22-25). The absence of laws governing illegal importation of firearms (though the government has identified at least one such law with respect to gunpowder) might therefore " 'have reflected a lack of political demand rather than constitutional limitations.' " *Antonyuk II* at *15 (quoting *Binderup v. Attorney General*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments)). "Stated differently, 'novelty does not mean unconstitutionality.' That is so even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Id.* (quoting *Binderup*, 336 F.3d at 368 (Hardiman, J., concurring in part and concurring in the judgments)).

"Fourth, courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Id.* As the Court explained, although the absence of analogous historical precedent had doomed New York's proper-cause requirement at issue in *Bruen*, "that was due to the exceptional nature of New York's proper-cause requirement, which conditioned the exercise of a federal constitutional right on the right holder's reasons for exercising the right." *Antonyuk II* at *15. The Court noted that a " 'more nuanced approach' will often be

necessary in cases challenging less exceptional regulations, including in cases concerning 'new circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 27-28). At least one such changed circumstances is relevant here: the "increasingly lethal guns in increasingly populous cities" that mark the post-Civil War era, *id.* at *32.

"Fifth, under the more nuanced approach, the 'historical inquiry that courts must conduct will often involve reasoning by analogy.'" *Id.* at *15 (quoting *Bruen*, 597 U.S. at 28). As *Antonyuk II* noted, *Rahimi* upheld "an extremely recent [1994] addition to the federal criminal code" that prohibited "firearm possession by individuals with civil protection orders resulting from domestic violence," orders which themselves are a "relatively recent legal innovation." *Antonyuk II* at *16. But "the [Supreme] Court was untroubled by the absence of . . . a close analogue" from the 18th or 19th centuries. *Id.* Instead, it relied on the broader observation that "various laws from the 18th century and earlier authorized the prohibition of firearm possession by persons identified by legislatures and courts as dangerous to others," concluding that § 922(g)(8) was "'sufficiently similar'" to that historical tradition that it passes constitutional muster. *Id.* (quoting *Rahimi*, 144 S. Ct. at 1902-03). Here, while § 922(a)(3) may too lack a "historical twin" from the 18th or 19th centuries, the history of colonial and state control over the interstate firearms trade laws amply demonstrates its consistency with this nation's historical tradition. (Gov't Br. 25-28).

"Sixth, just as the existence *vel non* of a *distinctly similar* historical regulation is not dispositive, it is likewise not dispositive whether *comparable*

historical regulations exist in significant numbers. . . . [D]epending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk II* at \*16-17. The Court should accordingly reject any argument that the government must identify additional firearms trafficking laws beyond those already collected. (*Contra* Appellant Reply Br. 14-15.)

Seventh, both 1791, the time of the Second Amendment's ratification, and 1868, the time of the Fourteenth Amendment's ratification, are relevant for considering the historical understanding of the Second Amendment right. *Id.* at \*17-19. In *Antonyuk*, the Court was addressing a state law, and observed that both historical periods were "focal points" for its analysis. *Id.* The Court also observed that the Supreme Court has expressly left open the question of "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope," including in cases addressing federal laws, such as *Rahimi. Id.* at \*17; *see Rahimi*, 144 S. Ct. at 1898 n.1 (declining to decide whether the 1868 time period is the primary reference point for determining "the scope of the right against the Federal Government"). *Bruen* also declined to decide this question, while noting that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," 597 U.S. at 37. Considering the reasoning in the Supreme Court's decisions, and noting that other courts of appeals have considered both 1791 and 1868 to be the relevant periods, the *Antonyuk* Court concluded that both

periods are pertinent to the analysis of the scope of the Second Amendment right and "our national tradition of firearms regulation." *Antonyuk II* at \*18-19.

## II.    *Antonyuk II*'s Analysis of the CCIA Supports the Constitutionality of § 922(a)(3)

*Antonyuk II* most clearly dispels Lucha El's argument that the District Court erred in its application of the legal standard. (Appellant Br. 20-24). Lucha El suggests that there are, in essence, two distinct historical inquiries: one where there is a new societal problem, in which analogical reasoning is permitted; and a far more constrained historical inquiry where the societal problem is not new, and analogical reasoning is prohibited. (*Id.* at 21). That is incorrect.[2]

*Antonyuk II* makes clear that the historical inquiry always looks to relevant principles and does not begin and end with the absence of a distinctly similar historical regulation. "[N]ovelty does not mean unconstitutionality . . . even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Antonyuk II* at \*15 (quotation marks omitted). Accordingly, even if the societal problems addressed by § 922(a)(3) are not new—and, given the rise in the illicit firearms trade, urbanization, and increasing interpersonal gun violence, that premise is far from obvious—the government may still look to the principles underlying this nation's historical tradition of firearms regulation and reason by analogy, rather than confining itself to the cramped search for an historical twin urged by Lucha El.

---

[2] Lucha El appears to acknowledge that *Rahimi* itself undercuts this argument. (Appellant Reply Br. 14 n.4).

Beyond the broad principles elucidated by *Antonyuk II*, their specific application to the challenged provisions of the CCIA supports the government's arguments here. Most directly relevant is the Court's analysis of the CCIA's sensitive places provisions, which looked for historical analogues that demonstrated relevant principles with a broader perspective than the district court in that case (or than Lucha El suggests here). *Antonyuk II*'s discussion of the CCIA's good moral character requirement, meanwhile, highlights the importance of the Supreme Court's discussions of presumptively lawful regulatory measures. Finally, those provisions of the CCIA that the Court found likely unconstitutional—the social media disclosure and restricted location provisions—are inapposite and unhelpful to Lucha El.

### A. *Antonyuk II*'s Analysis of Sensitive Places Supports the Constitutionality of § 922(a)(3)

The Court's discussion of sensitive places cautions against Lucha El's cramped view of relevant historical analogues. For example, the Court considered laws prohibiting guns in schools, which demonstrated a historical tradition of "prohibiting firearm carriage for the protection of vulnerable populations." *Antonyuk II* at *48. And it looked to laws prohibiting those with mental illness or alcohol addiction from joining militias, finding that they demonstrate that those groups have "historically been considered to make up a vulnerable population justifying firearm regulation." *Id*. Taken together, "the relevantly similar feature of these analogues is the *how* and the *why*: firearm prohibition (how) in places frequented by and for the protection of vulnerable populations (why)." *Id*. at *49.

In doing so, the Court rejected an argument that would have construed the relevant principles far more narrowly. The district court had focused on protection of *children* as the relevant historical principle, rather than protection of vulnerable populations more broadly. *Id.* Similarly, the district court had discounted the relevance of the militia laws because those imposed a lesser burden than the CCIA's prohibition of firearms carriage. *Id.* Instead of these narrow constructions, the *Antonyuk II* Court drew the "how" and the "why" broadly: firearm prohibition in places frequented by and for the protection of vulnerable persons.

Here, too, the how and the why of § 922(a)(3) align with the relevant historical analogues. The government has pointed to numerous laws evincing the same "how" (prohibition on certain types of trade) and the same "why" (for public safety and to channel firearms trade through regulated channels). (Gov't Br. 25-28). In fact, § 922(a)(3) imposes a far lesser burden on the right of armed self-defense—if any at all—because "it does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168.

Accordingly, the Court should reject Lucha El's argument that the government must identify laws that specifically prohibited importation of firearms, or that the government's proffered analogues are too dissimilar. (Appellant Br. 22-23). Rather, as in *Antonyuk II*, the Court should identify the relevant historical principle—the government's authority to control and channel the interstate firearms trade—and apply it to the statute at issue here.

## B. *Antonyuk II*'s Analysis of the Good Moral Character Requirement Supports the Constitutionality of § 922(a)(3)

*Antonyuk II*'s analysis of the good moral character requirement also supports the constitutionality of § 922(a)(3) because it emphasizes that, in examining historical analogues, it is the *substance* of a regulation, rather than its *form*, that is instructive. *Antonyuk II* considered the permissibility of New York's licensing regime. In doing so, it examined both licensing regimes from the post-Civil War era as well as criminal prohibitions from around the time of the 14th Amendment's enactment. With regard to the latter category, the Court noted that "*Rahimi* strongly suggests that what matters in the search for historical antecedents of modern firearms regulations is the *substance* of the regulation, rather than the *form*." *Antonyuk II* at \*36. The Court noted that *Rahimi* relied upon historical antecedents that "did not utilize anything like the modern civil protective order that triggered the prohibition of 18 U.S.C. § 922(g)(8) that was upheld in *Rahimi*." *Id.*

Here, the Government's precedents regarding the importation of gunpowder and the export and sale of firearms both involve the substance of regulation of the interstate trade in firearms and ammunition. Lucha El makes much of the fact that Section 922(a)(3) regulates *acquisition* of firearms from out-of-state, whereas other provisions regulate *sale*. (Appellant Br. 22-23). But § 922(a)(3) works in tandem with provisions like § 922(a)(1)(A) to "stop circumvention of state laws regulating gun possession." *Decastro*, 682 F.3d at 168. To focus narrowly on the distinction between acquisition and sale is thus to elevate form over substance—an approach squarely foreclosed by *Rahimi* and *Antonyuk II*.

### C. The Provisions Rejected by *Antonyuk II* Have Limited Relevance to § 922(a)(3)

*Antonyuk II* upheld injunctions against two aspects of the CCIA.[3] First, the Court determined that requirement of disclosure of social media handles was likely unconstitutional. This analysis, however, sounded far more in the First Amendment tradition of anonymity in public speech than in any Second Amendment principle applicable to § 922(a)(3). *Antonyuk II* at *40-41. Second, the Court concluded that the restricted locations provision was likely unconstitutional as applied to private property held open to the public. This restriction—which functionally would have placed sharp limits on the ability of law-abiding, responsible citizens to carry weapons in public—would approach the type of near-universal restrictions invalidated in *Heller*, *McDonald*, and *Bruen*. *Antonyuk II* at *75-78. By contrast, § 922(a)(3) imposes no restriction whatsoever on the right of persons to acquire, keep, and bear arms in self-defense, other than whatever minor administrative burden might pertain to acquisition through an in-state FFL instead of an illicit out-of-state source.

The CCIA requires an applicant to "submit . . . a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicant[']s character and conduct." N.Y. Penal L. § 400.00(1)(o)(iv). The Court held that this condition was without historical

---

[3] The Court also left in place a prior limited injunction regarding places of worship as applied to one plaintiff's church; however, this was solely based upon the Free Exercise Clause rather than the Second Amendment. *See Antonyuk I*, 89 F.4th at 346.

precedent, and thus upheld the injunction against it. *Antonyuk II* at *40-41. The substance of the Court's analysis, however, focused on the First Amendment tradition of pseudonymous speech. *Id.* at *40 ("To require disclosure of handles is thus to demand that applicants effectively forfeit their right to pseudonymous speech on social media (where so much speech now takes place)."). Lucha El's challenge does not implicate any similar First Amendment concerns, and there is a robust historical tradition of regulating interstate firearms trade.

The CCIA also prohibits possession of a weapon in a restricted location without the owner's affirmative consent via clear and conspicuous signage. "The effect of this 'restricted location' provision is to create a default presumption that carriage on any private property is unlawful—whether property is open or closed to the public—unless the property owner has indicated by 'clear and conspicuous signage' or express verbal consent that carriage is allowed." *Antonyuk II* at *74. The Court found that the state had failed to supply any sufficiently analogous historical precedents to the restriction as to property held open to the public, because all of the state's precedents restricted possession of firearms on private property closed to the public. *Id.* at *78. The statute thus "functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights." *Id.* "That burden is entirely out of step with that imposed by the proffered analogues, which appear to have created a presumption against carriage only on private property not open to the public." *Id.* That type of blanket impingement upon the right to keep and bear arms is akin to

the type of broad default that was rejected in *Bruen*, and to the blanket restrictions on handgun possession rejected in *Heller* and *McDonald*. By contrast, the Court, although it remanded for further consideration of the restricted locations provision as applied to closed property, signaled that the historical precedents cited by the state did establish a tradition of preventing the carrying of firearms on private property closed to the public. *Id.*

Section 922(a)(3) has no bearing upon free speech and does not create a default presumption against keeping or bearing arms by the general law-abiding public. Rather, it channels commerce in firearms through lawful channels, consistent with this nation's historical tradition of regulating the interstate trade in firearms, gunpowder, and ammunition. Section 922(a)(3) is thus consistent with the principles drawn from this nation's historical tradition of firearms regulation.

This Court should affirm the District Court's judgment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/ Lucas Issacharoff
LUCAS ISSACHAROFF
ASHLEY C. NICOLAS
MADISON REDDICK SMYSER
NATHAN REHN
Assistant United States Attorneys

cc: Counsel of record (via electronic filing)

## CERTIFICATION OF COMPLIANCE

Pursuant to the Court's order of November 8, 2024, the undersigned counsel hereby certifies that, as measured by the word processing system used to prepare this brief, there are 3,438 words in this brief.

DAMIAN WILLIAMS
*United States Attorney for the*
*Southern District of New York*

By:     LUCAS ISSACHAROFF
*Assistant United States Attorney*