24-162-cr
*United States v. Perez*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2024
Argued: December 12, 2024
Decided: August 19, 2025

No. 24-162-cr

---

UNITED STATES OF AMERICA

*Appellee,*

*v.*

KEITH VEREEN,

*Defendant,*

STEVEN PEREZ, a/k/a LUCHA,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 1:22-cr-644-2, Jed S. Rakoff, *Judge*.

1

————————————————

Before:          Robinson, Pérez, and Nathan, *Circuit Judge*s.

Defendant-Appellant Steven Perez, also known as Lucha El, appeals from a judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*) convicting him of one count of interstate transport of firearms, in violation of 18 U.S.C. § 922(a)(3), and one count of conspiracy to transport or receive firearms from outside his state of residency, in violation of 18 U.S.C. § 371.  On appeal from his conviction, Lucha El challenges § 922(a)(3) as violating the Second Amendment.  We conclude that § 922(a)(3) is a lawful regulation placing conditions and qualifications on the commercial sale of firearms that does not meaningfully constrain Lucha El's protected right to "keep" and "bear" arms.  Furthermore, even if it more substantially constrained that right, § 922(a)(3) is consistent with this nation's historical tradition of firearm regulations.    Accordingly, Lucha El's convictions pursuant to § 922(a)(3) did not violate the Second Amendment.

AFFIRMED.

————

KENDRA L. HUTCHINSON, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

2

LUCAS ISSACHAROFF (Ashley
C. Nicholas, Madison Reddick
Smyser, Nathan Rehn, *on the
brief*), Assistant United States
Attorneys, *for* Damian
Williams, United States
Attorney for the Southern
District of New York, New
York, NY, *for Appellee*.

———

NATHAN, *Circuit Judge*:

Federal law prohibits any individual from "transport[ing] into or receiv[ing] in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State" unless he has a federal firearms license or fits within a limited exception. 18 U.S.C. § 922(a)(3). Defendant-Appellant Steven Perez, also known as Lucha El,[1] was found guilty of one count of interstate transport of firearms, in violation of 18 U.S.C. § 922(a)(3), and one count of conspiracy to transport or receive firearms from outside his state of residency, in violation of 18 U.S.C. § 371. Lucha El appeals his convictions, arguing that the judgment violates the Second Amendment.

We disagree. This Court previously upheld § 922(a)(3) in the face of a Second Amendment challenge. *United States v. Decastro*, 682 F.3d 160, 163–69 (2d Cir. 2012). We reaffirm that conclusion and hold

---

[1] This opinion hereafter refers to Perez by his preferred name of Lucha El.

that § 922(a)(3) does not violate the Second Amendment as applied to Lucha El.  Applying the text-and-history framework set out in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), we conclude that § 922(a)(3) is valid for two independent reasons.  First, § 922(a)(3) is a commercial sale regulation that is "presumptively lawful" as long as it does not meaningfully constrain Lucha El's Second Amendment right to "keep" and "bear" arms.  *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008); *Gazzola v. Hochul*, 88 F.4th 186, 195–98 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024).  As we already held in *United States v. Decastro*, § 922(a)(3) "only minimally affects the ability to acquire a firearm" and places no restrictions on ownership and use.  682 F.3d at 164.  The constraints that § 922(a)(3) does impose, including barring the use of anonymous out-of-state straw purchasers to conceal firearms transactions and circumvent lawful in-state regulations, do not implicate the right to "keep" and "bear" arms as it has been construed since *District of Columbia v. Heller*.

Second, even if § 922(a)(3) could be understood to meaningfully constrain Lucha El's access to firearms, the government has identified numerous colonial and Founding-era laws that regulated the movement of arms across borders and disarmed individuals deemed dangerous by the government, demonstrating that § 922(a)(3) is consistent with this nation's historical tradition of firearm regulation.  *Cf. United States v. Rahimi*, 602 U.S. 680, 698 (2024).  Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND

Lucha El is a resident of New York State who has twice been arrested for unlawful possession of firearms.  He was first arrested in the Bronx, New York, after law enforcement received reports of an armed male in the area matching his description.  Officers recovered from Lucha El's person a handgun that had been purchased in South Carolina by a straw purchaser, Keith Vereen.  Two weeks later, he was arrested on an interstate in Massachusetts, after state troopers approached two vehicles carrying him and other individuals who self-identified as members of a militia group.  During a search of the vehicle, law enforcement recovered multiple firearms, which had been purchased by Vereen in South Carolina, alongside multiple magazines and over a thousand rounds of ammunition.  Lucha El was subsequently charged in the Southern District of New York with interstate transport of firearms, in violation of 18 U.S.C. § 922(a)(3).

The relevant text of § 922(a)(3) provides:

It shall be unlawful . . . for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C)

5

> shall not apply to the transportation of any firearm
> acquired in any State prior to the effective date of this
> chapter[.]

18 U.S.C. § 922(a)(3).

In other words, absent limited exceptions inapplicable to Lucha El, an individual without a requisite federal license cannot transport into or receive in his state of residence any firearm purchased or otherwise obtained out of state. Section 922(a)(3) does not regulate any other aspect of firearm acquisition. The statute did not prohibit Lucha El from buying a firearm in New York pursuant to New York law. It also did not prohibit him from becoming a licensed importer, manufacturer, dealer, or collector, all of whom may transport firearms purchased out of state into New York. Indeed, under § 922(a)(3), Lucha El could have purchased a firearm out of state and received it in New York if he had first transferred it to an in-state federal licensee. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Q&As, *To whom may an unlicensed person transfer firearms under the GCA?*, *available at* https://perma.cc/YV4H-X3FQ.

Following indictment, Lucha El moved to dismiss the charge against him, arguing that 18 U.S.C. § 922(a)(3) violates the Second Amendment. The district court denied the motion. *United States v. Libertad*, 681 F. Supp. 3d 102, 115 (S.D.N.Y. 2023). The government then filed a superseding indictment adding a charge of conspiracy to receive firearms from outside his state of residency, in violation of 18 U.S.C. § 371.

At trial, the government put forward evidence that Lucha El was a resident of New York who lacked the requisite state permits to purchase guns legally in New York. To circumvent this restriction,

6

he purchased guns through a "straw purchaser," Keith Vereen, who was authorized to purchase firearms on his own behalf in South Carolina but who in fact purchased these arms for Lucha El and others. On at least one occasion, Lucha El paid Vereen via a wire transfer. Vereen then transported the firearms from South Carolina to New York City, where Lucha El received them.

A jury found Lucha El guilty of violating § 922(a)(3) and conspiring to violate § 922(a)(3). The district court sentenced him to a term of 16 months' imprisonment, to be followed by three years' supervised release, and ordered the forfeiture of the firearms involved in the offense. Lucha El timely appealed.

## DISCUSSION

On appeal, Lucha El only raises one issue: whether his convictions are unconstitutional because 18 U.S.C. § 922(a)(3) violates the Second Amendment. "We review challenges to the constitutionality of federal statutes *de novo*." *United States v. Griffith*, 284 F.3d 338, 345 (2d Cir. 2002).

We hold that § 922(a)(3) is a lawful regulation on the commercial sale of firearms that does not meaningfully constrain New Yorkers' ability to keep or bear arms. Even absent a historical analogue, then, it is constitutional under the Supreme Court's decisions in *Bruen* and *Heller*, this Court's decision in *Decastro*, and this Court's post-*Bruen* decision in *Gazzola*. In any event, § 922(a)(3) is also consistent with the nation's historical tradition of firearm regulation, which has, since the Founding, encompassed limitations on the movement of firearms across borders. We thus conclude that

§ 922(a)(3) survives under both steps of the analytic framework set out in *Bruen*. Because Lucha El fails on his as-applied challenge to § 922(a)(3), he also fails on his facial challenge. *See Rahimi*, 602 U.S. at 693. We therefore affirm the judgment of the district court.

## I.   *Heller*, *Bruen* **and Their Progeny**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. When evaluating whether a firearms regulation violates the Second Amendment, we apply a "test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. This analysis proceeds in two steps: First, we ask whether the Second Amendment's text applies to the challenged regulation; second, if it does, we ask whether the regulation is consistent with the nation's historical tradition of firearm regulation. *See Antonyuk v. James*, 120 F.4th 941, 964 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) (*Antonyuk II*).

The text of the Second Amendment protects the right to "keep and bear Arms." In *Heller*, the Supreme Court explained that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons,'" and that "bear arms" means to "wear, bear, or carry . . . for the purpose of being armed and ready for offensive or defensive action[.]" 554 U.S. at 582, 584 (alteration accepted) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998)). Together, these elements "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. Nonetheless, "laws imposing conditions and qualifications on the commercial sale of

arms" are "presumptively lawful," because in most cases they do not infringe the right to "keep" and "bear" arms. *Id.* at 626-27 & n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion); *Bruen*, 597 U.S. at 80–81 (Kavanaugh, *J.*, concurring); *Rahimi*, 602 U.S. at 735 (Kavanaugh, *J.*, concurring).

Of course, to "keep" and "bear" arms, one must also be able to acquire them and maintain them in operable condition. *See Gazzola*, 88 F.4th at 196. "[T]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Id.* (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)). But, as other Circuits have recognized, such "ancillary rights" are only protected to the extent that they are "necessary to the realization" of the textually specified right to keep and bear arms. *Id.* at 197 (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc)); *see also Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1196 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024) ("[I]n the context of implied corollary rights, . . . our analysis begins one step removed from the plain text. If [a] regulation . . . does not restrict conduct necessary to effectuate that right, the proposed conduct . . . is not protected by the plain text of the Second Amendment and the regulation need not satisfy *Bruen*'s second step, even though it regulates conduct connected to firearms."); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 121 (10th Cir. 2024) ("[I]t seems inconsistent to conclude that step one is a textual analysis and to then take an expansive view of the text to infer concomitant rights that are not present in the language of the Second

9

Amendment."). Put differently, regulations on the means of acquiring, transporting, and storing firearms only implicate the text of the Second Amendment if they meaningfully constrain the right to possess and carry arms. "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations" that fall short of infringing the right to keep and bear arms. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring).

Accordingly, post-*Bruen*, we have upheld a range of regulations on firearms retailers based on the determination that they do not "meaningfully constrain[]" New Yorkers' "relatively easy access to sellers of firearms." *Gazzola*, 88 F.4th at 197–98 (upholding requirements that sellers keep firearms in locked vaults or safes, install security alarms, provide additional employee training, allow police to access store premises, and more). In doing so, we held that "'gun buyers have no right to have a gun store in a particular location,' nor a right to 'travel' no more than short 'distances' to the most convenient gun store that provides what they deem a satisfactory 'retail experience.'" *Id.* (quoting *Teixeira*, 873 F.3d at 679–80 & n.13).

To be clear, the question of whether a regulation implicates the text of the Second Amendment is not the kind of "means-end scrutiny" that the Supreme Court rejected in *Bruen*. We do not "assess the costs and benefits of firearms restrictions" nor ask whether "on a case-by-case basis . . . the right is *really worth* insisting upon." *Bruen*, 597 U.S. at 23 (cleaned up). Rather, in this step of the analysis we ask merely the threshold question whether the constraint on an ancillary right is sufficient to constitute an infringement of the textually

10

enumerated right to "keep" and "bear" arms.

If we determine that a regulation does pertain to the right to "keep" or "bear" arms, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. "[I]f a challenged regulation fits within that tradition, it is lawful under the Second Amendment." *Rahimi*, 602 U.S. at 691 (upholding a federal statute prohibiting certain individuals subject to active restraining orders prohibiting them from possessing firearms). To determine whether a modern regulation is "relevantly similar" to a historical analogue, we must examine "[w]hy and how the regulation burdens the right." *Id.* at 692. However, the Supreme Court has cautioned against applying "a law trapped in amber" and emphasized that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691-92. Thus, while a "law must comport with the principles underlying the Second Amendment, . . . it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). And, because the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated," "a more nuanced approach" is warranted in "cases implicating unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27–28. This methodology reflects the commonsense truth that the Second Amendment "is not unlimited," and does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

## II.    Analysis

Applying this body of law, we conclude that Lucha El's challenge to § 922(a)(3) fails for two independent reasons.  Under step one of *Bruen*'s analytic framework, § 922(a)(3) does not meaningfully constrain an individual's ability to keep and bear firearms, and it is therefore a lawful regulation on commercial sales.  Alternatively, under step two of the *Bruen* analysis, § 922(a)(3) is consistent with the nation's longstanding tradition of regulating the transportation of firearms across state lines.

### A. Text

As a threshold matter, we must determine whether § 922(a)(3) implicates the Second Amendment's textually specified right to "keep" (i.e., possess) and "bear" (i.e., carry) arms.  *Heller*, 554 U.S. at 582, 584.  Because § 922(a)(3) regulates only the mode of acquiring firearms, it implicates the text of the Second Amendment only if it makes acquiring firearms sufficiently more difficult so as to meaningfully constrain individuals from keeping or bearing them. *Gazzola*, 88 F.4th at 195–98.

This Court has already answered that question in *United States v. Decastro*, which held that § 922(a)(3) "only minimally affects the ability to acquire a firearm."  682 F.3d at 164.  Because that holding is both accurate and not implicated by the *Bruen* line of cases, the Court sees no reason to reconsider it.

*Decastro* concerned a defendant who had transported to New York a gun purchased out of state and who was subsequently convicted under § 922(a)(3).  *Id.* at 161–63.  This Court rejected Decastro's constitutional challenge to § 922(a)(3).  *Id*. at 168–69.  The

12

crux of the Court's holding was that § 922(a)(3) "does not impose a substantial burden on the exercise of . . . Second Amendment rights." *Id.* at 168. Specifically, the law "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Id.* It also "does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state." *Id.* Individuals therefore retain "ample alternative means of acquiring firearms[.]" *Id.* Indeed, only individuals actively seeking to circumvent their home state's lawful gun regulations—themselves subject to Second Amendment scrutiny—are inconvenienced in any way by § 922(a)(3). *See id.*

Lucha El objects that *Decastro* predated *Bruen*, in which the Supreme Court rejected the second part of a then-common framework that applied either strict scrutiny or intermediate scrutiny based on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Bruen*, 597 U.S. at 18 (quotation marks omitted). Pursuant to *Bruen*, courts may consider whether "the challenged law regulates activity falling outside the scope of the right as originally understood" but may not conduct means-end scrutiny. *Id.* at 18–19 (quotation marks omitted). Lucha El argues that *Decastro* engaged in that type of means-end scrutiny, and therefore no longer binds this Court. *See Dale v. Barr*, 967 F.3d 133, 142–43 (2d Cir. 2020) ("Where an intervening Supreme Court decision casts doubt on the prior [Second Circuit] ruling, we are not bound to follow that prior ruling." (cleaned up)). We disagree.

First, the relevant portion of *Decastro* is its holding concerning

13

the effect, or lack thereof, that § 922(a)(3) has on firearm acquisition and ownership. *Decastro* framed the primary question "in terms of the burden on the ability of [individuals] to possess firearms for self-defense." 682 F.3d at 165. We ultimately concluded that, while § 922(a)(3) "prohibits the transportation into one's state of residence of firearms acquired outside the state," it leaves "ample alternative means of acquiring firearms for self-defense purposes." *Id.* at 168. That determination is consistent with *Heller*'s observation that commercial sale regulations are presumptively lawful and is unaffected by *Bruen* and its progeny.

Applying similar reasoning in the post-*Bruen* era, this Court in *Gazzola* reiterated that commercial sale regulations are constitutionally valid so long as they do not "have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." 88 F.4th at 196. In *Gazzola*, we upheld New York's commercial regulations on sales of firearms and ammunitions, which required federally licensed firearms dealers and businesses to, among other things, secure firearms in a locked safe outside of business hours; install security alarm systems; provide police-developed training to employees; provide state police with full access to the premises for onsite inspections; conduct background checks for ammunition sales; and prohibit minors from entering stores unaccompanied. *Id.* at 192. Finding "no evidence that New Yorkers currently lack, or will lack under the challenged statutes, relatively easy access to sellers of firearms," we determined that the challenged regulations were lawful without needing to engage in *Bruen*'s step-two historical analysis. *Id.* at 197–98.

14

Furthermore, while *Decastro* used outdated terminology regarding "level[s] of scrutiny," 682 F.3d at 165, it did not actually engage in means-ends analysis. What *Bruen* rejected was asking "whether a statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests[.]" 597 U.S. at 23 (cleaned up). In other words, suspect "means" cannot be justified by sufficiently weighty "ends." In *Decastro*, we faced only the antecedent question of whether § 922(a)(3) was a sufficiently material constraint on access to firearms to implicate the Second Amendment at all and had no occasion to consider the weight of the government interests § 922(a)(3) serves. And, furthermore, we made clear that this threshold question was not a close one, since the impact of § 922(a)(3) on gun ownership was "minimal[]." *Decastro*, 682 F.3d at 164, 168.

As a result, we conclude that *Decastro* remains good law. However, even if *Decastro* were not binding, we would again hold that § 922(a)(3) does not meaningfully constrain the ability to keep and bear arms, and that it is constitutional under step one of the *Bruen* inquiry. Section 922(a)(3) merely obligates individuals to generally comply with their state's firearm regulations by requiring in-state firearm acquisition, or out-of-state acquisition through a federally licensed in-state dealer. It thus "impos[es] conditions and qualifications on the commercial sale of arms," but is not "so restrictive that it threatens a citizen's right to acquire firearms." *Gazzola*, 88 F.4th at 195–96 (quoting *Heller*, 554 U.S. at 626–27). Section 922(a)(3) also includes a plethora of safety valves, including exceptions for inheritance; federally licensed importers, dealers and

15

collectors; sporting rentals; and in-person transactions that comply with the laws of the recipient's state. And, as explained above, § 922(a)(3) imposes no restrictions whatsoever on the most common and convenient mode of firearms acquisition—in-state purchases. Accordingly, there is no "evidence . . . that New York citizens will be meaningfully constrained—or, for that matter, constrained at all—in acquiring firearms and ammunition." *Gazzola*, 88 F.4th at 197.

The facts here further illustrate why § 922(a)(3) does not meaningfully constrain the right to keep and bear arms. Lucha El does not argue that he sought to buy rare or unique firearms, or that he would have been unable to lawfully acquire in New York the handguns with which he and his coconspirators were caught. He also does not allege that he applied for a federal license to transport firearms across state lines, or that he would have been unable to secure such a license. Furthermore, the guns at issue here actually came from federally licensed dealers, just not ones in New York State. The only apparent restriction that § 922(a)(3) imposed on Lucha El's conduct, then, was that he buy guns under his own name. Ultimately, the Second Amendment protects the right to keep and bear arms, not the right to acquire arms in secret from an anonymous straw purchaser. Because Lucha El identifies no meaningful constraint that § 922(a)(3) imposes on his ability to acquire firearms, nor any practical effect at all, the Second Amendment's plain text does not cover the conduct at issue here.

Accordingly, we reaffirm *Decastro* and hold that § 922(a)(3) is a lawful commercial sale regulation that does not materially constrain Lucha El's Second Amendment right to "keep" and "bear" arms.

### B. History

In the alternative, we hold that § 922(a)(3) does not violate the Second Amendment because the government has met its burden of showing that § 922(a)(3) is consistent with this nation's historical tradition of firearm regulation.

As a threshold matter, we must determine the degree of similarity required. *Bruen* explained that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence." 597 U.S. at 26 (emphasis added). Other times, such as when a regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," more nuanced analogical reasoning applies, and the historical counterpart need only be "relevantly similar." *Id.* at 27–29. As Lucha El concedes, *Rahimi* clarified that the "relevantly similar" analysis is the appropriate test here. *Rahimi* concerned 18 U.S.C. § 922(g)(8), which criminalizes firearm possession by an individual subject to a domestic violence restraining order if the order found that the defendant posed a safety threat to their intimate partner or their partner's children, or if it explicitly prohibited the use or threat of force against those individuals. Without first holding that the statute implicated unprecedented societal concerns or dramatic technological changes, *Rahimi* applied the "relevantly similar" framework. 602 U.S. at 692. The Court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added). "Why and how the

17

regulation burdens the right are central to [the] inquiry." *Id.*

Applying the "relevantly similar" analysis to a federal law, we look to "the prevailing understanding of the right to bear arms in . . . 1791" and "time periods in close proximity to 1791." *Antonyuk II*, 120 F.4th at 972–73; *see also Bruen*, 597 U.S. at 34 (noting that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them" (emphasis omitted) (quoting *Heller*, 554 U.S. at 634–35)).[2]

The government identifies two historical traditions consistent with § 922(a)(3)—first, colonial and founding-era state laws regulating the movement of firearms and gunpowder between colonies and across borders; and second, contemporaneous statutes disarming those deemed dangerous. These traditions, independently and together, satisfy the "how" and the "why" inquiries under *Bruen.*

Concerning the "how," the burdens imposed by § 922(a)(3) are consistent with those imposed by historical laws restricting the trade of firearms and ammunition across jurisdictional lines. As the Ninth Circuit recognized, "colonial governments substantially controlled

---

[2] In *Antonyuk II*, which concerned a state law, we looked to both "evidence of the pre-Civil War and Reconstruction Eras." 120 F.4th at 973. We did so in part because "the right to keep and bear arms is applicable to the States through the Fourteenth Amendment, which was adopted in 1868." *Id.* at 972 (citation omitted). But, while we acknowledged that "individual rights enumerated in the Bill of Rights . . . have the same scope as against the Federal Government," we nonetheless concluded that "1791 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." *Id.* at 974 (quotation marks omitted). Because the historical record from the Founding is more than sufficient to justify § 922(a)(3), we need not look beyond it. But we express no opinion here as to whether Reconstruction-era evidence can ever be relevant when determining the constitutionality of federal firearms laws.

the firearms trade," including by "controll[ing] the conditions of trade[.]" *Teixeira*, 873 F.3d at 685. The government identifies an extensive list of such regulations in force at the Founding. For example, Connecticut banned the sale of firearms by its residents outside the colony. 1 J. Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May, 1665, at 138–39 (Hartford, Brown & Parsons 1850) ("[N]o ammunition should be traded with any that live out of the Jurisdictions[.]" (cleaned up)). Similarly, Virginia sharply restricted the possession of firearms and ammunition more than "three miles [from] English plantations," in an attempt to keep arms out of the hands of Native Americans. Act II, An Act Prohibiting Trade with Indians (1675), *in* 2 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 336–37 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823) [hereinafter Virginia Law]. The Virginia Law emphasized that the prohibition applied universally, even though it affected individuals conducting lawful trade and "not actually trading [or] selling . . . to or with the Indians." *Id.* (cleaned up).

Colonies also tightly regulated the transportation of both gunpowder and ammunition. One Massachusetts law, for example, required "all . . . that shall import . . . either powder, lead, bullets, shot, or any ammunition whatsoever, shall give particular notice of the quantity . . . to the publick Notary . . . who [shall] take particular notice of the same, with the mark & number, and faithfully [record] the names of the persons to whom they are sold." Powder, § 1 (1651), *in* The Colonial Laws of Massachusetts: Reprinted from the Edition of

19

1660 with the Supplements to 1672 Containing also, the Body of Liberties of 1641, at 186 (William H. Whitmore ed., Boston, Rockwell & Churchill 1889) (cleaned up) [hereinafter Massachusetts Law]. A Providence law went further, requiring a license to sell gunpowder within the city. *See* An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, § 2 (1821), *in* The Charter and Ordinances of the City of Providence, with the Acts of the General Assembly Relating to the City, 48 (1821 law) (Providence, Knowles & Vose 1845) [hereinafter Providence Law]. Several laws also required licenses for the exportation of powder. *See, e.g.*, Massachusetts Law § 2 ("[N]o person . . . shall transport any Gunpowder out of this Jurisdiction, without license first obtained from some two of the Magistrates." (cleaned up)); An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1775), *in* 15 The Public Records of the Colony of Connecticut, from May, 1775 to June, 1776, Inclusive, with the Journal of the Council of Safety from June 7, 1775, to October 2, 1776, and an Appendix Containing Some Council Proceedings, 1663–1710, at 190–92 (Charles J. Hoadly ed., Hartford, Case, Lockwood, & Brainard Co. 1890) (providing that no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license" (cleaned up)). And a federal law enacted by the Third Congress entirely prohibited, for a period of time, "export from the United States [of] any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulphur or saltpetre." Act of May 22, 1794, ch. 33, § 1, 1 Stat. 369, 369.[3]

---

[3] Lucha El argues that principles of party presentation prevent a court from considering

Taken together, these laws demonstrate a Founding-era historical tradition of restricting arms transactions across borders. The burden imposed by such laws is precisely the type of burden imposed by § 922(a)(3).

Lucha El contends that the government has not shown that the burden imposed by § 922(a)(3) is consistent with a historical tradition because many of the government's proffered analogues regulate sale rather than purchase. As an initial matter, this argument misreads the § 922(a)(3), which regulates only interstate transportation and receipt of firearms, not purchases of particular firearms or by particular individuals. The statute's explicit coverage of firearms "dealer[s]" and "importer[s]" further illustrates its focus on conditions of trade as opposed to individual gun ownership. It is therefore best understood as a limitation on the movement of firearms around the country, in the tradition of the colonial era laws cited above. Second, at least some of the Government's historical analogues did involve import, as opposed to export, regulations. *See, e.g.*, Providence Law; Massachusetts Law; An Act Providing for the Inspection of Gun-Powder, ch. 337, §§ 1–12, 1794 Pa. Laws 764, 764–769 (requiring that all imported gunpowder be deposited at the public

---

historical laws not presented by the parties, as the district court did when it raised the law enacted by the Third Congress. Although "[c]ourts are . . . *entitled* to decide a case based on the historical record compiled by the parties," *Bruen*, 597 U.S. at 25 n.6 (emphasis added), nothing in *Bruen* suggests that it cabined a court's authority to take judicial notice of undisputed facts whose accuracy cannot reasonably be questioned, Fed. R. Evid. 201(b). *See Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982) (holding that judicial notice of historical evidence is admissible when there is "no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible").

gunpower magazine and prohibiting the sale of such gunpowder prior to an official inspection). And third, some of the historical analogues restricted sales to remain within permitted zones much smaller than entire states. *See, e.g.*, Virginia Law (prohibiting sales more than three miles from English plantations). Such laws necessarily operated as restrictions on in-state purchases, not merely on out-of-state sales.

More fundamentally, focusing narrowly on buyer-side, as opposed to seller-side, regulations reads *Rahimi* and *Bruen* too narrowly. *Rahimi* made clear that the proper inquiry looks to "the principles that underpin our regulatory tradition," and does not require a "historical twin." 602 U.S. at 692 (quotation marks omitted). Based on this kind of analogical reasoning, *Rahimi* upheld a temporary ban on firearm possession triggered by a civil protective order's finding of perceived risk, even though no historical law imposed an identical burden or specifically disarmed domestic abusers. *Rahimi* instead found two historical analogues by identifying the relevant similarity at a higher level of generality. It found that surety laws allowed magistrates to require those deemed at risk of future misbehavior, including the misuse of firearms, to either post a bond or be jailed. *Id.* at 695–96. It also noted that "going armed" laws disarmed those convicted of "riding or going armed . . . [to] terrify[] the good people of the land." *Id.* at 697 (quoting 4 Blackstone 149). Although "[these] statutes did not utilize anything like the modern civil protective order that triggered the prohibition of 18 U.S.C. § 922(g)(8) that was upheld in *Rahimi*," they nonetheless were valid analogues because "they all used their differing procedural

22

mechanisms to disarm those who were determined to be dangerous." *Antonyuk*, 120 F.4th at 998. Here, a prohibition on selling outside of state borders and a prohibition on buying outside of state borders are two sides of the same coin, where the ultimate "burden on the right of armed self-defense," *Bruen*, 597 U.S. at 29, is the same—that one must generally transact in-state.

Concerning the "why," § 922(a)(3) serves similar purposes to those served by its historical analogues. Congress enacted § 922(a)(3) in part to prevent dangerous individuals from acquiring firearms, reasoning "that the ease with which any person can acquire firearms . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a), 82 Stat. 197, 225. The statute makes explicit mention of cross-border transactions, noting "that the acquisition on a mail-order basis of firearms . . . by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances." *Id*. Likewise, the Senate Report on § 922 made clear that "[t]he principal purposes of title IV are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States." S. Rep. No. 90-1097, at 28 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2113–14.

Numerous Founding-era laws similarly sought to ensure compliance with proper channels of firearm acquisition and prevent

23

potentially dangerous individuals from acquiring weapons. As this Court previously recognized, *Rahimi* itself collected "various laws from the 18th century and earlier [that] authorized the prohibition of firearm possession by persons identified by legislatures and courts as dangerous to others." *Antonyuk*, 120 F.4th at 971 (citing *Rahimi*, 602 U.S. at 699–700). "English, American colonial, and early American histories abound with examples of laws demonstrating that legislatures had broad authority to regulate firearms, including by disarming large classes of people . . . based on a perception that persons in those categories were inherently dangerous or non-law-abiding." *Zherka v. Bondi*, 140 F.4th 68, 85 (2d Cir. 2025).

Some historical laws, like § 922(a)(3), did not target specific groups deemed dangerous but instead imposed generally applicable restrictions. The colonial Connecticut law discussed above, which criminalized the sale of arms outside one's jurisdiction, did so in an effort to prevent sale of weapons to Native Americans, whom colonists perceived as dangerous. Trumbull, *supra*, at 138 (prohibiting trade of ammunition outside the jurisdiction "whereby [it] might supply the Ind[i]ans"). Similarly, the Virginia prohibition on possession of arms or ammunition more than three miles from an English plantation did so as part of an act prohibiting trade with Native Americans. Virginia Law, *supra*, at 336–37. Other early colonial laws also criminalized the sale or provision of firearms or ammunition to Native Americans. *See, e.g.*, Of the Private Trade of Those Who Sail in the Service, *in* Laws and Ordinances of New Netherland, 1638-1674, at 278 (E.B. O'Callaghan trans., Albany, Weed, Parsons & Co. 1868) (1656 ordinance prohibiting the carrying of arms

24

or ammunition to sell or barter to Native Americans); 1 Records of the Governor and Company of the Massachusetts Bay in New England 196 (Nathaniel B. Shurtleff, ed., Boston, William White 1853) (1637 law prohibiting selling firearms to or repairing firearms for Native Americans).

Although "[m]any of those laws are offensive to contemporary moral sensitivities, or might well be deemed unconstitutional today on First and Fourteenth Amendment grounds," "[t]hey are . . . relevant to the Second Amendment historical analysis that *Bruen* requires we conduct." *Zherka*, 140 F.4th at 85. Such historical analogues, far more expansive and burdensome than the law at issue here, reflect a longstanding tradition of regulating firearm transactions, and even possession, in order to keep weapons out of the hands of those deemed dangerous. And just like § 922(a)(3), the Connecticut and Virginia laws enacted generally-applicable restrictions—prohibiting *any* sale of weapons outside the jurisdiction or *any* possession of more-than-necessary weapons three miles from an English plantation—to prevent certain individuals from acquiring weapons.

Lucha El argues that these historical laws are insufficient in number to satisfy the history and tradition test. We disagree. First, the government has offered a reasonably substantial number of analogues. But even if it hadn't, *Antonyuk* made clear that "it is . . . not dispositive whether comparable historical regulations exist in significant number," as *Bruen*'s rejection of the sufficiency of only a few historical analogues "occurred in the exceptional context of a regulation that 'contradicted the overwhelming weight of other, more

contemporaneous historical evidence.'"  120 F.4th at 971–72 (cleaned up) (quoting *Bruen*, 597 U.S. at 67–68).  Because Lucha El has not provided countervailing contemporaneous historical evidence, the government need not provide historical analogues in significant number.

The government has thus met its burden under *Bruen* of showing that § 922(a)(3) is consistent with this nation's historical tradition of firearm regulation.

## CONCLUSION

In sum, § 922(a)(3) is a presumptively lawful commercial sale regulation that does not eliminate, or even materially burden, the ability of law-abiding, responsible citizens to keep and bear firearms.  Furthermore, § 922(a)(3)'s application to Lucha El is consistent with our nation's historical tradition of firearm regulation and therefore satisfies the second prong of the *Bruen* test as well.  Accordingly, we find that Lucha El's conviction pursuant to § 922(a)(3) does not violate the Second Amendment.

The judgment of the United States District Court for the Southern District of New York is **AFFIRMED**.